UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Michael H. Holland, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  07-cv-490 (PLF) |
| | ) | |
| Freeman United Coal Mining Co., et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| Freeman United Coal Mining Co., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  07-cv-1050 (PLF) |
| | ) | |
| United Mine Workers of America, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT UNITED MINE WORKERS OF
AMERICA'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure and Local Civil Rule 7,

Defendant United Mine Workers of America ("UMWA" or "Union"), by its undersigned

counsel, hereby submits its Motion for Summary Judgment.  As demonstrated in the attached

Memorandum of Points and Authorities in support of its Motion for Summary Judgment, the

UMWA is entitled to the relief requested because there is no factual or legal basis to support the

claim by Freeman United Coal Mining, Co. ("Freeman") and Monterey Coal Company

("Monterey") that these companies should be absolved of their contractual responsibility to remit

contributions to the 1974 UMWA Pension Plan.

Respectfully submitted,

John R. Mooney, Bar No. 375886
Mark J. Murphy, Bar No. 453060
Mooney, Green, Baker & Saindon, P.C.
1920 L Street, N.W.
Suite 400
Washington, D.C. 20036
(202) 783-0010
(202) 783-6088 facsimile

Counsel for Defendant
United Mine Workers of America

September 7, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Michael H. Holland, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  07-cv-490 (PLF) |
| | ) | |
| Freeman United Coal Mining Co., et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| Freeman United Coal Mining Co., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  07-cv-1050 (PLF) |
| | ) | |
| United Mine Workers of | ) | |
| America, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE UNITED MINE WORKERS OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure and Local Civil Rule 7(a),

Defendant United Mine Workers of America ("UMWA" or "Union"), by its undersigned

counsel, hereby submits this Memorandum of Points and Authorities in support of its Motion for

Summary Judgment.  As demonstrated below, the UMWA is entitled to the relief requested

because there is no factual or legal basis to support the claim by Freeman United Coal Mining,

Co. ("Freeman") and Monterey Coal Company ("Monterey") that these companies should be

absolved of their contractual responsibility to remit contributions to the 1974 UMWA Pension Plan.

## FACTUAL BACKGROUND

This case concerns an effort by Freeman and Monterey to avoid commitments they made under National Bituminous Coal Wage Agreements ("NBCWAs") which were negotiated between the Union and the Bituminous Coal Operators Association ("BCOA"). The UMWA and BCOA have maintained a bargaining relationship since approximately 1950. See Complaint, at ¶ 13, Defendant United Mine Workers of America's Statement of Material Facts As To Which There Is No Genuine Dispute ("SOF"), at ¶ 3. Freeman was a member of the BCOA from 1966 until 1997. Id. at ¶ 21; SOF, at ¶ 25. Monterey was a member of BCOA from at least 1974 through 1988. SOF, at ¶ 27. In order to place the consolidated cases before this Court in their proper context, a brief summary of the collective bargaining history between the Union and BCOA - including Freeman and Monterey's involvement in that process - is necessary.

As part of their collective bargaining negotiations, the Union and BCOA created certain pension funds, including the 1974 UMWA Pension Plan ("1974 Plan") - which is involved in these consolidated cases. The 1974 Plan was initially created when the UMWA Welfare and Retirement Fund of 1950 was split in response to the passage of ERISA. SOF, at ¶ 4. The 1974 Plan was created to provide pension benefits to miners (and their dependents) who retired after December 31, 1975. Id. The 1950 UMWA Pension Plan and Trust was created to provide pension benefits to miners (and their dependents) who retired prior to December 31, 1975. Id.

These pension plans were to be funded by contributions from coal operators, like Freeman and Monterey, who were parties to the NBCWAs. In fact, every NBCWA negotiated

2

since 1974 has contained both the contribution rates to the pension trusts and the precise level of benefits to be provided by the pension plans.  SOF, at ¶ 7.  The negotiated rates and benefit levels have been uniform for all currently signatory employers and for all beneficiaries.  Id.

Because the Union and BCOA were concerned with the financial stability of their health and retirement funds, they agreed upon certain provisions during negotiations for the 1978 NBCWA to address these concerns.  These provisions were adopted so that signatory employers (like Freeman and Monterey) would not be able to withdraw from the Trust Funds and dump their liability for benefit obligations on remaining employers.  SOF, at ¶ 8.  Thus, the Union and BCOA agreed on a contractual provision that required all employers to pay the same level of contributions.  Id.

The parties also adopted a provision that became know in the industry as the "evergreen" provision.  Id.  That clause, which was inserted in the controlling plan and trust documents, provides that any employer who employed a participant eligible for benefits from the 1974 Plan (as well as other pension and benefit plans) or any employer that was obligated to make contributions to the 1974 Plan was "obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto."  SOF, at ¶ 8.

In <u>United Mine Workers of America 1974 Pension Trust v. Pittston</u>, 984 F.2d 469, 473 (D.C. Cir. 1993), the Court of Appeals, conclusively determined the appropriate application of this language.  In <u>Pittston</u>, the Court held that if a coal industry employer had signed one or more

3

NBCWAs containing the "evergreen" provision such an employer had assumed a "fully

enforceable" obligation

> to make continuing contributions to the [UMWA] trusts; and this
> obligation include[s] an agreement to make contributions at [the]
> rates specified in subsequent NBCWAs, without regard to whether
> the employer is still a party to the subsequent agreements

Pittston, 984 F.2d 474.

It is undisputed that both Freeman and Monterey have signed NBCWAs containing the

"evergreen" provision. See 1974 Pension Trust Complaint, at ¶ 22, 44, Freeman Answer, at ¶ 24;

Monterey Answer, at ¶ 44; SOF, at ¶ 25, ¶ 27. The 2007 NBCWA sets the relevant contribution

rate to the 1974 Plan at $2.00 per hour worked. See 1974 Trust Complaint, at ¶ 23; SOF, at 15.

Despite their status as signatory employers, neither company has remitted contributions to the

1974 Trust at the rate set by the 2007 NBCWA.

Instead, in February, 2007 Freeman commenced a lawsuit against the Union, the 1974

Trust and BCOA in the United States District Court for the Central District of Illinois. In that

suit, Freeman seeks a declaration that it is not obligated to contribute to the 1974 Plan at the rates

established in the 2007 NBCWA because, according to Freeman, the 2007 NBCWA is a national

agreement in name only and should not be considered a subsequent NBCWA. See Freeman

Complaint, at ¶ 45 (d)-(f). Thus, Freeman essentially seeks to avoid the decision in Pittston.

The 1974 Plan, under the controlling authority of Pittston, initiated a separate collection

action in this Court against Freeman and Monterey seeking to enforce the obligation of those

companies under the "evergreen" provision to make contributions to the 1974 Plan at the rate set

in the 2007 NBCWA. Thereafter, Freeman's action was transferred to this Court and the two

4

cases were subsequently consolidated.

The Union submits its motion for summary judgment on Count I of Freeman's Complaint seeking a declaration that the 2007 NBCWA is not a successor agreement to the prior national agreement - the 2002 NBCWA. See Freeman Complaint, at ¶ 45 (e).[1] As demonstrated below, the negotiations between the Union and BCOA, the subsequent ratification by the Union's membership and the overwhelming response by the organized sector of the bituminous coal industry to the 2007 NBCWA, unquestionably establish that the 2007 NBCWA is a successor agreement as contemplated by the "evergreen" provision. Thus, Freeman's request for a declaratory judgment to the contrary should be denied. Based upon application of the "evergreen" provision, both Freeman and Monterey are required to make contributions to the 1974 Pension Trust at the rates set forth in the 2007 NBCWA.

## STANDARD OF REVIEW

Summary judgment is viewed as an appropriate method "to secure the just, speedy, and inexpensive determination of [an] action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party. See Foreman v. Small, 271 F.3d 285, 291 (D.C. Cir. 2001). Nevertheless, summary judgment should be granted unless the non-moving party "set[s] forth specific facts showing that there is a genuine issue for trial."

---

[1] In the interest of judicial economy, the Union does not separately address Freeman's attempt to re-litigate application of the "evergreen" provision (see Freeman Complaint, at ¶ 45(d)), which was resolved in Pittston. Rather, the Union incorporates by reference, the arguments set forth by the 1974 Pension Plan in its motion for summary judgment with respect to the binding and conclusive effect of the Pittston decision to the liability of Freeman and Monterey. See Memorandum of Points and Authorities in Support of the 1974 Pension Trust's Motion for Summary Judgment on the Issue of Liability, at 10-20.

Kingman Park Civic Ass'n v. Williams, 348 F.3d 1033, 1041 (D.C. Cir. 2003) (citing Fed. R. Civ. P. 56(e)). Here, the Union submits that summary judgment is appropriate on the claim brought against the Union in Freeman's Complaint seeking a declaration that the 2007 NBCWA is not a successor agreement to the 2002 NBCWA. See Freeman Complaint, at ¶ 45(e). As demonstrated below, there is no genuine issue of fact with respect to the nation-wide character of the 2007 NBCWA - a labor contract that both the Union and the organized sector of the bituminous coal industry recognize as the industry standard.

## ARGUMENT

In its Complaint, Freeman claims that:

> [i]n 2006, BCOA negotiated a new collective bargaining agreement with the UMWA, the so-called 2007 NBCWA. While this agreement remains denominated as a 'national' agreement, it amounts to nothing more than an agreement between the UWMA and Consol covering Consol's mining operations.

See Freeman Complaint, at ¶ 30. Freeman also claims that the 2007 NCBWA is "tantamount to a single company agreement." Id. at ¶ 31. Such statements are wholly untrue and demonstrate, at best, a profound ignorance of the organized bituminous coal industry over at least the last half century.

Since approximately 1950, the UMWA has been responsible for negotiating the NBCWA on a regular basis with BCOA. See SOF, at ¶ 3. The NBCWA establishes the industry standard for wages and terms and conditions for an overwhelming majority of UMWA members working in the coal industry. Id.

6

It sets that standard in two ways:  immediately for those companies that are members of

BCOA, and subsequently through a process by which other companies -- at UMWA's urging --

agree to accept the terms of the NBCWA as their own.  Companies that accept the terms of the

NBCWA are sometimes described as "me-too" companies  (agreements with these companies

involve placing a new cover on the NBCWA and including possible differences in some of the

local provisions for  the "me-too" company's own workforce).  See SOF, at ¶ 3.

Within the past twenty-five years, the National Agreement has been negotiated and renewed,

with any mutually agreed upon modifications, in 1974, 1978, 1981, 1984, 1988, 1993, 1998,

2002 and 2007.  Id.

The same practice described above was followed during negotiations that led to the 2007

NBCWA.  Thus, the Union met with BCOA beginning in 2006 to negotiate a successor

agreement to the 2002 NBCWA.  See SOF, at ¶ 10.  At that time, BCOA represented Central

Ohio Coal Company, Consolidation Coal Company, Eight-Four Mining Company, Helvetia Coal

Company, Island Creek Coal Company, Keystone Coal Mining Corporation, Laurel Run Mining

Company, McElroy Coal Company, Quarto Mining Company, Southern Ohio Coal Company,

and Windsor Coal Company.  Id.  These employers represented over 50% of the tonnage of the

BCOA membership on the effective date of the 2002 NBCWA.  Id.

Similar to bargaining that led to the 1998 and 2002 NBCWAs, Cecil E. Roberts - the

President of the UMWA - negotiated on a one-to-one basis with the Chairman of the BCOA.  See

SOF, at ¶ 9.  In 2006, the Chairman of the BCOA Negotiating Committee was Peter Lilly, who

also served as the Chief Operating Officer of Consolidation Coal.  Id.  In 2002, the Chairman of

the BCOA Negotiating Committee was J. Brett Harvey, who was the President of Consolidation

Coal Company at the time. In 1998, the Chairman of the BCOA Negotiating Committee was

B.R. Brown, who was then the Chairman of Consolidation Coal. Id.

Consistent with past bargaining, the Union determined its priorities based on the direction

provided by its membership during the Union's Convention. See SOF, at ¶ 12. At the 2006

UMWA International Convention, the membership overwhelmingly passed a Constitutional

Mandate to negotiate increased pension benefits in the upcoming NBCWA negotiations. Id. In

fact, Article 1 of the UMWA Constitution was amended to include the goal of "improvement in

pensions for our active, laid-off and retired members, as well as maintaining current levels of

health care coverage, shall remain the top priorities of the United Mine Workers of America."

Id. With this directive from the UMWA Convention, the Union was committed to improving the

pension benefits for its active and retired members.

Subsequently, over the course of negotiations, the UMWA was able to secure pension

benefit increases for its membership. See SOF, at ¶ 13. These benefit increases, combined with

new statutory requirements concerning pension funding levels, led the UMWA and BCOA to set

the 1974 Plan contribution rate contained in the 2007 NBCWA. It is this contribution rate that

Freeman and Monterey have refused to pay. Id. at ¶ 14.

The Union presented the tentative 2007 NBCWA to its members in the same manner as

previous NBCWAs had been presented. Thus, upon concluding negotiations with BCOA in mid-

December 2006, the UMWA notified all Local Unions whose members had been employed

under the 2002 NBCWA, whether for companies that had been members of the BCOA in 2002

or companies (like Monterey) that had signed "me-too" agreements, and scheduled contract

8

explanation meetings for December 19 and ratification votes on December 21, 2006. See SOF, at ¶ 18.

On December 21, 2006, each of the Local Unions voted on whether to accept the terms of the 2007 NBCWA. The only exception concerned several smaller coal companies (like Freeman) that were signatory to "me too" agreements that would only expire a year or more later than the December 31, 2006 expiration date of the NBCWA. The Union's members collectively ratified the 2007 NBCWA by an overwhelming margin of votes. The members that ratified the 2007 NBCWA represent approximately 75% of the Union's active membership in the coal mining industry.

When the Union announced the result of the ratification votes, it also stated that it intended the ratified contract to be an industry-wide agreement. See SOF, at ¶ 19. Therefore, consistent with previous NBCWAs, the Union announced that it would provide coal companies that were not members of the BCOA with an opportunity to sign the 2007 agreement. Id.

Consistent with its announcement, the UMWA notified the non-BCOA companies who had been signatory to the 2002 NBCWA, or who had signed "me-too" agreements, and requested that they agree to the provisions of the National Agreement. The UMWA advised these companies that the terms had already been ratified and they could accept the provisions of the National Agreement without an additional ratification vote. In relatively short order following the nationwide ratification vote, all of the major coal operators in the bituminous coal industry signed on to the relevant provisions of the 2007 NBCWA. Id. at ¶ 20.

Although several of the non-BCOA companies requested bargaining to address issues particular to their operations, all of those who had agreed to the terms of the 2002 NBCWA (with

Monterey being the sole exception) ultimately executed the 2007 NBCWA; some with minor

modifications in areas other than the 1974 Pension Plan. In addition to the employers directly

signatory to the 2007 NBCWA, 31 coal companies agreed to be bound by its terms, or to

otherwise accept the obligation to contribute to the 1974 Plan at the rates specified in Article XX

of the 2007 NBCWA. See SOF, at ¶ 21 (listing companies).

      In addition to the 11 employers represented by BCOA in 2006 which were listed above

(see supra, at 7), the BCOA represented 12 other employers during negotiations for the 2002

NBCWA. See SOF, at ¶ 22. Seven of those 12 employers, Apogee Coal Co., Colony Bay Coal

Company, Eastern Associated Coal Corp., Hobet Mining, Mountain View Coal Company,

Peabody Coal Company and Pine Ridge Coal Company, subsequently adopted the terms of the

2007 NBCWA. Id. The five remaining employers, Affinity Mining Company, Kent Coal

Company, Martinka Coal Company, Squaw Creek Coal Company and Sterling Smokeless Coal

Company, are no longer operating. Id.

      Based upon the above, the position taken by Freeman and Monterey arguing that the 2007

NBCWA is not a successor agreement to the 2002 NBCWA is simply wrong. Indeed, based

upon the industry response to the 2007 NBCWA, Freeman and Monterey are the only companies

in the organized sector of the bituminous coal industry that do not view this contract as a national

agreement, similar to each previous NBCWA from approximately 1950 to the present.

      During decades of collective bargaining, the UMWA and the BCOA have established and

maintained, through the National Bituminous Coal Wage Agreement, the prevailing contractual

standards for the industry. The UMWA develops bargaining positions with membership input

obtained through meetings and conventions, while BCOA has its own internal processes for

developing its bargaining positions. This process remained unchanged during bargaining that led to the 2007 NBCWA. Consistent with its long-standing practice, the Union considers the 2007 NBCWA to establish the standards for the organized bituminous coal industry. See SOF, at ¶ 23. The UMWA negotiated and ratified it as such and, not surprisingly, the 2007 NBCWA has been treated by the organized bituminous coal industry as the industry standard. Id.

Freeman's claim that the 2007 NBCWA is a "single company agreement with the UMWA," ignores the fact that 50 coal operators agreed to be bound by the terms of that labor contract either as signatory employers or by executing "me too" agreements. The fact that two coal operators (Freeman and Monterey) did not adopt the 2007 NBCWA does nothing to alter its designation as a national agreement.[2] Accordingly, because the 2007 NBCWA is clearly a successor agreement to the prior NBCWA, Freeman and Monterey must remit pension contributions to the 1974 Plan at the rate set by the 2007 NBCWA. See Pittston, 984 F.2d 474.

---

[2] In its Complaint, Freeman also wrongly claims that the 2007 NBCWA is not a successor agreement because "[i]n negotiating the 2007 NBCWA, BCOA acted as a mere instrumentality of Consol." See Freeman ¶ 30. This claim, like Freeman's attack on the nation-wide character of the 2007 NBCWA, is not supported by fact. In the first instance, a Consol representative has been the lead negotiator for the BCOA for years, including when Freeman was a member of the BCOA. See SOF, at ¶ 9.

Second, since 1978, the UMWA and BCOA have included contractual language (appearing as Art. XX (d)(vi)(a) in the 2002 NBCWA) that has specified how provisions requiring action by BCOA would be satisfied in the event BCOA ceased to exist – in which case the authority of the Employer Settlor would fall to those Employers with the majority of BCOA tonnage at the time the 2002 NBCWA became effective. See SOF, at ¶ 5. The employers that were BCOA members at the time of the 2007 NBCWA negotiations represented over 50% of the tonnage of the BCOA membership on the effective date of the 2002 NBCWA. Id. at ¶ 10. Although the BCOA negotiated the 2007 NBCWA, if it had ceased to exist, the same entities representing the BCOA in 2007 were authorized to establish the required contributions to the 1974 Pension Plan.

11

## CONCLUSION

For the reasons discussed above, the Union's motion for summary judgment should be

granted and Freeman's request for declaratory judgment should be denied.


Respectfully submitted,


John R. Mooney, Bar No. 375886
Mark J. Murphy, Bar No. 453060
Mooney, Green, Baker & Saindon, P.C.
1920 L Street, N.W.
Suite 400
Washington, D.C. 20036
(202) 783-0010
(202) 783-6088 facsimile

Counsel for Defendant
United Mine Workers of America

September 7, 2007


12

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Michael H. Holland, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 07-cv-490 (PLF) |
| Freeman United Coal Mining Company, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| Freeman United Coal Mining Company, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07-cv-1050 (PLF) |
| | ) | |
| v. | ) | |
| | ) | |
| United Mine Workers of America, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT UNITED MINE WORKERS OF AMERICA'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Civil Rule 7(h), Defendant United Mine Workers of America ("UMWA" or "Union"), by its undersigned counsel and in support of its motion for summary judgment, respectfully submits its statement of material facts as to which there is no genuine issue.

1.     The United Mine Workers of America is a labor organization established in 1890 for the purpose of securing safe and just working conditions for coal miners and other workers through collective bargaining and legislation, and for the purpose of preserving opportunities for

gainful and humane employment in the nation's coal mines, processing plants and associated facilities. The Union has active and retired members throughout the United States and Canada. See Declaration of Cecil E. Roberts ("Roberts Declaration"), at ¶ 2. (A copy of the Roberts Declaration is attached hereto as Exhibit 1.)

2.      The UMWA is comprised of the International Union and its constituent Local Unions. The International Union maintains District Offices as divisions, whose geographic boundaries have been determined by the International Executive Board, in which the supreme executive and judicial powers of the International Union are vested in accordance with the Constitution of the International Union effective April 13, 2006. Within each District, the International Union charters Local Unions, which have localized jurisdiction over members at a particular coal mining or other facility represented by the UMWA. An individual's membership in the UMWA consists of membership in the Local Union, the District in whose territory the Local Union is located, and the International Union. See Roberts Declaration, at ¶ 3.

3.      Since approximately 1950, the International Union has been responsible for negotiating the National Bituminous Coal Wage Agreement ("NBCWA") on a regular basis with the Bituminous Coal Operators Association ("BCOA"), a multiemployer association of coal producers. The NBCWA establishes the industry standard for wages and terms and conditions for an overwhelming majority of our members working in the coal industry. It sets that standard in two ways: immediately for those companies that are members of BCOA, and subsequently through a process by which other companies -- at UMWA's urging -- agree to accept the terms of the NBCWA as their own. Companies that accept the terms of the NBCWA are sometimes described as "me-too" companies (agreements with these companies sometimes involved placing a new cover on the NBCWA and including possible differences in some of the local provisions for the "me-too" company's own workforce.) The group of employers who

ultimately accept the terms of the NBCWA represents approximately 75% of our active membership in the coal mining industry. Within the past twenty-five years, the National Agreement has been negotiated and renewed, with any mutually agreed upon modifications, in 1974, 1978, 1981, 1984, 1988, 1993, 1998, 2002 and 2007. Each of these agreements provided health and retirement benefits for UMWA members. See Roberts Declaration, at ¶ 6.

4.      From 1950 to 1974, all health and retirement benefits were provided by a single multiemployer fund, the UMWA Welfare and Retirement Fund. In 1974, after the passage of ERISA, the UMWA and the BCOA agreed to separate that fund into distinct pension and benefits plans. The 1950 Pension Plan and Trust was created to provide pension benefits to miners (and their dependents and survivors) who retired prior to December 31, 1975. The UMWA 1974 Pension Plan and Trust was created to provide pension benefits to miners (and their dependents and survivors) who retired after December 31, 1975. These pension plans, together with several retiree health care benefit plans, were collectively referred to as the "UMWA Health and Retirement Funds" or "the Funds." See Roberts Declaration, at ¶ 7

5.      From their inception, the UMWA and the BCOA have been the settlors of the UMWA Health and Retirement Funds. As settlors the UMWA and the BCOA are the parties with the authority to amend the plan and trust documents. Since 1978, the UMWA and BCOA have included contractual language (appearing as Art. XX (d)(vi)(a) in the 2002 NBCWA) that has specified how provisions requiring action by the BCOA would be satisfied in the event the BCOA ceased to exist – in which case the authority of the Employer Settlor would fall to those Employers with the majority of BCOA tonnage at the time the 2002 NBCWA became effective. See Roberts Declaration, at ¶ 8.

3

6.    The UMWA and the BCOA have amended the plan and trust documents shortly after reaching agreement on each new NBCWA, in order to ensure that the plan and trust documents reflect all relevant, collectively-bargained modifications in "the terms and conditions of" the Trust. Thus, following this practice, the UMWA and the BCOA amended the plan and trust documents shortly after reaching agreement on the 1978, 1981, 1984, 1988, 1993, 1998, 2002, and 2007 NBCWAs. Specifically in this regard, the UMWA and the BCOA adopted various amendments to the plan and trust documents governing the 1974 Pension Trust on February 7, 2007—making those amendments effective as of January 1, 2007 so as to coincide with the January 1, 2007 effective date of the 2007 NBCWA. See Roberts Declaration, at ¶ 9.

7.    Unlike many other multiemployer benefit plans, the underlying concept of the UMWA Funds is that all eligible employees receive uniform benefits, and that all participating employers are required to pay a uniform contribution rate. Starting in 1974 and continuing to the present day, the UMWA and the BCOA have agreed that the benefit levels and the contribution rates to the trusts would be contractually established and maintained. Every NBCWA negotiated since 1974 has contained both the contribution rates to the pension trusts and the precise level of benefits provided by the pension plans, and have been uniform for all currently signatory employers and for all beneficiaries. See Roberts Declaration, at ¶ 10.

8.    During negotiations for the 1978 NBCWA, the bargaining parties agreed upon certain provisions to ensure the financial stability of the health and retirement funds. These provisions were adopted because of a shared UMWA and BCOA concern that employers should not be able to withdraw from the Trust Funds and leave liability for benefit obligations on the remaining employers. In addition to agreeing on a provision that required that all employers pay the same level of contributions, the parties adopted a clause that became known as the

4

"evergreen" provision. That clause, which was inserted in the controlling plan and trust documents, provides that any employer who employed a participant eligible for benefits from the 1974 Pension Plan (as well as the other pension and benefit plans) or any employer that was obligated to make contributions to the Plan was "obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto." See Roberts Declaration, at ¶ 11.

9.      As set forth in the UMWA Constitution, the President of the UMWA, International Union is provided the authority to chair all bargaining. Cecil E. Roberts has been president of the UMWA, International Union since his election in 1995. Prior to being elected President, Mr. Roberts served in the office of Vice President of the UMWA, International Union beginning in 1982. Thus, in his capacity as either Vice-President or President of the UMWA, International Union, Mr. Roberts has participated in the UMWA negotiations with BCOA for each successive NBCWA, *i.e.*, 1984, 1988, 1993 (including the 1996 reopener), 1998, 2002 and 2007 NBCWAs. In bargaining for the 1998 and 2002 NBCWAs and, most recently, the 2007 NBCWA, Mr. Roberts directly negotiated on a one-on-one basis with the Chairman of the BCOA. In 2006, the BCOA Chairman was Peter Lilly. Mr. Lilly is also the Chief Operating Officer of Consolidation Coal Company. In 2002, the Chairman of the BCOA Negotiating Committee was J. Brett Harvey, who was the President of Consolidation Coal Company at the time. In 1998, the Chairman of the BCOA Negotiating Committee was B.R. Brown, who was then the Chairman of Consolidation Coal. See Roberts Declaration, at ¶12.

5

10.     In the 2006 negotiations for a successor agreement to the 2002 NBCWA, the BCOA represented Central Ohio Coal Company, Consolidation Coal Company, Eight-Four Mining Company, Helvetia Coal Company, Island Creek Coal Company, Keystone Coal Mining Corporation, Laurel Run Mining Company, McElroy Coal Company, Quarto Mining Company, Southern Ohio Coal Company, and Windsor Coal Company.  These employers represented over 50% of the tonnage of the BCOA membership on the effective date of the 2002 NBCWA.  See Roberts Declaration, at ¶ 13.

11.     In negotiating for the 2007 NBCWA, the UMWA and the BCOA addressed the matter of the appropriate level of contributions that employers participating in the 1974 Pension Plan would be required to make over the life of the new contract.   Both the Union and the BCOA were concerned with compliance with the Pension Protection Act of 2006, P.L. 109-280, federal legislation enacted in August 2006 to enhance and protect retirement savings for millions of Americans covered by traditional defined benefit plans. Unlike previous statutes, the PPA directs the timing of corrective actions that are required to avoid funding problems with multiemployer pension plans and imposes an obligation to take action as soon as funding problems are projected to occur within a specified time in the future.  The requirement of early intervention is imposed by categorizing the funding level of the pension plan and imposing obligations depending on the plan's status.  In general the statute requires a multiemployer pension plan to fully fund all benefits, and that if it either fails to remain above 80% funded or is projected to suffer funding deficiencies in the future, the law mandates certain actions that may include additional contributions and benefit modifications.  See Roberts Declaration, at ¶14.

12.     Consistent with the UMWA efforts throughout the course of the Roberts administration, the Union entered into the 2006 negotiations with the intention to negotiate an

6

increase in pension benefits for its members in the 2007 NBCWA. The imperative to increase

pension benefits reflected the actions of the membership at the UMWA International

Conventions in 2003 and 2006. At the 2006 Convention, the membership overwhelmingly

passed a Constitutional Mandate to negotiate increased pension benefits in the upcoming

NBCWA negotiations. Article 1 of the UMWA Constitution was amended to include the goal

"The improvement in pensions for our active, laid-off and retired members, as well as

maintaining current levels of health care coverage, shall remain the top priorities of the United

Mine Workers of America." With this directive from the UMWA Convention, the Union was

committed to improving the pension benefits for its active and retired members. Because of this

intention to secure increased pension benefits, as well as the new legal requirements regarding

the need for increased funding of the Pension Plan, the Union understood that there would need

to be an increase in the required employer contributions to the Pension Plan. See Roberts

Declaration, at ¶ 15

13.     In light of these concerns, the Union sought, and obtained in the 2007 NBCWA,

an increase in the pension accrual for active employees of an additional $10 per month per year

of service (over the term of the contract) over the benefits provided in 2006. The 2007 NBCWA

also provided pension increases of $20 a month (over the term of the contract) to existing retirees

and widows and provided them with a one-time annual lump sum bonus for each of the five

years of the contract.   The benefit improvements increased the liability of the 1974 Plan by

approximately $600 million. See Roberts Declaration, at ¶ 16.

14.     During the course of our negotiations, Mr. Lilly and Mr. Roberts discussed the

contribution levels required to comply with the Pension Protection Act's funding levels as well

as the UMWA's demand for increased pension benefits. Mr. Lilly provided Mr Roberts with

7

actuarial calculations performed by the BCOA's actuaries, AON, to achieve the necessary

funding for the 1974 Pension Plan to remain above the 80% statutory requirement for the period

2007 through 2011.  Mr. Roberts referred these actuarial reports to Micheal Buckner, who the

Union presently retains as a benefits consultant, for review.  Mr. Buckner shared the calculations

with the UMWA's actuaries, Watson Wyatt.  Mr. Buckner reported back to Mr. Roberts that the

projections provided by the BCOA were reasonably based, and consequently the UMWA and

BCOA reached agreement on the matter of the level of contributions to the 1974 Pension Plan.

See Roberts Declaration, at ¶ 17

     15.    Pursuant to this agreement, the employers were required to contribute $2.00 per

hour to the 1974 Pension Plan beginning January 1, 2007, and increasing over the 5-year term of

the contract to $5.50 per hour.  Under the 1978 NBCWA, the contribution rates established for

the 1974 and 1950 Pension Plans were based upon a combination of tons of coal produced and

hours worked.  Under that Agreement, Article XX(d) provided that the BCOA had the authority

to require the entire contribution amount based upon an hourly contribution rate, using a tonnage

equivalent  to convert the tonnage rate to an hourly rate.  In 1988, contributions based upon

tonnage were generally eliminated in favor of exclusively hourly contributions.  The following

table shows the contribution rates to the 1950 and 1974 Pension Plans, the rates converting any

tonnage rate into its hourly equivalent, and the rate in today's dollars adjusted for inflation (using

the inflation calculator located on the Bureau of Labor Statistics web site at

http://www.bls.gov/cpi/):

| | 1950 Pension | | 1974 Pension | | Total Hourly Equivalent | CPI Adjusted |
| | Per Ton | Per Hour | Per Ton | Per Hour | | |
|---|---|---|---|---|---|---|
| 1978 NBCWA | | | | | | |
| March 27, 1978-March 26, 1979 | $0.950 | | $0.080 | $0.750 | $2.280 | $7.29 |
| March 27, 1979-March 26, 1980 | $0.950 | | $0.080 | $0.760 | $2.295 | $6.57 |
| March 27, 1980-End of Agreement | $0.950 | | $0.080 | $0.750 | $2.295 | $5.82 |
| 1981 NBCWA | | | | | | |
| June 7, 1981-June 6, 1982 | $0.950 | | $0.080 | $1.037 | $2.685 | $6.17 |
| June 7, 1982-June 6, 1983 | $1.110 | | $0.080 | $0.997 | $2.901 | $6.26 |
| June 7, 1983-End of Agreement | $1.110 | | $0.080 | $1.017 | $2.920 | $6.11 |
| 1984 NBCWA | | | | | | |
| October 1, 1984-September 30, 1985 | $1.110 | | $0.070 | $1.030 | $3.690 | $7.15 |
| October 1, 1985-September 30, 1986 | $1.110 | | $0.066 | $0.970 | $3.654 | $6.94 |
| October 1, 1986-September 30, 1987 | $1.110 | | $0.066 | $0.970 | $3.680 | $6.75 |
| October 1, 1987-End of Agreement | $1.100 | | $0.066 | $1.020 | $3.711 | $6.53 |
| 1988 NBCWA | | | | | | |
| February 1, 1988-January 31, 1989 | | $0.000 | | $0.470 | $0.470 | $0.83 |
| February 1, 1989-January 31, 1990 | | $0.000 | | $0.595 | $0.595 | $0.99 |
| February 1, 1990-End of Agreement | | $0.000 | | $0.710 | $0.710 | $1.13 |
| 1993 NBCWA | | | | | | |
| December 16, 1993-End of Agreement | | $0.000 | | $0.750 | $0.750 | $1.08 |
| 1998 NBCWA | | | | | | |
| January 1, 1998-End of Agreement | | $0.000 | | $0.750 | $0.750 | $0.96 |
| 2002 NBCWA | | | | | | |
| January 1, 2002-December 31, 2002 | | $0.000 | | $0.000 | $0.000 | $0.00 |
| January 1, 2003-End of Agreement | | $0.000 | | $0.000 | $0.000 | $0.00 |

On June 30, 2007, the 1950 Pension Plan merged into the 1974 Pension Plan. Consequently, the rate payable to the 1974 Pension Plan today can only fairly be compared to the total pension contribution rates owed to the 1950 and 1974 Pension Plans under earlier agreements. As the table shows, the pension contribution owed under the 1978 NBCWA, the 1981 NBCWA and the 1984 NBCWA was higher than the current rate, reaching as high as $3.71 by the end of the term

of the 1984 NBCWA. Adjusted for inflation, in today's dollars, the rate payable under each of those contracts far exceeded the highest rate payable under the 2007 NBCWA. See Roberts Declaration, at ¶ 18.

16.        Furthermore, the employers have not made any contributions to the Pension Plan since mid-1998. This nearly nine-year hiatus in pension contributions was pursuant to the provisions of the NBCWA. The 1998 NBCWA provided that once the Pension Plan reached a certain level of funding, the contribution rate would drop to $0.00 an hour and $0.00 per ton for existing signatories. Around July 1998, the 1974 Pension Plan achieved the anticipated level of funding and from that point, through the expiration of the 2002 NBCWA on December 31, 2006, signatory employers were required to report hours but make no contributions to the Plan. From that time through December 31, 2006, the miners working for signatory employers (including those at Freeman United and Monterey Coal) continued to earn pension credit toward vesting and for purposes of determining the amounts that the 1974 Pension Trust will be obligated to pay them after they retire, even though the employers were making no contributions. Consequently, by the time negotiations for the 2007 NBCWA began, the Union did not believe it was unfair to the employers to seek a pension increase as well as a contribution increase given the fact that signatory employers had experienced a nine-year hiatus from the obligation to make any contributions to the Pension Plan. See Roberts Declaration, at ¶19.

17.        On December 15, 2006 a tentative agreement between the UMWA and the BCOA for a new, five-year agreement effective January 1, 2007 was announced. The Union informed its membership that the agreement was the culmination of months of hard work and that there had been  significant hurdles to overcome, particularly in the areas of pensions, retiree health care and wages. Nevertheless, the Union reported that the parties were able to overcome

10

the obstacles and hammer out an agreement. The contract provided for a 20% increase in wages over the life of the agreement and a $1,000 wage bonus that was payable immediately. In fact, it was the largest wage increase the Union negotiated since 1974. See Roberts Declaration, at ¶ 20.

18.        Upon concluding negotiations with the BCOA in mid-December 2006, the UMWA notified all Local Unions whose members had been employed under the 2002 NBCWA, whether for companies that had been members of the BCOA in 2002 or companies (like Monterey) that had signed "me-too" agreements, and scheduled contract explanation meetings for December 19 and ratification votes on December 21, 2006. On December 21, each of the Local Unions voted on whether to accept the terms of the 2007 NBCWA. The only exception concerned several smaller coal companies (like Freeman) that were signatory to "me too" agreements that would only expire a year or more later than the December 31, 2006 expiration date of the NBCWA. The Union's members collectively ratified the 2007 NBCWA by an overwhelming margin of votes. As stated above, the members that ratified the 2007 NBCWA represent approximately 75% of the Union's active membership in the coal mining industry. See Roberts Declaration, at ¶ 21.

19.        In announcing the results of the ratification votes, the Union stated that it intended the contract to be an industry-wide agreement and that it was going to provide the coal companies that were not members of BCOA with an opportunity to sign the agreement. See Roberts Declaration, at ¶ 22.

20.        After the ratification vote was held, the UMWA notified the non-BCOA companies who had been signatory to the 2002 NBCWA, or who had signed "me-too" agreements, and requested that they agree to the provisions of the National Agreement. The UMWA advised these companies that the terms had already been ratified and they could accept

11

the provisions of the National Agreement without an additional ratification vote. In relatively short order following the nationwide ratification vote, all of the major coal operators in the industry signed on to the relevant provisions of the 2007 NBCWA. For example, Jim Walter Resources signed a contract mirroring the National Agreement on January 17, 2007. The miners covered by this agreement had participated in the ratification vote in December. Similarly, the mines operated by Peabody Energy, which produce a significant portion of the tonnage in the organized coal industry, signed agreements mirroring the National Agreement in February 2007. Magnum Coal Company, the parent of Apogee Coal Co., also signed on in February. PinnOak Resources and the Pittsburg & Midway Coal Mining Company signed similar agreements in March 2007. Negotiations with Foundation Coal Holdings, Inc., the parent of Cumberland Coal Resources LP and Emerald Coal Resources LP came to the same result in April 2007. See Roberts Declaration, at ¶ 23.

21.        Although several of the non-BCOA companies requested bargaining to address issues particular to their operations, all of those who had agreed to the terms of the 2002 NBCWA (with Monterey being the sole exception) ultimately executed the 2007 NBCWA; some with minor modifications in areas other than the 1974 Pension Plan. In addition to the employers directly signatory to the 2007 NBCWA, the following agreed to be bound by its terms, or to otherwise accept the obligation to contribute to the UMWA Health and Retirement Funds at the rates specified in Article XX of the NBCWA:

      a.        Homer City Coal Processing Corporation

      b.        Pinnacle Mining Company, LLC

      c.        Pinnacle Land Company, LLC

      d.        Long Branch Energy

e.          Laurel Coal Corp.

f.          Mountain Edge Mining Inc., LLC

g.          Pine Ridge Coal Company, LLC

h.          Rivers Edge Mining, Inc.

i.          Colony Bay Coal Company

j.          Mountain View Coal Company, LLC

k.          Apogee Coal Company, LLC

l.          Hobet Mining LLC

m.          Eastern Associated Coal LLC

n.          Peabody Coal Company, LLC

o.          Pittsburg & Midway Coal Mining Company

p.          Emerald Coal Resources, LP

q.          Cumberland Coal Resources, LP

r.          Litwar Processing Company, LLC

s.          Transervice Inc.

t.          Keystone Service Industries Inc.

u.          Bluestone Coal Corporation.

v.          Double Bonus Coal Company

w.          Justice Energy Company

x.          Dynamic Energy Inc.

y.          R&S Coal Company

z.          Ohio Valley Coal Company

aa.         Conesville Coal Preparation Company

|      |                            |
|------|----------------------------|
| bb.  | Jim Walter Resources, Inc. |
| cc.  | Drummond Company LLC       |
| dd.  | Oak Grove Resources LLC    |
| ee.  | Oak Grove Land Company LLC |

See Roberts Declaration, at ¶ 24.

22.    In addition to the 11 employers represented by BCOA in 2006 that are identified in paragraph 10 above, the BCOA represented 12 other employers during negotiations for the 2002 NBCWA.   Seven of those 12 employers, Apogee Coal Co., Colony Bay Coal Company, Eastern Associated Coal Corp., Hobet Mining, Mountain View Coal Company, Peabody Coal Company and Pine Ridge Coal Company, subsequently adopted the terms of the 2007 NBCWA.  The five remaining employers, Affinity Mining Company, Kent Coal Company, Martinka Coal Company, Squaw Creek Coal Company and Sterling Smokeless Coal Company, are no longer operating.  See Roberts Declaration, at ¶ 25.

23.    In sum, during decades of collective bargaining, the UMWA and the BCOA have established and maintained, through the National Bituminous Coal Wage Agreement, the prevailing contractual standards for the industry.  The UMWA develops bargaining positions with membership input obtained through meetings and conventions, while the BCOA has its own internal processes for developing its bargaining positions.  Consistent with its long-standing practice, the Union considers the 2007 NBCWA to establish the standards for the organized bituminous coal industry.  The UMWA negotiated and ratified it as such and, not surprisingly, the 2007 NBCWA has been treated by the organized bituminous coal industry as the industry standard.  See Roberts Declaration, at ¶ 26.

14

24.        As of July 2007, there are approximately 360 UMWA members working at the Freeman United mines and 260 members working at the Monterey operations. See Roberts Declaration, at ¶ 27.

25.        Freeman United withdrew from the BCOA in 1997. See Complaint, at ¶ 21. Prior to its withdrawal, Freeman United had been a member of the BCOA since 1966. During that time, it was signatory to the all of the NBCWAs negotiated by the BCOA. After Freeman United left the BCOA, the Union engaged in collective bargaining for successor agreements directly with Freeman. See Complaint, at ¶ 21. See Roberts Declaration, at ¶ 28.

26.        Freeman's current collective bargaining agreement with the UMWA expires in January 2008. See Complaint, at ¶ 21. Similar to predecessor agreements, the contract provides pension credits under the 1974 Pension Plan to Freeman's active employees and pension benefits from the 1974 Pension Plan to Freeman's retirees and their eligible dependents, including the increased benefits established in the 2007 NBCWA. Among other things, Freeman's collective bargaining agreement incorporates by reference the terms and conditions of the 1974 Pension Plan. Article XX(c) of Freeman's agreement states in relevant part:

> The United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1974 Pension Trust are set forth in the United Mine Workers of America 1974 Pension Plan ("1974 Pension Plan"), which is incorporated by reference and made a part of this Agreement.

See Roberts Declaration, at ¶ 29.

27.    Monterey Coal was a member of BCOA from at least 1974 through 1988 and withdrew from the BCOA during the term of the 1988 NBCWA. During that time it was signatory to all the NBCWAs negotiated by the BCOA. After Monterey left the BCOA, the

Union engaged in collective bargaining for successor agreements directly with Monterey, with Monterey signing "me-too" agreements in 1993, 1998 and 2002.The UMWA-represented employees at Monterey Coal are working under the terms and conditions of the 2002 Agreement. Similar to predecessor agreements, the contract provides pension credits under the 1974 Pension Plan to Monterey's active employees and pension benefits from the 1974 Pension Plan to Monterey's retirees and their eligible dependents, including the increased benefits established in the 2007 NBCWA. Among other things, Monterey's collective bargaining agreement incorporates by reference the terms and conditions of the 1974 Pension Plan. Article XX(c) of Monterey's agreement states in relevant part:

> The United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1974 Pension Trust are set forth in the United Mine Workers of America 1974 Pension Plan ("1974 Pension Plan"), which is incorporated by reference and made a part of this Agreement.

See Roberts Declaration, at ¶ 30.

16

Respectfully submitted,

John R. Mooney, Bar No. 375886
Mark J. Murphy, Bar No. 453060
Mooney, Green, Baker & Saindon, P.C.
1920 L Street, N.W.
Suite 400
Washington, D.C. 20036
(202) 783-0010
(202) 783-6088 facsimile

Counsel for Defendant
United Mine Workers of America

September 7, 2007

17

# EXHIBIT 1

## DECLARATION OF CECIL E. ROBERTS

Cecil E. Roberts, being duly sworn, deposes and states as follows:

1.      I am now, and I have been since December 1995, the duly elected President of the United Mine Workers of America ("UMWA" or "Union"), an International Union located in Fairfax, Virginia.  Prior to January 2000, the UMWA had maintained its headquarters in Washington, D.C. for many decades.

2.      The United Mine Workers of America is a labor organization established in 1890 for the purpose of securing safe and just working conditions for coal miners and other workers through collective bargaining and legislation, and for the purpose of preserving opportunities for gainful and humane employment in the nation's coal mines, processing plants and associated facilities.  The Union has active and retired members throughout the United States and Canada.

3.      The UMWA is comprised of the International Union and its constituent Local Unions.  The International Union maintains District Offices as divisions, whose geographic boundaries have been determined by the International Executive Board, in which the supreme executive and judicial powers of the International Union are vested in accordance with the Constitution of the International Union effective April 13, 2006.  Within each District, the International Union charters Local Unions, which have localized jurisdiction over members at a particular coal mining or other facility represented by the UMWA.  An individual's membership in the UMWA consists of membership in the Local Union, the District in whose territory the Local Union is located, and the International Union.

4.    After concluding my active duty military service, including combat service in Vietnam, I began working for the Carbon Fuel Company in the West Virginia coal fields in 1971 under the then existing NBCWA.  In addition to working in a variety of classified bargaining unit positions during my employment at Carbon Fuel, I served as a committeeman for Local Union 2236, representing fellow members in the grievance/arbitration procedure under the contract.  I also served as a safety representative, monitoring compliance with federal and state safety laws and regulations, and bringing safety grievances for workers.

5.    In 1977 the membership elected me to the position of Vice-President in District 17, whose territory generally consisted of southern West Virginia.  In 1982 I ran for International Union office and was elected Vice-President.  I was subsequently re-elected several times and held that position on a full-time basis for thirteen years, until becoming President of the International Union in December 1995.

6.    Since approximately 1950, the International Union has been responsible for negotiating the National Bituminous Coal Wage Agreement ("NBCWA") on a regular basis with the Bituminous Coal Operators Association ("BCOA"), a multiemployer association of coal producers.  The NBCWA establishes the industry standard for wages and terms and conditions for an overwhelming majority of our members working in the coal industry.  It sets that standard in two ways:  immediately for those companies that are members of BCOA, and subsequently through a process by which other companies -- at UMWA's urging -- agree to accept the terms of the NBCWA as their own.  Companies that accept the terms of the NBCWA are sometimes described as "me-too" companies (agreements with these companies sometimes involved placing a new cover on the NBCWA and including possible differences in some of the local

2

provisions for the "me-too" company's own workforce.) The group of employers who ultimately accept the terms of the NBCWA represents approximately 75% of our active membership in the coal mining industry. Within the past twenty-five years, the NBCWA has been negotiated and renewed, with any mutually agreed upon modifications, in 1974, 1978, 1981, 1984, 1988, 1993, 1998, 2002 and 2007. Each of these agreements provided health and retirement benefits for UMWA members. I have been actively involved in the negotiation of every NBCWA beginning in 1984.

7.      From 1950 to 1974, all health and retirement benefits were provided by a single multiemployer fund, the UMWA Welfare and Retirement Fund. In 1974, after the passage of ERISA, the UMWA and the BCOA agreed to separate that fund into distinct pension and benefits plans. The 1950 Pension Plan and Trust was created to provide pension benefits to miners (and their dependents and survivors) who retired prior to December 31, 1975. The UMWA 1974 Pension Plan and Trust was created to provide pension benefits to miners (and their dependents and survivors) who retired after December 31, 1975. These pension plans, together with several retiree health care benefit plans, were collectively referred to as the "UMWA Health and Retirement Funds" or "the Funds."

8.      From their inception, the UMWA and the BCOA have been the settlors of the UMWA Health and Retirement Funds. As settlors the UMWA and the BCOA are the parties with the authority to amend the plan and trust documents. Since 1978, the UMWA and BCOA have included contractual language (appearing as Art. XX (d)(vi)(a) in the 2002 NBCWA) that has specified how provisions requiring action by the BCOA would be satisfied in the event the

3

BCOA ceased to exist – in which case the authority of the Employer Settlor would fall to those Employers with the majority of BCOA tonnage at the time the 2002 NBCWA became effective.

9.    The UMWA and the BCOA have amended the plan and trust documents shortly after reaching agreement on each new NBCWA, in order to ensure that the plan and trust documents reflect all relevant, collectively-bargained modifications in "the terms and conditions of" the Trust. Thus, following this practice, the UMWA and the BCOA amended the plan and trust documents shortly after reaching agreement on the 1978, 1981, 1984, 1988, 1993, 1998, 2002, and 2007 NBCWAs. Specifically in this regard, the UMWA and the BCOA adopted various amendments to the plan and trust documents governing the 1974 Pension Trust on February 7, 2007—making those amendments effective as of January 1, 2007 so as to coincide with the January 1, 2007 effective date of the 2007 NBCWA.

10.    Unlike many other multiemployer benefit plans, the underlying concept of the UMWA Funds is that all eligible employees receive uniform benefits, and that all participating employers are required to pay a uniform contribution rate. Starting in 1974 and continuing to the present day, the UMWA and the BCOA have agreed that the benefit levels and the contribution rates to the trusts would be contractually established and maintained. Every NBCWA negotiated since 1974 has contained both the contribution rates to the pension trusts and the precise level of benefits provided by the pension plans, and have been uniform for all currently signatory employers and for all beneficiaries.

11.    During negotiations for the 1978 NBCWA, the bargaining parties agreed upon certain provisions to ensure the financial stability of the health and retirement funds. These provisions were adopted because of a shared UMWA and BCOA concern that employers should

4

not be able to withdraw from the Trust Funds and leave liability for benefit obligations on the remaining employers. In addition to agreeing on a provision that required that all employers pay the same level of contributions, the parties adopted a clause that became known as the "Evergreen" provision. That clause, which was inserted in the controlling plan and trust documents, provides that any employer who employed a participant eligible for benefits from the 1974 Pension Plan (as well as the other pension and benefit plans) or any employer that was obligated to make contributions to the Plan was "obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto."

12.     Since my election to the office of Vice President in 1982, I have participated in the UMWA negotiations with BCOA for each successive NBCWA, *i.e.*, 1984, 1988, 1993 (including the 1996 reopener), 1998, 2002 and 2007 NBCWAs. As President of the International Union, I have the responsibility, as set forth in the UMWA Constitution, to chair all bargaining. In bargaining for the 1998 and 2002 NBCWAs and, most recently, the 2007 NBCWA, I directly negotiated on a one-on-one basis with the Chairman of the BCOA Negotiating Committee. In 2006, the Chairman of the BCOA Negotiating Committee was Peter Lilly. Mr. Lilly is also the Chief Operating Officer of Consolidation Coal Company. In 2002, the Chairman of the BCOA Negotiating Committee was J. Brett Harvey, who was the President of Consolidation Coal Company at the time. In 1998, the Chairman of the BCOA Negotiating Committee was B.R. Brown, who was then the Chairman of Consolidation Coal Company.

5

13.    In the 2006 negotiations for a successor agreement to the 2002 NBCWA, the BCOA represented Central Ohio Coal Company, Consolidation Coal Company, Eight-Four Mining Company, Helvetia Coal Company, Island Creek Coal Company, Keystone Coal Mining Corporation, Laurel Run Mining Company, McElroy Coal Company, Quarto Mining Company, Southern Ohio Coal Company, and Windsor Coal Company. These employers represented over 50% of the tonnage of the BCOA membership on the effective date of the 2002 NBCWA.

14.    In negotiating for the 2007 NBCWA, the UMWA and the BCOA addressed the matter of the appropriate level of contributions that employers participating in the 1974 Pension Plan would be required to make over the life of the new contract.   Both the Union and the BCOA were concerned with compliance with the Pension Protection Act of 2006, P.L. 109-280, federal legislation enacted in August 2006 to enhance and protect retirement savings for millions of Americans covered by traditional defined benefit plans. Unlike previous statutes, the PPA directs the timing of corrective actions that are required to avoid funding problems with multiemployer pension plans and imposes an obligation to take action as soon as funding problems are projected to occur within a specified time in the future. The requirement of early intervention is imposed by categorizing the funding level of the pension plan and imposing obligations depending on the plan's status. In general the statute requires a multiemployer pension plan to fully fund all benefits, and that if it either fails to remain above 80% funded or is projected to suffer funding deficiencies in the future, the law mandates certain actions that may include additional contributions and benefit modifications.

15.    Consistent with my efforts throughout the course of my presidency, I entered into the 2006 negotiations with the intention to negotiate an increase in pension benefits for our

6

members in the 2007 NBCWA. The imperative to increase pension benefits reflected the actions

of the membership at the UMWA International Conventions in 2003 and 2006. At the 2006

Convention, with my complete support, the membership overwhelmingly passed a Constitutional

Mandate to negotiate increased pension benefits in the upcoming NBCWA negotiations. Article

1 of the UMWA Constitution was amended to include the goal "The improvement in pensions

for our active, laid-off and retired members, as well as maintaining current levels of health care

coverage, shall remain the top priorities of the United Mine Workers of America." With this

directive from the UMWA Convention, I was committed to improving the pension benefits for

our active and retired members. Because of my intention to secure increased pension benefits, as

well as the new legal requirements regarding the need for increased funding of the Pension Plan,

I understood that there would need to be an increase in the required employer contributions to the

Pension Plan.

16.    In light of these concerns, the Union sought, and obtained in the 2007 NBCWA,

an increase in the pension accrual for active employees of an additional $10 per month per year

of service (over the term of the contract) over the benefits provided in 2006. The 2007 NBCWA

also provided pension increases of $20 a month (over the term of the contract) to existing retirees

and widows and provided them with a one-time annual lump sum bonus for each of the five years

of the contract. The benefit improvements increased the liability of the 1974 Plan by

approximately $600 million.

17.    During the course of our negotiations, Mr. Lilly and I discussed the contribution

levels required to comply with the Pension Protection Act's funding levels as well as the

UMWA's demand for increased pension benefits. Mr. Lilly provided me with actuarial

7

calculations performed by the BCOA's actuaries, AON, to achieve the necessary funding for the 1974 Pension Plan to remain above the 80% statutory requirement for the period 2007 through 2011.  I referred these actuarial reports to Micheal Buckner, who the Union presently retains as a benefits consultant, for review.  Mr. Buckner shared the calculations with the UMWA's actuaries, Watson Wyatt.  Mr. Buckner reported back to me that the projections provided by the BCOA were reasonably based, and consequently the UMWA and BCOA reached agreement on the matter of the level of contributions to the 1974 Pension Plan.

18.    Pursuant to our agreement, the employers were required to contribute $2.00 per hour to the 1974 Pension Plan beginning January 1, 2007, and increasing over the 5-year term of the contract to $5.50 per hour.  It is important to put these contribution rates in perspective, compared to the level of pension contributions required under our contracts in the past.  Under the 1978 NBCWA, the contribution rates established for the 1974 and 1950 Pension Plans were based upon a combination of tons of coal produced and hours worked.  Under that Agreement, Article XX(d) provided that the BCOA had the authority to require the entire contribution amount based upon an hourly contribution rate, using a tonnage equivalent to convert the tonnage rate to an hourly rate.  In 1988, contributions based upon tonnage were generally eliminated in favor of exclusively hourly contributions.  The following table shows the contribution rates to the 1950 and 1974 Pension Plans, the rates converting any tonnage rate into its hourly equivalent, and the rate in today's dollars adjusted for inflation (using the inflation calculator located on the Bureau of Labor Statistics web site at http://www.bls.gov/cpi/):

8

| | 1950 Pension | | 1974 Pension | | Total Hourly Equivalent | CPI Adjusted |
|---|---|---|---|---|---|---|
| | Per Ton | Per Hour | Per Ton | Per Hour | | |
| 1978 NBCWA | | | | | | |
| March 27, 1978-March 26, 1979 | $0.950 | | $0.080 | $0.750 | $2.280 | $7.29 |
| March 27, 1979-March 26, 1980 | $0.950 | | $0.080 | $0.760 | $2.295 | $6.57 |
| March 27, 1980-End of Agreement | $0.950 | | $0.080 | $0.750 | $2.295 | $5.82 |
| 1981 NBCWA | | | | | | |
| June 7, 1981-June 6, 1982 | $0.950 | | $0.080 | $1.037 | $2.685 | $6.17 |
| June 7, 1982-June 6, 1983 | $1.110 | | $0.080 | $0.997 | $2.901 | $6.26 |
| June 7, 1983-End of Agreement | $1.110 | | $0.080 | $1.017 | $2.920 | $6.11 |
| 1984 NBCWA | | | | | | |
| October 1, 1984-September 30, 1985 | $1.110 | | $0.070 | $1.030 | $3.690 | $7.15 |
| October 1, 1985-September 30, 1986 | $1.110 | | $0.066 | $0.970 | $3.654 | $6.94 |
| October 1, 1986-September 30, 1987 | $1.110 | | $0.066 | $0.970 | $3.680 | $6.75 |
| October 1, 1987-End of Agreement | $1.100 | | $0.066 | $1.020 | $3.711 | $6.53 |
| 1988 NBCWA | | | | | | |
| February 1, 1988-January 31, 1989 | | $0.000 | | $0.470 | $0.470 | $0.83 |
| February 1, 1989-January 31, 1990 | | $0.000 | | $0.595 | $0.595 | $0.99 |
| February 1, 1990-End of Agreement | | $0.000 | | $0.710 | $0.710 | $1.13 |
| 1993 NBCWA | | | | | | |
| December 16, 1993-End of Agreement | | $0.000 | | $0.750 | $0.750 | $1.08 |
| 1998 NBCWA | | | | | | |
| January 1, 1998-End of Agreement | | $0.000 | | $0.750 | $0.750 | $0.96 |
| 2002 NBCWA | | | | | | |
| January 1, 2002-December 31, 2002 | | $0.000 | | $0.000 | $0.000 | $0.00 |
| January 1, 2003-End of Agreement | | $0.000 | | $0.000 | $0.000 | $0.00 |

On June 30, 2007, the 1950 Pension Plan merged into the 1974 Pension Plan. Consequently, the rate payable to the 1974 Pension Plan today can only fairly be compared to the total pension contribution rates owed to the 1950 and 1974 Pension Plans under earlier agreements. As the table shows, the pension contribution owed under the 1978 NBCWA, the 1981 NBCWA and the 1984 NBCWA was higher than the current rate, reaching as high as $3.71 per hour by the end of

9

the term of the 1984 NBCWA. Adjusted for inflation, in today's dollars, the rate payable under each of those contracts far exceeded the highest rate payable under the 2007 NBCWA.

19.    Furthermore, the employers have not made any contributions to the 1974 Pension Plan since mid-1998. This nearly nine-year hiatus in pension contributions was pursuant to the provisions of the NBCWA. The 1998 NBCWA provided that once the 1974 Pension Plan reached a certain level of funding, the contribution rate would drop to $0.00 an hour and $0.00 per ton for existing signatories. Around July 1998, the 1974 Pension Plan achieved the anticipated level of funding and from that point, through the expiration of the 2002 NBCWA on December 31, 2006, signatory employers were required to report hours but make no contributions to the Plan. From that time through December 31, 2006, the miners working for signatory employers (including those at Freeman United and Monterey Coal) continued to earn pension credit toward vesting and for purposes of determining the amounts that the 1974 Pension Trust will be obligated to pay them after they retire, even though their employers were making no contributions. Consequently, by the time negotiations for the 2007 NBCWA began, I did not believe it was unfair to the employers to seek a pension increase as well as a contribution increase given the fact that signatory employers had experienced a nine-year hiatus from the obligation to make any contributions to the Pension Plan.

20.    On December 15, 2006 we announced a tentative agreement between the UMWA and the BCOA for a new, five-year agreement effective January 1, 2007. I informed the membership that the agreement was the culmination of months of hard work and that there had been significant hurdles to overcome, particularly in the areas of pensions, retiree health care and wages. Nevertheless, I reported that the parties were able to overcome the obstacles and hammer

out an agreement. The contract provided for a 20% increase in wages over the life of the agreement and a $1,000 wage bonus that was payable immediately. In fact, it was the largest wage increase the Union negotiated since 1974.

21.     Upon concluding negotiations with the BCOA in mid-December 2006, the UMWA made arrangements for national ratification of the 2007 NBCWA. The UMWA notified all Local Unions whose members had been employed under the 2002 NBCWA, whether for companies that had been members of the BCOA in 2002 or companies (like Monterey) that had signed "me-too" agreements, and scheduled contract explanation meetings for December 19 and ratification votes on December 21, 2006. On December 21, each of the Local Unions voted on whether to accept the terms of the 2007 NBCWA. The only exception concerned several smaller coal companies (like Freeman) that were signatory to "me too" agreements that would only expire a year or more later than the December 31, 2006 expiration date of the 2002 NBCWA. Our members collectively ratified the 2007 NBCWA by an overwhelming margin of votes. As stated above, the members that ratified the 2007 NBCWA represent approximately 75% of our active membership in the coal mining industry.

22.     Throughout our negotiations with the BCOA in 2006, it was the UMWA's intention that it would negotiate a labor contract with the BCOA, the 2007 NBCWA, which would establish the industry standard for wages, pensions, and other terms and conditions of employment, just as the UMWA and BCOA had done in the 2002 and prior NBCWAs. Consequently, in announcing the results of the ratification votes, I stated that the UMWA intended the contract to be an industry-wide agreement and that we were going to provide the coal companies that were not members of BCOA with an opportunity to sign the agreement.

11

Press releases that the UMWA issued at that time, and in connection with the process of obtaining other companies' agreement to the 2007 NBCWA, are attached as Exhibit A.

23.     After the ratification vote was held, the UMWA notified the non-BCOA companies who had been signatory to the 2002 NBCWA, or who had signed "me-too" agreements, and requested that they agree to the provisions of the NBCWA. The UMWA advised these companies that the terms had already been ratified and they could accept the provisions of the National Agreement without an additional ratification vote. In relatively short order following the nationwide ratification vote, all of the major coal operators in our industry signed on to the relevant provisions of the 2007 NBCWA. For example, Jim Walter Resources signed a contract mirroring the National Agreement on January 17, 2007. The miners covered by this agreement had participated in the ratification vote in December. Similarly, the mines operated by Peabody Energy, which produce a significant portion of the tonnage in the organized coal industry, signed agreements mirroring the National Agreement in February 2007. Magnum Coal Company, the parent of Apogee Coal Co., also signed on in February. PinnOak Resources and the Pittsburg & Midway Coal Mining Company signed similar agreements in March 2007. Negotiations with Foundation Coal Holdings, Inc., the parent of Cumberland Coal Resources LP and Emerald Coal Resources LP came to the same result in April 2007.

24.     Although several of the non-BCOA companies requested bargaining to address issues particular to their operations, all of those who had agreed to the terms of the 2002 NBCWA (with Monterey being the sole exception) ultimately executed the 2007 NBCWA; some with minor modifications in areas other than the 1974 Pension Plan. In addition to the employers directly signatory to the 2007 NBCWA, the following agreed to be bound by its terms, or to

12

otherwise accept the obligation to contribute to the UMWA Health and Retirement Funds at the rates specified in Article XX of the NBCWA:

a.    Homer City Coal Processing Corporation

b.    Pinnacle Mining Company, LLC

c.    Pinnacle Land Company, LLC

d.    Long Branch Energy

e.    Laurel Coal Corp.

f.    Mountain Edge Mining Inc., LLC

g.    Pine Ridge Coal Company, LLC

h.    Rivers Edge Mining, Inc.

i.    Colony Bay Coal Company

j.    Mountain View Coal Company, LLC

k.    Apogee Coal Company, LLC

l.    Hobet Mining LLC

m.    Eastern Associated Coal LLC

n.    Peabody Coal Company, LLC

o.    Pittsburg & Midway Coal Mining Company

p.    Emerald Coal Resources, LP

q.    Cumberland Coal Resources, LP

r.    Litwar Processing Company, LLC

s.    Transervice Inc.

t.    Keystone Service Industries Inc.

13

u.      Bluestone Coal Corporation.

v.      Double Bonus Coal Company

w.      Justice Energy Company

x.      Dynamic Energy Inc.

y.      R&S Coal Company

z.      Ohio Valley Coal Company

aa.     Conesville Coal Preparation Company

bb.     Jim Walter Resources, Inc.

cc.     Drummond Company LLC

dd.     Oak Grove Resources LLC

ee.     Oak Grove Land Company LLC

25.     In addition to the 11 employers represented by BCOA in 2006 that are identified in paragraph 13 above, the BCOA represented 12 other employers during negotiations for the 2002 NBCWA.  Seven of those 12 employers, Apogee Coal Co., Colony Bay Coal Company, Eastern Associated Coal Corp., Hobet Mining, Mountain View Coal Company, Peabody Coal Company and Pine Ridge Coal Company, subsequently adopted the terms of the 2007 NBCWA. The five remaining employers, Affinity Mining Company, Kent Coal Company, Martinka Coal Company, Squaw Creek Coal Company and Sterling Smokeless Coal Company, are no longer operating.

26.     In sum, during decades of collective bargaining, the UMWA and the BCOA have established and maintained, through the National Bituminous Coal Wage Agreement, the prevailing contractual standards for the industry.  The UMWA develops bargaining positions

14

with membership input obtained through meetings and conventions. Consistent with its long-standing practice, the Union considers the 2007 NBCWA to establish the standards for the organized bituminous coal industry. The UMWA negotiated and ratified it as such and, not surprisingly, the 2007 NBCWA has been treated by the organized bituminous coal industry as the industry standard.

27.     As of July 2007, there are approximately 360 UMWA members working at the Freeman United mines and 260 members working at the Monterey operations.

28.     Freeman United was a member of the BCOA when I was elected as Vice President in 1982 and remained a member of the BCOA until 1997. In fact, I believe Freeman United was a member of the BCOA since 1966. During that time, it was signatory to the all of the NBCWAs negotiated by the BCOA. After Freeman United left the BCOA, the Union engaged in collective bargaining for separate collective bargaining agreements directly with Freeman.

29.     Freeman's current collective bargaining agreement with the UMWA expires in January 2008. Similar to predecessor agreements, the contract provides pension credits under the 1974 Pension Plan to Freeman's active employees and pension benefits from the 1974 Pension Plan to Freeman's retirees and their eligible dependents, including the increased benefits established in the 2007 NBCWA. Among other things, Freeman's collective bargaining agreement incorporates by reference the terms and conditions of the 1974 Pension Plan. Article XX(c) of Freeman's agreement states in relevant part:

> The United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1974 Pension Trust are set forth in the United Mine Workers of America 1974

Pension Plan ("1974 Pension Plan"), which is incorporated by reference and made a part of this Agreement.

30.          Monterey Coal was a member of BCOA from at least 1974 through 1988 and withdrew from the BCOA during the term of the 1988 NBCWA. During that time it was signatory to all the NBCWAs negotiated by the BCOA. After Monterey left the BCOA, the Union engaged in collective bargaining for successor agreements directly with Monterey, with Monterey signing "me-too" agreements in 1993, 1998 and 2002.The UMWA-represented employees at Monterey Coal are working under the terms and conditions of the 2002 Agreement. Similar to predecessor agreements, the contract provides pension credits under the 1974 Pension Plan to Monterey's active employees and pension benefits from the 1974 Pension Plan to Monterey's retirees and their eligible dependents, including the increased benefits established in the 2007 NBCWA. Among other things, Monterey's collective bargaining agreement incorporates by reference the terms and conditions of the 1974 Pension Plan. Article XX(c) of Monterey's agreement states in relevant part:

> The United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1974 Pension Trust are set forth in the United Mine Workers of America 1974 Pension Plan ("1974 Pension Plan"), which is incorporated by reference and made a part of this Agreement.

16

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Cecil E. Roberts
International President, United Mine Workers of America


Executed on September 4 , 2007.

17

# EXHIBIT A

**News from the United Mine Workers of America, AFL-CIO, CLC**

# UMWA

8315 Lee Highway
Fairfax, VA 22031-2215

Cecil E. Roberts, President
Daniel J. Kane, Secretary-Treasurer

Communications Department • 703-208-7240 • FAX 703-208-7227

[Back to UMWA Press Releases]

**For Immediate Release**
December 21, 2006
Contact: Phil Smith
(703) 208-7241

### UMWA members ratify new National Bituminous Coal Wage Agreement in 'historic' vote

Members of the United Mine Workers of America (UMWA) ratified a new collective bargaining agreement with the Bituminous Coal Operators Association (BCOA) in a nationwide vote yesterday, with an unprecedented 80 percent voting in favor of the new agreement.

"This is an historic vote for the UMWA," International President Cecil E. Roberts said. "Never before has a contract been ratified by such a wide margin. I'm humbled that the membership saw fit to so strongly endorse our efforts at the bargaining table.

"In an era when workers in other industries are being confronted with significant cuts in health care benefits and pension benefits–if they can hang onto those benefits at all–this agreement represents a significant departure from that trend," Roberts said. "There are no concessions, no givebacks in this agreement. There are only gains for current members, retirees and their families."

The agreement will, at the outset, be between the UMWA and Consol Energy, which is the only company currently in the BCOA. The union will present the agreement to the other coal companies between now and mid-January.

"This agreement is going to be the industry-wide agreement, as far as the UMWA is concerned," Roberts said. "That's our message to the other companies. It is a fair agreement for our members, and we believe it is fair for the companies as well. The level of support the members gave the agreement with their ratification vote speaks for itself, and we hope that the other companies are listening.

"We're going to give the other coal companies an opportunity to sign this agreement through the middle of January," Roberts said. "Hopefully they will do that. But if they don't, the union will make a determination at that time as to what action we will take.

"Miners at companies which have not yet signed the agreement will report to work on January 2nd and will continue to work until told otherwise by the International Union," Roberts said, noting that under federal labor law the terms and conditions of the national contract negotiated in 2002 will continue in full force and effect until a new agreement is reached with those companies.

Details of the newly ratified agreement:

The new five-year agreement calls for a 20 percent across-the-board increase in wages over the life of the agreement, and a $1,000 bonus to be paid immediately. When wage roll-ups and other improvements in the contract are factored in, the overall hourly cost of this agreement will increase by 32% percent.

"This is the largest wage increase we've negotiated since 1974," Roberts said. "It's front-loaded, so members will see an immediate benefit in their paycheck. Over the life of the agreement, a miner working at the top rate will see over $32,000 more in his paycheck for just working straight time."

Underground miners working at the top rate will be earning $24.42 per hour in the final year of the contract. The training rate for new miners will be $22.77 per hour in the last year of the agreement.

Pensions for future retirees will be increased by $10 per month, per year of service over the life of the agreement, and pensions for current retirees have been raised as well. "A miner who retires with 30 years of service at the end of the term of this agreement will see almost a $600 per month increase in his pension check," Roberts said.

The BCOA also agreed to increase contributions to the UMWA 1974 Pension Fund over the life of the agreement. By the end of the agreement in 2011, the companies will have made over $500 million in contributions to the pension plan. The 1974 Pension Plan currently has $6.2 billion in funds.

Even though the agreement is initially with Consol Energy, other coal companies–like Peabody Energy, Foundation Coal Company, Jim Walter Resources and others–will be bound by the pension improvements and pension contribution rates included in the new agreement because they are part of the UMWA Health and Retirement Funds, which includes the UMWA 1974 Pension Fund.

The union preserved full health care benefits for active and retired members nd their dependents, with no increase in co-payments. The agreement also liminates a cap on what retirees who receive health care benefits from heir former employers can earn and still receive those benefits.

Improvements were made in other areas of the agreement as well, including an dditional day off for members with 19 or more years of service, higher enefits for lost time due to sickness or accidents, improved life insurance benefits and more.

[Back to UMWA Press Releases]

News from the United Mine Workers of America, AFL-CIO, CLC

**UMWA**

8315 Lee Highway
Fairfax, VA 22031-2215

Cecil E. Roberts, President
Daniel J. Kane, Secretary-Treasurer

Communications Department • 703-208-7240 • FAX 703-208-7227

[Back to UMWA Press Releases]

**For Immediate Release**
January 17, 2007
Contact: Phil Smith
(703) 208-7241

### UMWA reaches agreement with Jim Walter Resources, boosting compensation, benefits for nearly 1,000 miners

The United Mine Workers of America (UMWA) announced today that Jim Walter Resources (JWR) has signed a contract that mirrors the national contract the UMWA negotiated with the Bituminous Coal Operators Association (BCOA) last month, which includes significant gains in wages and benefits for UMWA members working at JWR over the next five years.

"By agreeing to the wage and benefit improvements contained in the BCOA contract, JWR has recognized the BCOA contract as the blueprint for all UMWA-represented companies industry-wide," said UMWA International President Cecil E. Roberts. "JWR also recognized that this agreement is a good and workable agreement for miners and mine operators in Alabama, just as it is for miners and operators in West Virginia, Pennsylvania, the Midwest and everywhere else in the nation."

Roberts noted that there are still some coal companies which have not signed the BCOA agreement. "Now is the time for the remaining operators, whose workers have toiled without a contract since the year began, to come on board and sign this agreement," he said. "We sincerely hope we can reach an agreement with those other companies as soon as possible, but we are preparing and training our local union leaders and members for the alternative in case we cannot."

As in the BCOA agreement, the JWR agreement calls for a 20 percent across-the-board increase in wages over the life of the agreement, and a $1,000 bonus to be paid immediately. Underground miners working at the top rate will be earning $24.42 per hour in the final year of the contract. The training rate for new miners will be $22.77 per hour in the last year of the agreement. There are additional improvements in health care and insurance coverage as well.

Because JWR participates in the UMWA Health and Retirement Funds, the company was already bound by the significant pension improvements for active and retired miners contained in the BCOA agreement.

The UMWA represents nearly 1,000 miners at three underground mines operated by JWR in Tuscaloosa County, Ala. Those members voted to ratify the BCOA agreement last month, meaning the agreement with JWR will go into effect

immediately.

[Back to UMWA Press Releases]

**News from the United Mine Workers of America, AFL-CIO, CLC**

UNITED MINE WORKERS
OF AMERICA

**UMWA**

8315 Lee Highway
Fairfax, VA 22031-2215

Cecil E. Roberts, President
Daniel J. Kane, Secretary-Treasurer

Communications Department • 703-208-7240 • FAX 703-208-7227

[Back to UMWA Press Releases]

**For Immediate Release**
February 13, 2007
Contact: Phil Smith
(703) 208-7241

### Magnum Coal latest company to sign national coal agreement with UMWA

United Mine Workers of America (UMWA) International President Cecil E. Roberts announced today that Magnum Coal Company has agreed to the terms and conditions of the national bituminous coal wage agreement the union initially negotiated with the Bituminous Coal Operators' Association (BCOA) last December.

"We are pleased that Magnum has agreed to all the provisions of the national agreement," Roberts said. "Our members at Magnum have been working over 40 days without a contract, and it was time for the company to step up and join the other coal operators who have already recognized that this is a fair agreement for the workers and the companies."

As in the BCOA agreement, UMWA members will receive an immediate $1.50 per hour increase and a total $4.00 per hour increase over the life of the agreement. Magnum has agreed to pay the initial increase retroactively to January 1, the date when the previous contract had expired.

UMWA miners will also receive the $1,000 bonus negotiated in the BCOA contract, as well as pension improvements, maintenance of current health care benefits for active and retired members with no changes and other insurance improvements.

Magnum Coal Company is the controlling company for several mines represented by the UMWA in Boone and Logan Counties, W. Va. The UMWA has about 2,500 active and retired members that are covered by this agreement. Magnum is a corporate entity that was spun off from Arch Coal last year.

Roberts said that so far, Consol Energy, Jim Walters Resources, Peabody Energy, Ohio Valley Coal and now Magnum have agreed to the national agreement with the UMWA. "There are a very few other companies out there who have not yet signed the national agreement," Roberts said. "The clock is ticking, and the alarm is going to start ringing very soon. We will continue to talk with those companies, but they must realize that our patience will not last forever."

[Back to UMWA Press Releases]

News from the United Mine Workers of America, AFL-CIO, CLC

# UMWA

UNITED MINE WORKERS OF AMERICA

8315 Lee Highway
Fairfax, VA 22031-2215

Cecil E. Roberts, President
Daniel J. Kane, Secretary-Treasurer

Communications Department • 703-208-7240 • FAX 703-208-7227

[Back to UMWA Press Releases]

**For Immediate Release**
February 9, 2007
Contact: Phil Smith
(703) 208-7241

### UMWA reaches agreement with Peabody Energy on new 5-year agreement

United Mine Workers of America (UMWA) International President Cecil E. Roberts told a meeting of UMWA local union officers who had gathered in Charleston, W. Va., today to discuss a looming strike against Peabody Energy that the union has reached an agreement with the company for a new five-year contract.

"This agreement mirrors the Bituminous Coal Operators' Association (BCOA) agreement in every respect," Roberts said, referring to the agreement the UMWA negotiated with the BCOA in late December of last year. "Peabody has agreed to the terms and conditions of the National Bituminous Coal Wage Agreement at every mine where the previous agreement had expired.

Roberts noted that the current agreement at Peabody's Highland mine in western Kentucky does not expire until the end of 2007. "We have been and will continue to talk with the company about accepting the provisions of the national agreement at that mine either before the current agreement expires there or at the expiration of that agreement," he said.

"We believe this is a fair agreement for our members," Roberts said. "It's also a fair agreement for Peabody, just as it is for every other coal company, no matter where they operate--be it West Virginia, Pennsylvania, Ohio, Alabama or the Midwest. It meets both the miners' and the companies' needs as our industry moves forward to continue meeting America's power generation demands.

"This victory is largely due to the strength and unity of our members," Roberts said. "Without their solidarity, Peabody would not have gotten the message that we were serious about getting the national agreement at all the Peabody mines that were working without a new contract. But the company eventually got that message, and they understood that our members were willing to stand together and do whatever it took to get a new agreement."

Like the BCOA agreement, the Peabody contract calls for an immediate across-the-board raise of $1.50 per hour, and a total wage increase of $4.00 per hour over the life of the agreement. Peabody has agreed to make these increases retroactive to January 1 of this year. UMWA members will also receive a $1,000 bonus.

The contract maintains current health care benefits and makes improvements in prescription drug formularies. Members with 19 or more years of service will receive another vacation day, and there are increases in the clothing allowance, sickness and accident coverage, life insurance, and other benefits. As a contributor to the UMWA Health and Retirement Funds, Peabody was already locked into the pension increases that were negotiated with the BCOA.

UMWA members working at Peabody mines voted to ratify the BCOA agreement in late December 2006. Since this agreement is not different from the BCOA agreement, they will not have to vote again.

[Back to UMWA Press Releases]



News from the United Mine Workers of America, AFL-CIO, CLC

8315 Lee Highway
Fairfax, VA 22031-2215

Cecil E. Roberts, President
Daniel J. Kane, Secretary-Treasurer

Communications Department • 703-208-7240 • FAX 703-208-7227

[Back to UMWA Press Releases]

**For Immediate Release**
March 2, 2007
Contact: Phil Smith
(703) 208-7241

### UMWA reaches agreement with PinnOak Resources on new 5-year agreement

The United Mine Workers of America (UMWA) announced today that it has reached a new five-year agreement with PinnOak Resources covering some 1,500 active and retired coal miners n West Virginia and Alabama. The agreement mirrors the gains the union has won in agreements with the Bituminous Coal Operators Association (BCOA), Jim Walter Resources and Peabody Energy, among others.

"The agreement with PinnOak provides the same wage increases, bonus, pension improvements and improvements in health care and other benefits that other UMWA coal miners have won so far this year," UMWA International President Cecil E. Roberts said. "We're pleased PinnOak miners have won this agreement."

As in the BCOA agreement, UMWA members will receive an immediate $1.50 per hour increase and a total $4.00 per hour increase over the life of the agreement. PinnOak has agreed to pay the initial increase retroactively to Jan. 1, the date the previous contract expired.

UMWA miners at PinnOak will also receive the $1,000 bonus negotiated in the BCOA contract, as well as pension improvements, maintenance of current health care benefits for active and retired members with no changes and other insurance improvements.

PinnOak operates two mines: the Pinnacle mine in Wyoming County, W. Va., employs over 400 miners and the Oak Grove mine in Adger, Ala.. employs about 340 miners.

[Back to UMWA Press Releases]

News from the United Mine Workers of America, AFL-CIO, CLC

# UMWA

8315 Lee Highway
Fairfax, VA 22031-2215

Cecil E. Roberts, President
Daniel J. Kane, Secretary-Treasurer

Communications Department • 703-208-7240 • FAX 703-208-7227

[Back to UMWA Press Releases]

**For Immediate Release**
March 23, 2007
Contact: Phil Smith
(703) 208-7241
571-345-8338

### UMWA reaches agreement with P&M Coal for new contract

The United Mine Workers of America (UMWA) announced today that it has reached a new five-year collective bargaining agreement with the Pittsburg and Midway Coal Mining Co. (P&M), a subsidiary of Chevron Corp.

"This agreement incorporates all the provisions of the agreements the union has reached over the last several months with other coal companies, including the Bituminous Coal Operators Association (BCOA)," UMWA International President Cecil E. Roberts said. "It includes the wage ncreases, the bonus, the improved pension provisions and continuation of the current health care benefits with no cuts.

"We are very pleased to have been able to reach this agreement with P&M," Roberts said. "We look forward to continuing our good working relationship with the company in the coming years."

As in the BCOA agreement, UMWA members will receive an immediate $1.50 per hour increase and a total $4.00 per hour increase over the life of the agreement. P&M has agreed to pay the initial increase retroactively to February 2, 2007, the date the previous contract had expired.

UMWA miners will also receive the $1,000 bonus negotiated in the BCOA contract, as well as pension improvements, maintenance of current health care benefits for active and retired members with no cuts in benefits and other insurance improvements.

The UMWA represents 350 miners as well as hundreds of retirees at P&M's North River mine in Alabama.

The UMWA has now reached new collective bargaining agreements with all the major coal companies where previous contracts expired over the last several months. The only remaining company that has not yet reached an agreement is Foundation Coal, whose agreement with the UMWA expires April 1, 2007.

[Back to UMWA Press Releases]

**News from the United Mine Workers of America, AFL-CIO, CLC**

UMWA

8315 Lee Highway
Fairfax, VA 22031-2215

Cecil E. Roberts, President
Daniel J. Kane, Secretary-Treasurer

Communications Department • 703-208-7240 • FAX 703-208-7227

[Back to UMWA Press Releases]

**For Immediate Release**
April 12, 2007
Contact: Phil Smith
703-208-7241
571-345-8338

### UMWA, Foundation reach agreements, strike ends

The United Mine Workers of America (UMWA) and affiliates of Foundation Coal
Holdings, Inc., have reached agreements at all three mines where the UMWA has
been on strike for the last week, the union announced today.

"We have successfully concluded negotiations with Foundation's affiliates
Cumberland Coal Resources, LP, Emerald Coal Resources, LP, and Wabash Mine
Holding Company today," UMWA International President Cecil E. Roberts said. "As
of now, our pickets have been withdrawn and our members are preparing to go to
work tomorrow."

Roberts said that specifics of the agreement would not be released until the local
unions had been briefed later this evening. "I can say, however, that the union
was able to maintain the national contract pattern in all respects at the Cumberland and
Emerald mines, and indeed negotiated improvements in the national agreement in
several areas.

"We have also negotiated a significant severance package in terms of pay and future
retiree health care benefits for the miners at the Wabash mine in Illinois," Roberts
said. The company announced the closure of that mine on April 4, citing aged
infrastructure, soft market conditions and geologic challenges as reasons for the
closure. "One very important part of the agreement with Wabash will give those
miners rights to jobs at Cumberland and Emerald as positions come open, which is
likely to happen very rapidly," Roberts said.

Another provision of the agreement with Wabash gives the UMWA successorship
rights for the next five years to a large section of the seam of coal that was being
mined at Wabash. "If Wabash or any other company comes in and mines that block of
coal, they will do it with UMWA members, with the 2007 national agreement in
effect," Roberts said.

"We sincerely wish that we could have concluded this agreement last week before the
strike began," Roberts said. "But we are gratified that we have been able to reach this
agreement after just a short work stoppage. Our negotiating team–Marty Hudson,
Executive Assistant to the President; Ed Yankovich, International District 2 Vice

President, and the officers of all three affected local unions–did an outstanding job and deserve the thanks of every member. Secretary-Treasurer Kane joins me in commending them.

"The strength and solidarity displayed by our members at all three mines over this past week have been simply outstanding," Roberts said. "It was clear to all concerned that they were sticking together and were not going to back down. I commend them, their families and their communities for their tremendous unity and sense of common purpose. We would not be able to make this announcement today without that."

[Back to UMWA Press Releases]

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Michael H.Holland, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| v.                                    ) | Case No. 07-cv-490 (PLF) |
| ) | |
| Freeman United Coal Mining Co., et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

| | |
|---|---|
| Freeman United Coal Mining Co., ) | |
| ) | |
| Plaintiff, ) | |
| v.                                    ) | Case No. 07-cv-1050 |
| ) | |
| United Mine Workers of ) | |
| America, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## **ORDER**

Upon consideration of the United Mine Workers of America's Motion for Summary

Judgment, any opposition thereto, as well as any reply in support thereof it is, on this the

_____ day of _____, 2007 hereby

ORDERED that the Motion for Summary Judgement is granted.   It is further

ORDERED that the declaratory judgment sought in Count I of Plaintiff Freeman's

Complaint is denied.


_____
Judge, United States District Court
for the District of Columbia