# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Michael H. Holland, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | Case No. 07-cv-490 (PLF) |
| Freeman United Coal Mining Company, ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ————————————————————) | |
| Freeman United Coal Mining ) | |
| Company, ) | |
| ) | |
| Plaintiff, ) | Case No. 07-cv-1050 (PLF) |
| ) | |
| v. ) | |
| ) | |
| United Mine Workers of ) | |
| America, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ————————————————————) | |

## MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY BY THE UNITED MINE WORKERS OF AMERICA 1974 PENSION TRUST AND ITS TRUSTEES

Pursuant to Fed. R. Civ. P. 56(c) and Local Rules 7 and 56.1, the United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust" or "Trust") and its Trustees hereby move this Court for entry of summary judgment in their favor on the issue of Freeman United Coal Mining Company's ("Freeman") and Monterey Coal Company's ("Monterey") liability to make contributions to the Trust at the rates

specified in the National Bituminous Coal Wage Agreement of 2007

("2007 NBCWA").[1]

In Freeman's case, this liability issue is presented both by the

1974 Pension Trust's Complaint in Case No. 07-490 seeking to enforce

Freeman's obligation to make contributions to the Trust at the rates

specified in the 2007 NBCWA, and by Count I of Freeman's Complaint in

Case No. 07-1050 seeking a declaratory judgment that Freeman is *not*

obligated to make contributions to the Trust at the rates specified in the

2007 NBCWA.  In Monterey's case, this liability issue is presented solely

by the 1974 Pension Trust's Complaint; unlike Freeman, Monterey has

not filed a separate action seeking declaratory relief with respect to its

---

[1] The instant Motion leaves for another day the issue of the amount of the
monetary award due to the 1974 Pension Trust under 29 U.S.C. § 1132,
based on Freeman's and Monterey's failure to make contributions to the
Trust at the rates specified in the 2007 NBCWA.  However, in the event
that the instant Motion is granted by the Court, we make the following
proposal designed to achieve a prompt and efficient resolution of the
damages issue:

> The parties shall confer in an attempt to reach agreement on
> the amount that Freeman United Coal Mining Company and
> Monterey Coal Company, respectively, owe to the 1974
> Pension Trust in contributions that have become due for the
> period beginning January 1, 2007, and advise the Court
> within 20 days whether they have reached such an
> agreement and, if so, the amount that shall be included in
> the Court's final judgment.  In the event that the parties
> cannot reach agreement on that amount, they shall jointly
> file a proposed schedule for litigation regarding the damages
> that should be awarded pursuant to the Court's Order
> granting summary judgment on the issue of liability.

This proposal is reflected in the proposed Order submitted herewith.

obligation to make contributions to the Trust at the rates specified in the 2007 NBCWA.

The grounds for this Motion are fully set forth in the accompanying Memorandum of Points and Authorities.  The 1974 Pension Trust and its Trustees also are filing with this Motion:  (i) a Statement of Material Facts As To Which There Is No Genuine Issue; (ii) the Declarations of Dale Stover and Julia Penny Clark; and (iii) a proposed Order.

Respectfully submitted,


DAVID W. ALLEN
General Counsel
D.C. Bar No. 81638
LARRY D. NEWSOME
Associate General Counsel
D.C. Bar No. 254763
CHRISTOPHER F. CLARKE
Senior Assistant General
Counsel
D.C. Bar No. 441708
UMWA HEALTH &
RETIREMENT FUNDS
Office of the General Counsel
2121 K Street, N.W.
Washington, D.C.  20037
Telephone:  202-521-2238

___/s/_____
JULIA PENNY CLARK
D.C. Bar No. 269609
ANDREW D. ROTH
D.C. Bar No. 414038
CHARLOTTE GARDEN
D.C. Bar No. 489040
Bredhoff & Kaiser P.L.L.C.
805 Fifteenth Street N.W.
Suite 1000
Washington, DC 20005
Telephone:  202-842-2600

*Counsel for Michael H. Holland, Micheal W. Buckner, B.V. Hyler and Steven F. Schaab and the United Mine Workers of America 1974 Pension Trust*


Dated: September 7, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Michael H. Holland, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 07-cv-490 (PLF) |
| Freeman United Coal Mining Company, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| Freeman United Coal Mining Company, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07-cv-1050 (PLF) |
| | ) | |
| v. | ) | |
| | ) | |
| United Mine Workers of America, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT
ON THE ISSUE OF LIABILITY BY THE UNITED MINE
WORKERS OF AMERICA 1974 PENSION TRUST AND ITS TRUSTEES**

The United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust" or "Trust") and its Trustees hereby submit this Memorandum of Points and Authorities in support of their Motion for Summary Judgment on the liability issue presented by these consolidated cases.

**STATEMENT OF THE CASE**

The liability issue presented herein is whether Freeman United Coal Mining Company ("Freeman") and Monterey Coal Company ("Monterey") are obligated to make contributions to the 1974 Pension Trust under a contractual provision known as the "evergreen" or "continuing contributions" clause.

In *United Mine Workers of America 1974 Pension Trust v. Pittston*, 984 F.2d 469, 473 (D.C. Cir. 1993) ("*Pittston*"), the Court of Appeals for this Circuit—affirming a summary judgment ruling by Judge Hogan of this Court—definitively determined the meaning and enforceability of the evergreen clause "as a matter of law."  Specifically, in its *Pittston* decision, the Court of Appeals held that *every* coal company employer that has signed one or more National Bituminous Coal Wage Agreements ("NBCWA") between the United Mine Workers of America ("UMWA") and the Bituminous Coal Operators Association ("BCOA") containing the evergreen clause has thereby assumed a "fully enforceable," *id.* at 479, obligation

> to make continuing contributions to the [UMWA] trusts;
> and this obligation include[s] an agreement to make
> contributions at [the] rates specified in subsequent
> NBCWAs, without regard to whether the employer [is] still
> a party to the subsequent agreements.

*Id.* at 474.  It is *undisputed* that both Freeman and Monterey have signed one or more NBCWAs between the UMWA and the BCOA containing the evergreen clause.  *See* 1974 Pension Trust Complaint ("Trust Cplt.") ¶¶

24 & 44; Answer of Defendant Freeman United Coal Mining Company ("Freeman Answer") ¶ 24; Answer of Defendant Monterey Coal Company ("Monterey Answer") ¶ 44; Declaration of Cecil Roberts ("Roberts Decl.") ¶¶ 11, 28, 30 (accompanying the UMWA's separate motion for summary judgment).[1]

Notwithstanding the *Pittston* decision, Freeman and Monterey have refused to contribute to the 1974 Pension Trust "at [the] rates specified in" the most recent NBCWA between the UMWA and the BCOA—*i.e.*, the 2007 NBCWA. Freeman brought suit against the 1974 Pension Trust, the UMWA and the BCOA in the United States District Court for the Central District of Illinois, seeking *inter alia*, in Count I of its Complaint therein, a declaratory judgment that Freeman is *not* obligated under the evergreen clause to make contributions to the Trust at the 2007 NBCWA rates. The 1974 Pension Trust brought its own suit in this Court against Freeman and Monterey, as well as seven other coal companies, seeking to enforce those companies' obligation under the evergreen clause to

---

[1] Indeed, both Freeman and Monterey were members of the BCOA and signatories to the then-current NBCWA during the litigation of the *Pittston* case. *See* Roberts Decl. ¶¶ 28, 30. Moreover, 1291 Freeman retirees and 410 Monterey retirees currently are drawing vested pension benefits from the 1974 Pension Trust by virtue of those companies' participation in the Trust, *see* Declaration of Dale Stover ("Stover Decl.") ¶ 8, and approximately 360 active Freeman employees and 260 active Monterey employees currently are earning credit towards future pensions from the Trust, *see* Roberts Decl. ¶ 27.

make contributions to the Trust at the 2007 NBCWA rates.[2]  Freeman's lawsuit was transferred to this Court on May 25, 2007, and consolidated with the 1974 Pension Trust's enforcement action on June 25, 2007.

The 1974 Pension Trust's Complaint and Count I of Freeman's Complaint present the same question for decision by this Court on the instant motion for summary judgment by the Trust:   Are coal company employers signatory to a prior NBCWA containing the evergreen clause obligated as a matter of law to make contributions to the 1974 Pension Trust at the rates specified in the 2007 NBCWA?  As we demonstrate below, the answer to that question is "yes."  Count II of Freeman's Complaint relates solely to the BCOA, and thus is addressed by the BCOA in its separate motion for summary judgment on Count II.

<div align="center">ARGUMENT</div>

A.     The *Pittston* Case and Decision

Given its centrality to the matter at hand, we begin with an extensive discussion of the *Pittston* case and its ultimate resolution—first by Judge Hogan of this Court, and then by the Court of Appeals for this Circuit.

1.     The *Pittston* case was in actuality one of four consolidated cases in which the meaning and enforceability of the evergreen clause were adjudicated.  *See In re United Mine Workers of Am.*

---

[2] Those seven other coal companies are now making contributions to the 1974 Pension Trust pursuant to the terms of the 2007 NBCWA, and thus have been voluntarily dismissed from the case by the Trust.

*Employee Benefit Plans Litig.*, 782 F. Supp. 658, 659-60 & nn.1-2 (D.D.C. 1992).  The *Pittston* case was the lead case in this Court, so for clarity's sake we refer collectively to the four decided cases as "the *Pittston* case." Likewise, because the *Pittston* case was the lead case on appeal, we refer to the Court of Appeals' decision in that case as "the *Pittston* decision."

The *Pittston* case was presented to Judge Hogan on cross-motions for summary judgment by the plaintiff UMWA Trusts and the defendant Coal Companies.  In his decision disposing of the cross-motions, Judge Hogan began with the following background statement of the litigation:

> Although the causes of action in the four cases at issue are technically distinct, each involves the interpretation of the "evergreen clause" or "continuing contributions clause," which is found in the language of the UMWA 1950 Benefit Plan and Trust . . ., the UMWA 1950 Pension Trust . . ., *the UMWA 1974 Pension Trust* . . ., and the 1974 Benefit Plan and Trust.  The terms of these Trusts were negotiated by the . . . [BCOA] and the UMWA in 1978.  According to the Trusts and the BCOA, who is acting as *amicus curiae* in these cases, the evergreen clause was intended to provide for the long-term financing of pensions and health benefits for elderly miners who retired from the coal industry.  Thus, allegedly to ensure that the obligation to contribute would apply equally to all participating employers, the BCOA and the UMWA placed the evergreen clause into the trust documents, which are incorporated by reference into the collective bargaining agreements of every employer that elects to participate in the Trusts, *including employers who are not members of the BCOA.*

782 F. Supp. at 660-61 (emphasis added) (footnotes omitted).

Judge Hogan observed that "[t]he language of the evergreen clause is the same in each [of the four] Trust[s] except that the name of the Trust is different in each one."  *Id.* at 661.  He set out as an "example"

the evergreen clause as written in the 1984 plan and trust documents

governing the 1950 Benefit Trust.  *Id.*  Inasmuch as the instant case

involves the 1974 Pension Trust only, we quote below—as a more apt

"example"—the evergreen clause as written in the 1984 plan and trust

documents governing the 1974 Pension Trust:

> Any Employer who employed any Participant eligible for
> coverage under, or who received or receives benefits
> under, the 1974 Pension Plan, or any Employer who was
> or is required to make, or who has made or makes
> contributions to the 1974 Pension Plan and Trust, is
> obligated and required to comply with the terms and
> conditions of the 1974 Pension Plan and Trust, as
> amended from time to time, including, but not limited to,
> making the contributions required under the National
> Bituminous Coal Wage Agreement of 1978, as amended
> from time to time, and any successor agreements thereto,
> including, but not limited to, the National Bituminous
> Coal Wage Agreement of 1984.[3]

    The most succinct statement of the dispute between the parties to

the *Pittston* case—and the events giving rise to that dispute—can be

found in the Court of Appeals' subsequent decision therein.  Accordingly,

putting Judge Hogan's decision aside for a brief moment, we quote the

relevant passage in the Court of Appeals' decision at this juncture:

> The dispute in this case arose upon the expiration of the
> NBCWAs to which the [defendant] Coal Companies were
> signatories.  Instead of entering into successor NBCWAs,
> the Coal Companies withdrew from the BCOA and
> negotiated individual labor agreements with the UMWA
> which included modifications of their contribution
> obligations to the trusts.  The Trustees then brought suit,

_____

[3] 1974 Pension Plan, p. 22, Art. VIII, § B.(16); 1974 Pension Trust, p. 9,
Art. X (reproduced as Exhibits A & B to the Declaration of Dale Stover,
respectively).

> contending that the evergreen clause obligates the Coal
> Companies to continue contributing to the trusts at the
> levels established in successor NBCWAs.

984 F.2d at 472 (footnotes omitted).

2. In his decision, Judge Hogan concluded *as a matter of law* that: (i) the evergreen clause properly was interpreted "to create a continuing obligation to contribute for those employers who elect to participate [in the UMWA Trusts]," 782 F. Supp. at 675; *see also id.* at 667; and (ii) nothing in "federal labor policy" precluded the enforcement of the employers' continuing contribution obligation under the evergreen clause, *id.* at 674; *see also id.* at 668-70. "[H]a[ving] reached these legal conclusions," Judge Hogan granted summary judgment in favor of the 1974 Pension Trust and the other UMWA Trusts that were parties to the *Pittston* case. *See id.* at 675.

In granting summary judgment in favor of the UMWA Trusts, Judge Hogan squarely rejected the defendant Coal Companies' argument "that their 1988 and 1990 individual collective bargaining agreements with the UMWA [purporting to modify the Companies' contribution obligations to the Trusts] are 'successor agreements' within the meaning of the evergreen clause":

> The evergreen clause provides that employers who choose
> to participate in the Trusts become obligated to comply
> with the terms and conditions of the Trusts, "including,
> but not limited to, making the contributions required
> under the [NBCWA] of 1978, as amended from time to
> time, and any successor agreements *thereto*, including,
> but not limited to, the [NBCWA] of 1984." (Emphasis
> added.) Notwithstanding defendants' arguments to the

> contrary, it is clear to the Court from the language of the
> evergreen clause that the word "thereto" specifically refers
> to the [NBCWA] of 1978.  *The only successor agreements
> to that agreement are the [NBCWAs] of 1984, 1988, and
> subsequent years.*
>
> [In this regard,] the Court finds no ambiguity in the
> meaning of "successor agreements thereto," . . . .

*Id.* at 663-64 (emphasis added).

On appeal, the defendant Coal Companies argued "that the District

Court [had] erred as a matter of law in construing the evergreen clause."

984 F.2d at 473.  The Court of Appeals flatly rejected that argument.

The Court of Appeals began by describing the summary judgment

ruling below and its basis in the summary judgment record:

> The District Court, relying on the words of the agreements
> and the extrinsic evidence properly before it, concluded
> that the only reasonable interpretation of the evergreen
> clause is one premised on a principle of "perpetual
> obligation."  Accordingly, the District Court granted
> summary judgment for the Trustees.

*Id.* The Court of Appeals then went on to state its reasons for

"agree[ing] with the conclusion reached by the District Court":

> In cases requiring the court to construe the
> meaning of a contract, the dispute may be resolved *as a
> matter of law* if the contested agreement admits of only
> one reasonable interpretation. . . .
>
> Applying this analytical framework to the contract
> provisions at hand, we conclude that the District Court
> was fully justified in granting summary judgment in favor
> of the Trustees.  The language of the relevant provisions
> in the applicable trust and collective bargaining
> agreements unambiguously obliges signatory employers
> to contribute to the trusts at the rates specified in the
> current NBCWA, irrespective of the employer's failure to
> sign that NBCWA.  The evergreen clause in the trust
> documents clearly does not include a durational

limitation to the employer's duty to contribute to the trusts. . . .

This plain construction of the evergreen clause is corroborated by voluminous extrinsic evidence submitted by the Trustees.[4] . . . Thus, not only is the language of the evergreen clause clear in its effect of permanently binding signatory employers to the contribution rates established in current NBCWAs, but it appears that negotiators on *both* sides of the bargaining table at the 1978 negotiations understood the import of that language.

*Id.* at 473-74 (first emphasis added; second emphasis in original).

And, like the District Court, the Court of Appeals found wholly "unconvincing" the defendant Coal Companies' argument that "*non-NBCWA* labor agreements" between the UMWA and *non-BCOA* employers can qualify as "successor" agreements within the meaning of the evergreen clause, thereby "allow[ing] for the modification of contribution requirements [to the Trusts] in [such] *non-NBCWA* labor agreements." *Id.* at 475 (emphasis added).  In this regard, the Court of Appeals explained, "the phrase [in the evergreen clause] allowing for modifications in successor agreements clearly refers to the prior NBCWA, leading us to the natural inference that the only 'successor' agreement to an NBCWA *is another NBCWA*." *Id.* (emphasis added).

"In sum," said the Court of Appeals,

the Trustees provided the District Court with a compelling argument and specific evidence indicating that theirs was *the only reasonable interpretation of the evergreen clause*

---

[4] So that the summary judgment record in the instant case is complete, each item of extrinsic evidence relied on by the Court of Appeals is attached as an Exhibit to the accompanying Declaration of Julia Penny Clark.

9

and that no material factual dispute remained for trial.
The Coal Companies responded with *an untenable reading
of the contractual language* and general evidence that the
Trustees' interpretation of the evergreen clause is of
recent origins.  This evidence falls far short of what is
necessary to undermine or contradict the Trustees'
evidence. . . .  Thus, we affirm the District Court's award
of summary judgment to the Trustees.

*Id.* at 475-76 (emphasis added) (citation omitted).

> B.    The *Pittston* Decision's Binding And Conclusive Effect

As set out in detail above, in its *Pittston* decision, the Court of
Appeals for this Circuit definitively determined the meaning and
enforceability of the evergreen clause "as a matter of law."  The *Pittston*
decision thus states the law of this Circuit with regard to the meaning
and enforceability of the evergreen clause.  And, under the familiar
principle of *stare decisis*, that Circuit law is binding and conclusive in
this subsequent action involving the evergreen clause.

Two decisions by the United States Court of Appeals for the Fifth
Circuit succinctly state this *stare decisis* principle as it applies in the
specific context presented here—*viz.*, in the specific context of a prior
appellate decision interpreting a contract provision as a matter of law.  In
*REO Industries, Inc. v. Natural Gas Pipeline Co.*, 932 F.2d 447 (5th Cir.
1991), the Fifth Circuit explained that where it has in a prior decision
interpreted a contract provision as a matter of law, "[w]e are, of course,
bound by *stare decisis* to our . . . [prior] contract interpretation.  Thus,
we must interpret the same contract in the same manner."  *Id.* at 454.

And, in *Robbins v. Amoco Production Co.*, 952 F.2d 901 (5th Cir. 1992),

the Fifth Circuit elaborated on this principle as follows:

> Because the interpretation of the unambiguous terms of a
> contract is purely a question of law, . . ., *stare decisis*
> dictates that [our prior] decision . . . [rendering such an
> interpretation of the contract at issue] must govern this
> case.  As one court observed, [When a court of last resort]
> has once given a definitive effect to a specific writing or a
> particular fact situation–as when it determines the true
> construction of a will or the validity of a deed– . . . such
> determination is binding and conclusive in all subsequent
> suits involving the same subject matter, whether the
> parties and the property are the same or not.  This result
> is reached by virtue of *stare decisis*.

*Id.* at 904 (citations omitted).

For present purposes, the upshot of the foregoing is this:  The

*Pittston* decision conclusively establishes *as a matter of law*—and it is not

open to Freeman and Monterey in this proceeding to deny—that when

Freeman and Monterey signed on to prior NBCWAs containing the

evergreen clause, they assumed a "fully enforceable," 984 F.2d at 479,

obligation

> to make continuing contributions to the [1974 Pension]
> [T]rust[ ]; and this obligation include[s] an agreement to
> make contributions at [the] rates specified in subsequent
> NBCWAs, without regard to whether [Freeman and
> Monterey] still a[re] party to the subsequent agreements.

*Id.* at 474.

Indeed, after the Court of Appeals' 1993 decision in *Pittston*

definitively construing the evergreen clause, both Freeman and Monterey

entered into new collective bargaining agreements with the UMWA that—

11

like the prior NBCWAs signed by Freeman and Monterey—incorporated the evergreen clause by reference. *See* Roberts Declaration ¶¶ 29, 30.

> ### C.    Freeman's and Monterey's Attempted Houdini Act

In Houdini-like fashion, Freeman and Monterey seek to unshackle themselves from the *Pittston* decision's binding pronouncements, and escape their obligation under the evergreen clause "to make continuing contributions to" the 1974 Pension Trust.

It is not altogether clear from their respective pleadings in these cases what avenue or avenues of escape Freeman and Monterey believe are open to them. But as we now show, no avenue of escape exists.

1.    In its Complaint in the case transferred to this Court, Freeman avers that it "withdrew from BCOA in 1997"; that it "subsequently negotiated separate collective bargaining agreements with the UMWA in 1998 and 2003"; and that the latter agreement (*i.e.*, "[t]he 2003 Freeman Agreement") currently is in effect and does not expire until 2008. *See* Freeman Cplt. ¶ 21. Freeman goes on to argue in its Complaint that it "is not required to make the contributions demanded by" the 1974 Pension Trust pursuant to the evergreen clause because, *inter alia,* "[t]he 2003 Freeman Agreement" does not itself require such contributions. *Id.* ¶ 45(a)-(c); *accord* Freeman Answer ¶ 25(a)-(c).

Freeman's argument is inconsistent with the Court of Appeals' decision in *Pittston*, and thus must be rejected by this Court. The very

question presented in *Pittston* was whether "the evergreen clause obligate[d] the [defendant] Coal Companies to continue contributing to the trusts at the levels established in successor NBCWAs" notwithstanding the fact that the Coal Companies—rather than sign on to the successor NBCWAs—"withdrew from the BCOA and negotiated individual labor agreements with the UMWA" that did not themselves require such contributions. *Supra* pp. 6-7. The Court of Appeals' answer to that question—as a matter of law—was "yes." *Supra* pp. 8-10. Thus, under the Court of Appeals' decision in *Pittston*, Freeman's evergreen clause obligation "to make continuing contributions to the [1974 Pension] [T]rust" *stands entirely unaffected by* Freeman's withdrawal from the BCOA in 1997 and subsequent negotiation of a separate 2003-2008 collective bargaining agreement with the UMWA that does not itself require such contributions.

The Court of Appeals' decision in *Pittston* also speaks directly to the obligation of evergreen clause signatory employers in a situation parallel to that of Monterey. Monterey denies in its Answer to the 1974 Pension Trust's Complaint "that it is currently signatory to a collective bargaining agreement [with the UMWA]." *See* Monterey Answer ¶ 72. As the Court of Appeals concluded, "[t]he language of the [evergreen clause] unambiguously obliges signatory employers to contribute to the trusts at the rates specified in the current NBCWA, *irrespective of the employer's failure to sign that NBCWA*." 984 F.2d at 473 (emphasis added). Thus,

13

just as Freeman's evergreen clause obligation "to make continuing contributions to the [1974 Pension] [T]rust" stands entirely unaffected by Freeman's subsequent negotiation of a collective bargaining agreement with the UMWA that does not itself require such contributions, Monterey's evergreen clause obligation "to make continuing contributions to the [1974 Pension] [T]rust" stands entirely unaffected by the fact that Monterey is not party to a current collective bargaining agreement with the UMWA requiring such contributions.

       2.    Freeman also avers in its Complaint in the transferred case that by reason of further employer withdrawals, the BCOA "is now dominated solely by Consolidation Coal Company and its affiliates ('Consol')." *See* Freeman Cplt. ¶¶ 1, 29. That being so, Freeman argues, it "is not required to make the contributions demanded by" the 1974 Pension Trust, because "[t]he 2007 NBCWA [between the UMWA and the BCOA] is not a successor agreement to the 2002 NBCWA, the prior national agreement," *id.* ¶ 45(e); rather, "[w]hile this agreement remains denominated as a 'national' agreement, it amounts to nothing more than an agreement between UMWA and Consol covering Consol's mining operations," *id.* ¶ 30. *See also* Freeman Answer ¶ 25(f). Monterey joins in this argument, as shown by the following statement in its Answer to the 1974 Pension Trust's Complaint: "Defendant Monterey admits that an agreement which purports to be a 2007 national agreement took effect on January 1, 2007. The allegation in the second sentence of paragraph

14

22 that this agreement is a successor agreement to the 1978 NBCWA is denied." *See* Monterey Answer ¶ 22.

Freeman and Monterey's argument along these lines fails for two independent reasons, which we set out separately in subparts a. and b. below.

a.    To begin with, Freeman's and Monterey's argument rests on the unstated premise that the obligation of evergreen clause signatory employers is limited to the obligation to make the contributions required by "successor agreements" to the 1978 NBCWA. But that assumption is belied by the plain language of the evergreen clause itself.

Under the plain language of the evergreen clause, the obligation of signatory employers is defined in broad and sweeping terms as the obligation "to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time." *Supra* p. 6. To be sure, the evergreen clause expressly states that this obligation "*include*[*s*]" the obligation to make the contributions required by the 1978 NBCWA "and any successor agreements thereto." *Id.* (emphasis added). At the same time, however, the evergreen clause expressly states that this obligation is "*not limited to*" the obligation to make the contributions required by "successor agreements." *Id.* (emphasis added).

Given this plain language, it follows that if making the contributions required by the 2007 NBCWA is a "term[ ] and condition[ ]

15

of" the 1974 Pension Trust, Freeman and Monterey are obligated by the

evergreen clause to make those contributions—wholly without regard to

whether the 2007 NBCWA is a "successor agreement." This point

standing alone is fatal to Freeman's and Monterey's argument based on

the asserted non-successor-agreement status of the 2007 NBCWA,

inasmuch as making the contributions required by the 2007 NBCWA

most assuredly is a "term[ ] and condition[ ] of" the 1974 Pension Trust.

The "terms and conditions of" the 1974 Pension Trust are

established by, and set out in detail in, the plan and trust documents "as

amended from time to time." And, from the moment of the 1974 Pension

Trust's creation until today, the authority to amend the plan and trust

documents has resided in the UMWA and the BCOA as the so-called

"settlors" of the Trust. Roberts Decl. ¶ 8.[5]

Since 1978, when the evergreen clause was first adopted and

included in the plan and trust documents governing the 1974 Pension

Trust, *see supra* p. 5, the UMWA and the BCOA have followed the

practice of amending the plan and trust documents shortly after

---

[5] The 2002 plan and trust documents were in effect when the UMWA and
BCOA adopted the recent amendments thereto discussed in text. Those
documents clearly and unambiguously vested the amendment authority
in the UMWA and the BCOA. Both the plan document and the trust
document state, in pertinent part and in identical language, that: (i)
"The Employers and the Union, by joint action, reserve the right at any
time and from time to time to modify or amend in whole or part any or all
of the provisions of this instrument"; and (ii) "Any action of the
Employers which may, or must be taken hereunder may be taken by
BCOA." 1974 Pension Plan, pp. 29-31, Art. VIII, §§ B.(3) & (15); 1974
Pension Trust, p.9, Art. X & XI (reproduced as Exhibits C & D to the
Declaration of Dale Stover, respectively).

reaching agreement on a new NBCWA, in order to ensure that the plan and trust documents reflect all relevant, collectively-bargained modifications in "the terms and conditions of" the Trust, *see* Roberts Declaration ¶ 9.  Thus, the UMWA and the BCOA amended the plan and trust documents shortly after reaching agreement on the 1978, 1981, 1984, 1988, 1993, 1998 and 2002 NBCWAs.  *Id.*  The UMWA and the BCOA followed the same practice shortly after reaching agreement on the 2007 NBCWA.  Specifically in this regard, the UMWA and the BCOA adopted various amendments to the plan and trust documents governing the 1974 Pension Trust on February 7, 2007—making those amendments effective as of January 1, 2007 so as to coincide with the January 1, 2007 effective date of the 2007 NBCWA.  *Id.*

The 2007 plan and trust documents, as amended effective January 1, 2007, are reproduced in full as Exhibits E and F to the accompanying Declaration of Dale Stover.  As set out below, these 2007 plan and trust documents expressly provide that making the contributions required *by the 2007 NBCWA* is a "term[ ] and condition[ ] of" the 1974 Pension Trust.  Indeed, the plan and trust documents do so in classic belt-and-suspenders fashion.

The 2007 plan document—which delineates the "terms and conditions of" the 1974 Pension Trust in substantially greater detail than its companion 2007 trust document—begins by defining the word "Employer" to include any employer that was signatory to an NBCWA

17

between 1974 and 2007.  *See* Stover Decl., Exh. E (1974 Pension Plan), pp.1-2, Art. I, § A.(1)-(2).[6]  As we have shown, it is undisputed that both Freeman and Monterey meet this plan document definition of "Employer."  *Supra* pp. 2-3.

After defining the word Employer, the 2007 plan document goes on to address—in three separate provisions—the issue of Employer contributions to the 1974 Pension Trust.  The first of these three provisions states, in full:

> Contributions to the 1974 Pension Trust to fund the benefits under this Plan *shall be paid solely by the Employers in accordance with Article XX of the National Bituminous Coal Wage Agreement of 2007,* as amended from time to time, and any successor agreements to that specific Agreement.

*Id.* (1974 Pension Plan), p. 31, Art. VIII, § B.(8) (emphasis added).

The second provision—which follows almost immediately—drives home the point that Employers are obligated by the terms of the Pension Plan and Trust to make contributions to the Trust in accordance with the 2007 NBCWA, by specifying the penalties that attach in the event of Employer non-compliance with that specific contribution obligation:

> In the event that an Employer fails to make contributions to the Plan *required by Article XX of the National Bituminous Coal Wage Agreement of 2007*, interest (calculated at a rate established by the Trustees at the beginning of each calendar year) shall accrue from the date due until the date on which payment is made. . . .

*Id.* (1974 Pension Plan), p. 32, Art. VIII, § B.(10) (emphasis added).

---

[6] The companion 2007 trust document provides the same definition of the word "Employer."  *See* Stover Decl., Exh. F (1974 Pension Trust), pp.1-2, Art. I, (1)-(2).

Last, but certainly not least, the 2007 plan document contains an updated version of the evergreen clause, which reiterates the obligation of evergreen clause signatory employers "to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time," and which specifies that that obligation includes the obligation to make the contributions required by "*the National Bituminous Coal Wage Agreement of 2007.*" *Id.* (1974 Pension Plan), p. 33, Art. VIII, § B.(16) (emphasis added).[7]

Taken individually and collectively, these 2007 plan and trust document provisions indisputably render the making of the contributions required by the 2007 NBCWA a "term[ ] and condition[ ] of" the 1974 Pension Trust.  Freeman and Monterey thus are obligated by the evergreen clause to make those contributions—wholly without regard to the question whether the 2007 NBCWA is a "successor agreement" to the prior NBCWAs.

This evergreen clause obligation to make the contributions required by the 2007 NBCWA, we hasten to add, is *separate from* and *in addition to* any obligation that Freeman might have under the "guarantee clause" in the 2003 Freeman Agreement, *see* Freeman Cplt. ¶ 22, to make those contributions.  Thus, Freeman's averment that it is not obligated by its guarantee clause to make the contributions required by

---

[7] This updated version of the evergreen clause appears *in haec verba* in the 2007 trust document as well.  *See* Stover Decl., Exh. F (1974 Pension Trust), p. 10, Art. X.

the 2007 NBCWA—because the guarantee clause obligates Freeman "to make contributions at rates set by BCOA only when additional contributions [are] necessary to fund guaranteed benefits during the term of the 2003 Agreement, and there is no such need," *see id.* ¶ 45(b)— is a *non sequitur* that avails Freeman nothing even if true.

        b.      The foregoing is, we submit, dispositive of Freeman's and Monterey's argument that it is not obligated by the evergreen clause to make contributions to the 1974 Pension Trust at the rates specified in the 2007 NBCWA because the 2007 NBCWA is not a "successor agreement" to prior NBCWAs. Nevertheless, we would be remiss if we failed to show that Freeman's and Monterey's argument is baseless taken on its own terms.

To reiterate, in its decision in the *Pittston* case, the Court of Appeals stated that "the [evergreen clause] phrase allowing for modifications in successor agreements clearly refers to the prior NBCWA, leading us to the natural inference that the only 'successor' agreement to an NBCWA *is another NBCWA*." 984 F.2d at 475 (emphasis added).

Against this background, Freeman's and Monterey's argument reduces to the proposition that while the "National Bituminous Coal Wage Agreement of 2007" was negotiated and entered into by the same parties—the UMWA and the BCOA—that negotiated and entered into all prior NBCWAs; and while the UMWA and the BCOA gave their agreement the title "National Bituminous Coal Wage Agreement of 2007"; the

"National Bituminous Coal Wage Agreement of 2007" between the UMWA and the BCOA is not *truly* "another NBCWA," 984 F.2d at 475—and thus not *truly* a "successor agreement[] . . . to the prior NBCWA [of 2002]," *id.*—by virtue of the fact that through a series of employer withdrawals from the BCOA, the BCOA "is now dominated solely by Consolidation Coal Company and its affiliates." Freeman Cplt. ¶ 1.

None of the NBCWAs has undertaken to define the characteristics that are necessary for an agreement to be considered an NBCWA. Thus, in assessing what characterizes a true NBCWA—as opposed to an NBCWA in name only—it is necessary to consider other factors external to the underlying NBCWA document itself. And, because this is an issue of contract interpretation, the factors to be considered in making this assessment are the understandings of, and the actions of, the relevant players in the organized sector of the bituminous coal mining industry—*i.e.*, the UMWA and the coal companies that employ UMWA-represented coal miners.

These factors are explored in depth in the accompanying Declaration of current UMWA President Cecil E. Roberts, who "ha[s] been actively involved in the negotiation of every NBCWA beginning in 1984." Roberts Decl. ¶ 6. From his Declaration, a clear picture emerges of an agreement that qualifies as a true "successor" NBCWA—*i.e.*, an agreement between the UMWA and the BCOA that is designed to establish, and does establish, the industry standard respecting the terms

and conditions of employment under which UMWA-represented coal miners across the country will work during the period covered by the agreement.  *See infra* pp. 22-25.

The UMWA and the BCOA have for decades negotiated NBCWAs at regular intervals of between 3-5 years—with the impending expiration of the then-current NBCWA and the onset of negotiations over a successor NBCWA marking, on each occasion, the beginning of a new collective bargaining cycle.  *See* Roberts Decl. ¶ 6.  Following this decades-old practice, the UMWA and the BCOA met in late 2006, to negotiate the terms of an NBCWA to replace the expiring 2002 NBCWA.  *See id.* ¶¶ 12, 20-22, 26.

As it had in every prior round of negotiations with the BCOA over a successor NBCWA, the UMWA went into the most recent round of negotiations seeking to obtain, for the benefit of its membership nationwide, terms or conditions of employment that would serve as the standard for the organized sector of the bituminous coal mining industry.  *See id.* ¶ 22.  And, upon concluding negotiations with the BCOA to its satisfaction in mid-December of 2006, the UMWA treated the resulting agreement with the BCOA—*i.e.*, the 2007 NBCWA—as a national, standard-setting agreement by submitting the 2007 NBCWA for ratification votes by UMWA members across the country whose collective bargaining agreements were similarly due for renegotiation—*including* employees of numerous coal companies that are *not* BCOA member

companies and thus are *not* direct parties to the 2007 NBCWA.  *See id.* ¶ 21.  The UMWA members who participated in that ratification vote constituted approximately 75% of the UMWA's active membership in the bituminous coal mining industry.  *Id.*  And, "[those] members collectively ratified the 2007 NBCWA by an overwhelming margin of votes."  *Id.*

The 2007 NBCWA directly covers only those BCOA member companies signatory thereto.  However, promptly after this nationwide ratification process, the UMWA began approaching non-BCOA companies that previously had agreed to be bound by the terms of the 2002 NBCWA in an effort to secure their agreement to the terms of the 2007 NBCWA.[8]  In this connection, the UMWA told the non-BCOA companies that if they signed an agreement committing themselves to the terms of the 2007 NBCWA, it would not be necessary for the UMWA to submit that agreement for a separate ratification vote by the company's employees, inasmuch as the terms of the 2007 NBCWA already had been approved in the nationwide ratification process.  *See id.* ¶ 23.

The employer community response to this UMWA solicitation was overwhelmingly positive, as described in the following passages from the Roberts Declaration:

> In relatively short order following the nationwide
> ratification vote, all of the major coal operators in our
> industry signed on to the relevant provisions of the 2007

---

[8] Monterey was one such non-BCOA company, but Freeman was not, since Freeman was at the time operating under an agreement with a later, January 2008 expiration date—*i.e.* the 2003 Freeman Agreement.  *See* Roberts Decl. ¶ 21; *supra* p. 12.

NBCWA.  For example, Jim Walter Resources signed a contract mirroring the National Agreement on January 17, 2007.  The miners covered by this agreement had participated in the ratification vote in December. Similarly, the mines operated by Peabody Energy, which produce a significant portion of the tonnage in the organized coal industry, signed agreements mirroring the National Agreement in February 2007.  Magnum Coal Company, the parent of Apogee Coal Co., also signed on in February.  PinnOak Resources and the Pittsburg & Midway Coal Mining Company signed similar agreements in March 2007.  Negotiations with Foundation Coal Holdings, Inc., the parent of Cumberland Coal Resources LP and Emerald Coal Resources LP came to the same result in April 2007.

Although several of the non-BCOA companies requested bargaining to address issues particular to their operations, all of those who had agreed to the terms of the 2002 NBCWA (with Monterey being the sole exception) ultimately executed the 2007 NBCWA; some with minor modifications in areas other than the 1974 Pension Plan.

*Id.* ¶¶ 23-24.[9]

The upshot of the foregoing is this:  With the sole exception of Monterey, every coal company that previously had agreed to the terms of the 2002 NBCWA has now agreed to the principal terms of the 2007 NBCWA—*including,* in particular, the terms of the 2007 NBCWA relating to the 1974 Pension Trust.  That being the case, the proposition advanced by Freeman and Monterey that the 2007 NBCWA is not a true "successor" to prior NBCWAs—but rather is "nothing more than an agreement between UMWA and Consol covering Consol's mining operations," Freeman Cplt. ¶ 30—borders on the frivolous.

_____

[9] The non-BCOA companies that executed the 2007 NBCWA, thirty-one in number, are identified in ¶ 24 of the Roberts Declaration.

c.    Freeman's and Monterey's argument based on the asserted non-successor-agreement status of the 2007 NBCWA is fatally flawed on other grounds as well:  It wholly ignores the established purpose of the evergreen clause, and would, if accepted, completely undermine that purpose to the point of imperiling the 1974 Pension Trust's very existence.

With regard to the purpose of the evergreen clause—as it bears directly on Freeman's and Monterey's attempt to escape their continuing contribution obligation under that clause—there is no need to tread any new ground.  In his decision granting summary judgment in favor of the UMWA Trusts in the *Pittston* case, Judge Hogan stated:

> Having reviewed the voluminous evidence of the negotiating history of the evergreen clause, the Court is convinced that the clause was intended to ensure that all participating employers would contribute equally to the Trusts *and would not be permitted to withdraw from participation and leave the burden for funding the pension and health benefits of retired miners to the remaining participating employers.*

782 F. Supp. at 667 (emphasis added).

Included in that voluminous negotiating history evidence was the Declaration of Roger M. Haynes, "who was the chairman of the BCOA subcommittee on benefits for the 1978 negotiations (as well as for the 1971, 1974, 1981, and 1984 negotiations)."  *See id.* at 665.  Judge Hogan quoted from the Haynes Declaration at length in his opinion, *id.* at 665-66, noting that "Mr. Haynes' statements [therein] are illustrative of the declarations of [several] other former BCOA negotiators," *id.* at

25

666.  Given the position taken by Freeman and Monterey in the instant case, Judge Hogan's lengthy quotation from the Haynes Declaration bears verbatim quotation here, with pertinent emphases added:

> The evergreen clause was not a "technical" provision to assist the Funds in collecting delinquent contributions, and was not discussed in those terms.  It was an important provision negotiated to make sure that *any* coal operator that voluntarily agreed to participate in the Funds in 1978 *could not simply walk away from the Funds and leave its retirees behind*, or negotiate cut-rate contributions with the UMWA, *at the expense of the remaining employers*. . . .
>
> .    .    .    .    .
>
> These provisions were placed in the trust documents so that we could be sure that the trust documents would apply to any non-BCOA employer that wanted to participate in the Funds, even if that employer was not signatory to the NBCWA.  In other words, an employer did not have to be a BCOA member or even signatory to a wrap-around contract to participate in the Funds.[10] Non-BCOA employers were free to negotiate with the UMWA any terms and conditions of employment that they could negotiate.  *But once an employer agreed with the UMWA to participate in the Funds by using the Funds to provide benefits to its employees and retirees, that employer had to participate on the same terms as all other participating employers.*  Each employer had to contribute to the Funds at the same rate, and each would receive the same level of benefits for its employees and retirees.  *By insisting on these contractual preconditions for participation in the Funds in 1978 and thereafter, the Funds' settlors, BCOA and the UMWA, agreed that the Funds should not become a "last man's club" where certain employers could pull out entirely*, or contribute at reduced rates, *at the expense of the remaining employers.*

---

[10] As Judge Hogan explained elsewhere in his opinion, a "wrap around" or "me-too" contract is a contract between the UMWA and an industry employer that is "patterned after the NBCWA and also incorporat[es] the Trusts by reference."  782 F. Supp. at 661; *see also* Roberts Decl. ¶ 6.

*Id.* at 665-66.

Another declaration relied on by Judge Hogan that is of particular significance in the present context is the Declaration of Donald Pierce, who "participated in the 1978 negotiations on behalf of the UMWA." *See id.* at 666. In that Declaration, Pierce explains the belt-and-suspenders approach followed by the bargaining parties in the plan and trust documents, *see supra* pp. 17-19, as an effort to back up the UMWA's oral assurances at the bargaining table with iron-clad contract language "bind[ing] all employers who agreed to participate in the Trusts" to "pay the same levels of contributions that were required of BCOA members under the NBCWA," and precluding such employers from "withdraw[ing] from the Funds and leav[ing] liabilities as the responsibility of the remaining employers," *see* Pierce Decl. ¶¶ 7-11 (reproduced as Exhibit A to the Clark Declaration).

As we have shown, BCOA and non-BCOA companies alike—comprising a substantial majority of the employers in the organized sector of the bituminous coal mining industry—have agreed to make and are making contributions to the 1974 Pension Trust pursuant to the 2007 NBCWA. Thus, if Freeman and Monterey were allowed by this Court to "walk away from the [Trust] and leave [their] retirees behind," Freeman and Monterey would be taking that step "at the expense of the remaining [contributing] employers"—a result squarely at odds with the

27

purpose of the evergreen clause.  *See* 782 F. Supp. at 665-66 (quoting the Haynes Declaration).

Indeed, if Freeman and Monterey were allowed by this Court to "walk away from the [1974 Pension Trust] and leave [their] retirees behind," there could well be a rush to the exits on the part of the remaining contributing employers upon the expiration of the 2007 NBCWA, as they stumble over one another to avoid being the sole member of a "last man's club."  *See id.*  Such a rush to the exits would completely undermine the purpose of the evergreen clause, and imperil the 1974 Pension Trust's very existence.

3.    Finally, we feel compelled to address, albeit briefly, the allegation in Freeman's Complaint that the contributions required by the 2007 NBCWA to the 1974 Pension Trust are "unfair and unreasonable." *See* Freeman Cplt. ¶ 1.  We feel this compulsion *not* because that allegation is relevant in any way to the Trust's action to enforce Freeman's obligation under the evergreen clause to make the contributions required by the 2007 NBCWA:  Under hornbook contract law principles, a contractual obligation freely undertaken by a competent party is to be enforced by a court in accordance with its terms, without the court stopping to consider the fairness or reasonableness of the contracting parties' bargain.  *See Exxon Mobil Corp. v. Federal Energy Regulatory Comm.*, 430 F.3d 1166, 1177 n.7 (D.C. Cir. 2005) ("[T]he general rule of freedom of contract includes the freedom to make a bad

28

bargain.") (internal quotation marks omitted). Rather, we feel this compulsion because Freeman's allegation of "unfair[ness] and unreasonable[ness]" is itself so "unfair and unreasonable" as to cry out for setting the record straight.

The accompanying Declaration of UMWA President Cecil E. Roberts includes a table showing the contribution rates to both the 1950 and 1974 Pension Plans under prior NBCWAs—adjusted to convert any tonnage rate into its hourly equivalent, and also adjusted for inflation. *See* Roberts Decl. ¶ 18.[11] This table—together with Roberts' discussion of certain facts not reflected on the table itself—make two irrefutable points that belie Freeman's allegation of "unfair[ness] and unreasonable[ness]" vis-à-vis the pension plan contributions required by the 2007 NBCWA.

First, participating employers in the 1950 and 1974 Pension Plans—including Freeman—were not required to make and did not make *any* contributions to *either* Pension Plan from mid-1998 through the expiration of the 2002 NBCWA on December 31, 2006. *See id.* ¶¶ 18-19. Thus, going into the 2007 NBCWA, participating employers—including Freeman—had just enjoyed an *eight-and-one-half year hiatus* from making pension plan contributions of any kind. During this lengthy

---

[11] As Roberts points out, the 1950 Pension Plan merged into the 1974 Pension Plan effective June 30, 2007. "Consequently, the rate payable to the 1974 Pension Plan today can only fairly be compared to the total pension contribution rates owed to the 1950 and 1974 Pension Plans under earlier agreements." Roberts Decl. ¶ 18.

hiatus, moreover, the participating employers' active employees—including Freeman's active employees—continued to accrue credit towards the pensions that the 1974 Pension Trust will be obligated to pay them when they retire.  *See id* ¶ 19.

Second, the pension plan contributions required under the 2007 NBCWA are relatively low by historical standards.  As the table in the Roberts Declaration shows, even before adjusting for inflation, the combined pension plan contribution rate to the 1950 and 1974 Pension Plans was higher in each of the ten years covered by the 1978, 1981 and 1984 NBCWAs than the current $2.00 contribution rate to the 1974 Pension Plan under the 2007 NBCWA.  And, adjusting for inflation, the contribution rates payable over the ten-year period covered by the 1978, 1981 and 1984 NBCWAs fell within a range ($5.82 - $7.29) that is uniformly higher than the contribution rate range ($2.00 - $5.50) under the five-year term of the 2007 NBCWA.  *See id.* ¶ 18.

We would also note that Freeman's allegation of "unfair[ness] and unreasonable[ness]" rings especially hollow in view of:  (i) Congress' enactment in August 2006 of the Pension Protection Act of 2006, P.L. 109-280, which substantially increased the funding requirements for defined-benefit pension plans such as the 1974 Pension Plan, *see* Roberts Decl. ¶ 14; and (ii) the fact that every other evergreen clause signatory employer—save Freeman and Monterey—has shown a

30

willingness to make the contributions required by the 2007 NBCWA, *see supra* p. 4 n.2 & pp. 23-24.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment on the Issue of Liability by the 1974 Pension Trust and its Trustees should be granted.

Respectfully submitted,

|  |  |
|---|---|
|  | ___/s/_____ |
| DAVID W. ALLEN | JULIA PENNY CLARK |
| General Counsel | D.C. Bar No. 269609 |
| D.C. Bar No. 81638 | ANDREW D. ROTH |
| LARRY D. NEWSOME | D.C. Bar No. 414038 |
| Associate General Counsel | CHARLOTTE GARDEN |
| D.C. Bar No. 254763 | D.C. Bar No. 489040 |
| CHRISTOPHER F. CLARKE | Bredhoff & Kaiser P.L.L.C. |
| Senior Assistant General | 805 Fifteenth Street N.W. |
| Counsel | Suite 1000 |
| D.C. Bar No. 441708 | Washington, DC 20005 |
| UMWA HEALTH & | Telephone:  202-842-2600 |
| RETIREMENT FUNDS | |
| Office of the General Counsel | *Counsel for Michael H. Holland,* |
| 2121 K Street, N.W. | *Micheal W. Buckner, B.V. Hyler* |
| Washington, D.C.  20037 | *and Steven F. Schaab and the* |
| Telephone:  202-521-2238 | *United Mine Workers of America* |
| | *1974 Pension Trust* |

Dated: September 7, 2007

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Michael H. Holland, *et al.*          ) | |
|                              ) | |
|              Plaintiffs,        ) | |
|                              ) | |
|            v.              ) | |
|                              ) | Case No. 07-cv-490 (PLF) |
| Freeman United Coal Mining Company,   ) | |
| *et al.*,                             ) | |
|                              ) | |
|              Defendants.     ) | |
| Freeman United Coal Mining       ) | |
| Company,                           ) | |
|                              ) | |
|            Plaintiff,         ) | Case No. 07-cv-1050 (PLF) |
|                              ) | |
|            v.              ) | |
|                              ) | |
| United Mine Workers of            ) | |
| America, *et al.*,                  ) | |
|                              ) | |
|            Defendants.     ) | |

## STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE BY THE UNITED MINE WORKERS OF AMERICA 1974 PENSION TRUST AND ITS TRUSTEES

Pursuant to Local Rule 56.1, and in support of their Motion for Summary Judgment on the Issue of Liability, the United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") and its Trustees hereby set forth the following material facts as to which there is no genuine issue:

1.    Freeman United Coal Mining Company ("Freeman") and Monterey Coal Company ("Monterey") have signed multiple National

Bituminous Coal Wage Agreements ("NBCWA") containing—by incorporation of the 1974 Pension Trust plan and trust documents—a contractual provision known as the "evergreen clause."  One of those NBCWAs signed by both Freeman and Monterey was the 1984 NBCWA, which incorporated by reference the evergreen clause as follows:

> Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Wage Agreement of 1978 as amended from time to time, and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 1984.

Declaration of Cecil E. Roberts ("Roberts Decl.") ¶¶ 11, 28-30; Declaration of Dale Stover ("Stover Decl.") ¶ 3, Exh. A (1974 Pension Plan) at Art. VIII § B(16) & Exh. B (1974 Pension Trust) at Art. X.

  2.  The most recent UMWA collective bargaining agreements to which Freeman and Monterey are parties also incorporate the 1974 Pension Trust plan and trust documents by reference, and thus include the evergreen clause.  The version of the evergreen clause in those agreements is identical to the one quoted in paragraph 1 above, except that the final clause reads "including, but not limited to, the National Bituminous Coal Wage Agreement of 2002."  Roberts Decl. ¶¶ 29-30; Stover Decl. ¶ 3, Exh. C (1974 Pension Plan) at Art. VIII, § B (16) & Exh. F (1974 Pension Trust) at Art. X.

3.      Exhibits E and F to the Stover Declaration, respectively, are copies of the plan and trust documents as the UMWA and the BCOA amended them effective January 1, 2007.

4.      Exhibits C and D to the Stover Declaration, respectively, are copies of the plan and trust documents as they were in effect immediately before the UMWA and the BCOA amended them effective January 1, 2007.

5.      In mid-December 2006, the UMWA and the BCOA reached a tentative agreement on the terms of a new national agreement—titled the National Bituminous Coal Wage Agreement of 2007 ("2007 NBCWA"). Roberts Decl., ¶¶ 6, 20-21.  The UMWA thereupon made arrangements for national ratification of the 2007 NBCWA.  *Id.* ¶ 21.  Specifically, the UMWA scheduled ratification votes by each Local Union whose members had been employed under the 2002 NBCWA—whether for companies that had been members of the BCOA in 2002 or companies (like Monterey) that had signed "me too" agreements—in which each of the Local Unions voted on whether to accept the terms of the 2007 NBCWA.  *Id.*  The only exception concerned several smaller coal companies (like Freeman) that were signatory to "me too" agreements that were scheduled to expire a year or more after the December 31, 2006 expiration date of the 2002 NBCWA.  *Id.*

6.     These UMWA members, representing approximately 75% of UMWA's active membership in the coal mining industry, ratified the 2007 NBCWA.  *Id.*

7.     After this nationwide ratification process, the UMWA approached non-BCOA companies that previously had agreed to be bound by the terms of the 2002 NBCWA in an effort to secure their agreement to the terms of the 2007 NBCWA.  (Monterey was one such non-BCOA company, but Freeman was not, since at that time Freeman was operating under an agreement with a later, January 2008 expiration date.)  In this connection, the UMWA told the non-BCOA companies that if they signed an agreement committing themselves to the terms of the 2007 NBCWA, it would not be necessary for the UMWA to submit that agreement for a separate ratification vote by the company's employees, inasmuch as the terms of the 2007 NBCWA already had been approved in the nationwide ratification process.  Roberts Decl. ¶¶ 21-23, 29.

8.     Although several of the non-BCOA companies requested bargaining to address issues particular to their operations, all of those who had agreed to the terms of the 2002 NBCWA (with Monterey being the sole exception) ultimately agreed to the terms of the 2007 NBCWA; some with minor modifications in areas other than the 1974 Pension Plan.  *Id.* ¶ 24.

9.     The 2007 NBCWA set a contribution rate of $2.00 per man-hour worked to the 1974 Pension Trust beginning January 1, 2007, and

increasing over the 5-year term of the contract to $5.50 per hour.  Id. ¶ 18.

    10.    Freeman has not contributed to the 1974 Pension Trust since the new rate became effective on January 1, 2007.  1974 Pension Trust Complaint ("Complaint") ¶ 1; Answer of Defendant Freeman United Coal Mining Company ¶ 1.

    11.    Monterey has not contributed to the 1974 Pension Trust since the new rate became effective on January 1, 2007.  Complaint ¶ 1; Answer of Defendant Monterey Coal Company ¶ 1.


DAVID W. ALLEN
General Counsel
D.C. Bar No. 81638
LARRY D. NEWSOME
Associate General Counsel
D.C. Bar No. 254763
CHRISTOPHER F. CLARKE
Senior Assistant General
Counsel
D.C. Bar No. 441708
UMWA HEALTH &
RETIREMENT FUNDS
Office of the General Counsel
2121 K Street, N.W.
Washington, D.C.  20037
Telephone:  202-521-2238

_____/s/_____
JULIA PENNY CLARK
D.C. Bar No. 269609
ANDREW D. ROTH
D.C. Bar No. 414038
CHARLOTTE GARDEN
D.C. Bar No. 489040
Bredhoff & Kaiser P.L.L.C.
805 Fifteenth Street N.W.
Suite 1000
Washington, DC 20005
Telephone:  202-842-2600

*Counsel for Michael H. Holland, Micheal W. Buckner, B.V. Hyler and Steven F. Schaab and the United Mine Workers of America 1974 Pension Trust*


Dated: September 7, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Michael H. Holland, *et al*. | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 07-cv-490 (PLF) |
| Freeman United Coal Mining Company, *et al.*, | ) |
| Defendants. | ) |
| Freeman United Coal Mining Company, | ) |
| Plaintiff, | ) Case No. 07-cv-1050 (PLF) |
| v. | ) |
| United Mine Workers of America, *et al.*, | ) |
| Defendants. | ) |

## DECLARATION OF DALE STOVER

I, Dale Stover, declare as follows:

1.      I am an adult resident of the State of West Virginia. I make this declaration based on my personal knowledge of the facts set forth herein.

2.      I have been employed since January 2, 1980 by the United Mine Workers of America Health & Retirement Funds ("UMWA Funds"). Since November 3, 2003, I have held the position of Director of Finance and General Services (previously Comptroller). As Director of Finance and General Services (as well as Comptroller), my responsibilities include monitoring

United Mine Workers of America 1974 Pension Trust (the "1974 Pension Trust")—and taking steps to ensure employer compliance with their contractual contribution obligations.

3. Historically, employer contribution requirements have been set forth in National Bituminous Coal Wage Agreements (NBCWA) between the United Mine Workers of America ("UMWA") and the Bituminous Coal Operators Association ("BCOA"), as well as by Pension Plan and Pension Trust documents incorporated by reference into the NBCWAs. The UMWA and the BCOA amend the Plan and Trust documents governing the 1974 Pension Trust periodically. The Plan and Trust documents as amended by the UMWA and BCOA, effective January 1, 1984, are attached hereto as Exhibits A and B, respectively. The Plan and Trust documents that were in effect immediately prior to the January 1, 2007 effective date of the current NBCWA—the NBCWA of 2007—are attached hereto as Exhibits C and D, respectively. The Plan and Trust documents as amended by the UMWA and BCOA, effective January 1, 2007, are attached hereto as Exhibits E and F, respectively.

5. Employer contribution requirements typically are expressed as a set dollar amount that employers must pay for each hour worked by an eligible employee. Between July 1998 and December 2006, the applicable NBCWAs and Plan and Trust documents set the rate of employers' contributions to the 1974 Pension Trust at $0 per hour. Thus, for 94 months, participating employers obtained pension credits on behalf of their employees at no cost.

6. During this time period, Freeman United Coal Mining Company ("Freeman") was actively engaged in the coal mining business, as shown by the fact that Freeman filed reports with the UMWA Funds indicating that its pension-eligible employees worked a total of

7,146,603 hours during this period. The 1974 Pension Trust has given those pension-eligible employees full credit based on these reported hours.

7.     During the same time period, Monterey Coal Company ("Monterey") was actively engaged in the coal mining business, as shown by the fact that Monterey filed reports with the UMWA Funds indicating that its pension-eligible employees worked a total of 4,388,012 hours during this period.  The 1974 Pension Trust has given those pension-eligible employees full credit based on these reported hours.

8.     My staff has examined the 1974 Pension Trust's records of pension benefits paid out to retirees whose last employer that was obligated to contribute to the 1974 Pension Trust was Freeman or Monterey ("Freeman retirees" and "Monterey retirees").  This examination reveals that, as of September 1, 2007, 1,291 Freeman and 410 Monterey retirees are drawing vested pension benefits from the 1974 Pension Trust.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Kearneysville, WV this 7th day of September, 2007.

_____
Dale Stover

# EXHIBIT A

# UNITED MINE WORKERS OF AMERICA

## 1974 PENSION PLAN

UMWA 1974 PENSION PLAN
TABLE OF CONTENTS
(Material in Parenthesis Does Not Appear as a Title in Document)

ARTICLE I - <u>INTRODUCTION</u>. . . . . . . . . . . . . . . . . . 1

   A. Definitions . . . . . . . . . . . . . . . . . . . . 1

       (1) "Wage Agreement". . . . . . . . . . . . . . 1
       (2) "Employer". . . . . . . . . . . . . . . . . 2
       (3) "Construction Employer" . . . . . . . . . . 2
       (4) "Bituminous Coal Segment" . . . . . . . . . 2
       (5) "Participant". . . . . . . . . . . . . . . 2
       (6) "Pensioner" . . . . . . . . . . . . . . . . 2
       (7) "1974 Pension Trust". . . . . . . . . . . . 2
       (8) "Trustees". . . . . . . . . . . . . . . . . 2
       (9) "Credited Service". . . . . . . . . . . . . 2
     (10) "Hours Worked". . . . . . . . . . . . . . . 3

   B. When Retirement Occurs. . . . . . . . . . . . . 3

   C. Attainment of Age . . . . . . . . . . . . . . . 4


ARTICLE II - <u>ELIGIBILITY</u>. . . . . . . . . . . . . . . . . 4

   A. Age 55 Retirement . . . . . . . . . . . . . . . 4

   B. Normal Retirement . . . . . . . . . . . . . . . 4

   C. Disability Retirement . . . . . . . . . . . . . 5

   D. Minimum Disability Retirement . . . . . . . . . 5

   E. Deferred Vested Retirement. . . . . . . . . . . 6

   F. Nonduplication. . . . . . . . . . . . . . . . . 6

       (1) (Entitlement) . . . . . . . . . . . . . . . 6
       (2) (Retirement before 12/31/75). . . . . . . . 6
       (3) (Reemployment). . . . . . . . . . . . . . . 7

   G. Employment for Vesting Purposes . . . . . . . . 7


ARTICLE III - <u>AMOUNT OF PENSION</u> . . . . . . . . . . . . . 8

   A. Retirement On or After June 7, 1981 . . . . . . 8

       (1) Age 55 Retirement Pension . . . . . . . . . 9
       (2) Normal Retirement Pension . . . . . . . . . 9
       (3) Disability Retirement Pension . . . . . . . 9
       (4) Minimum Disability Retirement Pension . . . 9
       (5) Deferred Vested Pension . . . . . . . . . . 9

i

UMWA 1974 PENSION PLAN
Table of Contents Continued
(Material in Parenthesis Does Not Appear as Title in Document)

ARTICLE III - AMOUNT OF PENSION (cont.) . . . . . . . . . . 10

  B. Increased Pension. . . . . . . . . . . . . . . . 10

  C. Application for Pension and Commencement,
     Suspension and Termination of Pensions . . . . . . 10

     (1) (First Payment). . . . . . . . . . . . . . . . 10
     (2) (Last Payment) . . . . . . . . . . . . . . . . 11
     (3) (Date Payable) . . . . . . . . . . . . . . . . 11
     (4) (Suspension) . . . . . . . . . . . . . . . . . 11
     (5) (Reemployment) . . . . . . . . . . . . . . . . 11

ARTICLE IV - CREDITED SERVICE. . . . . . . . . . . . . . . 11

  A. Nonsignatory Service . . . . . . . . . . . . . . . 11

     (1) (Service after 12/31/36) . . . . . . . . . . . 11
     (2) (Service before 1/1/37) . . . . . . . . . . . 12
     (3) (Credit for occupational injury/disease) . . . 12
     (4) (Military Service) . . . . . . . . . . . . . . 12

  B. Signatory Service. . . . . . . . . . . . . . . . . 13

     (1) (Definition) . . . . . . . . . . . . . . . . . 13
     (2) (Credit for occupational injury/disease) . . . 13
     (3) (Credit while receiving Sickness/Accident
        benefits) . . . . . . . . . . . . . . . . . 14
     (4) (Credit for employment by UMWA). . . . . . . . 14
     (5) (Military Service) . . . . . . . . . . . . . . 14
     (6) (Service for Employers who later became
        signatory). . . . . . . . . . . . . . . . . 15

  C. Additional Rules Concerning Credited Service . . . 15

     (1) (Employment after 4/1/71) . . . . . . . . . . 15
     (2) (Combination of rules) . . . . . . . . . . . . 15
     (3) (Maximum nonsignatory service allowed
        after 12/31/81) . . . . . . . . . . . . . . 15
     (4) (Ownership, operation, Management of mine) . . 15
     (5) (Maximum nonsignatory service credited). . . . 16
     (6) (Participants with less than 10 years
        signatory service). . . . . . . . . . . . . 16
     (7) (Service credit accruals). . . . . . . . . . . 16
     (8) (Last day of credited service) . . . . . . . . 16
     (9) (Temporary supervisory duties) . . . . . . . . 16

UMWA 1974 PENSION PLAN
Table of Contents Continued
(Material in Parenthesis Docs Not Appear as Title in Document)

ARTICLE V - <u>REEMPLOYMENT AFTER ATTAINMENT OF PENSION</u>
             <u>ELIGIBILITY</u>. . . . . . . . . . . . . . . . 17

    A. (General Rules). . . . . . . . . . . . . . . . 17

    B. (Reemployment before receiving deferred vested
       pension). . . . . . . . . . . . . . . . . . . 17

    C. (Reemployment after receiving deferred vested
       pension). . . . . . . . . . . . . . . . . . . 17


ARTICLE VI - <u>SURVIVING SPOUSE BENEFIT</u>. . . . . . . . . 17

    A. (1) (Eligibility). . . . . . . . . . . . . . . 17
       (2) (Amount) . . . . . . . . . . . . . . . . . 17
       (3) (Length of marriage) . . . . . . . . . . . 18
       (4) (Terms of payment) . . . . . . . . . . . . 18

    B. (1) (Noneligibility) . . . . . . . . . . . . . 18
       (2) (Reemployment) . . . . . . . . . . . . . . 18


ARTICLE VII - <u>JOINT AND SURVIVOR ANNUITIES</u> . . . . . . 18

    A. (Amount) . . . . . . . . . . . . . . . . . . . 18

    B. (Eligibility). . . . . . . . . . . . . . . . . 18

    C. (Election Period). . . . . . . . . . . . . . . 19

    D. (Spousal consent of waiver). . . . . . . . . . 19

    E. (Qualified Surviving Spouse) . . . . . . . . . 19

    F. (Payment). . . . . . . . . . . . . . . . . . . 19

ARTICLE VIII - <u>MISCELLANEOUS</u> . . . . . . . . . . . . . 19

    A. Determination of Eligibility . . . . . . . . . 19

    B. General. . . . . . . . . . . . . . . . . . . . 20

       (1) (Rules and Regulations). . . . . . . . . . 20
       (2) (Transfer of benefits) . . . . . . . . . . 20
       (3) (Amendment of plan). . . . . . . . . . . . 20
       (4) (Termination of plan). . . . . . . . . . . 20

UMWA 1974 PENSION PLAN
Table of Contents Continued
(Material in Parenthesis Does Not Appear as Title in Document)

ARTICLE VIII - <u>MISCELLANEOUS</u> (cont.) . . . . . . . . . . . 20

    B. General (cont.). . . . . . . . . . . . . . . . . . 20

        (5) (Forfeitures). . . . . . . . . . . . . . . . . 20
        (6) (Denial notification/review) . . . . . . . . . 20
        (7) (Fiduciary responsibilities) . . . . . . . . . 21
        (8) (Contributions). . . . . . . . . . . . . . . . 21
        (9) (Merger or consolidation/transfer of
            assets of liabilities). . . . . . . . . . . . 21
      (10) (Liquidated Damages) . . . . . . . . . . . . . 21
      (11) (Rights of participants on termination). . . . 21
      (12) (Integrity of assets/mistaken
           contribution) . . . . . . . . . . . . . . . . 21
      (13) (Trustee responsibilities) . . . . . . . . . . 21
      (14) (Laws) . . . . . . . . . . . . . . . . . . . . 22
      (15) (Action by Employers). . . . . . . . . . . . . 22
      (16) (Employers in plan). . . . . . . . . . . . . . 22
      (17) (Tax deductibility of contributions) . . . . . 22

ARTICLE IX - <u>PARTICIPANTS COVERED BY A SUCCESSOR PLAN</u>. . . 22

ARTICLE X - <u>(WITHDRAWAL LIABILITY)</u> . . . . . . . . . . . . 22

    A. (Calculation of withdrawal liabilities) . . . . . . 22

    B. (Construction segment) . . . . . . . . . . . . . . 23

        (1) (Credited service) . . . . . . . . . . . . . . 23
        (2) (Allocation of assets) . . . . . . . . . . . . 23
        (3) (Investment income). . . . . . . . . . . . . . 23
        (4) (Payments) . . . . . . . . . . . . . . . . . . 24

    C. (Interest assumption). . . . . . . . . . . . . . . 24

    D. (Availability of assets) . . . . . . . . . . . . . 24

    E. (Withdrawal liability formula) . . . . . . . . . 24

    F. (Common control) . . . . . . . . . . . . . . . . . 25

    G. (Payment of withdrawal liability). . . . . . . . . 25

    H. (Late payment) . . . . . . . . . . . . . . . . . . 25

UMWA 1974 PENSION PLAN
Table of Contents Continued
(Material in Parenthesis Does Not Appear as Title in Document)

ARTICLE X - (cont.) . . . . . . . . . . . . . . . . . . . 25

    I. (Default) . . . . . . . . . . . . . . . . . . . 25

    J. (Prepayment). . . . . . . . . . . . . . . . . . 26

    K. (Termination of plan) . . . . . . . . . . . . . 26

    L. (Partial withdrawal). . . . . . . . . . . . . . 26

    M. (Presumptive partial withdrawal). . . . . . . . 26

    N. (Sale of Assets). . . . . . . . . . . . . . . . 26

    O. (Response to court action). . . . . . . . . . . 27


APPENDIX A - <u>Acturial Equivalence Factors for
Deferred Vested Retirement Benefits
Commencing Prior to Age 62</u> . . . . . . . . . . 28


APPENDIX B - <u>Table of Percentages to be Applied
Against Pension Payable to Partici-
pant Under Joint and Survivors
Annuities</u> . . . . . . . . . . . . . . . . . . . 29


(SIGNATURE PAGE) . . . . . . . . . . . . . . . . . . . . . 31

v

UNITED MINE WORKERS OF AMERICA
1974 PENSION PLAN
EFFECTIVE DECEMBER 6, 1974
ARTICLE I - INTRODUCTION

Pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974, the United Mine Workers of America 1974 Pension Plan (hereinafter sometimes referred to as the "1974 Pension Plan" or the "Plan") provides pension benefits as hereinafter set forth. The Plan is effective as of December 6, 1974 (the "effective date") and, as amended March 27, 1978, April 29, 1980, June 7, 1981, and October 1, 1984, the provisions of the Plan are set forth below. Except in the case of total disability resulting from mine accidents occurring after the effective date, this Plan does not provide benefits to persons retiring on or before December 31, 1975, but such persons may be entitled to pension benefits under the United Mine Workers of America 1950 Pension Plan (hereinafter referred to as the "1950 Pension Plan").

Except to the extent otherwise required by the Employee Retirement Income Security Act of 1974 ("ERISA") or other applicable law, governmental rule or regulation, and except to the extent that the 1974 Pension Plan or 1974 Pension Trust specifically provides otherwise, or as required by the context, all amendments to the 1974 Pension Plan effective as of October 1, 1984, pursuant to the authority contained in Article VIII herein, shall be given only prospective application commencing on October 1, 1984, and shall have no retroactive application whatsoever. The amendments effective as of October 1, 1984, shall not be deemed to be an approval or disapproval by the parties to any action or failure to act by any Trustee or Trustees for any period prior to October 1, 1984. The terms and provisions of the 1974 Pension Plan in effect as of September 30, 1984, shall continue in effect and shall be applicable only to circumstances or events which occurred prior to October 1, 1984, and which are not governed by the amendments adopted as of October 1, 1984.

A. **Definitions**

(1) "Wage Agreement" means the National Bituminous Coal Wage Agreement of 1974, as amended from time to time and any successor thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 1984. Any reference in this Plan to the Wage Agreement or to the bituminous coal wage agreement then in effect shall also refer (a) to the Sub-bituminous and Lignite Agreement and the National Coal Mine Construction Agreement with respect to any period for which such agreements provide that pension benefits shall be made available pursuant to this Plan or a predecessor plan established under the bituminous coal wage agreement, and (b) with respect to any period prior to the 1950 Bituminous Coal Wage Agreement, to any collective bargaining contract between the United Mine Workers of America and any employer in the bituminous coal industry, and (c) solely for the purposes of determining who is required to make contributions to, and receive benefits under, the 1974 Pension Trust, any other collective bargaining contract entered into between the United Mine Workers of America and any Employer in the bituminous coal industry, which contract provides that contributions shall be made to or benefit payments made from this Plan.

(2) "Employer" means an employer who is signatory to the Wage Agreement, or, with respect to prior periods, was signatory to the bituminous coal wage agreement then in effect.

(3) "Construction Employer" means an Employer that is signatory to the National Coal Mine Construction Agreement of 1984, as amended from time to time and any successor thereto; or is signatory to any other collective bargaining contract with the United Mine Workers of America which provides that contributions shall be made to the 1974 Pension Trust for construction work related to the development, expansion or alteration of coal mines, provided that substantially all the employees, with respect to whom the employer has an obligation to contribute, perform construction work related to the development, expansion or alteration of coal mines, including the erection of tipples and preparation plants and other facilities placed in, on or around the coal mines, sinking of shafts, slopes, drifts or tunnels and all other such coal-related work that is performed under a Wage Agreement. In the case of a Construction Employer which is a single trade or business and which is also signatory to a Wage Agreement other than a Wage Agreement described in the preceding sentence, the Construction Employer shall be treated as an Employer other than a Construction Employer with respect to its employees or operations for which it has an obligation to contribute to the Plan pursuant to such Wage Agreement.

(4) "Bituminous Coal Segment" and "Coal Mine Construction Segment" mean the two accounts within the 1974 Pension Plan maintained after June 30, 1981, for the sole purpose of calculating employer withdrawal liability under Article X.

(5) "Participant" means any person who is employed in a classified job for an Employer after the effective date and any person entitled to receive pension benefits under the Plan; provided, however, that any person who is not employed in a classified job for an Employer on the effective date shall not become a participant until such person completes at least 1,000 hours of Credited Service within a 12-month period after the effective date, or unless such person is subject to the provisions of Article II(f)(3).

(6) "Pensioner" means any person who is receiving a pension pursuant to Article II of this Plan.

(7) "1974 Pension Trust" means the trust established pursuant to the National Bituminous Coal Wage Agreement of 1974 to fund this Plan.

(8) "Trustees" means the Trustees of the 1974 Pension Trust, who shall be named fiduciaries pursuant to Section 402 of ERISA and the Plan Administrator, as that term is defined in that Act; provided, however, that the 1974 Pension Trust may be amended to designate other or additional named fiduciaries under said Trust and the Plan.

(9) "Credited Service" means signatory and nonsignatory service determined pursuant to Article IV.

74PP.2

(10) "Hour of Service" shall mean each hour for which the participant is directly or indirectly paid or entitled to be paid by the Employer (a) for the performance of duties or (b) on account of a period of time during which no duties are performed due to vacation, holiday, illness, sickness and accident, incapacity, layoff, bereavement, jury duty, military duty or leave of absence; or (c) time spent performing contractual obligations such as safety inspections and mine committee work, even though such time off is not paid for by the Employer, provided that:

(1) except for hours of service credited on account of a period during which a Participant is eligible to receive benefits under Article IV(B)(3), no more than 501 hours of service shall be credited to a Participant on account of a single continuous period during which the Participant performed no duties;

(2) no credit shall be given for payments made or due under a plan maintained solely for the purpose of complying with the applicable worker's compensation or unemployment compensation or disability insurance laws or payments which solely reimburse a Participant for medically related expenses incurred by the Participant; and

(3) hours of service shall be credited for back pay for the period for which such back pay was awarded, irrespective of mitigation of damages, either awarded or agreed to by the Employer to the extent such back pay represents payment for hours which are required to be taken into account. However, no hours of service shall be credited for back pay if such hours were previously credited. The determination of hours of service for reasons other than the performance of duties shall be made in accordance with the applicable rules of the regulations prescribed by the Secretary of Labor under 29 C.F.R. Part 2530.200b-2(b).

(11) "UMWA" or "Union" shall mean the United Mine Workers of America.

(12) "Hours Worked" shall mean (a) each hour for which an employee is paid, or entitled to payment, for the performance of duties for the Employer during the calendar year, and (b) hours for which back pay, irrespective of mitigation of damages, is awarded or agreed to by an Employer, to the extent that such award or agreement is intended to compensate an Employee for periods which the Employee would have been engaged in a performance of duties for the Employer. Time spent performing contractual obligations such as safety inspections and mine committee work and periods of time when the Participant is eligible to receive sickness and accident benefits shall be included as hours worked.

B.  When Retirement Occurs

For the purposes of this Plan, in the case of any Participant, retirement shall be considered to occur on the last day of credited service, within the meaning of Article IV C(8), provided that on such day he was eligible for an immediate or deferred pension under this Plan.

74PP.3

C. **Attainment of Age**

For the purposes of this Plan, a Participant shall be deemed to have attained an age as of 12:01 A.M. on the respective anniversary date of the Participant's birth.

ARTICLE II - ELIGIBILITY

A. **Age 55 Retirement**

Any Participant who (a) has at least 10 years of signatory service or at least twenty years of credited service, including the required amount of signatory service as set forth in Article IV(C)(6), and (b) has attained the age of 55 years (but not the age of 62) prior to retirement shall be eligible to retire on or after October 1, 1984, and shall upon his retirement (hereinafter "Age 55 Retirement") be eligible for a pension.

B. **Normal Retirement**

(1) Any Participant shall be eligible to retire on or after October 1, 1984, and shall upon his retirement (hereinafter "Normal Retirement") be eligible for a pension, provided such Participant has attained the normal retirement date which shall be the earlier of —

    (a) a Participant's attainment of age 62 years and completion of at least 10 years of signatory service or at least 20 years of credited service, including the required amount of signatory service as set forth in Article IV(C)(6), or

    (b) the later of —

      (i) the time a Participant attains age 62, or
      (ii) the 10th anniversary of the time the Participant became employed in signatory service.

(2) In determining the time the Participant became employed in signatory service (for purposes of Article II(B)(1)(b)(ii)), any employment of a Participant in signatory service who is not entitled to a pension under Article II (A) or (E) (Age 55 Retirement or Deferred Vested Retirement) shall be disregarded if it precedes a period of consecutive one-year breaks in signatory service and the number of consecutive one-year breaks in signatory service equals or exceeds the greater of

    (a) five, or

    (b) the aggregate number of years of signatory service before such breaks.

In addition to the foregoing, any employment prior to a period of consecutive one-year breaks in signatory service shall be disregarded unless the Employee completes 1,000 hours of signatory service within a 12-month period after the breaks in signatory service. Such aggregate number of years of signatory service before any period of consecutive one-year breaks in signatory service shall be deemed not to include any years of signatory service not required to

74PP.4

be taken into account under this subparagraph by reason of any prior break in signatory service. For purposes of this Article II(B)(1)(b)(ii), a year of signatory service shall be calculated on the basis of a calendar year and in the manner specified in Article IV; a break in signatory service shall be defined in accordance with the terms of Article II(G)(3); and nonclassified signatory service shall be disregarded unless it immediately precedes or follows classified signatory service with the same Employer.

C.  Disability Retirement

A Participant who (a) has at least 10 years of signatory service prior to retirement, and (b) becomes totally disabled as a result of a mine accident occurring on or after October 1, 1984, shall, upon retirement (hereinafter "Disability Retirement"), be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

When a Participant who has been receiving a disability pension under this Section C recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the Participant's ability to perform classified work in the industry. The continuance of a disability pension shall be based on medical evidence that supports the Participant's inability to be employed in classified work in the industry.

If such Participant is medically certified able to perform classified work in the industry, he will no longer be eligible for a disability pension.

D.  Minimum Disability Retirement

Any Participant who (a) has less than 10 years of signatory service prior to retirement and (b) becomes totally disabled as a result of a mine accident occurring on or after October 1, 1984, shall, upon retirement (hereinafter "Minimum Disability Retirement") be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

When a Participant who has been receiving a disability pension under this Section D recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the Participant's ability to perform classified work in the industry. The continuance of a disability pension shall be based on medical evidence that supports the Participant's inability to be employed in classified work in the industry.

If such Participant is medically certified able to perform classified work in the industry, such Participant will no longer be eligible for a disability pension.

E.  Deferred Vested Retirement

(1) Any Participant who ceases working in a classified job for an Employer for any reason, except as provided in (2) below, and who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension"), upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, provided

(a) the Participant's last day of Credited Service is on or after October 1, 1984, but prior to the attainment of age 55, and

(b) the Participant has

(i) at least 10 years of signatory service, or

(ii) at least 20 years of Credited Service as set forth in Article IV(C)(6).

(2) Any Participant who ceases working in a classified job for an Employer, who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension - Special") upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, calculated pursuant to Article III A(5)(b), provided

(a) the Participant's last day of Credited Service is on or after October 1, 1984, but prior to attainment of age 55;

(b) had 20 years of signatory service on the date last worked;

(c) had attained the age of 50 on the date last worked; and either

(d) had been laid off and had not refused recall to the mine from which the Participant was laid off; or

(e) had been terminated under Article III, Section (j) of the Wage Agreement (or if the Participant had not been terminated, there had been a deterioration in physical condition which prevented the Participant from performing the Participant's regular work as determined by a panel of three physicians, if the degree of physical deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter.

Within a reasonable period of time after such Participant's employment has ceased, an appropriate written notice of eligibility and other relevant data will be provided.

F.  Nonduplication

(1) A Participant shall be entitled to receive a pension under only one of the foregoing paragraphs of this Article II with respect to any retirement.

(2) Except as provided in paragraph (C), (D), or (F)(3) of this Article II, any person whose retirement occurs on or before December 31, 1975, shall

not be entitled to receive pension benefits under this Plan, but shall be entitled only to receive such benefits as may be provided under the 1950 Pension Plan.

(3) Any person who (a) retires on or before December 31, 1975, (b) at the time of retirement is entitled to or, upon attaining age 55 would be entitled to, a pension benefit under the 1950 Pension Plan, and (c) is again employed for at least 250 hours in a classified job for an Employer after December 31, 1975, shall upon subsequent retirement (or, if later, upon attaining age 55) be eligible for a pension only under this Plan and not under the 1950 Pension Plan, in the amount hereinafter specified. The amount of pension for a Participant described in this paragraph shall be the sum of the amount of pension to which such Participant would be entitled upon attaining age 55 under the 1950 Pension Plan if he had not been employed in a classified job for an Employer after December 31, 1975, plus the excess of (i) over (ii) where (i) is the pension to which such Participant would be entitled except for this paragraph under Article III(A)(2) or III(B)(2) based upon all years of Credited Service under this Plan and (ii) is the pension to which such Participant would be entitled under Article III(A)(2) or III(B)(2) based solely on his Credited Service prior to December 31, 1975.

G.  Employment for Vesting Purposes

(1) For purposes of this Article II, all years of classified service by a Participant with Employers signatory to the bituminous coal wage agreement then in effect shall be used for purposes of any eligibility requirement of minimum signatory service under this Article. A year of service shall be calculated on the basis of a calendar year and in accordance with the terms of Article IV(A).

(2) For purposes of this Article II, years of nonclassified signatory service in the coal industry by a Participant after May 28, 1946, for Employers signatory to the bituminous coal wage agreement then in effect shall be used for purposes of any eligibility requirement of minimum signatory service provided that:

(a) the nonclassified signatory service with an Employer immediately preceded or followed classified signatory service with the same Employer;

(b) credit for nonclassified service shall not be given for any calendar year in which the Participant completed less than 1,000 hours of such service, as defined under Article I(A)(7);

(c) all years of service before age 18 shall be disregarded;

(d) all years of service performed before January 1, 1971, shall be disregarded unless the Participant completed at least three years of employment after December 31, 1970;

Provided further that, if the employee has not earned a non-forfeitable right to a pension:

(e) all years of service prior to a break in service shall be disregarded unless the employee completes 1,000 hours of service within a 12-month period after the break;

(f) all years of service prior to any period of consecutive one-year breaks in service shall be disregarded if the number of such consecutive one-year breaks equals or exceeds the greater of (i) five, or (ii) the aggregate number of years of service before such breaks. Such aggregate number of years of service before such breaks shall be deemed not to include any years of service not required to be taken into account under this subparagraph by reason of any prior break in service.

(3) For purposes of Article II(G)(2) and II(B)(2), an employee shall incur a break in service for any calendar year in which such Employee completes not more than 500 hours of service; provided that, in the case of an Employee who is absent from work for any period —

(a) by reason of the pregnancy of the Employee,

(b) by reason of the birth of a child of the Employee,

(c) by reason of the placement of a child with the Employee in connection with the adoption of such child by such Employee, or

(d) for purposes of caring for such child for a period beginning immediately following such birth or placement,

the Employee shall be considered to have completed the hours of service which otherwise would normally have been credited to him but for such absence, subject to the limitation set forth in Article I A(8)(1). The preceding sentence shall be applicable only in the year in which the Employee's absence from work begins, if the Employee would be prevented from incurring a one-year break in service in such year solely because of the application of the preceding sentence, or in any other case, in the immediately following year. No credit will be given to an Employee pursuant to this subparagraph unless the Employee furnishes to the Trustees such timely information as they may reasonably require to establish that the absence from work is for reasons referred to in (a), (b), (c), or (d) above, and the number of days for which there was such an absence.

(4) The provisions of this paragraph shall be interpreted and construed in accordance with the requirements of ERISA and the regulations issued thereunder.

### ARTICLE III - AMOUNT OF PENSION

A.  Retirement On or After October 1, 1984

A pension granted to a Participant who retires on or after October 1, 1984, pursuant to Article II shall consist of a pension amount payable in monthly installments provided in accordance with the provisions of this Article III as set forth below.

74PP.8

(1) <u>Age 55 Retirement Pension</u>

(a) A deferred pension, commencing after attainment of age 62, computed under the provisions of paragraph 2 below; or, at the election of the Participant, (b) an immediate pension, equal to the deferred pension to which the Participant could have been eligible under (a) above had the Participant so elected, reduced by 1/4 of one percent (1%) for each full month (3 percent (3%) per year) between the date on which pension benefits began and the date on which Participant attains age 62.

(2) <u>Normal Retirement Pension</u>

For retirements occurring during the first three years of the 1984 Wage Agreement the amount of pension for Normal Retirement shall be determined as follows:

(a) for each year of credited non-signatory service as defined herein, $7.50 per month;

(b) for each of the first 10 years of credited signatory service, $16.50 per month;

(c) for each year of credited signatory service in excess of 10 years but not to exceed 20 years, $17.00 per month;

(d) for each year of credited signatory service in excess of 20 years but not to exceed 30 years, $17.50 per month;

(e) for each year of credited signatory service in excess of 30 years, $18.00 per month.

For retirements occurring during on or after October 1, 1987, the rates shown in (b), (c), (d) and (e) above shall be increased by $0.50.

Proportional credit shall be allowed for any fractional years of credited service pursuant to Article IV hereof.

(3) <u>Disability Retirement Pension</u>

Subject to (4) below for a Participant whose disabling accident occurs after October 1, 1984, the pension payment shall be computed under the provisions of paragraph (2) above.

(4) <u>Minimum Disability Retirement Pension</u>

The amount of pension for Minimum Disability Retirement shall be $165 per month for disabilities occurring during the first three years of the 1984 Wage Agreement, and $170 per month for disabilities occurring on or after October 1, 1987.

(5) <u>Deferred Vested Pension</u>

(a) The amount of a deferred vested pension (Article II E(1) shall be a pension, commencing on or after attainment of age 62, computed under the provisions of Subsection A(2) of this Article III, or, at the Participant's

election, between ages 55 and 62 with the pension payable reduced to its actuarial equivalent pursuant to Appendix A; provided, however, that in the case of any Participant with at least (20) years of credited service, such pension shall not be reduced to less than $150.00 per month.

(b) The amount of a deferred vested pension (Article II E(2)) shall be a pension, commencing on or after attainment of age 62, computed under the provisions of Subsection A(2) of this Article III, or, at the Participant's election, between ages 55 and 62 with the pension computed under the provisions of Subsection A(1) of this Article III.

B.  Increased Pension

(1) The pension of any Participant who retired prior to October 1, 1984, on other than a deferred vested (II E(1)) or minimum disability pension shall be increased effective October 1, 1984, by $10 per month and shall be further increased by $10 per month effective October 1, 1987.

(2) The pension of any Participant who retired prior to October 1, 1984, on a minimum disability pension shall be increased effective October 1, 1984, to $160.00 per month, and shall be further increased effective October 1, 1987, to $170.00 per month.

(3) Surviving Spouse benefit for any Surviving Spouse of a pensioner (other than a deferred vested pensioner not eligible as a deferred vested pensioner - special) who died prior to October 1, 1984, shall be increased effective October 1, 1984, by $5.00 per month and shall be further increased by $5.00 per month effective October 1, 1987.

(4) Except as provided in (5) below, increases in pensions are not applicable to Participants whose employment was terminated prior to October 1, 1984, and who will become eligible for only a deferred vested pension (II E(1)).

(5) Any Participant who retired prior to the effective date of the 1981 Wage Agreement, is eligible to receive a deferred vested pension under this Plan and satisfies the criteria in Article II E(2), shall have his pension recomputed pursuant to the provisions of Subsection A(2) of this Article III (3% reduction) but based on the maximum benefit formula in effect at his retirement.  Such Participant shall have his pension increased by any increases applicable to Age 55 Retirement which occurred after the date of his retirement and application for pension.  Any increase under this paragraph shall be applied prospectively only.

C.  Application for Pension and Commencement, Suspension and Termination of Pensions

Payments of pensions shall be subject to the following:

(1) The first payment on any pension shall be made as soon as possible after an application for pension has been received and shall be for the month following the month in which the Participant retires (Article I B) and becomes eligible for a pension in accordance with Article II; provided, however, that

in the case of a deferred pension pursuant to Article III(A)(1) or a deferred vested pension pursuant to Article III(A)(5), such payment shall be for the later of (a) the month specified by the Participant in his application for pension if such month is subsequent to the month in which such Participant attains age 55, or (b) the month in which the application for pension is received, but not later than the month following the month in which such Participant attains age 62.

(2) The last payment shall be for the month in which the pensioner dies.

(3) Pension payments shall be payable on the first day of each month at the pensioner's last address of record.

(4) Pension payments shall be suspended for any month in which the pensioner is employed, subsequent to commencement of such payments, in the bituminous coal industry, in the same trade or craft (trade or craft shall mean the coal mining industry), and in the same geographic area covered by this Plan. The provisions of this paragraph shall be interpreted in accordance with any regulations issued pursuant to Sections 203(a)(3) and (B) of ERISA.

(5) Any Participant who continues to be employed by an Employer after retirement shall not be entitled to receive pension benefits under this Plan until such time as such Participant is no longer employed by an Employer.

ARTICLE IV - CREDITED SERVICE

A.   Nonsignatory Service

Subject to the limitations in paragraph C of this Article IV, credited service is a period during which the participant meets the requirements of subparagraphs (1), (2), (3) or (4) below. Any credited service shall be nonsignatory service unless it qualifies as signatory service pursuant to Article IV(B) hereof.

(1) A Participant shall receive credit for a year of service for any calendar year in which he worked, subsequent to December 31, 1936, as an employee in a job classified in the then existing bituminous coal wage agreement for an employer in the coal industry for at least 1,000 hours of service, with credit given for the next lowest 1/4 year in the event any employee works less than 1,000 hours of service as follows:

| | |
|---|---|
| 750-999 hours, | 3/4 year |
| 500-749 hours, | 1/2 year |
| 250-499 hours, | 1/4 year |
| 249 hours or less, | 0 |

With respect to any period of such service for which records of hours of service are not available or it is not feasible in light of the administrative and cost difficulties involved to compile a record of service, an applicant shall be deemed to have worked a thousand hours of service if the employee received wages in an amount equal to the product of (i) the lesser of 125 days or 1/2 the average number of days the bituminous mines in the United States were active, multiplied by (ii) the daily basic rate paid in the bituminous coal industry for that year; provided that for any year for which information

is not available as to the average number of days the mines were active, the available data for the nearest year next preceding shall be used; provided further that if an applicant earned less than the minimum amount required for a year of service, credit for service shall be given to the next lowest 1/4 year in the manner indicated with respect to hours of service.

(2) A Participant shall receive credit for a year of service for any calendar year in which the Participant worked, prior to January 1, 1937, as an employee in a job classified in the then existing coal wage agreement for an Employer in the bituminous coal industry, in a minimum of at least six (6) months during a calendar year, provided that if the applicant worked in less than six (6) months, credit for service shall be awarded to the next lowest one-fourth (1/4) year, based upon service in six (6) months equalling a year's service.

(3) A Participant shall receive credit for a year of service for any calendar year in which the Participant received state worker's compensation payments pursuant to an award as a result of an occupational disease or injury sustained in the mine while regularly employed in a classified job under the bituminous coal wage agreement then in effect; provided, in the case of occupational disease, the Participant had been so employed by an Employer signatory to the Wage Agreement then in effect for at least ten (10) years after May 28, 1946. Credit shall be given up to a maximum of four (4) years service credit from date of injury, or from the date of last employment in case of occupational disease, provided the Participant did not work regularly (earned at least $200 per month) during the compensable period. Benefits awarded pursuant to the Federal Coal Mine Health and Safety Act of 1969 shall be deemed "state worker's compensation payments" within the meaning of this section, only if the miner was last regularly employed in the coal industry after the enactment date of the Act, December 30, 1969, in a classified job under the bituminous coal wage agreement then in effect, and had been so employed by an operator signatory to the agreement for at least ten (10) years after May 28, 1946. In no event shall any service be credited under this paragraph (3) with respect to periods after December 6, 1974.

(4) A Participant shall receive credit for a year of service for any year served in the military service of the United States in any war, national emergency, or international police action, immediately following regular employment in a classified job under the bituminous coal wage agreement then in effect, provided that credit for such service shall be limited to the original period of enlistment or obligated military service; and provided further that the Participant returned to work in a classified job within twelve (12) months after his date of separation from the military service, unless he was precluded from doing so by service connected sickness, accident, or other disability, and returns to work in a classified job when no longer precluded by such disability. Service credit for the period of military service shall be computed in the same manner as credit is computed for service prior to 1937, as described in paragraph A(2) hereof.

74PP.12

B. <u>Signatory Service</u>

Credited signatory service is:

(1)(a) For any calendar year prior to January 1, 1978, service as defined in paragraph A(1) hereof during which a Participant worked as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

(b) For purposes of determining eligibility for a pension (vesting) under Article II, service for any calendar year subsequent to December 31, 1977 during which a Participant works as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect, computed based on hours of service as defined in Article I A(8) as follows:

| Hours of Service During a Calendar Year as a Classified Employee for a Signatory Employer | Percentage of a Year of of Credited Signatory Service |
|---|---|
| 249 or less | 0% |
| 250 – 499 | 25% |
| 500 – 749 | 50% |
| 750 – 999 | 75% |
| 1,000 or more | 100% |

(c) For purposes of determining the amount of pension, under Article III, service for any calendar year subsequent to December 31, 1977, during which a Participant works as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect, computed based on hours worked as defined in Article I A(10) as follows:

| Hours Worked During a Calendar Year as a Classified Employee for a Signatory Employer | Percentage of a Year of of Credited Signatory Service |
|---|---|
| 249 or less | 0% |
| 250 – 499 | 25% |
| 500 – 749 | 50% |
| 750 – 999 | 75% |
| 1,000 or more | 100% |

(2) Service prior to December 6, 1974, as defined in paragraph A(3) hereof during which a Participant received state worker's compensation payments if such payments are pursuant to an award as a result of an occupational disease or injury awarded after May 28, 1946, and if the Participant was last regularly employed prior to such service as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

(3) Service, at a rate of 8 hours for each regularly scheduled work day, during which a Participant receives or is eligible to receive weekly Sickness and Accident Benefits pursuant to Article XI of the National Bituminous Coal Wage Agreement of 1974, as amended from time to time, and any successor agreements thereto.

74PP.13

(4) A Participant who retires on or after March 27, 1978, shall receive credit for a year of service for any calendar year (including calendar years prior to 1978) in which he rendered service as an employee of the United Mine Workers of America (UMWA) in the coal industry immediately following regular employment in a classified job under the bituminous coal wage agreement then in effect; provided that the Participant does not, or is not eligible to, receive a pension or other retirement income from the UMWA. Credit or service with the UMWA shall be computed in the same manner as:

(a) credit is computed for service prior to 1937, as described in paragraph A(2) hereof, or

(b) credit is computed for service under the pension plan of the UMWA, whichever is greater, for service prior to January 1, 1978.

Credit for service after December 31, 1977, shall be computed in the same manner as credit is computed for service under the pension plan of the UMWA.

In no event shall a Participant receive credit under this paragraph (4) while receiving a pension under this Plan.

Notwithstanding anything in this paragraph (4) to the contrary, a Participant,

(a) who is not employed in a classified job for an Employer on March 27, 1978, or

(b) who is not employed by the UMWA on March 27, 1978, or

(c) who had retired prior to March 27, 1978, and was eligible to receive, or upon application would have been eligible to receive, a pension under the 1950 Pension Plan, the 1974 Pension Plan or a retirement plan of the UMWA prior to March 27, 1978,

shall not receive signatory service credit for the years of UMWA employment described above if it occurred prior to March 27, 1978, unless such Participant is re-employed in a classified job and

(1) obtains at least 3 years of credited service after March 27, 1978, or

(2) ceases to be employed in the classified job or employed by the UMWA as the result of
        (i) nonoccupational disability or accident

(ii) occupational injury for which the Participant receives worker's compensation, or

(3) dies after March 27, 1973 at a time when the Participant is employed in a classified job for an Employer or when employed by the UMWA.

(5) Service as defined in paragraph A(4) hereof during which a Participant served in the military service of the United States, provided that the

classified employment referred to therein (both before and after military
service) is for an Employer signatory to the bituminous coal wage agreement then
in effect and provided further, however, that for military service credited
after December 31, 1974, the Participant returned to work in a classified job
within ninety (90) days after the date of separation from the military service
or such longer period as may be allowed by law.

(6) Service (within the meaning of paragraph A(1) hereof) by an employee
in a classified job for an Employer not signatory to the bituminous coal wage
agreement then in effect if (i) such service is continuous, (ii) such Employer
becomes a signatory to the bituminous coal wage agreement after the effective
date as a result of recognizing the UMWA as the bargaining representative of
its employees, (iii) the employee is working in a classified job with such
Employer at the time such Employer becomes signatory to the bituminous coal
wage agreement, and (iv) such employee remains in a classified job with such
Employer during the twenty-four month period immediately following the date on
which such Employer becomes signatory to the bituminous coal wage agreement;
provided, however, that not more than ten (10) years of nonsignatory service
may be recognized or awarded as signatory service to any person pursuant to
this paragraph (6).

C.   Additional Rules Concerning Credited Service

(1) Except as provided in Article IV(B)(6), employment after April 1,
1971, will not constitute credited service under paragraph A(1) hereof unless
such employment was in a classified job for an Employer.

(2) A Participant shall not be credited with more than one year of service
for any calendar year by reason of any combination of the rules of this Article
IV.

(3) The maximum number of years of nonsignatory service which may be
included in the credited service of any Participant retiring after December 31,
1981 shall be the number of years by which twenty years exceeds such
Participant's signatory service, but not in excess of ten years.

(4) No credit for service shall be awarded a Participant for any period in
which such Participant was directly connected with the ownership, operation or
management of a mine; provided, however, that in the case of any Participant
who received credit for such service before July 1, 1974, under the terms of
the pension plan program established under the United Mine Workers of America
Welfare and Retirement Fund of 1950, credit shall be awarded for any period
prior to July 1, 1975, in which the Participant worked as an employee in a
classified job in a mine in which such Participant had no controlling interest,
as a member of a cooperative or gang-working crew which shared the profits and
losses, and which was operated under the bituminous coal wage agreement then in
effect; and provided further, that in the case of a Participant who received
credit for service before July 1, 1974, under the terms of the pension plan
program established under the United Mine Workers of America Welfare and
Retirement Fund of 1950, credit for signatory service shall be awarded for any
period prior to July 1, 1975, during which such Participant worked in a
classified job pursuant to an agreement to produce coal for a signatory coal
company which exercised control over the operation of the mine and was
responsible for royalty payments on such coal produced to the 1974 Pension
Trust or its predecessor.

74PP.15

(5) The following maximum years of nonsignatory service may be included in credited service under this Plan:

| Date of Retirement | Maximum Years of Nonsignatory Service |
|---|---|
| January 1, 1978 to December 31, 1978 | 13 |
| January 1, 1979 December 31, 1979 | 12 |
| January 1, 1980 to December 31, 1980 | 11 |
| January 1, 1981 and thereafter | 10 |

(6) A Participant with less than ten years of signatory service shall not be entitled to receive a pension under paragraph (A), (B), or (E) of Article II unless such Participant has at least twenty years of credited service, including at least the following minimum number of years of signatory service:

| Date of Retirement | Years of Signatory Service Required |
|---|---|
| January 1, 1978 to December 31, 1978 | Seven (7) years |
| January 1, 1979 to December 31, 1979 | Eight (8) years |
| January 1, 1980 to December 31, 1980 | Nine (9) years |
| January 1, 1981 and thereafter | Ten (10) years |

(7) Except as provided in Article V, service credits shall not be accrued subsequent to the effective date of pension payments.

(8) In the case of any Participant, except a Participant covered under Article IV B(4), the last day of credited service shall be the last day on which the Participant works as an employee in a classified job for an Employer, unless such Participant continues to accrue credited service during the period for which such Participant receives or is eligible to receive weekly sickness and accident benefit pursuant to Article XI of the Wage Agreement, in which case the last day of credited service shall be the last day for which such sickness and accident benefits are paid or would have been paid. For a Participant covered under Article IV B(4), the last day of credited service shall be the later of the last day as determined in the preceding sentence or the last day the Participant worked for the UMWA.

(9) An employee who is regularly employed in a classified job for an Employer and who performs supervisory duties on a temporary basis for not more than 120 work days during any consecutive period of 12 months, shall be deemed to be employed in a classified job during the days on which the Participant performs such supervisory duties.

74PP.16

## ARTICLE V – REEMPLOYMENT AFTER ATTAINMENT OF PENSION ELIGIBILITY

A.  Any Participant who has been retired and receiving a pension under this Plan and who shall be reemployed in a classified job by an Employer shall, for the purpose of calculating any subsequent pension benefits to which such Participant may become entitled, upon subsequent retirement, be granted a pension equal to the sum of the pension such Participant was previously receiving plus the excess of (i) over (ii) where (i) is the pension to which such Participant would be entitled at the time of such retirement, based upon all years of Credited Service under the Plan and (ii) is the pension to which such Participant would be entitled at the time of such retirement, based solely on Credited Service at the time of his previous retirement.

B.  Any Participant eligible for a deferred vested pension under this Plan whose shall be reemployed in a classified job by an Employer prior to the commencement of pension benefit shall, for the purpose of calculating any subsequent pension benefits to which he may become entitled, be granted his credited service applicable to the deferred vested pension plus his credited service accrued after such reemployment.

C.  Any Participant who is reemployed in a classified job by an Employer after attainment of eligibility for a deferred vested pension under this Plan, whose employment is subsequently terminated and who at that time is not eligible for a pension under any provision of Article II by reason of Article IV(C)(6), shall be considered to be eligible for the deferred vested pension for which such Participant was eligible prior to such reemployment and upon application for pension the date of retirement shall be considered to be the date of retirement which would, upon application for pension, have been applicable to the deferred vested pension for which such Participant was eligible prior to such reemployment.

## ARTICLE VI – SURVIVING SPOUSE BENEFIT

A.  (1) Except as provided in paragraph (B) of this Article, a Surviving Spouse Benefit is provided for any Participant who (a) has retired and is receiving a pension under this Plan, except a Participant receiving a deferred vested pension who has not completed at least twenty years of credited service, (b) has not retired but at the date of s death otherwise met the eligibility requirements for an immediate pension under Article II(A), (B), (C) or (D) under this Plan, or (c) has attained age 55 with at least twenty years of credited service and who has retired and is entitled to elect an immediate pension under Article II(A), II(B) or II(E) at the date of death.

(2) The amount of such benefit shall be equal to 50% of the amount of the Participant's pension at the time of death or, in the event the Participant dies after age 55 at a time when such Participant was eligible to elect a pension or to retire and receive a pension under Article II, but prior to the receipt of a pension, 50% of the amount of the pension such Participant would have received if such Participant had elected a pension or retired and become entitled to a pension as of the date immediately preceding the date of death.

74PP.17

(3) The Surviving Spouse Benefit will not be effective unless the Participant and the spouse have been married throughout the nine-month period ending on the date of the Participant's death or unless such nine-month requirement would be waived for purposes of determining entitlement to widow's or widower's insurance benefits under the Social Security Act.

(4) Payment to an eligible spouse will commence as of the first of the month following the month in which the Participant's death occurs and the final payment shall be made for the month in which the spouse's death occurs.

B. (1) Any Participant who is not employed in a classified job for an Employer on December 6, 1974, is not covered for a Surviving Spouse Benefit under this Article unless such Participant (a) obtains at least three years of credited service after such date, or (b) had ceased to be employed in a classified job as a result of (i) layoff, (ii) nonoccupational disability or accident, or (iii) occupational injury for which such Participant was receiving workers' compensation, or (c) such Participant dies at a time when he is employed in a classified job for an Employer.

(2) Any Participant who retires on or before December 31, 1975, and is again employed in a classified job for an Employer after such retirement, is not covered for a Surviving Spouse Benefit under this Article unless (a) such Participant obtains at least three years of credited service after such reemployment or (b) unless such reemployment ceases as a result of (i) layoff, (ii) nonoccupational disability or accident, or (iii) occupational injury for which worker's compensation benefits were awarded, or (c) such Participant dies while employed in a classified job for an Employer.

## ARTICLE VII - JOINT AND SURVIVOR ANNUITIES

A. Notwithstanding any other provision of this Plan, if a Participant qualifies for a pension under this Plan, but is not covered by a Surviving Spouse Benefit, the Pension benefit otherwise provided to such Participant shall be reduced actuarially pursuant to Appendix B, and 50% of such reduced pension benefit will be continued, after the death of the Participant, for the life of any qualified surviving spouse; provided, however, that such Participant may elect, within the election period specified in Paragraph C(1) below, and subject to the requirement of Paragraph D below, not to take a joint and survivor annuity as provided for in this Article and instead to receive a pension benefit for life only.

B. If a Participant has completed 10 years of signatory service for vesting purposes, calculated pursuant to Article II (G), is not covered by a Surviving Spouse Benefit, and dies before he is entitled to elect or elects to receive a pension benefit, the qualified surviving spouse shall be entitled to receive a survivor's benefit in the form of an annuity for life in an amount equal to 50% of the pension benefit the decedent would have received if the decedent had —

(1) separated from service on the date of death,

(2) survived to age 55,

(3) retired with an immediate Joint and Survivor Annuity as provided for in this Article at age 55, and

(4) died on the day after the day on which the decedent would have attained age 55.

Payment to a qualified spouse under this paragraph will commence on the first of the month following the month in which the decedent would have attained age 55, and the final payment shall be for the month in which the spouse's death occurs.

C. (1) The "election period" in the case of an election to waive the Joint and Survivor Annuity described in Paragraph A shall be the 180-day period ending on the date of the commencement of benefits. Prior to the election period, the Trustees shall furnish the Participant (a) a general description or explanation of the qualified Joint and Survivor Annuity, the circumstances in which it will be provided unless the Participant elects not to have benefits provided in that form, the availability of such election and the right to revoke such election, and the rights of the Participant's spouse; and (b) a general explanation of the relative financial effect of such election on the Participant's pension. In the event a Participant elects not to receive a Joint and Survivor Annuity, such election shall not become effective if the Participant dies within a period of two years beginning on the date of such election.

(2) A Participant may revoke any election made pursuant to this Article at any time during the applicable election period.

D. An election made under this Article shall not take effect unless—

(1) the spouse of the Participant consents in writing to such election, and the spouse's consent acknowledges the effect of such election and is witnessed by a Plan representative or a notary public, or

(2) it is established to the satisfaction of the Trustees that the consent required under subparagraph (1) may not be obtained because there is no spouse, because the spouse cannot be located, or because of such other circumstances as the Trustees may by law consider.

E. A qualified surviving spouse shall be any spouse who has been married to the Participant for at least nine months prior to death, unless such nine-month requirement would be waived for purposes of determining entitlement to widow or widower's insurance benefits under the Social Security Act.

F. Except as provided in Paragraph B above, payment to a qualified surviving spouse under this Article will commence as of the first of the month following the month in which the Participant's death occurs, and the final payment shall be made for the month in which the spouse's death occurs.

ARTICLE VIII - MISCELLANEOUS

A. Determination of Eligibility

The Trustees or such other named fiduciaries as may be properly designated shall have full and final determination as to all issues concerning eligibility for benefits.

74PP.19

B. <u>General</u>

(1) The Trustees are authorized to promulgate rules and regulations to implement this Plan, and those rules and regulations shall be binding upon all persons dealing with and Participants claiming benefits under this Plan.

(2) No benefit payable under this Plan shall be subject in any way to alienation, sale, transfer, assignment, pledge, attachments, garnishments, execution or encumbrance of any kind, and any attempt to accomplish the same shall be void. Notwithstanding the foregoing, the Plan shall comply with any qualified domestic relations order, as that term is defined in ERISA.

(3) The Employers and the Union, by joint action, reserve the right at any time and from time to time to modify or amend in whole or in part any or all of the provisions of this instrument or to terminate this Plan, without reopening or otherwise affecting the integrity of any other provision of the Wage Agreement, by a written agreement between the Employers and the Union, provided, however, that:

(a) this Plan shall not be amended in such manner as would cause or permit any part of the assets in the 1974 Pension Trust to be diverted to purposes other than the exclusive benefit of the Participants and their beneficiaries;

(b) this Plan shall not be amended to deny to a Participant retroactively any benefits to which such Participant was entitled under this Plan, unless such amendment is necessary to conform this Plan to, or to satisfy the conditions of, any law, governmental regulations or ruling; and

(c) the Employers and the Union have delegated to the Trustees the authority and responsibility to make certain changes and amendments as set forth in Article XX(g)(4) of the National Bituminous Coal Wage Agreement of 1984, as amended from time to time, and any successor agreements to that specific Agreement.

(4) Upon the termination of this Plan or the complete discontinuance of contributions to the 1974 Pension Trust, this Plan shall remain in force and effect for the period necessary to complete the payment of benefits in accordance with the terms of this Plan to the extent assets in the 1974 Pension Trust are available to pay such benefits.

(5) Forfeitures arising from the operation of the Plan shall not be used to increase the benefits which otherwise would be received under this Plan.

(6) Any Participant or beneficiary whose claim for benefits under this Plan has been denied shall be (a) provided with adequate notice in writing setting forth the specific reasons for such denial, such notice shall be written in a manner calculated to be understood by the Participant, and (b) afforded a reasonable opportunity for a full and fair review of the decision denying the claim by an appropriate named fiduciary or a person properly designated to carry out such responsibility.

(7) The Trustees are hereby authorized to allocate fiduciary responsibilities in any manner permitted pursuant to section 405(c) of ERISA and to appoint an investment manager or managers as permitted by section 402(c) of ERISA.

(8) Contributions to the 1974 Pension Trust to fund the benefits under this Plan shall be paid solely by the Employers in accordance with Article XX of the National Bituminous Coal Wage Agreement of 1984, as amended from time to time, and any successor agreements to that specific Agreement.

(9) In the event that this Plan merges or consolidates with, or transfers some or all of its assets or liabilities to, any other plan, no Participant or beneficiary herein shall, solely on account of merger, consolidation or transfer, be entitled to an accrued benefit immediately following such event which is less than the benefit to which such Participant or beneficiary would have been entitled immediately preceding such event.

(10) In the event that an Employer fails to make the contributions to the Plan required by Article XX of the National Bituminous Coal Wage Agreement of 1984, interest (calculated at a rate established by the Trustees at the beginning of each calendar year) shall accrue from the date due until the date on which payment is made. If the Trustees file suit to collect unpaid contributions, plus accrued interest, and a judgment is entered by the courts in favor of the Trustees, the judgment entered shall provide for an additional amount equal to the accrued interest in liquidated damages.

(11) Upon the termination or partial termination of the Plan, the rights of all affected Participants to benefits accrued to the date of such termination or partial termination, are nonforfeitable to the extent required by law or to the extent provided for under the National Bituminous Coal Wage Agreement of 1984.

(12) Except as otherwise provided herein, it shall be unlawful for any part of the assets held pursuant to this Plan, other than such part as is required to pay taxes and administrative expenses, to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the Participants of the Plan except that in the case of a contribution which is made by an Employer by a mistake of fact, or law (other than a mistake relating to Plan qualification), such mistaken contribution may be returned to the Employer within six months after the Trustees determine that the contribution was mistakenly made.

(13) To the extent not inconsistent with the provisions hereof, the Trustees shall comply with the further requirements imposed upon them by and shall have the further powers contained in Article XX, Sections (e), (f), and (g) of the National Bituminous Coal Wage Agreement of 1984, as amended from time to time, and any successor agreements to that specific Agreement.

(14) This instrument, and the 1974 Pension Trust shall be construed, regulated and administered in accordance with Federal law, and, to the extent not preempted or inconsistent with such Federal law, the laws of the District of Columbia.

(15) Any action of the Employers which may, or must, be taken hereunder may be taken by those Employers who at the time are parties to the Wage Agreement and who represent fifty-one percent (51%) or more of the total contributions made to the 1974 Pension Trust during the calendar year previous to that in which the action is taken, and the Trustees shall be fully protected in acting in accordance with any action taken by such Employers, to the extent permitted by law.

(16) Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978 as amended from time to time and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 1984.

(17) The Employers, the Union and the Trustees shall fully cooperate to obtain all necessary rulings and do all other acts appropriate to ensure that the 1974 Pension Plan and Trust are qualified under Section 401 of the Internal Revenue Code, and that contributions are deductible under Section 404 of the Internal Revenue Code.

## ARTICLE IX - PARTICIPANTS COVERED BY A SUCCESSOR PLAN

The following individuals shall cease to be Participants in the Plan and shall not be entitled to benefits hereunder (with respect to Credited Service prior to December 6, 1977):

(1) A Participant in this Plan who retired prior to December 6, 1977, if the Participant is entitled to a pension under a plan qualified under Section 401(a) of the Internal Revenue Code and established by an employer pursuant to an agreement with the UMWA which is a successor agreement to the Western Surface Coal Wage Agreement of 1975, provided that the pension is at least as great as the pension due under the terms of this Plan in effect on December 5, 1977;

(2) A Participant in this Plan prior to December 6, 1977, who on or after December 6, 1977, is an employee of a employer which is signatory with the UMWA to a successor agreement to the Western Surface Coal Wage Agreement of 1975, if the Participant becomes a participant in a pension plan qualified under Section 401(a) of the Internal Revenue Code established by such employer pursuant to such agreement, provided that the plan gives credit for participation, vesting and Credited Service prior to December 6, 1977, determined under the terms of this Plan in effect on December 5, 1977.

## ARTICLE X

A. As soon as practicable after an Employer's complete or partial withdrawal, the Trustees shall calculate and demand payment of withdrawal liability in accordance with Section 4219 of ERISA.  In the case of a

74PP.22

Construction Employer that withdraws on or after July 1, 1981, the amount of unfunded vested benefits allocable to it will be determined with reference to the unfunded vested benefits of the Coal Mine Construction Segment of the 1974 Pension Plan. In the case of an Employer other than a Construction Employer that withdraws on or after July 1, 1981, the amount of unfunded vested benefits allocable to it will be determined with reference to the unfunded vested benefits of the Bituminous Coal Segment of the 1974 Pension Plan.

B. The Trustees shall establish the Bituminous Coal and Coal Mine Construction Segments of the 1974 Pension Plan for the sole purpose of calculating employer withdrawal liability under this Article. Assets and liabilities will be allocated to the two segments in accordance with the following:

(1) All of a Participant's Credited Service under the Plan through June 30, 1981 will be allocated to the Coal Mine Construction Segment if the Participant's last Credited Service on or before June 30, 1981 was rendered for a Construction Employer. All of a Participant's Credited Service under the Plan through June 30, 1981 will be allocated to the Bituminous Coal Segment if the Participant's last Credited Service on or before June 30, 1981 was rendered for an Employer other than a Construction Employer. Service credited under the Plan for any period after June 30, 1981 will be allocated to the Coal Mine Construction Segment if rendered for a Construction Employer, or to the Bituminous Coal Segment if rendered for an Employer other than a Construction Employer. If a Participant renders service for both a Construction Employer and an Employer other than a Construction Employer within the same calendar year, his Credited Service will be allocated on a pro rata basis between the two segments. For purposes of this paragraph, in the case of service credit earned in the 1981 calendar year, credit hours attributable to service prior to July 1, 1981, will be assigned as follows:

| Number of Credit Hours Attributable to Participant's Service Prior to July 1, 1981 | Credited Service Assigned to Period Prior to July 1, 1981 |
|---|---|
| 250 or less | 0 |
| 250 - 499 | 1/4 year |
| 500 - 749 | 1/2 year |
| 750 - 999 | 3/4 year |
| 1,000 or more | 1 year |

(2) An initial allocation of assets will be made to the Bituminous Coal and Coal Mine Construction Segments in order that as of June 30, 1981, the proportion of assets to liabilities in each segment is identical. Contributions and withdrawal liability payments made by Construction employers after June 30, 1981 will be allocated to the Coal Mine Construction Segment. Contributions and withdrawal liability payments made by Employers other than Construction Employers after June 30, 1981 will be allocated to the Bituminous Coal Segment. Plan and Trust expenses after June 30, 1981, will be allocated to each segment in the same ratio as the segment's income bears to the total income of the Trust; however, extraordinary expenses generated specially by the

segment will be charged to that segment alone. The Trustees' determinations concerning the initial allocation of assets under this paragraph shall be final and binding on all persons dealing with the Plan.

(3) Investment income (including realized and unrealized capital gains and losses) will be allocated monthly to each segment in the same ratio that the segment's assets bear to the total assets of the Trust.

(4) Pension and other benefit payments made under the Plan will be charged to each segment in the same ratio that credited service on which a payment is based is allocated to the specific segment.

C. The Trustees shall adopt (and modify as appropriate) a reasonable interest assumption used to calculate the value of unfunded vested benefits under the Plan which will be uniformly applicable to withdrawals by all Employers.

D. The Bituminous Coal and Coal Mine Construction Segments are maintained solely for the purpose of determining withdrawal liability under this Article. The benefit levels, eligiblity rules, credited service provisions, and all other rules and regulations of the Plan shall be applied uniformly to all Participants. All Trust assets are available to pay all benefits under the Plan. In the event that only one segment has unfunded vested benefits in a given Plan year, the excess of allocated assets over the value of vested benefits in the other segment will be used to reduce the first segment's unfunded vested benefits. Notwithstanding any other provision of this Article X, if as of the last day of any Plan year the Trustees determine that all or substantially all of the Employers that have an obligation to contribute to one segment have withdrawn from that segment, the liability of any Employer that withdraws from the Plan in that or any subsequent Plan year shall be calculated under the provisions in effect for withdrawals occurring on or before June 30, 1981.

E. The amount of unfunded vested benefits allocable to an Employer that withdraws from the Plan is the product of —

(1) the appropriate segment's unfunded vested benefits as of the end of the Plan year preceding the Plan year in which the Employer withdraws, less the value as of the end of such year of all outstanding claims for withdrawal liability with respect to that segment which can reasonably be expected to be collected from that segment's Employers withdrawing before such year; multiplied by

(2) a fraction – (a) the numerator of which is the total amount required to be contributed by the Employer under the Plan with respect to the appropriate Plan segment for the last 5 Plan years ending before the withdrawal, and

(b) the denominator of which is the total amount contributed with respect to the appropriate Plan segment under the Plan by all of the appropriate segment's Employers for the last 5 Plan years ending

74PP.24

before the withdrawal, increased by any Employer contributions owed (to the segment) with respect to earlier periods which were collected in those Plan years, and decreased by any amount contributed to the Plan during those Plan years by Employers who withdrew from that segment of the Plan during those Plan years.

(3) For purposes of subparagraph (E)(2)(b) the "total amount contributed" for a Plan year includes contributions actually received during the Plan year, and contributions received on or before July 31 following the end of the Plan year. Contributions counted for one Plan year may not be counted for any other Plan year.

F. For purposes of determining whether a withdrawal has occurred and for purposes of assessing withdrawal liability under this Article, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single Employer and all such trades and businesses as a single Employer. (The preceding sentence shall not be deemed to preclude assessing liability under any other applicable law.) In the case of an Employer which contributes to the 1974 Pension Trust through one or more trades or businesses which would otherwise be considered Construction Employers and one or more trades or businesses which would otherwise be considered Employers other than Construction Employers, all calculations related to the establishment of the Bituminous Coal and Coal Mine Construction Segments of the Plan will be performed as if each trade or business were a separate Employer. In the case of an Employer described in the preceding sentence, the amount of unfunded vested benefits allocable to the Employer in the event of a complete withdrawal will be the sum of all unfunded vested benefits allocable to the individual trades or businesses calculated as if they were separate Employers. In the case of an Employer described in the third sentence of this paragraph, the amount of unfunded vested benefits allocable in the event of a partial withdrawal will be determined by the Trustees, based upon the proportional extent to which the partial withdrawal is attributable to each trade or business, and assigning liability (based on the unfunded vested benefits of the appropriate segments) accordingly. The Trustees shall have the authority to establish rules implementing such assignment of liability.

G. Payment of withdrawal liability must begin within 60 days, notwithstanding any request for review or appeal of the determination of the amount of such liability, after the date on which the Trustees notify the Employer of the amount of withdrawal liability. Annual payments are to be made in twelve (12) equal installments, due on the 10th day of each month.

H. If payment is not made when due, interest on the payment shall accrue from the due date until the date on which the payment is made. Interest on delinquent payment of withdrawal liability shall be payable at the rate established by the PBGC pursuant to Section 4219(c)(6). Default will occur if the Employer fails to make payment when due and then fails to make payment within 60 days after receiving written notice from the Trustees of such failure, or as otherwise determined pursuant to Section 4219(c)(5).

I. If any Employer defaults on payment (as determined pursuant to Section 4219(c)(5)), the Trustees shall require immediate payment of the outstanding

amount of withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made. If the Trustees file suit to collect the outstanding balance of withdrawal liability, plus accrued interest, and a judgment is entered by the court in favor of the Trustees, the judgment entered shall provide for an additional amount equal to 20% of the outstanding amount of withdrawal liability as liquidated damages. The Trustees shall have the authority to promulgate rules regarding default and an arbitration procedure.

J. An Employer is entitled to prepay the outstanding amount of any unpaid withdrawal liability, plus accrued interest, if any, in whole or in part, without penalty. However, if the pre-payment is made pursuant to a withdrawal which is later determined to be part of a withdrawal described in Section 4219(c)(1)(D) of ERISA, the withdrawal liability of the Employer shall not be limited to the amount of pre-payment.

K. In the event that this Plan terminates, an Employer's obligation to make payments under this Article ceases at the end of the Plan year in which the assets of this Plan (exclusive of withdrawal liability claims) are sufficient to meet all obligations of this Plan, as determined by the PBGC.

L. In conformance with Section 4208(c) of ERISA, in any Plan year following an Employer's partial withdrawal under Section 4205(a)(1) of ERISA, when the number of contribution base units with respect to which the Employer has an obligation to contribute for such year equals or exceeds 130% of the number of contribution base units with respect to which the Employer had an obligation to contribute in the partial withdrawal year, the amount of the Employer's partial withdrawal liability payment for such year shall be reduced pro rata, in accordance with PBGC regulations.

M. The presumptive partial withdrawal rules in Section 4205(a) and (b) of ERISA shall apply to this Plan.

N. A complete or partial withdrawal of an Employer (hereinafter in this section referred to as the "seller") under this Plan does not occur solely because, as a result of a bona fide, arm's-length sale of assets to an unrelated party (hereinafter in this section referred to as the "purchaser"), the seller ceases covered operations or ceases to have an obligation to contribute for such operations, if —

(1) the purchaser is, or becomes at the time of the sale, signatory to the Wage Agreement or any other collective bargaining agreement entered into with the United Mine Workers of America which provides that contributions at the same rate as contributions required under the Wage Agreement shall be made to this Plan;

(2) the purchaser has an obligation to contribute to this Plan with respect to the operations for substantially the same employees and the same number of contribution base units for which the seller had an obligation to contribute to this Plan;

(3) the purchaser provides to the Plan for a period of 5 plan years commencing with the first plan year beginning after the sale of assets, a bond or escrow deposit meeting the requirements of Section 4204 (a)(1)(B). If the Plan is in reorganization, the amount of such bond or escrow deposit shall be twice the amount provided in Section 4204 (a)(1)(B).

(4) the contract for sale provides that, if the purchaser withdraws in a complete withdrawal, or a partial withdrawal with respect to operations, during such first 5 Plan years, the seller is secondarily liable for any withdrawal liability the seller would have had to this Plan with respect to the operations (but for this section) if the liability of the purchaser with respect to this Plan is not paid.

If the purchaser —

(1) withdraws before the last day of the fifth plan year beginning after the sale, and

(2) fails to make any withdrawal liability payment when due, because of a complete or partial withdrawal, then the seller shall pay to this Plan an amount equal to the payment that would have been due from the seller but for this section.

If all, or substantially all, of the seller's assets are distributed, or if the seller is liquidated before the end of the 5 plan year period described above, then the seller shall provide a bond issued by a corporate surety company that is an acceptable surety for purposes of Section 412 of ERISA, or an amount held in escrow by a bank or similar financial institution satisfactory to the Trustees, in an amount equal to the present value of the withdrawal liability the seller would have had but for this paragraph.

If only a portion of the seller's assets are distributed during such period, then a bond or escrow shall be required, in accordance with rules established by the Trustees, to the extent consistent with PBGC regulations.

The liability of the party furnishing a bond or escrow under the above paragraph shall be reduced, upon payment of the bond thereof.

For the purposes of this section, the liability of the purchaser shall be determined as if the purchaser had been required to contribute to this Plan in the year of the sale and the 4 plan years preceding the sale the amount the seller was required to contribute for such operations for such 5 plan years.

O. If a court or tribunal of competent jurisdiction determines by a final decision or award that any provision of this Article X creates two separate multiemployer plans, or limits or reduces any employer's liability under this Article in a manner not specifically provided for herein, then the amendments to this Plan, creating two segments for the sole purpose of calculating employer liability under this Article, shall thereafter be considered null and void (without affecting any other provision of this Plan), and all employer liability under this Article shall, prospectively from the date of any such holding, be calculated under the provisions in effect for withdrawals occurring on or before June 30, 1981.

74PP.27

APPENDIX A

ACTUARIAL EQUIVALENCE FACTORS FOR DEFERRED VESTED
RETIREMENT BENEFITS COMMENCING PRIOR TO AGE 62

The following factors are to be multiplied by the full accrued benefit
payable commencing at normal retirement age 62 to yield the equivalent
benefit payable commencing at the indicated age:

| AGE Years | Months | Actuarial Equivalence Factor | AGE Years | Months | Actuarial Equivalence Factor |
|---|---|---|---|---|---|
| 55 | 0 | .522 | 56 | 0 | .569 |
| | 1 | .526 | | 1 | .573 |
| | 2 | .529 | | 2 | .577 |
| | 3 | .533 | | 3 | .582 |
| | 4 | .537 | | 4 | .586 |
| | 5 | .541 | | 5 | .590 |
| | 6 | .545 | | 6 | .595 |
| | 7 | .549 | | 7 | .599 |
| | 8 | .553 | | 8 | .604 |
| | 9 | .557 | | 9 | .608 |
| | 10 | .561 | | 10 | .612 |
| | 11 | .565 | | 11 | .617 |
| 57 | 0 | .621 | 58 | 0 | .680 |
| | 1 | .626 | | 1 | .685 |
| | 2 | .631 | | 2 | .691 |
| | 3 | .636 | | 3 | .696 |
| | 4 | .641 | | 4 | .702 |
| | 5 | .646 | | 5 | .707 |
| | 6 | .651 | | 6 | .713 |
| | 7 | .655 | | 7 | .718 |
| | 8 | .660 | | 8 | .724 |
| | 9 | .665 | | 9 | .729 |
| | 10 | .670 | | 10 | .735 |
| | 11 | .675 | | 11 | .740 |

74PP.28

(cont.)

| AGE | | Actuarial Equivalence | AGE | | Actuarial Equivalence |
| Years | Months | Factor | Years | Months | Factor |
|---|---|---|---|---|---|
| 59 | 0 | .746 | 60 | 0 | .820 |
| | 1 | .752 | | 1 | .827 |
| | 2 | .758 | | 2 | .834 |
| | 3 | .765 | | 3 | .841 |
| | 4 | .771 | | 4 | .848 |
| | 5 | .777 | | 5 | .855 |
| | 6 | .783 | | 6 | .863 |
| | 7 | .789 | | 7 | .870 |
| | 8 | .796 | | 8 | .877 |
| | 9 | .802 | | 9 | .884 |
| | 10 | .808 | | 10 | .891 |
| | 11 | .814 | | 11 | .898 |
| 61 | 0 | .905 | 62 | 0 | 1.000 |
| | 1 | .913 | | | |
| | 2 | .920 | | | |
| | 3 | .928 | | | |
| | 4 | .936 | | | |
| | 5 | .944 | | | |
| | 6 | .952 | | | |
| | 7 | .960 | | | |
| | 8 | .968 | | | |
| | 9 | .976 | | | |
| | 10 | .984 | | | |
| | 11 | .992 | | | |

Actuarial Basis:  95% of 1959-61 U.S. Total Male Population
Mortality Table at 5% Interest.

APPENDIX B

TABLE OF PERCENTAGES TO BE APPLIED
AGAINST PENSION PAYABLE TO PARTICIPANT
UNDER JOINT AND SURVIVOR ANNUITIES

AGE OF PARTICIPANT*

| AGE OF SPOUSE* | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 |
|---|---|---|---|---|---|---|---|---|
| | % | % | % | % | % | % | % | % |
| 50 | 85.1 | 84.2 | 83.3 | 82.3 | 81.2 | 80.2 | 79.1 | 77.9 |
| 51 | 85.6 | 84.7 | 83.7 | 82.7 | 81.7 | 80.7 | 79.6 | 78.5 |
| 52 | 86.0 | 85.1 | 84.2 | 83.2 | 82.2 | 81.2 | 80.1 | 79.0 |
| 53 | 86.5 | 85.6 | 84.7 | 83.7 | 82.8 | 81.7 | 80.7 | 79.6 |
| 54 | 86.9 | 86.1 | 85.2 | 84.3 | 83.3 | 82.3 | 81.2 | 80.1 |
| 55 | 87.4 | 86.6 | 85.7 | 84.8 | 83.8 | 82.8 | 81.8 | 80.7 |
| 56 | 87.9 | 87.1 | 86.2 | 85.3 | 84.4 | 83.4 | 82.4 | 81.3 |
| 57 | 88.3 | 87.5 | 86.7 | 85.8 | 84.9 | 84.0 | 83.0 | 81.9 |
| 58 | 88.8 | 88.0 | 87.2 | 86.4 | 85.5 | 84.5 | 83.6 | 82.6 |
| 59 | 89.3 | 88.5 | 87.7 | 86.9 | 86.0 | 85.1 | 84.2 | 83.2 |
| 60 | 89.7 | 89.0 | 88.3 | 87.4 | 86.6 | 85.7 | 84.8 | 83.8 |
| 61 | 90.2 | 89.5 | 88.8 | 88.0 | 87.2 | 86.3 | 85.4 | 84.5 |
| 62 | 90.7 | 90.0 | 89.3 | 88.5 | 87.7 | 86.9 | 86.0 | 85.1 |

* Age to nearest birthday.

Pension payable to qualified surviving spouse pursuant to Article VII will be
equal to 50% of the Participant's Pension as Reduced in Accordance with the
above Table.

IN WITNESS WHEREOF, the Employers and the Union, pursuant to proper authority, have caused this instument, effective December 6, 1974 and amended as of October 1, 1984, to be signed by their proper officers or representative in Washington, D. C. on this _____ day of _____, 1984.

UNITED MINE WORKERS OF AMERICA

International President

International Vice President

International Secretary-Treasurer

BITUMINOUS COAL OPERATORS ASSOCIATION, INC.

President

74PP.31

# EXHIBIT B

# UNITED MINE WORKERS OF AMERICA

# 1974 PENSION TRUST

UMWA 1974 PENSION TRUST

TABLE OF CONTENTS

(Material in Parenthesis Does Not Appear as a Title in Document)

(INTRODUCTION). . . . . . . . . . . . . . . . . . . . . 1

ARTICLE I (Definitions) . . . . . . . . . . . . . . . . 1

      (1) "Wage Agreement". . . . . . . . . . . . . . 1
      (2) "Employer". . . . . . . . . . . . . . . . . 2
      (3) "Plan". . . . . . . . . . . . . . . . . . . 2
      (4) "Trustees". . . . . . . . . . . . . . . . . 2
      (5) "UMWA" or "Union" . . . . . . . . . . . . . 2

ARTICLE II      (Administration). . . . . . . . . . . . . . 2

ARTICLE III     (Creation). . . . . . . . . . . . . . . . . 3

ARTICLE IV      (Trustee responsibilities). . . . . . . . . 3

ARTICLE V       (Control of assets) . . . . . . . . . . . . 4

ARTICLE VI      (Asset management). . . . . . . . . . . . . 4

ARTICLE VII     (Trustee compensation). . . . . . . . . . . 6

ARTICLE VIII    (Trustee liability) . . . . . . . . . . . . 6

ARTICLE IX      (Record-keeping, reporting) . . . . . . . . 7

ARTICLE X       (Employer action) . . . . . . . . . . . . . 8

ARTICLE XI      (Amendments). . . . . . . . . . . . . . . . 9

ARTICLE XII     (Use of trust assets) . . . . . . . . . . . 9

SIGNATURES. . . . . . . . . . . . . . . . . . . . . . . .10

UNITED MINE WORKERS OF AMERICA
1974 PENSION TRUST

Pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974, there is hereby established a trust to be known as the "United Mine Workers of America 1974 Pension Trust" (hereinafter sometimes referred to as "Trust" or "1974 Pension Trust") for the purpose of making benefit payments pursuant to the provisions of the United Mine Workers of America 1974 Pension Plan (hereinafter sometimes referred to as the "Plan" or the "1974 Pension Plan"). The provisions of said 1974 Pension Trust are effective as of December 6, 1974, and, as amended as of March 27, 1978, April 29, 1980, June 7, 1981, and October 1, 1984, are as set forth below.

Except to the extent otherwise required by the Employee Retirement Income Security Act of 1974 ("ERISA") or other applicable law, governmental rule or regulation, and except to the extent that the 1974 Pension Plan or 1974 Pension Trust specifically provides otherwise, or as required by the context, all amendments to the 1974 Pension Trust effective as of October 1, 1984, pursuant to the authority contained in Article XI herein, shall be given only prospective application commencing on October 1, 1984, and shall have no retroactive application whatever. The amendments effective as of October 1, 1984, shall not be deemed to be an approval or disapproval by the parties to any action or failure to act by any Trustee or Trustees for any period prior to October 1, 1984. The terms and provisions of the 1974 Pension Trust in effect as of September 30, 1984, shall continue in effect and shall be applicable only to circumstances or events which occurred prior to October 1, 1984, and which are not governed by the amendments adopted as of October 1, 1984.

ARTICLE I

The following terms shall have the meanings herein set forth:

(1) "Wage Agreement" means the National Bituminous Coal Wage Agreement of 1974, as amended from time to time and any successor thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 1984. Any reference in this Trust to the Wage Agreement or to the bituminous coal wage agreement then in effect shall also refer (a) to the Sub-bituminous and Lignite Agreement and the National Coal Mine Construction Agreement with respect to any period for which such agreements provide that pension benefit payments shall be made available pursuant to this Trust or a predecessor Trust established under the bituminous coal wage agreement, (b) with respect to any period prior to the 1950 Bituminous Coal Wage Agreement, to any collective bargaining contract between the United Mine Workers of America and any employer in the bituminous coal industry, and (c) solely for the purposes of determining who is required to make contributions to, and receive benefits under, the 1974 Pension Trust, any other collective bargaining contract entered into between the United Mine Workers of America and any employer in the bituminous coal industry, which contract provides that contributions shall be made to or benefit payments made from this Plan.

(2)  "Employer" means an employer who is signatory to the Wage Agreement or, with respect to prior periods, was signatory to the bituminous coal wage agreement then in effect.

(3)  "Plan" shall refer to the "United Mine Workers of America 1974 Pension Plan" established pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974.

(4)  "Trustees" shall mean the trustees of this Trust designated in accordance with the provisions of Article II hereof, who shall be the named fiduciaries required pursuant to Section 402 of ERISA and the Plan Administrator, as that term is defined in that Act; provided, however, that this instrument may be amended pursuant to Article XI hereof to designate other or additional named fiduciaries.

(5)  "UMWA" or "Union" shall mean the United Mine Workers of America.

## ARTICLE II

The 1974 Pension Trust shall be administered by a Board of five Trustees, two of whom shall be appointed as representatives of the Employers, two of whom shall be appointed as representatives of the Union, and one of whom shall be a neutral party selected by the other four.  The Union may remove the Trustees appointed by it and the Employers may remove the Trustees appointed by them. The neutral party may be removed by the joint action of the Trustees appointed by the Union and the Trustees appointed by the Employers.

For purposes of taking any action and all other aspects of administration under the 1974 Pension Plan or Trust, a quorum shall consist of two of the five Trustees, one of whom must be a representative of the Union, and one of whom must be a representative of the Employers; provided, however, that a quorum shall not be deemed to exist unless all Trustees have received reasonable notice of the meeting at which any action is taken, unless such notice is waived.  Any Trustee may call a meeting of the Trustees pursuant to the provisions hereof.

In the event that a meeting is held or action is taken without the participation of both of the Trustees appointed by the Union and both of the Trustees appointed by the Employers, each side (the Employer Trustees and the Union Trustees) shall be required to vote as a unit.  In all other cases, each Trustee will be entitled to one vote.

In the event of resignation, death, removal, inability or unwillingness to serve of a Trustee appointed by the Employers or a Trustee appointed by the Union, the Employers shall appoint the successor of the Trustee originally appointed by them in accordance with the terms of Article XX of the National Bituminous Coal Wage Agreement of 1984, as amended from time to time, and any successor agreements to that specific Agreement, and the Union shall appoint the successor of the Trustee originally appointed by it.  In the event of resignation, death, removal, inability or unwillingness to serve of the neutral Trustee, the Trustees appointed by the Employers and the Trustees appointed by the Union shall designate the successor neutral Trustee.  In the event of a

deadlock on the designation or agreement as to any future neutral Trustee, an impartial umpire shall be selected either by agreement of the four Trustees, representatives of the contracting parties hereto, or by petition by either of the contracting parties hereto to the United States District Court of the District of Columbia for the appointment of such an impartial umpire, all as made and provided in Section 302(c) of the Labor-Management Relations Act of 1947.

The five Trustees so designated shall constitute the Board of Trustees to administer the 1974 Pension Trust, as it may be amended from time to time.

It is agreed by the contracting parties hereto that the Trustees herein provided for, or their duly appointed successors, shall serve for the duration of the National Bituminous Coal Wage Agreement of 1984 as amended from time to time, and as long thereafter as the proper continuation and administration of said Trust shall require. At the expiration of that specific Agreement, and upon the expiration of each successor to that specific Agreement, the Employers and the Union shall have the right to select new Trustees as provided for herein, including the selection of the neutral Trustee as provided for herein.

One of the Trustees designated by the Union shall be Chairman of the Trustees.

This Trust shall have its principal place of business in Washington, D.C., or such other place as may be determined by the Trustees.

ARTICLE III

The 1974 Pension Trust established with the Trustees hereunder is an irrevocable trust created pursuant to Section 302(c) of the Labor-Management Relations Act of 1947, which shall endure as long as the purposes for its creation shall exist. The 1974 Pension Trust consists of such sums of money and other property, acceptable to the Trustees, as from time to time shall be contributed to, held by, or paid or delivered to the Trustees and such earnings, profits, and increments thereon as may occur from time to time. All such money and other property delivered to the Trustees and all investments and reinvestments made therewith or proceeds thereof and all earnings and profits thereon, less the payments which at the time of reference shall have been made by the Trustees as authorized herein, are referred to herein as the "assets of the 1974 Pension Trust." The assets of the 1974 Pension Trust shall be held by the Trustees and dealt with in accordance with the express provisions of this instrument and the requirements of law.

The monies to be paid into the 1974 Pension Trust shall not in any manner be liable for or subject to the debts, contract, liabilities or torts of the parties entitled to such money, i.e., the beneficiaries of said 1974 Pension Trust under the terms of the instrument.

ARTICLE IV

The Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, are directd and authorized (a) to hold, to invest and to

reinvest the assets of the 1974 Pension Trust as provided herein; (b) to pay monies from the 1974 Pension Trust in accordance with the terms of the Plan for the purpose of distributing the benefits payable under the Plan; and (c) to pay the cost of administration of the 1974 Pension Trust as hereinafter provided.

## ARTICLE V

The Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, shall have full discretionary powers of management and control, of sale and resale, in fee simple or otherwise, mortgage, lease, and pledge, of the assets of the 1974 Pension Trust, and shall not be restricted to investments in securities or property of the character now or hereafter authorized by law or rules of the United States District Court for the District of Columbia. To the extent permitted by ERISA, the Trustees are authorized to invest assets of the 1974 Pension Trust in deposits described in Section 408(b)(4) of ERISA, and in common or collective trust funds or pooled investment funds, including but not limited to those described in Section 408(b)(8) of ERISA. In the event that the Trustees invest assets of the 1974 Pension Trust in a pooled investment trust which is exempt from taxation as a group trust under Sections 401(a) and 501(a) of the Internal Revenue Code of 1954 (with respect to funds which equitably belong to participating trusts described in such Sections of the Code), the provisions of said pooled investment trust shall be deemed to be a part of the Plan. The assets of the 1974 Pension Trust shall be invested and reinvested, without distinction between principal and income, in securities and other forms of property, including but not limited to, real estate, corporate stocks (common and preferred), debentures, bonds and other obligations whether or not secured. The Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, shall not be limited to the amount or type of any investment in relation to the amount or type of investments constituting the Trust as a whole, except as provided by ERISA.

The Trustees or such other persons as may be properly designated pursuant to Article IX hereof may, in their discretion, keep such portion of the assets of the 1974 Pension Trust in cash or cash balances as the Trustees may determine to be reasonably necessary to satisfy the current needs of the Trust.

## ARTICLE VI

Neither by way of limitation nor in derogation, but in amplification of any powers granted herein, the Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, are further authorized:

(1) To purchase, sell, exchange, convey, transfer or dispose of, and also to grant options with respect to, any property, whether real or personal, at any time held by them and to make any sale, private or public;

(2) To retain, manage, operate, repair, improve, develop, preserve, mortgage or lease for any period any real property interests or rights held by the Trustees upon such terms and conditions as the Trustees deem proper, either

alone or by joining with others, using other trust assets for any of such purposes if by them deem advisable; to modify, extend, renew, or otherwise adjust any or all of the provisions of any such mortgage or lease, including the waiver of rentals, if by them deemed advisable;

(3) To compromise, compound and settle any debt or obligations due from third persons to them or to third persons from them, as Trustees hereunder, and to reduce the rate of interest on, to extend or otherwise modify, or to foreclose upon default or otherwise enforce, any such obligations;

(4) To vote in person or by proxy and to give general or special proxies or powers of attorney, with or without power of substitution, on any securities or other investments held by them;

(5) To exercise any rights or options appurtenant to any securities or other property held by them for the conversion thereof into other securities or property, or to exercise any rights or options held by them to subscribe for or purchase additional securities or other property, and to make any and all necessary payments with respect to any such conversion or exercise;

(6) To join in, dissent from or oppose, the reorganization, recapitaliza-tion, consolidation, sale or merger of corporations or properties of which they may hold stocks, bonds or other securities or in which they may be interested, upon such terms and conditions as they may deem prudent; to pay any expenses, assessments or subscriptions in connection therewith and to accept any securities or property (whether or not the Trustees would be authorized to then invest in such securities or property) which may be issued upon any such reorganization, recapitalization, consolidation, sale or merger, and thereafter to hold the same;

(7) To make, execute, acknowledge and deliver any and all deeds, leases, mortgages, assignments, documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

(8) To enforce any right, obligation or claim in their absolute discretion and in general to protect in any way the interest of the Trust, either before or after default with respect to any such right, obligation or claim, and, in case they shall consider such action for the best interest of the Trust, in their absolute discretion to abstain from the enforcement of any right, obligation or claim and to abandon any property, whether real or personal, which at any time may be held by them;

(9) To borrow or raise money for the purpose of the Trust in such amount and upon such terms and conditions as in their absolute discretion they may deem advisable; and for any sums so borrowed to issue their promissory note as Trustees and to secure the repayment thereof by mortgaging or pledging all or any part of the Trust; and no person lending money to the Trustees shall be bound to see to the application of the money loaned or to inquire into the validity, expediency or propriety of any such borrowing;

74PT.5

(10) To employ suitable agents and counsel from time to time, and to pay them reasonable expenses and compensation;

(11) To retain without liability for depreciation any securities or property at any time purchased and/or received by the Trustees as a part of the Trust;

(12) To do all acts which may be necessary to comply with any of the requirements of ERISA or any other federal law;

(13) To enter into any and all contracts and agreements for carrying out the terms of the Plan and the 1974 Pension Trust and for the administration of such Plan and Trust; and

(14) To do all acts which they may deem necessary or proper and to exercise any and all powers of the Trustees under this instrument under such terms and conditions as they may deem to be for the best interest of the Trust.

The Trustees may, in their sole discretion, cause the securities which from time to time may comprise the Trust, to be registered in their name as Trustees hereunder, or in the name of their nominee without disclosing the ownership thereof or to take and keep the same unregistered, and to retain them, or any part thereof, in such condition that they will pass by delivery.

Notwithstanding the above authority granted the Trustees hereunder, no power shall be exercisable in any manner which will, or might, prevent the 1974 Pension Plan and Trust from qualifying, or continuing to qualify, under Section 401 of the Internal Revenue Code, nor shall any action be taken by the Trustees which violates the requirements of ERISA or any other applicable law, governmental rule or regulation.

ARTICLE VII

The expenses incurred by the Trustees in the performance of their duties hereunder, including reasonable compensation for the Trustees in accordance with Section 408(c)(2) of ERISA, for agents, and for service of counsel rendered to the Trustees and expenses incident thereto, and all other proper charges and disbursements of the Trustees, including all taxes of any kind and all kinds whatsoever that may be levied or assessed under existing or future laws of any jurisdiction upon or in respect of the Trust hereby created or any money, property or securities forming a part thereof, shall be paid by the Trustees out of the Trust.

ARTICLE VIII

A Trustee shall not be liable for the making, retention, or sale of any investment or reinvestment made by him as herein provided; for any loss to or diminution of the Trust; or for anything done or omitted under this instrument, except for his own willful misconduct or lack of good faith, or any other action or omission for which personal liability is imposed under Part 4 of Subtitle B of Title I of ERISA. Any Trustee may consult with legal counsel concerning any questions which may arise with reference to his duties under

this instrument, and, except as otherwise provided by ERISA, the opinion of such counsel shall be full and complete protection in respect to any action taken or suffered by such Trustee hereunder in good faith and in accordance with the opinion of such counsel.

When and if a monetary claim or suit is lodged against one or more fiduciaries of the Trust, including the Trustees thereof, in their individual capacities, arising out of their actions as fiduciaries, the Trust may engage and compensate counsel to represent such fiduciary until a final court decision, or a final government agency decision if no court appeal is filed, finds that such fiduciary in his individual capacity (1) has breached his fiduciary obligations under the Employee Retirement Income Security Act; (2) by so doing has caused a loss to the Trust or its corresponding Plan or has gained by use of Trust assets; and (3) is therefore liable in his individual capacity for damages or to return any profit occasioned by such breach to the complaining person, persons, entity or entities.

If the Trust expends moneys for counsel under the preceding paragraph, and the individual liability described therein is so finally determined against one or more fiduciaries, each individual found so liable shall reimburse the Trust for moneys so expended for his counsel.

No provision in this Article shall be construed in its interpretation so as to violate the provisions of Section 410 of the Employee Retirement Income Security Act.

ARTICLE IX

The Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, shall keep accurate and detailed accounts of all investments, receipts, and disbursements and other transactions hereunder, and such accounts, books and records relating thereto shall be open to inspection and audit by the Employers and the Union and by the beneficiaries of the 1974 Pension Trust at all reasonable times at the offices of the 1974 Pension Trust. The Trustees, or such other persons as may be properly designated pursuant to this Article IX shall be responsible for providing participants and beneficiaries under the plan with all information required to be furnished pursuant to the provisions of ERISA or the regulations promulgated thereunder.

For purposes of computing charges to the funding standard account of the Trust, the Trustees shall adopt any actuarial cost or funding method designated by the Employers, including the "short-fall method," and permitted now or hereafter by applicable federal law and federal regulations issued thereunder. The Trustees shall give the Employers notice sixty (60) days prior to the time any such election is required or permitted.

The Trustees, or such other persons as may be properly designated pursuant to this Article IX shall be responsible for maintaining records sufficient to comply with any requirements of ERISA and for the filing of all reports with the Labor Department, Treasury Department, and Pension Benefit Guaranty Corporation which may be required by any provision of ERISA or the regulations issued thereunder, including the plan description and reports specified by Section 101(b). A copy of each document or report provided to plan

participants or beneficiaries or filed by the Trustees pursuant to the requirements of ERISA or any other applicable law, governmental rule or regulation shall be sent to the Employers and to the Union unless the right to receive such copy has been waived in writing. The Trustees are authorized to apply for permission to implement an alternative method of satisfying any of the requirements of this Article IX in accordance with Section 110 of ERISA, and, upon receiving the approval of the Labor Department for such alternative method, may utilize such method in lieu of the corresponding requirements of ERISA and of Article IX of this instrument.

The Trustees shall provide the Employers and the Union with such other information and/or documentation as the Employers and the Union may reasonably request within a reasonable time from when such request shall be made.

Within 90 days following the close of each calendar year, or following the close of each such other annual period as may be adopted by the Trustees, and within 90 days after a Trustee ceases to be a Trustee as provided for in Article II hereof, the Trustees shall file with the Employers and the Union a written report setting forth in such form and detail as they may request the transactions effected by the Trustees during such calendar year or other annual period to the date on which such Trustee's tenure ceases. The annual report shall incorporate the report of an independent certified public accountant and shall be the same as required by Section 103 of ERISA unless the Employers and the Union shall jointly request that additional or supplemental information be incorporated in the report which they receive. Upon the expiration of ninety (90) days from the date of any report to the Employers and the Union, the Trustees shall be forever released and discharged from any liability or accountability to anyone as respects the propriety of their acts or transactions shown in the aforementioned report except as otherwise provided by law or with respect to any acts or transactions as to which the Employers or the Union shall file written objections with the Trustees within such period of ninety (90) days.

The Trustees are hereby authorized to allocate fiduciary responsibilities in any manner permitted pursuant to Section 405(c) of ERISA.

The Trustees may appoint an investment manager or managers to manage any investments held under this instrument as permitted by Section 402(c) of ERISA.

To the extent not inconsistent with the provisions hereof, the Trustees shall comply with the further requirements imposed upon them by and shall have the further powers contained in Article XX, Sections (e), (f), and (g) of the National Bituminous Coal Wage Agreement of 1984, as amended from time to time, and any successor agreements to that specific Agreement.

## ARTICLE X

Any action of the Employers which may, or must, be taken hereunder may be taken by those Employers who at the time are parties to the Wage Agreement and who represent fifty-one percent (51%) or more of the total contributions made

to this Trust during the calendar year (or such shorter period which may have elapsed after the effective date of this Trust), previous to that in which the action is taken, and the Trustees shall be fully protected in acting in accordance with any action taken by such Employers, to the extent permitted by law.

Any Employer who employed any participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 1984.

## ARTICLE XI

The Employers and the Union, by joint action, reserve the right at any time and from time to time to modify or amend in whole or in part any or all of the provisions of this instrument, without reopening or otherwise affecting the integrity of any other provision of the Wage Agreement, by a written agreement between the Employers and Union, provided, however, that such modification or amendment does not permit any part of the corpus or income of the Trust to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the participants and their beneficiaries, and provided further, that the Employers and the Union have delegated to the Trustees the authority and responsibility to make certain changes and amendments as set forth in Article XX(g)(4) of the National Bituminous Coal Wage Agreement of 1984, as amended from time to time, and any successor agreements to that specific Agreement.

## ARTICLE XII

Notwithstanding anything to the contrary contained in this instrument, or any amendment hereto, it shall be unlawful for any part of the 1974 Pension Trust, other than such part as is required to pay taxes and administrative expenses, to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the participants and beneficiaries of the Plan, except that in the case of a contribution which is made by an Employer by a mistake of fact, or law (other than a mistake relating to Plan qualification), such mistaken contribution may be returned to the Employer within six months after the Trustees determine that the contribution was mistakenly made. Monies held by the 1974 Pension Trust do not constitute a part of the deceased beneficiary's estate which can be claimed by his administrator, executor, heirs, or creditors, unless such person or persons are otherwise eligible under the terms and conditions of the Plan, nor are said monies equivalent to the proceeds of an insurance policy in which a beneficiary may be designated; and no participant or beneficiary of the Plan may, during his lifetime, assign, devise or will monies from this Trust, and any attempt so to do shall be void.

74PT.9

To the extent not inconsistent with and permitted by applicable law, governmental rule or regulation, and in such manner as to ensure that the 1974 Pension Plan and Trust is qualified under Section 401 of the Internal Revenue Code and that contributions are deductible under Section 404 of the Internal Revenue Code, the Trustees shall transfer assets or liabilities, or both, of the Trust, in such amounts, at such times and in such manner as the Employers and the Union may jointly direct, to any other trust qualified under Section 401 of the Internal Revenue Code which provides benefits to persons who at any time were or are participants under the 1974 Pension Plan.

The Employers, the Union, and the Trustees shall fully cooperate to obtain all necessary rulings and do all other acts appropriate to ensure that the 1974 Pension Plan and Trust is qualified under Section 401 of the Internal Revenue Code and that contributions are deductible under Section 404 of the Internal Revenue Code.

Any assets which remain upon termination of the 1974 Pension Plan, after satisfaction of all benefits and liabilities arising under the 1974 Pension Plan and 1974 Pension Trust in a manner consistent with the principles of Section 4044 of ERISA, shall be distributed as may be mutually agreed upon by the Employers and the Union.

### ARTICLE XIII

This instrument shall be construed, regulated and administered under Federal law and, to the extent not preempted or inconsistent with such Federal law, the laws of the District of Columbia.

IN WITNESS WHEREOF, the Employers and the Union, pursuant to proper authority, have caused this instrument, effective December 6, 1974, and amended as of October 1, 1984, to be signed by their proper officers or representatives in Washington, D.C., this_____ day of _____, 1984.

UNITED MINE WORKERS OF AMERICA

_____
International President

_____
International Vice President

_____
International Secretary-Treasurer

BITUMINOUS COAL OPERATORS' ASSOCIATION, INC.

_____
President

Accepted by _____  2-7-85
                  (Trustee)              (Date)

74PT.10

Accepted by: _Paul R. Dea_ 2-7-85
                    (Trustee)        (Date)

Accepted by _Joseph P. Bre_ 2-7-85
                    (Trustee)        (Date)

Accepted by _Wm. Miller_ 2-7-85
                    (Trustee)        (Date)

Accepted by _____ _____
                    (Trustee)        (Date)

74PT.11

# EXHIBIT C

UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN
EFFECTIVE DECEMBER 6, 1974

## ARTICLE I - INTRODUCTION

Pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974, the United Mine Workers of America 1974 Pension Plan (hereinafter sometimes referred to as the "1974 Pension Plan" or the "Plan") provides pension benefits as hereinafter set forth. The Plan is effective as of December 6, 1974 (the "effective date") and, as amended March 27, 1978, April 29, 1980, June 7, 1981, October 1, 1984, February 1, 1988, February 1, 1991, January 16, 1992, December 16, 1993, August 16, 1996, January 1, 1998, and January 1, 2002, the provisions of the Plan are set forth below. Except in the case of total disability resulting from mine accidents occurring after the effective date, this Plan does not provide benefits to persons retiring on or before December 31, 1975, but such persons may be entitled to pension benefits under the United Mine Workers of America 1950 Pension Plan (hereinafter referred to as the "1950 Pension Plan").

The 1974 Pension Plan and Trust is a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950.

Except to the extent otherwise required by the Employee Retirement Income Security Act of 1974 ("ERISA") or other applicable law, governmental rule or regulation, and except to the extent that the 1974 Pension Plan or 1974 Pension Trust specifically provides otherwise, or as required by the context, all amendments to the 1974 Pension Plan effective as of January 1, 2002, pursuant to the authority contained in Article VIII herein, shall be given only prospective application commencing on January 1, 2002, and shall have no retroactive application whatsoever. The amendments effective as of January 1, 2002, shall not be deemed to be an approval or disapproval by the parties to any action or failure to act by any Trustee or Trustees for any period prior to January 1, 2002. The terms and provisions of the 1974 Pension Plan in effect as of December 31, 2001, shall continue in effect and shall be applicable only to circumstances or events which occurred prior to January 1, 2002, and which are not governed by the amendments adopted as of January 1, 2002.

*Section A* Definitions

(1)     "Wage Agreement" means the National Bituminous Coal Wage Agreement of 1974, as amended from time to time and any successor thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2002. Any reference in this Plan to the Wage Agreement or to the bituminous coal wage agreement then in effect shall also refer (a) to the Sub-bituminous and Lignite Agreement and the National Coal Mine Construction Agreement with respect to any period for which such agreements provide that pension benefits shall be made available pursuant to this Plan or a predecessor plan established under the bituminous coal wage agreement, and (b) with respect to any period prior to the 1950 Bituminous Coal Wage Agreement, to any collective bargaining contract between the United Mine Workers of America and any employer in the bituminous coal industry, and (c) solely for the purposes of determining who is required to make contributions to, and receive benefits under, the 1974 Pension Trust, any other collective bargaining contract entered into between the United Mine Workers of America and any Employer in the bituminous coal industry, which contract provides that contributions shall be made to or benefit payments made from this Plan.

(2)     "Employer" means an employer who is signatory to the Wage Agreement, or, with respect to prior periods, was signatory to the bituminous coal wage agreement then in effect.

(3)     "Construction Employer" means an Employer that is signatory to the National Coal Mine Construction Agreement of 1984, as amended from time to time and any successor thereto; or is signatory to any other collective bargaining contract with the United Mine Workers of America which provides that contributions shall be made to the 1974 Pension Trust or the United Mine Workers of America 1985 Construction Workers Pension Trust for construction work related to the development, expansion or alteration of coal mines, provided that substantially all the employees, with respect to whom the employer has an obligation to contribute, perform construction work related to the development, expansion or alteration of coal mines, including the erection of tipples and preparation plants and other facilities placed in, on or around the coal mines, sinking of shafts, slopes, drifts or tunnels and all other such coal-related work that is performed under a Wage Agreement.  In the case of a Construction Employer which is a single trade or business and which is also signatory to a Wage Agreement other than a Wage Agreement described in the preceding sentence, the Construction Employer shall be treated as an Employer other than a Construction Employer with respect to its employees or operations for which it has an obligation to contribute to the Plan pursuant to such Wage Agreement.

(4)     "Bituminous Coal Segment" and "Coal Mine Construction Segment" mean the two accounts within the 1974 Pension Plan maintained after June 30, 1981, for the sole purpose of calculating employer withdrawal liability under Article X.

(5)     "Participant" means any person who is employed in a classified job for an Employer after the effective date and any person entitled to receive pension benefits under the Plan; provided, however, that any person who is not employed in a classified job for an Employer on the effective date shall not become a participant until such person completes at least 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 2002 NBCWA) of Credited Service within a 12-month period after the effective date, or unless such person is subject to the provisions of Article II(f)(3).

(6)     "Pensioner" means any person who is receiving a pension pursuant to Article II of this Plan.

(7)     "1974 Pension Trust" means the trust established pursuant to the National Bituminous Coal Wage Agreement of 1974 to fund this Plan.

(8)     "Trustees" means the Trustees of the 1974 Pension Trust, who shall be named fiduciaries pursuant to Section 402 of ERISA and the Plan Administrator, as that term is defined in that Act; provided, however, that the 1974 Pension Trust may be amended to designate other or additional named fiduciaries under said Trust and the Plan.

(9)     "Credited Service" means signatory and nonsignatory service determined pursuant to Article IV.

2

(10)    "Hour of Service" shall mean each hour for which the participant is directly or indirectly paid or entitled to be paid by the Employer (a) for the performance of duties or (b) on account of a period of time during which no duties are performed due to vacation, holiday, illness, sickness and accident, incapacity, layoff, bereavement, jury duty, military duty or leave of absence; or (c) time spent performing contractual obligations such as safety inspections and mine committee work, even though such time off is not paid for by the Employer, provided that:

(1)    except for hours of service credited on account of a period during which a Participant is eligible to receive benefits under Article IV(B)(3), no more than 501 hours of service shall be credited to a Participant on account of a single continuous period during which the Participant performed no duties;

(2)    no credit shall be given for payments made or due under a plan maintained solely for the purpose of complying with the applicable worker's compensation or unemployment compensation or disability insurance laws or payments which solely reimburse a Participant for medically related expenses incurred by the Participant; and

(3)    hours of service shall be credited for back pay for the period for which such back pay was awarded, irrespective of mitigation of damages, either awarded or agreed to by the Employer to the extent such back pay represents payment for hours which are required to be taken into account. However, no hours of service shall be credited for back pay if such hours were previously credited. The determination of hours of service for reasons other than the performance of duties shall be made in accordance with the applicable rules of the regulations prescribed by the Secretary of Labor under 29 C.F.R. Part 2530.200b-2(b).

(11)    "UMWA" or "Union" shall mean the United Mine Workers of America.

(12)    "Hours Worked" shall mean (a) each hour for which an employee is paid, or entitled to payment, for the performance of duties for the Employer during the calendar year, and (b) hours for which back pay, irrespective of mitigation of damages, is awarded or agreed to by an Employer, to the extent that such award or agreement is intended to compensate an Employee for periods which the Employee would have been engaged in a performance of duties for the Employer. Time spent performing contractual obligations such as safety inspections and mine committee work and periods of time when the Participant is eligible to receive sickness and accident benefits shall be included as hours worked.

(13)    "Construction Industry Service" means, with respect to a participant,

(a)    all periods of service after June 20, 1985 with a Construction Employer that involves work related to the development, expansion or alteration of coal mines; and

(b)    all periods of signatory and nonsignatory service before July 1, 1985, if the participant's last such service before July 1,1985 was for a Construction Employer.

3

B.     When Retirement Occurs

For the purposes of this Plan, in the case of any Participant, retirement shall be considered to occur on the last day of credited service, within the meaning of Article IV C(8), provided that on such day he was eligible for an immediate or deferred pension under this Plan.

C.     Attainment of Age

For the purposes of this Plan, a Participant shall be deemed to have attained an age as of 12:01 A.M. on the respective anniversary date of the Participant's birth.

ARTICLE II – ELIGIBILITY

A.     Age 55 Retirement

Any Participant who (a) has at least 10 years of signatory service or at least twenty years of credited service, including the required amount of signatory service as set forth in Article IV(C)(6), and (b) has attained the age of 55 years (but not the age of 62) prior to retirement shall be eligible to retire on or after January 1, 2002, and shall upon his retirement (hereinafter "Age 55 Retirement") be eligible for a pension.

B.     Normal Retirement

(1)     Any Participant shall be eligible to retire on or after January 1, 2002, and shall upon his retirement (hereinafter "Normal Retirement") be eligible for a pension, provided such Participant has attained the normal retirement date which shall be the earlier of --

(a)     a Participant's attainment of age 62 years and completion of at least 10 years of signatory service or at least 20 years of credited service, including the required amount of signatory service as set forth in Article IV(C)(6), or

(b)     the later of --

(i)     the time a Participant attains age 65, or

(ii)     the 5th anniversary of the time the Participant became employed in signatory service.

(2)     In determining the time the Participant became employed in signatory service (for purposes of Article II(B)(1)(b)(ii)), any employment of a Participant in signatory service who is not entitled to a pension under Article II (A) or (E) (Age 55 Retirement or Deferred Vested Retirement) shall be disregarded if it precedes a period of consecutive one-year breaks in signatory service and the number of consecutive one-year breaks in signatory service equals or exceeds the greater of

4

    (a)      five, or

    (b)      the aggregate number of years of signatory service before such breaks.

In addition to the foregoing, any employment prior to a period of consecutive one-year breaks in signatory service shall be disregarded unless the Employee completes 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 2002 NBCWA) of signatory service within a 12-month period after the breaks in signatory service. Such aggregate number of years of signatory service before any period of consecutive one-year breaks in signatory service shall be deemed not to include any years of signatory service not required to be taken into account under this subparagraph by reason of any prior break in signatory service. For purposes of this Article II(B)(1)(b)(ii), a year of signatory service shall be calculated on the basis of a calendar year and in the manner specified in Article IV; a break in signatory service shall be defined in accordance with the terms of Article II(G)(3); and nonclassified signatory service shall be disregarded unless it immediately precedes or follows classified signatory service with the same Employer.

    C.    Disability Retirement

A Participant who (a) has at least 10 years of signatory service prior to retirement, and (b) becomes totally disabled as a result of a mine accident occurring on or after January 1, 2002, shall, upon retirement (hereinafter " Disability Retirement"), be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

When a Participant who has been receiving a disability pension under this Section C recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the Participant's ability to perform classified work in the industry. The continuance of a disability pension shall be based on medical evidence that supports the Participant's inability to be employed in classified work in the industry.

If such Participant is medically certified able to perform classified work in the industry, he will no longer be eligible for a disability pension.

    D.    Minimum Disability Retirement

Any Participant who (a) has less than 10 years of signatory service prior to retirement and (b) becomes totally disabled as a result of a mine accident occurring on or after January 1, 2002, shall, upon retirement (hereinafter "Minimum Disability Retirement") be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

When a Participant who has been receiving a disability pension under this Section D recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the Participant's ability to perform classified work in the industry. The continuance of a disability pension shall be based on medical evidence that supports the Participant's inability to be employed in classified work in the industry.

If such Participant is medically certified able to perform classified work in the industry, such Participant will no longer be eligible for a disability pension.

      E.     Deferred Vested and Special Retirement

      (1)     Any Participant who ceases working in a classified job for an Employer for any reason, except as provided in (2), (3), or (4) below, and who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension"), upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, provided

      (a)     the Participant's last day of Credited Service is on or after January 1, 2002, but prior to attainment of age 55;

      (b)     the Participant has

      (i)     at least 10 years of signatory service, or for a Participant with one hour of service on or after the date set by law for a five-year vesting schedule, at least 5 years of signatory service, or

      (ii)     at least 20 years of Credited Service as set forth in Article IV(C)(6).

      (2)     Any Participant who ceases working in a classified job for an Employer, who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension - Special") upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, calculated pursuant to Article III A(5)(b), provided

      (a)     the Participant's last day of Credited Service is on or after January 1, 2002, but prior to attainment of age 55;

      (b)     had 20 years of signatory service on the date last worked;

      (c)     had attained the age of 50 on the date last worked; and either

6

          (d)     had been laid off and had not refused recall to the mine from which the Participant was laid off; or

          (e)     had been terminated under Article III, Section (j) of the Wage Agreement (or if the Participant had not been terminated, there had been a deterioration in physical condition which prevented the Participant from performing the Participant's regular work as determined by a panel of three physicians, if the degree of physical deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter.

          (3)     Any Participant who ceases working in a classified job for an Employer, who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension-Enhanced 1996") upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, calculated pursuant to Article III A(5)(b), provided:

          (a)     the Participant's last day of Credited Service is on or after January 1, 2002, but prior to attainment of age 55;

          (b)     the Participant had 20 years of signatory service on the date last worked;

          (c)     the Participant had been laid off and had not refused recall to the mine from which the Participant was laid off; or

          (d)     he had been terminated under Article III, Section (j) of the Wage Agreement (or if the Participant had not been terminated, there had been a deterioration in physical condition which prevented the Participant from performing the Participant's regular work as determined by a panel of three physicians, if the degree of physical deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter; and

          (e) the Participant's pension benefits are not in pay status on or before August 16, 1996.

Within a reasonable period of time after such Participant's employment has ceased, an appropriate written notice of eligibility and other relevant data will be provided.

          (4)     Any Participant who, on or after January 1, 2002, ceases working in a classified job for an Employer and who is not eligible to receive a pension under any other provision of this Article II shall be eligible for a pension (hereinafter "Special Permanent Layoff Pension"), calculated pursuant to Article III A(5)(b), using the Participant's actual Credited Service and an assumed age of 55, provided:

          (a)     the Participant's last day of Credited Service is on or after January 1, 2002, but prior to attainment of age 55;

(b)    the Participant had 20 years of signatory service as of his last day of Credited Service;

(c)    (i)    the Participant was permanently laid off under circumstances in which his Employer has permanently closed the mine, or

(ii)    the Participant was permanently laid off, meaning that he was on layoff status for at least 180 days, and had not refused a recall to the mine from which he was laid off;

In the case of a layoff described in (c)(i) above, the pension will be effective on the first day of the first month following both the layoff and the filing of a pension application.  In the case of a layoff described in (c)(ii) above, the pension will be effective on the first day of the first month following both a period of 180 days after the layoff and the filing of a pension application.

Notwithstanding the foregoing, in the case of a Participant who earned no hours of credited signatory service during the period beginning November 1, 1997 and ending June 17, 1998, and who subsequently returned to active employment on or after June 18, 1998, in addition to meeting the requirements stated above, prior to satisfying Paragraph (4)(c), above, such Participant must either:

(d)    have earned at least 250 hours of credited signatory service, or

(e)    have returned to active employment as the result of a recall determined by the Trustees to have been to fill a bona fide job opening, and not for the purpose of entitling the Participant to this Special Permanent Layoff Pension benefit.

(5)    Any Participant who, on or after January 1, 2002, ceases working in a classified job for an Employer shall be eligible for a pension (hereinafter "Special 30-and-Out Layoff Pension"), calculated pursuant to Article III A(5)(b), but with no actuarial reduction on account of age, provided:

(a)    the Participant's last day of Credited Service is on or after January 1, 2002; and

(b)    the Participant had at least 30 years of signatory service on such last day of Credited service; and

(c)    the Participant has been laid off and has not refused a recall to the mine from which he was laid off;

(d)    if, because of a layoff, he was not actively at work as of December 31, 2001:

(i) he earned at least  250 hours of credited signatory service following his return to work, or

8

(ii)  he returned to active employment as the result of a recall determined by the Trustees to have been to fill a bona fide job opening, and not for the purpose of entitling the Participant to this Special 30-and-Out Layoff Pension benefit.

(6)      Any Participant who, on or after January 1, 2003 ceases working in a classified job for an Employer shall be eligible for a pension (hereinafter "30-and-Out Pension"), calculated pursuant to Article III A(5)(b), but with no actuarial reduction on account of age, provided:

(a)      the Participant's last day of Credited Service is on or after January 1, 2003; and

(b)      the Participant had at least 30 years of signatory service on such last day of Credited service;

(c)       if, because of a layoff, he was not actively at work as of December 31, 2001:

(i)  he earned at least  250 hours of credited signatory service following his return to work, or

(ii)  he returned to active employment as the result of a recall determined by the Trustees to have been to fill a bona fide job opening, and not for the purpose of entitling the Participant to this 30-and-Out Pension benefit.

F.      Nonduplication

(1)      A Participant shall be entitled to receive a pension under only one of the foregoing paragraphs of this Article II with respect to any retirement.

(2)      Except as provided in paragraph (C), (D), or (F)(3) of this Article II, any person whose retirement occurs on or before December 31, 1975, shall not be entitled to receive pension benefits under this Plan, but shall be entitled only to receive such benefits as may be provided under the 1950 Pension Plan.

(3)      Any person who (a) retires on or before December 31, 1975, (b) at the time of retirement is entitled to or, upon attaining age 55 would be entitled to, a pension benefit under the 1950 Pension Plan, and (c) is again employed for at least 250 hours in a classified job for an Employer after December 31, 1975, shall upon subsequent retirement (or, if later, upon attaining age 55) be eligible for a pension only under this Plan and not under the 1950 Pension Plan, in the amount hereinafter specified.  The amount of pension for a Participant described in this paragraph shall be the sum of the amount of pension to which such Participant would be entitled upon attaining age 55 under the 1950 Pension Plan if he had not been employed in a classified job for an Employer after December 31, 1975, plus the excess of (i) over (ii) where (i) is the pension to which such Participant would be entitled except for this paragraph under Article III(A)(2) or III(B)(2) based upon all years of Credited Service under this Plan and (ii) is the pension to

9

which such Participant would be entitled under Article III(A)(2) or III(B)(2) based solely on his Credited Service prior to December 31, 1975.

      G.     Employment for Vesting Purposes

          (1)     For purposes of this Article II, all years of classified service by a Participant with Employers signatory to the bituminous coal wage agreement then in effect shall be used for purposes of any eligibility requirement of minimum signatory service under this Article.  A year of service shall be calculated on the basis of a calendar year and in accordance with the terms of Article IV(A).

          (2)     For purposes of this Article II, years of nonclassified signatory service in the coal industry by a Participant after May 28, 1946, for Employers signatory to the bituminous coal wage agreement then in effect shall be used for purposes of any eligibility requirement of minimum signatory service provided that:

          (a)     the nonclassified signatory service with an Employer immediately preceded or followed classified signatory service with the same Employer;

          (b)     credit for nonclassified service shall not be given for any calendar year in which the Participant completed less than 1,000 hours of such service, as defined under Article I(A)(7);

          (c)     all years of service before age 18 shall be disregarded;

          (d)     all years of service performed before January 1, 1971, shall be disregarded unless the Participant completed at least three years of employment after December 31, 1970;

Provided further that, if the employee has not earned a non-forfeitable right to a pension:

          (e)     all years of service prior to a break in service shall be disregarded unless the employee completes 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 2002 NBCWA) of service within a 12-month period after the break;

          (f)     all years of service prior to any period of consecutive one-year breaks in service shall be disregarded if the number of such consecutive one-year breaks equals or exceeds the greater of (i) five, or (ii) the aggregate number of years of service before such breaks shall be deemed not to include any years of service not required to be taken into account under this subparagraph by reason of any prior break in service.

          (3)     For purposes of Article II(G)(2) and II(B)(2), an employee shall incur a break in service for any calendar year in which such Employee completes not more than 500 hours (or 400 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 2002 NBCWA) of service; provided that, in the case of an Employee who is absent from work for any period --

      (a)     by reason of the pregnancy of the Employee,

      (b)     by reason of the birth of a child of the Employee,

      (c)     by reason of the placement of a child with the Employee in connection with the adoption of such child by such Employee, or

      (d)     for purposes of caring for such child for a period beginning immediately following such birth or placement, the Employee shall be considered to have completed the hours of service which otherwise would normally have been credited to him but for such absence, subject to the limitation set forth in Article I A(8)(l). The preceding sentence shall be applicable only in the year in which the Employee's absence from work begins, if the Employee would be prevented from incurring a one-year break in service in such year solely because of the application of the preceding sentence, or in any other case, in the immediately following year. No credit will be given to an Employee pursuant to this subparagraph unless the Employee furnishes to the Trustees such timely information as they may reasonably require to establish that the absence from work is for reasons referred to in (a), (b), (c), or (d) above, and the number of days for which there was such an absence.

      (4)     The provisions of this paragraph shall be interpreted and construed in accordance with the requirements of ERISA and the regulations issued thereunder.

      (5)     Service after June 30, 1985 with a Construction Employer shall be used for purposes of paragraph G(1), only if the United Mine Workers of America 1985 Construction Workers Pension Plan grants participants credit for the same purposes under that plan for service with Employers, other than Construction Employers, except that a year of service shall be calculated on the basis of a calendar year and in accordance with the terms of Article IV.

ARTICLE III - AMOUNT OF PENSION AND DEATH BENEFIT

      A.     Retirement On or After January 1, 2002

A pension granted to a Participant who retires on or after January 1, 2002, pursuant to Article II shall consist of a pension amount payable in monthly installments provided in accordance with the provisions of this Article III as set forth below. In no event, however, shall the annual retirement benefit payable to a Participant exceed the limitation of Section 415 of the Internal Revenue Code of 1986 and any regulations promulgated thereunder.

11

(1)    Age 55 Retirement Pension

(a)    A deferred pension, commencing after attainment of age 62, computed under the provisions of paragraph 2 below; or, at the election of the Participant, (b) an immediate pension, equal to the deferred pension to which the Participant could have been eligible under (a) above had the Participant so elected, reduced by 1/4 of one percent (1%) for each full month (3 percent (3%) per year) between the date on which pension benefits began and the date on which Participant attains age 62.

(2)    <u>Normal Retirement Pension</u>

For retirements occurring during the 2002 Wage Agreement the amount of pension for Normal Retirement shall be determined as follows:

(a)    for each year of credited non-signatory service as defined herein, $18.00 per month;

(b)    for each of the first 10 years of credited signatory service earned prior to February 1, 1989, $38.50 per month;

(c)    for each year of credited signatory service in excess of 10 years but not to exceed 20 years earned prior to February 1, 1989, $39.00 per month;

(d)    for each year of credited signatory service in excess of 20 years but not to exceed 30 years earned prior to February 1, 1989, $39.50 per month;

(e)    for each year of credited signatory service in excess of 30 years earned prior to February 1, 1989, $40.00 per month.

(f)    The retirement benefit for a year of credited signatory service earned from February 1, 1989 to January 31, 1990, is $46.00 per month.

(g)    The retirement benefit for each year of credited signatory service earned from February 1, 1990 to December 16, 1993, is $50.50 per month.

(h)    The retirement benefit for each year of credited signatory service earned from December 16, 1993 is $53.50 per month.

(i)    Each amount specified in clauses (a) through (h) shall be increased by $2.00 in the case of any Participant who is employed in classified signatory service on or after January 1, 2004, and by an additional $4.00 in the case of any Participant who is employed in classified signatory service on or after January 1, 2006.

12

Proportional credit shall be allowed for any fractional years of credited service pursuant to Article IV hereof. Periods of Construction Industry Service shall be taken into account solely to determine whether the amount specified in clause (a), (b), (c), (d), or (e) is to be used in determining the amount of pension that is earned for a given period of Credited Service. In any year for which two of clauses (a), (b), (c), (d), or (e) would apply, if a Participant has both Credited Service and Construction Industry Service, the amount determined under each clause shall be equal to the amount that would be determined if Construction Industry Service in that year were considered service under this Plan, multiplied by a fraction, the numerator of which is the Participant's hours of service under this Plan for that year and the denominator of which is the sum of such hours and the Participant's hours of Construction Service for that year.

(3)    Disability Retirement Pension

Subject to (4) below for a Participant whose disabling accident occurs after January 1, 2002, the pension payment shall be computed under the provisions of paragraph (2) above. In the case of a participant who has both Construction Industry Service and Credited Service, the amount of pension under this subparagraph (3) shall be based only on the Participant's years of Credited Service and shall be determined in the same manner as under Article III.A.(2).

(4)    Minimum Disability Retirement Pension

The amount of pension for Minimum Disability Retirement shall be $230 per month for disabilities occurring on or after January 1, 2002. In any case in which a participant entitled to pension for Minimum Disability Retirement has both Credited Service and Construction Service, the amount of pension under this subparagraph (4) shall be equal to the amount otherwise payable under this subparagraph, multiplied by a fraction, the numerator of which is the number of years of Credited Service and the denominator of which is the sum of the number of years of Credited Service and the number of years of Construction Industry Service.

(5)    Deferred Vested Pension

(a)    The amount of a deferred vested pension (Article II E(1)) shall be a pension, commencing on or after attainment of age 62, computed under the provisions of Subsection A(2) of this Article III, or, at the Participant's election, between ages 55 and 62 with the pension payable reduced to its actuarial equivalent pursuant to Appendix A; provided, however, that in the case of any Participant with at least (20) years of credited service, such pension shall not be reduced to less than $180.00 per month.

(b)    The amount of a deferred vested pension (Article II E(2) and (3)) shall be a pension, commencing on or after attainment of age 62, computed under the provisions of Subsection A(2) of this Article III, or, at the Participant's election, between ages 55 and 62 with the pension computed under the provisions of Subsection A(l) of this Article III.

13

B.    Increased Pension

(1)    Increases in pensions under Plan amendments effective December 16, 1993 and August 16, 1996 are not applicable to Participants whose employment was terminated prior to December 16, 1993, and who will become eligible for only a deferred vested pension (II E(1)). Increases in pensions under Plan amendments effective August 16, 1996 are not applicable to Participants whose employment was terminated on or after December 16, 1993, and whose pension benefits are in pay status on or before August 16, 1996.

(2) (a) Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2002, shall be issued by November 1, 2002 a one-time single sum payment of $550. Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2003, shall be issued by November 1, 2003 a one-time single sum payment of $550. Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2004, shall be issued by November 1, 2004 a one-time single sum payment of $550. Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2005, shall be issued by November 1, 2005 a one-time single sum payment of $565. Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2006, shall be issued by November 1, 2006 a one-time single sum payment of $565.

(b)    Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2002 shall be issued by November 1, 2002 a one-time single sum payment of $425. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2003, shall be issued by November 1, 2003 a one-time single sum payment of $425. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2004, shall be issued by November 1, 2004 a one-time single sum payment of $425. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2005, shall be issued by November 1, 2005 a one-time single sum payment of $440. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2006, shall be issued by November 1, 2006 a one-time single sum payment of $440.

(c)    Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2002, shall be issued by November 1, 2002 a one-time single sum payment of $425. Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2003 shall be issued by November 1, 2003 a one-time single sum payment of $425. Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2004 shall be issued by November 1, 2004 a one-time single sum payment of $425. Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2005 shall be issued by November 1, 2005 a one-time single sum payment of $440. Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2006 shall be issued by November 1, 2006 a one-time single sum payment of $440.

(d)    Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2002, shall be issued by November 1, 2002 a one-time single sum payment of $425. Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31,

14

2003 shall be issued by November 1, 2003 a one-time single sum payment of $425. Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2004 shall be issued by November 1, 2004 a one-time single sum payment of $425. Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2005 shall be issued by November 1, 2005 a one-time single sum payment of $440. Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2006 shall be issued by November 1, 2006 a one-time single sum payment of $440.

(e)     In recognition of anticipated hardship due to increased medical costs under the UMWA 1993 Benefit Plan, any Pensioner, disabled miner not yet eligible for immediate pension benefits, or surviving spouse, who is eligible for benefits from the UMWA 1993 Benefit Plan as of January 1, 2002, will receive a one-time single sum payment of $2,250 on or before April 1, 2002, and on or about January 1 of each successive year of this Agreement. In recognition of anticipated hardship due to increased medical costs under the UMWA 1993 Benefit Plan, any Pensioner, disabled miner not yet eligible for immediate pension benefits, or surviving spouse, who is determined to be eligible for benefits from the 1993 Plan during the term of the 2002 NBCWA will receive a $2,250 one-time single sum payment on or about the later of April 1, 2002, or the first day of the second month following the month in which such individual is determined to be eligible for benefits from the 1993 Plan, and on or about January 1 of each successive year of the 2002 NBCWA.

(f)     The one-time single sum payments provided for herein are not intended as an ongoing feature of this Plan, and the Plan shall have no obligation to provide payments of this type other than those expressly provided for above.

C.     <u>Application for Pension and Commencement, Suspension and Termination of Pensions</u>

Payments of pensions shall be subject to the following:

(1)     The first payment on any pension shall be made as soon as possible after an application for pension has been received and shall be for the month following the month in which the Participant retires (Article I B) and becomes eligible for a pension in accordance with Article II; provided, however, that in the case of a deferred pension pursuant to Article III(A)(1) or a deferred vested pension pursuant to Article III(A)(5) (other than a Special Permanent layoff Pension pursuant to Article II.E(4)), such payment shall be for the later of (a) the month specified by the Participant in his application for pension if such month is subsequent to the month in which such Participant attains age 55, or (b) the month in which the application for pension is received, but not later than the month following the month in which such Participant attains age 62.

(2)     The last payment shall be for the month in which the pensioner dies.

(3)     Pension payments shall be payable on the first day of each month at the pensioner's last address of record.

(4)    Pension payments shall be suspended for any month in which the pensioner is employed, subsequent to commencement of such payments, in the bituminous coal industry, in the same trade or craft (trade or craft shall mean the coal mining industry), and in the same geographic area covered by this Plan.  The provisions of this paragraph shall be interpreted in accordance with any regulations issued pursuant to Sections 203(a)(3) and (B) of ERISA.

(5)    Any Participant who continues to be employed by an Employer after retirement shall not be entitled to receive pension benefits under this Plan until such time as such Participant is no longer employed by an Employer; provided, however, that benefit payments shall commence not later than April 1 of the calendar year following the calendar year in which the Participant attains age 70-1/2.

D.    Death Benefit

(1) Except as otherwise provided herein, a death benefit shall be paid to the named beneficiary of any pensioner (other than a Pensioner receiving a deferred vested pension based on less than 20 years of credited service or a Pensioner receiving a pension based in whole or in part on years of service credited under the terms of Article II G) whose death occurs on or after January 1, 2002, and who meets the requirements of paragraph (2) of this section.  The death benefit shall be equal to $7,000 if the named beneficiary is the Pensioner' s surviving spouse or dependent.  In any other case, the death benefit shall be equal to $6,000.  The death benefit provided under this section shall not be payable if any other death or life insurance benefit is paid on behalf of the Pensioner from any other Plan maintained by an Employer.

(2)    A Pensioner meets the requirements of this paragraph only if he is not entitled to death benefit coverage from a plan maintained by his former Employer and he meets one of the following conditions:

(i)    the Pensioner is a participant in the 1992 UMWA Benefit Plan;

(ii)    the Pensioner is a participant in the UMWA 1993 Benefit Trust;

(iii)    the Pensioner is a participant in an individual employer plan maintained pursuant to section 9711 of the Internal Revenue Code and whose last signatory employer ceased producing and/or processing coal prior to December 16, 1993;

(iv)    the Pensioner was entitled to death benefit coverage from this Plan on January 1, 2002 (or would have been had he been retired or eligible to retire on that date); or

(v)    the Pensioner's last signatory employer (the Employer for whom such pensioner last worked in signatory classified employment) is a current contributor to this Plan and is signatory either to the National Bituminous Coal Wage Agreement of 2002 or to an agreement (including prior agreements, where applicable) requiring a contribution obligation with respect to this Plan that is identical to the applicable contribution obligation set forth in the National Bituminous Coal Wage Agreement of 2002 (or prior National Bituminous Coal Wage Agreements, where applicable).

16

(3)     The death benefit provided under this section shall not be payable with respect to any Pensioner who was an eligible beneficiary of the United Mine Workers of America Combined Benefit Fund described in section 9703(f) of the Internal Revenue Code of 1986, as amended by the Coal Industry Retiree Health Benefit Act of 1992, whose death occurs on or after February 1, 1993.

(4)     For purposes of this section, the term "dependent" shall mean any person described in (a) through (e), below, as of the date of death of the Pensioner. A person shall be considered to have been a dependent of a Pensioner if such Pensioner or his spouse provided over one-half of the support to such person on a regular basis.

(i)     a spouse who is living with or being supported by the Pensioner;

(ii)     an unmarried dependent child of the Pensioner who has not attained age 22;

(iii)     a parent of a Pensioner or of a Pensioner's spouse, if the parent has been dependent upon and living in the same household (residence) as the Pensioner for a continuous period of at least one year;

(iv)     an unmarried dependent grandchild of a Pensioner or of a Pensioner's spouse who has not attained age 22, and is living in the same household (residence) with such Pensioner; and

(v)     a dependent child (of any age) of a Pensioner or of a Pensioner's spouse who is mentally retarded or who becomes disabled prior to attaining age 22, and such disability is continuous, and who is either living in the same household with such Pensioner or is confined to an institution for care or treatment.

E.     Benefit Increase for Pensions in Pay Status on December 31, 2001

The pension of any Participant or Surviving Spouse who is in pay status as of December 31, 2001 shall be increased by $15.00.

ARTICLE IV – CREDITED SERVICE

A.     Nonsignatory Service

Subject to the limitations in paragraph C of this article IV, credited service is a period during which the participant meets the requirements of subparagraphs (1), (2), (3) or (4) below. Any credited service shall be nonsignatory service unless it qualifies as signatory service pursuant to Article IV(B) hereof.

(1)     A Participant shall receive credit for a year of service for any calendar year in which he worked, subsequent to December 31, 1936, as an employee in a job classified in the then existing bituminous coal wage agreement for an employer in the coal industry for at least 1,000 hours of service,

17

with credit given for the next lowest 1/4 year in the event any employee works less than 1,000 hours of service as follows:

| | |
|---|---|
| 750-999 hours, | 3/4 year |
| 500-749 hours, | 1/2 year |
| 250-499 hours, | 1/4 year |
| 249 hours or less, | 0 |

With respect to any period of such service for which records of hours of service are not available or it is not feasible in light of the administrative and cost difficulties involved to compile a record of service, an applicant shall be deemed to have worked a thousand hours of service if the employee received wages in an amount equal to the product of (i) the lesser of 125 days or 1/2 the average number of days the bituminous mines in the United States were active, multiplied by (ii) the daily basic rate paid in the bituminous coal industry for that year; provided that for any year for which information is not available as to the average number of days the mines were active, the available data for the nearest year next preceding shall be used; provided further that if an applicant earned less than the minimum amount required for a year of service, credit for service shall be given to the next lowest 1/4 year in the manner indicated with respect to hours of service.

(2)    A Participant shall receive credit for a year of service for any calendar year in which the Participant worked, prior to January 1, 1937, as an employee in a job classified in the then existing coal wage agreement for an Employer in the bituminous coal industry, in a minimum of at least six (6) months during a calendar year, provided that if the applicant worked in less than six (6) months, credit for service shall be awarded to the next lowest one-fourth (1/4) year, based upon service in six (6) monthly equaling a year's service.

(3)    A Participant shall receive credit for a year of service for any calendar year in which the Participant received state worker's compensation payments pursuant to an award as a result of an occupational disease or injury sustained in the mine while regularly employed in a classified job under the bituminous coal wage agreement then in effect; provided, in the case of occupational disease, the Participant had been so employed by an Employer signatory to the Wage Agreement then in effect for at least ten (10) years after May 28, 1946. Credit shall be given up to a maximum of four (4) years service credit from date of injury, or from the date of last employment in case of occupational disease, provided the Participant did not work regularly (earned at least $200 per month) during the compensable period. Benefits awarded pursuant to the Federal Coal Mine Health and Safety Act of 1969 shall be deemed "state worker's compensation payments" within the meaning of this section, only if the miner was last regularly employed in the coal industry after the enactment date of the Act, December 30, 1969, in a classified job under the bituminous coal wage agreement then in effect, and had been so employed by an operator signatory to the agreement for at least ten (l0) years after May 28, 1946. In no event shall any service be credited under this paragraph (3) with respect to periods after December 6, 1974.

18

(4)     A Participant shall receive service credit for any period of service in the military service of the United States, to the extent required by section 414(u) of the Internal Revenue Code.

B.     Signatory Service

Credited signatory service is:

(1)     (a)     For any calendar year prior to January 1, 1978, service as defined in paragraph A(l) hereof during which a Participant worked as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

(b)     For purposes of determining eligibility for a pension (vesting) under Article II, service for any calendar year subsequent to December 31, 1977 during which a Participant works as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect, computed based on hours of service as defined in Article I A(10) as follows:

| Hours of Service During a Calendar Year as a Classified Employee for a Signatory Employer | Percentage of a Year of Credited Signatory Service |
|---|---|
| 49 or less | 0% |
| 250 - 499 | 25% |
| 500 - 749 | 50% |
| 750 - 999 | 75% |
| 1,000 or more | 100% |

Notwithstanding the foregoing, a classified Employee working on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the National Bituminous Coal Wage Agreement of 2002 shall receive credit for a percentage of a year calculated in accordance with the following schedule:

| Hours Worked On Weekend/Holiday Crew | Percentage of a Year of Signatory Service |
|---|---|
| less than 200 | 0 |
| 200-399 | 25% |
| 400-599 | 50% |
| 600-799 | 75% |
| 800 or more | 100% |

19

A Classified Employee who earns both regular hours and weekend/holiday crew hours during a calendar year, but who earns fewer than 1,000 hours in total for the year, may combine the partial credits earned under each of the schedules shown above.

Special Rule for 1993 -- For the calendar year 1993, a classified Employee who participated in an authorized strike following expiration of the 1988 Wage Agreement, or who was laid off as a direct result of such an authorized strike, and who worked at least 500 hours will receive credit for a full year of signatory service.

        (c)     For purposes of determining the amount of pension, under Article III, service for any calendar year subsequent to December 31, 1977, during which a Participant works as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect, computed based on hours worked as defined in Article I A(12) as follows:

| Hours of Service During a Calendar Year as a Classified Employee for a Signatory Employer | Percentage of a Year of Credited Signatory Service |
|---|---|
| 249 or less | 0% |
| 250 – 499 | 25% |
| 500 – 749 | 50% |
| 750 – 999 | 75% |
| 1,000 or more | 100% |

Notwithstanding the foregoing, a classified Employee working on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the National Bituminous Coal Wage Agreement of 2002 shall receive credit for a percentage of a year calculated in accordance with the following schedule:

20

| Hours Worked On Weekend/Holiday Crew | Percentage of a Year of Signatory Service |
|---|---|
| less than 200 | 0 |
| 200-399 | 25% |
| 400-599 | 50% |
| 600-799 | 75% |
| 800 or more | 100% |

A Classified Employee who earns both regular hours and weekend/holiday crew hours during a calendar year, but who earns fewer than 1,000 hours in total for the year, may combine the partial credits earned under each of the schedules shown above.

Special Rule for 1993 -- For the calendar year 1993, a classified Employee who participated in an authorized strike following expiration of the 1988 Wage Agreement, or who was laid off as a direct result of such an authorized strike, and who worked at least 500 hours will receive credit for a full year of signatory service.

       (2)     Service prior to December 6, 1974, as defined in paragraph A(3) hereof during which a Participant received state worker's compensation payments if such payments are pursuant to an award as a result of an occupational disease or injury awarded after May 28, 1946, and if the Participant was last regularly employed prior to such service as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

       (3)     Service during which a Participant receives or is eligible to receive weekly Sickness and Accident Benefits pursuant to Article XI of the National Bituminous Coal Wage Agreement of 1974, as amended from time to time, and any successor agreements thereto. Service shall be computed at a rate of 8 hours for each regularly scheduled work day, or if greater than 8 hours, then at a rate equal to the number of hours, for each regularly scheduled work day, that the Participant would have worked under an alternate work schedule under Article IV(c) of the Wage Agreement.

       (4)     A Participant who retires on or after March 27, 1978, shall receive credit for a year of service for any calendar year (including calendar years prior to 1978) in which he rendered service as an employee of the United Mine Workers of America (UMWA) in the coal industry immediately following regular employment in a classified job under the bituminous coal wage agreement then in effect; provided that the Participant does not, or is not eligible to, receive a pension or other retirement income from the UMWA. Credit or service with the UMWA shall be computed in the same manner as:

21

(a)    credit is computed for service prior to 1937, as described in paragraph A(2) hereof, or

(b)    credit is computed for service under the pension plan of the UMWA, whichever is greater, for service prior to January 1, 1978.

Credit for service after December 31, 1977, shall be computed in the same manner as credit is computed for service under the pension plan of the UMWA.

In no event shall a Participant receive credit under this paragraph (4) while receiving a pension under this Plan.

Notwithstanding anything in this paragraph (4) to the contrary, a Participant,

(a)    who is not employed in a classified job for an Employer on March 27, 1978, or

(b)    who is not employed by the UMWA on March 27, 1978, or

(c)    who had retired prior to March 27, 1978, and was eligible to receive, or upon application would have been eligible to receive, a pension under the 1950 Pension Plan, the 1974 Pension Plan or a retirement plan of the UMWA prior to March 27, 1978, shall not receive signatory service credit for the years of UMWA employment described above if it occurred prior to March 27, 1978, unless such Participant is re-employed in a classified job and

(1)    obtains at least 3 years of credited service after March 27, 1978, or

(2)    ceases to be employed in the classified job or employed by the UMWA as the result of

(i)    nonoccupational disability or accident

(ii)    occupational injury for which the Participant receives worker's compensation, or

(3)    dies after March 27, 1978 at a time when the Participant is employed in a classified job for an Employer or when employed by the UMWA.

22

(5)    Service as defined in paragraph A(4) hereof during which a Participant served in the military service of the United States, provided that the classified employment referred to therein (both before and after military service) is for an Employer signatory to the bituminous coal wage agreement then in effect and provided further, however, that for military service credited after December 31, 1974, the Participant returned to work in a classified job within ninety (90) days after the date of separation from the military service or such longer period as may be allowed by law.

(6)    Service (within the meaning of paragraph A(l) hereof) by an employee in a classified job for an Employer not signatory to the bituminous coal wage agreement then in effect if (i) such service is continuous, (ii) such Employer becomes a signatory to the bituminous coal wage agreement after the effective date as a result of recognizing the UMWA as the bargaining representative of its employees, (iii) the employee is working in a classified job with such Employer at the time such Employer becomes signatory to the bituminous coal wage agreement, and (iv) such employee remains in a classified job with such Employer during the twenty-four month period immediately following the date on which such Employer becomes signatory to the bituminous coal wage agreement; provided, however, that not more than ten (10) years of nonsignatory service may be recognized or awarded as signatory service to any person pursuant to this paragraph (6).

C.    Additional Rules Concerning Credited Service

(1)    Except as provided in Article IV(B)(6), employment after April 1, 1971, will not constitute credited service under paragraph A(l) hereof unless such employment was in a classified job for an Employer.

(2)    A Participant shall not be credited with more than one year of service for any calendar year by reason of any combination of the rules of this Article IV.

(3)    The maximum number of years of nonsignatory service which may be included in the credited service of any Participant retiring after December 31, 1981 shall be the number of years by which twenty years exceeds such Participant's signatory service, but not in excess of ten years.

(4)    No credit for service shall be awarded a Participant for any period in which such Participant was directly connected with the ownership, operation or management of a mine; provided, however, that in the case of any Participant who received credit for such service before July 1, 1974, under the terms of the pension plan program established under the United Mine Workers of America Welfare and Retirement Fund of 1950, credit shall be awarded for any period prior to July 1, 1975, in which the Participant worked as an employee in a classified job in a mine in which such Participant had no controlling interest, as a member of a cooperative or gang-working crew which shared the profits and losses, and which was operated under the bituminous coal wage agreement then in effect; and provided further, that in the case of a Participant who received credit for service before July 1, 1974, under the terms of the pension plan program established under the United Mine Workers of America Welfare and Retirement Fund of 1950, credit for signatory service shall be awarded for any period prior to July 1, 1975, during which such Participant worked in a classified job pursuant to an agreement to produce coal for a

23

signatory coal company which exercised control over the operation of the mine and was responsible for royalty payments on such coal produced to the 1974 Pension Trust or its predecessor.

      (5)    The following maximum years of nonsignatory service may be included in credited service under this Plan:

| Date of Retirement | Maximum Years of Nonsignatory Service |
|---|---|
| January 1, 1978 to December 31, 1978 | 13 |
| January 1, 1979 to December 31, 1979 | 12 |
| January 1, 1980 to December 31, 1980 | 11 |
| January 1, 1981 and thereafter | 10 |

      (6)    Subject to Article II E(1)(b)(i), a Participant with less than ten years of signatory service shall not be entitled to receive a pension under paragraph (A), (B), or (E) of Article II unless such Participant has at least twenty years of credited service, including at least the following minimum number of years of signatory service:

| Date of Retirement | Years of Signatory Service Required |
|---|---|
| January 1, 1978 to December 31, 1978 | Seven (7) years |
| January 1, 1979 to December 31, 1979 | Eight (8) years |
| January 1, 1980 to December 31, 1980 | Nine (9) years |
| January 1, 1981 and thereafter | Ten (10) years |

      (7)    Except as provided in Article V, service credits shall not be accrued subsequent to the effective date of pension payments.

      (8)    In the case of any Participant, except a Participant covered under Article IV B(4), the last day of credited service shall be the last day on which the Participant works as an employee in a classified job for an Employer, unless such Participant continues to accrue credited service during the period for which such Participant receives or is eligible to receive weekly sickness and accident benefit pursuant to Article XI of the Wage Agreement, in which case the last day of credited service shall be the last day for which such sickness and accident benefits are paid or would have been paid. For a Participant covered under Article IV B(4), the last day of credited service shall be the later of the last day as determined in the preceding sentence or the last day the Participant worked for the UMWA.

24

(9)    An employee who is regularly employed in a classified job for an Employer and who performs supervisory duties on a temporary basis for not more than 120 work days during any consecutive period of 12 months, shall be deemed to be employed in a classified job during the days on which the Participant performs such supervisory duties.

D.    Construction Industry Service

(1)    Notwithstanding anything to the contrary, and except for purposes of Article II.C and II.D and as provided by Article II.G, no Construction Industry Service of a Participant shall be considered Credited Service under this Plan.

(2)    In any case in which a Participant has both Construction Industry Service and at least one hour of service creditable under paragraphs B or C of this Article for any year beginning after December 31, 1985, the Participant's Credited Service for that year shall be determined by multiplying the Credited Service the Participant would be entitled to if Construction Industry Service were considered service under this Article by a fraction, the numerator of which is the Participant's hours of service creditable under this Article for that year and the denominator of which is the sum of such hours and the Participant's hours of Construction Industry Service for that year.

(3)    In any case in which, after June 30, 1985, and before January 1, 1986, a Participant has both Construction Industry Service and at least one hour of service creditable under the provisions of paragraphs B or C of this Article, the Participant's Credited Service for that year shall be equal to the sum of his Credited Service for the period beginning January 1, 1985, and ending June 30, 1985, and a fraction of what his Credited Service would be for the period beginning July 1, 1985 and ending December 31, 1985, if Construction Industry Service were considered service under this Article. Such fraction is determined by dividing the Participant's hours of service under paragraphs B and C of this Article by the sum of such hours of service and the Participant's hours of Construction Industry Service.

(4)    Notwithstanding subparagraph D.(2) or D.(3), the Credited Service of a Participant for a year in which either subparagraph applies shall not exceed one minus the portion of a year for which the Participant receives credit for accrual purposes under the United Mine Workers of America Construction Workers Pension Plan. If, in any year, a Participant receives one year of credit for accrual purposes under the United Mine Workers of America Construction Workers Pension Plan, he shall not be entitled to any Credited Service for such year.

ARTICLE V – REEMPLOYMENT AFTER ATTAINMENT OF PENSION ELIGIBILITY

A.    Any Participant who has been retired and receiving a pension under this Plan and who shall be reemployed in a classified job by an Employer shall, for the purpose of calculating any subsequent pension benefits to which such Participant may become entitled, upon subsequent retirement, be granted a pension equal to the sum of the pension such Participant was previously receiving plus the excess of (i) over (ii) where (i) is the pension to which such Participant would be entitled at the time of such retirement,

25

based upon all years of Credited Service under the Plan and (ii) is the pension to which such Participant would be entitled at the time of such retirement, based solely on Credited Service at the time of his previous retirement.

        B.      Any Participant eligible for a deferred vested pension under this Plan whose shall be reemployed in a classified job by an Employer prior to the commencement of pension benefit shall, for the purpose of calculating any subsequent pension benefits to which he may become entitled, be granted his credited service applicable to the deferred vested pension plus his credited service accrued after such reemployment.

        C.      Any Participant who is reemployed in a classified job by an Employer after attainment of eligibility for a deferred vested pension under this Plan, whose employment is subsequently terminated and who at that time is not eligible for a pension under any provision of Article II by reason of Article IV(C)(6), shall be considered to be eligible for the deferred vested pension for which such Participant was eligible prior to such reemployment and upon application for pension the date of retirement shall be considered to be the date of retirement which would, upon application for pension, have been applicable to the deferred vested pension for which such Participant was eligible prior to such reemployment.

ARTICLE VI – SURVIVING SPOUSE BENEFIT

        A.    (1)     Except as provided in paragraph (B) of this Article, a Surviving Spouse Benefit is provided for any Participant who (a) has retired and is receiving a pension under this Plan, except a Participant receiving a deferred vested pension who has not completed at least twenty years of credited service, (b) has not retired but at the date of his death otherwise met the eligibility requirements for an immediate pension under Article II(A), (B), (C), (D) or (E)(6) under this Plan, or (c) has attained age 55 with at least twenty years of credited service and who has retired and is entitled to elect an immediate pension under Article II(A), II(B) or II(E) at the date of death.

           (2)     The amount of such benefit shall be equal to 75% of the amount of the Participant's pension at the time of death or, in the event the Participant dies after age 55 at a time when such Participant was eligible to elect a pension or to retire and receive a pension under Article II, but prior to the receipt of a pension, 75% of the amount of the pension such Participant would have received if such Participant had elected a pension or retired and become entitled to a pension as of the date immediately preceding the date of death.

           (3)     The Surviving Spouse Benefit will not be effective unless the Participant and the spouse have been married throughout the nine-month period ending on the date of the Participant's death or unless such nine-month requirement would be waived for purposes of determining entitlement to widow's or widower's insurance benefits under the Social Security Act.

           (4)     Payment to an eligible spouse will commence as of the first of the month following the month in which the Participant's death occurs and the final payment shall be made for the month in which the spouse's death occurs.

B.     (1)     Any Participant who is not employed in a classified job for an Employer on December 6, 1974, is not covered for a Surviving Spouse Benefit under this Article unless such Participant (a) obtains at least three years of credited service after such date, or (b) had ceased to be employed in a classified job as a result of (i) layoff, (ii) nonoccupational disability or accident, or (iii) occupational injury for which such Participant was receiving workers' compensation, or (c) such Participant dies at a time when he is employed in a classified job for an Employer.

(2)     Any Participant who retires on or before December 31, 1975, and is again employed in a classified job for an Employer after such retirement, is not covered for a Surviving Spouse Benefit under this Article unless (a) such Participant obtains at least three years of credited service after such reemployment or (b) unless such reemployment ceases as a result of (i) layoff, (ii) nonoccupational disability or accident, or (iii) occupational injury for which worker's compensation benefits were awarded, or (c) such Participant dies while employed in a classified job for an Employer.

C.     (1)     A Surviving Spouse benefit is provided for any Participant who completed at least ten years of credited service, who died as a result of a mine accident during the term of the National Bituminous Coal Wage Agreement of 1978 or 1981, and who was not in Construction Industry Service at the time of the mine accident. The amount of such Surviving Spouse benefit shall be a lump sum in the amount of $10,000, plus $100.00 a month beginning with the month of February, 1998 and for each month thereafter during the spouse's eligibility. The final payment shall be made for the month in which the spouse's death (or if earlier, the spouse's remarriage) occurs.

(2)     The Surviving Spouse Benefit will not be effective unless (a) the Participant and the spouse were married throughout the nine-month period ending on the date of the Participant's death or unless such nine-month requirement would be waive d for purposes of determining entitlement to widow's or widower's insurance benefits under the Social Security Act; (b) the spouse was never eligible for a monthly benefit under this Plan or under any other plan or provision under a Wage Agreement; and (c) the spouse has never remarried and is surviving on February 1, 1998.

ARTICLE VII - JOINT AND SURVIVOR ANNUITIES

A.     Notwithstanding any other provision of this Plan, if a Participant qualifies for a pension under this Plan, but is not covered by a Surviving Spouse Benefit, the Pension benefit otherwise provided to such Participant shall be reduced actuarially pursuant to Appendix B, and 50% of such reduced pension benefit will be continued, after the death of the Participant, for the life of any qualified surviving spouse; provided, however, that such Participant may elect, within the election period specified in Paragraph C(1) below, and subject to the requirement of Paragraph D below, not to take a joint and survivor annuity as provided for in this Article and instead to receive a pension benefit for life only.

B.     If a Participant has completed 5 years of signatory service for vesting purposes, calculated pursuant to Article II (G), is not covered by a Surviving Spouse Benefit, and dies before he is entitled to elect or elects to receive a pension benefit, the qualified surviving spouse shall be entitled to receive a

27

survivor's benefit in the form of an annuity for life in an amount equal to 75% of the pension benefit the decedent would have received if the decedent had --

> (1)     separated from service on the date of death,

> (2)     survived to age 55 (in the case of a decedent who died before attaining age 55),

> (3)     retired with an immediate Joint and Survivor Annuity as provided for in this Article at age 55, (or, if later on the date before the decedent's date of death).

> (4)     died on the day after the day on which the decedent would have attained age 55 (in the case of a decedent who died before attaining age 55).

Payment to a qualified spouse under this paragraph will commence on the first of the month following the month in which the decedent would have attained age 55 (or, if later, the first of the month following the month of the decedent's death) and the final payment shall be for the month in which the spouse's death occurs. Notwithstanding the foregoing, payment to a surviving spouse of a Participant who died prior to age 55, but while eligible for an immediate pension benefit, will commence on the first of the month following the month of the Participant's death. The benefit shall be calculated as set forth herein, but as if the Participant had retired with an immediate Joint and Survivor Annuity on the date before the date of his death.

C.     (1)     The "election period" in the case of an election to waive the Joint and Survivor Annuity described in Paragraph A shall be the 90-day period ending on the date of the commencement of benefits. Not less than 30 days and not more than 90 days prior to the date of the commencement of benefits, the Trustees shall furnish the Participant (a) a general description or explanation of the qualified Joint and Survivor Annuity, the circumstances in which it will be provided unless the Participant elects not to have benefits provided in that form, the availability of such election and the right to revoke such election, and the rights of the Participant's spouse; and (b) a general explanation of the relative financial effect of such election on the Participant's pension. In the event a Participant elects not to receive a Joint and Survivor Annuity, such election shall not become effective if the Participant dies within a period of two years beginning on the date of such election.

> (2)     A Participant may revoke any election made pursuant to this Article at any time during the applicable election period.

D.     An election made under this Article shall not take effect unless--

> (1)     the spouse of the Participant consents in writing to such election, and the spouse's consent acknowledges the effect of such election and is witnessed by a Plan representative or a notary public, or

28

(2)    It is established to the satisfaction of the Trustees that the consent required under subparagraph (1) may not be obtained because there is no spouse, because the spouse cannot be located, or because of such other circumstances as the Trustees may by law consider.

E.    A qualified surviving spouse shall be any spouse who has been married to the Participant for at least nine months prior to death, unless such nine-month requirement would be waived for purposes of determining entitlement to widow or widower's insurance benefits under the Social Security Act.

F.    Except as provided in Paragraph B above, payment to a qualified surviving spouse under this Article will commence as of the first of the month following the month in which the Participant's death occurs, and the final payment shall be made for the month in which the spouse's death occurs.

ARTICLE VIII – MISCELLANEOUS

A.    Determination of Eligibility

The Trustees or such other named fiduciaries as may be properly designated shall have full and final determination as to all issues concerning eligibility for benefits.

B.    General

(1)    The Trustees are authorized to promulgate rules and regulations to implement this Plan, and those rules and regulations shall be binding upon all persons dealing with and Participants claiming benefits under this Plan.

(2)    No benefit payable under this Plan shall be subject in any way to alienation, sale, transfer, assignment, pledge, attachments, garnishments, execution or encumbrance of any kind, and any attempt to accomplish the same shall be void. Notwithstanding the foregoing, the Plan shall comply with any qualified domestic relations order, as that term is defined in ERISA, and with any written authorization by a Participant or beneficiary made pursuant to paragraph (19) of this section.

(3)    The Employers and the Union, by joint action, reserve the right at any time and from time to time to modify or amend in whole or in part any or all of the provisions of this instrument or to terminate this Plan, without reopening or otherwise affecting the integrity of any other provision of the Wage Agreement, by a written agreement between the Employers and the Union, provided, however, that:

(a)    this Plan shall not be amended in such manner as would cause or permit any part of the assets in the 1974 Pension Trust to be diverted to purposes other than the exclusive benefit of the Participants and their beneficiaries;

(b)    this Plan shall not be amended to deny to a Participant retroactively any benefits to which such Participant was entitled under this Plan, unless such amendment is necessary to conform this Plan to, or to satisfy the conditions of, any law, governmental regulations or ruling;

29

(c)    the Employers and the Union have delegated to the Trustees the authority and responsibility to make certain changes and amendments as set forth in Article XX(g)(4) of the National Bituminous Coal Wage Agreement of 2002, as amended from time to time, and any successor agreements to that specific Agreement; and

(d)    any written agreement executed by the Union shall be signed by the International President.

(4)    Upon the termination of this Plan or the complete discontinuance of contributions to the 1974 Pension Trust, this Plan shall remain in force and effect for the period necessary to complete the payment of benefits in accordance with the terms of this Plan to the extent assets in the 1974 Pension Trust are available to pay such benefits.

(5)    Forfeitures arising from the operation of the Plan shall not be used to increase the benefits which otherwise would be received under this Plan.

(6)    Any Participant or beneficiary whose claim for benefits under this Plan has been denied shall be (a) provided with adequate notice in writing setting forth the specific reasons for such denial, such notice shall be written in a manner calculated to be understood by the Participant, and (b) afforded a reasonable opportunity for a full and fair review of the decision denying the claim by an appropriate named fiduciary or a person properly designated to carry out such responsibility.

(7)    The Trustees are hereby authorized to allocate fiduciary responsibilities in any manner permitted pursuant to section 405(c) of ERISA and to appoint an investment manager or managers as permitted by section 402(c) of ERISA.

(8)    Contributions to the 1974 Pension Trust to fund the benefits under this Plan shall be paid solely by the Employers in accordance with Article XX of the National Bituminous Coal Wage Agreement of 2002, as amended from time to time, and any successor agreements to that specific Agreement.

(9)    In the event that this Plan merges or consolidates with, or transfers some or all of its assets or liabilities to, any other plan, no Participant or beneficiary herein shall, solely on account of merger, consolidation or transfer, be entitled to an accrued benefit immediately following such event which is less than the benefit to which such Participant or beneficiary would have been entitled immediately preceding such event.

(10)    In the event that an Employer fails to make the contributions to the Plan required by Article XX of the National Bituminous Coal Wage Agreement of 2002, interest (calculated at a rate established by the Trustees at the beginning of each calendar year) shall accrue from the date due until the date on which payment is made. If the Trustees file suit to collect unpaid contributions, plus accrued

30

interest, and a judgment is entered by the courts in favor of the Trustees, the judgment entered shall provide for an additional amount equal to the accrued interest in liquidated damages.

(11)    Upon the termination or partial termination of the Plan, the rights of all affected Participants to benefits accrued to the date of such termination or partial termination, are nonforfeitable to the extent required by law or to the extent provided for under the National Bituminous Coal Wage Agreement of 2002.

(12)    Except as otherwise provided herein, it shall be unlawful for any part of the assets held pursuant to this Plan, other than such part as is required to pay taxes and administrative expenses, to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the Participants of the Plan except that in the case of a contribution which is made by an Employer by a mistake of fact, or law (other than a mistake relating to Plan qualification), such mistaken contribution may be returned to the Employer within six months after the Trustees determine that the contribution was mistakenly made.

(13)    To the extent not inconsistent with the provisions hereof, the Trustees shall comply with the further requirements imposed upon them by and shall have the further powers contained in Article XX, Sections (e), (f), and (g) of the National Bituminous Coal Wage Agreement of 2002, as amended from time to time, and any successor agreements to that specific Agreement.

(14)    This instrument, and the 1974 Pension Trust shall be construed, regulated and administered in accordance with Federal law, and, to the extent not preempted or inconsistent with such Federal law, the laws of the District of Columbia.

(15)    Any action of the Employers which may, or must, be taken hereunder may be taken by BCOA. Any action which must be taken in writing shall be signed by the President of BCOA.

(16)    Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978 as amended from time to time and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2002.

(17)    The Employers, the Union and the Trustees shall fully cooperate to obtain all necessary rulings and do all other acts appropriate to ensure that the 1974 Pension Plan and Trust are qualified under Section 401 of the Internal Revenue Code, and that contributions are deductible under Section 404 of the Internal Revenue Code.

(18)    Notwithstanding any other provision of this Plan to the contrary, a distribution of benefits shall commence to a participant not later than the April 1 of the calendar year following the calendar year in which the Participant attains age 70-1/2 and shall be distributed over the life of such

31

Participant or over the lives of such Participant and his surviving spouse, in accordance with Section 401(a)(9) of the Internal Revenue Code of 1986 and any regulations promulgated thereunder. In the event that the Participant dies before distributions have commenced hereunder, the surviving spouse shall begin to receive a distribution of the benefit, if any, to which such spouse is entitled no later than the date on which the participant would have attained age 70-1/2 and shall be distributed over the life of such surviving spouse.

       (19)    Any Participant or beneficiary whose benefit is in pay status (including a disabled miner who is entitled to a one-time single sum payment of $2,250) may voluntarily authorize the Trustees to check-off an amount from his or her monthly benefit for remittance to the UMWA of Union membership dues, including assessments, initiation fees, credit union, voluntary COMPAC contributions and other voluntary deductions, or from his or her one-time single sum payment of $2,250 for remittance to the UMWA 1993 Benefit Trust of the required annual payment, provided that an y such arrangement must be terminable by the Trustees upon reasonable notice, must be revocable by the Participant at any time upon reasonable notice to the Trustees, and either:

       (a)    such arrangement must not permit any Participant or beneficiary to check-off an amount exceeding 10% of his or her monthly benefit; or

       (b)    the designated recipient must file a written acknowledgement that it has no enforceable right in or to any Plan benefit or portion thereof (except to the extent of payments actually received pursuant to the terms of the arrangement); and

an agreement for such check-off is in effect between the Plan and the Union, or between the Plan and the UMWA 1993 Benefit Trust. Any check-off authorization must be in writing, must be voluntary and must comply in all respects with the requirements of the Internal Revenue Code of 1986, as amended, ERISA, the Labor Management Relations Act of 1947, as amended, and any other applicable law.

       (20)    (a)    Notwithstanding any provision of the plan to the contrary that would otherwise limit a distributee's election under this part, a distributee may elect, at the time and in the manner prescribed by the Trustees, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

       (b)    An "eligible rollover distribution" is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under Section 401(a)(9) of the Code; the portion of any distribution that is not includible in gross income (determined without regard to the exclusion of net unrealized appreciation with respect to employer securities); and any amount that is treated by the Plan as distributed on account of hardship.

32

(c)    An "eligible retirement plan" is an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in section 403(a) of the Code, or a qualified trust described in Section 401(a) of the Code, that accepts that distributee's eligible rollover distribution. However, in the case of an eligible rollover distribution to the surviving spouse, an eligible retirement plan is an individual retirement account or individual retirement annuity.

(d)    A "distributee" includes a Pensioner and a surviving spouse. In addition, a Pensioner's surviving spouse and the Pensioner's spouse or former spouse who is an alternate payee under a qualified domestic relations order, as defined in Section 414(q) of the code, are distributees with regard to the interest of the spouse or former spouse.

(e)    A "direct rollover" is a payment by the Plan to the eligible retirement plan specified by the distributee.

ARTICLE IX - PARTICIPANTS COVERED BY A SUCCESSOR PLAN

The following individuals shall cease to be Participants in the Plan and shall not be entitled to benefits hereunder (with respect to Credited Service prior to December 6, 1977):

(1)    A Participant in this Plan who retired prior to December 6, 1977, if the Participant is entitled to a pension under a plan qualified under Section 401(a) of the Internal Revenue Code and established by an employer pursuant to an agreement with the UMWA which is a successor agreement to the Western Surface Coal Wage Agreement of 1975, provided that the pension is at least as great as the pension due under the terms of this Plan in effect on December 5, 1977;

(2)    A Participant in this Plan prior to December 6, 1977, who on or after December 6, 1977, is an employee of a employer which is signatory with the UMWA to a successor agreement to the Western Surface Coal Wage Agreement of 1975, if the Participant becomes a participant in a pension plan qualified under Section 401(a) of the Internal Revenue Code established by such employer pursuant to such agreement, provided that the plan gives credit for participation, vesting and Credited Service prior to December 6, 1977, determined under the terms of this Plan in effect on December 5, 1977.

ARTICLE X

A.    As soon as practicable after an Employer's complete or partial withdrawal, the Trustees shall calculate and demand payment of withdrawal liability in accordance with Section 4219 of ERISA. In the case of a Construction Employer that withdraws on or after July 1, 1981, the amount of unfunded vested benefits allocable to it will be determined with reference to the unfunded vested benefits of the Coal Mine Construction Segment of the 1974 Pension Plan. In the case of an Employer other than a Construction Employer that withdraws on or after July 1, 1981, the amount of unfunded vested benefits allocable to it will be determined with reference to the unfunded vested benefits of the Bituminous Coal Segment of the 1974 Pension Plan.

33

B.     The Trustees shall establish the Bituminous Coal and Coal Mine Construction Segments of the 1974 Pension Plan for the sole purpose of calculating employer withdrawal liability under this Article. Assets and liabilities will be allocated to the two segments in accordance with the following:

(1)     All of a Participant's Credited Service under the Plan through June 30, 1981 will be allocated to the Coal Mine Construction Segment if the Participant's last Credited Service on or before June 30, 1981 was rendered for a Construction Employer. All of a Participant's Credited Service under the Plan through June 30, 1981 will be allocated to the Bituminous Coal Segment if the Participant's last Credited Service on or before June 30, 1981 was rendered for an Employer other than a Construction Employer. Service credited under the Plan for any period after June 30, 1981 will be allocated to the Coal Mine Construction Segment if rendered for a Construction Employer, or to the Bituminous Coal Segment if rendered for an Employer other than a Construction Employer. If a Participant renders service for both a Construction Employer and an Employer other than a Construction Employer within the same calendar year, his Credited Service will be allocated on a pro rata basis between the two segments. For purposes of this paragraph, in the case of service credit earned in the 1981 calendar year, credit hours attributable to service prior to July 1, 1981, will be assigned as follows:

| Number of Credit Hours Attributable to Participant's Service Prior to July 1, 1981 | Credited Service Assigned to Period Prior to July 1, 1981 |
|---|---|
| 250 or less | 0 |
| 250 - 499 | 1/4 year |
| 500 - 749 | 1/2 year |
| 750 - 999 | 3/4 year |
| 1,000 or more | 1 year |

(2)     An initial allocation of assets will be made to the Bituminous Coal and Coal Mine Construction Segments in order that as of June 30, 1981, the proportion of assets to liabilities in each segment is identical. Contributions and withdrawal liability payments made by Construction employers after June 30, 1981 will be allocated to the Coal Mine Construction Segment. Contributions and withdrawal liability payments made by Employers other than Construction Employers after June 30, 1981 will be allocated to the Bituminous Coal Segment. Plan and Trust expenses after June 30, 1981, will be allocated to each segment in the same ratio as the segment's income bears to the total income of the Trust; however, extraordinary expenses generated specially by one segment will be charged to that segment alone. The Trustees' determinations concerning the initial allocation of assets under this paragraph shall be final and binding on all persons dealing with the Plan.

34

(3)     Investment income (including realized and unrealized capital gains and losses) will be allocated monthly to each segment in the same ratio that the segment's assets bear to the total assets of the Trust.

(4)     Pension and other benefit payments made under the Plan will be charged to each segment in the same rat io that credited service on which a payment is based is allocated to the specific segment.

C.     The Trustees shall adopt (and modify as appropriate) a reasonable interest assumption used to calculate the value of unfunded vested benefits under the Plan which will be uniformly applicable to withdrawals by all Employers.

D.     The Bituminous Coal and Coal Mine Construction Segments are maintained solely for the purpose of determining withdrawal liability under this Article. The benefit levels, eligibility rules, credited service provisions, and all other rules and regulations of the Plan shall be applied uniformly to all Participants. All Trust assets are available to pay all benefits under the Plan. In the event that only one segment has unfunded vested benefits in a given Plan year, the excess of allocated assets over the value of vested benefits in the other segment will be used to reduce the first segment's unfunded vested benefits. Notwithstanding any other provision of this Article X, if as of the last day of any Plan year the Trustees determine that all or substantially all of the Employers that have an obligation to contribute to one segment have withdrawn from that segment, the liability of any Employer that withdraws from the Plan in that or any subsequent Plan year shall be calculated under the provisions in effect for withdrawals occurring on or before June 30, 1981.

E.     The amount of unfunded vested benefits allocable to an Employer that withdraws from the Plan is the product of --

(1)     the appropriate segment's unfunded vested benefits as of the end of the Plan year preceding the Plan year in which the Employer withdraws, less the value as of the end of such year of all outstanding claims for withdrawal liability with respect to that segment which can reasonably be expected to be collected from that segment's Employers withdrawing before such year; multiplied by

(2)     a fraction - (a) the numerator of which is the total amount required to be contributed by the Employer under the Plan with respect to the appropriate Plan segment for the last 5 Plan years ending before the withdrawal, and

(b)     the denominator of which is the total amount contributed with respect to the appropriate Plan segment under the Plan by all of the appropriate segment's Employers for the last 5 Plan years ending before the withdrawal, increased by any Employer contributions owed (to the segment) with respect to earlier periods which were collected in those Plan years, and decreased by any amount contributed to the Plan during those Plan years by Employers who withdrew from that segment of the Plan during those Plan years.

(3)     For purposes of subparagraph (E)(2)(b) the "total amount contributed" for a Plan year includes contributions actually received during the Plan year, and contributions received on or before July 31 following the end of the Plan year.  Contributions counted for one Plan year may not be counted for any other Plan year.

F.     For purposes of determining whether a withdrawal has occurred and for purposes of assessing withdrawal liability under this Article, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single Employer and all such trades and businesses as a single Employer.  (The preceding sentence shall not be deemed to preclude assessing liability under any other applicable law.)  In the case of an Employer which contributes to the 1974 Pension Trust through one or more trades or businesses which would otherwise be considered Construction Employers and one or more trades or businesses which would otherwise be considered Employers other than Construction Employers, all calculations related to the establishment of the Bituminous Coal and Coal Mine Construction Segments of the Plan will be performed as if each trade or business were a separate Employer.  In the case of an Employer described in the preceding sentence, the amount of unfunded vested benefits allocable to the Employer in the event of a complete withdrawal will be the sum of all unfunded vested benefits allocable to the individual trades or businesses calculated as if they were separate Employers.  In the case of an Employer described in the third sentence of this paragraph, the amount of unfunded vested benefits allocable in the event of a partial withdrawal will be determined by the Trustees, based upon the proportional extent to which the partial withdrawal is attributable to each trade or business, and assigning liability (based on the unfunded vested benefits of the appropriate segments) accordingly.  The Trustees shall have the authority to establish rules implementing such assignment of liability.

G.     Payment of withdrawal liability must begin within 60 days, notwithstanding any request for review or appeal of the determination of the amount of such liability, after the date on which the Trustees notify the Employer of the amount of withdrawal liability.  Annual payments are to be made in twelve (12) equal installments, due on the l0th day of each month.

H.     If payment is not made when due, interest on the payment shall accrue from the due date until the date on which the payment is made.  Interest on delinquent payment of withdrawal liability shall be payable at the rate established by the PBGC pursuant to Section 4219(c)(6).  Default will occur if the Employer fails to make payment when due and then fails to make payment within 60 days after receiving written notice from the Trustees of such failure, or as otherwise determined pursuant to Section 4219(c)(5).

I.     If any Employer defaults on payment (as determined pursuant to Section 4219(c)(5)), the Trustees shall require immediate payment of the outstanding amount of withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made.  If the Trustees file suit to collect the outstanding balance of withdrawal liability, plus accrued interest, and a judgment is entered by the court in favor of the Trustees, the judgment entered shall provide for an additional amount equal to 20% of the outstanding amount of withdrawal liability as liquidated damages.  The Trustees shall have the authority to promulgate rules regarding default and an arbitration procedure.

36

J.     An Employer is entitled to prepay the outstanding amount of any unpaid withdrawal liability, plus accrued interest, if any, in whole or in part, without penalty. However, if the pre-payment is made pursuant to a withdrawal which is later determined to be part of a withdrawal described in Section 4219(c)(l)(D) of ERISA, the withdrawal liability of the Employer shall not be limited to the amount of pre-payment.

K.     In the event that this Plan terminates, an Employer's obligation to make payments under this Article ceases at the end of the Plan year in which the assets of this Plan (exclusive of withdrawal liability claims) are sufficient to meet all obligations of this Plan, as determined by the PBGC.

L.     In conformance with Section 4208(c) of ERISA, in any Plan year following an Employer's partial withdrawal under Section 4205(a)(l) of ERISA, when the number of contribution base units with respect to which the Employer has an obligation to contribute for such year equals or exceeds 130% of the number of contribution base units with respect to which the Employer had an obligation to contribute in the partial withdrawal year, the amount of the Employer' s partial withdrawal liability payment for such year shall be reduced pro rata, in accordance with PBGC regulations.

M.     The presumptive partial withdrawal rules in Section 4205(a) and (b) of ERISA shall apply to this Plan.

N.     A complete or partial withdrawal of an Employer (hereinafter in this section referred to as the "seller") under this Plan does not occur solely because, as a result of a bona fide, arm's-length sale of assets to an unrelated party (hereinafter in this section referred to as the "purchaser"), the seller ceases covered operations or ceases to have an obligation to contribute for such operations, if --

(1)     the purchaser is, or becomes at the time of the sale, signatory to the Wage Agreement or any other collective bargaining agreement entered into with the United Mine Workers of America which provides that contributions at the same rate as contributions required under the Wage Agreement shall be made to this Plan;

(2)     the purchaser has an obligation to contribute to this Plan with respect to the operations for substantially the same employees and the same number of contribution base units for which the seller had an obligation to contribute to this Plan;

(3)     the purchaser provides to the Plan for a period of 5 plan years commencing with the first plan year beginning after the sale of assets, a bond or escrow deposit meeting the requirements of Section 4204 (a)(1)(B). If the Plan is in reorganization, the amount of such bond or escrow deposit shall be twice the amount provided in Section 4204 (a)(1)(B).

(4)     the contract for sale provides that, if the purchaser withdraws in a complete withdrawal, or a partial withdrawal with respect to operations, during such first 5 Plan years, the seller is secondarily liable for any withdrawal liability the seller would have had to this Plan with respect to the operations (but for this section) if the liability of the purchaser with respect to this Plan is not paid.

37

If the purchaser --

        (1)    withdraws before the last day of the fifth plan year beginning after the sale, and

        (2)    fails to make any withdrawal liability payment when due, because of a complete or partial withdrawal, then the seller shall pay to this Plan an amount equal to the payment that would have been due from the seller but for this section.

If all, or substantially all, of the seller's assets are distributed, or if the seller is liquidated before the end of the 5 plan year period described above, then the seller shall provide a bond issued by a corporate surety company that is an acceptable surety for purposes of Section 412 of ERISA, or an amount held in escrow by a bank or similar financial institution satisfactory to the Trustees, in an amount equal to the present value of the withdrawal liability the seller would have had but for this paragraph.

If only a portion of the seller's assets are distributed during such period, then a bond or escrow shall be required, in accordance with rules established by the Trustees, to the extent consistent with PBGC regulations.

The liability of the party furnishing a bond or escrow under the above paragraph shall be reduced, upon payment of the bond thereof.

For the purposes of this section, the liability of the purchaser shall be determined as if the purchaser had been required to contribute to this Plan in the year of the sale and the 4 plan years preceding the sale the amount the seller was required to contribute for such operations for such 5 plan years.

        O.    If a court or tribunal of competent jurisdiction determines by a final decision or award that any provision of this Article X creates two separate multiemployer plans, or limits or reduces any employer's liability under this Article in a manner not specifically provided for herein, then the amendments to this Plan, creating two segments for the sole purpose of calculating employer liability under this Article, shall thereafter be considered null and void (without affecting any other provision of this Plan), and all employer liability under this Article shall, prospectively from the date of any such holding, be calculated under the provisions in effect for withdrawals occurring on or before June 30, 1981.

## ARTICLE XI - SOCIAL SECURITY SUPPLEMENT

        A.    <u>Eligibility For Benefit</u>

Each Employer signatory to the National Bituminous Coal Wage Agreement of 2002, or to another Wage Agreement meeting the requirements of section C of this Article, shall notify the Trustees of the names of individuals eligible for the annual supplemental benefit payable under this Article. Eligibility is limited to individuals who, as of January 1, 2002 and thereafter during the term of the National Bituminous Coal Wage Agreement of 2002, are both eligible for Employer-provided health benefits under such Employer's

individual health plan maintained pursuant to its Wage Agreement and subject to such plan's annual deductible requirement. No individual who has received a health care bonus payment from his Employer shall be eligible for a benefit under this Article for the same year. Subject to the foregoing, eligible individuals are as follows:

      1.    A Pensioner who is not eligible for unreduced Social Security benefits and who is covered under this Plan.

      2.    A deceased Pensioner's surviving spouse who is not eligible for unreduced Social Security benefits and who is covered under this Plan.

      3.    A deceased employee's surviving spouse who is not eligible for unreduced Social Security benefits, regardless of whether such surviving spouse is otherwise entitled to a currently payable benefit under this Plan.

B.    <u>Amount of Benefit</u>

The benefit is payable on January 1 of each year after 2001 which is during the term of the National Bituminous Coal Wage Agreement of 2002. The benefit will be in the amount of $1,000.00 except in the case of the following:

      1.    The payment for a surviving spouse whose Employer-provided health care will terminate during the calendar year will be the pro-rata portion of $1,000 that reflects the number of calendar quarters during which the surviving spouse is entitled to Employer-provided health care under the plan during such year.

      2.    The payment for a Pensioner or a surviving spouse for the calendar year in which he or she will attain eligibility for unreduced Social Security benefits shall be the pro-rata portion of $1,000 that reflects the number of calendar quarters during such year prior to the month in which he or she attains such eligibility.

      3.    The payment for a disabled individual who is not eligible for Medicare benefits will cease to be in effect beginning with the first calendar year following his or her eligibility for Medicare benefits.

      4.    The payment for any individual shall not exceed the lesser of the amount specified in the applicable Wage Agreement as payable by this Plan, or the following: $1,000 for an individual who is subject to a deductible of at least $750 during the calendar year under the applicable Employer's individual health plan; $750 for an individual subject to a deductible of at least $562 during the calendar year, but less than $750; $500 for an individual subject to a deductible of at least $375 during the calendar year, but less

39

than $562; and $250 for an individual subject to a deductible of at least $187 during the calendar year, but
less than $375.

C.    Other Wage Agreements

A Wage Agreement meets the requirements of this section if:

1.    it requires contributions to this Plan that conform to the requirements of Article VIII.B(16)
and that are to continue at least through the term of the National Bituminous Coal Wage Agreement of
2002;

2.    it provides for an individual employer health plan that includes an annual deductible
requirement applicable to participants and beneficiaries (other than retirees and surviving spouses eligible
for unreduced Social Security benefits  and disabled employees eligible for Medicare benefits);

3.    it provides for the Employer to pay to each employee subject to the deductible
requirement an annual payment related to the amount of the deductible; and

4.    it provides for this Plan to make an annual payment to each retiree and surviving
spouse subject to the deductible requirement, in the same amount that would be paid under the applicable
Wage Agreement to an active employee subject to the same deductible requirement.

APPENDIX A

ACTUARIAL EQUIVALENCE FACTORS FOR DEFERRED VESTED
RETIREMENT BENEFITS COMMENCING PRIOR TO AGE 62

The following factors are to be multiplied by the full accrued benefit payable commencing at normal retirement age 62 to yield the equivalent benefit payable commencing at the indicated age:

| AGE Years | Months | Actuarial Equivalence Factor | AGE Years | Months | Actuarial Equivalence Factor |
|---|---|---|---|---|---|
| 55 | 0 | .522 | 56 | 0 | .569 |
|  | 1 | .526 |  | 1 | .573 |
|  | 2 | .529 |  | 2 | .577 |
|  | 3 | .533 |  | 3 | .582 |
|  | 4 | .537 |  | 4 | .586 |
|  | 5 | .541 |  | 5 | .590 |
|  | 6 | .545 |  | 6 | .595 |
|  | 7 | .549 |  | 7 | .599 |
|  | 8 | .553 |  | 8 | .604 |
|  | 9 | .557 |  | 9 | .608 |
|  | 10 | .561 |  | 10 | .612 |
|  | 11 | .565 |  | 11 | .617 |
| 57 | 0 | .621 | 58 | 0 | .680 |
|  | 1 | .626 |  | 1 | .685 |
|  | 2 | .631 |  | 2 | .691 |
|  | 3 | .636 |  | 3 | .696 |
|  | 4 | .641 |  | 4 | .702 |
|  | 5 | .646 |  | 5 | .707 |
|  | 6 | .651 |  | 6 | .713 |
|  | 7 | .655 |  | 7 | .718 |
|  | 8 | .660 |  | 8 | .724 |
|  | 9 | .665 |  | 9 | .729 |
|  | 10 | .670 |  | 10 | .735 |
|  | 11 | .675 |  | 11 | .740 |
| 59 | 0 | .746 | 60 | 0 | .820 |
|  | 1 | .752 |  | 1 | .827 |
|  | 2 | .758 |  | 2 | .834 |
|  | 3 | .765 |  | 3 | .841 |
|  | 4 | .771 |  | 4 | .848 |
|  | 5 | .777 |  | 5 | .855 |

41

|    |    |       |    |    |       |
|----|----|-------|----|----|-------|
|    | 6  | .783  |    | 6  | .863  |
|    | 7  | .789  |    | 7  | .870  |
|    | 8  | .796  |    | 8  | .877  |
|    | 9  | .802  |    | 9  | .884  |
|    | 10 | .808  |    | 10 | .891  |
|    | 11 | .814  |    | 11 | .898  |
| 61 | 0  | .905  | 62 | 0  | 1.000 |
|    | 1  | .913  |    |    |       |
|    | 2  | .920  |    |    |       |
|    | 3  | .928  |    |    |       |
|    | 4  | .936  |    |    |       |
|    | 5  | .944  |    |    |       |
|    | 6  | .952  |    |    |       |
|    | 7  | .960  |    |    |       |
|    | 8  | .968  |    |    |       |
|    | 9  | .976  |    |    |       |
|    | 10 | .984  |    |    |       |
|    | 11 | .992  |    |    |       |

Actuarial Basis:  95% of 1959-61 U.S. Total Male Population
Mortality Table at 5% Interest.

42

**APPENDIX B**

TABLE OF PERCENTAGES TO BE APPLIED
AGAINST PENSION PAYABLE TO PARTICIPANT
UNDER JOINT AND SURVIVOR ANNUITIES

AGE OF PARTICIPANT*

| AGE OF SPOUSE* | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 |
|---|---|---|---|---|---|---|---|---|
| | % | % | % | % | % | % | % | % |
| 50 | 85.1 | 84.2 | 83.3 | 82.3 | 81.2 | 80.2 | 79.1 | 77.9 |
| 51 | 85.6 | 84.7 | 83.7 | 82.7 | 81.7 | 80.7 | 79.6 | 78.5 |
| 52 | 86.0 | 85.1 | 84.2 | 83.2 | 82.2 | 81.2 | 80.1 | 79.0 |
| 53 | 86.5 | 85.6 | 84.7 | 83.7 | 82.8 | 81.7 | 80.7 | 79.6 |
| 54 | 86.9 | 86.1 | 85.2 | 84.3 | 83.3 | 82.3 | 81.2 | 80.1 |
| 55 | 87.4 | 86.6 | 85.7 | 84.8 | 83.8 | 82.8 | 81.8 | 80.7 |
| 56 | 87.9 | 87.1 | 86.2 | 85.3 | 84.4 | 83.4 | 82.4 | 81.3 |
| 57 | 88.3 | 87.5 | 86.7 | 85.8 | 84.9 | 84.0 | 83.0 | 81.9 |
| 58 | 88.8 | 88.0 | 87.2 | 86.4 | 85.5 | 84.5 | 83.6 | 82.6 |
| 59 | 89.3 | 88.5 | 87.7 | 86.9 | 86.0 | 85.1 | 84.2 | 83.2 |
| 60 | 89.7 | 89.0 | 88.3 | 87.4 | 86.6 | 85.7 | 84.8 | 83.8 |
| 61 | 90.2 | 89.5 | 88.8 | 88.0 | 87.2 | 86.3 | 85.4 | 84.5 |
| 62 | 90.7 | 90.0 | 89.3 | 88.5 | 87.7 | 86.9 | 86.0 | 85.1 |

* Age to nearest birthday.

Pension payable to qualified surviving spouse pursuant to Article VII
(A) will be equal to 50% of the Participant's Pension as reduced in
accordance with the above Table.  The benefit payable to a qualified
surviving spouse under Article VII (B) will be equal to 75% of the
amount reduced in accordance with the above table.

43

IN WITNESS WHEREOF, the Employers and the Union, pursuant to proper authority, have caused this instrument, effective December 6, 1974, and amended as of January 1, 2002, to be signed by their proper officers or representatives in Washington, D.C. on this ___*18*___ day of *February* 2002.

UNITED MINE WORKERS OF AMERICA

_____
International President

BITUMINOUS COAL OPERATORS'
ASSOCIATION, INC.

_____
President

44

# EXHIBIT D

UNITED MINE WORKERS OF AMERICA 1974 PENSION TRUST

Pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974, there is hereby established a trust to be known as the "United Mine Workers of America 1974 Pension Trust" (hereinafter sometimes referred to as "Trust" or "1974 Pension Trust") for the purpose of making benefit payments pursuant to the provisions of the United Mine Workers of America 1974 Pension Plan (hereinafter sometimes referred to as the "Plan" or the "1974 Pension Plan"). The provisions of said 1974 Pension Trust are effective as of December 6, 1974, and, as amended as of March 27, 1978, April 29, 1980, June 7, 1981, October 1, 1984, February 1, 1988, February 1, 1991, December 16, 1993, January 1, 1998, and January 1, 2002, are as set forth below.

The 1974 Pension Plan and Trust is a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950.

Except to the extent otherwise required by the Employee Retirement Income Security Act of 1974 ("ERISA") or other applicable law, governmental rule or regulation, and except to the extent that the 1974 Pension Plan or 1974 Pension Trust specifically provides otherwise, or as required by the context, all amendments to the 1974 Pension Trust effective as of January 1, 2002, pursuant to the authority contained in Article XI herein, shall be given only prospective application commencing on January 1, 2002, and shall have no retroactive application whatever. The amendments effective as of January 1, 2002, shall not be deemed to be an approval or disapproval by the parties to any action or failure to act by any Trustee or Trustees for any period prior to January 1, 2002. The terms and provisions of the 1974 Pension Trust in effect as of December 31, 2001, shall continue in effect and shall be applicable only to circumstances or events which occurred prior to January 1, 2002, and which are not governed by the amendments adopted as of January 1, 2002.

ARTICLE I

The following terms shall have the meanings herein set forth:

(1)     "Wage Agreement" means the National Bituminous Coal Wage Agreement of 1974, as amended from time to time and any successor thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2002. Any reference in this Trust to the Wage Agreement or to the bituminous coal wage agreement then in effect shall also refer (a) to the Sub-bituminous and Lignite Agreement and the National Coal Mine Construction Agreement with respect to any period for which such agreements provide that pension benefit payments shall be made available pursuant to this Trust or a predecessor Trust established under the bituminous coal wage agreement, (b) with respect to any period prior to the 1950 Bituminous Coal Wage Agreement, to any collective bargaining contract between the United Mine Workers of America and any employer in the bituminous coal industry, and (c) solely for the purposes of determining who is required to make contributions to, and receive benefits under, the 1974 Pension Trust, any other collective bargaining contract entered into between the United Mine Workers of America and any employer in the bituminous coal industry, which contract provides that contributions shall be made to or benefit payments made from this Plan.

(2)    "Employer" means an employer who is signatory to the Wage Agreement or, with respect to prior periods, was signatory to the bituminous coal wage agreement then in effect.

(3)    "Plan" shall refer to the "United Mine Workers of America 1974 Pension Plan" established pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974.

(4)    "Trustees" shall mean the trustees of this Trust designated in accordance with the provisions of Article II hereof, who shall be the named fiduciaries required pursuant to Section 402 of ERISA and the Plan Administrator, as that term is defined in that Act; provided, however, that this instrument may be amended pursuant to Article XI hereof to designate other or additional named fiduciaries.

(5)    "UMWA" or "Union" shall mean the United Mine Workers of America.

<div align="center">ARTICLE II</div>

The 1974 Pension Trust shall be administered by a Board of four Trustees, two of whom shall be appointed as representatives of the Employers, and two of whom shall be appointed as representatives of the Union.  The Union may remove the Trustees appointed by it, at any time and for any reason, and the Employers may remove the Trustees appointed by them, at any time and for any reason.

For purposes of taking any action and all other aspects of administration under the 1974 Pension Plan or Trust, a quorum shall consist of two of the four Trustees, one of whom must be a representative of the Union, and one of whom must be a representative of the Employers; provided, however, that a quorum shall not be deemed to exist unless all Trustees have received reasonable notice of the meeting at which any action is taken, unless such notice is waived.  Any Trustee may call a meeting of the Trustees pursuant to the provisions hereof.  The Trustees need not be physically present to constitute a quorum, but may conduct business telephonically or through similar modes of simultaneous communication. Alternatively, the Trustees may act without meeting, by written resolution signed by all Trustees.

In the event that a meeting is held or action is taken without the participation of both of the Trustees appointed by the Union and both of the Trustees appointed by the Employers, each side (the Employer Trustees and the Union Trustees) shall be required to vote as a unit.  In all other cases, each Trustee will be entitled to one vote.

In the event of resignation, death, removal, inability or unwillingness to serve of a Trustee appointed by the Employers or a Trustee appointed by the Union, the Employers shall appoint the successor of the Trustee originally appointed by them in accordance with the terms of Article XX of the National Bituminous Coal Wage Agreement of 2002, as amended from time to time, and any successor agreements to that specific Agreement, and the Union shall appoint the successor of the Trustee originally appointed by it.  In the event of a deadlock on the administration of the Trust Fund between the Employer Trustees and the Union Trustees, an impartial umpire shall be selected either by agreement of the four Trustees, representatives of the contracting parties hereto, or by petition by either of the contracting parties hereto or by either of the two groups of Trustees to the United States District Court of

<div align="center">2</div>

the District of Columbia for the appointment of such an impartial umpire, all as made and provided in Section 302(c) of the Labor-Management Relations Act of 1947.

The four Trustees so designated shall constitute the Board of Trustees to administer the 1974 Pension Trust, as it may be amended from time to time. The Union shall designate one Trustee to serve as Chairman.

The UMWA and the BCOA may each designate a liaison representative who shall be permitted to attend Trustee meetings, to request and receive data and information relating to Fund operations, and to meet with Fund staff and representatives regarding issues relating to the Fund.

The Trustees shall retain outside co-counsel who shall serve as the legal advisors to the Fund and the Trustees. This shall not preclude the Trustees from exercising their authority to retain additional counsel as set forth in Article VI(10).

This Trust shall have its principal place of business in Washington, D.C., or such other place as may be determined by the Trustees.

## ARTICLE III

The 1974 Pension Trust established with the Trustees hereunder is an irrevocable trust created pursuant to Section 302(c) of the Labor-Management Relations Act of 1947, which shall endure as long as the purposes for its creation shall exist. The 1974 Pension Trust consists of such sums of money and other property, acceptable to the Trustees, as from time to time shall be contributed to, held by, or paid or delivered to the Trustees and such earnings, profits, and increments thereon as may occur from time to time. All such money and other property delivered to the Trustees and all investments and reinvestments made therewith or proceeds thereof and all earnings and profits thereon, less the payments which at the time of reference shall have been made by the Trustees as authorized herein, are referred to herein as the "assets of the 1974 Pension Trust." The assets of the 1974 Pension Trust shall be held by the Trustees and dealt with in accordance with the express provisions of this instrument and the requirements of law.

The monies to be paid into the 1974 Pension Trust shall not in any manner be liable for or subject to the debts, contract, liabilities or torts of the parties entitled to such money, i.e., the beneficiaries of said 1974 Pension Trust under the terms of the instrument.

## ARTICLE IV

The Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, are directed and authorized (a) to hold, to invest and to reinvest the assets of the 1974 Pension Trust as provided herein; (b) to pay monies from the 1974 Pension Trust in accordance with the terms of the Plan for the purpose of distributing the benefits payable under the Plan; and (c) to pay the cost of administration of the 1974 Pension Trust as hereinafter provided.

3

Subject to the provisions of this Trust and the Plan, the Trustees shall have full and exclusive authority and discretion to determine all questions of coverage and eligibility, including all factual determinations, investment of trust funds, delivery of benefits, and all other related matters. They shall have full discretionary power to construe the provisions of this Agreement and Declaration of Trust and the Plan. The Trustees are empowered to promulgate such reasonable rules and regulations as they determine to be desirable for carrying out the purposes of this Trust and of the Plan.

## ARTICLE V

The Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, shall have full discretionary powers of management and control, of sale and resale, in fee simple or otherwise, mortgage, lease, and pledge, of the assets of the 1974 Pension Trust, and shall not be restricted to investments in securities or property of the character now or hereafter authorized by law or rules of the United States District Court for the District of Columbia. To the extent permitted by ERISA, the Trustees are authorized to invest assets of the 1974 Pension Trust in deposits described in Section 408(b)(4) of ERISA, and in common or collective trust funds or pooled investment funds, including but not limited to those described in Section 408(b)(8) of ERISA. In the event that the Trustees invest assets of the 1974 Pension Trust in a pooled investment trust which is exempt from taxation as a group trust under Sections 401(a) and 501(a) of the Internal Revenue Code (with respect to funds which equitably belong to participating trusts described in such Sections of the Code), the provisions of said pooled investment trust shall be deemed to be a part of the Plan. The assets of the 1974 Pension Trust shall be invested and reinvested, without distinction between principal and income, in securities and other forms of property, including but not limited to, real estate, corporate stocks (common and preferred), debentures, bonds and other obligations whether or not secured. The Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, shall not be limited to the amount or type of any investment in relation to the amount or type of investments constituting the Trust as a whole, except as provided by ERISA.

The Trustees or such other persons as may be properly designated pursuant to Article IX hereof may, in their discretion, keep such portion of the assets of the 1974 Pension Trust in cash or cash balances as the Trustees may determine to be reasonably necessary to satisfy the current needs of the Trust.

## ARTICLE VI

Neither by way of limitation nor in derogation, but in amplification of any powers granted herein, the Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, are further authorized:

(1)    To purchase, sell, exchange, convey, transfer or dispose of, and also to grant options with respect to, any property, whether real or personal, at any time held by them and to make any sale, private or public;

(2)    To retain, manage, operate, repair, improve, develop, preserve, mortgage or lease for any period any real property interests or rights held by the Trustees upon such terms and conditions as the Trustees

4

deem proper, either alone or by joining with others, using other trust assets for any of such purposes if by them deem advisable; to modify, extend, renew, or otherwise adjust any or all of the provisions of any such mortgage or lease, including the waiver of rentals, if by them deemed advisable;

(3)     To compromise, compound and settle any debt or obligations due from third persons to them or to third persons from them, as Trustees hereunder, and to reduce the rate of interest on, to extend or otherwise modify, or to foreclose upon default or otherwise enforce, any such obligations;

(4)     To vote in person or by proxy and to give general or special proxies or powers of attorney, with or without power of substitution, on any securities or other investments held by them;

(5)     To exercise any rights or options appurtenant to any securities or other property held by them for the conversion thereof into other securities or property, or to exercise any rights or options held by them to subscribe for or purchase additional securities or other property, and to make any and all necessary payments with respect to any such conversion or exercise;

(6)     To join in, dissent from or oppose, the reorganization, recapitalization, consolidation, sale or merger of corporations or properties of which they may hold stocks, bonds or other securities or in which they may be interested, upon such terms and conditions as they may deem prudent; to pay any expenses, assessments or subscriptions in connection therewith and to accept any securities or property (whether or not the Trustees would be authorized to then invest in such securities or property) which may be issued upon any such reorganization, recapitalization, consolidation, sale or merger, and thereafter to hold the same;

(7)     To make, execute, acknowledge and deliver any and all deeds, leases, mortgages, assignments, documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

(8)     To enforce any right, obligation or claim in their absolute discretion and in general to protect in any way the interest of the Trust, either before or after default with respect to any such right, obligation or claim, and, in case they shall consider such action for the best interest of the Trust, in their absolute discretion to abstain from the enforcement of any right, obligation or claim and to abandon any property, whether real or personal, which at any time may be held by them:

(9)     To borrow or raise money for the purpose of the Trust in such amount and upon such terms and conditions as in their absolute discretion they may deem advisable; and for any sums so borrowed to issue their promissory note as Trustees and to secure the repayment thereof by mortgaging or pledging all or any part of the Trust; and no person lending money to the Trustees shall be bound to see to the application of the money loaned or to inquire into the validity, expediency or propriety of any such borrowing;

(10)    To employ suitable agents and counsel from time to time, and to pay them reasonable expenses and compensation;

5

(11)    To retain without liability for depreciation any securities or property at any time purchased and/or received by the Trustees as a part of the Trust;

(12)    To do all acts which may be necessary to comply with any of the requirements of ERISA or any other federal law;

(13)    To enter into any and all contracts and agreements for carrying out the terms of the Plan and the 1974 Pension Trust and for the administration of such Plan and Trust; and

(14)    To do all acts which they may deem necessary or proper and to exercise any and all powers of the Trustees under this instrument under such terms and conditions as they may deem to be for the best interest of the Trust.

(15) To enter into an arrangement with the UMWA for the check-off of membership dues, including assessments, initiation fees, credit union, voluntary COMPAC contributions and other voluntary deductions, and/or the UMWA 1993 Benefit Trust for remittance to the UMWA 1993 Benefit Trust of the required annual payment; provided that any such arrangement must be terminable by the Trustees upon reasonable notice, must be revocable by the Participant at any time upon reasonable notice to the Trustees, and either

(a)    such arrangement must not permit any Participant or beneficiary to check-off an amount exceeding 10% of his or her monthly benefit; or

(b)    the designated recipient must file a written acknowledgement that it has no enforceable right in or to any plan benefit or portion thereof (except to the extent of payments actually received pursuant to the terms of the arrangement);

and such arrangement must comply in all respects with the requirements of the Internal Revenue Code of 1986, as amended, ERISA, the Labor Management Relations Act of 1947, as amended, and any other applicable law.

The Trustees may, in their sole discretion, cause the securities which from time to time may comprise the Trust, to be registered in their name as Trustees hereunder, or in the name of their nominee without disclosing the ownership thereof or to take and keep the same unregistered, and to retain them, or any part thereof, in such condition that they will pass by delivery.

Notwithstanding the above authority granted the Trustees hereunder, no power shall be exercisable in any manner which will, or might, prevent the 1974 Pension Plan and Trust from qualifying, or continuing to qualify, under Section 401 of the Internal Revenue Code, nor shall any action be taken by the Trustees which violates the requirements of ERISA or any other applicable law, governmental rule or regulation.

6

## ARTICLE VII

The expenses incurred by the Trustees in the performance of their duties hereunder, including reasonable compensation for the Trustees in accordance with Section 408(c)(2) of ERISA, for agents, and for service of counsel rendered to the Trustees and expenses incident thereto, and all other proper charges and disbursements of the Trustees, including all taxes of any kind and all kinds whatsoever that may be levied or assessed under existing or future laws of any jurisdiction upon or in respect of the Trust hereby created or any money, property or securities forming a part thereof, shall be paid by the Trustees out of the Trust.

## ARTICLE VIII

A Trustee shall not be liable for the making, retention, or sale of any investment or reinvestment made by him as herein provided; for any loss to or diminution of the Trust; or for anything done or omitted under this instrument, except for his own willful misconduct or lack of good faith, or any other action or omission for which personal liability is imposed under Part 4 of Subtitle B of Title I of ERISA. Any Trustee may consult with legal counsel concerning any questions which may arise with reference to his duties under this instrument, and, except as otherwise provided by ERISA, the opinion of such counsel shall be full and complete protection in respect to any action taken or suffered by such Trustee hereunder in good faith and in accordance with the opinion of such counsel.

When and if a monetary claim or suit is lodged against one or more fiduciaries of the Trust, including the Trustees thereof, in their individual capacities, arising out of their actions as fiduciaries, the Trust may engage and compensate counsel to represent such fiduciary until a final court decision, or a final government agency decision if no court appeal is filed, finds that such fiduciary in his individual capacity (1) has breached his fiduciary obligations under the Employee Retirement Income Security Act; (2) by so doing has caused a loss to the Trust or its corresponding Plan or has gained by use of Trust assets; and (3) is therefore liable in his individual capacity for damages or to return any profit occasioned by such breach to the complaining person, persons, entity or entities.

If the Trust expends moneys for counsel under the preceding paragraph, and the individual liability described therein is so finally determined against one or more fiduciaries, each individual found so liable shall reimburse the Trust for moneys so expended for his counsel.

No provision in this Article shall be construed in its interpretation so as to violate the provisions of Section 410 of the Employee Retirement Income Security Act.

## ARTICLE IX

The Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, shall keep accurate and detailed accounts of all investments, receipts, and disbursements and other transactions hereunder, and such accounts, books and records relating thereto shall be open to inspection and audit by the Employers and the Union and by the beneficiaries of the 1974 Pension Trust at all reasonable times at the offices of the 1974 Pension Trust. The Trustees, or such other persons as may be

properly designated pursuant to this Article IX shall be responsible for providing participants and beneficiaries under the plan with all information required to be furnished pursuant to the provisions of ERISA or the regulations promulgated thereunder.

For purposes of computing charges to the funding standard account of the Trust, the Trustees shall adopt any actuarial cost or funding method designated by the Employers, including the "short-fall method," and permitted now or hereafter by applicable federal law and federal regulations issued thereunder. The Trustees shall give the Employers notice sixty (60) days prior to the time any such election is required or permitted.

The Trustees, or such other persons as may be properly designated pursuant to this Article IX shall be responsible for maintaining records sufficient to comply with any requirements of ERISA and for the filing of all reports with the Labor Department, Treasury Department, and Pension Benefit Guaranty Corporation which may be required by any provision of ERISA or the regulations issued thereunder, including the plan description and reports specified by Section 101(b). A copy of each document or report provided to plan participants or beneficiaries or filed by the Trustees pursuant to the requirements of ERISA or any other applicable law, governmental rule or regulation shall be sent to the Employers and to the Union unless the right to receive such copy has been waived in writing. The Trustees are authorized to apply for permission to implement an alternative method of satisfying any of the requirements of this Article IX in accordance with Section 110 of ERISA, and, upon receiving the approval of the Labor Department for such alternative method, may utilize such method in lieu of the corresponding requirements of ERISA and of Article IX of this instrument.

The Trustees shall provide the Employers and the Union with such other information and/or documentation as the Employers and the Union may reasonably request within a reasonable time from when such request shall be made.

The Trustees shall provide the Employers and the Union with quarterly reports summarizing all pending litigation involving the Trust and the Plan and describing all significant operational issues that are under review. Within 90 days following the close of each calendar year, or following the close of each such other annual period as may be adopted by the Trustees, and within 90 days after a Trustee ceases to be a Trustee as provided for in Article II hereof, the Trustees shall file with the Employers and the Union a written report setting forth in such form and detail as they may request the transactions effected by the Trustees during such calendar year or other annual period to the date on which such Trustee's tenure ceases. The annual report shall incorporate the report of an independent certified public accountant and shall be the same as required by Section 103 of ERISA unless the Employers and the Union jointly request that additional or supplemental information be incorporated in the report which they receive. Upon the expiration of ninety (90) days from the date of any report to the Employers and the Union, the Trustees shall be forever released and discharged from any liability or accountability to anyone as respects the propriety of their acts or transactions shown in the aforementioned report except as otherwise provided by law or with respect to any acts or transactions as to which the Employers or the Union shall file written objections with the Trustees within such period of ninety (90) days.

8

The UMWA or the BCOA may audit the accounts, books and records, and operation of the Plan and Trust, at any time and for any reason, upon reasonable notice to the Trustees. The Trustees shall cooperate fully in connection with any such audit and shall make available appropriate personnel and records deemed necessary by the auditors for inspection and copying at reasonable times and places.

The Trustees are hereby authorized to allocate fiduciary responsibilities in any manner permitted pursuant to Section 405(c) of ERISA.

The Trustees may appoint an investment manager or managers to manage any investments held under this instrument as permitted by Section 402(c) of ERISA.

To the extent not inconsistent with the provisions hereof, the Trustees shall comply with the further requirements imposed upon them by and shall have the further powers contained in Article XX, Sections (e), (f), and (g) of the National Bituminous Coal Wage Agreement of 2002, as amended from time to time, and any successor agreements to that specific Agreement.

## ARTICLE X

Any action of the Employers which may, or must, be taken hereunder may be taken by BCOA. Any action which must be taken in writing shall be signed by the President of BCOA.

Any Employer who employed any participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2002.

## ARTICLE XI

The Employers and the Union, by joint action, reserve the right at any time and from time to time to modify or amend in whole or in part any or all of the provisions of this instrument, without reopening or otherwise affecting the integrity of any other provision of the Wage Agreement, by a written agreement between the Employers and Union, provided, however, that such modification or amendment does not permit any part of the corpus or income of the Trust to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the participants and their beneficiaries, and provided further, that the Employers and the Union have delegated to the Trustees the authority and responsibility to make certain changes and amendments as set forth in Article XX(g)(4) of the National Bituminous Coal Wage Agreement of 2002, as amended from time to time, and any successor agreements to that specific Agreement. Any written agreement executed by the Union shall be signed by the International President.

9

## ARTICLE XII

Notwithstanding anything to the contrary contained in this instrument, or any amendment hereto, it shall be unlawful for any part of the 1974 Pension Trust, other than such part as is required to pay taxes and administrative expenses, to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the participants and beneficiaries of the Plan, except that in the case of a contribution which is made by an Employer by a mistake of fact, or law (other than a mistake relating to Plan qualification), such mistaken contribution may be returned to the Employer within six months after the Trustees determine that the contribution was mistakenly made. Monies held by the 1974 Pension Trust do not constitute a part of the deceased beneficiary's estate which can be claimed by his administrator, executor, heirs, or creditors, unless such person or persons are otherwise eligible under the terms and conditions of the Plan, nor are said monies equivalent to the proceeds of an insurance policy in which a beneficiary may be designated; and no participant or beneficiary of the Plan may, during his lifetime, assign, devise or will monies from this Trust, and any attempt so to do shall be void.

Notwithstanding the foregoing, a Participant or beneficiary may make a voluntary, revocable assignment permitted under an arrangement established by the Trustees pursuant to Article VI(15).

To the extent not inconsistent with and permitted by applicable law, governmental rule or regulation, and in such manner as to ensure that the 1974 Pension Plan and Trust is qualified under Section 401 of the Internal Revenue Code and that contributions are deductible under Section 404 of the Internal Revenue Code, the Trustees shall transfer assets or liabilities, or both, of the Trust, in such amounts, at such times and in such manner as the Employers and the Union may jointly direct, to any other trust qualified under Section 401 of the Internal Revenue Code which provides benefits to persons who at any time were or are participants under the 1974 Pension Plan.

The Employers, the Union, and the Trustees shall fully cooperate to obtain all necessary rulings and do all other acts appropriate to ensure that the 1974 Pension Plan and Trust is qualified under Section 401 of the Internal Revenue Code and that contributions are deductible under Section 404 of the Internal Revenue Code.

Any assets which remain upon termination of the 1974 Pension Plan, after satisfaction of all benefits and liabilities arising under the 1974 Pension Plan and 1974 Pension Trust in a manner consistent with the principles of Section 4044 of ERISA, shall be distributed as may be mutually agreed upon by the Employers and the Union.

In accordance with the requirements of Section 4232 of the Employee Retirement Income Security Act of 1974, as amended, the Trustees shall transfer to the United Mine Worker of America Construction Workers Pension Trust in such manner as the Employers and the Union may jointly direct the following assets of the Trust:

(a)    All claims for withdrawal liability for withdrawals of Construction Employers from the Plan after June 30, 1981; and

10

(b)     An amount equal to the balance of the assets in the Construction Segment of the Plan, determined in accordance with Article X of the Plan, adjusted to reflect any liabilities of such segment that are retained by the Plan and to prevent any increase in the unfunded vested benefits of the Plan as a result of the transfer and reduced by all costs of the transfer, including, but not limited to, attorneys' fees, staff time, actuarial work, and document preparation.

(c)     All outstanding claims (including notes from employers, if any) for contributions from employers signatory only to the National Coal Mine Construction Agreement of 1985 or its predecessors or only to another collective bargaining contract with the United Mine Workers of America that provides that contributions shall be made to this Trust solely for construction work related to the development, expansion or alteration of coal mines and not for any other work.

<div align="center">ARTICLE XIII</div>

This instrument shall be construed, regulated and administered under Federal law and, to the extent not preempted or inconsistent with such Federal law, the laws of the District of Columbia.

IN WITNESS WHEREOF, the Employers and the Union, pursuant to proper authority, have caused this instrument, effective December 6, 1974, and amended as of January 1, 2002, to be signed by their proper officers or representatives in Washington, D.C., this 18 day of February, 2002.

<div align="center">UNITED MINE WORKERS OF AMERICA</div>

International President

BITUMINOUS COAL OPERATORS' ASSOCIATION, INC.

President

11

Accepted by:

Dated: **2-28-02**                         _____
                                                    Trustee

Dated: **2-28-02**                         _____
                                                    Trustee

Dated: **2-28-02**                         _____
                                                    Trustee

Dated: **2-28-02**                         _____
                                                    Trustee

12

# EXHIBIT E

UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN
EFFECTIVE DECEMBER 6, 1974

## ARTICLE I - INTRODUCTION

Pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974, the United Mine Workers of America 1974 Pension Plan (hereinafter sometimes referred to as the "1974 Pension Plan" or the "Plan") provides pension benefits as hereinafter set forth.  The Plan is effective as of December 6, 1974 (the "effective date") and, as amended March 27, 1978, April 29, 1980, June 7, 1981, October 1, 1984, February 1, 1988, February 1, 1991, January 16, 1992, December 16, 1993, August 16, 1996, January 1, 1998, January 1, 2002, June 27, 2003, December 18, 2003, and January 1, 2007, the provisions of the Plan are set forth below.  Except in the case of total disability resulting from mine accidents occurring after the effective date, this Plan does not provide benefits to persons retiring on or before December 31, 1975, but such persons may be entitled to pension benefits under the United Mine Workers of America 1950 Pension Plan (hereinafter referred to as the "1950 Pension Plan").

The 1974 Pension Plan and Trust is a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950.

Except to the extent otherwise required by the Employee Retirement Income Security Act of 1974 ("ERISA" ) or other applicable law, governmental rule or regulation, and except to the extent that the 1974 Pension Plan or 1974 Pension Trust specifically provides otherwise, or as required by the context, all amendments to the 1974 Pension Plan effective as of January 1, 2007, pursuant to the authority contained in Article VIII herein, shall be given only prospective application commencing on January 1, 2007, and shall have no retroactive application whatsoever.  The amendments effective as of January 1, 2007, shall not be deemed to be an approval or disapproval by the parties to any action or failure to act by any Trustee or Trustees for any period prior to January 1, 2007.  The terms and provisions of the 1974 Pension Plan in effect as of December 31, 2006, shall continue in effect and shall be applicable only to circumstances or events which occurred prior to January 1, 2007, and which are not governed by the amendments adopted as of  January 1, 2007.

*Section A*  Definitions

(1)    "Wage Agreement" means the National Bituminous Coal Wage Agreement of 1974, as amended from time to time and any successor thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2007.  Any reference in this Plan to the Wage Agreement or to the bituminous coal wage agreement then in effect shall also refer (a) to the Sub-bituminous and Lignite Agreement and the National Coal Mine Construction

I-WA/2698738.1

Agreement with respect to any period for which such agreements provide that pension benefits shall be made available pursuant to this Plan or a predecessor plan established under the bituminous coal wage agreement, and (b) with respect to any period prior to the 1950 Bituminous Coal Wage Agreement, to any collective bargaining contract between the United Mine Workers of America and any employer in the bituminous coal industry, and (c) solely for the purposes of determining who is required to make contributions to, and receive benefits under, the 1974 Pension Trust, any other collective bargaining contract entered into between the United Mine Workers of America and any Employer in the bituminous coal industry, which contract provides that contributions shall be made to or benefit payments made from this Plan.

      (2)    "Employer" means an employer who is signatory to the Wage Agreement, or, with respect to prior periods, was signatory to the bituminous coal wage agreement then in effect.

      (3)    "Construction Employer" means an Employer that is signatory to the National Coal Mine Construction Agreement of 1984, as amended from time to time and any successor thereto; or is signatory to any other collective bargaining contract with the United Mine Workers of America which provides that contributions shall be made to the 1974 Pension Trust or the United Mine Workers of America 1985 Construction Workers Pension Trust for construction work related to the development, expansion or alteration of coal mines, provided that substantially all the employees, with respect to whom the employer has an obligation to contribute, perform construction work related to the development, expansion or alteration of coal mines, including the erection of tipples and preparation plants and other facilities placed in, on or around the coal mines, sinking of shafts, slopes, drifts or tunnels and all other such coal-related work that is performed under a Wage Agreement. In the case of a Construction Employer which is a single trade or business and which is also signatory to a Wage Agreement other than a Wage Agreement described in the preceding sentence, the Construction Employer shall be treated as an Employer other than a Construction Employer with respect to its employees or operations for which it has an obligation to contribute to the Plan pursuant to such Wage Agreement.

      (4)    "Bituminous Coal Segment" and "Coal Mine Construction Segment" mean the two accounts within the 1974 Pension Plan maintained after June 30, 1981, for the sole purpose of calculating employer withdrawal liability under Article X.

      (5)    "Participant" means any person who is employed in a classified job for an Employer after the effective date and any person entitled to receive pension benefits under the Plan; provided, however, that any person who is not employed in a classified job for an Employer on the effective date shall not become a participant until such person completes at least 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 2007 NBCWA) of Credited Service within a 12-month period after the effective date, or unless such person is subject to the provisions of Article II(f)(3).

2

(6)    "Pensioner" means any person who is receiving a pension pursuant to Article II of this Plan.

(7)    "1974 Pension Trust" means the trust established pursuant to the National Bituminous Coal Wage Agreement of 1974 to fund this Plan.

(8)    "Trustees" means the Trustees of the 1974 Pension Trust, who shall be named fiduciaries pursuant to Section 402 of ERISA and the Plan Administrator, as that term is defined in that Act; provided, however, that the 1974 Pension Trust may be amended to designate other or additional named fiduciaries under said Trust and the Plan.

(9)    "Credited Service" means signatory and nonsignatory service determined pursuant to Article IV.

(10)    "Hour of Service" shall mean each hour for which the participant is directly or indirectly paid or entitled to be paid by the Employer (a) for the performance of duties or (b) on account of a period of time during which no duties are performed due to vacation, holiday, illness, sickness and accident, incapacity, layoff, bereavement, jury duty, military duty or leave of absence; or (c) time spent performing contractual obligations such as safety inspections and mine committee work, even though such time off is not paid for by the Employer, provided that:

(1)    except for hours of service credited on account of a period during which a Participant is eligible to receive benefits under Article IV(B)(3), no more than 501 hours of service shall be credited to a Participant on account of a single continuous period during which the Participant performed no duties;

(2)    no credit shall be given for payments made or due under a plan maintained solely for the purpose of complying with the applicable worker's compensation or unemployment compensation or disability insurance laws or payments which solely reimburse a Participant for medically related expenses incurred by the Participant; and

(3)    hours of service shall be credited for back pay for the period for which such back pay was awarded, irrespective of mitigation of damages, either awarded or agreed to by the Employer to the extent such back pay represents payment for hours which are required to be taken into account. However, no hours of service shall be credited for back pay if such hours were previously credited. The determination of hours of service for reasons other than the performance of duties shall be made in accordance with the applicable rules of the regulations prescribed by the Secretary of Labor under 29 C.F.R. Part 2530.200b-2(b).

(11)    "UMWA" or "Union" shall mean the United Mine Workers of America.

3

(12)    "Hours Worked" shall mean (a) each hour for which an employee is paid, or entitled to payment, for the performance of duties for the Employer during the calendar year, and (b) hours for which back pay, irrespective of mitigation of damages, is awarded or agreed to by an Employer, to the extent that such award or agreement is intended to compensate an Employee for periods which the Employee would have been engaged in a performance of duties for the Employer. Time spent performing contractual obligations such as safety inspections and mine committee work and periods of time when the Participant is eligible to receive sickness and accident benefits shall be included as hours worked.

(13)    "Construction Industry Service" means, with respect to a participant,

(a)    all periods of service after June 20, 1985 with a Construction Employer that involves work related to the development, expansion or alteration of coal mines; and

(b)    all periods of signatory and nonsignatory service before July 1, 1985, if the participant's last such service before July 1,1985 was for a Construction Employer.

B.    When Retirement Occurs

For the purposes of this Plan, in the case of any Participant, retirement shall be considered to occur on the last day of credited service, within the meaning of Article IV C(8), provided that on such day he was eligible for an immediate or deferred pension under this Plan.

C.    Attainment of Age

For the purposes of this Plan, a Participant shall be deemed to have attained an age as of 12:01 A.M. on the respective anniversary date of the Participant's birth.

ARTICLE II – ELIGIBILITY

A.    Age 55 Retirement

Any Participant who (a) has at least 10 years of signatory service or at least twenty years of credited service, including the required amount of signatory service as set forth in Article IV(C)(6), and (b) has attained the age of 55 years (but not the age of 62) prior to retirement shall be eligible to retire on or after January 1, 2007, and shall upon his retirement (hereinafter "Age 55 Retirement") be eligible for a pension.

4

B.     Normal Retirement

(1)     Any Participant shall be eligible to retire on or after January 1, 2007, and shall upon his retirement (hereinafter "Normal Retirement") be eligible for a pension, provided such Participant has attained the normal retirement date which shall be the earlier of --

(a)     a Participant's attainment of age 62 years and completion of at least 10 years of signatory service or at least 20 years of credited service, including the required amount of signatory service as set forth in Article IV(C)(6), or

(b)     the later of --

(i)     the time a Participant attains age 65, or

(ii)     the 5th anniversary of the time the Participant became employed in signatory service.

(2)     In determining the time the Participant became employed in signatory service (for purposes of Article II(B)(1)(b)(ii)), any employment of a Participant in signatory service who is not entitled to a pension under Article II (A) or (E) (Age 55 Retirement or Deferred Vested Retirement) shall be disregarded if it precedes a period of consecutive one-year breaks in signatory service and the number of consecutive one-year breaks in signatory service equals or exceeds the greater of

(a)     five, or

(b)     the aggregate number of years of signatory service before such breaks.

In addition to the foregoing, any employment prior to a period of consecutive one-year breaks in signatory service shall be disregarded unless the Employee completes 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 2007 NBCWA) of signatory service within a 12-month period after the breaks in signatory service. Such aggregate number of years of signatory service before any period of consecutive one-year breaks in signatory service shall be deemed not to include any years of signatory service not required to be taken into account under this subparagraph by reason of any prior break in signatory service. For purposes of this Article II(B)(1)(b)(ii), a year of signatory service shall be calculated on the basis of a calendar year and in the manner specified in Article IV; a break in signatory service shall be defined in accordance with the terms of Article II(G)(3); and nonclassified signatory service shall be disregarded unless it immediately precedes or follows classified signatory service with the same Employer.

C.     Disability Retirement

A Participant who (a) has at least 10 years of signatory service prior to retirement, and (b) becomes totally disabled as a result of a mine accident occurring on or after January 1, 2007, shall, upon retirement (hereinafter " Disability Retirement"), be eligible for a pension while so disabled.  A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

When a Participant who has been receiving a disability pension under this Section C recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the Participant's ability to perform classified work in the industry.  The continuance of a disability pension shall be based on medical evidence that supports the Participant's inability to be employed in classified work in the industry.

If such Participant is medically certified able to perform classified work in the industry, he will no longer be eligible for a disability pension.

D.     Minimum Disability Retirement

Any Participant who (a) has less than 10 years of signatory service prior to retirement and (b) becomes totally disabled as a result of a mine accident occurring on or after January 1, 2007, shall, upon retirement (hereinafter "Minimum Disability Retirement") be eligible for a pension while so disabled.  A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

When a Participant who has been receiving a disability pension under this Section D recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the Participant's ability to perform classified work in the industry.  The continuance of a disability pension shall be based on medical evidence that supports the Participant's inability to be employed in classified work in the industry.

If such Participant is medically certified able to perform classified work in the industry, such Participant will no longer be eligible for a disability pension.

E.     Deferred Vested and Special Retirement

(1)     Any Participant who ceases working in a classified job for an Employer for any reason, except as provided in (2), (3), or (4) below, and who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter

6

"Deferred Vested Pension"), upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, provided

      (a)    the Participant's last day of Credited Service is on or after January 1, 2007, but prior to attainment of age 55;

      (b)    the Participant has

      (i)    at least 10 years of signatory service, or for a Participant with one hour of service on or after the date set by law for a five-year vesting schedule, at least 5 years of signatory service, or

      (ii)    at least 20 years of Credited Service as set forth in Article IV(C)(6).

      (2)    Any Participant who ceases working in a classified job for an Employer, who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension-Enhanced 1996") upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, calculated pursuant to Article III A(5)(b), provided:

      (a)    the Participant's last day of Credited Service is on or after January 1, 2007, but prior to attainment of age 55;

      (b)    the Participant had 20 years of signatory service on the date last worked;

      (c)    the Participant had been laid off and had not refused recall to the mine from which the Participant was laid off; or

      (d)    he had been terminated under Article III, Section (j) of the Wage Agreement (or if the Participant had not been terminated, there had been a deterioration in physical condition which prevented the Participant from performing the Participant's regular work as determined by a panel of three physicians, if the degree of physical deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter; and

      (e) the Participant's pension benefits are not in pay status on or before August 16, 1996.

Within a reasonable period of time after such Participant's employment has ceased, an appropriate written notice of eligibility and other relevant data will be provided.

     (3)    Any Participant who, on or after January 1, 2007, ceases working in a classified job for an Employer and who is not eligible to receive a pension under any other provision of this Article II shall be eligible for a pension (hereinafter "Special Permanent Layoff Pension"), calculated pursuant to Article III A(5)(b), using the Participant's actual Credited Service and an assumed age of 55, provided:

         (a)    the Participant's last day of Credited Service is on or after January 1, 2007, but prior to attainment of age 55;

         (b)    the Participant had 20 years of signatory service as of his last day of Credited Service;

         (c)    (i)    the Participant was permanently laid off under circumstances in which his Employer has permanently closed the mine, or

         (ii)    the Participant was permanently laid off, meaning that he was on layoff status for at least 180 days, and had not refused a recall to the mine from which he was laid off;

In the case of a layoff described in (c)(i) above, the pension will be effective on the first day of the first month following both the layoff and the filing of a pension application.  In the case of a layoff described in (c)(ii) above, the pension will be effective on the first day of the first month following both a period of 180 days after the layoff and the filing of a pension application.

Notwithstanding the foregoing, in the case of a Participant who earned no hours of credited signatory service during the period beginning November 1, 1997 and ending June 17, 1998, and who subsequently returned to active employment on or after June 18, 1998, in addition to meeting the requirements stated above, prior to satisfying Paragraph (4)(c), above, such Participant must either:

         (d)    have earned at least 250 hours of credited signatory service, or

         (e)    have returned to active employment as the result of a recall determined by the Trustees to have been to fill a bona fide job opening, and not for the purpose of entitling the Participant to this Special Permanent Layoff Pension benefit.

     (4)    Any Participant who, on or after January 1, 2007 ceases working in a classified job for an Employer shall be eligible for a pension (hereinafter "30-and-Out Pension"), calculated pursuant to Article III A(5)(b), but with no actuarial reduction on account of age, provided:

(a)    the Participant's last day of Credited Service is on or after January 1, 2007; and

(b)    the Participant had at least 30 years of signatory service on such last day of Credited service;

(c)    if, because of a layoff, he was not actively at work as of December 31, 2006:

(i) he earned at least  250 hours of credited signatory service following his return to work, or

(ii) he returned to active employment as the result of a recall determined by the Trustees to have been to fill a bona fide job opening, and not for the purpose of entitling the Participant to this 30-and-Out Pension benefit.

F.    Nonduplication

(1)    A Participant shall be entitled to receive a pension under only one of the foregoing paragraphs of this Article II with respect to any retirement.

(2)    Except as provided in paragraph (C), (D), or (F)(3) of this Article II, any person whose retirement occurs on or before December 31, 1975, shall not be entitled to receive pension benefits under this Plan, but shall be entitled only to receive such benefits as may be provided under the 1950 Pension Plan.

(3)    Any person who (a) retires on or before December 31, 1975, (b) at the time of retirement is entitled to or, upon attaining age 55 would be entitled to, a pension benefit under the 1950 Pension Plan, and (c) is again employed for at least 250 hours in a classified job for an Employer after December 31, 1975, shall upon subsequent retirement (or, if later, upon attaining age 55) be eligible for a pension only under this Plan and not under the 1950 Pension Plan, in the amount hereinafter specified.  The amount of pension for a Participant described in this paragraph shall be the sum of the amount of pension to which such Participant would be entitled upon attaining age 55 under the 1950 Pension Plan if he had not been employed in a classified job for an Employer after December 31, 1975, plus the excess of (i) over (ii) where (i) is the pension to which such Participant would be entitled except for this paragraph under Article III(A)(2) or III(B)(2) based upon all years of Credited Service under this Plan and (ii) is the pension to which such Participant would be entitled under Article III(A)(2) or III(B)(2) based solely on his Credited Service prior to December 31, 1975.

9

G.     Employment for Vesting Purposes

(1)     For purposes of this Article II, all years of classified service by a Participant with Employers signatory to the bituminous coal wage agreement then in effect shall be used for purposes of any eligibility requirement of minimum signatory service under this Article. A year of service shall be calculated on the basis of a calendar year and in accordance with the terms of Article IV(A).

(2)     For purposes of this Article II, years of nonclassified signatory service in the coal industry by a Participant after May 28, 1946, for Employers signatory to the bituminous coal wage agreement then in effect shall be used for purposes of any eligibility requirement of minimum signatory service provided that:

(a)     the nonclassified signatory service with an Employer immediately preceded or followed classified signatory service with the same Employer;

(b)     credit for nonclassified service shall not be given for any calendar year in which the Participant completed less than 1,000 hours of such service, as defined under Article I(A)(7);

(c)     all years of service before age 18 shall be disregarded;

(d)     all years of service performed before January 1, 1971, shall be disregarded unless the Participant completed at least three years of employment after December 31, 1970;

Provided further that, if the employee has not earned a non-forfeitable right to a pension:

(e)     all years of service prior to a break in service shall be disregarded unless the employee completes 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 2007 NBCWA) of service within a 12-month period after the break;

(f)     all years of service prior to any period of consecutive one-year breaks in service shall be disregarded if the number of such consecutive one-year breaks equals or exceeds the greater of (i) five, or (ii) the aggregate number of years of service before such breaks shall be deemed not to include any years of service not required to be taken into account under this subparagraph by reason of any prior break in service.

(3)     For purposes of Article II(G)(2) and II(B)(2), an employee shall incur a break in service for any calendar year in which such Employee completes not more than 500 hours (or 400 hours worked on the weekend/holiday crew of a signatory Employer as provided in

10

Appendix C of the 2007 NBCWA) of service; provided that, in the case of an Employee who is absent from work for any period --

    (a)      by reason of the pregnancy of the Employee,

    (b)      by reason of the birth of a child of the Employee,

    (c)      by reason of the placement of a child with the Employee in connection with the adoption of such child by such Employee, or

    (d)      for purposes of caring for such child for a period beginning immediately following such birth or placement, the Employee shall be considered to have completed the hours of service which otherwise would normally have been credited to him but for such absence, subject to the limitation set forth in Article I A(8)(l). The preceding sentence shall be applicable only in the year in which the Employee's absence from work begins, if the Employee would be prevented from incurring a one-year break in service in such year solely because of the application of the preceding sentence, or in any other case, in the immediately following year. No credit will be given to an Employee pursuant to this subparagraph unless the Employee furnishes to the Trustees such timely information as they may reasonably require to establish that the absence from work is for reasons referred to in (a), (b), (c), or (d) above, and the number of days for which there was such an absence.

    (4)      The provisions of this paragraph shall be interpreted and construed in accordance with the requirements of ERISA and the regulations issued thereunder.

    (5)      Service after June 30, 1985 with a Construction Employer shall be used for purposes of paragraph G(1), only if the United Mine Workers of America 1985 Construction Workers Pension Plan grants participants credit for the same purposes under that plan for service with Employers, other than Construction Employers, except that a year of service shall be calculated on the basis of a calendar year and in accordance with the terms of Article IV.

ARTICLE III - AMOUNT OF PENSION AND DEATH BENEFIT

    A.      Retirement On or After January 1, 2007

A pension granted to a Participant who retires on or after January 1, 2007, pursuant to Article II shall consist of a pension amount payable in monthly installments provided in accordance with the provisions of this Article III as set forth below. In no event, however, shall the annual retirement benefit payable to a Participant exceed the limitation of Section 415 of the Internal Revenue Code of 1986 and any regulations promulgated thereunder.

11

(1)    Age 55 Retirement Pension

(a)    A deferred pension, commencing after attainment of age 62, computed under the provisions of paragraph 2 below; or, at the election of the Participant, (b) an immediate pension, equal to the deferred pension to which the Participant could have been eligible under (a) above had the Participant so elected, reduced by 1/4 of one percent (1%) for each full month (3 percent (3%) per year) between the date on which pension benefits began and the date on which Participant attains age 62.

(2)    <u>Normal Retirement Pension</u>

For retirements occurring during the 2007 Wage Agreement the amount of pension for Normal Retirement shall be determined as follows:

(a)    for each year of credited non-signatory service as defined herein, $28.00 per month;

(b)    for each of the first 10 years of credited signatory service earned prior to February 1, 1989, $48.50 per month;

(c)    for each year of credited signatory service in excess of 10 years but not to exceed 20 years earned prior to February 1, 1989, $49.00 per month;

(d)    for each year of credited signatory service in excess of 20 years but not to exceed 30 years earned prior to February 1, 1989, $49.50 per month;

(e)    for each year of credited signatory service in excess of 30 years earned prior to February 1, 1989, $50.00 per month.

(f)    The retirement benefit for a year of credited signatory service earned from February 1, 1989 to January 31, 1990, is $56.00 per month.

(g)    The retirement benefit for each year of credited signatory service earned from February 1, 1990 to December 16, 1993, is $60.50 per month.

(h)    The retirement benefit for each year of credited signatory service earned from December 16, 1993 is $63.50 per month.

(i)    Each amount specified in clauses (a) through (h) shall be increased by $4.00 in the case of any Participant who is employed in classified signatory service on or after January 1, 2009, and by an additional $2.00 in the case of any Participant who is employed in classified signatory service on or after January 1, 2011.

12

Proportional credit shall be allowed for any fractional years of credited service pursuant to Article IV hereof. Periods of Construction Industry Service shall be taken into account solely to determine whether the amount specified in clause (a), (b), (c), (d), or (e) is to be used in determining the amount of pension that is earned for a given period of Credited Service. In any year for which two of clauses (a), (b), (c), (d), or (e) would apply, if a Participant has both Credited Service and Construction Industry Service, the amount determined under each clause shall be equal to the amount that would be determined if Construction Industry Service in that year were considered service under this Plan, multiplied by a fraction, the numerator of which is the Participant's hours of service under this Plan for that year and the denominator of which is the sum of such hours and the Participant's hours of Construction Service for that year.

(3)    Disability Retirement Pension

Subject to (4) below for a Participant whose disabling accident occurs after January 1, 2007, the pension payment shall be computed under the provisions of paragraph (2) above. In the case of a participant who has both Construction Industry Service and Credited Service, the amount of pension under this subparagraph (3) shall be based only on the Participant's years of Credited Service and shall be determined in the same manner as under Article III A.(2).

(4)    Minimum Disability Retirement Pension

The amount of pension for Minimum Disability Retirement shall be $245 per month for disabilities occurring on or after January 1, 2007, and shall be $250 per month for disabilities occurring on or after January 1, 2009. In any case in which a participant entitled to pension for Minimum Disability Retirement has both Credited Service and Construction Service, the amount of pension under this subparagraph (4) shall be equal to the amount otherwise payable under this subparagraph, multiplied by a fraction, the numerator of which is the number of years of Credited Service and the denominator of which is the sum of the number of years of Credited Service and the number of years of Construction Industry Service.

(5)    Deferred Vested Pension

(a)    The amount of a deferred vested pension (Article II E(1)) shall be a pension, commencing on or after attainment of age 62, computed under the provisions of Subsection A(2) of this Article III, or, at the Participant's election, between ages 55 and 62 with the pension payable reduced to its actuarial equivalent pursuant to Appendix A; provided, however, that in the case of any Participant with at least (20) years of credited service, such pension shall not be reduced to less than $195.00 per month effective January 1, 2007, or $200.00 per month effective January 1, 2009.

(b)    The amount of a deferred vested pension (Article II E(2)) shall be a pension, commencing on or after attainment of age 62, computed under the provisions of

13

Subsection A(2) of this Article III, or, at the Participant's election, between ages 55 and 62 with the pension computed under the provisions of Subsection A(l) of this Article III.

B.    Increased Pension

(1)    Increases in pensions under Plan amendments effective December 16, 1993 and August 16, 1996 are not applicable to Participants whose employment was terminated prior to December 16, 1993, and who will become eligible for only a deferred vested pension (II E(1)). Increases in pensions under Plan amendments effective August 16, 1996 are not applicable to Participants whose employment was terminated on or after December 16, 1993, and whose pension benefits are in pay status on or before August 16, 1996.

(2) (a)  Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2007, shall be issued by November 1, 2007 a one-time single sum payment of $565. Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2008, shall be issued by November 1, 2008 a one-time single sum payment of $565. Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2009, shall be issued by November 1, 2009 a one-time single sum payment of $565. Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2010, shall be issued by November 1, 2010 a one-time single sum payment of $580. Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2011, shall be issued by November 1, 2011 a one-time single sum payment of $580.

(b)    Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2007 shall be issued by November 1, 2007 a one-time single sum payment of $440. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2008, shall be issued by November 1, 2008 a one-time single sum payment of $440. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2009, shall be issued by November 1, 2009 a one-time single sum payment of $440. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2010, shall be issued by November 1, 2010 a one-time single sum payment of $455. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2011, shall be issued by November 1, 2011 a one-time single sum payment of $455.

(c)    Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2007, shall be issued by November 1, 2007 a one-time single sum payment of $440. Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2008 shall be issued by November 1, 2008 a one-time single sum payment of $440. Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2009 shall be issued by November 1, 2009 a one-time single sum payment of $440. Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2010 shall be issued by November 1, 2010 a one-time single sum payment of $455. Any Surviving Spouse whose

14

benefit under Article VI is in pay status as of October 31, 2011 shall be issued by November 1, 2011 a one-time single sum payment of $455.

     (d)     Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2007, shall be issued by November 1, 2007 a one-time single sum payment of $440. Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2008 shall be issued by November 1, 2008 a one-time single sum payment of $440. Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2009 shall be issued by November 1, 2009 a one-time single sum payment of $440. Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2010 shall be issued by November 1, 2010 a one-time single sum payment of $455. Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2011 shall be issued by November 1, 2011 a one-time single sum payment of $455.

     (e)     The one-time single sum payments provided for herein are not intended as an ongoing feature of this Plan, and the Plan shall have no obligation to provide payments of this type other than those expressly provided for above.

     C.     <u>Application for Pension and Commencement, Suspension and Termination of Pensions</u>

Payments of pensions shall be subject to the following:

     (1)     The first payment on any pension shall be made as soon as possible after an application for pension has been received and shall be for the month following the month in which the Participant retires (Article I B) and becomes eligible for a pension in accordance with Article II; provided, however, that in the case of a deferred pension pursuant to Article III(A)(l) or a deferred vested pension pursuant to Article III(A)(5) (other than a Special Permanent layoff Pension pursuant to Article II E(3)), such payment shall be for the later of (a) the month specified by the Participant in his application for pension if such month is subsequent to the month in which such Participant attains age 55, or (b) the month in which the application for pension is received, but not later than the month following the month in which such Participant attains age 62.

     (2)     The last payment shall be for the month in which the pensioner dies.

     (3)     Pension payments shall be payable on the first day of each month at the pensioner's last address of record.

     (4)     Pension payments shall be suspended for any month in which the pensioner is employed, subsequent to commencement of such payments, in the bituminous coal industry, in the same trade or craft (trade or craft shall mean the coal mining industry), and in the

15

same geographic area covered by this Plan. The provisions of this paragraph shall be interpreted in accordance with any regulations issued pursuant to Sections 203(a)(3) and (B) of ERISA.

(5)    Any Participant who continues to be employed by an Employer after retirement shall not be entitled to receive pension benefits under this Plan until such time as such Participant is no longer employed by an Employer; provided, however, that benefit payments shall commence not later than April 1 of the calendar year following the calendar year in which the Participant attains age 70-1/2.

D.    Death Benefit

(1) Except as otherwise provided herein, a death benefit shall be paid to the named beneficiary of any pensioner (other than a Pensioner receiving a deferred vested pension based on less than 20 years of credited service or a Pensioner receiving a pension based in whole or in part on years of service credited under the terms of Article II G) whose death occurs on or after January 1, 2007, and who meets the requirements of paragraph (2) of this section. The death benefit shall be equal to $8,500 if the named beneficiary is the Pensioner's surviving spouse or dependent. In any other case, the death benefit shall be equal to $7,000. The death benefit provided under this section shall not be payable if any other death or life insurance benefit is paid on behalf of the Pensioner from any other Plan maintained by an Employer.

(2)    A Pensioner meets the requirements of this paragraph only if he is not entitled to death benefit coverage from a plan maintained by his former Employer and he meets one of the following conditions:

(i)    the Pensioner is a participant in the 1992 UMWA Benefit Plan;

(ii)    the Pensioner is a participant in the UMWA 1993 Benefit Trust;

(iii)    the Pensioner is a participant in an individual employer plan maintained pursuant to section 9711 of the Internal Revenue Code and whose last signatory employer ceased producing and/or processing coal prior to December 16, 1993;

(iv)    the Pensioner was entitled to death benefit coverage from this Plan on December 31, 2006 (or would have been had he been retired or eligible to retire on that date); or

(v)    the Pensioner's last signatory employer (the Employer for whom such pensioner last worked in signatory classified employment) is a current contributor to this Plan and is signatory either to the National Bituminous Coal Wage Agreement of 2007 or to an agreement (including prior agreements, where applicable) requiring a contribution obligation with respect to this Plan that is identical to the applicable contribution obligation set forth in the

16

National Bituminous Coal Wage Agreement of 2007 (or prior National Bituminous Coal Wage Agreements, where applicable).

(3)     The death benefit provided under this section shall not be payable with respect to any Pensioner who was an eligible beneficiary of the United Mine Workers of America Combined Benefit Fund described in section 9703(f) of the Internal Revenue Code of 1986, as amended by the Coal Industry Retiree Health Benefit Act of 1992, whose death occurs on or after February 1, 1993.

(4)     For purposes of this section, the term "dependent" shall mean any person described in (a) through (e), below, as of the date of death of the Pensioner.  A person shall be considered to have been a dependent of a Pensioner if such Pensioner or his spouse provided over one-half of the support to such person on a regular basis.

(i)     a spouse who is living with or being supported by the Pensioner;

(ii)     an unmarried dependent child of the Pensioner who has not attained age 22;

(iii)     a parent of a Pensioner or of a Pensioner's spouse, if the parent has been dependent upon and living in the same household (residence) as the Pensioner for a continuous period of at least one year;

(iv)     an unmarried dependent grandchild of a Pensioner or of a Pensioner's spouse who has not attained age 22, and is living in the same household (residence) with such Pensioner; and

(v)     a dependent child (of any age) of a Pensioner or of a Pensioner's spouse who is mentally retarded or who becomes disabled prior to attaining age 22, and such disability is continuous, and who is either living in the same household with such Pensioner or is confined to an institution for care or treatment.

E.     Benefit Increase for Pensions in Pay Status on December 31, 2006

The pension of any Participant or Surviving Spouse who is in pay status as of December 31, 2006 shall be increased by $15.00 effective January 1, 2007, and by an additional $5.00 effective January 1, 2009.

17

ARTICLE IV – <u>CREDITED SERVICE</u>

    A.    <u>Nonsignatory Service</u>

Subject to the limitations in paragraph C of this article IV, credited service is a period during which the participant meets the requirements of subparagraphs (l), (2), (3) or (4) below.  Any credited service shall be nonsignatory service unless it qualifies as signatory service pursuant to Article IV(B) hereof.

        (1)    A Participant shall receive credit for a year of service for any calendar year in which he worked, subsequent to December 31, 1936, as an employee in a job classified in the then existing bituminous coal wage agreement for an employer in the coal industry for at least l,000 hours of service, with credit given for the next lowest 1/4 year in the event any employee works less than 1,000 hours of service as follows:

| | |
|---|---|
| 750-999 hours, | 3/4 year |
| 500-749 hours, | 1/2 year |
| 250-499 hours, | 1/4 year |
| 249 hours or less, | 0 |

With respect to any period of such service for which records of hours of service are not available or it is not feasible in light of the administrative and cost difficulties involved to compile a record of service, an applicant shall be deemed to have worked a thousand hours of service if the employee received wages in an amount equal to the product of (i) the lesser of 125 days or 1/2 the average number of days the bituminous mines in the United States were active, multiplied by (ii) the daily basic rate paid in the bituminous coal industry for that year; provided that for any year for which information is not available as to the average number of days the mines were active, the available data for the nearest year next preceding shall be used; provided further that if an applicant earned less than the minimum amount required for a year of service, credit for service shall be given to the next lowest 1/4 year in the manner indicated with respect to hours of service.

        (2)    A Participant shall receive credit for a year of service for any calendar year in which the Participant worked, prior to January 1, 1937, as an employee in a job classified in the then existing coal wage agreement for an Employer in the bituminous coal industry, in a minimum of at least six (6) months during a calendar year, provided that if the applicant worked in less than six (6) months, credit for service shall be awarded to the next lowest one-fourth (1/4) year, based upon service in six (6) monthly equaling a year's service.

18

(3)    A Participant shall receive credit for a year of service for any calendar year in which the Participant received state worker's compensation payments pursuant to an award as a result of an occupational disease or injury sustained in the mine while regularly employed in a classified job under the bituminous coal wage agreement then in effect; provided, in the case of occupational disease, the Participant had been so employed by an Employer signatory to the Wage Agreement then in effect for at least ten (10) years after May 28, 1946. Credit shall be given up to a maximum of four (4) years service credit from date of injury, or from the date of last employment in case of occupational disease, provided the Participant did not work regularly (earned at least $200 per month) during the compensable period. Benefits awarded pursuant to the Federal Coal Mine Health and Safety Act of 1969 shall be deemed "state worker's compensation payments" within the meaning of this section, only if the miner was last regularly employed in the coal industry after the enactment date of the Act, December 30, 1969, in a classified job under the bituminous coal wage agreement then in effect, and had been so employed by an operator signatory to the agreement for at least ten (10) years after May 28, 1946. In no event shall any service be credited under this paragraph (3) with respect to periods after December 6, 1974.

(4)    Effective December 12, 1994, a Participant shall receive service credit for any period of service in the military service of the United States, to the extent required by section 414(u) of the Internal Revenue Code.

B.    Signatory Service

Credited signatory service is:

(1)    (a)  For any calendar year prior to January 1, 1978, service as defined in paragraph A(l) hereof during which a Participant worked as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

(b)    For purposes of determining eligibility for a pension (vesting) under Article II, service for any calendar year subsequent to December 31, 1977 during which a Participant works as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect, computed based on hours of service as defined in Article I A(10) as follows:

19

| Hours of Service During a Calendar Year as a Classified Employee for a Signatory Employer | Percentage of a Year of Credited Signatory Service |
|---|---|
| 249 or less | 0% |
| 250 - 499 | 25% |
| 500 - 749 | 50% |
| 750 - 999 | 75% |
| 1,000 or more | 100% |

Notwithstanding the foregoing, a classified Employee working on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the National Bituminous Coal Wage Agreement of 2007 shall receive credit for a percentage of a year calculated in accordance with the following schedule:

| Hours Worked On Weekend/Holiday Crew | Percentage of a Year of Signatory Service |
|---|---|
| less than 200 | 0 |
| 200-399 | 25% |
| 400-599 | 50% |
| 600-799 | 75% |
| 800 or more | 100% |

A Classified Employee who earns both regular hours and weekend/holiday crew hours during a calendar year, but who earns fewer than 1,000 hours in total for the year, may combine the partial credits earned under each of the schedules shown above.

Special Rule for 1993 -- For the calendar year 1993, a classified Employee who participated in an authorized strike following expiration of the 1988 Wage Agreement, or who was laid off as a direct result of such an authorized strike, and who worked at least 500 hours will receive credit for a full year of signatory service.

        (c)    For purposes of determining the amount of pension, under Article III, service for any calendar year subsequent to December 31, 1977, during which a Participant works as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect, computed based on hours worked as defined in Article I A(12) as follows:

20

| Hours of Service During a Calendar Year as a Classified Employee for a Signatory Employer | Percentage of a Year of Credited Signatory Service |
|---|---|
| 249 or less | 0% |
| 250 – 499 | 25% |
| 500 – 749 | 50% |
| 750 – 999 | 75% |
| 1,000 or more | 100% |

Notwithstanding the foregoing, a classified Employee working on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the National Bituminous Coal Wage Agreement of 2007 shall receive credit for a percentage of a year calculated in accordance with the following schedule:

| Hours Worked On Weekend/Holiday Crew | Percentage of a Year of Signatory Service |
|---|---|
| less than 200 | 0 |
| 200-399 | 25% |
| 400-599 | 50% |
| 600-799 | 75% |
| 800 or more | 100% |

A Classified Employee who earns both regular hours and weekend/holiday crew hours during a calendar year, but who earns fewer than 1,000 hours in total for the year, may combine the partial credits earned under each of the schedules shown above.

Special Rule for 1993 -- For the calendar year 1993, a classified Employee who participated in an authorized strike following expiration of the 1988 Wage Agreement, or who was laid off as a direct result of such an authorized strike, and who worked at least 500 hours will receive credit for a full year of signatory service.

      (2)     Service prior to December 6, 1974, as defined in paragraph A(3) hereof during which a Participant received state worker's compensation payments if such payments are

21

pursuant to an award as a result of an occupational disease or injury awarded after May 28, 1946, and if the Participant was last regularly employed prior to such service as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

(3)    Service during which a Participant receives or is eligible to receive weekly Sickness and Accident Benefits pursuant to Article XI of the National Bituminous Coal Wage Agreement of 1974, as amended from time to time, and any successor agreements thereto. Service shall be computed at a rate of 8 hours for each regularly scheduled work day, or if greater than 8 hours, then at a rate equal to the number of hours, for each regularly scheduled work day, that the Participant would have worked under an alternate work schedule under Article IV(c) of the Wage Agreement.

(4)    A Participant who retires on or after March 27, 1978, shall receive credit for a year of service for any calendar year (including calendar years prior to 1978) in which he rendered service as an employee of the United Mine Workers of America (UMWA) in the coal industry immediately following regular employment in a classified job under the bituminous coal wage agreement then in effect; provided that the Participant does not, or is not eligible to, receive a pension or other retirement income from the UMWA.  Credit or service with the UMWA shall be computed in the same manner as:

(a)    credit is computed for service prior to 1937, as described in paragraph A(2) hereof, or

(b)    credit is computed for service under the pension plan of the UMWA, whichever is greater, for service prior to January 1, 1978.

Credit for service after December 31, 1977, shall be computed in the same manner as credit is computed for service under the pension plan of the UMWA.

In no event shall a Participant receive credit under this paragraph (4) while receiving a pension under this Plan.

Notwithstanding anything in this paragraph (4) to the contrary, a Participant,

(a)    who is not employed in a classified job for an Employer on March 27, 1978, or

(b)    who is not employed by the UMWA on March 27, 1978, or

(c)    who had retired prior to March 27, 1978, and was eligible to receive, or upon application would have been eligible to receive, a pension under the 1950 Pension Plan, the 1974 Pension Plan or a retirement plan of the UMWA prior to March 27, 1978, shall not

22

receive signatory service credit for the years of UMWA employment described above if it occurred prior to March 27, 1978, unless such Participant is re-employed in a classified job and

(1)     obtains at least 3 years of credited service after March 27, 1978, or

(2)     ceases to be employed in the classified job or employed by the UMWA as the result of

(i)     nonoccupational disability or accident

(ii)    occupational injury for which the Participant receives worker's compensation, or

(3)     dies after March 27, 1978 at a time when the Participant is employed in a classified job for an Employer or when employed by the UMWA.

(5)     Service as defined in paragraph A(4) hereof during which a Participant served in the military service of the United States, provided that the classified employment referred to therein (both before and after military service) is for an Employer signatory to the bituminous coal wage agreement then in effect and provided further, however, that for military service credited after December 31, 1974, the Participant returned to work in a classified job within ninety (90) days after the date of separation from the military service or such longer period as may be allowed by law.

(6)     Service (within the meaning of paragraph A(1) hereof) by an employee in a classified job for an Employer not signatory to the bituminous coal wage agreement then in effect if (i) such service is continuous, (ii) such Employer becomes a signatory to the bituminous coal wage agreement after the effective date as a result of recognizing the UMWA as the bargaining representative of its employees, (iii) the employee is working in a classified job with such Employer at the time such Employer becomes signatory to the bituminous coal wage agreement, and (iv) such employee remains in a classified job with such Employer during the twenty-four month period immediately following the date on which such Employer becomes signatory to the bituminous coal wage agreement; provided, however, that not more than ten (10) years of nonsignatory service may be recognized or awarded as signatory service to any person pursuant to this paragraph (6).

23

C.    Additional Rules Concerning Credited Service

(1)    Except as provided in Article IV(B)(6), employment after April 1, 1971, will not constitute credited service under paragraph A(l) hereof unless such employment was in a classified job for an Employer.

(2)    A Participant shall not be credited with more than one year of service for any calendar year by reason of any combination of the rules of this Article IV.

(3)    The maximum number of years of nonsignatory service which may be included in the credited service of any Participant retiring after December 31, 1981 shall be the number of years by which twenty years exceeds such Participant's signatory service, but not in excess of ten years.

(4)    No credit for service shall be awarded a Participant for any period in which such Participant was directly connected with the ownership, operation or management of a mine; provided, however, that in the case of any Participant who received credit for such service before July l, 1974, under the terms of the pension plan program established under the United Mine Workers of America Welfare and Retirement Fund of 1950, credit shall be awarded for any period prior to July 1, 1975, in which the Participant worked as an employee in a classified job in a mine in which such Participant had no controlling interest, as a member of a cooperative or gang-working crew which shared the profits and losses, and which was operated under the bituminous coal wage agreement then in effect; and provided further, that in the case of a Participant who received credit for service before July l, 1974, under the terms of the pension plan program established under the United Mine Workers of America Welfare and Retirement Fund of 1950, credit for signatory service shall be awarded for any period prior to July 1, 1975, during which such Participant worked in a classified job pursuant to an agreement to produce coal for a signatory coal company which exercised control over the operation of the mine and was responsible for royalty payments on such coal produced to the 1974 Pension Trust or its predecessor.

(5)    The following maximum years of nonsignatory service may be included in credited service under this Plan:

| Date of Retirement | Maximum Years of Nonsignatory Service |
|---|---|
| January 1, 1978 to December 31, 1978 | 13 |
| January 1, 1979 to December 31, 1979 | 12 |
| January 1, 1980 to December 31, 1980 | 11 |
| January 1, 1981 and thereafter | 10 |

24

(6)    Subject to Article II E(1)(b)(i), a Participant with less than ten years of signatory service shall not be entitled to receive a pension under paragraph (A), (B), or (E) of Article II unless such Participant has at least twenty years of credited service, including at least the following minimum number of years of signatory service:

| Date of Retirement | Years of Signatory Service Required |
|---|---|
| January 1, 1978 to December 31, 1978 | Seven (7) years |
| January 1, 1979 to December 31, 1979 | Eight (8) years |
| January 1, 1980 to December 31, 1980 | Nine (9) years |
| January 1, 1981 and thereafter | Ten (10) years |

(7)    Except as provided in Article V, service credits shall not be accrued subsequent to the effective date of pension payments.

(8)    In the case of any Participant, except a Participant covered under Article IV B(4), the last day of credited service shall be the last day on which the Participant works as an employee in a classified job for an Employer, unless such Participant continues to accrue credited service during the period for which such Participant receives or is eligible to receive weekly sickness and accident benefit pursuant to Article XI of the Wage Agreement, in which case the last day of credited service shall be the last day for which such sickness and accident benefits are paid or would have been paid.  For a Participant covered under Article IV B(4), the last day of credited service shall be the later of the last day as determined in the preceding sentence or the last day the Participant worked for the UMWA.

(9)    An employee who is regularly employed in a classified job for an Employer and who performs supervisory duties on a temporary basis for not more than 120 work days during any consecutive period of 12 months, shall be deemed to be employed in a classified job during the days on which the Participant performs such supervisory duties.

D.    Construction Industry Service

(1)    Notwithstanding anything to the contrary, and except for purposes of Article II C and II D and as provided by Article II G, no Construction Industry Service of a Participant shall be considered Credited Service under this Plan.

(2)    In any case in which a Participant has both Construction Industry Service and at least one hour of service creditable under paragraphs B or C of this Article for any year

25

beginning after December 31, 1985, the Participant's Credited Service for that year shall be determined by multiplying the Credited Service the Participant would be entitled to if Construction Industry Service were considered service under this Article by a fraction, the numerator of which is the Participant's hours of service creditable under this Article for that year and the denominator of which is the sum of such hours and the Participant's hours of Construction Industry Service for that year.

(3)     In any case in which, after June 30, 1985, and before January 1, 1986, a Participant has both Construction Industry Service and at least one hour of service creditable under the provisions of paragraphs B or C of this Article, the Participant's Credited Service for that year shall be equal to the sum of his Credited Service for the period beginning January 1, 1985, and ending June 30, 1985, and a fraction of what his Credited Service would be for the period beginning July 1, 1985 and ending December 31, 1985, if Construction Industry Service were considered service under this Article. Such fraction is determined by dividing the Participant's hours of service under paragraphs B and C of this Article by the sum of such hours of service and the Participant's hours of Construction Industry Service.

(4)     Notwithstanding subparagraph D.(2) or D.(3), the Credited Service of a Participant for a year in which either subparagraph applies shall not exceed one minus the portion of a year for which the Participant receives credit for accrual purposes under the United Mine Workers of America Construction Workers Pension Plan. If, in any year, a Participant receives one year of credit for accrual purposes under the United Mine Workers of America Construction Workers Pension Plan, he shall not be entitled to any Credited Service for such year.

ARTICLE V – REEMPLOYMENT AFTER ATTAINMENT OF PENSION ELIGIBILITY

A.     Any Participant who has been retired and receiving a pension under this Plan and who shall be reemployed in a classified job by an Employer shall, for the purpose of calculating any subsequent pension benefits to which such Participant may become entitled, upon subsequent retirement, be granted a pension equal to the sum of the pension such Participant was previously receiving plus the excess of (i) over (ii) where (i) is the pension to which such Participant would be entitled at the time of such retirement, based upon all years of Credited Service under the Plan and (ii) is the pension to which such Participant would be entitled at the time of such retirement, based solely on Credited Service at the time of his previous retirement.

B.     Any Participant eligible for a deferred vested pension under this Plan whose shall be reemployed in a classified job by an Employer prior to the commencement of pension benefit shall, for the purpose of calculating any subsequent pension benefits to which he may become entitled, be granted his credited service applicable to the deferred vested pension plus his credited service accrued after such reemployment.

26

C.    Any Participant who is reemployed in a classified job by an Employer after attainment of eligibility for a deferred vested pension under this Plan, whose employment is subsequently terminated and who at that time is not eligible for a pension under any provision of Article II by reason of Article IV(C)(6), shall be considered to be eligible for the deferred vested pension for which such Participant was eligible prior to such reemployment and upon application for pension the date of retirement shall be considered to be the date of retirement which would, upon application for pension, have been applicable to the deferred vested pension for which such Participant was eligible prior to such reemployment.

## ARTICLE VI – <u>SURVIVING SPOUSE BENEFIT</u>

A.    (1)    Except as provided in paragraph (B) of this Article, a Surviving Spouse Benefit is provided for any Participant who (a) has retired and is receiving a pension under this Plan, except a Participant receiving a deferred vested pension who has not completed at least twenty years of credited service, (b) has not retired but at the date of his death otherwise met the eligibility requirements for an immediate pension under Article II(A), (B), (C), (D) or (E)(6) under this Plan, or (c) has attained age 55 with at least twenty years of credited service and who has retired and is entitled to elect an immediate pension under Article II(A), II(B) or II(E) at the date of death.

(2)    The amount of such benefit shall be equal to 75% of the amount of the Participant's pension at the time of death or, in the event the Participant dies after age 55 at a time when such Participant was eligible to elect a pension or to retire and receive a pension under Article II, but prior to the receipt of a pension, 75% of the amount of the pension such Participant would have received if such Participant had elected a pension or retired and become entitled to a pension as of the date immediately preceding the date of death.

(3)    The Surviving Spouse Benefit will not be effective unless the Participant and the spouse have been married throughout the nine-month period ending on the date of the Participant's death or unless such nine-month requirement would be waived for purposes of determining entitlement to widow's or widower's insurance benefits under the Social Security Act.

(4)    Payment to an eligible spouse will commence as of the first of the month following the month in which the Participant's death occurs and the final payment shall be made for the month in which the spouse's death occurs.

B.    (1)    Any Participant who is not employed in a classified job for an Employer on December 6, 1974, is not covered for a Surviving Spouse Benefit under this Article unless such Participant (a) obtains at least three years of credited service after such date, or (b) had ceased to be employed in a classified job as a result of (i) layoff, (ii) nonoccupational disability or accident, or (iii) occupational injury for which such Participant was receiving workers'

<div align="center">27</div>

compensation, or (c) such Participant dies at a time when he is employed in a classified job for an Employer.

(2)     Any Participant who retires on or before December 3l, 1975, and is again employed in a classified job for an Employer after such retirement, is not covered for a Surviving Spouse Benefit under this Article unless (a) such Participant obtains at least three years of credited service after such reemployment or (b) unless such reemployment ceases as a result of (i) layoff, (ii) nonoccupational disability or accident, or (iii) occupational injury for which worker's compensation benefits were awarded, or (c) such Participant dies while employed in a classified job for an Employer.

C.     (1)     A Surviving Spouse benefit is provided for any Participant who completed at least ten years of credited service, who died as a result of a mine accident during the term of the National Bituminous Coal Wage Agreement of 1978 or 1981, and who was not in Construction Industry Service at the time of the mine accident.  The amount of such Surviving Spouse benefit shall be a lump sum in the amount of $10,000, plus $100.00 a month beginning with the month of February, 1998 and for each month thereafter during the spouse's eligibility. The final payment shall be made for the month in which the spouse's death (or if earlier, the spouse's remarriage) occurs.

(2)     The Surviving Spouse Benefit will not be effective unless (a) the Participant and the spouse were married throughout the nine-month period ending on the date of the Participant's death or unless such nine-month requirement would be waive d for purposes of determining entitlement to widow's or widower's insurance benefits under the Social Security Act; (b) the spouse was never eligible for a monthly benefit under this Plan or under any other plan or provision under a Wage Agreement; and (c) the spouse has never remarried and is surviving on February 1, 1998.

## ARTICLE VII - <u>JOINT AND SURVIVOR ANNUITIES</u>

A.     Notwithstanding any other provision of this Plan, if a Participant qualifies for a pension under this Plan, but is not covered by a Surviving Spouse Benefit, the Pension benefit otherwise provided to such Participant shall be reduced actuarially pursuant to Appendix B, and 50% of such reduced pension benefit will be continued, after the death of the Participant, for the life of any qualified surviving spouse; provided, however, that such Participant may elect, within the election period specified in Paragraph C(l) below, and subject to the requirement of Paragraph D below, not to take a joint and survivor annuity as provided for in this Article and instead to receive a pension benefit for life only.

B.     If a Participant has completed 5 years of signatory service for vesting purposes, calculated pursuant to Article II (G), is not covered by a Surviving Spouse Benefit, and dies before he is entitled to elect or elects to receive a pension benefit, the qualified surviving spouse

28

shall be entitled to receive a survivor's benefit in the form of an annuity for life in an amount equal to 75% of the pension benefit the decedent would have received if the decedent had --

      (1)    separated from service on the date of death,

      (2)    survived to age 55 (in the case of a decedent who died before attaining age 55),

      (3)    retired with an immediate Joint and Survivor Annuity as provided for in this Article at age 55, (or, if later on the date before the decedent's date of death).

      (4)    died on the day after the day on which the decedent would have attained age 55 (in the case of a decedent who died before attaining age 55).

Payment to a qualified spouse under this paragraph will commence on the first of the month following the month in which the decedent would have attained age 55 (or, if later, the first of the month following the month of the decedent's death) and the final payment shall be for the month in which the spouse's death occurs. Notwithstanding the foregoing, payment to a surviving spouse of a Participant who died prior to age 55, but while eligible for an immediate pension benefit, will commence on the first of the month following the month of the Participant's death. The benefit shall be calculated as set forth herein, but as if the Participant had retired with an immediate Joint and Survivor Annuity on the date before the date of his death.

      C.    (1)    The "election period" in the case of an election to waive the Joint and Survivor Annuity described in Paragraph A shall be the 90-day period ending on the date of the commencement of benefits. Not less than 30 days and not more than 90 days prior to the date of the commencement of benefits, the Trustees shall furnish the Participant (a) a general description or explanation of the qualified Joint and Survivor Annuity, the circumstances in which it will be provided unless the Participant elects not to have benefits provided in that form, the availability of such election and the right to revoke such election, and the rights of the Participant's spouse; and (b) a general explanation of the relative financial effect of such election on the Participant's pension. In the event a Participant elects not to receive a Joint and Survivor Annuity, such election shall not become effective if the Participant dies within a period of two years beginning on the date of such election.

      (2)    A Participant may revoke any election made pursuant to this Article at any time during the applicable election period.

      D.    An election made under this Article shall not take effect unless--

      (1)    the spouse of the Participant consents in writing to such election, and the spouse's consent acknowledges the effect of such election and is witnessed by a Plan representative or a notary public, or

<div align="center">29</div>

(2)     It is established to the satisfaction of the Trustees that the consent required under subparagraph (1) may not be obtained because there is no spouse, because the spouse cannot be located, or because of such other circumstances as the Trustees may by law consider.

E.     A qualified surviving spouse shall be any spouse who has been married to the Participant for at least nine months prior to death, unless such nine-month requirement would be waived for purposes of determining entitlement to widow or widower's insurance benefits under the Social Security Act.

F.     Except as provided in Paragraph B above, payment to a qualified surviving spouse under this Article will commence as of the first of the month following the month in which the Participant's death occurs, and the final payment shall be made for the month in which the spouse's death occurs.

## ARTICLE VIII – MISCELLANEOUS

A.     <u>Determination of Eligibility</u>

The Trustees or such other named fiduciaries as may be properly designated shall have full and final determination as to all issues concerning eligibility for benefits.

B.     <u>General</u>

(1)     The Trustees are authorized to promulgate rules and regulations to implement this Plan, and those rules and regulations shall be binding upon all persons dealing with and Participants claiming benefits under this Plan.

(2)     No benefit payable under this Plan shall be subject in any way to alienation, sale, transfer, assignment, pledge, attachments, garnishments, execution or encumbrance of any kind, and any attempt to accomplish the same shall be void. Notwithstanding the foregoing, the Plan shall comply with any qualified domestic relations order, as that term is defined in ERISA, and with any written authorization by a Participant or beneficiary made pursuant to paragraph (19) of this section.

(3)     The Employers and the Union, by joint action, reserve the right at any time and from time to time to modify or amend in whole or in part any or all of the provisions of this instrument or to terminate this Plan, without reopening or otherwise affecting the integrity of any other provision of the Wage Agreement, by a written agreement between the Employers and the Union, provided, however, that:

(a)    this Plan shall not be amended in such manner as would cause or permit any part of the assets in the 1974 Pension Trust to be diverted to purposes other than the exclusive benefit of the Participants and their beneficiaries;

(b)    this Plan shall not be amended to deny to a Participant retroactively any benefits to which such Participant was entitled under this Plan, unless such amendment is necessary to conform this Plan to, or to satisfy the conditions of, any law, governmental regulations or ruling;

(c)    the Employers and the Union have delegated to the Trustees the authority and responsibility to make certain changes and amendments as set forth in Article XX(g)(4) of the National Bituminous Coal Wage Agreement of 2007, as amended from time to time, and any successor agreements to that specific Agreement; and

(d)    any written agreement executed by the Union shall be signed by the International President.

(4)    Upon the termination of this Plan or the complete discontinuance of contributions to the 1974 Pension Trust, this Plan shall remain in force and effect for the period necessary to complete the payment of benefits in accordance with the terms of this Plan to the extent assets in the 1974 Pension Trust are available to pay such benefits.

(5)    Forfeitures arising from the operation of the Plan shall not be used to increase the benefits which otherwise would be received under this Plan.

(6)    Any Participant or beneficiary whose claim for benefits under this Plan has been denied shall be (a) provided with adequate notice in writing setting forth the specific reasons for such denial, such notice shall be written in a manner calculated to be understood by the Participant, and (b) afforded a reasonable opportunity for a full and fair review of the decision denying the claim by an appropriate named fiduciary or a person properly designated to carry out such responsibility.

(7)    The Trustees are hereby authorized to allocate fiduciary responsibilities in any manner permitted pursuant to section 405(c) of ERISA and to appoint an investment manager or managers as permitted by section 402(c) of ERISA.

(8)    Contributions to the 1974 Pension Trust to fund the benefits under this Plan shall be paid solely by the Employers in accordance with Article XX of the National Bituminous Coal Wage Agreement of 2007, as amended from time to time, and any successor agreements to that specific Agreement.

(9)    In the event that this Plan merges or consolidates with, or transfers some or all of its assets or liabilities to, any other plan, no Participant or beneficiary herein shall, solely

31

on account of merger, consolidation or transfer, be entitled to an accrued benefit immediately following such event which is less than the benefit to which such Participant or beneficiary would have been entitled immediately preceding such event.

(10)    In the event that an Employer fails to make the contributions to the Plan required by Article XX of the National Bituminous Coal Wage Agreement of 2007, interest (calculated at a rate established by the Trustees at the beginning of each calendar year) shall accrue from the date due until the date on which payment is made. If the Trustees file suit to collect unpaid contributions, plus accrued interest, and a judgment is entered by the courts in favor of the Trustees, the judgment entered shall provide for an additional amount equal to the accrued interest in liquidated damages.

(11)    Upon the termination or partial termination of the Plan, the rights of all affected Participants to benefits accrued to the date of such termination or partial termination, are nonforfeitable to the extent required by law or to the extent provided for under the National Bituminous Coal Wage Agreement of 2007.

(12)    Except as otherwise provided herein, it shall be unlawful for any part of the assets held pursuant to this Plan, other than such part as is required to pay taxes and administrative expenses, to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the Participants of the Plan except that in the case of a contribution which is made by an Employer by a mistake of fact, or law (other than a mistake relating to Plan qualification), such mistaken contribution may be returned to the Employer within six months after the Trustees determine that the contribution was mistakenly made.

(13)    To the extent not inconsistent with the provisions hereof, the Trustees shall comply with the further requirements imposed upon them by and shall have the further powers contained in Article XX, Sections (e), (f), and (g) of the National Bituminous Coal Wage Agreement of 2007, as amended from time to time, and any successor agreements to that specific Agreement.

(14)    This instrument, and the 1974 Pension Trust shall be construed, regulated and administered in accordance with Federal law and, to the extent not preempted or inconsistent with such Federal law, the laws of the District of Columbia.

(15)    Any action of the Employers which may, or must, be taken hereunder may be taken only by BCOA. Any action which must be taken in writing shall be signed by the President of BCOA. In the event that BCOA ceases to exist, or in the event that more than 50% of the tonnage membership of BCOA on the Effective Date of the 2007 Wage Agreement has withdrawn prior to the time when BCOA is required or permitted to take action under this Article, then such action may be taken by a majority vote, based on tonnage, of existing Employers who were BCOA members on the Effective Date of the 2007 Wage Agreement.

32

(16)    Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978 as amended from time to time and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2007.

(17)    The Employers, the Union and the Trustees shall fully cooperate to obtain all necessary rulings and do all other acts appropriate to ensure that the 1974 Pension Plan and Trust are qualified under Section 401 of the Internal Revenue Code, and that contributions are deductible under Section 404 of the Internal Revenue Code.

(18)    Notwithstanding any other provision of this Plan to the contrary, a distribution of benefits shall commence to a participant not later than the April 1 of the calendar year following the calendar year in which the Participant attains age 70-1/2 and shall be distributed over the life of such Participant or over the lives of such Participant and his surviving spouse, in accordance with Section 401(a)(9) of the Internal Revenue Code of 1986 and any regulations promulgated thereunder.  In the event that the Participant dies before distributions have commenced hereunder, the surviving spouse shall begin to receive a distribution of the benefit, if any, to which such spouse is entitled no later than the date on which the participant would have attained age 70-1/2 and shall be distributed over the life of such surviving spouse.

(19)    Any Participant or beneficiary whose benefit is in pay status may voluntarily authorize the Trustees to check-off an amount from his or her monthly benefit for remittance to the UMWA of Union membership dues, including assessments, initiation fees, credit union, voluntary COMPAC contributions and other voluntary deductions, provided that any such arrangement must be terminable by the Trustees upon reasonable notice, must be revocable by the Participant at any time upon reasonable notice to the Trustees, and either:

(a)    such arrangement must not permit any Participant or beneficiary to check-off an amount exceeding 10% of his or her monthly benefit; or

(b)    the designated recipient must file a written acknowledgement that it has no enforceable right in or to any Plan benefit or portion thereof (except to the extent of payments actually received pursuant to the terms of the arrangement); and an agreement for such check-off is in effect between the Plan and the Union,.  Any check-off authorization must be in writing, must be voluntary and must comply in all respects with the requirements of the Internal Revenue Code of 1986, as amended, ERISA, the Labor Management Relations Act of 1947, as amended, and any other applicable law.

33

(20)    (a)    Notwithstanding any provision of the plan to the contrary that would otherwise limit a distributee's election under this part, a distributee may elect, at the time and in the manner prescribed by the Trustees, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(b)    An "eligible rollover distribution" is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under Section 401(a)(9) of the Code; the portion of any distribution that is not includible in gross income (determined without regard to the exclusion of net unrealized appreciation with respect to employer securities); and any amount that is treated by the Plan as distributed on account of hardship.

(c)    An "eligible retirement plan" is an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in section 403(a) of the Code, or a qualified trust described in Section 401(a) of the Code, that accepts that distributee's eligible rollover distribution. However, in the case of an eligible rollover distribution to the surviving spouse, an eligible retirement plan is an individual retirement account or individual retirement annuity.

(d)    A "distributee" includes a Pensioner and a surviving spouse. In addition, a Pensioner's surviving spouse and the Pensioner's spouse or former spouse who is an alternate payee under a qualified domestic relations order, as defined in Section 414(q) of the code, are distributees with regard to the interest of the spouse or former spouse.

(e)    A "direct rollover" is a payment by the Plan to the eligible retirement plan specified by the distributee.

## ARTICLE IX - PARTICIPANTS COVERED BY A SUCCESSOR PLAN

The following individuals shall cease to be Participants in the Plan and shall not be entitled to benefits hereunder (with respect to Credited Service prior to December 6, 1977):

(1)    A Participant in this Plan who retired prior to December 6, 1977, if the Participant is entitled to a pension under a plan qualified under Section 401(a) of the Internal Revenue Code and established by an employer pursuant to an agreement with the UMWA which is a successor agreement to the Western Surface Coal Wage Agreement of 1975, provided that the pension is at least as great as the pension due under the terms of this Plan in effect on December 5, 1977;

34

1-WA/2698738.1

(2)    A Participant in this Plan prior to December 6, 1977, who on or after December 6, 1977, is an employee of a employer which is signatory with the UMWA to a successor agreement to the Western Surface Coal Wage Agreement of 1975, if the Participant becomes a participant in a pension plan qualified under Section 401(a) of the Internal Revenue Code established by such employer pursuant to such agreement, provided that the plan gives credit for participation, vesting and Credited Service prior to December 6, 1977, determined under the terms of this Plan in effect on December 5, 1977.

ARTICLE X

A.    As soon as practicable after an Employer's complete or partial withdrawal, the Trustees shall calculate and demand payment of withdrawal liability in accordance with Section 4219 of ERISA.  In the case of a Construction Employer that withdraws on or after July 1, 1981, the amount of unfunded vested benefits allocable to it will be determined with reference to the unfunded vested benefits of the Coal Mine Construction Segment of the 1974 Pension Plan.  In the case of an Employer other than a Construction Employer that withdraws on or after July 1, 1981, the amount of unfunded vested benefits allocable to it will be determined with reference to the unfunded vested benefits of the Bituminous Coal Segment of the 1974 Pension Plan.

B.    The Trustees shall establish the Bituminous Coal and Coal Mine Construction Segments of the 1974 Pension Plan for the sole purpose of calculating employer withdrawal liability under this Article.  Assets and liabilities will be allocated to the two segments in accordance with the following:

(1)    All of a Participant's Credited Service under the Plan through June 30, 1981 will be allocated to the Coal Mine Construction Segment if the Participant's last Credited Service on or before June 30, 1981 was rendered for a Construction Employer.  All of a Participant's Credited Service under the Plan through June 30, 1981 will be allocated to the Bituminous Coal Segment if the Participant's last Credited Service on or before June 30, 1981 was rendered for an Employer other than a Construction Employer.  Service credited under the Plan for any period after June 30, 1981 will be allocated to the Coal Mine Construction Segment if rendered for a Construction Employer, or to the Bituminous Coal Segment if rendered for an Employer other than a Construction Employer.  If a Participant renders service for both a Construction Employer and an Employer other than a Construction Employer within the same calendar year, his Credited Service will be allocated on a pro rata basis between the two segments.  For purposes of this paragraph, in the case of service credit earned in the 1981 calendar year, credit hours attributable to service prior to July 1, 1981, will be assigned as follows:

35

I-WA/2698738.1

| Number of Credit Hours Attributable to Participant's Service Prior to July 1, 1981 | Credited Service Assigned to Period Prior to July 1, 1981 |
|---|---|
| 250 or less | 0 |
| 250 - 499 | 1/4 year |
| 500 - 749 | 1/2 year |
| 750 - 999 | 3/4 year |
| 1,000 or more | 1 year |

(2)    An initial allocation of assets will be made to the Bituminous Coal and Coal Mine Construction Segments in order that as of June 30, 1981, the proportion of assets to liabilities in each segment is identical. Contributions and withdrawal liability payments made by Construction employers after June 30, 1981 will be allocated to the Coal Mine Construction Segment. Contributions and withdrawal liability payments made by Employers other than Construction Employers after June 30, 1981 will be allocated to the Bituminous Coal Segment. Plan and Trust expenses after June 30, 1981, will be allocated to each segment in the same ratio as the segment's income bears to the total income of the Trust; however, extraordinary expenses generated specially by one segment will be charged to that segment alone. The Trustees' determinations concerning the initial allocation of assets under this paragraph shall be final and binding on all persons dealing with the Plan.

(3)    Investment income (including realized and unrealized capital gains and losses) will be allocated monthly to each segment in the same ratio that the segment's assets bear to the total assets of the Trust.

(4)    Pension and other benefit payments made under the Plan will be charged to each segment in the same ratio that credited service on which a payment is based is allocated to the specific segment.

C.    The Trustees shall adopt (and modify as appropriate) a reasonable interest assumption used to calculate the value of unfunded vested benefits under the Plan which will be uniformly applicable to withdrawals by all Employers.

D.    The Bituminous Coal and Coal Mine Construction Segments are maintained solely for the purpose of determining withdrawal liability under this Article. The benefit levels, eligibility rules, credited service provisions, and all other rules and regulations of the Plan shall be applied uniformly to all Participants. All Trust assets are available to pay all benefits under the Plan. In the event that only one segment has unfunded vested benefits in a given Plan year, the excess of allocated assets over the value of vested benefits in the other segment will be used to reduce the first segment's unfunded vested benefits. Notwithstanding any other provision of this Article X, if as of the last day of any Plan year the Trustees determine that all or

36

1-WA/2698738.1

substantially all of the Employers that have an obligation to contribute to one segment have withdrawn from that segment, the liability of any Employer that withdraws from the Plan in that or any subsequent Plan year shall be calculated under the provisions in effect for withdrawals occurring on or before June 30, 1981.

E.    For any withdrawal occurring on or after July 1, 2003, the amount of unfunded vested benefits allocable to an Employer that withdraws from the Plan is the product of --

(1)    the appropriate segment's unfunded vested benefits as of the end of the Plan year preceding the Plan year in which the Employer withdraws, less the value as of the end of such year of all outstanding claims for withdrawal liability with respect to that segment which can reasonably be expected to be collected from that segment's Employers withdrawing before such year; multiplied by

(2)    a fraction - (a) the numerator of which is the total numbers of hours worked for which amounts were required to be contributed by the Employer with respect to the appropriate Plan segment under the Plan for the last 5 Plan years ending before the withdrawal, and

(b)    the denominator of which is the total number of hours worked for which amounts were required to be contributed with respect to the appropriate Plan segment under the Plan by all of the appropriate segment's Employers for the last 5 Plan years ending before the withdrawal, decreased by the number of any hours worked for which amounts were required to be contributed to the Plan during those Plan years by Employers who withdrew from that segment of the Plan during those Plan years.

(3)    "Hours worked for which amounts were required to be contributed" counted for one Plan year may not be counted for any other Plan year.

F.    For purposes of determining whether a withdrawal has occurred and for purposes of assessing withdrawal liability under this Article, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single Employer and all such trades and businesses as a single Employer.  (The preceding sentence shall not be deemed to preclude assessing liability under any other applicable law.)  In the case of an Employer which contributes to the 1974 Pension Trust through one or more trades or businesses which would otherwise be considered Construction Employers and one or more trades or businesses which would otherwise be considered Employers other than Construction Employers, all calculations related to the establishment of the Bituminous Coal and Coal Mine Construction Segments of the Plan will be performed as if each trade or business were a separate Employer.  In the case of an Employer described in the preceding sentence, the amount of unfunded vested benefits allocable to the Employer in the event of a complete withdrawal will be the sum of all unfunded vested benefits allocable to the individual trades or businesses calculated as if they were separate Employers.  In the case of an Employer described in the third sentence of

37

this paragraph, the amount of unfunded vested benefits allocable in the event of a partial withdrawal will be determined by the Trustees, based upon the proportional extent to which the partial withdrawal is attributable to each trade or business, and assigning liability (based on the unfunded vested benefits of the appropriate segments) accordingly. The Trustees shall have the authority to establish rules implementing such assignment of liability.

      G.     Payment of withdrawal liability must begin within 60 days, notwithstanding any request for review or appeal of the determination of the amount of such liability, after the date on which the Trustees notify the Employer of the amount of withdrawal liability. Annual payments are to be made in twelve (12) equal installments, due on the 10th day of each month.

      H.     If payment is not made when due, interest on the payment shall accrue from the due date until the date on which the payment is made. Interest on delinquent payment of withdrawal liability shall be payable at the rate established by the PBGC pursuant to Section 4219(c)(6). Default will occur if the Employer fails to make payment when due and then fails to make payment within 60 days after receiving written notice from the Trustees of such failure, or as otherwise determined pursuant to Section 4219(c)(5).

      I.     If any Employer defaults on payment (as determined pursuant to Section 4219(c)(5)), the Trustees shall require immediate payment of the outstanding amount of withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made. If the Trustees file suit to collect the outstanding balance of withdrawal liability, plus accrued interest, and a judgment is entered by the court in favor of the Trustees, the judgment entered shall provide for an additional amount equal to 20% of the outstanding amount of withdrawal liability as liquidated damages. The Trustees shall have the authority to promulgate rules regarding default and an arbitration procedure.

      J.     An Employer is entitled to prepay the outstanding amount of any unpaid withdrawal liability, plus accrued interest, if any, in whole or in part, without penalty. However, if the pre-payment is made pursuant to a withdrawal which is later determined to be part of a withdrawal described in Section 4219(c)(1)(D) of ERISA, the withdrawal liability of the Employer shall not be limited to the amount of pre-payment.

      K.     In the event that this Plan terminates, an Employer's obligation to make payments under this Article ceases at the end of the Plan year in which the assets of this Plan (exclusive of withdrawal liability claims) are sufficient to meet all obligations of this Plan, as determined by the PBGC.

      L.     In conformance with Section 4208(c) of ERISA, in any Plan year following an Employer's partial withdrawal under Section 4205(a)(1) of ERISA, when the number of contribution base units with respect to which the Employer has an obligation to contribute for such year equals or exceeds 130% of the number of contribution base units with respect to which the Employer had an obligation to contribute in the partial withdrawal year, the amount of the

<div align="center">38</div>

Employer' s partial withdrawal liability payment for such year shall be reduced pro rata, in accordance with PBGC regulations.

M.    The presumptive partial withdrawal rules in Section 4205(a) and (b) of ERISA shall apply to this Plan.

N.    A complete or partial withdrawal of an Employer (hereinafter in this section referred to as the "seller") under this Plan does not occur solely because, as a result of a bona fide, arm's-length sale of assets to an unrelated party (hereinafter in this section referred to as the "purchaser"), the seller ceases covered operations or ceases to have an obligation to contribute for such operations, if --

(1)    the purchaser is, or becomes at the time of the sale, signatory to the Wage Agreement or any other collective bargaining agreement entered into with the United Mine Workers of America which provides that contributions at the same rate as contributions required under the Wage Agreement shall be made to this Plan;

(2)    the purchaser has an obligation to contribute to this Plan with respect to the operations for substantially the same employees and the same number of contribution base units for which the seller had an obligation to contribute to this Plan;

(3)    the purchaser provides to the Plan for a period of 5 plan years commencing with the first plan year beginning after the sale of assets, a bond or escrow deposit meeting the requirements of Section 4204 (a)(1)(B). If the Plan is in reorganization, the amount of such bond or escrow deposit shall be twice the amount provided in Section 4204 (a)(1)(B). If the amount of the bond or escrow deposit is determined to be zero, and if the purchaser is subject to the higher contribution rate set forth in Article XX(d)(1)(ii) of the National Bituminous Coal Wage Agreement, then the amount of the bond shall be set at an amount estimated by the Trustees to equal one year of contributions for the purchaser at such higher rate. If the Plan is in reorganization, the amount of such bond or escrow deposit shall be twice the amount provided in Section 4202(a)(1)(B) or this paragraph.

(4)    the contract for sale provides that, if the purchaser withdraws in a complete withdrawal, or a partial withdrawal with respect to operations, during such first 5 Plan years, the seller is secondarily liable for any withdrawal liability the seller would have had to this Plan with respect to the operations (but for this section) if the liability of the purchaser with respect to this Plan is not paid.

If the purchaser --

(1)    withdraws before the last day of the fifth plan year beginning after the sale, and

39

      (2)     fails to make any withdrawal liability payment when due, because of a complete or partial withdrawal, then the seller shall pay to this Plan an amount equal to the payment that would have been due from the seller but for this section.

If all, or substantially all, of the seller's assets are distributed, or if the seller is liquidated before the end of the 5 plan year period described above, then the seller shall provide a bond issued by a corporate surety company that is an acceptable surety for purposes of Section 412 of ERISA, or an amount held in escrow by a bank or similar financial institution satisfactory to the Trustees, in an amount equal to the present value of the withdrawal liability the seller would have had but for this paragraph.

If only a portion of the seller's assets are distributed during such period, then a bond or escrow shall be required, in accordance with rules established by the Trustees, to the extent consistent with PBGC regulations.

The liability of the party furnishing a bond or escrow under the above paragraph shall be reduced, upon payment of the bond thereof.

For the purposes of this section, the liability of the purchaser shall be determined as if the purchaser had been required to contribute to this Plan in the year of the sale and the 4 plan years preceding the sale based on the same number of hours worked for which amounts were required to be contributed by the seller for such operations for such 5 plan years.

    O.    Definitions

      a.    For purposes of this Article X, "hours worked for which amounts were required to be contributed" means all hours for which the Employer actually owed contributions to the Plan as well as all hours for which the Employer would have owed contributions to the Plan had the contribution rate been greater than 0¢.

      b.    For purposes of Section 4219(c)(1)(C)(i)(I) and any other provision of ERISA or this Plan requiring the use of contribution base units, for any withdrawal occurring on or after July 1, 2003, the term "contribution base units" shall have the same meaning as "hours worked for which amounts were required to be contributed."

    P.    If a court or tribunal of competent jurisdiction determines by a final decision or award that any provision of this Article X creates two separate multiemployer plans, or limits or reduces any employer's liability under this Article in a manner not specifically provided for herein, then the amendments to this Plan, creating two segments for the sole purpose of calculating employer liability under this Article, shall thereafter be considered null and void (without affecting any other provision of this Plan), and all employer liability under this Article shall, prospectively from the date of any such holding, be calculated under the provisions in effect for withdrawals occurring on or before June 30, 1981.

APPENDIX A

ACTUARIAL EQUIVALENCE FACTORS FOR DEFERRED VESTED
RETIREMENT BENEFITS COMMENCING PRIOR TO AGE 62

The following factors are to be multiplied by the full accrued benefit payable commencing at normal retirement age 62 to yield the equivalent benefit payable commencing at the indicated age:

| AGE Years | Months | Actuarial Equivalence Factor | AGE Years | Months | Actuarial Equivalence Factor |
|-----------|--------|------------------------------|-----------|--------|------------------------------|
| 55 | 0 | .522 | 56 | 0 | .569 |
|    | 1 | .526 |    | 1 | .573 |
|    | 2 | .529 |    | 2 | .577 |
|    | 3 | .533 |    | 3 | .582 |
|    | 4 | .537 |    | 4 | .586 |
|    | 5 | .541 |    | 5 | .590 |
|    | 6 | .545 |    | 6 | .595 |
|    | 7 | .549 |    | 7 | .599 |
|    | 8 | .553 |    | 8 | .604 |
|    | 9 | .557 |    | 9 | .608 |
|    | 10 | .561 |   | 10 | .612 |
|    | 11 | .565 |   | 11 | .617 |
| 57 | 0 | .621 | 58 | 0 | .680 |
|    | 1 | .626 |    | 1 | .685 |
|    | 2 | .631 |    | 2 | .691 |
|    | 3 | .636 |    | 3 | .696 |
|    | 4 | .641 |    | 4 | .702 |
|    | 5 | .646 |    | 5 | .707 |
|    | 6 | .651 |    | 6 | .713 |
|    | 7 | .655 |    | 7 | .718 |
|    | 8 | .660 |    | 8 | .724 |
|    | 9 | .665 |    | 9 | .729 |
|    | 10 | .670 |   | 10 | .735 |
|    | 11 | .675 |   | 11 | .740 |
| 59 | 0 | .746 | 60 | 0 | .820 |
|    | 1 | .752 |    | 1 | .827 |
|    | 2 | .758 |    | 2 | .834 |
|    | 3 | .765 |    | 3 | .841 |
|    | 4 | .771 |    | 4 | .848 |

41

1-WA/2698738.1

| | | | | | |
|---|---|---|---|---|---|
| | 5 | .777 | | 5 | .855 |
| | 6 | .783 | | 6 | .863 |
| | 7 | .789 | | 7 | .870 |
| | 8 | .796 | | 8 | .877 |
| | 9 | .802 | | 9 | .884 |
| | 10 | .808 | | 10 | .891 |
| | 11 | .814 | | 11 | .898 |
| 61 | 0 | .905 | 62 | 0 | 1.000 |
| | 1 | .913 | | | |
| | 2 | .920 | | | |
| | 3 | .928 | | | |
| | 4 | .936 | | | |
| | 5 | .944 | | | |
| | 6 | .952 | | | |
| | 7 | .960 | | | |
| | 8 | .968 | | | |
| | 9 | .976 | | | |
| | 10 | .984 | | | |
| | 11 | .992 | | | |

Actuarial Basis:  95% of 1959-61 U.S. Total Male Population
Mortality Table at 5% Interest.

42

I-WA/2698738.1

**APPENDIX B**

TABLE OF PERCENTAGES TO BE APPLIED
AGAINST PENSION PAYABLE TO PARTICIPANT
<u>UNDER JOINT AND SURVIVOR ANNUITIES</u>

| AGE OF SPOUSE* | AGE OF PARTICIPANT* | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 |
| | % | % | % | % | % | % | % | % |
| 50 | 85.1 | 84.2 | 83.3 | 82.3 | 81.2 | 80.2 | 79.1 | 77.9 |
| 51 | 85.6 | 84.7 | 83.7 | 82.7 | 81.7 | 80.7 | 79.6 | 78.5 |
| 52 | 86.0 | 85.1 | 84.2 | 83.2 | 82.2 | 81.2 | 80.1 | 79.0 |
| 53 | 86.5 | 85.6 | 84.7 | 83.7 | 82.8 | 81.7 | 80.7 | 79.6 |
| 54 | 86.9 | 86.1 | 85.2 | 84.3 | 83.3 | 82.3 | 81.2 | 80.1 |
| 55 | 87.4 | 86.6 | 85.7 | 84.8 | 83.8 | 82.8 | 81.8 | 80.7 |
| 56 | 87.9 | 87.1 | 86.2 | 85.3 | 84.4 | 83.4 | 82.4 | 81.3 |
| 57 | 88.3 | 87.5 | 86.7 | 85.8 | 84.9 | 84.0 | 83.0 | 81.9 |
| 58 | 88.8 | 88.0 | 87.2 | 86.4 | 85.5 | 84.5 | 83.6 | 82.6 |
| 59 | 89.3 | 88.5 | 87.7 | 86.9 | 86.0 | 85.1 | 84.2 | 83.2 |
| 60 | 89.7 | 89.0 | 88.3 | 87.4 | 86.6 | 85.7 | 84.8 | 83.8 |
| 61 | 90.2 | 89.5 | 88.8 | 88.0 | 87.2 | 86.3 | 85.4 | 84.5 |
| 62 | 90.7 | 90.0 | 89.3 | 88.5 | 87.7 | 86.9 | 86.0 | 85.1 |

* Age to nearest birthday.

Pension payable to qualified surviving spouse pursuant to
Article VII (A) will be equal to 50% of the Participant's
Pension as reduced in accordance with the above Table.  The
benefit payable to a qualified surviving spouse under Article
VII (B) will be equal to 75% of the amount reduced in accordance
with the above table.

43

IN WITNESS WHEREOF, the Employers and the Union, pursuant to proper authority, have caused this instrument, effective December 6, 1974, and amended as of January 1, 2007, to be signed by their proper officers or representatives in Washington, D.C. on this _Seventh_ day of _Feb_, 2007.

UNITED MINE WORKERS OF AMERICA

_____
International President

BITUMINOUS COAL OPERATORS'
ASSOCIATION, INC.

_____
President

Accepted by:

Dated: _2/27/2007_     _____
Trustee

Dated: _2/27/2007_     _____
Trustee

Dated: _2/27/2007_     _____
Trustee

Dated: _2/28/07_     _____
Trustee

I-WA/2698738.1

44

# EXHIBIT F

UNITED MINE WORKERS OF AMERICA 1974 PENSION TRUST

Pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974, there is hereby established a trust to be known as the "United Mine Workers of America 1974 Pension Trust" (hereinafter sometimes referred to as "Trust" or "1974 Pension Trust") for the purpose of making benefit payments pursuant to the provisions of the United Mine Workers of America 1974 Pension Plan (hereinafter sometimes referred to as the "Plan" or the "1974 Pension Plan"). The provisions of said 1974 Pension Trust are effective as of December 6, 1974, and, as amended as of March 27, 1978, April 29, 1980, June 7, 1981, October 1, 1984, February 1, 1988, February 1, 1991, December 16, 1993, January 1, 1998, January 1, 2002, and January 1, 2007 are as set forth below.

The 1974 Pension Plan and Trust is a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950.

Except to the extent otherwise required by the Employee Retirement Income Security Act of 1974 ("ERISA") or other applicable law, governmental rule or regulation, and except to the extent that the 1974 Pension Plan or 1974 Pension Trust specifically provides otherwise, or as required by the context, all amendments to the 1974 Pension Trust effective as of January 1, 2007, pursuant to the authority contained in Article XI herein, shall be given only prospective application commencing on January 1, 2007, and shall have no retroactive application whatever. The amendments effective as of January 1, 2007, shall not be deemed to be an approval or disapproval by the parties to any action or failure to act by any Trustee or Trustees for any period prior to January 1, 2007. The terms and provisions of the 1974 Pension Trust in effect as of December 31, 2006, shall continue in effect and shall be applicable only to circumstances or events which occurred prior to January 1, 2007, and which are not governed by the amendments adopted as of January 1, 2007.

ARTICLE I

The following terms shall have the meanings herein set forth:

(1)    "Wage Agreement" means the National Bituminous Coal Wage Agreement of 1974, as amended from time to time and any successor thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2007. Any reference in this Trust to the Wage Agreement or to the bituminous coal wage agreement then in effect shall also refer (a) to the Sub-bituminous and Lignite Agreement and the National Coal Mine Construction Agreement with respect to any period for which such agreements provide that pension benefit payments shall be made available pursuant to this Trust or a predecessor Trust established under the bituminous coal wage agreement, (b) with respect to any period prior to the 1950 Bituminous Coal Wage Agreement, to any collective bargaining contract between the United Mine Workers of America and any employer in the bituminous coal industry, and (c) solely for the purposes of determining who is required to make contributions to, and receive benefits under, the 1974 Pension Trust, any other collective bargaining contract entered into between the United Mine Workers of America and

1-WA/2698777.1

any employer in the bituminous coal industry, which contract provides that contributions shall be made to or benefit payments made from this Plan.

(2)    "Employer" means an employer who is signatory to the Wage Agreement or, with respect to prior periods, was signatory to the bituminous coal wage agreement then in effect.

(3)    "Plan" shall refer to the "United Mine Workers of America 1974 Pension Plan" established pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974.

(4)    "Trustees" shall mean the trustees of this Trust designated in accordance with the provisions of Article II hereof, who shall be the named fiduciaries required pursuant to Section 402 of ERISA and the Plan Administrator, as that term is defined in that Act; provided, however, that this instrument may be amended pursuant to Article XI hereof to designate other or additional named fiduciaries.

(5)    "UMWA" or "Union" shall mean the United Mine Workers of America.

## ARTICLE II

The 1974 Pension Trust shall be administered by a Board of four Trustees, two of whom shall be appointed as representatives of the Employers, and two of whom shall be appointed as representatives of the Union.  The Union may remove the Trustees appointed by it, at any time and for any reason, and the Employers may remove the Trustees appointed by them, at any time and for any reason.

For purposes of taking any action and all other aspects of administration under the 1974 Pension Plan or Trust, a quorum shall consist of two of the four Trustees, one of whom must be a representative of the Union, and one of whom must be a representative of the Employers; provided, however, that a quorum shall not be deemed to exist unless all Trustees have received reasonable notice of the meeting at which any action is taken, unless such notice is waived.  Any Trustee may call a meeting of the Trustees pursuant to the provisions hereof.  The Trustees need not be physically present to constitute a quorum, but may conduct business telephonically or through similar modes of simultaneous communication.  Alternatively, the Trustees may act without meeting, by written resolution signed by all Trustees.

In the event that a meeting is held or action is taken without the participation of both of the Trustees appointed by the Union and both of the Trustees appointed by the Employers, each side (the Employer Trustees and the Union Trustees) shall be required to vote as a unit.  In all other cases, each Trustee will be entitled to one vote.

In the event of resignation, death, removal, inability or unwillingness to serve of a Trustee appointed by the Employers or a Trustee appointed by the Union, the Employers shall appoint the successor of the Trustee originally appointed by them in accordance with the terms of Article XX of the National Bituminous Coal Wage Agreement of 2007, as amended from time to time,

I-WA/2698777.1

2

and any successor agreements to that specific Agreement, and the Union shall appoint the successor of the Trustee originally appointed by it. In the event of a deadlock on the administration of the Trust Fund between the Employer Trustees and the Union Trustees, an impartial umpire shall be selected either by agreement of the four Trustees, representatives of the contracting parties hereto, or by petition by either of the contracting parties hereto or by either of the two groups of Trustees to the United States District Court of the District of Columbia for the appointment of such an impartial umpire, all as made and provided in Section 302(c) of the Labor-Management Relations Act of 1947.

The four Trustees so designated shall constitute the Board of Trustees to administer the 1974 Pension Trust, as it may be amended from time to time. The Union shall designate one Trustee to serve as Chairman.

The UMWA and the BCOA may each designate a liaison representative who shall be permitted to attend Trustee meetings, to request and receive data and information relating to Fund operations, and to meet with Fund staff and representatives regarding issues relating to the Fund.

The Trustees shall retain outside co-counsel who shall serve as the legal advisors to the Fund and the Trustees. This shall not preclude the Trustees from exercising their authority to retain additional counsel as set forth in Article VI(10).

This Trust shall have its principal place of business in Washington, D.C., or such other place as may be determined by the Trustees.

<div align="center">ARTICLE III</div>

The 1974 Pension Trust established with the Trustees hereunder is an irrevocable trust created pursuant to Section 302(c) of the Labor-Management Relations Act of 1947, which shall endure as long as the purposes for its creation shall exist. The 1974 Pension Trust consists of such sums of money and other property, acceptable to the Trustees, as from time to time shall be contributed to, held by, or paid or delivered to the Trustees and such earnings, profits, and increments thereon as may occur from time to time. All such money and other property delivered to the Trustees and all investments and reinvestments made therewith or proceeds thereof and all earnings and profits thereon, less the payments which at the time of reference shall have been made by the Trustees as authorized herein, are referred to herein as the "assets of the 1974 Pension Trust." The assets of the 1974 Pension Trust shall be held by the Trustees and dealt with in accordance with the express provisions of this instrument and the requirements of law.

The monies to be paid into the 1974 Pension Trust shall not in any manner be liable for or subject to the debts, contract, liabilities or torts of the parties entitled to such money, i.e., the beneficiaries of said 1974 Pension Trust under the terms of the instrument.

<div align="center">3</div>

## ARTICLE IV

The Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, are directed and authorized (a) to hold, to invest and to reinvest the assets of the 1974 Pension Trust as provided herein; (b) to pay monies from the 1974 Pension Trust in accordance with the terms of the Plan for the purpose of distributing the benefits payable under the Plan; and (c) to pay the cost of administration of the 1974 Pension Trust as hereinafter provided.

Subject to the provisions of this Trust and the Plan, the Trustees shall have full and exclusive authority and discretion to determine all questions of coverage and eligibility, including all factual determinations, investment of trust funds, delivery of benefits, and all other related matters. They shall have full discretionary power to construe the provisions of this Agreement and Declaration of Trust and the Plan. The Trustees are empowered to promulgate such reasonable rules and regulations as they determine to be desirable for carrying out the purposes of this Trust and of the Plan.

## ARTICLE V

The Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, shall have full discretionary powers of management and control, of sale and resale, in fee simple or otherwise, mortgage, lease, and pledge, of the assets of the 1974 Pension Trust, and shall not be restricted to investments in securities or property of the character now or hereafter authorized by law or rules of the United States District Court for the District of Columbia. To the extent permitted by ERISA, the Trustees are authorized to invest assets of the 1974 Pension Trust in deposits described in Section 408(b)(4) of ERISA, and in common or collective trust funds or pooled investment funds, including but not limited to those described in Section 408(b)(8) of ERISA. In the event that the Trustees invest assets of the 1974 Pension Trust in a pooled investment trust which is exempt from taxation as a group trust under Sections 401(a) and 501(a) of the Internal Revenue Code (with respect to funds which equitably belong to participating trusts described in such Sections of the Code), the provisions of said pooled investment trust shall be deemed to be a part of the Plan. The assets of the 1974 Pension Trust shall be invested and reinvested, without distinction between principal and income, in securities and other forms of property, including but not limited to, real estate, corporate stocks (common and preferred), debentures, bonds and other obligations whether or not secured. The Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, shall not be limited to the amount or type of any investment in relation to the amount or type of investments constituting the Trust as a whole, except as provided by ERISA.

The Trustees or such other persons as may be properly designated pursuant to Article IX hereof may, in their discretion, keep such portion of the assets of the 1974 Pension Trust in cash or cash balances as the Trustees may determine to be reasonably necessary to satisfy the current needs of the Trust.

1-WA/2698777.1

ARTICLE VI

Neither by way of limitation nor in derogation, but in amplification of any powers granted herein, the Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, are further authorized:

(1)    To purchase, sell, exchange, convey, transfer or dispose of, and also to grant options with respect to, any property, whether real or personal, at any time held by them and to make any sale, private or public;

(2)    To retain, manage, operate, repair, improve, develop, preserve, mortgage or lease for any period any real property interests or rights held by the Trustees upon such terms and conditions as the Trustees deem proper, either alone or by joining with others, using other trust assets for any of such purposes if by them deem advisable; to modify, extend, renew, or otherwise adjust any or all of the provisions of any such mortgage or lease, including the waiver of rentals, if by them deemed advisable;

(3)    To compromise, compound and settle any debt or obligations due from third persons to them or to third persons from them, as Trustees hereunder, and to reduce the rate of interest on, to extend or otherwise modify, or to foreclose upon default or otherwise enforce, any such obligations;

(4)    To vote in person or by proxy and to give general or special proxies or powers of attorney, with or without power of substitution, on any securities or other investments held by them;

(5)    To exercise any rights or options appurtenant to any securities or other property held by them for the conversion thereof into other securities or property, or to exercise any rights or options held by them to subscribe for or purchase additional securities or other property, and to make any and all necessary payments with respect to any such conversion or exercise;

(6)    To join in, dissent from or oppose, the reorganization, recapitalization, consolidation, sale or merger of corporations or properties of which they may hold stocks, bonds or other securities or in which they may be interested, upon such terms and conditions as they may deem prudent; to pay any expenses, assessments or subscriptions in connection therewith and to accept any securities or property (whether or not the Trustees would be authorized to then invest in such securities or property) which may be issued upon any such reorganization, recapitalization, consolidation, sale or merger, and thereafter to hold the same;

(7)    To make, execute, acknowledge and deliver any and all deeds, leases, mortgages, assignments, documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

5

(8)     To enforce any right, obligation or claim in their absolute discretion and in general to protect in any way the interest of the Trust, either before or after default with respect to any such right, obligation or claim, and, in case they shall consider such action for the best interest of the Trust, in their absolute discretion to abstain from the enforcement of any right, obligation or claim and to abandon any property, whether real or personal, which at any time may be held by them:

(9)     To borrow or raise money for the purpose of the Trust in such amount and upon such terms and conditions as in their absolute discretion they may deem advisable; and for any sums so borrowed to issue their promissory note as Trustees and to secure the repayment thereof by mortgaging or pledging all or any part of the Trust; and no person lending money to the Trustees shall be bound to see to the application of the money loaned or to inquire into the validity, expediency or propriety of any such borrowing;

(10)     To employ suitable agents and counsel from time to time, and to pay them reasonable expenses and compensation;

(11)     To retain without liability for depreciation any securities or property at any time purchased and/or received by the Trustees as a part of the Trust;

(12)     To do all acts which may be necessary to comply with any of the requirements of ERISA or any other federal law;

(13)     To enter into any and all contracts and agreements for carrying out the terms of the Plan and the 1974 Pension Trust and for the administration of such Plan and Trust; and

(14)     To do all acts which they may deem necessary or proper and to exercise any and all powers of the Trustees under this instrument under such terms and conditions as they may deem to be for the best interest of the Trust.

(15) To enter into an arrangement with the UMWA for the check-off of membership dues, including assessments, initiation fees, credit union, voluntary COMPAC contributions and other voluntary deductions; provided that any such arrangement must be terminable by the Trustees upon reasonable notice, must be revocable by the Participant at any time upon reasonable notice to the Trustees, and either

(a)     such arrangement must not permit any Participant or beneficiary to check-off an amount exceeding 10% of his or her monthly benefit; or

(b)     the designated recipient must file a written acknowledgement that it has no enforceable right in or to any plan benefit or portion thereof (except to the extent of payments actually received pursuant to the terms of the arrangement);

1-WA/2698777.1

and such arrangement must comply in all respects with the requirements of the Internal Revenue Code of 1986, as amended, ERISA, the Labor Management Relations Act of 1947, as amended, and any other applicable law.

The Trustees may, in their sole discretion, cause the securities which from time to time may comprise the Trust, to be registered in their name as Trustees hereunder, or in the name of their nominee without disclosing the ownership thereof or to take and keep the same unregistered, and to retain them, or any part thereof, in such condition that they will pass by delivery.

Notwithstanding the above authority granted the Trustees hereunder, no power shall be exercisable in any manner which will, or might, prevent the 1974 Pension Plan and Trust from qualifying, or continuing to qualify, under Section 401 of the Internal Revenue Code, nor shall any action be taken by the Trustees which violates the requirements of ERISA or any other applicable law, governmental rule or regulation.

## ARTICLE VII

The expenses incurred by the Trustees in the performance of their duties hereunder, including reasonable compensation for the Trustees in accordance with Section 408(c)(2) of ERISA, for agents, and for service of counsel rendered to the Trustees and expenses incident thereto, and all other proper charges and disbursements of the Trustees, including all taxes of any kind and all kinds whatsoever that may be levied or assessed under existing or future laws of any jurisdiction upon or in respect of the Trust hereby created or any money, property or securities forming a part thereof, shall be paid by the Trustees out of the Trust.

## ARTICLE VIII

A Trustee shall not be liable for the making, retention, or sale of any investment or reinvestment made by him as herein provided; for any loss to or diminution of the Trust; or for anything done or omitted under this instrument, except for his own willful misconduct or lack of good faith, or any other action or omission for which personal liability is imposed under Part 4 of Subtitle B of Title I of ERISA. Any Trustee may consult with legal counsel concerning any questions which may arise with reference to his duties under this instrument, and, except as otherwise provided by ERISA, the opinion of such counsel shall be full and complete protection in respect to any action taken or suffered by such Trustee hereunder in good faith and in accordance with the opinion of such counsel.

When and if a monetary claim or suit is lodged against one or more fiduciaries of the Trust, including the Trustees thereof, in their individual capacities, arising out of their actions as fiduciaries, the Trust may engage and compensate counsel to represent such fiduciary until a final court decision, or a final government agency decision if no court appeal is filed, finds that such fiduciary in his individual capacity (1) has breached his fiduciary obligations under the Employee Retirement Income Security Act; (2) by so doing has caused a loss to the Trust or its corresponding Plan or has gained by use of Trust assets; and (3) is therefore liable in his

7

individual capacity for damages or to return any profit occasioned by such breach to the complaining person, persons, entity or entities.

If the Trust expends moneys for counsel under the preceding paragraph, and the individual liability described therein is so finally determined against one or more fiduciaries, each individual found so liable shall reimburse the Trust for moneys so expended for his counsel.

No provision in this Article shall be construed in its interpretation so as to violate the provisions of Section 410 of the Employee Retirement Income Security Act.

<div align="center">ARTICLE IX</div>

The Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, shall keep accurate and detailed accounts of all investments, receipts, and disbursements and other transactions hereunder, and such accounts, books and records relating thereto shall be open to inspection and audit by the Employers and the Union and by the beneficiaries of the 1974 Pension Trust at all reasonable times at the offices of the 1974 Pension Trust. The Trustees, or such other persons as may be properly designated pursuant to this Article IX shall be responsible for providing participants and beneficiaries under the plan with all information required to be furnished pursuant to the provisions of ERISA or the regulations promulgated thereunder.

For purposes of computing charges to the funding standard account of the Trust, the Trustees shall adopt any actuarial cost or funding method designated by the Employers, including the "short-fall method," and permitted now or hereafter by applicable federal law and federal regulations issued thereunder. The Trustees shall give the Employers notice sixty (60) days prior to the time any such election is required or permitted.

The Trustees, or such other persons as may be properly designated pursuant to this Article IX shall be responsible for maintaining records sufficient to comply with any requirements of ERISA and for the filing of all reports with the Labor Department, Treasury Department, and Pension Benefit Guaranty Corporation which may be required by any provision of ERISA or the regulations issued thereunder, including the plan description and reports specified by Section 101(b). A copy of each document or report provided to plan participants or beneficiaries or filed by the Trustees pursuant to the requirements of ERISA or any other applicable law, governmental rule or regulation shall be sent to the Employers and to the Union unless the right to receive such copy has been waived in writing. The Trustees are authorized to apply for permission to implement an alternative method of satisfying any of the requirements of this Article IX in accordance with Section 110 of ERISA, and, upon receiving the approval of the Labor Department for such alternative method, may utilize such method in lieu of the corresponding requirements of ERISA and of Article IX of this instrument.

The Trustees shall provide the Employers and the Union with such other information and/or documentation as the Employers and the Union may reasonably request within a reasonable time from when such request shall be made.

<div align="center">8</div>

The Trustees shall provide the Employers and the Union with quarterly reports summarizing all pending litigation involving the Trust and the Plan and describing all significant operational issues that are under review. Within 90 days following the close of each calendar year, or following the close of each such other annual period as may be adopted by the Trustees, and within 90 days after a Trustee ceases to be a Trustee as provided for in Article II hereof, the Trustees shall file with the Employers and the Union a written report setting forth in such form and detail as they may request the transactions effected by the Trustees during such calendar year or other annual period to the date on which such Trustee's tenure ceases. The annual report shall incorporate the report of an independent certified public accountant and shall be the same as required by Section 103 of ERISA unless the Employers and the Union shall jointly request that additional or supplemental information be incorporated in the report which they receive. Upon the expiration of ninety (90) days from the date of any report to the Employers and the Union, the Trustees shall be forever released and discharged from any liability or accountability to anyone as respects the propriety of their acts or transactions shown in the aforementioned report except as otherwise provided by law or with respect to any acts or transactions as to which the Employers or the Union shall file written objections with the Trustees within such period of ninety (90) days.

The UMWA or the BCOA may audit the accounts, books and records, and operation of the Plan and Trust, at any time and for any reason, upon reasonable notice to the Trustees. The Trustees shall cooperate fully in connection with any such audit and shall make available appropriate personnel and records deemed necessary by the auditors for inspection and copying at reasonable times and places.

The Trustees are hereby authorized to allocate fiduciary responsibilities in any manner permitted pursuant to Section 405(c) of ERISA.

The Trustees may appoint an investment manager or managers to manage any investments held under this instrument as permitted by Section 402(c) of ERISA.

To the extent not inconsistent with the provisions hereof, the Trustees shall comply with the further requirements imposed upon them by and shall have the further powers contained in Article XX, Sections (e), (f), and (g) of the National Bituminous Coal Wage Agreement of 2007, as amended from time to time, and any successor agreements to that specific Agreement.

9

ARTICLE X

Any action of the Employers which may, or must, be taken hereunder may be taken only by BCOA. Any action which must be taken in writing shall be signed by the President of BCOA. In the event that BCOA ceases to exist, or in the event that more than 50% of the tonnage membership of BCOA on the Effective Date of the 2007 Wage Agreement has withdrawn prior to the time when BCOA is required or permitted to take action under this Article, then such action may be taken by a majority vote, based on tonnage, of existing Employers who were BCOA members on the Effective Date of the 2007 Wage Agreement.

Any Employer who employed any participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2007.

ARTICLE XI

The Employers and the Union, by joint action, reserve the right at any time and from time to time to modify or amend in whole or in part any or all of the provisions of this instrument, without reopening or otherwise affecting the integrity of any other provision of the Wage Agreement, by a written agreement between the Employers and Union, provided, however, that such modification or amendment does not permit any part of the corpus or income of the Trust to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the participants and their beneficiaries, and provided further, that the Employers and the Union have delegated to the Trustees the authority and responsibility to make certain changes and amendments as set forth in Article XX(g)(4) of the National Bituminous Coal Wage Agreement of 2007, as amended from time to time, and any successor agreements to that specific Agreement. Any written agreement executed by the Union shall be signed by the International President.

ARTICLE XII

Notwithstanding anything to the contrary contained in this instrument, or any amendment hereto, it shall be unlawful for any part of the 1974 Pension Trust, other than such part as is required to pay taxes and administrative expenses, to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the participants and beneficiaries of the Plan, except that in the case of a contribution which is made by an Employer by a mistake of fact, or law (other than a mistake relating to Plan qualification), such mistaken contribution may be returned to the Employer within six months after the Trustees determine that the contribution was mistakenly made. Monies held by the 1974 Pension Trust do not constitute a part of the deceased beneficiary's estate which can be claimed by his administrator, executor, heirs, or creditors,

10

1-WA/2698777.1

unless such person or persons are otherwise eligible under the terms and conditions of the Plan, nor are said monies equivalent to the proceeds of an insurance policy in which a beneficiary may be designated; and no participant or beneficiary of the Plan may, during his lifetime, assign, devise or will monies from this Trust, and any attempt so to do shall be void.

Notwithstanding the foregoing, a Participant or beneficiary may make a voluntary, revocable assignment permitted under an arrangement established by the Trustees pursuant to Article VI(15).

To the extent not inconsistent with and permitted by applicable law, governmental rule or regulation, and in such manner as to ensure that the 1974 Pension Plan and Trust is qualified under Section 401 of the Internal Revenue Code and that contributions are deductible under Section 404 of the Internal Revenue Code, the Trustees shall transfer assets or liabilities, or both, of the Trust, in such amounts, at such times and in such manner as the Employers and the Union may jointly direct, to any other trust qualified under Section 401 of the Internal Revenue Code which provides benefits to persons who at any time were or are participants under the 1974 Pension Plan.

The Employers, the Union, and the Trustees shall fully cooperate to obtain all necessary rulings and do all other acts appropriate to ensure that the 1974 Pension Plan and Trust is qualified under Section 401 of the Internal Revenue Code and that contributions are deductible under Section 404 of the Internal Revenue Code.

Any assets which remain upon termination of the 1974 Pension Plan, after satisfaction of all benefits and liabilities arising under the 1974 Pension Plan and 1974 Pension Trust in a manner consistent with the principles of Section 4044 of ERISA, shall be distributed as may be mutually agreed upon by the Employers and the Union.

In accordance with the requirements of Section 4232 of the Employee Retirement Income Security Act of 1974, as amended, the Trustees shall transfer to the United Mine Worker of America Construction Workers Pension Trust in such manner as the Employers and the Union may jointly direct the following assets of the Trust:

(a)     All claims for withdrawal liability for withdrawals of Construction Employers from the Plan after June 30, 1981; and

(b)     An amount equal to the balance of the assets in the Construction Segment of the Plan, determined in accordance with Article X of the Plan, adjusted to reflect any liabilities of such segment that are retained by the Plan and to prevent any increase in the unfunded vested benefits of the Plan as a result of the transfer and reduced by all costs of the transfer, including, but not limited to, attorneys' fees, staff time, actuarial work, and document preparation.

(c)     All outstanding claims (including notes from employers, if any) for contributions from employers signatory only to the National Coal Mine Construction Agreement of 1985 or its

11

predecessors or only to another collective bargaining contract with the United Mine Workers of America that provides that contributions shall be made to this Trust solely for construction work related to the development, expansion or alteration of coal mines and not for any other work.

### ARTICLE XIII

This instrument shall be construed, regulated and administered under Federal law and, to the extent not preempted or inconsistent with such Federal law, the laws of the District of Columbia.

IN WITNESS WHEREOF, the Employers and the Union, pursuant to proper authority, have caused this instrument, effective December 6, 1974, and amended as of January 1, 2007, to be signed by their proper officers or representatives in Washington, D.C., this 7th day of February 2007.

UNITED MINE WORKERS OF AMERICA

_____
International President

BITUMINOUS COAL OPERATORS'
ASSOCIATION, INC.

_____
President

Accepted by:

Dated: 2/27/2007          _____
                          Trustee

Dated: 2/27/2007          _____
                          Trustee

Dated: 2/27/2007          _____
                          Trustee

1-WA/2698777.1

12

Dated: ____2/28/07____          _Michael A Hole_
                                      Trustee

1-WA/2698777.1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Michael H. Holland, *et al.* )<br><br>Plaintiffs, )<br><br>v. )<br><br>Freeman United Coal Mining Company, )<br>*et al.*, )<br><br>Defendants. )<br>———————————————————— )<br>Freeman United Coal Mining )<br>Company, )<br><br>Plaintiff, )<br><br>v. )<br><br>United Mine Workers of )<br>America, *et al.*, )<br><br>Defendants. ) | Case No. 07-cv-490 (PLF)<br><br><br><br>Case No. 07-cv-1050 (PLF) |

## DECLARATION OF JULIA PENNY CLARK

I, Julia Penny Clark, declare as follows:

1.     I am an adult resident of Maryland.  I make this declaration based on my personal knowledge of the facts set forth herein.

2.     I was the lead attorney for the United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") in *In re United Mine Workers of America Employee Benefit Plans Litig.*, 782 F.Supp. 658 (D.D.C. 1992).   That case was appealed to the United States Court of Appeals for the District of Columbia Circuit under the name

*United Mine Workers of America 1974 Pension Trust v. Pittston Co.*; the D.C. Circuit's opinion in that case can be found at 984 F.2d 469 (D.C. Cir. 1993).

3.      In the *Pittston* appeal, the 1974 Pension Trust filed five declarations on which the court of appeals relied in its decision. Copies of these declarations are attached hereto as follows:

- Declaration of Donald E. Pierce, Jr., February 27, 1991 (attached as Exhibit A).

- Declaration of B.M. Shaner, March 4, 1991 (attached as Exhibit B).

- Declaration of David W. Kempken, March 5, 1991 (attached as Exhibit C).

- Declaration of K.L. Young, March 5, 1991 (attached as Exhibit D).

- Declaration of Roger M. Haynes, March 7, 1991 (attached as Exhibit E).

4.      In addition, the *Pittston* court relied on a few additional documents, which are described below, and copies of which are also attached hereto as follows:

- BCOA Proposals dated January 23, 1978 (attached as Exhibit F).

- Memorandum of B.M. Shaner, Manager of Employee Benefits for Bethlehem Steel Corporation, to John O'Connell, Vice President for Labor Relations, Bethlehem Steel Corporation (May 23, 1978). (attached as Exhibit G).

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington DC, this 6th day of September, 2007.

_Julia Penny Clark_
Julia Penny Clark

# EXHIBIT A

## DECLARATION OF DONALD E. PIERCE, JR.

Donald E. Pierce, Jr., makes the following Declaration:

1. I am a trustee of the United Mine Workers of America Health and Retirement Funds -- the 1950 Pension Fund, the 1950 Benefit Fund, the 1974 Pension Fund, and the 1974 Benefit Fund (the Funds). I have served in that capacity since April 1, 1985.

2. The trust and plan documents that govern each of the Funds are periodically negotiated between the Bituminous Coal Operators Association (BCOA) and the United Mine Workers of America (UMWA) in connection with negotiation of each National Bituminous Coal Wage Agreement (NBCWA). NBCWAs and associated trust and plan documents for the four Funds were negotiated between the BCOA and the UMWA in collective bargaining in 1974, 1977-78, 1981, 1984, and 1988.

3. From March 1973 to July 1976 I was employed as Assistant Director of Research for the UMWA. From the Fall of 1976 to March 1985 I was employed by the UMWA as a consulting economist and as a consultant on issues related to health and retirement benefits. In that capacity I participated on behalf of the UMWA in the 1977-78 negotiations with the BCOA.

4. In the 1977-78 negotiations between the UMWA and the BCOA, negotiations over economic issues and major contract

000563

- 2 -

issues were conducted by representatives of each party at the "Main Table." I served as a consultant to the UMWA representatives at the Main Table on economic issues. There were also certain committees that discussed specific issues. One of those committees was the Benefits Subcommittee, which discussed issues pertaining to the Funds. That Subcommittee was made up of representatives from the BCOA and from the UMWA. I served as a consultant to the UMWA members of that Subcommittee.

5. The negotiations that led to the 1978 NBCWA began in the fall of 1977 and were not concluded until late March of 1978, with an industry-wide strike that ran from early December 1977 to late March of 1978.

6. The Benefits Subcommittee began its meetings in November of 1977. The BCOA's Subcommittee chairman was Roger Haynes of Consolidation Coal Company. The other BCOA members of the Subcommittee were Ben Shaner and David Kempken of Bethlehem Steel Corporation, Bob Revitte and Ken Young of Peabody Coal, George Hanshaw of U.S. Steel, and John Yorke of Island Creek Coal Company. Kevin Counihan, an employee of the BCOA, also attended many of the committee meetings. Wilbert Killion was the UMWA's chairman for the Benefits Subcommittee. The other UMWA members of the Subcommittee were Don Lawley, a member of the UMWA International Executive Board, Julius Mullins, Secretary-Treasurer for UMWA District 30, Lloyd Baker,

000564

- 3 -

UMWA District 20 President, and Homer Alley, from UMWA
District 15. Harry Huge served as an adviser to the Benefits
Subcommittee; at the outset of the negotiations he was a
trustee of the Funds, but he resigned that position in November
1977 to become a special counsel to the UMWA negotiating team.
John Woodrum, a member of UMWA's legal staff, also advised the
UMWA representatives on the Benefits Committee.

7. Among the concerns that the BCOA presented to the
Benefits Subcommittee in the Subcommittee's early meetings were
the BCOA's belief that all employers participating in the
Trusts must pay the same levels of contributions that were
required of BCOA members under the NBCWA, and the BCOA's belief
that employers should not be able to withdraw from the Funds
and leave liabilities as the responsibility of the remaining
employers. During the early discussions of the Benefits
Subcommittee I assured the BCOA that the UMWA had no intention
of negotiating any contracts that would have the effect of
increasing the share of liabilities that BCOA members would
have to pay to support the Funds. I understood that this was
UMWA's policy at the time. Haynes was not satisfied with my
assurances. These issues became Main Table negotiating demands.

8. At some point in January 1978 I was asked by the UMWA
Main Table negotiators to review language related to these
issues that had been drafted by the BCOA. Those provisions
were drafted for inclusion in the plan and trust documents, so
that they would bind all employers who agreed to participate in
the Trusts. The provisions that BCOA presented to us were

000565

- 4 -

changed slightly in subsequent discussions by the Main Table

negotiators and ultimately the UMWA and the BCOA agreed to them.

9.   One of those provisions, as agreed to by the BCOA and

the UMWA, was as follows:

> Contributions to the 1950 Pension Trust to fund the
> benefits under this Plan shall be paid solely by the
> Employers in accordance with Article XX of the National
> Bituminous Coal Wage Agreement of 1974 as amended from
> time to time, and any successor agreements to that
> specific agreement.

Identical provisions were placed in the relevant documents for

each of the four Trusts, with appropriate changes in the

references to the particular Trusts.

10.   Another provision related to the issues described in

paragraph 7, which the BCOA and the UMWA ultimately agreed to,

is the clause that is sometimes referred to as the "evergreen"

clause or the "continuing contributions" clause.   It was

included in each plan and trust document and provides (with

changes in each document to identify correctly the Fund to

which it applies):

> Any Employer who employed any participant eligible for
> coverage under, or who received or receives benefits
> under, the 1950 Pension Plan, or any Employer who was or
> is required to make, or who has made or makes
> contributions to the 1950 Pension Plan and Trust, is
> obligated and required to comply with the terms and
> conditions of the 1950 Pension Plan and Trust, as amended
> from time to time, including, but not limited to, making
> the contributions required under the National Bituminous
> Coal Wage Agreement of 1978, as amended from time to time,
> and any successor agreements thereto.

11.   In 1979 I testified on behalf of the UMWA at hearings

held by the Pension Task Force, Subcommittee on

Labor-Management Relations, of the House Committee on Education

and Labor of the United States Congress.   The legislation under

00056

- 5 -

consideration in those hearings was a bill that ultimately was
enacted (with changes) as the Multiemployer Pension Plan
Amendments Act of 1980.  One of the purposes of that bill was
to impose a monetary liability on employers that withdraw from
participation in a multiemployer pension plan.  In the course
of that testimony (Exhibit A), I described the "evergreen" or
"continuing contributions" clause that BCOA and UMWA had
negotiated in 1978, as follows:

> We think it is imperative that existing,
> participating employers in multiemployer plans be kept in
> the fold.  In the last negotiations, the Mine Workers and
> the operators added the following parallel language to
> each of the plans in trust, and that language, which I
> shall not quote, essentially obligated all present
> employers who were contributing to the multiemployer
> plans, to continue contributing into the future based on
> contributions called for in successor agreements to the
> National Bituminous Coal Wage Agreement, whether or not
> that particular employer remained signatory to the Wage
> Agreement.

> By attempting to insure that as many employers as
> possible remained, the union, of course, was helping to
> guarantee that an ever-increasing liability would not be
> added to employers who might remain, had other employers
> abandoned the plan.

The description that I gave in that testimony accurately
reflected my understanding of the "evergreen" or "continuing
contributions" clause.

12.  In 1981 I provided an affidavit (Exhibit B) to the
National Labor Relations Board in connection with an unfair
labor practice proceeding involving Garland Coal.  That
affidavit accurately reflected my understanding of the
"evergreen" or "continuing contributions" clause.

000567

- 6 -

I declare under penalty of perjury that the foregoing is true and correct.

*Donald E. Pierce Jr.*
Donald E. Pierce, Jr.

Dated:  February 27, 1991

000568

III A

FOR PITTSTON / A&E

PUBLIC HEARINGS ON H.R. 3904
MULTIEMPLOYER PLAN TERMINATION INSURANCE PROPOSALS

BEFORE THE

COMMITTEE ON EDUCATION AND LABOR

SUBCOMMITTEE ON

LABOR-MANAGEMENT RELATIONS

PENSION TASK FORCE


TESTIMONY

OF

DONALD PIERCE

FOR

UNITED MINE WORKERS OF AMERICA


YL10001892

000569

Mr. Chairman, members of the Committee, my name is Don Pierce. I am an Economist representing the United Mine Workers of America. With me is Mr. Randy Vehar, an attorney with the UMWA. Our prepared remarks have been kept brief. The UMWA will, of course, be happy to add whatever detailed information to the record regarding the three major multiemployer pension funds it helps to sponsor, that the Committee may desire.

The UMWA, along with the signatories to the National Bituminous Coal Wage Agreement, maintains the 1950 Pension Plan and Trust, a pension plan that covers nearly 80,000 retired mine workers and provides a monthly pension benefit of $275.00. The monthly cash flow needs of that fund are approximately 21 million dollars. That sum flows but before any contributions can serve to amortize the nearly 2 billion dollars in unfunded vested liabilities which burden that fund. All of the contributions to the 1950 Fund come from a 95 cent per ton royalty on each ton of coal mined under the National Bituminous Coal Wage Agreement.

The UMWA and the signatories to the National Bituminous Coal Wage Agreement also maintain the 1974 Pension Plan and Trust, a pension plan that covers nearly 160,000 active miners and mine construction workers and 8,000 retired mine workers. The unfunded vested liability of the 1974 Fund is approximately 1.8 billion dollars. Contributions to this Fund are made for each man hour worked and each ton of coal mined under the National Bituminous Coal Wage Agreement, and for each man hour worked under the National Coal Mine Construction Agreement. Pensions received by the 8,000 retirees are a function of the years of service which the miner earned during his years in the coal industry.

YL10001893

000570

-2-

Both the 1950 and the 1974 Pension Funds are a con-
tinuation of the original 1950 Welfare and Retirement
Fund established some 30 years ago after a series of strikes
and government seizure of the mines. The large unfunded
liabilities that exist today are largely a result of the
operation of that original Fund on a pay-as-you-go basis,
the stagnation of the coal industry during the 50's and
60's, the payment of health benefits from that Fund and
court orders which swelled the number of eligible retirees.
In 1974, UMWA and the industry agreed in negotiations
to separate the provision of health benefits from that of
pension benfits, and to begin funding the pension liabili-
ties that had accrued under the original 1950 Fund. In
order to accomplish that objective and to establish a mo-
dern pension plan for working miners, retirees were allo-
cated to one of two funds. Those who retired before 1976
were to be covered by the 1950 Pension Plan. Those who
retired after 1976 were to be covered by the 1974 Pension
Plan. A large part of the impetus for these decisions
was the Employee Retirement Income Security Act (ERISA)
of 1974, passed in September, 1974, just before the expira-
tion of the 1971 National Agreement.

The UMWA and the anthracite operators sponsor the
Anthracite Health and Welfare Fund. The Fund covers approx-
imately 12,000 retirees and 2,000 active miners. It pro-
vides a monthly benefit of just $20.00. All contributions
to that fund are on the basis of a $1.50 per ton royalty
on each ton of anthracite mined under the Anthracite Agree-
ment. Every dollar received by the Fund goes to meet the
cash flow needs of the Fund.

YL10001894

000571

-3-

Practically every difficulty which the proposed legislation attempts to address has been experienced by the three funds for which I have offered thumbnail sketches. The Anthracite Fund is a classic example of a fund in a declining industry. Nearly 1500 dollars per year must be contributed for each active miner just to provide a meager $20.00 monthly pension for each retiree. Not one cent can go toward the provision of retirement security for the active miner. Because of the ever increasing royalty necessary, it has been nearly impossible to add new participating employers to that Fund. All the competitive pressures present in a declining industry have acted in the opposite direction.

During the strike which accompanied the last negotiations in the bituminous industry, the 1950 Pension Fund retirees missed pension payments for three months. While the miners later received these pensions, for nearly a quarter of a year these retirees were without a substantial part of the income on which they must rely to provide the necessities of life. The 1974 Fund has found itself short of the required contribution to the Funding Standard Account for the latest valuation period due to contributions missed during the same contract strike. Finally, because of the financial liability, real or perceived, which a new employer must be ready to shoulder when he enters a multiemployer fund, the UMWA has had great difficulties in adding new participants to the 1950 and 1974 Pension Plans.

With these first hand experiences, what general direction does the UMWA feel that the proposed changes in ERISA should take?

-4-

1.  It is imperative that existing participating employers in multiemployer plans be kept in the fold.  In the last negotiations the UMWA and the operators added the following or parallel language to each of the plans and trusts under the Wage Agreement:

"any employer who employed any participant eligible for coverage under, or who received or receives benefits under, the 1950 Pension Plan, or any employer who was or is required to make, or who has made or makes contributions to the 1950 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1950 Pension Plan and Trust, as amended from time to time, including, but not limited to making contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time and any successor agreement thereto."

By insuring that as many employers as possible remain liable for their contribution to the plan, one helps guarantee that an ever increasing liability is not added to those employers who remain with the plan while others abandon the plan.

2.  It is important, however, that new entrants to multiemployer plans not find themselves burdened with responsibilities for all of the accumulated unfunded liabilities of the past.  While such employers should find themselves obligated to contribute on an equal footing with existing employers for the period in which the new employers are members, upon the withdrawal of such a new employer, the liability of such an employer should be a function of additional accrued unfunded liability for the period in which said new employer was a participant.

3.  Financial and administrative relief must be provided for multiemployer plans which are weathering short term crises.  Whether a temporary turn in the health of an

YL10001896

000573

-5-

industry or a contract strike results in decreased contributions to a plan, retirees should be assured of an uninterrupted flow in their pensions and plan administrators should find reasonable treatment by the Departments of Labor and Treasury with regard to meeting requirements for contributions to the Funding Standard Account.

4. Benefit guarantees for retirees should be at the same levels as benefit receipt under the plan with some reasonable period for phasing in benefit increases.

5. Premiums for insuring benefits must be kept reasonable. There must be, in addition to contributed premiums by plan participants, funds available from the general revenues of the federal government. For plans the size of the 1950 and 1974 Plans only the guarantee of benefits by federal monies offers any real security to retirees under those plans.

6. The continuation of existing funds must be promoted and the encouragement of the creation of new funds must not be forgotten. It is true that the all-or-nothing termination must be discouraged; in our attempts to do so, however, we must not reduce the likelihood that workers will enjoy the portability that multiemployer funds offer. Until we have some sort of universal private pension coverage with complete portability, workers must rely on multiemployer plans.

Do the revisions proposed by the Pension Benefit Guarantee Corporation (PBGC) meet these needs for multiemployer plans and more particularly do they meet the needs of the three UMWA Pension Plans?

YL1000189?
000574

-6-

The general thrust of the proposed revisions related
to withdrawal liability is in the right direction with
regard to small multiemployer plans, particularly those
in the construction and building trades. The revisions
fail, however, to fully meet the needs of multiemployer
plans of the size of the 1950 and 1974 Plans. With a rel-
atively small number of large employers and a multitude
of small employers it is imperative that the withdrawal
rules be written to be more binding than those proposed
by the PBGC. The provision to allow plans to override the
de minimis test for exemption by plan amendment is in the
right direction so long as same can be added during the next
round of bargaining in the coal industry. Certainly, if
the future benefits to be received by retirees are to be
protected from inflation, some method to make withdrawal
less attractive for large employers must be incorporated
in any withdrawal determination of liability. Finally,
because of the nature of the coal industry, the definitions
for partial withdrawal must be flexible enough to handle
the frequent openings and closing of mines by a given
employer.

Particularly in the area of benefit guarantees are
the proposals unfair. To reduce the effective protection
of a miner's pension to a level of only 75% and then to
institute a five year cliffhanger provision is to take away
part of the protection that was originally intended by
Congress. While the UMWA thinks it understands the reason-
ing behind such reduced guarantees, it cannot comprehend why
the pensioner must bear the burden for a declining industry
or employer reluctance to fully pay for that which was pro-
mised the pensioner at the time of his retirement . The
failure of the PBGC to recommend the use of federal monies

YL10001393

00057

-7-

to completely guarantee benefits is a glaring deficiency
in the proposal.  The proposed increases in premium pay-
ments would do little if anything to provide real guarantees
of even reduced benefits in the event of a termination
of a Fund the size of the 1950 Fund.  In effect, the UMWA
is being asked to help guarantee an insurance scheme which
might benefit some smaller multiemployer funds but which
offers no real insurance for its own members' benefits.

Plan reorganization rules, as proposed, may work for
smaller multiemployers.  With regard to the 1950 Fund,
however, the proposed revisions would technically place
it in reorganization.  Clearly, the 1950 Fund, even with the
difficulties it has experienced in the recent past, should
not be placed into reorganization.

The UMWA supports the minimum funding standards as
proposed in the revisions.  The 1974 Fund is funded on a
30-year basis and the 1950 Fund over a much shorter period,
cash flow requirements necessitating same.  So long as
reasonable flexibility is guaranteed the parties in an
industry with the vicissitudes of the coal industry, the
removal of the option to fund over a period as long as
forty years is not onerous.

Finally, the proposed withdrawal rules with the method
for determining liability would act to make it almost
impossible for new employers to be added to the contribu-
tors in any multiemployer fund and particularly funds with
existing unfunded liability of the magnitude of the 1950
and 1974 Funds.  Some method must be found to prevent
what will thwart the expansion of membership in existing
Funds.

Without having spoken to the details of the proposed
legislation, we offer these broad comments.  I shall try
to respond to any questions the Committee may have.

YL10001899
000576

# HEARINGS ON THE MULTIEMPLOYER PENSION PLAN AMENDMENTS ACT OF 1979

# HEARINGS

BEFORE THE

## TASK FORCE ON WELFARE AND PENSION PLANS

OF THE

## SUBCOMMITTEE ON LABOR-MANAGEMENT RELATIONS

OF THE

## COMMITTEE ON EDUCATION AND LABOR HOUSE OF REPRESENTATIVES

NINETY-SIXTH CONGRESS

FIRST SESSION

ON

# H.R. 3904

TO AMEND THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 AND THE INTERNAL REVENUE CODE OF 1954, AS AMENDED, FOR THE PURPOSE OF IMPROVING RETIREMENT INCOME SECURITY UNDER PRIVATE MULTIEMPLOYER PENSION PLANS BY STRENGTHENING THE FUNDING REQUIREMENTS FOR THOSE PLANS, AUTHORIZING PLAN PRESERVATION MEASURES FOR FINANCIALLY TROUBLED MULTIEMPLOYER PENSION PLANS, AND REVISING THE MANNER IN WHICH THE PENSION PLAN TERMINATION INSURANCE PROVISIONS APPLY TO MULTIEMPLOYER PLANS

HEARINGS HELD IN WASHINGTON, D.C., ON JUNE 5 AND 7, 1979

Printed for the use of the Committee on Education and Labor

418

Mr. McNamara. Thank you, Mr. Chairman.

Mr. Groom. Thank you.

[Recess.]

Mr. Peyser. The hearing will resume at this time.

I might say, at this time, it is the intention of the committee, as votes interrupt, to have the members move back and forth and we will continue so that everyone will, hopefully, have an opportunity to testify.

Mr. Pierce, we welcome you, and look forward to your testimony. As you know, whatever you would like to have submitted in your written testimony for the record, we will be glad to do, and you can either summarize, or proceed in any way you wish to handle that.

## STATEMENT OF DONALD PIERCE, ECONOMIST, UNITED MINE WORKERS OF AMERICA, ACCOMPANIED BY RANDY VEHAR, STAFF ATTORNEY

Mr. Pierce. Thank you, Mr. Chairman.

I have with me Randy Vehar, an attorney from the UMWA, and I am an economist with the Mine Workers.

I will try to summarize from my written statement by mentioning the general aims which the UMWA would like to see promoted by whatever revisions emerge in the PBGC legislation.

We think it is imperative that existing, participating employers in multiemployer plans be kept in the fold. In the last negotiations, the Mine Workers and the operators added the following parallel language to each of the plans in trust, and that language, which I shall not quote, essentially obligated all present employers who were contributing to the multiemployer plans, to continue contributing into the future based on contributions called for in successor agreements to the National Bituminous Coal Wage Agreement, whether or not that particular employer remained signatory to the Wage Agreement.

By attempting to insure that as many employers as possible remained, the union, of course, was helping to guarantee that an ever-increasing liability would not be added to employers who might remain, had other employers abandoned the plan.

Whereas the trustees of the Teamsters Western Fund were concerned about the premiums in the guarantee section, I think that the withdrawal of employers from funds and the calculation of liability associated with those withdrawals are foremost on the minds of the members of the Mine Workers.

I think you will find that that testimony is reasonably parallel, although we will mention some reservations we have with regard to the revisions to that which was presented by the Bituminous Coal Operators' Association in your hearings on Tuesday.

It is important, however, that new entrants to multiemployer plans not find themselves burdened with responsibilities for all of the accumulated unfunded liabilities of the past.

While such employers should find themselves obligated to contribute on an equal footing with existing employers for the period in which the new employers are members, upon the withdrawal of such a new

employer, the liability additional accrued new employer was a par

A third general should be at the same reasonable period for p

We do think that kept reasonable, but the from participating fund of the Federal Govern Workers' 1950 and 19 by Federal moneys o plans.

Finally, the continu the encouragement of While it is true that couraged, in our attem that workers will enjoy

Until we have som with complete portabi multiemployer plans. visions meet these gene

We think the general related to withdrawal for smaller multiemp fully meet the plans the Mine Workers.

With a relatively sm tude of smaller employe be written to be more The provision to allo exemption by plan ame same can be added dur There is an interim per of the bill, where it wo smaller employers to mu

Certainly, if the futu protected from inflation tractive for larger emplo tion of withdrawal liabil

Actuarial calculation in many multiemployer per year of service. The allowance for assumed in per year of service.

To allow an employer share of existing unfund for the future, when the course, necessitate high ensuring that employers of their existing unfunde increased pensions.

000578

419

employer, the liability of such an employer should be a function of the additional accrued unfunded liability for the period in which said new employer was a participant.

A third general aim would be that benefit guarantees for retirees should be at the same levels as benefit receipt under the plan, with some reasonable period for phasing in benefit increases.

We do think that premiums for insuring these benefits should be kept reasonable, but there must be, in addition to contributed premiums from participating funds, monies available from the general revenues of the Federal Government. For plans the size of the United Mine Workers' 1950 and 1974 pension funds, only the guarantee of benefits by Federal moneys offers any real security to retirees under those plans.

Finally, the continuation of existing funds must be promoted and the encouragement of the creation of new funds must not be hindered. While it is true that the all or nothing termination should be discouraged, in our attempts to do so, we must not reduce the likelihood that workers will enjoy the portability that multiemployer funds offer.

Until we have some sort of universal, private pension coverage with complete portability, workers are going to be forced to rely on multiemployer plans. The question then arises, do the proposed revisions meet these general aims?

We think the general thrust of those revisions, insofar as they are related to withdrawal liability, is in the right direction, particularly for smaller multiemployer plans. The revisions fail, however, to fully meet the plans the size of the 1950 and 1974 pension plans of the Mine Workers.

With a relatively small number of large employers, and a multitude of smaller employers, it is imperative that the withdrawal rules be written to be more binding than those proposed by the PBGC. The provision to allow plans to overrule the *de minimis* test for exemption by plan amendment is in the right direction, so long as same can be added during future negotiations in the coal industry. There is an interim period, given the proposed date of effectiveness of the bill, where it would be unclear as to what rules were binding smaller employers to multiemployer plans.

Certainly, if the future benefits to be received by retirees are to be protected from inflation, some method to make withdrawal less attractive for larger employers must be incorporated in any determination of withdrawal liability.

Actuarial calculations for the Mine Workers' funds are based, as in many multiemployer funds, on assumed dollar/monthly benefits per year of service. The actuarial techniques, in general, do not make allowance for assumed increases in the future in those monthly amounts per year of service.

To allow an employer to escape by putting up the present value of his share of existing unfunded liabilities really leaves workers at risk for the future, when the need for increasing pension benefits will, of course, necessitate higher contribution levels, but not method of ensuring that employers who have left, in posting the present value of their existing unfunded vested liability, do share in funding those increased pensions.

000579

420

Finally, because of the nature of the coal industry, definitions for partial withdrawal must be flexible to handle the frequent openings and closings of mines by a given employer.

Particularly in the area of benefit guarantee do we find the proposals unfair. To reduce the effective protection of a miner's pension to a level of only 75 percent, and then to institute a 5-year cliffhanger provision for phasing in increased benefits is to take away part of the protection that was originally intended by Congress.

While the UMWA thinks it understands the reasoning behind such reduced guarantees, it cannot comprehend why the pensioner must bear the burden for a declining industry, or employer reluctance to fully pay for that which was promised the pensioner at the time of his retirement.

The failure of the PBGC to recommend the use of Federal moneys to completely guarantee benefits is a serious deficiency in the proposal. The proposed increases in premium payments would do little, if anything, to provide real guarantees of even reduced benefits in the event of the termination of a fund, the size of the 1950 fund.

In effect, the UMWA is being asked to help guarantee an insurance scheme, which might benefit some smaller multiemployer funds, but which offers no real insurance for its own members' benefits.

I might add, though, that the Mine Workers are more than willing to take their fair share of insurance for these smaller multiemployer funds, and do not find the increased premiums onerous in and of themselves, but feel they ought to be coupled with further guarantees from Federal funds.

With regard to plan reorganization rules, we have technical consideration insofar as the 1950 fund might very well, under the proposed definitions, be found to be in reorganization. While it is currently being funded on approximately a 12-year schedule, the requirement that it be funded, perhaps, even faster concerns us.

In general, we support the minimum funding standards as proposed in the revisions. The 1974 fund is already funded on approximately a 30-year basis, and the 1950 fund over a much shorter period. So long as there is flexibility, such as the shortfall method for taking care of some of the vicissitudes which the coal industry is wont to experience, the removal of the option to fund over a 40-year period is bearable.

Finally, as I mentioned earlier, the proposed withdrawal rules with a method for determining withdrawal liability would make it almost impossible to add new employers to the existing funds. The liabilities, real or perceived, which many of these employers find in joining funds, where they will have to assume, after a very short period of participation, a share of the total, historical, unfunded liability, has acted as a serious barrier to the addition, in the last 3 years, of new employers to those funds.

I will be happy to try to respond to any particular questions which you may have.

[Statement referred to appears in appendix.]

Mr. PEYSER. Thank you for your testimony. We do have a couple of questions, and one is of particular concern. You characterized this as broad testimony, and perhaps because of that we are misunderstanding some of the implications.

000580

421

It appears that you are proposing a system of 100 percent guarantees and the use of general revenues that would encourage and enable, really, active workers and employers to shift the entire burden of a fund to the Federal Government, and to the American people, without regard to whether or not the industry can afford to support the fund, simply because there are large numbers of retirees relative to active workers.

Would you clarify your testimony on this position as to what you mean by the Federal involvement here, and the takeover, really, by the Federal Government with general revenues?

Mr. PIERCE. Yes: I will attempt to do that.

Just as the proposed reorganization plans propose a number of steps for determining what the health of a given plan is, what the particular burden of liabilities that it bears with respect to the available assets for the plan is, before even loan guarantees under the proposals can go into effect, we feel that it is entirely possible and consistent with our testimony that to have ultimate Federal guarantees of benefits coupled with rather stringent regulations for determining what the actual solvency or degree of solvency of a fund is, it might be that short-term loans, for instance, from the Federal Government to plans, based on certain demonstrated deficiencies in contributions—perhaps due to contract strikes or to other problems within the short-term health of the industry—would be an appropriate remedy.

Just as the PBGC has felt that it is possible to describe in ascending sequence the degree of difficulty that the plan is in, we think that this would be possible to do, having at the end, reliance on Federal guarantees.

We are surely not proposing any sort of an open-ended scheme which would allow employers and unions, perhaps in consort, to dump liabilities onto the general populace.

Mr. PEYSER. If I may, at that point, if you started this kind of a process, wouldn't it carry through to all pension plans, really, that were covered, and not just multiemployer?

How would you end up justifying not using Federal general revenue funds for all plans that fell into this situation?

Then you might turn into a very different program than the one that was intended originally.

Mr. PIERCE. Well, I think, as we mention in our testimony, we are concerned about the necessity for some sort of universal, private coverage. It is unfortunate, perhaps, that the President's Pension Commission's life is overlapping this in such a manner that their report may very well come after some legislative decisions are made here.

Indeed, I think the Mine Workers would support the necessity of providing guarantees for all pensions. The fact that a portion of them may come under private pension plans rather than multiemployer pension plans, does not take away the necessity for those types of protections.

Mr. PEYSER. I see that our Chairman of the full Education and Labor Committee, Mr. Perkins, has arrived and he has for many years, of course, been a great benefactor in working for the men who work in these mines, and I know that he has a tremendous concern for them.

000581

422

Perhaps, you have a question at this time. Mr. Chairman. that you would like to ask.

Chairman PERKINS: Thank you, Mr. Chairman.

I have not had the opportunity to meet and discuss this subject matter with the economist for the UMW Welfare Fund. I have not had the privilege of working with the organization as I did during the years gone by, when we had so many problems, in the forties and the fifties, and even in the sixties.

As an economist for a multiemployer fund, are you supporting the extension of the mandatory coverage that is proposed in the legislation for a period of 10 months?

Mr. PIERCE. While we would prefer to have that legislation in effect at the moment, I think that so long as we feel there is reasonable expectation that some final agreement can be reached on the proposed revisions, that the 10-month period is one that the Mine Workers can live with.

Chairman PERKINS. If it were a period of 12 or 18 months, you would be reluctant about agreeing to an extension of that length of time, taking the Government out of the responsibility for these pensions that fall under the multiemployer plans. Am I correct?

Mr. PIERCE. That is correct.

Chairman PERKINS. Let me thank you, gentlemen, for your testimony. I know something about your problems. I grew up in a mining area, and I have always been interested in trying to work for the welfare of the coal miners. knowing something about their plight and background. It has always been my philosophy, and still will be in the future.

Let me compliment you for your appearance here this morning. Thank you very much.

Mr. PEYSER. Thank you, Mr. Chairman.

One quick question that I would like to direct to you, Mr. Pierce. dealing with an issue that comes up many times in large pension plans. such as your own, and that is the situation of notification of individual participants' benefit changes.

Do you find that in this notification process. in the continuing to maintain as required under the present regulations, a burdensome problem, or is it something that it is easily resolvable, or how do you view it?

Mr. PIERCE. I think the more appropriate party to speak to that would be a representative of the health and retirement fund. The trustees of those funds, of course, have the obligation for making that notification.

We, at the union, do realize that there are administrative difficulties associated with a plan like our own, which covers so many miners, ranging from operations with three to four men to those with several thousand. We feel that the effort for that notification, both of rights and benefit levels and general description of the plan, is an imperative one. Regardless of the administrative difficulties involved, the best efforts have to be made by those responsible under the existing statutes for doing so.

Mr. PEYSER. I pose this to you as an economist because the cost involved in this factor, as some have pointed out, is a very substantial

423

dollar figure. I was just wondering whether there were any recommendations of either changes of methods of informing of rights and benefits, or perhaps a different set of rules as to when people should be notified on benefits.

I think in the previous testimony that we had from the Teamsters, they make a special point of this, of the cost of this kind of notification as it presently exists. So I was just raising it because it has an economic impact on the total plan as well. However, I will defer that until another time, with appropriate questions.

Is there any other testimony at this time that you would wish to give?

Mr. PIERCE. No; I think that this is all. We will, of course, have further comments to add to the record, and any particular detailed technical materials which the union would add in addition to that which I am sure you will request from the trustees of the funds, we would be happy to add that also.

Mr. PEYSER. Thank you for your testimony. We appreciate that.

The next witness is Karen Ferguson.

Karen, would you mind coming here, and if you will defer for one moment, the chairman of the committee will return to take the Chair, and I will leave to go and vote. This is one of the problems of the morning when the House is in session, and we are conducting these hearings. So, if you will just suspend for a moment until the chairman comes, we will get underway.

[Recess.]

Mr. THOMPSON. The subcommittee will resume.

Ms. Ferguson, welcome. I am sorry about the confusion, but there are some unusual parliamentary things going on on the floor.

Your statement will be made a part of the record in full, and you are recognized.

## STATEMENT OF KAREN FERGUSON, ESQ., PENSION RIGHTS CENTER

Ms. FERGUSON. Thank you, Mr. Chairman.

I am Karen Ferguson, director of the Pension Rights Center. With your permission, I would like to summarize my prepared statement.

H.R. 3904 is an extraordinarily complex bill, yet for all its complexity, the basic scheme it proposes is very simple. The bill would permit companies and unions to promise pension plan participants ever-increasing benefits until such time as their plans get into trouble.

At that point, they would be permitted summarily to cut back on all promised benefits to the levels in effect 5 years earlier. If possible for them to do so, employers and unions would be required to negotiate contribution rates sufficient to pay for these reduced benefits. If they are not able to raise contribution rates, benefits would have to be cut back still further. If at that point contributions are not sufficient to pay even this minimal amount, the PBGC would make loans to the plan to supplement the contributions.

The PBGC proposal represents a very neat, practical scheme for everyone. Everyone, that is, except the retirees, whose interests and needs have been completely disregarded.

As the members of the subcommittee well know, pensioners need every cent they are receiving. Their standard of living has been sub-

000583

EXHIBIT B

## AFFIDAVIT

I, DONALD PIERCE, hereby state the following:

During the 1977-78 contract negotiations between the United Mine Workers of America ("UMWA") and the Bituminous Coal Operators Association ("BCOA"), I handled on behalf of the UMWA issues regarding the 1950 and 1974 UMWA Pension Plans and Trusts, including proposed amendments to these documents. Throughout bargaining, the issue as to the continued existence of the 1950 Plan, in particular, complicated the negotiations immensely. As well, it was not clear whether or not one of the present settlors of the Plans, the BCOA, would continue as then constituted.

Once the negotiators of the National Bituminous Coal Wage Agreement of 1978 ("1978 National Agreement") finally agreed to continue the UMWA multiemployer plans, there was an interest that the divisiveness regarding this issue not be soon repeated. There was the underlying awareness that some of the then members of the BCOA would possibly not remain so.

In response to this concern, Article V, Section (15) was proposed as new language to the UMWA 1950 Pension Plan (similar language was proposed for the 1974 Pension Plan). The language in the plan documents at that time provided:

> Any Employer who employed any participant eligible for coverage under, or who received or receives benefits under, the 1950 Pension Plan, or any Employer who was required to make, or has made or makes contributions to the 1950 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1950 Pension Plan and Trust, as amended from time to time, including, but not limited to, making contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time

000584

Similar language is now found at Article V, Section 21 of 1950 Pension Plan.

Much like the subsequently enacted ERISA Amendments of 1 the intent was to insure by contract that employers continue to fund their responsibilities past the term of the National Bituminous Coal Wage Agreement of 1978, [1] at least through the term of any successor agreement to the 1978 Agreement. [2]

It was our belief, therefore, that in negotiating the 1978 Agreement, we were making a contractual commitment, not just for the three (3) year term of the 1978 Agreement, but also thereafter with the contribution rates still to be set in our BCOA negotiations. Thus, for example, a 1978 BCOA member (and, thus, a signatory to the 1978 National Agreement), who might have subsequently negotiated a separate agreement with the UMWA in 1978, would already have committed itself, as a signatory to the 1978 National Agreement, to continue to contribute royalties under the 1981 National Agreement pursuant to its obligation under Article V, Section (15) of the 1950 Pension Plan (and related 1974 Plan provisions).

Subsequent to the negotiation and ratification of the 1978 National Agreement between the BCOA and the UMWA, it is my understanding that Jeff Porter, III, Vice President of Garland Coal & Mining Company, contacted UMWA officials and

---

[1] During the 1977-78 negotiations, there was frequent speculation that the traditional national agreement might not be continued either for the successor agreements to the 1974 National Agreement, or to the eventual 1978 National Agreement. Various persons, for instance, were suggesting regional agreements.

[2] This concern was directed primarily toward the 1950 Plan, since the greatest portion of the funding requirements would arise during the late 1970's through the mid-1980's, at which time the Plan should be well-funded. Similar language was added to the 1974 Plan, however, almost as a matter of course once Article V, Section (15) had been added to the 1950 Plan.

indicated his desire to sign a 1978 National Agreement, which he did sign.

_Donald E. Pierce J._
DONALD PIERCE

I, DONALD PIERCE, state under penalty of perjury that the foregoing is true and correct.  Executed this 2nd day of _August_, 1981.

_Donald E. Pierce J._
DONALD PIERCE

# EXHIBIT B

## DECLARATION OF B. M. SHANER

I, B. M. Shaner, declare as follows:

1.   I retired from Bethlehem Steel Corporation ("Bethlehem") in 1979 after working for Bethlehem for 30 years.

2.   During the 1977-78 contract negotiations between the United Mine Workers of America ("UMWA") and the Bituminous Coal Operators' Association ("BCOA"), I was the Manager of Employee Benefits Programs at Bethlehem, and a member of the BCOA benefits committee.  The benefits committee consisted of representatives from several BCOA member companies.  The benefits committee was primarily responsible for negotiating and drafting contractual provisions pertaining to employee benefits, including provisions pertaining to the UMWA Health and Retirement Funds ("the Funds").

3.   During the 1977-78 negotiations, I attended numerous meetings with BCOA and UMWA negotiators concerning the Funds. I generally took notes at those meetings.  To the best of my knowledge, my notes accurately reflect what was discussed at the meetings.

4.   Attachment 1 consists of my handwritten notes of a Benefits Committee meeting between BCOA and the UMWA on Friday, November 11, 1977.  At that meeting, we discussed the issue of employer withdrawals from the Funds.  My notes state in relevant part:

> "ERISA - no longer permits liability to only a pay as you go basis.  Companies now liable up to 30% of assets. Therefore, entirely a new ball game.
>
> Escape vehicle under ERISA for some small companies to withdraw without liability and then that liability must be assumed by remaining companies.  Would have an extremely adverse effect on continuing Pension Plans if large numbers

000587

of employers to withdraw.  BCOA will not sit by and let BCOA
be stuck with all liability.

<p style="text-align:center">* * *</p>

Haynes to continue his dissertation on withdrawal
possibilities of Western operators, ABC contractors,
and signatory operators who are not represented by BCOA
all of which could greatly adversely affect status of
Funds.  We will not sit idly by & let our liabilities
increase because of escape of liabilities by those
employers.

Pierce - Union has no intention with respect to all 3
groups of bargaining which will have any impact on
increasing BCOA liabilities."

5.     As reflected in my November 11, 1977 notes, BCOA was

very concerned about employers "escaping" or withdrawing from the

Funds, while leaving their benefits costs behind for payment by

BCOA member companies.  Our concerns were not limited to health

benefits.  BCOA was concerned that, under the federal pension

law, ERISA, companies could withdraw without liability from the

multiemployer funds, and their pension liabilities would then be

shifted to the remaining employers, including BCOA member

companies.  BCOA was concerned that the Union might encourage or

permit withdrawals by negotiating special deals with certain

employers that would permit those employers to pull out of the

Funds, at the expense of those remaining.  As my November 11,

1977 notes indicate, BCOA informed the Union that it would not

tolerate a situation in which BCOA's liabilities would increase

because of other employers being permitted to withdraw from the

Funds.  Mr. Pierce and the UMWA understood our concerns and

assured us that the Union would not allow this to happen.

<p style="text-align:center">-2-</p>

6.  In response to the concerns described above, BCOA
negotiated contractual provisions to protect its members.  The
primary provision negotiated to accomplish this purpose was the
so-called "evergreen" clause.  The evergreen clause was intended
to protect BCOA member companies against other employers pulling
out of the Funds and dumping their liabilities on the remaining
employers.  The evergreen clause was negotiated to ensure that
all employers signatory to the 1978 Agreement would have a
continuing obligation to contribute to the Funds (both the
pension and the health funds), and at the uniform rate
established in the NBCWA as negotiated by BCOA and the UMWA.  Any
employer that signed the 1978 NBCWA was being obligated to
contribute to the Funds at the NBCWA-established rate, and that
obligation was to continue so long as successor NBCWAs were
negotiated by BCOA and the UMWA and required such contributions.

7.  Attachment 2 consists of a May 23, 1978 memorandum from
me to Bethlehem's Vice President for Labor Relations, John
O'Connell.  In this memorandum, I explained to Mr. O'Connell a
change that was made in the evergreen clause in May 1978.  The
evergreen clause as initially drafted bound all employers who
were signatory to the 1978 NBCWA and who had employed miners
covered by the 1950 Pension and Benefit Funds. It was discovered
in May 1978, however, that the language would not have covered a
new signatory employer who did not have any pensioners covered by
the 1950 Funds.  This omission was discovered by K.L. Houck, the
employer-appointed trustee to the Funds.  In communicating this

-3-

000589

problem to Mr. O'Connell, I described BCOA's intent underlying the evergreen clause as follows:

> "It was the intent of BCOA during negotiations to ensure that appropriate language be provided in the various Plan and Trust documents to ensure that signatory employers contribute to all Trusts and that a signatory employer could not pull out and thereby terminate its liability."

Because the negotiating parties did not want to exclude new employers from the requirements of the evergreen clause, we tightened the contractual language in May 1978 so that such employers would be included.  The following underlined language was added to accomplish that purpose:

> Any employer who employed any Participant eligible for coverage under or who receives or received benefits under the 1950 Pension Plan or any Employer who was or is required to make or who has made or makes contribution to the 1950 Pension Plan, is obligated and required to comply with the terms and conditions of the 1950 Pension Plan, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto.

As stated in my May 23, 1978 memorandum, both BCOA and the UMWA reviewed this language, agreed to this amendment, and this language was included in the trust documents for each of the Funds.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

_____
Date

_____
B.M. Shaner

-4-

000590

Attachment 2

BCOA-UMWA Benefits Committee
meeting
Friday 11/11/77    10:15

Industry                    Union

(same)                      Willard Killian
                            Julius Mullins
                            Jim Blair
                            Lon Alexander
                            Don Pierce


Haynes - important to UMWA to maintain Funds. Concern
for small companies providing benefits. Pierce
indicated we may develop methods for controlling
medical costs + developing HMO's


Industry not interested in being in hospital, clinic or HMO business
+ that is not a proper function of Trustees administering level of
benefits negotiated by settlors. Sees no need of a third party
(Trustees) how is best way of delivering health benefits

    Continuing note from Haynes in an attempt to
educate UMWA Benefits Committee representatives of the
continuing deterioration of UMWA Coal production + productivity
adverse court decisions making large number of former employees
eligible for pension + huge liability which resulted - ERISA -
no longer permits liability on a pay as you go basis - companies
now builds up to 30% of assets. Therefore entirely a new ball game

    Except while under ERISA for some small companies to withdraw
without liability + then that liability must be assumed by
remaining companies. Would have an extremely adverse effect of
continuing liabilities if large number of employees to
withdraw, BCOA will not sit by + let BCOA
be stuck with all liability

000591

Union expects to curtail wild cat strikes with great increase in tonnage + therefore see growth of assets of all Funds

Industry sees no basis upon which to expect that to happen and count go on the assumption there will be no strike on 12/1 although we will work hard in an attempt to prevent that occurrence.

Fanning wants to "horse trade" - his "trade" is for us to give up on the defined benefit plan - he had nothing to offer in return

Haynes - 25¢/ton at a minimum to maintain current level of benefits from defaulting.

Haynes - announces of water problems falling out

No BCOA member can withdraw from contract during negotiations
Union - what is status of legality as of 12/1 if there is no contract?
Industry - do not have answer to that question. Although with a strike some companies may be forced out of business + hence would involuntarily withdraw

Long discussion on wildcat strikes
    Caucus by Union
Union returned stating they understood our position + suggest reconvening until morning
Haynes to continue his dissertation on widespread possibilities of lockouts, sectors, A.B. contractors and auxiliary sectors who are not represented by BCOA all of which could greatly adversely affect Funds status of Funds. We will not sit idly by - let no liabilities increase because of escape of liabilities by those employers.

000592

Preview - Union has no intention with respect to all 3 groups of bargaining which will have any impact on increasing BCoA liabilities.

000593

Attachment 2

May 23, 1978

Mr. O'Connell:

As you are aware, K. L. Houck, following his review of the various Pension Plan and Trust documents prepared by BCOA after conclusion of negotiations, found a serious problem with specific language which appeared in each such document and which, if left unchanged, would have resulted in loss of income to those Funds from any new Employer who becomes signatory to the Agreement. Furthermore, the proposed language went counter to a recent court decision which involved an Employer and the Trustees. The Employer in the case contended that as a new signatory Employer it did not have any liability to contribute to either the 1950 Benefit Plan or the 1950 Pension Trust because it did not and never could have any employees covered by that Benefit Plan or Pension Trust. The court ruled that the Employer was responsible to make all contributions required by Article XX of the Labor Agreement.

It was the intent of BCOA during negotiations to ensure that appropriate language be provided in the various Plan and Trust documents to ensure that signatory employers contribute to all Trusts and that a signatory employer could not pull out and thereby terminate its liability.

The following language was proposed to cover this intent by representatives of Steptoe & Johnson and is the language which K. L. Houck found to be deficient inasmuch as it did not cover the responsibility of a new signatory employer to make all contributions required by Article XX of the Labor Agreement.

"Any Employer who employed any participant eligible for coverage under the 1950 Pension Plan on whose behalf such Employer made or makes contributions for such participant, is obligated and required to comply with the terms and conditions of the 1950 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto."

Following a review by the parties, the following amended language will be included in the Plans and Trusts. That language has been agreed to by the Union, is acceptable to K. L. Houck, and covers the entire intent of BCOA.

"Any Employer who employed any participant eligible for coverage under or who received or receives benefits under the 1950 Pension Plan or any Employer who was or is required to make or who has made or makes contributions to the 1950 Pension Plan or Trust, is obligated

000594

- 2 -

and required to comply with the terms and conditions
of the 1950 Pension Plan and Trust, as amended from
time to time, including, but not limited to, making
the contributions required under the National
Bituminous Coal Wage Agreement of 1978, as amended
from time to time, and any successor agreements
thereto."


B. M. SHANER

B. M. Shaner

# EXHIBIT C

## DECLARATION OF DAVID W. KEMPKEN

I, David W. Kempken, declare as follows:

1.    I am the Director of Employee Benefits, Wage and Salary Administration, for Chrysler Motors Corporation.

2.    From 1975 to 1985, I worked on employee benefit matters for Bethlehem Steel Corporation ("Bethlehem"), which was a member of the Bituminous Coal Operators' Association ("BCOA").

3.    From late 1975 to mid-1984, I was a member of the BCOA benefits committee.  The benefits committee consisted of representatives from several BCOA member companies.  The benefits committee met on a regular basis and, among other things, reviewed and monitored the activities of the United Mine Workers of America Health and Retirement Funds ("the Funds").

4.    In the 1977-78 and 1981 negotiations between BCOA and the United Mine Workers of America ("UMWA"), I was a member of the BCOA-UMWA benefits subcommittee.  The benefits subcommittee, which consisted of representatives from both BCOA and the UMWA, negotiated and drafted contractual provisions pertaining to employee benefits, including provisions pertaining to the UMWA Funds.  Subject to the approval of the parties' main table negotiators, these provisions generally became part of the National Bituminous Coal Wage Agreement ("NBCWA"), or the trust documents that are incorporated by reference into the NBCWA.

5.    During the 1977-78 negotiations, I participated in numerous discussions with UMWA and BCOA negotiators regarding

000596

the future financing of the Funds.  Both BCOA and the UMWA
recognized that the Funds were facing liabilities in the
billions of dollars and that an enormous group effort was
needed over the long haul to ensure the Funds' continued
existence.  During the negotiations, BCOA and the UMWA agreed
to a contractual provision known as the "evergreen" clause.
The evergreen clause requires that each employer that agreed
to participate in the Funds in 1978 or thereafter shall
contribute to the Funds at the NBCWA-established rate, and
that the obligation to contribute shall continue so long as
successor NBCWAs are negotiated by BCOA and the UMWA and
require such contributions.  The evergreen clause, as
negotiated in 1978, stated:

> Any Employer who employed any Participant
> eligible for coverage under, or who receives or
> received benefits under, the [Trust], or any
> Employer who was or is required to make, or who
> has made or makes contributions to the [Trust],
> is obligated and required to comply with the
> terms and conditions of the [Trust], as amended
> from time to time, including, but not limited
> to, making the contributions required under the
> National Bituminous Coal Wage Agreement of
> 1978, as amended from time to time, and any
> successor agreements thereto.

6.    The evergreen clause did not require any employer to
participate in the Funds in 1978, and was not intended to
require any employer to participate.  Rather, our intent was
to make sure that if an employer voluntarily agreed with the
UMWA to participate in the Funds and to provide benefits
through the Funds to its employees and retirees, then that
employer would pay its fair share of the Funds' expenses, and

-2-

000597

not dump its liabilities onto the remaining employers. BCOA
wanted to ensure that employers would not participate in the
Funds for a few years, and then attempt to shift their benefit
costs to the remaining employers by withdrawing from the Funds
and not making any continuing contributions. BCOA also wanted
to make sure that employers could not transfer their benefit
costs to BCOA companies and other signatories by negotiating
with the UMWA cut-rate contributions that, in effect, require
those employers paying the full rate to subsidize the benefit
costs of those paying lower nonconforming rates. In addition,
because a substantial number of beneficiaries in the Funds
formerly worked for companies that were no longer in business,
their benefits costs were considered an industry-wide
responsibility and BCOA wanted to ensure that its members did
not pay a disproportionate share of this liability.

7.    To accomplish these objectives, I assisted in
drafting the evergreen clause. Most of the drafting took
place in January and February of 1978, although some minor
changes were made later. The evergreen clause was discussed
with UMWA negotiators on several occasions, including the
UMWA's chief benefits spokesman, Don Pierce. The UMWA was
well aware of the clause's purpose and effect. The evergreen
clause was discussed with the UMWA in terms of ensuring that
the Funds would not become a "last man's club" where one
company's benefits costs could be shifted to another, or where
industry-wide benefits costs could be transferred to a few

-3-

000598

remaining employers.  UMWA representatives clearly stated and agreed that each employer participating in the Funds was being required to bear a fair share of the Funds' liabilities, and that no employer or group of employers would be permitted to negotiate special deals that would permit them to dump their retiree benefits costs into the Funds, for payment by the remaining employers.

8.   There are several documents written during the 1977 and 1978 negotiations that reflect some of the discussions that we had leading up to the evergreen clause.  These documents consist of my handwritten notes of negotiating sessions, or typed reports based on my notes.  These documents accurately record discussions that we had with the UMWA at the time.  For example:

a.   Attachment 1 consists of my copy of the report of the BCOA Benefits Committee that concerns a meeting with the UMWA Benefits Committee on November 11, 1977.  Page two of this report states:

> Industry spokesmen continued by reviewing the potential serious problems connected with the possible withdrawal from the Funds of the Western operators, the ABC contractors and non-BCOA companies which are signatory to the wage agreement. It was clearly pointed out that Industry will not sit idly by and watch this happen.

In this early negotiating session, BCOA was informing the UMWA that it would not tolerate a situation in which employers could negotiate withdrawals from the Funds, leaving BCOA member companies behind to pay for all of the Funds'

-4-

■000599

liabilities. As I stated earlier, BCOA had a legitimate concern about employer withdrawals from the multiemployer Fund because such withdrawals could result in companies shifting their benefits costs to BCOA members, or transferring industrywide benefits costs to a few remaining employers.

b. Attachment 2 consists of the report of the BCOA Benefits Committee meeting with the UMWA Benefits Committee on November 17, 1977. Page four of this report states:

> Roger Haynes then reviewed for Huge Industry's continued concern for the Union negotiating Western employers out of the Trusts and the Industry's fears that such action can expand to ABC contractors and others. He went on to explain that concern in the form of increasing liabilities for remaining employers and the fact that the Western surface and ABC Companies were not now paying their fair share of the past service liabilities under the 1974 Pension Plan and the reason that situation exists as a fact because of the Union's failure to extract proper contribution rates from them.

In this negotiating session, BCOA again was reminding the Union that it would not participate in the Funds if the Union could negotiate special deals with certain employers, especially if that would increase the liability of the remaining employers, such as BCOA member companies. The reference to the "Union negotiating Western employers out of the Trusts," referred to an agreement in late 1977 between the UMWA and approximately nine Western coal operators under which the Western operators took their employees and pensioners out of the Funds and established single-employer pension and health plans to cover them. The problem with this arrangement, from BCOA's perspective, was that it left the

-5-

000600

remaining employers solely responsible for the substantial number of beneficiaries in the Funds who formerly worked for companies that were no longer in business and were therefore not making any contributions to the Funds. As I noted above, these costs were considered an industrywide responsibility, and BCOA wanted to ensure that its members did not pay a disproportionate share of this liability.

9.    In response to these concerns, the UMWA repeatedly assured us that it agreed that all employers would be treated equally concerning their contribution obligations to the Funds, and none would be permitted to dump their benefits costs on the others. In agreeing to the evergreen clause, the UMWA recognized the importance of requiring employers' contribution obligations to continue beyond the term of their particular collective bargaining agreements with the UMWA, and the importance of requiring uniform contribution rates. The UMWA clearly stated and agreed that the Funds would not become a last man's club where ever-increasing costs were being transferred to an ever-decreasing number of employers. The evergreen clause was negotiated to prevent this situation from occurring, and to protect BCOA members from getting caught "holding the bag" after other employers deserted the Funds.

10.    After the 1978 negotiations concluded, with the inclusion of the evergreen clause, I worked with the BCOA benefits committee in supporting the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). In so doing, we worked

-6-

000601

closely with the UMWA and Don Pierce in particular.  During this process, the UMWA once again made absolutely clear that it agreed that the evergreen clause was a central part of the funding provisions negotiated in the 1978 NBCWA, and that it was intended to require continuing contributions to the Funds by participating employers, and to prevent the Funds' benefits costs from being dumped onto those employers that remained in the Funds.

11.  During the 1981 negotiations between BCOA and the UMWA, I was once again a member of the Benefits Subcommittee that negotiated and drafted contractual provisions pertaining to the Funds.  During these negotiations, the UMWA proposed adding a sentence to the evergreen clause indicating that the clause was not limited by the passage of the Multiemployer Pension Plan Amendments Act of 1980.  In so doing, the UMWA reiterated its agreement that the evergreen clause requires employers to continue contributing to the Funds beyond the term of any individual employer's agreement with the UMWA. Attachment 3 consists of my typed bargaining notes from a March 3, 1981 subcommittee meeting with the UMWA.  In that meeting, the UMWA's chief benefits negotiator, Donald Pierce, stated:

> This language [evergreen clause] requires anyone who ever contributed to contribute into the future. Want to keep reference to 1978.  Asking you to consider something like this: "The language in this paragraph shall not be limited by the Multiemployer Pension Plan Amendments Act of 1980."  Think we have something stronger than the Act.  Relaying what our attorneys are relaying to us.

-7-

000602

12.   As a result of the 1981 negotiations, the evergreen clause was reaffirmed by the parties and once again included in the trust documents for each of the Funds.  Consistent with Mr. Pierce's comments in paragraph 11 above, the parties agreed in 1981 that the duty to contribute to the Funds would continue with respect to all employers signatory to the 1978 NBCWA, and any successor agreements thereto, including but not limited to the NBCWA of 1981.

13.   The term "successor agreements" in the evergreen clause was intended to refer to successor NBCWAs negotiated by BCOA and the UMWA, and not to other agreements negotiated by individual coal companies and the UMWA.  By requiring employers to continue to contribute according to the terms of successor NBCWAs, however, we did not create, and did not intend to create, an obligation to contribute to the Funds forever.  The obligation to contribute continues only so long as successor NBCWAs are negotiated by BCOA and the UMWA, and require contributions to the Funds.  If a successor NBCWA is not negotiated by BCOA and the UMWA, or if a successor NBCWA does not require contributions to the Funds, then the evergreen clause does not require any continuing contributions.

-8-

000603

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date  3/5/91

David W. Kempken

-9-

000604

# EXHIBIT D

## DECLARATION OF K.L. YOUNG

I, K.L. Young, make the following declaration on the basis of personal knowledge:

1.   I retired from Peabody Coal Company ("Peabody") in 1983 after working for Peabody for 36 years.

2.   During the 1977-78 contract negotiations between the United Mine Workers of America ("UMWA") and the Bituminous Coal Operators Association ("BCOA"), I was one of the principal negotiators for BCOA at the Benefits Subcommittee level on issues pertaining to the United Mine Workers of America 1950 Benefit Plan and Trust ("1950 Benefit Plan"), United Mine Workers of America 1950 Pension Plan ("1950 Pension Plan"), the United Mine Workers of America 1974 Benefit Plan and Trust ("1974 Benefit Plan"), and the United Mine Workers of America 1974 Pension Plan ("1974 Pension Plan") (collectively referred to as the "UMWA Health and Retirement Funds" or "the Funds"). I joined the Benefits Subcommittee shortly after Thanksgiving 1977.

3.   During the negotiations for the 1978 National Bituminous Coal Wage Agreement ("NBCWA"), one of the central issues facing the parties was the financial condition of the UMWA Funds. During the summer of 1977, the Funds ran out of money and had to borrow money and lower benefit levels. On December 6, 1977, the 1974 NBCWA expired. On that date,

000619

health and pension benefits were terminated completely for all
active and retired coal miners, and their spouses and
dependents.  These benefits remained cut off for more than
three months during a 111-day strike by the UMWA.

4.    During the 1977-78 negotiations, BCOA and the UMWA
proposed various provisions that were intended to provide
financial stability to the Funds.  Initially, BCOA proposed
eliminating the multiemployer Funds entirely and replacing
them with single-employer plans that would have provided the
same level of benefits that the Funds had provided.
Alternatively, if the Funds were going to continue to exist,
BCOA wanted to make sure that they had a broad funding base,
and that all employers participating in the Funds would pay
their fair share of the Funds' liabilities.

5.    During the 1977-78 negotiations, BCOA had several
concerns about continuing the multiemployer Funds arrangement.
First, BCOA was concerned that some participating employers
would attempt to withdraw from the Funds in the future, with
or without the agreement of the UMWA, and leave their benefits
costs behind for payment by the employers remaining in the
Funds.  Second, because the UMWA insisted on a uniform level
of benefits for all of the Funds' beneficiaries, BCOA wanted
to ensure that all participating employers contributed to the
Funds at a uniform rate.  In other words, BCOA was concerned
that some employers might attempt to negotiate cut-rate or

-2-

000620

"nonconforming" contracts with the UMWA that would permit those employers to contribute to the Funds at reduced rates, or not at all.  Nonconforming contracts were a serious concern to BCOA because they could result in other employers, such as BCOA member companies, being required to subsidize the benefits costs of those paying the lower, nonconforming rates. Third, many of the Funds' beneficiaries formerly worked for employers that were no longer in business and no longer making contributions to the Funds.  The benefits costs of these individuals were considered an industrywide responsibility, and BCOA wanted to ensure that its members did not have to pay a disproportionate share of those expenses.

6.   To address these concerns, and to provide financial stability to the Funds, BCOA and the UMWA agreed in 1978 to a contractual provision known as the "evergreen" or continuing contributions clause.  The intent of the evergreen clause was to ensure by contract (1) that each employer that voluntarily agreed to participate in the Funds in 1978 would contribute to the Funds at the uniform rate established under the NBCWA, and (2) that each employer that signed the 1978 NBCWA would continue to contribute to the Funds in the future, and at the rate established under the NBCWA, so long as successor NBCWAs were negotiated by the UMWA and BCOA and required such contributions.

-3-

7.    The evergreen clause was agreed upon by BCOA and the UMWA in the 1978 negotiations and placed in the trust documents for each of the four Funds.  The Trust documents were incorporated by reference into the NBCWA.  The evergreen clause stated:

> Any employer who employed any participant
> eligible for coverage under, or who
> received or receives benefits under, the
> [Trust], or any Employer who was or is
> required to make, or who has made or makes
> contributions to the [Trust], is obligated
> and required to comply with the terms and
> conditions of the [Trust], as amended from
> time to time, including, but not limited
> to, making the contributions required
> under the National Bituminous Coal Wage
> Agreement of 1978, as amended from time to
> time, and any successor agreements
> thereto.

8.    The intent and effect of the evergreen clause were discussed with UMWA negotiators on many occasions during the 1977-78 negotiations.  It was discussed in terms of ensuring that the Funds would not become a "last man's club" with respect to employer contribution obligations.  By the term "last man's club," we were referring to a situation where fewer and fewer employers were left paying for the benefits costs of employers that had withdrawn from the Funds or employers that were not contributing their fair share.  We were not forcing any employer to participate in the Funds, but wanted to ensure that if an employer chose to participate in 1978 or thereafter, that employer would have to participate on the same terms as all other participating employers.  An

-4-

000622

expression that we used in the negotiations to convey this point was, "If you want to play ball in our park [*i.e.*, the Funds], you have to play by our rules [*i.e.*, the contributions required by the NBCWA and trust documents]."

9.    There are several contemporaneous negotiating history documents that reflect the fundamental point that all employers agreeing to participate in the Funds were being required to contribute at the uniform rate established under the NBCWA.  These documents were written during or shortly after the 1978 negotiations, and accurately reflect discussions that we had concerning the evergreen clause:

a.    Attachment 1 consists of my handwritten notes dated December 28, 1977.  These notes state BCOA's position that "limitations" should be placed on participation in the Funds, namely, "any employer has to make contributions pursuant to Art. XX [of the NBCWA] w[ith] benefits according to [the] Plan."

b.    Attachment 2 consists of my handwritten notes dated January 14, 1978.  These notes reflect our intent to "[l]imit participation in all plans to companies paying full contribution[s] . . . ."

c.    Attachment 3 consists of BCOA's "Structural Objectives" with respect to the Funds as of January 15, 1978.  This document reflects in large part the position of BCOA that is stated in my handwritten notes dated January 14, 1978 (see

-5-

000623

attachment 2).  Concerning contributions to the Funds, this document shows one of BCOA's key objectives was to "[l]imit participation to all plans with equal royalty payment and equal benefit levels which are negotiated by BCOA."

      d.  Attachment 4 consists of a handwritten memorandum from BCOA representative Kevin Counihan to me dated November 29, 1978.  Mr. Counihan was a BCOA staff member who assisted BCOA negotiators during the 1977-78 negotiations, particularly at the Benefits Subcommittee level.  Mr. Counihan attended many subcommittee meetings during the negotiations. On page four of this memorandum, he states, "I am not aware of any UMWA contracts in existence which do not call for employer contributions to the 1950 and 1974 Plans, as specified in the National Bituminous Coal Wage Agreement of 1978.  Any such contract violates "lock-in" language in each 1950 and 1974 document: [quotes language of the evergreen clause]."

      10.  The evergreen clause does not require, and was not intended to require, perpetual contributions to the Funds. The clause was intended to require continued contributions to the Funds by all employers that signed the NBCWA of 1978, but only so long as successor NBCWAs were negotiated by the UMWA and BCOA and required such contributions.  The current "successor agreement" to the NBCWA of 1978 is the NBCWA of 1988.  It expires on February 1, 1993.  If no successor NBCWA to the NBCWA of 1988 is negotiated by the UMWA and BCOA, or if

-6-

000624

such an agreement is negotiated but does not require continued contributions to the Funds, then the evergreen clause would not require continued contributions to the Funds.

11.  The evergreen clause requires any employer that signed the NBCWA of 1978 to make the contributions required under the NBCWA of 1978, "as amended from time to time, and any successor agreements thereto."  The term "successor agreements" was intended to refer to successor NBCWAs negotiated by the UMWA and BCOA, not to individual agreements negotiated between the UMWA and individual coal companies.  In other words, to ensure that the Funds' uniform benefits would be provided by uniform contribution rates, the negotiating parties agreed that the "successor agreements" on which contributions were to be based would be successor national agreements negotiated by BCOA and the UMWA, and not individual company agreements.

I declare under penalty of perjury that the foregoing is true, complete, and accurate to the best of my knowledge.

March 5, 1991
_____
Date

K. L. Young
_____
K. L. Young

-7-

000625

# EXHIBIT E

## DECLARATION OF ROGER M. HAYNES

I, Roger M. Haynes, declare as follows:

1.    From January 1, 1967, to May 1987, I was employed by Consolidation Coal Company ("Consolidation"). I began there as the Manager of Personnel. Over the years, my responsibilities expanded and my title was changed several times. When I retired in 1987, I was the Vice President and General Manager of Human Resources.

2.    For most of the time that I was working for Consolidation, the company was a member of the Bituminous Coal Operators' Association ("BCOA"). BCOA is a multiemployer bargaining association that consists of certain coal operators that engage in collective bargaining with the United Mine Workers of America ("UMWA"). BCOA and the UMWA periodically negotiate the National Bituminous Coal Wage Agreement ("NBCWA"), a collective bargaining agreement that binds BCOA member companies and other employers that sign identical or "wrap-around" agreements with the UMWA.

3.    In July 1969, BCOA established a standing committee on employee benefits. I was a member of that committee from its inception, and was chosen to serve as the committee's first chairman in December 1971 or January 1972. Except for the period from approximately mid-1979 through mid-1981 (beginning when Consolidation withdrew from membership in BCOA), I was a member of the benefits committee and served as its chairman until my retirement.

000639

4.   Beginning with the 1971 negotiations, there was a benefits subcommittee in the national negotiations between BCOA and the UMWA.  The benefits subcommittee consisted of representatives from BCOA and from the UMWA, and served as the primary forum for negotiating employee benefits matters. I was BCOA's chairman on the benefits subcommittee for each round of national negotiations beginning in 1971 and extending until my retirement, namely, the negotiations leading to the NBCWAs of 1971, 1974, 1978, 1981, and 1984. The benefits subcommittee, along with several other specialized subcommittees (the particular subcommittees changed from year to year), reported to the parties' respective representatives at the main negotiating table, except in 1974 when the benefits subcommittee reported directly to the executive committee.  The main table negotiators had final authority to reach agreement on any issue discussed in the negotiations.  I was generally present when the main table negotiators discussed issues involving employee benefits.

5.   Since 1946, health and retirement benefits have been provided to employees in the coal industry through a multiemployer arrangement.  From 1950 to 1974, all benefits were provided by a single multiemployer fund, the UMWA Welfare and Retirement Fund.  In 1974, the negotiating

- 2 -

000640

parties (BCOA and the UMWA) divided the single fund into four separate funds.  The UMWA 1950 Pension Plan and 1950 Pension Trust ("1950 Pension Plan") and the UMWA 1950 Benefit Plan and Trust ("1950 Benefit Plan") were created to provide pension, health and death benefits to miners who retired prior to December 31, 1975, and their dependents and survivors.  The UMWA 1974 Pension Plan and 1974 Pension Trust ("1974 Pension Plan") were created to provide pension benefits to miners who retired after December 31, 1975, and their dependents and survivors.  The UMWA 1974 Benefit Plan and Trust ("1974 Benefit Plan") was created to provide health and death benefits to active miners, and miners who retired after December 31, 1975.  (In 1978, the 1974 Benefit Plan was amended to provide health and death benefits to retirees after December 31, 1975 whose last employer was "no longer in business."  Active miners, and retirees after December 31, 1975 whose last employer was still "in business," were covered by individual company plans, and not by the 1974 Benefit Plan.)  These four funds are collectively referred to as the "UMWA Health and Retirement Funds" or "the Funds."

6.    There is a high degree of employee mobility within the coal industry.  It is not uncommon for a miner to work for many different employers during the course of his career. There is also a high degree of employer turnover in the

- 3 -

8000641

industry. Employers are created and disappear as coal
deposits are found and are mined out. For these reasons and
others, it is difficult to identify the primary companies
that employed many of the miners who are beneficiaries in the
1950 Funds. Many of the companies that have beneficiaries in
the 1950 Funds are no longer making contributions to pay for
those benefits. In addition, all of the pensioners in the
1974 Benefit Plan, by definition, formerly worked for
companies that are "no longer in business" and not making any
contributions to the 1974 Benefit Plan. The Funds, however,
are obligated to provide benefits to every eligible
beneficiary, even if the company for which he worked is no
longer in business and not making any contributions.

7.    The fundamental concept of the UMWA Funds, unlike
many other multiemployer funds, is that all eligible
employees receive uniform benefits, and that all
participating employers are required to pay a uniform
contribution rate. Different employers have not been
permitted by the UMWA to choose different levels of benefits
for their employees or retirees by paying a different rate of
contributions.

8.    Prior to 1974, neither benefit levels nor
eligibility standards were set forth in the NBCWA. Only the
contribution rate was set in the collective bargaining

- 4 -

000642

agreement. Prior to 1974, the trustees of the Funds had the authority to set whatever benefit level could be provided with the negotiated contribution rate. The UMWA always bargained for uniform contribution rates (with one exception) and the trustees always set uniform benefits. The one exception to the uniform rate of contributions was a special rate that applied to sub-bituminous (lignite) coal. Because sub-bituminous coal could be produced with far fewer man-hours than other types of coal, a special rate was bargained for sub-bituminous coal. This special rate was eliminated in 1978.

9.    Throughout the history of the Funds, employers that were not members of BCOA have been allowed to contribute to the Funds and thus provide retirement and health benefits for their employees. This generally was accomplished by means of "wrap-around" or "me too" contracts, in which the UMWA sought and obtained agreements from other employers on the same terms that had been reached in the BCOA-UMWA agreement. In effect, the UMWA and the non-BCOA employers would simply put their own cover around the NBCWA and sign onto its terms. As of 1978 there were about 3000 employers contributing to the Funds under these wrap-around contracts. Prior to 1983 there

- 5 -

8000643

never was, to my knowledge, any wrap-around contract that
provided an employer contribution rate that was different
from the rate set in the NBCWA.

10.    In 1974, BCOA and the UMWA agreed to a fundamental
change in the way the Funds operated.  In addition to
dividing the single fund into four separate funds, the
parties agreed to establish benefit levels in the contract.
In 1974, the negotiating parties bargained not only the
employer contribution rates to the Funds but also the precise
pension benefits that the 1950 and 1974 Funds would provide.
In 1978, the parties bargained the precise health benefits
that the 1950 and 1974 Benefit Plans, and individual company
plans, would provide.  Since 1978, both the contribution
rates and the benefit levels have been set in the NBCWA and
both the bargained contribution rates and the bargained
benefit levels in the NBCWA have been uniform for all
signatory employers and for all beneficiaries.

11.    In general, the method that BCOA and the UMWA
followed to set the contribution rates was as follows.  The
negotiating parties agreed on the benefits that would be
provided from each of the Funds.  Actuaries calculated the
expected cost of providing those benefits month-by-month
during the anticipated term of the contract.  Economists
projected the levels of coal production (or hours worked)

- 6 -

000644

during those same periods and the percentage of total
production (or hours worked) that would be from employers
that were parties either to the NBCWA or to wrap-around
contracts.  We then divided the expected cost of providing
benefits for each of the Funds by the total tonnage (or
hours) to arrive at a single uniform rate of contributions
for each Fund for the term of the contract.

12.  As negotiators, we not only assumed that all
contributing employers -- whether BCOA members or parties to
wrap-around agreements -- would contribute at the uniform
rates set forth in the NBCWA, but I as the chief benefits
spokesman for BCOA discussed that fundamental assumption on
many, many occasions with representatives of the UMWA in the
benefits subcommittee.  Two of my favorite axioms during the
1977-78 negotiations were (1) we do not care whether an
employer decides to participate in the Funds or not, but we
care strongly that "if you play our game, you will play by
our rules," and (2) as a representative of BCOA or of
Consolidation, I will pledge "to pay my own bills, but I will
not pay a penny of somebody else's."  By these expressions, I
meant that BCOA member companies would agree to pay their
fair share of the Funds' liabilities, but would not agree to
pay for or subsidize the benefits costs of other employers.
Because the benefit structure in the Funds is uniform, and

- 7 -

8000645

because the contribution rate is based on the assumption that
each employer will pay a proportionate share (based on
production or hours worked) of the Funds' costs, if any
employer is allowed to contribute to the Funds at a lower
rate, or not at all, the other employers contributing to the
Funds will end up carrying that employer's share of the load.
Obviously, the employers to whom expensive benefits costs are
shifted will not continue to participate in the Funds in the
future under such conditions.  And this unwillingness to
participate will ultimately lead to the Funds' demise and the
beneficiaries will be the losers.

    13.  In 1974, when the single fund was divided into four
separate funds, BCOA and the UMWA agreed to allow
reallocation of contributions between the two 1950 Funds in
the event that contributions to one fund or the other fell
short of what was needed.  We realized that the process of
setting contribution rates based on projections of the cost
of benefits and production levels in the industry was not an
exact science.  If our projections fell short, we wanted to
avoid having to reopen the NBCWA in mid-term to negotiate a
solution.  For that reason, we included a provision in the
1974 NBCWA permitting the reallocation of contributions from
one of the 1950 Funds to the other, as long as the total
contribution from each employer was not affected.

- 8 -

000646

14.   During the term of the 1974 contract, serious
problems developed in the coal industry.  There were rampant
wildcat strikes throughout the coalfields and the UMWA seemed
to have lost control over its members.  The wildcat strikes
deprived the Funds of contributions.  If an employer could
not mine coal, it did not make contributions to the Funds.
The Funds, however, had to keep paying benefits to eligible
beneficiaries.  In approximately 1976, the 1950 Benefit Plan
ran out of money.  BCOA exercised its power to reallocate
contributions from the 1950 Pension Plan to the 1950 Benefit
Plan on more than one occasion in 1976 and 1977, but after
each reallocation the 1950 Benefit Plan ran out of money
again.  During the spring and summer of 1977, the trustees
borrowed money and lowered benefit levels.  Reduced benefits
produced even more wildcat strikes.  By December 6, 1977, the
1950 Funds were effectively broke and health benefits were
terminated completely for all active and retired miners.  On
December 7, 1977, a nationwide strike began in the coal
industry.  The strike lasted for more than three months, and
was not concluded until March 27, 1978, the effective date of
the NBCWA of 1978.  Health benefits resumed on or about
March 27, after a lapse of 111 days.

15.   These events heightened BCOA's concern about the
Funds.  The two pension funds had a total of about $6 billion

- 9 -

000647

in unfunded liabilities, and it was recognized that the two 1950 Funds in particular would be entering the term of a new contract deeply in debt.  BCOA was concerned that many contributing employers, including not only those under wrap-around contracts but even some BCOA members, might try to shift their share of this liability to the remaining employers by negotiating cut-rate contributions or by ceasing all contributions entirely and leaving their retirees behind, for payment by the Funds.  In either situation, the remaining employers would be left paying the other employers' share of the load, which we certainly did not want to do.  Although the UMWA in the past had professed agreement with the fundamental proposition that uniform benefits would be funded by uniform rates of contributions, BCOA realized that there was nothing in the trust documents that would expressly prohibit the UMWA from negotiating special deals with some employers, at the expense of others.

16.  Early in the 1978 negotiations, I expressed these concerns to the UMWA representatives in the benefits negotiating subcommittee.  Donald Pierce was the chief spokesman for the UMWA.  I stated that BCOA needed an express provision in the trust agreements that would keep individual employers from pulling out and leaving the remaining employers holding the bag, and that BCOA also needed an

- 10 -

000648

express provision that any employer participating in the Funds must make contributions at the uniform rate set in the NBCWA.  Pierce assured me that BCOA had nothing to worry about because the UMWA would not negotiate any deals that would have the effect of permitting one group of employers to dump liabilities on the remaining employers.  I responded that I understood that to be the current position of the UMWA but that I needed to have such a provision in the trust documents.  The UMWA agreed to include such a provision, without any real objection, because the UMWA was then in total agreement with the objective of equal treatment of all employers with respect to contributions to the Funds.

17.  We then proceeded to draft and reach agreement on a clause for the trust documents that would accomplish our agreed objective.  As a result, the following provision (with minor variations to identify each trust) was ultimately agreed upon and placed in the trust documents for each of the four UMWA Funds:

> Any Employer who employed any participant eligible for coverage under, or who received or receives benefits under, the 1950 Benefit Plan and Trust, or any Employer who was or is required to make, or who has made or makes contributions to the 1950 Benefit Plan and Trust, is obligated and required to comply with the terms and conditions of the 1950 Benefit Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended

- 11 -

000649

from time to time, and any successor agreements
thereto.

18.   This provision, sometimes referred to as the
"evergreen" clause, was designed to require each employer
that signed the NBCWA of 1978 to continue making
contributions to the UMWA Funds, and at the rate set forth in
the NBCWA, as long as the NBCWA of 1978 and "successor
agreements thereto" required such contributions.   The term
"successor agreements thereto" was intended to be successor
<u>national</u> agreements, and not agreements between the UMWA and
an individual company.   This concept of successor national
agreements was discussed with the UMWA on numerous occasions,
and the UMWA agreed to it without objection.

19.   The evergreen clause was not a "technical"
provision to assist the Funds in collecting delinquent
contributions, and was not discussed in those terms.   It was
an important provision negotiated to make sure that any coal
operator that voluntarily agreed to participate in the Funds
in 1978 could not simply walk away from the Funds and leave
its retirees behind, or negotiate cut-rate contributions with
the UMWA, at the expense of the remaining employers.   Stated
another way, this provision was negotiated to make sure that
each employer that voluntarily agreed to participate in the
Funds in 1978 would continue to pay its fair share of the
Funds' liabilities, and to prevent the Funds from becoming a

- 12 -

0006

"last man's club" where ever-increasing costs would be paid by an ever-decreasing number of employers. It was agreed to in the context of all participating employers saying to the UMWA and to each other that they were all in this together, and it was all for one and one for all. As I recall, the evergreen clause was drafted by BCOA in January 1978 and agreed to in concept by BCOA and the UMWA during January or February 1978. It was subsequently included in the trust documents that were incorporated into the NBCWA of 1978, and was carried forward in the trust documents that were incorporated into the NBCWAs of 1981 and 1984. The evergreen clause was drafted for inclusion in the trust documents so that it would bind all employers that agreed to participate in the Funds, even if those employers were not BCOA member companies. The trust documents were drafted by the Funds' settlors, BCOA and the UMWA, and can be changed only by the settlors, and not by the UMWA and an individual coal company.

20. In addition, in the 1978 negotiations we revised the definition of "Wage Agreement" to clarify the status of UMWA contracts providing for participation in the Funds. The trust documents governing each of the Funds contain a definition of "Wage Agreement" that had previously referred primarily to the national Wage Agreement for the term of each contract. We added a subparagraph (c) to this definition, so

- 13 -

000651

that in each of the trust documents, "Wage Agreement" was

defined as follows (with variations only as far as necessary

to identify each trust):

> "Wage Agreement" means the National Bituminous
> Coal Wage Agreement of 1974, as amended from time
> to time and any successor thereto, including, but
> not limited to, the National Bituminous Coal Wage
> Agreement of 1978.  Any reference in this Trust to
> the Wage Agreement or to the bituminous coal wage
> agreement then in effect shall also refer (a) to
> the Sub-bituminous and Lignite Agreement and the
> National Coal Mine Construction Agreement with
> respect to any period for which such agreements
> provide that pension benefit payments shall be made
> available pursuant to this Trust or a predecessor
> Trust established under the bituminous coal wage
> agreement, and (b) with respect to any period prior
> to the 1950 Bituminous Coal Wage Agreement, to any
> collective bargaining contract between the United
> Mine Workers of America and any employer in the
> bituminous coal industry, and (c) solely for the
> purposes of determining who is required to make
> contributions to, and receive benefits under, the
> 1950 Pension Trust, any other collective bargaining
> contract entered into between the United Mine
> Workers of America and any employer in the
> bituminous coal industry, which contract provides
> that contributions shall be made to or benefit
> payments made from this Plan.

21.  These provisions were placed in the trust documents

so that we could be sure that the trust documents would apply

to any non-BCOA employer that wanted to participate in the

Funds, even if that employer was not signatory to the NBCWA.

In other words, an employer did not have to be a BCOA member

or even signatory to a wrap-around contract to participate in

the Funds.  Non-BCOA employers were free to negotiate with

the UMWA any terms and conditions of employment that they

- 14 -

000652

could negotiate.  But once an employer agreed with the UMWA
to participate in the Funds by using the Funds to provide
benefits to its employees and retirees, that employer had to
participate on the same terms as all other participating
employers.  Each employer had to contribute to the Funds at
the same rate, and each would receive the same level of
benefits for its employees and retirees.  By insisting on
these contractual preconditions for participation in the
Funds in 1978 and thereafter, the Funds' settlors, BCOA and
the UMWA, agreed that the Funds should not become a "last
man's club" where certain employers could pull out entirely,
or contribute at reduced rates, at the expense of the
remaining employers.

    I declare under penalty of perjury that the foregoing is
true and correct to the best of my knowledge.


_____3-7-91_____
Date

_____
Roger M. Haynes


- 15 -

000653

# EXHIBIT F

BCOA PROPOSALS - JANUARY 23, 1978

(Non-economic)

1.  Stability of work force. *take out word (engaging*

2.  Incentive program to be instituted unilaterally by employer.

3.  Thirty-day probation period.

4.  Removal from panels after three-year period.

5.  Relief on bidding laterally and downward.

6.  Elimination of past customs and practice provisions of old contract.

7.  Removal of restriction of coal production on Sunday.

8.  Outside employees to work eight hours at company's option.

9.  Flexibility on reclamation projects.

10. Flexibility on use of helpers.

11. Abolition of sick leave.

12. Reduction from ninety days to forty-five days right to assign new employees.

13. Right of company to change starting time.

14. Indemnification for checkoff.

15. Deletion of purchased coal under Funds.

16. Protection for BCOA from pullouts from the 1950 Fund of non-BCOA signatory operators.

000689

EXHIBIT B

MEETING ON JANUARY 23, 1978

Present for BCOA were:

Hartman
Miller
Katlic
Hemphill

Present for FMCS was:

Horvitz

Present for UMWA were:

Miller
Church
Killion
Combs
Huge
Nathan

Horvitz - reviewed positions as of Saturday recess.
Wants resumption of two committees as before, i.e., economic and non-
economic.

Hartman - both sides recognize importance of time.

Proposal:

1.  1950 Pension Fund. - continue as is.  Benefits
    guaranteed.  No cap.

2.  1974 Health Fund be transferred with same benefits
    guaranteed through insurance.

1974 Pension Fund - continue as is.  Industry would have
option to convert to insurance plan and provide same pension up to
April 1, 1979 through insurance.

3.  UMW agrees - in event of wildcat, those who strike
    contribute to 1950 Fund $20 per day maximum of 10
    days.  If strike continues beyond 10 days, benefits
    suspended until return to work.

When strike is willfully and deliberately provoked by
employer, arbitrator shall order payback of $20 employee paid into
Fund.

Will still insist on stability clause.

EXHIBIT C
000690

UMWA:

1.  $15 to $150 - pay all back.

2.  Expedited procedure.

3.  No suspension of benefits.

B.  Miller:

1.  Sticking to $25.

2.  Sticking to suspension - not talking about suspending life insurance or death benefits.

3.  Employers penalty.  Agree to language that would require reimbursement to those affected.

Church:

$20.

B.  Miller:

Agree to $20 per day.  In interest of cleaning up contract.

Eye care program (steel industry),

Recess to 2:30 P.M.


Agree to take Funds structure and pay back both employee and company from table.  Subject to agreed language on payback.

January 23, 1978 - Afternoon session

B.  Miller list:

Article 1 - stability of work force.
Article 2 - production incentives.
Article 3 - probationary period;  seniority; maximum time on panel.
Article 4 - Relief on laterally bidding.
Article 5 - Custom and practices - fresh proposal.
Article 5 - Seven day week - 8 hours; outside employees stay with 7-1/2 day; where employee elects can have 8 hours (time and a half).
Article 6 - Reclamation flexibility.
Article 7 - Flexibility of helpers and crew members.
Article 8 - Consolidation of paid time off.
Article 9 - Reduce 90 days to 45 assignment of new employees.

Article 10 - Starting time.
Article 11 - Indemnification of checkoff.

Trades:

Article 17 - Seniority.

1. Thirty day probationary.
2. Limit duration of layoff panel three years.
3. Bid laterally or downward except by mutual
   agreement.

In return:

1. Where employer awards job given to subcommittee.

2. UMWA employees notification of posted vacancies.

   (Drop proposal 164)

   (Vacancy)

   Training 90 to 45.
   General retraining no less than two hour session.

Article 3 - Agree to pay 2 hours to safety committee
            for proven sickness.

Article 15 - Checkoff - attempt language when company
             will turn over monies in return for
             indemnification.

Hartman - 1974 pension:  prospective $1 - July of 1979;
$2.50 in July of 1980.

1950 non-black lung - $10 per person.

First year - $10
Second year - $10
Third year - $5

Exchange stability of work force for management's right
to strike.
Production incentives with due regard to safety.
Protect against signatories pulling out of 1950 Funds.
Elimination of non-signatory coal.

Recess to 8 P.M.

BCOA will give complete package upon reconvening.

Hartman - Haynes - $12,000 basic life for active
employees.  Accident - $24,000.  Dismemberment prorated.

1974 pension - agree to $1.00 per year - actual base 1,650 hours.

1950 pension remains as stated earlier.  Minimum disability - 55.  $250.

1974  benefit as presented January 18.

Wages 30¢, 21¢, 21¢.

Go with COLA as per contract.

Roll in 28¢ COLA in two years.

Agree to 5¢ shift differential in third year.

Not agree to any additional holiday.

Clothing allowance $100 each of three years.

Will not pay 11.8 mi. paid June to December.

Increase SA $110, $110, $120.

Past pension - 1974 - no black lung - $10, $10, $5.

Contingent on agreement tonight - will assist in securing money to pay February pension.

The UMW presented counterproposals. Operators walked out.

000693

# EXHIBIT G

May 23, 1978

Mr. O'Connell:

As you are aware, K. L. Houck, following his review of the various Pension Plan and Trust documents prepared by BCOA after conclusion of negotiations, found a serious problem with specific language which appeared in each such document and which, if left unchanged, would have resulted in loss of income to those Funds from any new Employer who becomes signatory to the Agreement. Furthermore, the proposed language went counter to a recent court decision which involved an Employer and the Trustees. The Employer in the case contended that as a new signatory Employer it did not have any liability to contribute to either the 1950 Benefit Plan or the 1950 Pension Trust because it did not and never could have any employees covered by that Benefit Plan or Pension Trust. The court ruled that the Employer was responsible to make all contributions required by Article XX of the Labor Agreement.

It was the intent of BCOA during negotiations to ensure that appropriate language be provided in the various Plan and Trust documents to ensure that signatory employers contribute to all Trusts and that a signatory employer could not pull out and thereby terminate its liability.

The following language was proposed to cover this intent by representatives of Steptoe & Johnson and is the language which K. L. Houck found to be deficient inasmuch as it did not cover the responsibility of a new signatory employer to make all contributions required by Article XX of the Labor Agreement.

"Any Employer who employed any participant eligible for coverage under the 1950 Pension Plan on whose behalf such Employer made or makes contributions for such participant, is obligated and required to comply with the terms and conditions of the 1950 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto."

Following a review by the parties, the following amended language will be included in the Plans and Trusts. That language has been agreed to by the Union, is acceptable to K. L. Houck, and covers the entire intent of BCOA.

"Any Employer who employed any participant eligible for coverage under or who received or receives benefits under the 1950 Pension Plan or any Employer who was or is required to make or who has made or makes contributions to the 1950 Pension Plan or Trust, is obligated

000594

- 2 -

and required to comply with the terms and conditions
of the 1950 Pension Plan and Trust, as amended from
time to time, including, but not limited to, making
the contributions required under the National
Bituminous Coal Wage Agreement of 1978, as amended
from time to time, and any successor agreements
thereto."

B. M. SHANER

B. M. Shaner

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Michael H. Holland, *et al.* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | )   Case No. 07-cv-490 (PLF) |
| Freeman United Coal Mining Company, | ) |
| *et al.,* | ) |
| | ) |
| Defendants. | ) |
| | ) |
| Freeman United Coal Mining | ) |
| Company, | ) |
| | ) |
| Plaintiff, | )   Case No. 07-cv-1050 (PLF) |
| | ) |
| v. | ) |
| | ) |
| United Mine Workers of | ) |
| America, *et al.,* | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PROPOSED ORDER**

Upon consideration of the Motion for Summary Judgment on the

Issue of Liability by the United Mine Workers of America 1974 Pension

Trust's ("1974 Pension Trust") and its Trustees, and the briefs and

supporting materials submitted by each party in connection with that

Motion, the Court

HEREBY FINDS that there are no material facts in dispute and

that Freeman United Coal Mining Company and Monterey Coal Company

are obligated as a matter of law to make contributions to the 1974

Pension Trust at the rates specified in the National Bituminous Coal

Wage Agreement of 2007 ("2007 NBCWA").  Accordingly,

IT IS HEREBY ORDERED that the Motion for Summary Judgment

on the Issue of Liability by the 1974 Pension Trust and its Trustees is

GRANTED; and

IT IS FURTHER ORDERED that Count I of the Complaint filed by

Freeman United Coal Mining Company in Case No. 07-1050 is

DISMISSED WITH PREJUDICE; and

IT IS FURTHER ORDERED that counsel for the parties shall confer

in an attempt to reach agreement on the amount that Freeman United

Coal Mining Company and Monterey Coal Company, respectively, owe to

the 1974 Pension Trust in contributions that have become due for the

period beginning January 1, 2007, and advise the Court within 20 days

whether they have reached such an agreement and, if so, the amount

that shall be included in the Court's final judgment.  In the event that

the parties cannot reach agreement on that amount, they shall jointly file

a proposed schedule for litigation regarding the damages that should be

awarded pursuant to this Order granting summary judgment on the

issue of liability.

SO ORDERED this _____ day of _____, 2007.

_____

Hon. Paul L. Friedman

Copies to:

Paul M. Smith
D.C. Bar No. 358870
Jessica Ring Amunson
D.C. Bar No. 497223
JENNER & BLOCK LLP
601 13th Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 639-6000
Facsimile:  (202) 661-4993
psmith@jenner.com
jamunson@jenner.com

Michael W. Robinson
D.C. Bar No. 437979
Gregory J. Ossi
D.C. Bar No. 460243
VENABLE LLP
8010 Towers Crescent Drive
Suite 300
Vienna, VA 22182
Telephone:  (703) 760-1600
Facsimile:  (703) 821-8949
mwrobinson@venable.com
gjossi@venable.com

***Attorneys for Freeman United Coal Mining Company***

John R. Woodrum
D.C. Bar No. 933457
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2400 N Street
Fifth Floor
Washington, DC 20037
Telephone:  (202)887-0800
Facsimile: (202) 887-0866
john.woodrum@ogletreedeakins.com

***Attorney for Monterey Coal Company***

Julia Penny Clark
D.C. Bar No. 269609
Andrew D. Roth
D.C. Bar No. 414038
Charlotte Garden
D.C. Bar No. 489040
BREDHOFF & KAISER P.L.L.C.

805 Fifteenth Street N.W.
Suite 1000
Washington, DC 20005
Telephone: (202) 842-2600
Facsimile:  (202) 842-1888
jpclark@bredhoff.com
cgarden@bredhoff.com
dvirk@bredhoff.com

David W. Allen
D.C. Bar No. 81638
Larry D. Newsome
D.C. Bar No. 254763
Christopher F. Clarke
D.C. Bar No. 441708
UMWA HEALTH & RETIREMENT FUNDS
Office of the General Counsel
2121 K Street, N.W.
Washington, D.C. 20037
Telephone: 202-521-2238
Facsimile:  (202) 842-1888
cclarke@umwafunds.org

***Attorneys for 1974 Pension Trust***

Peter Buscemi
D.C. Bar No. 269092
Stanley F. Lechner
D.C. Bar No. 370986
Charles P. Groppe
D.C. Bar No. 464035
MORGAN, LEWIS & BOCKIUS, L.L.P.
1111 Pennsylvania Avenue, NW
Seventh Floor
Washington, DC 20004-2541
(202) 739-5190
pbuscemi@morganlewis.com
slechner@morganlewis.com
cgroppe@morganlewis.com

***Attorneys for Bituminous Coal Operators Association***

John R. Mooney
D.C. Bar No. 375886
Mark J. Murphy
D.C. Bar. No. 453060

MOONEY, GREEN, BAKER, SAINDON, PC
1920 L Street, NW
Suite 400
Washington, DC 20036
(202) 783-0010
jmooney@mooneygreen.com
mmurphy@mooneygreen.com

***Attorneys for United Mine Workers of America***