# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Holland, et al.,      ) | |
|      ) | |
| Plaintiffs,      ) | |
|      ) | |
| v.      ) | Case No. 07-cv-490 (PLF) |
|      ) | |
| Freeman United Coal Mining Company, et al.,      ) | |
|      ) | |
| Defendants.      ) | |
|      ) | |
| Freeman United Coal Mining Company,      ) | |
|      ) | |
| Plaintiff,      ) | |
|      ) | |
| v.      ) | Case No. 07-cv-1050 (PLF) |
|      ) | |
| United Mine Workers of America, et al.,      ) | |
|      ) | |
| Defendants.      ) | |

## MOTION OF DEFENDANT BITUMINOUS COAL OPERATORS' ASSOCIATION, INC. FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7 and 56.1, Defendant Bituminous Coal Operators' Association, Inc. ("BCOA") hereby moves for entry of summary judgment in Case No. 07-cv-1050.

As explained more fully in BCOA's accompanying Memorandum of Points and Authorities, these consolidated cases involve an unjustified attempt by two coal companies, Freeman United Coal Mining Company ("Freeman") and Monterey Coal Company ("Monterey"), to walk away from their contractual obligation to pay for the

pension benefits provided to their active and retired coal miners by the UMWA 1974

Pension Trust, and an attempt by one of these companies (Freeman) to dump its

contribution obligation onto BCOA, which represents coal companies that are honoring

their contractual obligation and paying the very same contributions that Freeman is

attempting to avoid.

In support of this motion, BCOA is submitting (i) a Memorandum of Points and

Authorities, (ii) a Statement of Material Facts Not in Dispute, (iii) the Declaration of

Charles S. Perkins, III, and (iv) a proposed Order.

Respectfully submitted,

_____/s/_____

Peter Buscemi
D.C. Bar No. 269092
Stanley F. Lechner
D.C. Bar No. 370986
Charles P. Groppe
D.C. Bar No. 464035

Dared:  September 10, 2007

MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004
Tel:    (202) 739-3000
Fax:    (202) 739-3001
E-mail: pbuscemi@morganlewis.com
        slechner@morganlewis.com
        cgroppe@morganlewis.com

*Counsel for Defendant*
*Bituminous Coal Operators' Association,*
*Inc.*

## CERTIFICATE OF SERVICE

I, Charles P. Groppe, certify that, on behalf of Defendant BCOA, I served the foregoing

Motion for Summary Judgment and supporting papers by causing a true and correct copy of the

same to be delivered via the Court's ECF system (or, as indicated below, via First Class Mail,

postage prepaid) upon:

> Paul M. Smith
> Jessica R. Amunson
> Jenner & Block LLP
> 601 13th Street, NW
> Suite 12 South
> Washington, DC 20005
> psmith@jenner.com
> jamunson@jenner.com
>
> Susan C. Levy, Esq.
> Jenner & Block LLP
> 330 N. Wabash Avenue
> Chicago, IL 60611
> slevy@jenner.com
>
> Gregory J. Ossi, Esq.
> Michael W. Robinson, Esq.
> Venable LLP
> 8010 Towers Crescent Drive, Suite 300
> Vienna, VA 22182
> gjossi@venable.com
> mwrobinson@venable.com
>
> ***Counsel for Plaintiff***
>
> Julia Penny Clark
> Andrew D. Roth
> Charlotte Garden
> Bredhoff & Kaiser P.L.L.C.
> 805 Fifteenth Street N.W.
> Washington, DC  20005
> JPClark@Bredhoff.com
> aroth@bredhoff.com
> CGarden@Bredhoff.com
>
> ***Counsel for Defendant UMWA 1974 Pension Plan***
> ***and its Trustees***

Grant Crandall
Deborah Stern
United Mine Workers of America
8315 Lee Highway
Fairfax, VA 22031
dstern@umwa.org

John R. Mooney
Mark J. Murphy
Richard C. Welch
Mooney, Green, Baker
    & Saindon, P.C.
1920 L Street, N.W.
Washington, DC 20036
jmooney@mooneygreen.com
mmurphy@mooneygreen.com
rwelch@mooneygreen.com

***Counsel for Defendant United Mine Workers
    of America***

on this 10th day of September, 2007.

          /s/ Charles P. Groppe

Charles P. Groppe
*Counsel for Defendant*
*Bituminous Coal Operators' Association, Inc.*
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Ave, NW
Washington, DC 20004
Telephone: (202) 739-3000
Fax: (202) 739-3001
E-mail: cgroppe@morganlewis.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| Holland, et al., | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 07-cv-490 (PLF) |
| Freeman United Coal Mining Company, et al., | ) ) ) | |
| Defendants. | ) ) ) | |
| Freeman United Coal Mining Company, | ) ) | |
| Plaintiff, | ) ) | Case No. 07-cv-1050 (PLF) |
| v. | ) ) ) | |
| United Mine Workers of America, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF BCOA'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7 and 56.1,

Defendant Bituminous Coal Operators' Association, Inc. ("BCOA") submits this

memorandum of law in support of its motion for summary judgment against Plaintiff

Freeman United Coal Mining Company ("Freeman") in Case No. 07-cv-1050.  That case

is an action filed by Freeman against the United Mine Workers of America ("UMWA"),

BCOA, and the UMWA 1974 Pension Plan and its Trustees ("1974 Pension Trust" or

"Trustees").  BCOA is not a party in Case No. 07-cv-490, but it supports the motion for

summary judgment filed by the Trustees in that action to collect the contributions owed

to the 1974 Pension Trust by Freeman and Monterey Coal Company ("Monterey").

## ISSUES PRESENTED

These consolidated cases involve an unjustified attempt by two coal companies

(Freeman and Monterey) to evade their contractual obligation to pay for the pension

benefits provided to their active and retired coal miners by the 1974 Pension Trust.  One

of these companies (Freeman) brazenly seeks to foist its contribution obligation onto

BCOA, which represents coal companies that are honoring their contractual obligation to

pay the very same contributions that Freeman is attempting to avoid.  Two liability issues

are presented:

1.      Whether Freeman and Monterey are obligated under a contractual

provision known as the "evergreen clause" to contribute to the 1974 Pension Plan Trust at

the rate set forth in the National Bituminous Coal Wage Agreement ("NBCWA") of 2007

(currently $2.00 per hour for each hour worked by a contributing employer's active

employees).  With respect to this issue, there is binding authority in this jurisdiction

interpreting and enforcing the "evergreen clause" against coal companies similarly

situated to Freeman and Monterey, which have beneficiaries in the 1974 Pension Trust

but are not signatory to the current NBCWA.  *See In re United Mine Workers of America

Benefit Plans Litig.*, 782 F. Supp. 658 (D.D.C. 1992), *aff'd, United Mine Workers of

America 1974 Pension Plan, et al. v. Pittston Co.*, 984 F.2d 469 (D.C. Cir.), *cert. denied*,

509 U.S. 924 (1993) (*"Pittston"*).

2.      Assuming that Freeman is obligated to contribute to the 1974 Pension

Trust at the same rate (currently $2.00 per hour) being paid by all other contributing

employers in the coal industry, including BCOA members, the second issue is whether

Freeman is entitled to damages from BCOA because BCOA and the UMWA negotiated in collective bargaining the NBCWA of 2007, which contains increases in pension benefits for beneficiaries for the 1974 Pension Trust (including active and retired miners from Freeman) and a $2.00 per hour contribution rate to pay for those benefits. This damage claim against BCOA has been asserted by Freeman only (in Case No. 07-cv-1050) and not by Monterey or any other employer. With respect to this issue, it is undisputed that BCOA and the UMWA are the "settlors" or creators of the 1974 Pension Trust, and have negotiated for more than 30 years pension benefits and contribution rates to the 1974 Pension Trust, including in the NBCWAs of 1974, 1978, 1981, 1984, 1988, 1993, 1998, 2002, and 2007.

## SUMMARY OF BCOA POSITION

BCOA is a non-profit collective bargaining association located in Washington, D.C. For more than 50 years, BCOA has negotiated every NBCWA with the UMWA, including the 2007 NBCWA. *See* Declaration of Charles S. Perkins, III ("Perkins Decl."), ¶¶3-4.

Based on the controlling decision of the D.C. Circuit in the *Pittston* evergreen litigation, and based on the undisputed facts set forth below and in the accompanying Statement Of Material Facts Not In Dispute, these consolidated cases can and should be decided as a matter of law on summary judgment. Freeman and Monterey are obligated, as a matter of settled law under the evergreen clause, to contribute to the 1974 Pension Trust at the rate set forth in the 2007 NBCWA. Freeman, like all other employers participating in the 1974 Pension Trust, must honor its contractual commitment and has no legal basis for its unprecedented attempt to dump its contribution obligation onto

BCOA and its member companies, who are honoring their contractual commitment to the 1974 Pension Trust and paying the same rate as all other contributing employers.

By refusing to contribute to the 1974 Pension Trust while their active and retired miners continue to receive benefits from the 1974 Pension Trust, Freeman and Monterey are attempting to do precisely what the evergreen clause was designed to prevent. They are attempting to avoid their contractual obligation to contribute to the 1974 Pension Trust and shift the burden of funding pension benefits for their beneficiaries and all of the Trust's beneficiaries to the remaining contributing employers, including BCOA member companies and more than 30 non-BCOA companies. As stated by Judge Hogan in issuing summary judgment against similarly situated coal companies in the *Pittston* evergreen case, this action is directly contrary to the purpose and intent of the evergreen clause:

> Having reviewed the voluminous evidence of the negotiating history of the evergreen clause, the Court is convinced that the clause was intended to ensure that all participating employers would contribute equally to the Trusts and would not be permitted to withdraw from participation and leave the burden for funding the pension and health benefits of retired miners to the remaining participating employers.

782 F. Supp. at 667, *aff'd, United Mine Workers of America 1974 Pension Plan, et al. v. Pittston Co.*, 984 F. 2d  469 (D.C. Cir. 1993).

## STANDARD OF REVIEW

Summary judgment is an effective tool used "to secure the just, speedy, and inexpensive determination of [an] action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  It is not "a disfavored procedural shortcut . . . ." *Id.*

"Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

In ruling on a motion for summary judgment, the Court must construe the

evidence in the light most favorable to the nonmoving party. *See Foreman v. Small*, 271

F.3d 285, 291 (D.C. Cir. 2001). Summary judgment should be granted, however, unless

the non-moving party "set[s] forth specific facts showing that there is a genuine issue for

trial." *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1041 (D.C. Cir. 2003)

(citing Fed. R. Civ. P. 56(e)). A fact is considered material if, when applied to the

substantive law, it affects the outcome of the litigation. *See Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). "The existence of '*some* alleged factual dispute between

the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact.'" *Guerrero*

*v. Univ. of D.C.*, 251 F. Supp. 2d 13 (D.D.C. 2003) (citing *Anderson*, 477 U.S. at 247-48)

(emphasis in original).

In this case, there are no genuine issues of material fact, and summary judgment is

appropriate as a matter of law. As discussed in greater detail below, it is undisputed that

Freeman and Monterey are signatory to the evergreen clause; that the evergreen clause

requires contributions to the 1974 Pension Trust at the rate set forth in the current

NBCWA; and that the current NBCWA (the NBCWA of 2007) requires contributions to

the 1974 Pension Trust at the rate of $2.00 per hour for each hour worked by Freeman's

and Monterey's active classified employees. The meaning and enforceability of the

evergreen clause were decided in *Pittston,* and under the doctrine of *stare decisis* that

decision is binding on all parties here. Finally, the attempt by Freeman and Monterey to challenge the validity of the 2007 NBCWA fails as a matter of law, as does Freeman's ill-conceived and unsupported damages action against BCOA.

## ARGUMENT

**I.    Freeman and Monterey Are Bound By The Evergreen Clause And The Court's Decision In *Pittston*.**

Because Freeman and Monterey cannot deny the following undisputed facts or escape the controlling legal authority of the *Pittston* case, they cannot survive summary judgment on the issue of their liability to the 1974 Pension Trust.

First, it is undisputed that the evergreen clause initially was negotiated by BCOA and the UMWA in 1978, and has been carried forward and updated in each NBCWA negotiated by BCOA and the UMWA since that time, namely, the NBCWAs of 1981, 1984, 1988, 1993, 1998, 2002, and 2007. *See Pittston*, 984 F.2d at 472; Perkins Decl., ¶¶21-23; Declaration of Cecil E. Roberts ("Roberts Decl.) (accompanying the UMWA's separate motion for summary judgment), at ¶11. The evergreen clause is contained in the plan and trust documents for the 1974 Pension Plan, which are incorporated by reference into each NBCWA, including the 2007 NBCWA. *See Pittston*, 984 F.2d at 472; Perkins Decl., ¶¶21-23; Roberts Decl., ¶11.

It is undisputed that Freeman and Monterey are signatory to the evergreen clause by signing one or more NBCWAs while they were members of BCOA, and by incorporating by reference into their separate agreements with the UMWA the terms and conditions of the 1974 Pension Plan. *See* Perkins Decl., ¶¶26-27 (citing NBCWAs to which Freeman and Monterey were signatory while members of BCOA); Roberts Decl., ¶¶29-30 (noting that Freeman's and Monterey's separate agreements with the UMWA

expressly state that the 1974 Pension Plan "is incorporated by reference and made a part

of this Agreement").

The terms and conditions of the 1974 Pension Plan have included the evergreen

clause for each of the past 29 years – from 1978 to 2007. Perkins Decl., ¶22. The

evergreen clause in the plan document of the 1974 Pension Plan currently states as

follows:

> Any Employer who employed any Participant eligible for
> coverage under, or who received or receives benefits under,
> the 1974 Pension Plan, or any Employer who was or is
> required to make, or has made or makes contributions to
> the 1974 Pension Plan and Trust, is obligated and required
> to comply with the terms and conditions of the 1974
> Pension Plan and Trust, as amended from time to time,
> including, but not limited to, making the contributions
> required under the National Bituminous Coal Wage
> Agreement of 1978 as amended from time to time and any
> successor agreements thereto, including, but not limited to,
> the National Bituminous Coal Wage Agreement of 2007.

Perkins Decl., ¶23.

It is undisputed that Freeman and Monterey each employ and employed

"Participant[s] eligible for coverage, or who received or receives benefits under, the 1974

Pension Plan," within the meaning of the evergreen clause. Freeman currently employs

approximately 360 employees who accrue pension credits and other benefits under the

1974 Pension Plan, and Freeman formerly employed approximately 1291 retirees (and

their dependents) who currently are receiving various pension benefits from the 1974

Pension Plan. Roberts Decl., ¶27; Declaration of Dale Stover ("Stover Decl.")

(accompanying the UMWA 1974 Pension Plan's separate motion for summary

judgment), at ¶8. Monterey currently employs approximately 260 employees who accrue

benefits under the 1974 Pension Plan, and formerly employed approximately 410 retirees

(and their dependents) who currently are receiving benefits from the 1974 Pension Plan. Roberts Decl., ¶27; Stover Decl., ¶8.

Even though Freeman and Monterey are not signatory to the 2007 NBCWA, they are obligated as a matter of law under the evergreen clause and the decision in *Pittston* to contribute to the 1974 Plan at the rate set forth in the current NBCWA – the NBCWA of 2007. *See Pittston*, 984 F. 2d at 474 (holding that prior signatories to the evergreen clause are obligated "to make continuing contributions to the [UMWA] trust; *and this obligation include[s] an agreement to make contributions at [the] rates specified in subsequent NBCWAs, without regard to whether the employer [is] still a party to the subsequent agreements.")* (emphasis added). The contribution rate to the 1974 Pension Plan and Trust under the NBCWA of 2007 currently is $2.00 per hour. Perkins Decl., ¶24.

Freeman and Monterey are bound by the obligations of the evergreen clause through the principle of *stare decisis* because the *Pittston* decision is controlling law in this Court. Freeman's and Monterey's effort to avoid their evergreen obligations is especially egregious because each of these companies was a member of BCOA when the evergreen clause was negotiated and litigated. *See* Perkins Decl., ¶25. Freeman was a member of BCOA from 1966 to 1997; Monterey was a member of BCOA from 1972 to 1992. Perkins Decl., ¶¶15, 18. In short, Freeman and Monterey supported the enforcement of the evergreen clause against Pittston and other companies when those employers were attempting to do precisely what Freeman and Monterey are attempting to do here -- evade their contribution obligation to the 1974 Pension Trust while leaving

their beneficiaries in the Trust to receive pension benefits paid for by other employers.

This cynical ploy should not be permitted to proceed.

II.     **Freeman And Monterey Cannot Escape Their Contribution Obligations Under The Evergreen Clause By Challenging The Legitimacy Of The 2007 NBCWA -- Which Was Negotiated By BCOA And The UMWA, Ratified By The UMWA Membership Nationwide, And Adopted By The Majority Of The Coal Industry Nationwide In "Me Too" Agreements.**

Faced with binding authority in *Pittston* establishing that coal companies such as Freeman and Monterey must continue to contribute to the 1974 Pension Trust at the rate set forth in the current NBCWA (which is the 2007 NBCWA), Freeman and Monterey argue that the 2007 NBCWA is not "truly" an NBCWA, and not a "successor agreement" within the meaning of the evergreen clause, because it is "nothing more than an agreement between UMWA and Consol covering Consol's mining operations." Freeman's Complaint, ¶30; Answer of Monterey (filed in Case No. 1:07-490), at ¶22. This argument is without merit for several reasons.

A.     **The Coal Companies' Argument Is Inconsistent With *Pittston*.**

As the Trustees correctly note in their brief, the coal companies' argument that the 2007 NBCWA is not a "successor agreement" to the 1978 NBCWA within the meaning of the evergreen clause is contrary to the decision in *Pittston*.  Both Judge Hogan and the Court of Appeals rejected such an argument as a matter of law.  Judge Hogan found "no ambiguity in the meaning of 'successor agreements [to the 1978 NBCWA]' " - - that term "clear[ly]" is a reference to the "National Bituminous Coal Wage Agreements of 1984, 1988, and subsequent years," and "only" to such NBCWAs. 782 F. Supp at 664.  The Court of Appeals agreed, stating that the evergreen clause "unambiguously obligates signatory employees to contribute to the trusts at the rates specified in the current NBCWA, irrespective of the employer's failure [to] sign that NBCWA," and that "*only a*

*subsequent NBCWA can qualify as such a successor agreement.*" 984 F. 2d at 473-74

(emphasis added). In short, the argument that the 2007 NBCWA is not a successor to the

1978 NBCWA is wrong as a matter of law and contrary to the decision in *Pittston.*

In addition, the evergreen clause requires companies with beneficiaries in the

1974 Pension Plan "to comply with the terms and conditions of the 1974 Pension Plan

and Trust, *as amended from time to time . . . .*" (Emphasis added) One of the terms and

conditions of the 1974 Pension Plan and Trust, as amended in 2007, is to "fund the

benefits under this Plan" by making the contributions required under Article XX of the

NBCWA of 2007. Exhibit E to Stover Decl., citing Plan Document at Art. VIII.B. (8).

The contribution rate required under Article XX of the 2007 NBCWA currently is $2.00

per hour. Perkins Decl., ¶24.

As explained in the *Pittston* case, the placement of the evergreen clause in the

trust document of the 1974 Pension Trust was intentional, and designed to ensure that any

employer participating in the Trust, regardless of whether they were a member of BCOA

or signatory to the NBCWA, would be required to adhere to the terms and conditions of

the Trust, including contributing at the same rate as required of all other participating

employers. As stated in *Pittston*:

> [The evergreen] provisions were placed in the trust
> documents so that we could be sure that the trust
> documents would apply to any non-BCOA employer that
> wanted to participate in the Funds, even if that employer
> was not signatory to the NBCWA. In other words, an
> employer did not have to be a BCOA member or even a
> signatory to a wrap-around contract to participate in the
> Funds. . . . But once an employer agreed with the UMWA
> to participate in the Funds by using the Funds to provide
> benefits to its employees and retirees, that employer had to
> participate on the same terms as all other participating
> employers. Each employer had to contribute to the Funds

at the same rate, and each would receive the same level of
benefits for its employees and retirees.

782 F. Supp. at 665 (quoting Declaration of Roger M. Haynes, Chairman of BCOA's

Benefits Subcommittee).

In sum, both Freeman and Monterey are bound by the evergreen clause as

enforced in *Pittston,* and are required to contribute to the 1974 Pension Trust at the same

rate as all other contributing employers – currently $2.00 per hour.

**B.      The 2007 NBCWA Is Not Simply An Agreement Covering One
          Company.**

There are undisputed facts from the parties that negotiated the 2007 NBCWA –

BCOA and the UMWA – demonstrating that the 2007 NBCWA is not, as alleged by

Freeman, "nothing more than an agreement between the UMWA and Consol covering

Consol's mining operations." As explained by Cecil Roberts, President of the UMWA,

the 2007 NBCWA was negotiated with BCOA to establish the nationwide contractual

standard for the organized sector of the bituminous coal industry, just as prior NBCWAs

negotiated between BCOA and the UMWA established the standard for the industry. In

the words of UMWA President Roberts:

> Throughout our negotiations with the BCOA in 2006, it
> was the UMWA's intention that it would negotiate a labor
> contract with the BCOA, the 2007 NBCWA, which would
> establish the industry standard for wages, pensions, and
> other terms and conditions of employment, just as the
> UMWA and BCOA had done in the 2002 and prior
> NBCWAs.
>
> * * *
>
> [D]uring decades of collective bargaining, the UMWA and
> the BCOA have established and maintained, through the
> National Bituminous Coal Wage Agreement, the prevailing
> contractual standards for the industry . . . .  Consistent with
> its long-standing practice, the Union considers the 2007

> NBCWA to establish the standards for the organized
> bituminous coal industry.  The UMWA negotiated and
> ratified it as such and, not surprisingly, the 2007 NBCWA
> has been treated by the organized bituminous coal industry
> as the industry standard.

Roberts Decl., ¶¶22, 26.

There is irrefutable evidence showing that after BCOA and the UMWA

negotiated the 2007 NBCWA, UMWA members nationwide (not just from Consolidation

Coal Company) voted on and ratified the Agreement.  As explained by President Roberts:

> On December 21, [2006] each of the [UMWA] Local
> Unions voted on whether to accept the terms of the 2007
> NBCWA . . . .  Our members collectively ratified the 2007
> NBCWA by an overwhelming margin of votes . . . . [T]he
> members that ratified the 2007 NBCWA represent
> approximately 75% of our active membership in the coal
> mining industry.

Roberts Decl., ¶21.

Freeman and Monterey have not denied, and are unable to deny, the fact that the

2007 NBCWA as negotiated by BCOA and the UMWA has been adopted, via "me too"

agreements, by the overwhelming majority of unionized coal companies in the United

States, including 31 non-BCOA companies identified in paragraph 24 of Mr. Roberts'

Declaration.  These companies include small, medium-sized, and large coal companies

that produce the majority of the tonnage in the organized coal industry in the United

States.  Roberts Decl., ¶¶23, 24; Perkins Decl., ¶14.

Freeman contends that the 2007 NBCWA does not qualify as a successor

agreement to earlier NBCWAs because when the 2007 NBCWA was negotiated between

BCOA and the UMWA, BCOA's membership had declined to Consolidation Coal

Company and companies related to it.  Freeman Complaint ¶¶ 30-31.  This argument is

meritless.  BCOA readily admits that when it negotiated the 2007 NBCWA with the

UMWA, it had 11 Operator Members, consisting of Consolidation Coal Company and 10

commonly owned affiliates of Consolidation Coal Company. The number of companies

in BCOA, however, is undisputed and not a material fact in this case. Perkins Decl., ¶¶7,

9. There is no minimum membership requirement for BCOA in negotiating the

NBCWA, and neither Freeman nor Monterey can point to any authority supporting such

an argument. The salient fact is that the 2007 NBCWA, just as every NBCWA in the

past 50 years, was negotiated by BCOA and the UMWA, and it set the pattern for the

organized sector of the coal industry. Contrary to the unsupported contentions of

Freeman and Monterey, there is no authority suggesting that BCOA, however constituted,

cannot negotiate with the UMWA an NBCWA that sets the pattern for the industry.

The language of the NBCWA further undercuts the contention that BCOA must

consist of a certain number of members to negotiate the NBCWA. In every NBCWA

negotiated between 1978 and 2007, the negotiating parties (BCOA and the UMWA) have

included the following provision to address the possibility of BCOA ceasing to exist in

the future, or the possibility of more than 50% of the tonnage membership of BCOA

withdrawing from the Association:

> In the event BCOA ceases to exist, or in the event that
> more than 50% of the tonnage membership of BCOA on
> the Effective Date [of the NBCWA] has withdrawn prior to
> the time when the BCOA is required or permitted to take
> action under this Article [XX], then such action may be
> taken by majority vote, based on tonnage, of Employers
> who were BCOA members on the Effective Date.

Perkins Decl., ¶9.

In contrast, the NBCWA does not include any provision diminishing or

eliminating BCOA's authority to act simply because its membership has declined to a

certain number of companies – related or otherwise. Indeed, on the effective date of the

2002 NBCWA and the effective date of the 2007 NBCWA, Consolidation Coal Company

and its affiliates represented more than 50% of the tonnage membership of BCOA, and

neither Consolidation Coal nor its affiliates have withdrawn from BCOA since that time.

Perkins Decl., ¶10. In short, BCOA continued to exist at the time of the 2007 NBCWA

negotiations, and BCOA clearly had authority to negotiate the 2007 NBCWA with the

UMWA.

BCOA's role in the organized sector of the coal industry is well-established and

has been recognized by numerous federal courts. *See, e.g., Eastern Enterprises v. Apfel*,

524 U.S. 498, 506 (1998) (plurality opinion) (recognizing BCOA as "the primary

representative of coal operators in negotiations with the Union."); *Pittston Co. v. United

States*, 368 F.3d 385, 390-91 (4th Cir. 2004) (discussing BCOA's role in coal industry),

*cert. denied*, 544 U.S. 904 (2005); *UMWA v. Apogee Coal Co.*, 330 F.3d 740, 741 (6th

Cir. 2003) (noting BCOA's role in coal industry). In addition, Congress has recognized

BCOA as the negotiator of the NBCWAs in the Coal Industry Retiree Health Benefit Act,

26 U.S.C. §§ 9701 et seq., as amended (the "Coal Act"). *See* 26 U.S.C. § 9701 (b)(3)

*("The term 'National Bituminous Coal Wage Agreement' means a collective bargaining

agreement negotiated by the BCOA and the United Mine Workers of America").*

Moreover, on December 20, 2006, when BCOA had the same membership that it had

when it negotiated the 2007 NBCWA, Congress amended the Coal Act by delegating to

BCOA the authority to appoint two Trustees to the UMWA Combined Benefit Fund, a

retiree health benefit fund created by Congress in the Coal Act. *See* 26 U.S.C. §

9702(b)(1)(A) (as amended by Pub. L. No. 109-432, Div. C, Title II, § 213(a), 120 Stat.

3027) (Dec. 20, 2006) ("2 individuals who represent employers in the coal mining industry shall be designated by the BCOA.")

In summary, the UMWA, the organized sector of the coal industry, federal courts, and Congress all have recognized BCOA as the negotiator of the NBCWA and the settlor of the UMWA Funds. There is no reason to characterize the 2007 NBCWA as anything but the latest in a long line of NBCWAs negotiated by BCOA and the UMWA.

**III.    BCOA Owed No Duty To Freeman After Freeman Unequivocally Withdrew From BCOA In 1997, And Even Assuming Arguendo That A Duty Somehow Existed, BCOA Did Not Act Arbitrarily Toward Freeman By Negotiating A Contribution Rate To the 1974 Pension Trust That Applies Equally To All Coal Companies That Participate In the Trust, Including BCOA Members**

The final legal issue in this case is one raised by Freeman alone, and not Monterey or any other company. In Count II of Freeman's complaint in Case No. 07-cv-1050, Freeman alleges that BCOA owed "duties of good faith and fair dealing to its former members, including Freeman," when it negotiated the 2007 NBCWA. Complaint ¶52. Although Freeman purports to speak on behalf of "former members" of BCOA, none of those former members apparently shares Freeman's views. Indeed, of the more than 30 "former members" of BCOA that have adopted the 2007 NBCWA and currently are paying the $2.00 per hour contribution rate to the 1974 Pension Trust, none other than Freeman has asserted that BCOA owed it any duty in negotiating the 2007 NBCWA, let alone that BCOA breached any such duty. In addition, Freeman alleges that to the extent BCOA had the power to bind Freeman in the 2007 NBCWA (presumably through the evergreen clause), "then BCOA was acting as Freeman's actual or apparent agent and owed Freeman duties, including the duty to act in good faith and not arbitrarily or capriciously or unreasonably." Complaint ¶53. As discussed below, there are several problems with Freeman's argument – both jurisdictional and substantive.

A.    **The Court Should Decline Supplemental Jurisdiction Over Freeman's State Law Claim.**

Freeman's claim for damages from BCOA in Count II of its complaint is pled in the alternative and is triggered only if Count I fails. (Count I seeks a declaratory judgment under federal law that Freeman is not obligated to contribute to the 1974 Pension Trust). Because Freeman's Count I is without merit, the Court should decline to exercise supplemental jurisdiction over Freeman's Count II, which is based on state law. *See* 28 U.S.C. § 1367(c) (authorizing court to dismiss state law claims where it has dismissed all claims over which it has original jurisdiction); *see also Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005) ("[I]n the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims"); *Kingman Park Civic Association v. Williams*, 348 F.3d 1033, 1043 (D.C. Cir. 2003) (affirming dismissal of civic association's state law claims under 28 U.S.C. § 1367(c) where all federal claims raised regarding ward redistricting act were properly resolved).

B.    **Even If The Court Considers Freeman's State Law Claim, It Cannot Survive Summary Judgment.**

Although Freeman does not cite any specific state law as the source of the alleged duty of BCOA to act in "good faith" and not "arbitrarily or capriciously or unreasonably" with respect to Freeman, the principal-agency relationship alleged by Freeman (Complaint ¶53) is based on state law, as is the alleged duty of good faith and fair dealing (Complaint ¶ 52). *See, e.g., Resort Nursing Home v. NLRB*, 389 F. 3d 1262, 1270 (D.C. Cir. 2004) ("If an employer is dissatisfied with the representation of its multi-employer association, it retains its remedies against the association under contract and agency

law."); *see also WMATA v. Quik Serve Foods, Inc.*, 2006 WL 1147933, at *5 (D.D.C.

2006) (applying D.C. law to alleged breach of covenant of good faith and fair dealing).

It is well-established, however, that collective bargaining to determine the terms

of a pension plan is not a fiduciary function actionable under federal law. *See, e.g.,*

*United Independent Flight Officers, Inc. v. United Air Lines*, 756 F.2d 1262, 1268 (7th

Cir. 1985) ("[t]he duties imposed on a fiduciary are inconsistent with the demands of

negotiation and collective bargaining."). *See also Hartline v. Sheet Metal Workers' Nat'l*

*Pension Fund*, 134 F. Supp. 2d 1 (D.D.C. 2000) (setting of contribution rate for

multiemployer plan a settlor, not fiduciary, function because it involves matters of plan

design).

As a consequence, even if Freeman's damages claim against BCOA is considered

under state law and the law of the agency, it cannot survive summary judgment.

1.      **The Agency Relationship Between BCOA and Freeman**
        **Terminated In 1997.**

If the Court decides to exercise jurisdiction over Freeman's agency claim that

"BCOA was acting as Freeman's actual and apparent agent and owed Freeman duties" in

the negotiation of the 2007 NBCWA (Complaint ¶53), the claim plainly is without merit

and should be dismissed as a matter of law.

To establish an agency relationship with BCOA in 2006, when BCOA negotiated

the 2007 NBCWA, Freeman has the burden to prove by "clear and convincing evidence"

that it authorized its alleged agent, BCOA, to act on Freeman's behalf. *See* Restatement

(Third) of Agency §3.01. *See also Communications Vending Corp. of Ariz., Inc. v. FCC,*

365 F.3d 1064, 1072 (D.C. Cir. 2004) (citations omitted) (noting that, as a general rule,

party asserting agency relationship has the burden of proving both the existence of the

relationship and the authority of the agent).

Freeman is unable to satisfy its burden of proving that it authorized BCOA to act

on its behalf in negotiations for the 2007 NBCWA because in 1997, when Freeman

resigned its membership in BCOA, it unequivocally expressed its intent to withdraw any

authority to BCOA to negotiate on its behalf.  Freeman's July 29, 1997 letter to BCOA

states in relevant part:

> Pursuant to Article VII, Section (a) of the BCOA By-Laws,
> Freeman United Coal Mining Company (Freeman) hereby
> resigns its membership in the Bituminous Coal Operators
> Association (BCOA), effective immediately.  Accordingly,
> please take all actions necessary to remove our company
> from the BCOA official membership roster and
> committees, as well as any other lists, forms, summaries, or
> other documents (including all electronic media) within the
> control of the BCOA.
>
> *Freeman also hereby withdraws any and all authority
> which may previously have been granted to the BCOA to
> negotiate on its behalf with the International Union, United
> Mine Workers of America, any other labor organization, or
> any other entity whatsoever.*  This unequivocal withdrawal
> of bargaining authority is effective immediately, this 29th
> day of July, 1997.

Perkins Decl., ¶15, Attachment 1 (emphasis added).  In light of Freeman's clear and

unequivocal intent to withdraw any authority of BCOA to act on Freeman's behalf,

Freeman cannot as a matter of law prove the consensual element necessary to establish an

agency relationship.

## 2.   Freeman's Agency Claim Fails Due to Lack of Control.

Equally fatal to Freeman's principal-agent claim is the legal requirement that an

agency relationship cannot exist unless "the principal has the right throughout the

duration of the relationship to control the agent's acts."  Restatement (Third) of Agency,

p. 20; *see also C&E Serv., Inc. v. Ashland, Inc.*, Case No. 03-1857, __ F. Supp. 2d. __,

2007 WL 2206909, at *15 (D.D.C. Aug. 2, 2007) (agency is the "fiduciary relationship

which results from the manifestation of consent by one person to another that the other

shall act on his behalf and subject to his control") (citations omitted).  Freeman's claim

that BCOA was its agent based on the evergreen clause, without the principal's right to

control the agent, is unprecedented and unsupported, especially where Freeman itself

severed the relationship in 1997 and has had no control (or even attempted to exercise

any control) over BCOA since that time.  Perkins Decl., ¶¶15-17.

      Contracts alone do not create agency relationships absent a right to control.

*Chemtool Inc. v. Lubrication Technologies, Inc.*, 148 F.3d 742, 745 (7th Cir. 1998)

(stating that the right to control how the conduct is performed is "principal among [the]

considerations" for determining the existence of an agency relationship).  Instead, to

establish an agency relationship, Freeman must prove that it had a right to control the

conduct of BCOA with respect to matters Freeman entrusted to BCOA.  *See C&E Serv.,*

*Inc.*, 2007 WL 2206909, at *15 ("Generally, the determinative factor is 'whether the

employer has the right to control and direct the servant in the performance of his work

and the manner in which the work is to be done'") (citations omitted); *Railan v. Katyal*,

766 A.2d 998, 1010 (D.C. 2001) ("Generally an agency relationship results when one

person authorizes another to act on his behalf subject to his control, and the other

consents to do so.  This court considers the determinative factor to be the measure of

control.") (internal citations, punctuation omitted); *Int'l Longshoremen's Ass'n v. NLRB*,

56 F.3d 205, 213 (D.C. Cir. 1995) ("It is a fundamental principal of hornbook agency law

that an agency relationship arises only where the principal has the right to control the

conduct of the agent with respect to matters entrusted to him."); *Ludolph v. Bechtel Assoc. Prof'l Corp.*, 542 F. Supp. 630, 633 (D.D.C. 1982) ("The right of the principal to control the agent is crucial to the existence of an agency relationship.").

Here, Freeman exercised no control over the conduct of BCOA in its negotiation of the 2007 NBCWA, or in any BCOA–UMWA negotiations between 1997 and 2007. Perkins Decl., ¶¶15, 17. Among other things, Freeman did not inform BCOA of any intent to participate in, receive information about, or influence in any way, the negotiation of the 2007 NBCWA, including provisions regarding the 1974 Pension Trust. *Id.* Freeman did not make any inquiry of BCOA before or during the 2007 negotiations, did not offer any suggestions or comments regarding contributions to the 1974 Pension Trust, and did not attempt to exercise any control over BCOA's negotiations in any way. *Id.* Instead, when Freeman revoked its membership in BCOA, it severed all ties with BCOA and requested that BCOA remove virtually any trace of Freeman from BCOA's records. *Id.* Such conduct by Freeman is fundamentally at odds with an agency relationship, and no agency relationship existed between Freeman and BCOA as a matter of law.

### 3.    Freeman Cannot State A Claim for Breach Of The Duty Of Good Faith And Fair Dealing Under D.C. Law.

Freeman cannot establish under D.C. law that BCOA somehow owed or breached an alleged "duty of good faith and fair dealing" toward Freeman. Complaint ¶52. Under D.C. law, a covenant of good faith and fair dealing is implied in contracts between two parties. *See, e.g., Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006) (citations omitted); *see also C&E Serv., Inc.*, 2007 WL 2206909, at *13 (all contracts under D.C. law contain an implied covenant of good faith and fair dealing). Since Freeman's

withdrawal from BCOA in 1997, there has been no contractual relationship between BCOA and Freeman from which the Court could infer an implied duty of good faith and fair dealing. Freeman's contractual and contribution obligations under the evergreen clause are to the 1974 Pension Trust, not BCOA. Freeman thus is unable to establish a contractual relationship with BCOA from which the Court could infer a duty of good faith and fair dealing.

### 4.    <u>BCOA Did Not Breach Any Duty Owed To Freeman.</u>

Even if D.C. law somehow imposed on BCOA a duty of good faith and fair dealing toward non-BCOA member Freeman when BCOA negotiated the 2007 NBCWA, Freeman does not and cannot establish that BCOA breached that duty. As noted above, BCOA negotiated a uniform contribution rate to the 1974 Pension Trust (currently $2.00 per hour) that applies to all employers that participate in the 1974 Pension Plan, including BCOA member companies and non-BCOA member companies. Freeman was not singled out or treated differently from any other coal company with respect to the 1974 Pension Trust.

Freeman's active and retired miners (just like all other active and retired miners who are covered by the 1974 Pension Trust) are receiving the benefits of several pension benefit <u>increases</u> that were negotiated by BCOA and the UMWA in the 2007 NBCWA, including:

- For active employees, an increase of $10 per month per year of service for each year of future service;

- For active employees, an increase of $10 per month for each year of past service, payable on their retirement;

- For retirees, an increase in their pensions of $15.00 per month; and

- Lump sum payments of $565 for retirees, $440 for surviving spouses, and $440 for disability pensioners;

Perkins Decl., ¶41.

Freeman alleges that the pension contribution "formula" negotiated by BCOA (*i.e.*, contributions per hour instead of per ton) "imposes greater financial burdens on Freeman and other similarly situated coal operators than on Consol," and thus violates some undefined duty owed by BCOA to Freeman (Complaint ¶¶40-41). This argument cannot survive summary judgment.

As conclusively established in the Declarations of UMWA President Roberts and BCOA's Perkins, BCOA and the UMWA did not establish the per-hour contribution formula to the 1974 Pension Plan in the 2007 NBCWA. To the contrary, the basis for contributions to the 1974 Pension Trust was changed exclusively to a "per hour" basis in 1988, when Freeman was a member of BCOA. Perkins Decl., ¶33, Roberts Decl., ¶18.[1] Employer contributions to the 1974 Pension Plan have remained exclusively on a "per hour" basis during every NBCWA negotiation since that time, including the 1993 NBCWA negotiations, when Freeman was still a member of BCOA. Perkins Decl., ¶33.

Therefore, by its participation in BCOA in 1988 when the rate was changed exclusively to a per-hour basis, Freeman is estopped from raising this claim, and by waiting 19 years to assert this claim, Freeman is barred by the doctrine of laches. *See National R.R. Passenger Corp, v. Lexington Ins. Co.*, 357 F.Supp.2d 287, 296 (D.D.C. 2005) (in applying laches, court must consider whether plaintiff inexcusably or unreasonably delayed filing suit and whether defendant is prejudiced because of that

---

[1] From 1978 to 1988, contributions to the 1974 Pension Trust were based on a combination of "per hour" and "per ton" contributions, with the hourly rate ranging from $0.75 to $1.03, and the per ton rate ranging only from $.06 to $.08. *See* Roberts Decl. ¶18 (chart).

delay); *see also NAACP v. NAACP Legal Defense Educ. Fund, Inc.*, 753 F.2d 131, (D.C. Cir. 1985) (barring claim after 13 year delay); *Jenkins v. Peters*, 288 F.2d 401, 402 (D.C. Cir. 1961) (barring claim after 19 year delay).

### 5.     There Is No General Standard Of Reasonableness That Applies To The Results Of Collective Bargaining.

Freeman alleges in its complaint that BCOA owed a duty to Freeman during its collective bargaining negotiations with the UMWA to act "not arbitrarily or capriciously or unreasonably." Complaint ¶53. Freeman contends that the contribution rates to the 1974 Pension Plan negotiated by BCOA and the UMWA are "drastic" and "unreasonable." Complaint ¶55(d). These allegations are insufficient to withstand summary judgment.

Freeman's invitation for the court to analyze and decide the "reasonableness" of the collectively bargained contribution rate to the 1974 Pension Trust is misguided. There is no general standard of reasonableness that courts are authorized to apply in reviewing the terms of a collective bargaining agreement. As the Supreme Court has stated in reviewing the terms of a prior NBCWA negotiated by BCOA and the UMWA concerning the UMWA Trusts, "[t]here is no general requirement that the complex schedule of the various employee benefits must withstand judicial review under an undefined standard of reasonableness." *United Mine Workers of America Health & Retirement Funds v. Robinson*, 455 U.S. 562, 574 (1982). So long as the terms negotiated do not violate any law (*e.g.*, such as laws prohibiting discrimination on grounds of race, or laws regulating certain industries), "a federal court has no authority to modify the substantive terms of a collective-bargaining contract." *Id.* at 575-76.

In short, because the Court is not authorized to perform the "reasonableness" analysis requested by Freeman, this aspect of Freeman's complaint should also be dismissed as a matter of law, without the need for time-consuming and expensive discovery.

Notwithstanding the above, however, and without waiving BCOA's legal arguments or BCOA's objections to Freeman's discovery requests on this issue, BCOA submits that its negotiation of contributions to the 1974 Pension Trust was both reasonable and consistent with federal law. Indeed, in an era where many companies and industries have been unable or unwilling to fund their pension promises and Congress has intervened and passed a federal law, the Pension Protection Act of 2006, P.L. No. 109-280, to improve the funding of pension plans and remedy funding deficiencies, Freeman's lament about its contribution obligations rings especially hollow. This is particularly so given the fact that the 1974 Pension Trust, according to its independent actuaries, faced a funding deficit of approximately $1.2 billion ($6.97 billion liability and $5.80 billion assets) at the conclusion of the 2007 NBCWA negotiations. Perkins Decl. ¶43 (citing February 9, 2007 report from Mercer Human Resource Consulting, actuaries for the 1974 Pension Trust).

In addition, as noted by UMWA President Roberts in his Declaration, the current $2.00 per hour contribution rate is not "unprecedented" as alleged by Freeman. Complaint ¶1. To the contrary, the $2.00 per hour contribution rate now satisfies employers' contribution obligations to both the 1974 Pension Trust and the 1950 Pension Trust (which have been merged), and the contribution rate is lower than the hourly contribution rates that BCOA and non-BCOA employers (including Freeman) paid to

those Trusts under the 1978 NBCWA, the 1981 NBCWA, and the 1984 NBCWA, when the rate reached as high as $3.71 per hour.  Roberts Decl., ¶18.

Finally, as demonstrated by the declarations of UMWA President Roberts and BCOA's Perkins, BCOA and the UMWA negotiated the contribution requirements in the 2007 NBCWA to pay for collectively bargained benefits and to comply with the Pension Protection Act of 2006, which was passed by Congress and signed into law by the President on August 17, 2006.  Roberts Decl., ¶14; Perkins Decl., ¶¶39, 42.  In general, the Pension Protection Act encourages employers to fully fund their pension obligations, and imposes certain obligations and remedial requirements on employers and pension plans that have funding deficiencies.  Among other things, if a multiemployer pension plan such as the 1974 Pension Plan falls below 80% funded, it is considered "endangered."  If a plan is considered "endangered," notice of its funding deficiency must be provided to the Plan's participants and beneficiaries, the bargaining parties, the Pension Benefit Guaranty Corporation ("PBGC"), and the Department of Labor ("DOL"), and a Funding Improvement Plan must be developed to reduce the Plan's shortfall.  For "endangered" plans, the Funding Improvement Plan must reduce the percentage of underfunding (compared to 100% funding) by one-third within ten years, by taking necessary actions that could include additional contributions.  *See generally* 29 U.S.C. § 1085.

In order to pay for the UMWA bargaining demands, comply with the Pension Protection Act, and prevent the 1974 Pension Trust from falling below the 80% funded level and into "endangered" status, BCOA engaged its actuaries, analyzed the funding status of the Trust in light of the pension increases demanded by the UMWA, and

determined that employer contributions starting at $2.00 per hour and increasing over the term of the 2007 NBCWA were appropriate. Perkins Decl., ¶42. The UMWA and its benefits consultant reviewed the calculations from BCOA's actuaries, shared them with the UMWA's outside actuaries, and concluded that they were reasonably based. Roberts Decl. ¶17. BCOA and the UMWA thereby reached agreement on the level of contributions to the 1974 Pension Plan. Roberts Decl., ¶17, Perkins Decl., ¶¶41-42.

In summary, BCOA denies that it owed any duty to Freeman when it engaged in collective bargaining with the UMWA for the NBCWA of 2007. If any such duty existed, however, and the Court delves into the reasonableness of the pension contribution rate negotiated by BCOA and the UMWA, Freeman's allegations cannot withstand scrutiny or summary judgment.

## CONCLUSION

For all of the foregoing reasons, and the reasons stated by the Trustees and the UMWA in their separate motions for summary judgment, BCOA requests that the Court grant its motion for summary judgment and the motions of the Trustees and the UMWA.

Respectfully submitted,

_____/s/_____
Peter Buscemi
D.C. Bar No. 269092
Stanley F. Lechner
D.C Bar No. 370986
Charles P. Groppe
D.C. Bar No. 464035

DATED: September 10, 2007

MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004
Tel:    (202) 739-3000

Fax:    (202) 739-3001
E-mail: pbuscemi@morganlewis.com
        slechner@morganlewis.com
        cgroppe@morganlewis.com

*Counsel for Defendant*
Bituminous Coal Operators' Association,
Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Holland, et al., )<br><br>Plaintiff, )<br><br>v. )<br><br>Freeman United Coal Mining Company, )<br>et al., )<br><br>Defendants. ) | Case No. 07-cv-490 (PLF) |
| Freeman United Coal Mining Company, )<br><br>Plaintiff, )<br><br>v. )<br><br>United Mine Workers of )<br>America, et al., )<br><br>Defendants. ) | Case No. 07-cv-1050 (PLF) |

**DEFENDANT BCOA'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE**

Pursuant to Local Rules 7(h) and 56.1, Defendant Bituminous Coal Operators'

Association ("BCOA") hereby submits the following Statement of Material Facts Not In

Dispute in support of its Motion for Summary Judgment in Case No. 07-cv-1050.

Because the only claims that have been asserted against BCOA in these consolidated

cases are claims by Freeman United Coal Mining Company ("Freeman") in Case No. 07-

cv-1050, this Statement of Material Facts Not In Dispute addresses only those claims.

1.      For more than 50 years, BCOA has negotiated with the United Mine
Workers of America ("UMWA") a series of collective bargaining agreements titled,
National Bituminous Coal Wage Agreements, commonly known in the industry as
"NBCWAs." Freeman Complaint in 07-cv-1050 at ¶ 13.

2.      Freeman has been signatory to numerous NBCWAs, including the
NBCWAs of 1978, 1981, 1984, 1988, and 1993. Freeman Answer in 07-cv-490 at ¶ 24.

3.      The NBCWAs to which Freeman has been signatory state that the UMWA
1974 Pension Plan and 1974 Pension Trust are "incorporated by reference and made a
part of this Agreement." Freeman Answer in 07-cv-490 at ¶ 18, 24. *See also In re*
*United Mine Workers of America Employee Benefit Plans Litigation*, 782 F. Supp. 658,
661 (D.D.C. 1992), *aff'd, United Mine Workers of America 1974 Pension Trust v.*
*Pittston*, 984 F.2d 469, 472 (D.C. Cir. 1993), *cert. denied,* 509 U.S. 924 (1993).

4.      The current collective bargaining agreement between Freeman and the
UMWA states that the UMWA 1974 Pension Plan and 1974 Pension Trust are
"incorporated by reference and made a part of this Agreement." Roberts Decl. ¶ 29.

5.      The UMWA 1974 Pension Plan and 1974 Pension Trust include a
provision referred to as the "evergreen clause," which in 1984 stated as follows:

> Any Employer who employed any Participant eligible for
> coverage under, or who received or receives benefits under,
> the 1974 Pension Plan, or any Employer who was or is
> required to make, or who has made or makes contributions
> to the 1974 Pension Plan and Trust, is obligated and
> required to comply with the terms and conditions of the
> 1974 Pension Plan and Trust, as amended from time to
> time, including, but not limited to, making the contributions
> required under the National Bituminous Coal Wage
> Agreement of 1978 as amended from time to time and any
> successor agreements thereto, including, but not limited to,
> the National Bituminous Coal Wage Agreement of 1984.

Stover Decl., Exhibit A at Art. VIII. B. (16), and Exhibit B
at Art. X.

6.      The 1974 Pension Plan and 1974 Pension Trust continue to include the

evergreen clause, which currently states as follows:

> Any Employer who employed any Participant eligible for
> coverage under, or who received or receives benefits under,
> the 1974 Pension Plan, or any Employer who was or is
> required to make, or has made or makes contributions to
> the 1974 Pension Plan and Trust, is obligated and required
> to comply with the terms and conditions of the 1974
> Pension Plan and Trust, as amended from time to time,
> including, but not limited to, making the contributions
> required under the National Bituminous Coal Wage
> Agreement of 1978 as amended from time to time and any
> successor agreements thereto, including, but not limited to,
> the National Bituminous Coal Wage Agreement of 2007.
>
> Stover Decl., Exhibit E at Art. VIII. B. (16), and Exhibit F
> at Art. X.

7.      Freeman employed participants eligible for coverage under, or who

received or receive benefits under, the 1974 Pension Plan.  Stover Decl. ¶ 8.

8.      The contribution to the 1974 Pension Plan and Trust required under the

NBCWA of 2007, effective January 1, 2007, is $2.00 per hour for each hour of classified

work during calendar year 2007.  Perkins Decl. ¶ 24; Roberts Decl. ¶ 18; Freeman

Answer in 07-cv-490 at ¶ 23.

9.      Although Freeman's retirees are receiving from the 1974 Pension Plan the

pension benefits negotiated in the 2007 NBCWA, Freeman has not made any

contributions to the 1974 Pension Trust from January 1, 2007 to the present.  Freeman

Answer in 07-cv-490 at ¶ 1.

10.     Freeman was a member of BCOA from April 1966 until it withdrew its

membership on July 29, 1997.  When Freeman withdrew its membership, Freeman

revoked "any and all authority which may previously [had] been granted to the BCOA to

negotiate on its behalf" with the UMWA. A copy of Freeman's letter of withdrawal from

BCOA is appended as Attachment 1 to the Declaration of C. Perkins. *See* Perkins Decl. ¶

15.

11.     Freeman did not authorize BCOA to negotiate on its behalf, and Freeman

did not exercise any control over BCOA, when BCOA negotiated with the UMWA for

the NBCWA of 2007.   Perkins Decl. ¶ 17.

12.     From 1978 to 1988, contributions to the 1974 Pension Trust were based on

a combination of per-hour and per-ton contributions, with the hourly rate ranging from

$0.75 to $1.03, and the per-ton rate ranging from $.06 to $.08.  In the 1988 NBCWA,

BCOA and the UMWA changed the funding basis for the 1974 Pension Plan exclusively

to a per-hour basis, and employer contributions to the 1974 Pension Plan remain

exclusively on a per-hour basis today.   Roberts Decl. ¶ 18 (chart); Perkins Decl. ¶ 33.

13.     In December 2006, BCOA and the UMWA reached agreement on the

terms of a new collective bargaining agreement, titled the National Bituminous Coal

Wage Agreement of 2007 ("2007 NBCWA").  Freeman Complaint in 07-cv-1050 at ¶ 30;

Freeman Answer in 07-cv-490 at ¶ 22; Perkins Decl. ¶ 37; Roberts Decl. ¶ 20.

14.     The UMWA conducted a national ratification vote on the 2007 NBCWA

whereby approximately 75% of the UMWA membership nationwide, working for BCOA

and non-BCOA companies, voted on and ratified the 2007 NBCWA.  Roberts Decl. ¶ 21.

15.     More than 30 non-BCOA companies, including virtually all the major coal

operators in the unionized sector of the bituminous coal industry, have agreed to the

terms of the 2007 NBCWA (some with minor modifications in areas other than the 1974

Pension Plan) and have accepted the obligation to contribute to the 1974 Pension Plan at the $2.00 per hour rate specified in the 2007 NBCWA.  Roberts Decl. ¶ 23-24;  Perkins Decl. ¶ 14.

16.     After the 2007 negotiations were concluded, the 1974 Pension Plan's actuaries from Mercer Human Resource Consulting performed an analysis of the financial condition of the 1974 Pension Plan reflecting the effects of what had been negotiated in the 2007 NBCWA.  The February 9, 2007 Mercer analysis estimated that, as of July 1, 2006, in light of the negotiated benefit changes, the actuarial value of the 1974 Pension Plan's assets was approximately $5.8 billion and its liability was approximately $6.98 billion within the meaning of the Pension Protection Act of 2006. Perkins Decl. ¶ 43.

Respectfully submitted,

_____/s/_____
Peter Buscemi
D.C. Bar No. 269092
Stanley F. Lechner
D.C Bar No. 370986
Charles P. Groppe
D.C. Bar No. 464035

Dated: September 10, 2007

MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004
Tel:     (202) 739-3000
Fax:     (202) 739-3001
E-mail: pbuscemi@morganlewis.com
          slechner@morganlewis.com
          cgroppe@morganlewis.com

*Counsel for Defendant*
*Bituminous Coal Operators' Association,*
*Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Holland, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 07-cv-490 (PLF) |
| Freeman United Coal Mining Company, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| Freeman United Coal Mining Company, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07-cv-1050 (PLF) |
| | ) | |
| v. | ) | |
| | ) | |
| United Mine Workers of America, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF CHARLES S. PERKINS, III

I, Charles S. Perkins, III, do hereby declare as follows:

**A.      Introduction**

1.      I am currently the Secretary-Treasurer of the Bituminous Coal Operators'
Association, Inc. ("BCOA"). I became employed by BCOA in April 1976 and have
worked continuously as an economist employed by BCOA for 31 years until May 2007.
I currently provide economic and other services to BCOA as a consultant.

2.      I have been involved with or assisted BCOA in collective bargaining with
the United Mine Workers of America ("UMWA") throughout the term of my

employment. Among my duties at BCOA, I have monitored the UMWA 1974 Pension

Plan and Trust ("1974 Pension Plan"), analyzed its financial condition, and assisted

BCOA in collective bargaining involving the 1974 Pension Plan.

**B.    The Bituminous Coal Operators' Association ("BCOA")**

3.    BCOA is a non-profit corporation incorporated in the District of

Columbia. BCOA was formed in 1950 to bring order and stability to labor negotiations

and labor relations in the bituminous coal industry. BCOA's offices are located at 1776 I

Street, NW, Washington, D.C. 20036.

4.    BCOA has negotiated each National Bituminous Coal Wage Agreement

("NBCWA") with the UMWA since 1951. Most recently, BCOA negotiated the 2007

NBCWA with the UMWA. Negotiations for the 2007 NBCWA were conducted

primarily in Washington, D.C. or at the UMWA's headquarters in Fairfax County,

Virginia.

5.    BCOA's members consist of bituminous coal companies that have

authorized BCOA to represent them in the negotiation of collective bargaining

agreements with the UMWA ("Operator Members"), and bituminous coal companies that

have special expertise in coal industry matters, including health, safety, training, and

government affairs ("Industry Committee Members").

6.    At one time, BCOA represented more than 200 companies in the

bituminous coal industry. Because of changes in the industry over the last 50 years,

however, BCOA's membership has declined considerably.

7.    At present, BCOA's Operator Members include the Consolidation Coal

Company and ten of its commonly-owned affiliated companies: Central Ohio Coal

Company, Eighty-Four Mining Company, Helvetia Coal Company, Island Creek Coal Company, Keystone Coal Mining Corporation, Laurel Run Mining Company, McElroy Coal Company, Quarto Mining Company, Southern Ohio Coal Company, and Windsor Coal Company. These companies were represented by BCOA during the negotiation of the 2007 NBCWA.

8.     BCOA currently has the following Industry Committee Members: Peabody Energy, Foundation Coal Company, and Jim Walter Resources, Inc. Industry Committee Members do not participate in BCOA's negotiation of the NBCWA. In 2007, BCOA's Industry Committee Members signed "me too" agreements with the UMWA.

9.     There is no minimum membership requirement for BCOA in negotiating the NBCWA on behalf of its Operator Members. Instead, in every NBCWA negotiated between 1978 and 2007, BCOA and the UMWA have included the following provision to address the possibility of BCOA ceasing to exist in the future, or the possibility of more than 50% of the tonnage membership of BCOA withdrawing from the Association:

> In the event BCOA ceases to exist, or in the event that more than 50% of the tonnage membership of BCOA on the Effective Date [of the NBCWA] has withdrawn prior to the time when the BCOA is required or permitted to take action under this Article [XX], then such action may be taken by majority vote, based on tonnage, of Employers who were BCOA members on the Effective Date.

10.     On the effective date of the 2002 NBCWA and the effective date of the 2007 NBCWA, Consolidation Coal Company and its affiliates represented more than 50% of the tonnage membership of BCOA, and neither Consolidation Coal nor its affiliates have withdrawn from BCOA since that time.

C.    **The National Bituminous Coal Wage Agreement ("NBCWA")**

11.    One of BCOA's principal functions is the negotiation of the NBCWA with the UMWA. BCOA has negotiated every NBCWA with the UMWA since 1950 – namely, the 1951, 1952, 1955, 1956, 1958, 1964, and 1966 amendments to the NBCWA of 1950 and the NBCWAs of 1968, 1971, 1974, 1978, 1981, 1984, 1988, 1993, 1998, 2002, and 2007.

12.    The NBCWAs govern the terms and conditions of employment in the organized sector of the bituminous coal industry, including the provision of pension benefits to retired coal miners covered by the NBCWA, which incorporates by reference the 1974 Pension Plan and Trust. When ratified by the employees represented by the UMWA, the NBCWA applies to all covered operations of BCOA Operator Members, as well as other coal operators who agree to its terms by signing so-called "me-too" agreements directly with the UMWA.

13.    The principal negotiators for the 2007 NBCWA were Peter Lilly, Chairman of the BCOA Negotiating Committee and Chief Operating Officer ("COO") of Consolidation Coal Company, and Cecil Roberts, President of the UMWA. The principal negotiators for the 2002 NBCWA were Brett Harvey, Chairman of the BCOA Negotiating Committee and President of Consolidation Coal Company, and Cecil Roberts, President of the UMWA. The principal negotiators for the 1998 NBCWA were Bobby Brown, Chairman of the BCOA Negotiating Committee and Chairman of Consolidation Coal Company, and Cecil Roberts, President of the UMWA.

14.    In 2007, following the negotiation of the 2007 NBCWA between BCOA and the UMWA, numerous organized bituminous coal companies signed "me-too"

agreements with the UMWA based on the terms of the 2007 NBCWA. These companies

ranged from small operators to medium-sized companies to the largest coal companies in

the United States that produce the majority of the tonnage produced in the organized

sector of the coal industry, including Peabody Energy, Foundation Coal, Jim Walter

Resources, PinnOak Resources, and P&M Coal.

**D.    Freeman United's Membership In And Withdrawal From BCOA**

15.    Freeman United Coal Mining Company ("Freeman") joined BCOA in

April 1966 and remained a member for approximately 31 years until it withdrew its

membership from BCOA on July 29, 1997. When doing so, Freeman revoked "any and

all authority which may previously [have] been granted to the BCOA to negotiate on its

behalf" with the UMWA. Freeman also requested that BCOA erase completely

Freeman's status as a member of BCOA by requesting that BCOA "take all actions

necessary to remove" Freeman's name from "BCOA's official membership roster and

committees, as well as any other lists, forms, summaries, or other documents (including

all electronic media) within the control of BCOA." A copy of Freeman's letter of

withdrawal from BCOA is appended hereto as Attachment 1.

16.    BCOA complied with Freeman's requests, and no longer represented

Freeman's interests in collective bargaining with the UMWA.

17.    After Freeman withdrew from BCOA in 1997, it exercised no control over

the conduct of BCOA in subsequent negotiations with the UMWA, including the conduct

of BCOA in negotiation of the 2007 NBCWA. Freeman did not inform BCOA of any

intent to participate in, receive information about, or influence the negotiation of the 2007

NBCWA, including provisions regarding the 1974 Pension Trust. Freeman did not make

any inquiry of BCOA before or during the 2007 negotiations, did not offer any

suggestions or comments regarding contributions to the 1974 Pension Trust, and did not

attempt to influence or exercise control over BCOA's negotiations.

**E.    Monterey Coal Company's Membership In And Withdrawal From BCOA**

18.    Monterey Coal Company ("Monterey") joined BCOA in 1972 and

remained a member for 20 years until it unilaterally withdrew its membership from

BCOA on September 22, 1992.  When doing so, Monterey "revoke[d] any and all

authority previously granted BCOA as a multi-employer bargaining agent to act on

[Monterey's] behalf."  Monterey also noted that it would "continue to comply with the

lawful provisions of the National Bituminous Coal Wage Agreement of 1988," but would

not "recognize any extension or successor agreement negotiated by BCOA."  A copy of

Monterey's letter of withdrawal from BCOA is appended hereto as Attachment 2.

19.    BCOA complied with Monterey's request, and no longer represented

Monterey's interests in collective bargaining with the UMWA.

**F.    The Evergreen Clause**

20.    During the negotiations that led to the 1978 NBCWA, BCOA and the

UMWA amended the 1974 Pension Plan to include a provision known as the "evergreen"

clause.  As negotiated by BCOA on behalf of its members, including Freeman and

Monterey, the evergreen clause was intended to ensure that all participating employers in

the 1974 Pension Plan, as well as other health and pension plans contained in the

NBCWA (collectively, "UMWA Health & Retirement Funds"), would continue to share

in the financial burden of funding benefits provided by the Plan.  The language of the

clause as negotiated in 1978 provided as follows:

> Any Employer who employed any participant eligible for
> coverage under, or who received or receives benefits under,
> the 1974 Pension Plan, or any Employer who was or is
> required to make, or who has made or makes contributions
> to the 1974 Pension Plan and Trust, is obligated and
> required to comply with the terms and conditions of the
> 1974 Pension Plan and Trust, as amended from time to
> time, including, but not limited to, making the contributions
> required under the National Bituminous Coal Wage
> Agreement of 1978, as amended from time to time, and any
> successor agreements thereto.

By insisting on these contractual preconditions for participation in the UMWA Health &

Retirement Funds in 1978 and thereafter, the Funds' settlors, BCOA and the UMWA,

agreed that the UMWA Health & Retirement Funds should not become a "last man's

club" where certain employers could pull out entirely, or contribute at reduced rates, at

the expense of the remaining employers.

21.    BCOA and the UMWA, as the 1974 Pension Plan's settlors, have the

power to amend the 1974 Pension Plan and Trust documents to reflect the agreement that

was negotiated between BCOA and the UMWA in the NBCWA. Historically, BCOA

and the UMWA have amended the 1974 Pension Plan and Trust documents immediately

after reaching agreement over the terms of the NBCWA. BCOA and the UMWA

amended the 1974 Pension Plan immediately after completing negotiations for the 1981,

1984, 1988, 1993, 1998, 2002, and 2007 NBCWAs. The 1974 Pension Plan and Trust

documents are incorporated by reference in, and thus made part of, each NBCWA.

22.    BCOA and the UMWA retained the evergreen clause in each NBCWA

from 1978 to the present, including the recently negotiated 2007 NBCWA. Each such

NBCWA added in the Plan and Trust documents for the 1974 Plan, at the end of the

evergreen clause, the phrase "including, but not limited to, the National Bituminous Coal

Wage Agreement of [current year]." In keeping with this pattern, the current NBCWA

adds, at the end of the evergreen clause, "including, but not limited to, the National

Bituminous Coal Wage Agreement of 2007."

23.    The evergreen clause in the plan document of the 1974 Pension Plan

currently states as follows:

> Any Employer who employed any participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978 as amended from time to time, and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2007.

24.    BCOA and the UMWA amended the 1974 Pension Plan to require

employers to contribute to the 1974 Pension Plan at the rates set forth in the 2007

NBCWA. The contribution rates for the 1974 Pension Trust are $2.00 per hour for each

hour of classified work, for calendar year 2007; $3.50 per hour for calendar year 2008;

$4.25 for calendar year 2009; and $5.00 per hour for calendar year 2010; and $5.50 for

the period beginning on January 1, 2011 and ending when the 2007 NBCWA is

terminated.

25.    Freeman and Monterey were members of BCOA when BCOA and the

UMWA negotiated the evergreen clause with the UMWA in the 1978 NBCWA.

26.    Freeman remained a member of BCOA when BCOA and the UMWA

renegotiated and retained the evergreen clause in the NBCWAs of 1981, 1984, 1988, and

1993.

8

27.    Monterey remained a member of BCOA when BCOA and the UMWA renegotiated and retained the evergreen clause in the NBCWAs of 1981, 1984, and 1988.

**G.    Freeman's and Monterey's Participation In The Evergreen Litigation**

28.    During the 1980's, numerous coal companies withdrew from BCOA and either refused to contribute to the UMWA Health & Retirement Funds (including the 1974 Pension Trust) or negotiated separate agreements with the UMWA that purported to allow those companies to contribute to the applicable Trusts at reduced rates or not at all. The 1974 Pension Plan and other UMWA Health & Retirement Funds initiated litigation in the District of Columbia during 1988 to enforce the evergreen clause, asserting (1) that these companies had a contractual obligation to contribute at the rate set in the then-current NBCWA, and (2) that the rate could not be modified or superseded by individual company agreements with the UMWA. *See In re United Mine Workers of America Employee Benefit Plans Litigation*, 782 F. Supp. 658 (D.D.C. 1992).

29.    BCOA, including Freeman and Monterey, participated in the litigation as amicus curiae, in support of the UMWA Health & Retirement Funds (including the 1974 Pension Plan) to enforce the evergreen clause.

30.    In February 1992, while Freeman and Monterey were still members of BCOA, the United States District Court for the District of Columbia granted the Funds' motion for summary judgment, concluding, among other things, that (1) the evergreen clause binds coal companies that withdraw from BCOA, (2) the evergreen clause binds companies that negotiate separate agreements with the UMWA that purport to allow such companies to pay less than the contribution rate in the NBCWA or nothing at all, and (3) the reference to "successor agreements" in the evergreen clause refers to the NBCWAs of

1984, 1988, and "subsequent years." *In re UMWA Benefit Plans Litig.*, 782 F. Supp. at 664-67.

31.     In 1993, the United States Court of Appeals for the D.C. Circuit affirmed. *United Mine Workers of America 1974 Pension Trust v. Pittston*, 984 F.2d 469 (D.C. Cir. 1993).

32.     After the evergreen litigation was concluded, BCOA negotiated the 1993 NBCWA that again included the evergreen provision. Freeman continued to be a member of BCOA during those negotiations, and was signatory to the 1993 NBCWA at the time it withdrew from BCOA in 1997.

**H.     Contributions To, And Benefits From, the 1974 Pension Plan**

33.     From 1978 to 1988, contributions to the 1974 Pension Trust were based on a combination of per hour and per-ton contributions, with the hourly rate ranging from $0.75 to $1.03, and the per-ton rate from $.06 to $.08. In the 1988 NBCWA, BCOA and the UMWA changed the funding basis for the 1974 Pension Plan exclusively to a per-hour basis. BCOA and the UMWA have not deviated from that standard in the last 20 years.

34.     The 1998 NBCWA negotiated between BCOA and the UMWA provided that contributions to the 1974 Pension Plan would be 75.0 cents per hour until the 1974 Pension Trust reached "full funding," at which time the contribution rate would be reduced to 0.0 cents per hour. "Full funding" was defined as when the "market value of assets of the 1974 Pension Trust exceeds the present value of accrued benefits of the Trust," using the Plan's funding assumptions.

35.    On July 1, 1998, pursuant to the terms of the 1998 NBCWA, the 1974 Pension Plan reached full funding, and the contribution rate to the 1974 Pension Plan was reduced effective August 1998 to 0.0 cents per hour for all existing signatory employers. When this funding threshold was reached, participating employers (including Freeman and Monterey) were not required to contribute to the 1974 Pension Trust unless and until BCOA and the UMWA established a new contribution rate. Employees and retirees of participating employers, however, including employees and retirees of Freeman and Monterey, continued to earn pension credits or receive benefits from the assets of the 1974 Pension Plan.

36.    The zero contribution rate to the 1974 Pension Plan remained in place throughout the remaining term of the 1998 NBCWA and through the term of the 2002 NBCWA. As a result, contributing employers, including Freeman and Monterey, were not required to make contributions to the 1974 Pension Plan for nine years, even though their retirees and their dependents continued to receive pension and other benefits from the Plan and their current employees continued to accrue benefits under the Plan.

37.    On December 15, 2006, after months of negotiations, BCOA and the UMWA reached a tentative agreement for the 2007 NBCWA, a five-year agreement effective January 1, 2007. Among other things, the 2007 NBCWA contained pension and benefit increases for the 1974 Pension Plan, as well as the new contribution rate that BCOA and the UMWA had negotiated.

38.    The new contribution rates for the 1974 Pension Plan require that obligated employers (including Freeman and Monterey) contribute at the rate of $2.00 per hour during calendar year 2007; $3.50 an hour during calendar year 2008; $4.25 an

11

hour during calendar year 2009; $5.00 an hour during calendar year 2010; and $5.50 an hour during calendar year 2011.

39.    BCOA and the UMWA negotiated these contribution rates with the intent to fund the agreed-upon benefits and comply with the recently enacted Pension Protection Act of 2006 ("PPA"), which (a) imposes certain obligations on employers to fully fund their pension obligations and (b) requires certain remedial actions by employers and employee pension plans when such pension plans face funding deficiencies.  Most significantly, if a pension plan, including a multiemployer pension plan like the 1974 Pension Plan, falls below the PPA's 80% fully funded threshold, it is considered "endangered" under the PPA, and several affirmative steps must be taken to rise above the 80% funding threshold.

40.    During negotiations for the 2007 NBCWA, the UMWA made several proposals for increased pension benefits that would have altered significantly the 1974 Pension Plan's funding status and placed the 1974 Pension Plan in "endangered" status during the term of the 2007 NBCWA.

41.    BCOA and the UMWA reached agreement on a series of benefit increases for both active employees and retirees.  These benefit increases include (a) for active employees, an increase of $10 per month per year of service for each year of future service; (b) for active employees, an increase of $10 per month for each year of past service, payable on their retirement; (c) for retirees, an increase in their pensions of $15.00 per month; and (d) lump sum payments of $565 for retirees, $440 for surviving spouses, and $440 for disability pensioners.  These negotiated benefit increases were incorporated into the 1974 Pension Plan's governing plan documents.

42.    In order to pay for the UMWA bargaining demands, comply with the Pension Protection Act, and prevent the 1974 Pension Trust from falling below the 80% funded level and into "endangered" status, BCOA engaged its actuaries, analyzed the funding status of the Trust in light of the pension increases demanded by the UMWA, and determined that employer contributions starting at $2.00 per hour and increasing over the term of the 2007 NBCWA were appropriate.  These contribution rates, in light of the negotiated benefit increases for plan participants, were projected to be sufficient to keep the Plan out of "endangered" status.

43.    After the 2007 negotiations were concluded, the 1974 Pension Plan's actuaries from Mercer Human Resource Consulting performed an analysis of the financial condition of the 1974 Pension Plan reflecting the effects of what had been negotiated in the 2007 NBCWA.  The February 9, 2007 Mercer analysis estimated that, as of July 1, 2006, in light of the negotiated benefit changes, the actuarial value of the 1974 Pension Plan's assets was approximately $5.8 billion and its liability was approximately $6.98 billion within the meaning of the Pension Protection Act of 2006.

I declare under penalty of perjury that the foregoing is true and correct.

Charles S. Perkins, III

Date: SEPTEMBER 7, 2007

13

# ATTACHMENT 1

Jun-08-2007  03:23am  From-BCOA

T-988  P.002/004  F-383



JUL 2 9 1997

B.C.O.A.

## Freeman United Coal Mining Company

1999 Wabash Ave., Suite 200B
Springfield, IL 62704-5364
217/698-3300
Fax 217/698-3379

July 29, 1997

Mr. Joseph Brennan, President
Bituminous Coal Operators Association
918 Sixteenth Street
Washington, DC  20006

Re: <u>Resignation of Membership</u>

Dear Mr. Brennan,

Pursuant to Article VII, Section (a) of the BCOA By-Laws, Freeman United Coal Mining Company (Freeman) hereby resigns its membership in the Bituminous Coal Operators Association (BCOA), effective immediately. Accordingly, please take all actions necessary to remove our company name from the BCOA official membership roster and committees, as well as any other lists, forms, summaries, or other documents (including all electronic media) within the control of the BCOA.

Freeman also hereby withdraws any and all authority which may previously have been granted to the BCOA to negotiate on its behalf with the International Union, United Mine Workers of America, any other labor organization, or any other entity whatsoever. This unequivocal withdrawal of bargaining authority is effective immediately, this 29ᵗʰ day of July, 1997.

Finally, to the extent that Freeman may be required, by the BCOA By-Laws or otherwise, to make any payments to the BCOA in the future, these payments will be made solely because of such obligations, and any such payments shall not be construed as granting any authority to the BCOA or otherwise continuing any relationship between the BCOA and Freeman United Coal Mining Company.

Thank you for your prompt attention to this matter.

Sincerely,

Walter A. Gregory DHD

Walter A. Gregory, President and COO
Freeman United Coal Mining Company

By  Donald H Dame

Donald H. Dame
Authorized Representative

LH/102

# ATTACHMENT 2

# MONTEREY COAL COMPANY

POST OFFICE BOX 496 · CARLINVILLE, ILLINOIS 62626 · (217) 854-2611

J. D. GOODRICH, JR.
PRESIDENT

September 22, 1992

**RECEIVED**

SEP 2 5 1992

Mr. Joseph P. Brennan, President
Bituminous Coal Operators' Association, Inc.
918 16th Street, N.W. -- Suite 303
Washington, D.C. 20006 - 2971

Mr. Richard Trumka, President
United Mine Workers of America
900 15th Street N.W.
Washington, D.C. 20005

Gentlemen:

Pursuant to the constitution and by-laws of the Bituminous Coal Operators' Association, Inc. (BCOA), Monterey Coal Company (Monterey), hereby resigns membership in the BCOA.

Monterey revokes any and all authority previously granted BCOA as a multi-employer bargaining agent to act on our behalf. Monterey will continue to comply with the lawful provisions of the National Bituminous Coal Wage Agreement of 1988, but will not recognize any extension or successor agreement negotiated by BCOA.

Please advise immediately if you have any questions concerning this correspondence.

Very Truly Yours,

JDG:kks

c: J. R. Angelton, President
UMWA District 12

All BCOA Member Companies

A division of EXXON COAL USA, INC.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Holland, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Case No. 07-cv-490 (PLF) |
| Freeman United Coal Mining Company, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| Freeman United Coal Mining Company, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07-cv-1050 (PLF) |
| | ) | |
| v. | ) | |
| | ) | |
| United Mine Workers of America, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

Upon consideration of the Motion for Summary Judgment submitted by Defendant Bituminous Coal Operators' Association, Inc. ("BCOA"), any opposition thereto, as well as any reply in support thereof,

It is, on this _____ day of _____, 2007, hereby

ORDERED that BCOA's Motion for Summary Judgment is granted, and that Counts I and II against BCOA in the Complaint filed in Case No. 07-cv-1050 are DISMISSED with prejudice.

_____
Paul F. Friedman
United States District Judge