UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Michael H. Holland, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  07-cv-490 (PLF) |
| | ) | |
| Freeman United Coal Mining Co., et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| Freeman United Coal Mining Co., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  07-cv-1050 (PLF) |
| | ) | |
| United Mine Workers of | ) | |
| America, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**REPLY MEMORANDUM  IN
SUPPORT OF THE UNITED MINE WORKERS OF
AMERICA'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure and Local Civil Rule 7,

Defendant United Mine Workers of America ("UMWA" or "Union"), by its undersigned

counsel, hereby submits this reply memorandum in support of its motion for summary judgment.

For the reasons discussed below, as well as those set forth in its initial legal memorandum, the

UMWA is entitled to the relief requested.  The opposition briefs filed by Freeman United Coal

Mining Company ("Freeman") and Monterey Coal Company ("Monterey") fail to establish why

these companies should be absolved of their contractual responsibility to remit contributions to

the 1974 UMWA Pension Plan ("The 1974 Plan").

The contribution rate contained in the 2007 National Bituminous Coal Wage Agreement ("2007 NBCWA") is valid and not subject to collateral attack by either Freeman or Monterey - two companies who admittedly agreed to the process through which the Union and BCOA would set rates for contributions required to be made to this collectively bargained pension plan. As the Union previously explained, it is undisputed that prior to the 2007 NBCWA the contributing employers to the 1974 Plan - including Freeman and Monterey - had made no contributions to the pension plan for nearly nine years. See Defendant United Mine Workers of America's Statement of Material Facts As To Which There is No Genuine Issue ("UMWA SOF"), at ¶ 16.

It is further undisputed that when the BCOA and Union met to negotiate terms of a successor to the 2002 NBCWA, the parties were confronted with an aging union membership fast approaching retirement and newly passed pension reform litigation – in the form of the Pension Protection Act of 2006, P.L. No. 109-280. These circumstances required the Union and BCOA to negotiate contribution increases for the 1974 Plan. Freeman and Monterey hope to divert this Court's attention from these simple facts by alleging a grand conspiracy theory that suggests, among other things, that the entire organized bituminous coal industry acted in concert with the Union to impose "inequitable" and "unfair" business conditions on the coal operations of Freeman and Monterey.

Moreover, in the hope of persuading the Court that this case does not lend itself to the straightforward analysis that is actually called for, Freeman and Monterey argue that they are entitled to exhume and re-examine the voluminous discovery previously conducted by many of the same parties in the course of the Pittston litigation. See United Mine Workers of America

2

1974 Pension Trust v. Pittston, 782 F. Supp 658, aff'd, 984 F.2d 469 (D.C. Cir. 1993). As the Union has explained before, such a massive undertaking not only imposes an undue burden upon the UMWA but also needlessly expends judicial resources. Freeman and Monterey's effort to re-litigate the Pittston case amounts to a discovery fishing expedition that is wholly unnecessary to resolve the one question that this case presents – is the contribution rate set in the 2007 NBCWA valid? The Union submits that the answer to this question is an unequivocal yes.

First and foremost, Freeman and Monterey's suggestion that the 2007 NBCWA is not a successor to previous NBCWAs finds no support in either the facts or the law. As the Union previously established, the negotiations between the Union and BCOA, the subsequent ratification by the Union's membership, and the overwhelming adoption of the 2007 NBCWA by the organized sector of the bituminous coal industry unquestionably establish that the 2007 NBCWA is a successor agreement as contemplated by the "evergreen" clause.

As it had for over 50 years, the Union entered negotiations with BCOA in 2006 intent on bargaining a labor contract that would be the 2007 NBCWA. See Declaration of Cecil E. Roberts, at ¶ ¶ 21-22. Similarly consistent with the bargaining process that resulted in each previous NBCWA, the purpose of the contract negotiations was to set the industry standard for wages and terms and conditions of employment for the Union's members within the bituminous coal industry. See Declaration of Cecil E. Roberts, at ¶ 22. As the Union has demonstrated, there was no doubt that the BCOA was the appropriate party with which to bargain a successor labor contract. Id. at ¶ 25-26

Freeman and Monterey entirely ignore the above facts and instead suggest that this Court should focus on the fact that membership in BCOA had changed so as to render the organization

3

the functional equivalent of a single employer, namely Consolidation Coal Co. Freeman and

Monterey's entire conspiracy theory is derived from this premise. Absolutely no legal support is

provided, however, for the premise itself, i.e, that the 2007 NBCWA's status as a successor

agreement depends upon the number of coal companies that are members of BCOA.

In Flynn v. Dick Corporation, 384 F.Supp.2d 189, 194-95 (D.D.C. 2005) rev'd on other

grounds, 481 F.3d 824 (D.C. Cir. March 20, 2007), this Court was presented with a similar

question concerning whether a particular collective bargaining agreement should be considered a

"successor" to a previous labor contract. In that case, an employer agreed to be bound by both a

collective bargaining agreement negotiated between a union and certain employers' associations,

as well as any successor agreements. Id. at 191. Several years later, the same union negotiated a

collective bargaining agreement with one of the trade associations but not the other. The union

argued that this agreement was a successor agreement to the previous contract and bound the

defendant company. Id. at 194-95.

This Court concluded that the subsequent labor contract was a "successor" agreement and

that the terms of that agreement were binding on the defendant company. Id. at 195. In so

ruling, the Court considered a number of factors, including the scope of the work covered by

each contract, the workers covered by the agreements and the similarity between the terms of

each agreement. Id. The fact that the parties on the employer side of an agreement were not

identical did not prevent the Court from finding the agreement to be a valid successor agreement.

Freeman and Monterey suggest that the Court should not consider the overwhelming

scope and coverage of the 2007 NBCWA because a single employer agreement cannot be

transformed into a national agreement after it has been signed. See Freeman Coal Mining

4

Company's Opposition to the Motions for Summary Judgment Filed by the 1974 Pension Trust, United Mine Workers of America, and Bituminous Coal Operators' Association ("Freeman Opposition"), at 9, 18. As previously discussed in the Union's opening brief, the 2007 NBCWA was never treated as a single employer agreement, nor was it transformed into a national agreement after the fact; it was negotiated and ratified as a national agreement and the group of employers who ultimately accepted the terms of the 2007 NBCWA represents approximately 75% of the UMWA's active membership in the coal mining industry. In any event, Freeman and Monterey provide no legal support for their contrary position.

Moreover, such a rigid stance is inconsistent with the broad factors relied on by Flynn. When these factors are applied to the 2007 NBCWA, it is clear that this agreement is a "successor" agreement. The Union further submits that Flynn provides added support for its position that the overall factual context surrounding the 2007 NBCWA controls whether it is a successor agreement. Here, like in Flynn, the UMWA was a party to the 2007 NBCWA, as it was in all previous NBCWAs dating back to 1950. Similarly, the scope of the work and the individuals covered by the 2007 NBCWA did not differ from past agreements. Finally, a vast majority of the employers in the organized bituminous coal industry have accepted the terms of the 2007 NBCWA. Thus, based on the Flynn factors, the 2007 NBCWA is clearly the successor agreement to previous NBCWAs.

In order to accept the restrictive view of the 2007 NBCWA proposed by Freeman and Monterey, it would be necessary for this Court to entirely disregard over 50 years of industry practice in which the terms and conditions of the NBCWA are viewed as establishing the industry standard  - either immediately for companies who are members of BCOA or

5

subsequently through companies signing "me-too" agreements. See UMWA SOF, at 3. The

distinction that Freeman and Monterey seek to draw between BCOA companies and "me-too"

operators simply does not exist in the bituminous coal industry. Indeed, the concept of the

NBCWA as an industry wide contract is so well established that the Union was able to enter into

a labor contract with a non-BCOA company that agreed to be bound by the terms of the 2007

NBCWA even **prior** to its negotiation. See Ohio Valley Coal Company-UMWA Wage

Agreement, ("OVCC-UMWA Agreement") attached hereto as Exhibit 1.

The OVCC-UMWA Agreement, adopting in 2002 the terms of the anticipated 2007

NBCWA, comprehended the longstanding industry presumption that the Union's negotiations

with the BCOA would establish the terms that would succeed those of the 2002 NBCWA. Even

more significantly, however, in the context of this case, the OVCC-UMWA Agreement expressly

delineated the bargaining that would have to take place to establish a successor agreement

regardless of whether BCOA existed at the time. This bargaining was not conditioned on BCOA

membership. The terms of a successor agreement could be set by the Union and the largest coal

employer in terms of coal tonnage produced. According to the terms of the OVCC-UMWA

Agreement, such a contract would not be viewed as a single employer agreement.

The calculations relied on by the Union and BCOA when they negotiated an increase to

the 1974 Plan contribution rate also significantly undercut Freeman and Monterey's suggestion

that the 2007 NBCWA is a single employer agreement. When the parties considered how to pay

for the contemplated pension increases, they took into account the projected hours to be worked

in the organized sector of the bituminous coal industry over the life of the agreement rather than

the hours to be worked only by employees of BCOA member companies. See Declaration of

Mark J. Murphy, at ¶ 9.[1]  Such a consideration conclusively demonstrates that, from the inception

of bargaining that led to the 2007 NBCWA, the parties intended the agreement to be a national

agreement and not simply a single employer contract.

The Union submits that regardless of how the BCOA is constituted, the 2007 NBCWA is

a national agreement and must be viewed as a successor contract.  The Union entered

negotiations with the intention that the 2007 NBCWA would be a national agreement.  The

Union membership ratified the contract as a national agreement and the coal industry viewed the

2007 NBCWA as such.  Because it is the successor contract, Freeman and Monterey must

contribute to the 1974 Plan at the rates set in the 2007 NBCWA.

Even if this Court were to determine that the 2007 NBCWA was not a successor

agreement, Freeman and Monterey would still be required to contribute to the 1974 Plan at the

present rate agreed to by the UMWA and BCOA.  This is true because Article XX of the

NBCWA establishes the appropriate parties who may set the rate to be paid to the 1974 Plan by

contributing employers.  Specifically, Article XX (d)(1)(v) provides that

> [i]n the event the BCOA ceases to exist, **or** in the event more than
> 50% of the tonnage membership of the BCOA on the Effective
> Date has withdrawn prior to the time when the BCOA is required
> or permitted to take action under this Article, then such action may
> be taken by majority vote, based on tonnage, of Employers who
> were BCOA members on the Effective Date.

See Article XX (d)(1)(v) of the 2002 NBCWA included as Attachment 3 to Monterey's

Memorandum in Opposition to Motions for Summary Judgment (emphasis supplied).

---

[1] The underlying document referenced in the Murphy Declaration has been marked confidential by the Union.  The
Union intends to file this document under seal pursuant to the procedure set forth in Local Rule 5(j) and this Court's
October 2, 2007 Confidentiality Order.

In their opposition, Freeman and Monterey completely misinterpret this provision by failing to recognize the inclusion of the disjunctive "or." The coal companies mistakenly argue that this provision is only triggered if BCOA ceases to exist. See Freeman Opposition, at 12 n.2. That is simply not true.

Article XX can be triggered if BCOA members representing more than 50% of the member tonnage withdraw from the association. At the time of the 2006 negotiations, Consol and its subsidiaries represented over 50% of the tonnage of the BCOA membership on the effective date of the 2002 NBCWA. See UMWA SOF at ¶ 10. Therefore, according to the language of Article XX, the UMWA properly viewed the employers comprising BCOA (regardless of their corporate structure) to be the appropriate entity with which to bargain over the 1974 Plan contribution rate. The 1974 Plan contribution rate that was set by this group of employers (whether they are considered BCOA, Consol or some differently named trade group or association) and the UMWA is valid and applies to Freeman and Monterey.

In Pittston, this Court recognized that the underlying reason the Union and BCOA negotiated the evergreen provision was to ensure that "all participating employers would contribute equally to the [UMWA Health and Retirement] Trusts [,including the 1974 Plan,] and would not be permitted to withdraw from participation and leave the burden of funding health and retirement benefits of retired miners to the remaining employers." Pittston, 782 F.Supp. at 667. The language contained in Article XX of the NBCWAs provides that this equal financial burden will be preserved regardless of future BCOA membership

The importance the BCOA and Union placed on spreading the financial burden to all participating employers also fatally undercuts the argument made by Freeman and Monterey that

8

their refusal to contribute to the 1974 Plan at the rates set forth in the 2007 NBCWA will not fundamentally damage the ongoing viability of the 1974 Plan. See Freeman Opposition at 21-22. The coal operators cavalierly suggest that "[t]here would be no impact on the Trust's financial status because the employer would be paying to the Trust a required monthly payment that is set by the [Multiemployer Pension Plan Amendments Act of 1979 –"MPPAA"] based on the highest contribution rate and the average contributions over a period of years." Id. at 22.   The coal operators fail to inform the Court, however, that Freeman has already withdrawn from the 1974 Plan and Monterey has issued notices to the Union indicating that it will soon cease operations – which will inevitably lead to its withdrawal from the 1974 Plan.[2]  Given these facts, it becomes obvious that Freeman and Monterey's real motivation for pursuing this case is their desire to minimize the very liability that they claim should protect the 1974 Plan.[3]

---

[2] A copy of the WARN notice provided by Monterey to the Union is attached hereto as Exhibit 2.

[3] The desire to minimize their withdrawal liability may also explain why Freeman and Monterey suggest that MPPAA alone is adequate to address any harm that the 1974 Plan may suffer, while disregarding the fact that the Pension Protection Act of 2006 was passed because MPPAA had failed to prevent multi-employer pension plans from suffering the type of crisis that befalls a plan when employers withdraw from participation. As previously explained, the PPA sought to address this ongoing problem by imposing certain obligations and remedial requirements on employer and pension plans that fall below 80% funded. Under the PPA, such plans are considered "endangered" and must take certain steps to address their endangered status. Contrary to the coal companies' suggestion, the fact that the 1974 Plan is currently 83% funded does not suggest that the increase in the contribution rate negotiated by the UMWA and BCOA was not reasonable. If anything, it demonstrates the parties reached a compromise where the increased contributions would satisfy the statutory requirements while still leaving it fairly close to the 80% trigger.

## CONCLUSION

For the reasons discussed above, as well as those set forth in its initial memorandum, the

Union's motion for summary judgment should be granted and Freeman's request for declaratory

judgment should be denied.

Respectfully submitted,

John R. Mooney, Bar No. 375886
Mark J. Murphy, Bar No. 453060
Mooney, Green, Baker & Saindon, P.C.
1920 L Street, N.W.
Suite 400
Washington, D.C. 20036
(202) 783-0010
(202) 783-6088 facsimile

Counsel for Defendant
United Mine Workers of America

November 13, 2007

**MEMORANDUM OF UNDERSTANDING**
**REGARDING THE UNITED MINE WORKERS OF AMERICA**
**AND THE OHIO VALLEY COAL COMPANY WAGE AGREEMENT**

The United Mine Workers of America ("UMWA"), The Ohio Valley Coal Company, and The Ohio Valley Transloading Company (collectively referred to as the "Employer" or "Ohio Valley") agree on this 1ˢᵗ day of July, 2002, that the following terms (referred to herein as the "Agreement") shall be a part of the existing and successor collective bargaining agreements, between the parties, as provided herein.

1.      Upon the expiration of the current UMWA – Ohio Valley Wage Agreement on December 31, 2004, Ohio Valley and the UMWA agree that they will become party to the 2005 UMWA – Ohio Valley Wage Agreement.  Except as modified and superceded by the provisions herein, the terms of the 2002 National Bituminous Coal Wage Agreement ("NBCWA") shall be incorporated as the base labor agreement in the 2005 UMWA – Ohio Valley Wage Agreement for the period of January 1, 2005 through December 31, 2006, and thereafter the terms of the successor agreement negotiated between the UMWA and the Bituminous Coal Operators' Association, Inc. ("BCOA") (the anticipated 2007 NBCWA) shall be incorporated and provide the base labor terms of the 2005 UMWA - Ohio Valley Wage Agreement, except as modified herein.  If there is no BCOA at that time, then the terms of the successor agreement negotiated between the UMWA and the coal company with the greatest annual production of coal tonnage east of the Mississippi River under the jurisdiction of the UMWA in 2005 and 2006, and which Company is signatory to one or more agreements with the UMWA, shall be incorporated and provide the base labor terms of the 2005 UMWA - Ohio Valley Wage Agreement except as modified herein.  The 2005 UMWA - Ohio Valley Wage Agreement shall expire concurrent with the expiration date of the anticipated 2007 NBCWA.



2.    The UMWA agrees that Ohio Valley shall not be obligated to execute the Memorandum of Understanding Regarding Job Opportunities ("Jobs MOU") in its present form or in any later modifications and/or amendments as contained in any successor agreement negotiated between the UMWA and the BCOA or with any other Party; and that there shall be no expansion or effect of Article IA(f) and Article II of the 2005 UMWA - Ohio Valley Wage Agreement beyond the coal reserves dedicated as provided for in Paragraph 3 below.  The parties agree that the 2005 UMWA - Ohio Valley Wage Agreement shall apply only and exclusively to the property described in Exhibit A, Part I.

3.    The approximately fifty-four (54) million recoverable, saleable tons currently controlled by Belmont Coal, Inc. to the North of the Powhatan No. 6 Mine and by Consolidated Land Company ("Consolidated") to the West of the Powhatan No. 6 Mine, both described by map and legal description in Exhibit A, will be dedicated to Ohio Valley's Powhatan No. 6 Mine and placed under the jurisdiction of the present UMWA – Ohio Valley Wage Agreement and thereafter shall remain under the jurisdiction of the 2005 UMWA – Ohio Valley Wage Agreement (including the 2007 successor agreement incorporated herein).

Likewise, approximately five (5) million recoverable, saleable tons, located in the southeast corner of Ohio Valley's Powhatan's No. 6 Mine, and located south of S.R. 148, and cross hatched on the map made part of Exhibit A, will be deleted from Ohio Valley's reserves and transferred to Consolidated.  Ohio Valley represents that these reserves cannot ever physically be mined from Ohio Valley's Powhatan No. 6 Mine due to sealed and flooded old workings of The North American Coal Corporation's Powhatan No. 3 Mine, Oglebay Norton Company's Norton Mine, and Ohio Valley's Powhatan No. 6 Mine.

Furthermore, approximately three (3) million recoverable, saleable tons on the west side of the Powhatan No. 6 Mine, and underlying Bend Fork Creek, as shown by cross hatch on the map made part of Exhibit A, will be transferred to Consolidated.  Ohio Valley represents that, due to the presence of the Creek Valley, which physically limits the extent of

2



these reserves and negates economically mineable longwall panels to the west, these reserves will not be mined from the Powhatan No. 6 Mine. However, a small portion of them can be mined from the west.

4.    For the purposes of settling their dispute and compromising the parties' respective claims over the employment at the Powhatan No. 6 Mine of the Powhatan Mine No. 1, 3, and 5 lay-off panels of The North American Coal Corporation, the UMWA and Ohio Valley agree that Ohio Valley shall hire forty (40) qualified individuals from the Powhatan Mines Nos. 1, 3 and 5 lay-off panels of The North American Coal Corporation within sixty (60) days from the date a Combined Panel is established as provided for in this Agreement and provided in writing to Ohio Valley by the UMWA. Thereafter Ohio Valley shall continue hiring from such panel for new job openings that occur through December 31, 2004. During the term of the 2005 UMWA – Ohio Valley Wage Agreement, Ohio Valley shall make offers of employment to those individuals on the Combined Panels for two (2) out of five (5) of new classified job openings, and three (3) out of five (5) of the new classified job openings may be filled by Ohio Valley at its discretion, as provided herein. Jobs filled from such Combined Panel shall be considered new employment (and therefore subordinate to existing job rights of classified employees presently employed by Ohio Valley).

5.    a.) The panels previously designated in prior Agreements between the Parties as the Powhatan Mines Nos. 1, 3, and 5 layoff panels will henceforth be referred to as the "Combined Panel". This panel will consist of all names previously on the Powhatan Mines Nos. 1, 3, and 5 layoff panels of The North American Coal Corporation, as provided to Ohio Valley by the UMWA. The written Combined Panel provided by the UMWA will be attached hereto and identified as Exhibit B of this Agreement. Without respect to the Powhatan Mines Nos. 1, 3, and 5 panels being combined to create the Combined Panel for hiring opportunities to the operation of the Employer, the Powhatan Mine No. 1 panel shall also continue to remain intact and continue to be the panel that is called from for employment opportunities at The Ohio Valley Transloading Company.

3



b.) The new Combined Panel will also be subordinate to any Powhatan No. 6 Mine layoff panel now and in the future. Any laid off employee from Ohio Valley's Powhatan No. 6 Mine will be recalled to employment to jobs that they have expressed an interest in being recalled for on their panel forms, if these jobs are available, before the Combined Panel is utilized.

6.    Once the Powhatan No. 6 Mine panel has been exhausted, meaning that all on the Powhatan No. 6 Mine panel have been given an opportunity to be recalled to employment to a job that they have expressed interest in on their panel forms, if such jobs are available, then future job openings of a classified nature at the Powhatan No. 6 Mine shall be filled by Mine management, as follows:

a.)    Prior to January 1, 2005, all new job openings of a classified nature shall be filled from the Combined Panel in accordance with the Agreement between the Parties, including, but not limited to, Article XVII requirements.

b.)    After and including January 1, 2005, all new jobs of a classified nature shall be filled as follows:

i.) Two (2) out of every five (5) new job openings of a classified nature shall be filled from the Combined Panel in accordance with the Agreement between the Parties, including, but not limited to, Article XVII requirements.

ii.) Three (3) of each five (5) new job openings of a classified nature may be filled by Mine management at its sole discretion from any source, without regard to prior employment, training, experience, or layoff status.

4



iii.) Even though the Employer has discretion as to the order in which the two out of five are hired off the Combined Panel, there is no question that there must minimally be two hired off the Combined Panel out of every sequence of five new hires called to employment under this Agreement regardless of the total number hired at any given time.

7.    Within ten (10) days of the provision of a written Combined Panel by the UMWA, the following terms and conditions shall be applicable for the hiring as new employees from the Combined Panel:

i.) The Employer will mail, by certified/registered letter, return receipt requested, to each eligible person listed on the Powhatan Mines No. 1, 3, and 5 layoff panels, a registration form that must be completed by each individual and returned to the Employer within fourteen (14) days of receipt. Each panel member, in addition to affirmatively filling out a registration form which outlines their intent to accept hiring from the Employer, must also complete a form listing what jobs he/she would be interested in being hired for.

ii.) The Employer may require each member of the Combined Panel to renew his panel form in writing from time to time, but no more than once each year, in order to remain on the Combined Panel.  The Employer's responsibility to give notice to Combined Panel members and the Union District President, and the Combined Panel members' responsibility to respond and to otherwise provide the Employer with notice of changes to address and/or telephone number, shall be governed by the terms of Article XVII(e) ("Panel Custodians") of the 2002 NBCWA.

iii.) As part of this Agreement the panel lists of Powhatan Mines Nos. 1, 3, and. 5 shall be merged in order of seniority upon the receipt of registration forms returned by individuals on the Combined Panel pursuant to paragraph 7(i) above.



iv.)  Any person called to employment from the Combined Panel for work of a classified nature for which he/she expressed an interest during his/her registration or any subsequent registration must accept the job, unless unable due to an injury or illness at the time of the vacancy, pursuant to the time frames outlined in the Agreement or he/she will forfeit the job opportunity as well as any future hiring rights. Persons injured or ill at the time of a job vacancy will be passed over for that particular opportunity, but they will not be removed from the Combined Panel. Any future job vacancy which involves a job that this panel member has expressed interest in being hired will be offered to this individual if his/her seniority is sufficient at the time the vacancy occurs.

v.)  The Employer may, within the confines of the Agreement between the Parties and within the parameters of applicable law, require pre-employment drug screening and pre-employment physical examination consistent with the terms of Article III(j) ("Physical Examination") of the UMWA – Ohio Valley Wage Agreement and Ohio Valley's past practice thereunder.

vi.)  In the event that the Powhatan No. 6 Mine panel and the Combined Panel are exhausted, and all eligible candidates for employment have been hired, Mine management shall have the sole discretion on hiring from any source it chooses.

8.    RETIREE HEALTH CARE FOR NEW HIRES

a.)  The Parties hereto agree that pursuant to Article V Section C of the Employer's Individual Benefit Plan, to jointly modify such plan and Article XX of the National Agreement, for all purposes as described herein during the term of the Agreement and any future labor agreement between the Parties hereto applicable to the Powhatan No. 6 Mine. All Employees beginning employment subsequent to the effective date of this Agreement, whether from the Combined Panel or from any other source chosen by the Employer for jobs of a classified nature as outlined in this Agreement, shall be, for all purposes, without respect to any time or benefits earned in any other employment with any other employer in the coal industry, considered to be a "New Hire" of the Employer. These "New Hires" shall begin day



one with the Employer earning benefits, for purposes of attaining retiree health care, that are based solely on accrued service with the Employer. All Employees hired after the effective date of this Agreement must have actively performed work for no less than ten (10) years solely with the Employer before he/she is entitled to any Employer provided health care benefits upon their retirement.

b.) In regards to New Hires, the Employer shall establish and maintain an Employer benefit plan, at the levels of benefits provided other represented employees, to provide health and other non-pension benefits for New Hires. In order to be eligible for any retiree health benefits under the Employer Benefit Plan established herein, a New Hire must, upon retirement, satisfy the following criteria: (1) A New Hire must have his/her last signatory service with the Employer; and (2) such New Hire must have actively performed work for the Employer for not less than ten (10) years subsequent to the Effective Date of this Agreement; and (3) such New Hire must not be eligible to receive benefits under the Coal Act or any amendment or successor thereto. (The term "Employer" as used for all purposes herein of this Agreement shall exclusively and specifically mean The Ohio Valley Coal Company and The Ohio Valley Transloading Company). The eligibility criteria set forth in the preceding sentence must be satisfied or no medical benefits whatsoever shall be paid by the Employer regardless of whether a New Hire subsequently becomes eligible for a pension from the 1974 Pension Plan or any other Pension Plan. The Parties hereto expressly agree that there is no other method or manner by which New Hires or their dependents may obtain retiree health care from the Employer upon retirement.

c.) In recognition and acknowledgement of the parties' mutual interest in this resolution of the issue of hiring rights of the Powhatan Mines Nos. 1, 3, and 5 panels, the UMWA and Ohio Valley agree that they are obligated to cooperate in the defense of any challenge by any person or entity to the vesting requirements for retiree medical coverage of New Hires under this Agreement. Both Ohio Valley and the UMWA will stand firm in their mutual obligations to one another under the MOU, and particularly relative to the provisions of this Section 8 and any other agreements entered into by the parties.

7

d.)    As a condition of employment, the Parties agree that every New Hire will be required to execute a written acknowledgement that he or she has read, understands and accepts these provisions regarding health care.

9.    The UMWA and Ohio Valley will resolve by dismissal and/or withdrawal with prejudice all outstanding litigation matters, and all charges pending before the National Labor Relations Board that were filed, or could have been filed, including those involving Maple Creek Mining, Inc.

10.    To the extent that the employment of the Combined Panel members alleviates the contractual injuries alleged in pending grievances over contracting out or other assignment of classified work to supervisors or other non-classified employees in violation of the collective bargaining agreement, the UMWA will withdraw with prejudice all such pending grievances at Ohio Valley.    With respect to the remaining grievances, the Union and Ohio Valley management shall confer and make good faith efforts to resolve the grievances and the underlying issues giving rise to such grievances.

11.    The contributions required to the UMWA Health and Retirement Funds provided for in Article XX of the NBCWA apply only to Ohio Valley.

12.    In consideration for the foregoing, Ohio Valley agrees that, so long as the Century Mine of the American Energy Corporation is producing coal through the term of the 2005 UMWA – Ohio Valley Wage Agreement (the 2007 NBCWA), Ohio Valley will make every good faith effort to avoid layoffs of hourly, UWMA represented classified employees at the Powhatan No. 6 Mine, except in the event of situations beyond the control of Ohio Valley and its management.    The Employer agrees that in the event that situations beyond the control of Ohio Valley and its management cause it to cease mining activity, that it will provide the Union with information and documentation demonstrating the cessation of mining activity was caused by such circumstances.    Ohio Valley further agrees that it will make every good faith

8



effort to resume mining activity without delay, whether by correcting the circumstances that caused the cessation of mining activity, or by pursuing continued mining activity in other locations of the reserves which comprise the Powhatan No. 6 Mine, and that it will recall laid-off panel members to classified employment at the earliest date possible.

13.    In view of this intent, Ohio Valley intends to invest, subject to the ability to borrow the funds, at least seven (7) million dollars over four (4) years in upgrading the infrastructure of the Powhatan No. 6 Mine, including driving and cleaning air courses, upgrading the conveyor belt system, adding conveyor belt monitoring and the installation of roof support and additional underground track haulage, and in other construction. This will provide a more efficient and reliable operation and access for the 54 million tons of coal reserves transferred to Ohio Valley and placed under UMWA jurisdiction.

14.    The parties agree that if a dispute over the implementation of the terms and conditions of paragraph 12 arises, the Union may, at its discretion, seek redress in federal court without exhausting the grievance-arbitration provisions of the UMWA – Ohio Valley Wage Agreement.

15.    The explicit no-strike/no lockout provisions of the current UMWA – Ohio Valley Wage Agreement will continue into the 2005 UMWA – Ohio Valley Wage Agreement.

UNITED MINE WORKERS OF AMERICA

Cecil E. Roberts, President

THE OHIO VALLEY COAL COMPANY
THE OHIO VALLEY TRANSLOADING COMPANY

John R. Forrelli, President

9

# MONTEREY COAL COMPANY

A division of ExxonMobil Coal USA, Inc.
14300 Brushy Mound Road
Carlinville, Illinois 62626
217 854 3291 Telephone

October 31, 2007

Dear Employee:

ExxonMobil Coal USA, Inc. (EMCUSA) continues good-faith negotiations regarding the potential sale of Monterey Coal Company's No. 1 Mine. In the event that these negotiations are not successful, EMCUSA management is considering discontinuing operations by December 31, 2007.

Because there is a possibility that the potential sale may not be concluded and as required by the Worker Adjustment and Retraining Notification Act (WARN) in the event of a closure of operations, this letter will serve as notification that the ExxonMobil Coal USA, Inc., Monterey Coal Company is considering permanent cessation of operations of its No. 1 Mine, as follows:

| | |
|---|---|
| Name/Location: | ExxonMobil Coal USA, Inc. Monterey Coal Company No. 1 Mine 14300 Brushy Mound Road Carlinville, Illinois 62626 |
| Date of Cessation of Operations | December 31, 2007 |
| Date of First Employee Separations: | December 31, 2007 |
| Date Anticipated All Employees Separated: | December 31, 2007 |
| Company Contact: | W. T. Campbell HR Specialist 217-854-3291, ext. 253 |

This action is expected to be permanent and all operations including the entire mine, plant, office, etc. would be closed.

Bumping rights will not apply.

The United Mine Workers of America Local No. 1613 is the union representing the unit employees. The chief elected officer of the union is D. E. Stewart.

If a sale of assets is consummated, it is anticipated that the purchaser will continue operations. Whether a sale is consummated or the closure option is pursued, additional information on the closing and its effect on personnel will be provided to employees as it becomes available for sharing.

Sincerely,

Howard C. Schulz
General Manager

HCS:js
h:\mg\hcs\2007\warn notice to employees

An ExxonMobil Subsidiary