## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Holland, et al., | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) Case No. 07-cv-490 (PLF) |
| Freeman United Coal Mining Company, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| Freeman United Coal Mining Company, | ) |
| | ) |
| Plaintiff, | ) Case No. 07-cv-1050 (PLF) |
| | ) |
| v. | ) |
| | ) |
| United Mine Workers of America, et al., | ) |
| | ) |
| Defendants. | ) |

## MOTION OF THE
## BITUMINOUS COAL OPERATORS' ASSOCIATION, INC.
## FOR PROTECTIVE ORDER TO LIMIT SCOPE OF UPCOMING DEPOSITION

The Bituminous Coal Operators' Association, Inc. ("BCOA"), a defendant in Case No.

07-cv-1050, through its undersigned counsel, hereby moves the Court for a protective order

under Federal Rule of Civil Procedure 26(c) to prescribe the proper scope of the deposition of

Charles S. Perkins, BCOA's Secretary-Treasurer.  BCOA submits that the Court should permit

questioning only regarding the contribution rate to the UMWA 1974 Pension Trust as set by

the 2007 National Bituminous Coal Wage Agreement, which is the subject of this litigation.

This would include, of course, the matters raised by Mr. Perkins in his declaration submitted in support of BCOA's summary judgment motion.

For the reasons stated in the accompanying memorandum of law, it would be far more efficient and appropriate, given the circumstances in this case, to address the appropriate subject matter of Mr. Perkins' deposition in advance to eliminate disputes during the deposition regarding the subject areas that are and are not appropriate topics of inquiry.

Pursuant to Federal Rule of Civil Procedure 26(c) and Local Rule 7(m), counsel for BCOA certifies that the scope of discovery in this case has been disputed by the parties since last July and, to date, the parties have not been able to resolve it. On November 27, 2007, Plaintiff Freeman United Coal Mining Company ("Freeman") filed a motion to compel discovery responses from BCOA. In light of that motion, which BCOA will oppose in due course, BCOA seeks a protective order regarding the proper scope of the deposition Freeman previously has noticed of BCOA's Secretary-Treasurer.

Respectfully submitted,

_____/s/_____

Peter Buscemi
D.C. Bar No. 269092
Stanley F. Lechner
D.C Bar No. 370986
Charles P. Groppe
D.C. Bar No. 464035

DATED: November 30, 2007

MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004
Tel:    (202) 739-3000
Fax:    (202) 739-3001
E-mail: pbuscemi@morganlewis.com
        slechner@morganlewis.com
        cgroppe@morganlewis.com

*Counsel for Defendant*
Bituminous Coal Operators' Association, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| Holland, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Case No. 07-cv-490 (PLF) |
| Freeman United Coal Mining Company, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| Freeman United Coal Mining Company, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07-cv-1050 (PLF) |
| | ) | |
| v. | ) | |
| | ) | |
| United Mine Workers of | ) | |
| America, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OF THE
## BITUMINOUS COAL OPERATORS' ASSOCIATION, INC.
## IN SUPPORT OF ITS MOTION FOR PROTECTIVE ORDER
## REGARDING PROPER SCOPE OF UPCOMING DEPOSITION

### INTRODUCTION

The Bituminous Coal Operators' Association, Inc. ("BCOA"), a defendant in Case No. 07-cv-1050, through its undersigned counsel, hereby moves the Court for a protective order under Federal Rule of Civil Procedure 26(c), to prescribe the proper scope of the deposition of Charles S. Perkins, BCOA's Secretary-Treasurer. BCOA submits that the deposition should be limited to the contribution rate for the UMWA 1974 Pension Trust established in the National

Bituminous Coal Wage Agreement ("NBCWA") of 2007, which is the subject matter about which Freeman United Coal Mining Company ("Freeman") has complained.  This would include, of course, the matters raised by Mr. Perkins in his declaration submitted in support of BCOA's summary judgment motion.  Freeman should not, however, be permitted to roam further afield, as it has shown a propensity to do in the discovery requests it has served to date.

For the reasons that follow, BCOA submits that it would be more efficient and appropriate for this Court to address the proper scope of Mr. Perkins' deposition in advance, rather than in response to disputes arising during the course of the deposition.  This would help to eliminate wasteful and unnecessary disagreement among counsel regarding the proper subject matter for inquiry, including, for example, whether Freeman properly can seek to relitigate matters previously decided by this Court in the *Pittston* litigation.

Stripped to its core, this case involves one – and only one – issue: whether Freeman has an obligation to contribute to the United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") at the contribution rate negotiated by BCOA and the United Mine Workers of America ("UMWA") and contained in the NBCWA of 2007.  It is undisputed that Freeman has agreed to be bound by the terms of the 1974 Pension Trust and by a contractual provision known as the "evergreen" clause, which previously was the subject of extensive litigation in this Court.  *See In re United Mine Workers of America Benefit Plans Litig.*, 782 F. Supp. 658, 665 (D.D.C. 1992), *aff'd*, *United Mine Workers of America 1974 Pension Plan, et al. v. Pittston Co.*, 984 F.2d 469, 474 (D.C. Cir.), *cert. denied*, 509 U.S. 924 (1993) (*"Pittston"*).  As the D.C. Circuit explained in affirming this Court's decision, coal companies like Freeman "agreed to be bound by the evergreen clause to make continuing contributions to the trusts; and *the obligation includes an agreement to make contributions at the rates specified in subsequent*

*NBCWAs, without regard to whether the employer was still a party to the subsequent agreements*."  984 F.2d at 474 (emphasis added).

Since this litigation began, the parties have had a fundamental disagreement over the proper scope of discovery needed to determine whether, in light of *Pittston*, Freeman is obligated to contribute "at the rates specified in subsequent NBCWAs," and in particular, the rate "specified" in the NBCWA of 2007.  Despite the narrow issue raised here, Freeman has sought discovery on a host of subjects that stretch back over 30 years and that either encompass matters previously litigated and resolved in *Pittston* or have no relevance to Freeman's specific collectively-bargained contribution obligation to the 1974 Pension Trust contained in the 2007 NBCWA.[1]

BCOA, along with the UMWA and the 1974 Pension Trust, previously sought to bring this disagreement to the Court's attention on several occasions.  The defendants first raised the issue in their Local Rule 16.3 Report.  The defendants subsequently discussed the subject at the Court's July 19, 2007 status conference.  On both occasions, Freeman disagreed with the defendants' position, and instead professed a need for unfettered discovery into subjects that previously were litigated in *Pittston*.

In a motion to compel filed on November 27, Freeman asserted that the Court, on two prior occasions, has rejected efforts by BCOA, the UMWA, and the 1974 Pension Trust to limit the scope of discovery.  That is a mischaracterization of the Court's prior rulings.  The

---

[1]    In a second count of its complaint, Freeman maintains that, even if it is required to make contributions to the 1974 Pension Trust at the rate specified in the NBCWA of 2007, BCOA should be liable to Freeman for the amount of those contributions because, according to Freeman, the contribution rate was arbitrarily, capriciously, and unreasonably included in the 2007 NBCWA.  BCOA already has produced voluminous documents about the reasons for the challenged contribution rate, and BCOA is not seeking in this motion to restrict questioning of Mr. Perkins on that subject.

Court did not rule on the parties' objections to discovery requests served by Freeman. Rather, the Court noted that, in light of the anticipated breadth of Freeman's proposed discovery, "there are going to be a lot of objections that are going to filed by the other side, overbreadth going back too many years, and things like that, that a Magistrate Judge is going to have to decide." Transcript at 14 (attached as Exhibit 1). As a result, the Court cautioned Freeman not to "create more problems for yourself than you need to." *Id.* The Court declined, however, to require Freeman to postpone discovery altogether until after Freeman had submitted a Rule 56(f) affidavit in response to the anticipated summary judgment motions from BCOA, the UMWA, and the 1974 Pension Trust.

The 1974 Pension Trust, the UMWA, and BCOA subsequently filed motions for summary judgment in early September. Rather than respond to these motions within 11 days as required by Local Rule 7(a) and this Court's July 20 scheduling order, Freeman moved for an extension of time in which to respond. Freeman did not seek an expedited ruling on its motion. The Court did not rule on Freeman's motion until after Freeman's deadline for filing a summary judgment opposition had passed. Freeman responded by unilaterally granting itself the requested month-long extension, thus delaying completion of summary judgment briefing until mid-November. By doing so, Freeman also delayed resolution of the festering dispute over the proper scope of discovery in this case.

BCOA again raised this issue in its November 13 opposition to Freeman's request under Rule 56(f) for additional discovery and to stay consideration of the pending summary judgment motions until such discovery could be completed. On November 19, the Court granted Freeman's motion to continue discovery before a summary judgment ruling, and it authorized Freeman to file a supplemental summary judgment opposition brief after the close

of discovery.  At the same time, the Court referred resolution of "all discovery disputes, including those related to Rule 56(f) discovery," to the Magistrate Judge.

The proposed deposition of Mr. Perkins, as well as Freeman's proposed depositions of UMWA President Cecil Roberts and a Rule 30(b)(6) designee from non-party Consol Energy Inc., inevitably will present the ongoing dispute among the parties regarding the proper scope of discovery.[2]  Based on Freeman's prior discovery requests, its pleadings submitted in opposition to the pending motions for summary judgment, and the proposed topics of the discovery it seeks from non-party Consol Energy Inc., it is clear that Freeman will attempt to engage in a far-ranging examination of the witnesses consistent with its broad discovery requests, seeking to explore issues already resolved in *Pittston* or that have no relevance to this case.

Rather than repeatedly interrupt the deposition to obtain rulings on individual questions without the benefit of any written submissions to the Court, BCOA believes that the more prudent course is to bring the dispute to the Court's attention now, in advance of the deposition of Mr. Perkins, so that the matter can be addressed in an orderly way and the deposition can proceed more smoothly.  For the reasons more fully set forth below, BCOA submits that the requested protective order is appropriate and necessary, and will help to fulfill Rule 1's mandate for the "just, speedy, and inexpensive determination of every action."

---

[2]    On November 27, Freeman filed a motion to compel that challenges the objections BCOA has asserted in BCOA's responses to Freeman's First Request for Production of Documents.  BCOA intends to file a separate opposition to Freeman's motion.

## BACKGROUND

A.     The Issue in this Litigation.

These consolidated cases address whether two coal companies, Freeman and Monterey Coal Company, are obligated to contribute to the 1974 Pension Trust under the "evergreen" or "continuing contributions" clause.  The evergreen clause was created in 1978 and is contained in the 1974 Pension Trust's collectively-bargained governing plan and trust documents, which are incorporated by reference in a series of NBCWAs that have been negotiated by BCOA and the UMWA.

The meaning and application of the evergreen clause was vigorously contested by numerous coal companies in various federal courts beginning in 1988.  Ultimately, these actions were consolidated in this Court, which granted summary judgment to the 1974 Pension Trust and against the coal companies, ruling that the evergreen clause "was an important provision negotiated to make sure that any coal operator that voluntarily agreed to participate in the [UMWA] Funds in 1978[, including the 1974 Pension Trust,] could not simply walk away from the Funds and leave its retirees behind, or negotiate cut-rate contributions with the UMWA, at the expense of remaining employers."  782 F. Supp. at 665.  In February 1993, the D.C. Circuit affirmed this Court's decision, holding that the coal companies "agreed to be bound by the evergreen clause to make continuing contributions to the trusts; and the obligation includes an agreement to make contributions at the rates specified in subsequent NBCWAs, without regard to whether the employer was still a party to the subsequent agreements."  984 F.2d at 474.

B.     The Undisputed and Uncontroverted Facts in this Litigation.

It is undisputed that the evergreen clause states, in relevant part, that employers are required to contribute to the 1974 Pension Trust by "making contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, *and any successor agreements thereto*, including, but not limited to, the [most recent] National Bituminous Coal Wage Agreement . . . ." *See* 782 F. Supp. at 661 (emphasis added). In construing the meaning of the term "*any successor agreements thereto*," both this Court and the Court of Appeals held that it referred only to subsequent NBCWAs negotiated by BCOA and the UMWA. *See* 782 F. Supp. at 664 (holding that term "successor agreements [to the 1978 NBCWA]" referred to "the National Bituminous Coal Wage Agreement of 1984, 1988, and subsequent years," and "*only*" to those wage agreements); 984 F.2d at 473-74 (holding that the evergreen clause "unambiguously obligated signatory employers to contribute to the trusts at the rates specified in the current NBCWA, irrespective of the employer's failure [to] sign that NBCWA," and that "only a subsequent NBCWA can qualify as such a successor agreement" within the meaning of the evergreen clause.)

It also is undisputed that Freeman, as a member of BCOA from 1978 (when the evergreen clause was negotiated) until 1997, signed numerous NBCWAs that obligated Freeman to contribute to the 1974 Pension Trust under the evergreen clause. In addition, it is undisputed that Freeman, after it revoked its membership in BCOA, reaffirmed its evergreen obligation in subsequent, so-called, "me-too" agreements it signed directly with the UMWA. It is undisputed that BCOA and the UMWA, as they have done for more than 50 years, negotiated the terms of the NBCWA of 2007, and that agreement includes a new contribution rate for the UMWA 1974 Pension Trust. It also is undisputed that Freeman, in its own collective bargaining agreement, agreed to be bound by the terms of the 1974 Pension Trust

plan and trust documents and that the 1974 Pension Trust plan and trust documents, as amended in 2007, require contributions in accordance with the NBCWA of 2007. The contribution rate contained in the 2007 NBCWA, therefore, is binding on Freeman, but Freeman has refused, since January 1, 2007, to make any contributions to the 1974 Pension Trust.

### C.    The Parties' Disagreement Over the Proper Scope of Discovery.

Despite the Court's binding precedent in *Pittston*, and the undisputed facts already in the record, Freeman contests in this litigation whether the 2007 NBCWA in fact is a "successor" agreement within the meaning of the evergreen clause. Freeman has sought broad and burdensome discovery from the defendants that seeks to revisit the meaning of the evergreen clause going back to its creation in 1978. Among other things, Freeman, in its first set of document requests to BCOA, has requested that BCOA produce information on a wide range of subjects covering the negotiation of eight separate NBCWAs from 1978 to the present. In addition, with respect to the negotiation of the 2007 NBCWA itself, Freeman seeks unlimited information about the overall negotiations between BCOA and the UMWA that resulted in a 374-page collective bargaining agreement, not just information related to the negotiation of the 1974 Pension Trust contribution rates contained in a single provision of the overall agreement.

Freeman's effort to transform this case into something complex and in need of extensive discovery cannot conceal the critical fact that this case involves nothing more than Freeman's effort to avoid paying contributions to the 1974 Pension Trust, even while its retirees and their dependents continue to obtain benefits from the Trust, including the increased benefits provided in the NBCWA of 2007.

To date, BCOA has responded to Freeman's first set of document requests by producing several thousand pages of materials related to the negotiation of the current 1974 Pension Trust contribution rate in the 2007 NBCWA.  BCOA otherwise has objected to the scope of Freeman's requests on the grounds that, among other things, Freeman seeks information related to claims or defenses already resolved in the *Pittston* litigation or information not relevant to determining whether Freeman is obligated to contribute to the 1974 Pension Trust.

### D.    The Pending Motions for Summary Judgment.

In early September 2007, BCOA, the UMWA, and the 1974 Pension Trust filed motions for summary judgment that demonstrate that Freeman is obligated as a matter of law to contribute to the 1974 Pension Trust in accordance with the rates contained in the 2007 NBCWA.  These motions generally argue that the *Pittston* decision mandates that evergreen employers contribute to the 1974 Pension Trust at the rate contained in successor NBCWAs negotiated by BCOA and the UMWA, and that the 2007 NBCWA is such a successor agreement.  The motions also argue that Freeman agreed to be bound by the terms of the 1974 Pension Trust and that those terms require contributions at the rate specified in the 2007 NBCWA.

Freeman opposed the defendants' motions on October 22, 2007.  Freeman argued that the 2007 NBCWA is not a true "successor" agreement for purposes of the evergreen clause because BCOA allegedly is not a proper "multiemployer bargaining unit" that Freeman claims is required to negotiate successor NBCWAs.  In addition, Freeman filed a motion under Rule 56(f) that purported to identify additional facts that have yet to be discovered that allegedly would create a triable issue in this case.

In its opposition, however, Freeman did not dispute any of the material facts that underlie BCOA's motion or provide any authority for its contention that BCOA needs to be a "multiemployer bargaining unit" (or that it cannot qualify as such an entity because its 11 members are corporate affiliates).  Instead, Freeman simply made conclusory assertions about the general need for additional discovery and the fact that discovery is not yet completed in this case.

On November 19, the Court granted Freeman the opportunity to take additional discovery and then to file a further brief in opposition to summary judgment.  In doing so, however, the Court did not resolve the parties' dispute over the proper scope of discovery, but instead referred all such questions to the Magistrate Judge.

### E.     The Upcoming Deposition and the Need for a Protective Order.

On October 18, after BCOA filed its motion for summary judgment, Freeman served BCOA with a notice of deposition for Charles S. Perkins, BCOA's Secretary-Treasurer.[3]  The parties' disagreement over the scope of discovery potentially could arise repeatedly during the deposition, leading to numerous, wasteful interruptions and requiring the parties to attempt to obtain a resolution from the Court without the benefit of written submissions and a hearing.  To avoid this result, and to ensure that this case proceeds expeditiously, BCOA now seeks a protective order to prescribe the proper scope of the deposition.

---

[3]     Mr. Perkins submitted a declaration in support of BCOA's motion for summary judgment.  In its Rule 56(f) motion, however, Freeman – other than expressing a desire to take Mr. Perkins' deposition – did not identify any specific additional facts about which Mr. Perkins may have knowledge that could create a triable issue here.  For the Court's convenience, a copy of Mr. Perkins' declaration is attached as Exhibit 2.

## ARGUMENT

Federal Rule of Civil Procedure 26(c) empowers the Court, "for good cause shown," to "make any order which justice requires to protect a party . . . from annoyance, . . . oppression or undue burden or expense."  To accomplish this, Rule 26(c) authorizes the Court to decide whether discovery should be had, whether it should be limited under specified terms or conditions, and whether "certain matters [should] not be inquired into, or that the scope of . . . discovery be limited to certain matters."  Fed. R. Civ. P. 26(c)(1), (2), (4). In this case, good cause exists to issue a protective order limiting the scope of BCOA Secretary-Treasurer Perkins's deposition to matters concerning the contribution rate for the 1974 Pension Trust provided in the 2007 NBCWA, including the matters discussed by Mr. Perkins in his declaration.  These are the matters that relate to the sole issues that Freeman itself has asserted in this case – whether it has an obligation to contribute to the 1974 Pension Trust at the rates set forth in the 2007 NBCWA and whether those rates are unreasonable, arbitrary, or capricious.  Because the additional discovery topics about which Freeman may seek to question Mr. Perkins have no bearing on those issues, and Freeman itself has identified no specific facts under Rule 56(f) that it claims it needs to respond to the pending motions for summary judgment, BCOA requests that the Court issue a protective order to limit Mr. Perkins' deposition in this manner.

The discovery rules vest broad discretion in the district courts with respect to control of the discovery process to promote the just and efficient resolution of the case.  *Chagnon v. Bell*, 642 F.2d 1248, 1266 (D.C. Cir. 1980), *cert. denied*, 453 U.S. 911 (1981).  Indeed, the Supreme Court has emphasized that courts should not hesitate to exercise their power to restrict unnecessary discovery.  *Herbert v. Lando*, 441 U.S. 153, 177 (1979).  As this Court has

explained, such authority includes the power to limit the scope of discovery to the boundaries imposed by the subject matter of the litigation itself. *Cobell v. Norton*, 226 F.R.D. 67, 77 (D.D.C. 2005). In so limiting the scope of discovery, the Court in *Cobell* recognized that Rule 26 allows discovery only "where it is relevant to some claim or defense of the parties." *Id.* Accordingly, the Court acknowledged that it is proper to limit the scope of discovery to only those matters directly related to a party's claim or defense asserted in an action. *Id.*

Here, the sole claim asserted by Freeman is that it is not obligated to contribute to the 1974 Pension Trust at the rates set forth in the 2007 NBCWA. As such, it would be appropriate to limit the scope of Mr. Perkins' deposition to those subject matters that directly bear on the recently-set contribution rate for the 1974 Pension Trust. A decision that Freeman, in light of *Pittston* and under the facts already placed in the record, is obligated to contribute to the 1974 Pension Trust at the rates contained in the 2007 NBCWA, would obviate the need for any additional discovery or at least narrow the scope of any discovery going forward. In its opposition to BCOA's motion for summary judgment, Freeman nowhere contests the facts that BCOA has put forward in support of its motion. Instead, Freeman claims without any legal support that BCOA as currently constituted is not a proper "multiemployer bargaining unit" for purposes of negotiating a binding contribution rate under the evergreen clause. The resolution of this issue does not require wide-ranging additional discovery, for Freeman does not dispute the current organization and structure of BCOA, but merely whether, as so constituted, BCOA has the authority under the evergreen clause to negotiate a contribution rate binding on Freeman.

Moreover, despite this Court's instruction to Freeman at the July 19 scheduling conference, Freeman nowhere identifies in its pending Rule 56(f) motion the specific areas of

discovery it needs from Mr. Perkins to respond to BCOA's summary judgment motion. By not complying with the requirements of Rule 56(f), but instead making bald pronouncements that additional discovery is necessary and that the discovery period has not ended, Freeman has set the stage for the deposition to become a contentious fishing expedition into an irrelevant sea of issues already decided in the *Pittston* litigation or having no bearing on the issues in the case. Such an expedition potentially could turn each question into a discovery dispute, requiring constant Court intervention.

To avoid this possibility, and to save the parties from unduly burdensome and vexatious discovery on matters involving the creation of the evergreen clause and BCOA's role in negotiating contribution rates under it going back almost 30 years, BCOA requests the Court to exercise its discretion to limit the scope of Mr. Perkins' deposition to pertinent matters, as described above.

**CONCLUSION**

For all of the foregoing reasons, BCOA respectfully requests that the Court enter a protective order to limit the scope of Mr. Perkins' deposition to the contribution rate for the 1974 Pension Trust established in the 2007 NBCWA, including the matters discussed by Mr. Perkins in his declaration.

Respectfully submitted,

_____/s/_____

Peter Buscemi
D.C. Bar No. 269092
Stanley F. Lechner
D.C Bar No. 370986
Charles P. Groppe
D.C. Bar No. 464035

DATED: November 30, 2007        MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004
Tel:    (202) 739-3000
Fax:    (202) 739-3001
E-mail: pbuscemi@morganlewis.com
            slechner@morganlewis.com
            cgroppe@morganlewis.com

*Counsel for Defendant*
Bituminous Coal Operators' Association, Inc.

# EXHIBIT 1
## Transcript of July 19, 2007 Status Conference

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2
    MICHAEL H. HOLLAND, et al,        . Docket No. CV-07-490 (PLF)
 3
         Plaintiff,
 4                                    . Washington, D.C.
              v.                      . July 19, 2007
 5                                    . 10:00 a.m.
    FREEMAN UNITED COAL MINING        .
 6  COMPANY, et al,                   .
                                      .
 7       Defendant.                   .
    . . . . . . . . . . . . . . . .   .
 8                           TRANSCRIPT OF HEARING
                   BEFORE THE HONORABLE PAUL L. FRIEDMAN
 9                     UNITED STATES DISTRICT JUDGE

10  APPEARANCES:

11  For the Plaintiffs:        Bredhoff & Kaiser, PLLC
                               By: Julia Penny Clark, Esquire
12
                               UMWA Health & Retirement Funds
13                             By Christopher F. Clarke, Esquire

14                             Morgan, Lewis
                               By:  Peter Buscemi, Esquire
15
    For the Defendants:        Jenner & Block
16                             By: Jessica Ring Amunsom, Esquire
                                   Susan C. Levy, Esquire
17
                               Venable, LLP
18                             By:  Michael W. Robinson, Esquire
                                    Gregory J. Ossi, Esquire
19
                               Ogletree, Deakins, Nash,
20                             Smoak & Stewart, P.C.
                               By:  John R. Woodrum, Esquire
21
                               Mark Murphy, Esquire
22
    Court Reporter:            Linda L. Russo, RPR
23                             Official Court Reporter
                               Room 6403, U.S. Courthouse
24                             Washington, D.C. 20001
                               202.354.3244
25  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription
```

2

P R O C E E D I N G S

1
2          THE CLERK:  Civil action 07-490, Michael H. Holland
3   et al, versus Freeman United Coal Mining Company, et al.   For
4   the plaintiff, Ms. Clark, Mr. Clarke and Mr. Buscemi.    For the
5   defendants, Ms. Amunson, Mr. Robinson, Ms. Levy, Mr. Woodrum,
6   Mr. Murphy and Mr. Ossi.
7          THE COURT:  Good morning.  You need all these people
8   for a status conference?  Well, I was thinking that since you
9   can't agree on anything, that what we ought to do is go ahead
10  with fact discovery on liability but not damages, forget about
11  expert discovery for the time being.  The party that thinks
12  it's all a matter of law and we don't need any discovery can,
13  in addition to participating in discovery, move for summary
14  judgment any time they want to.  If the other side, any other
15  side will respond in accordance with the days set forth in the
16  rules, and if they think it's premature they can tell me it's
17  premature and that I shouldn't decide it until after fact
18  discovery is over.  And just because you file a motion, there's
19  no obligation to decide it.
20          With this many people here, it seems to me I should
21  refer all discovery disputes to a Magistrate Judge, and I'll
22  see you when the summary judgment motions are filed.
23          So all we need to do is set dates, since there are no
24  dates in your Rule 16.3 because you couldn't agree on a
25  procedure.  But I think we should set dates for fact discovery

3

1    and, as I said, if you want to file a motion for summary

2    judgment, the other side has to respond.  But I'm not sure

3    whether that makes sense.

4         I don't know how I can decide at this point whether

5    it's a pure question of law on one count or both counts.  If

6    it's a pure question of law, I guess you can move to dismiss.

7    But if you need some things outside the four corners of the

8    pleadings and the other side thinks you need discovery, I don't

9    know how to decide that other than to go ahead and have

10   discovery.

11        So who wants to suggest something in view of my

12   comments?

13        MR. ROBINSON:  I guess I'll take a shot at that.

14   Michael Robinson on behalf of the defendant Freeman.

15        Your Honor, during the conference we had suggested a

16   six month time period for fact discovery that I think would

17   take us to the end of January.  There was no magic to six

18   months.  I'm not suggesting that it necessarily has to be six

19   months, but that's at least the time frame that was discussed

20   in the context of the Rule 16, that if we were to proceed with

21   fact discovery that a period of six months would be more than

22   sufficient to complete that.

23        THE COURT:  And that's on liability.

24        MR. ROBINSON:  That's on the issue of liability.

25        THE COURT:  Do you think if at the end of that time

4

```
 1    your client's going to file a motion for summary judgment, one
 2    thing I wasn't clear on from what I read is whether or not
 3    anybody believes that expert discovery has to take place before
 4    a viable summary judgment motion can be filed.
 5           I think the party that would like to go forward with
 6    briefing without discovery, part of it is that discovery takes
 7    time and it costs money for everybody, and nothing costs more
 8    than expert discovery.
 9           MR. ROBINSON:  At this point in trying to predict the
10    future, I can't tell the Court that I think expert discovery
11    will be necessary to address whatever issues they wish to
12    raise.  I don't know the exact issues that they will raise, so
13    I think in that context, if we got to that point and there was
14    a summary judgment motion in which I needed an expert, I think
15    it would be incumbent on me at that point to come forward
16    pursuant to Rule 56 and tell the Court at that time.
17           As we stand here today I can't tell the Court that I
18    think expert discovery will be necessary to resolve the issues
19    that they may want to raise.
20           THE COURT:  Okay.  So you're suggesting six months
21    liability only, not experts yet.
22           MR. ROBINSON:  In that time frame like I -- you know,
23    again, the six months wasn't magic.  We were talking the four
24    to six month time period, and the four and five month period
25    put us right into the middle of the holidays, so we just pushed
```

5

1    it to January.

2              THE COURT:  Who else wants to weigh in?

3              MS. CLARK:  Your Honor, Julia Penny Clark for the

4    Pension Trust.  I think that we're going to need very little

5    discovery for our part.  I think that six months is probably an

6    adequate amount of time for fact discovery.  The main

7    complication on our side is that we have a very large volume of

8    materials from the prior litigation over the meaning of this

9    Evergreen clause, as well as the meaning of the Guarantee

10    clause, which they have listed as one of the topics they wish

11    to have discovery on.  And it's complicated with

12    confidentiality agreements that we signed in order to get those

13    documents.  And so the main thing that's going to take time on

14    our side is simply mustering those materials to respond to any

15    discovery requests that we receive.

16             THE COURT:  So you have confidentiality agreements

17    with people who are not parties to this litigation?

18             MS. CLARK:  That's correct.  Each of the coal

19    companies that produce negotiating materials to us has insisted

20    on confidentiality agreements, so we will need to get back to

21    them and try to negotiate with them an amendment to the

22    agreement that permits us to put it here under a similar

23    confidentiality agreement, which we hope to bring to the Court

24    fairly shortly.  But that will take some time.  And in light of

25    that, I think from our standpoint the six month period sounds

6

1    appropriate, but not because we're going to need a lot of fact

2    discovery on our side.

3         THE COURT:  And the other side is going to have to be

4    sympathetic and sensitive to the notion that you have to work

5    things out with other people before they get some of the

6    documents, so don't run in and try to take depositions before

7    you have the documents you need.

8         MS. CLARK:  Right.  And that, of course, depends on

9    what the scope of their actual requests are.  But they did list

10   negotiating documents in what they thought were the appropriate

11   subjects for discovery, and those are virtually all covered by

12   confidentiality agreements.  The ones that were actually filed

13   in court in the earlier litigation, many of them, the

14   confidentiality ended up being waived so that we wouldn't have

15   to file them under seal.  Those, once we sort them out, we'll

16   be able to provide free of those agreements, but there are,

17   many of the underlying documents are still confidential.

18        THE COURT:  The case you're referring to, was that

19   before Judge Hogan?

20        MS. CLARK:  Yes, primarily.  That was the

21   multidistrict litigation and the Pittston case, and a couple of

22   others.  That litigation went on for about ten years.

23        THE COURT:  Is that what's in store?

24        MS. CLARK:  We hope not, but that was one of the

25   reasons we were proposing a summary judgment motion up front to

```
1    try to narrow the issues, was in order to avoid any repeat of
2    that lengthy litigation.
3            There were other cases, the Island Creek case, in
4    which there was also extensive discovery following a Court of
5    Appeals ruling in I believe it was 1992, that reversed a
6    dismissal order that Judge Harris had entered.  And then the
7    Guarantee clause litigation, which went on for several years
8    itself.  So there's a lot of litigation, a lot of files, and I
9    asked my paralegals to give me an estimate of how many boxes,
10   and we're talking in the hundreds.
11           THE COURT:  Since you seem to be knowledgeable about
12   all this history, did Judge Hogan or Judge Harris use a
13   Magistrate Judge to assist in managing the discovery?
14           MS. CLARK:  Judge Hogan referred some discovery
15   disputes to Judge Kay, and that was, I think that was the
16   limit.  Deborah Robinson also saw something, but I think it was
17   extremely limited.  Judge Kay was the one who had more contact
18   with this.
19           THE COURT:  Obviously in a case this big with this
20   many documents, and confidentiality and protective orders, the
21   more you can try to work things out with each other in a
22   professional way will be helpful to everybody.
23           MS. CLARK:  Certainly.  It's also we find in the
24   interest of our clients not to spend a lot of money litigating
25   over issues that can be worked out.
```

8

```
 1              THE COURT:  I agree with that absolutely.  All right,
 2     any other thoughts, or anything else we should talk about?
 3              MR. ROBINSON:  Michael Robinson again.  In light of
 4     the comments regarding the confidentiality, I think our report
 5     indicated that if a protective order became necessary, that the
 6     parties would work that out.  I think that's probably something
 7     we need to start on right away.  There will need to be a
 8     protective order, and that is not an issue.  We should be able
 9     to work that out.
10              THE COURT:  I think Ms. Clark was suggesting just
11     that, that you need to work out a protective order.  She needs
12     to work things out with other people, and then you can start
13     the discovery process.
14              Maybe what we ought to do, and again, if the
15     plaintiffs want to file motion for summary judgment they can,
16     but I think what we ought to do is to go forward down this road
17     for six months.  And then maybe should we have another status
18     conference before anybody -- I'm not precluding anybody from
19     filing motions, but does it make sense to come back at that
20     point and say, okay, here's where we are, and we have now
21     decided this is what we want to do on motions, or we have now
22     decided we need experts before we do motions, or we need a
23     limited number of experts.  Is there something to be gained by
24     coming back in six months rather than just, say, the middle of
25     January, or the end of January discovery closes and here's the
```

9

1   dates for motions.  I'll do it however you all want.

2           You don't have to bring everybody next time.

3   Mr. Buscemi probably flew in from San Francisco, for all I

4   know.

5           MR. BUSCEMI:  Your Honor, I don't want to anticipate

6   disputes that may never arise, but I do think it's important to

7   inform the Court at the outset because we have an indication of

8   what we are likely to receive.  We haven't received any

9   discovery requests yet, of course, but we do have in paragraph

10  2-A of the proposed discovery plans submitted by opposing

11  counsel a laundry list of 11 different subject areas that they

12  say they wish to explore in discovery.  And I'll call Your

13  Honor's attention to just a couple of them.  If you look, for

14  example, at number --

15          THE COURT:  I don't know if I've seen that.  Have I

16  seen that?

17          MR. BUSCEMI:  Well, it's their proposed discovery

18  plan that was submitted with the local Rule 16.3 report.

19          THE COURT:  Okay, I have it.  Go ahead.

20          MR. BUSCEMI:  So if you look at paragraph 2-A, you

21  can see that they have already announced that they are going to

22  seek, for example look at number six, all negotiations and all

23  communications among or between the 1974 Pension Trust, BCOA,

24  and the UMWA regarding the Evergreen clause.  Number seven, all

25  negotiations regarding the Guarantee clause.  Well, those

10

1   clauses were initially adopted back in 1978.

2           This is essentially an effort to redo the extended

3   litigation to which Ms. Clark referred before Judge Hogan.  And

4   if in fact those are the discovery requests that we receive, at

5   least our clients intention would be to object to those

6   requests because there is no reason to start all over again

7   from the beginning, which is what they are suggesting they want

8   to do.

9           So I just wanted the Court to be aware, and I agree

10  with Ms. Clark that I know that Magistrate Judges can be very

11  helpful on discovery things, but on some of these big picture

12  items that have to do with the entire scope and context of the

13  litigation and what tasks we're going to try to perform in the

14  litigation, the Court's involvement might be very helpful

15  because I think there are going to be some threshold questions,

16  at least if the discovery requests that we get track what's

17  here in paragraph 2-A.

18          THE COURT:  Mr. Robinson.

19          MR. ROBINSON:  Briefly, Your Honor, in response to

20  the Court's question about whether an additional conference

21  would be helpful, we believe that it would be helpful.  And

22  whether you set that in January or at the end of the six

23  months, we think that would be helpful.  It may be very short

24  if the parties have made progress and we have an agreed plan at

25  that point as to how to go forward, but we think that would be

11

1    helpful.

2         In response to the anticipated objections to

3    discovery, we're not relitigating the Pittston case.  There are

4    facts and evidence that are relevant to today's issues that

5    were also relevant to that case, but that doesn't make us

6    attempting, or it shouldn't be suggested that we're simply

7    trying to relitigate that case.  Facts and evidence can be

8    relevant to many different issues.  And so when we submitted

9    our discovery plan where we gave the Court some suggested dates

10   and gave a preview of some of the types of issues, that was in

11   the spirit of showing the Court the types of issues that might

12   come up.

13        If they have objections to the actual discovery

14   requests when they are served, I'm assuming that will be

15   referred to the Magistrate Judge as the Court suggested

16   earlier.

17        THE COURT:  I've got two competing discover plans

18   here, or are they the same?

19        MR. ROBINSON:  I believe you do have two competing

20   discovery plans.  One was submitted as our proposed plan if

21   discovery was to proceed as has now been decided, and the

22   funds -- and the Union had submitted their own plan based on I

23   believe some period of time where there would be no discovery

24   until after summary judgment motions were decided.  So each

25   side had put their competing ideas into a plan.

Linda L. Russo, RPR
Official Court Reporter

1          THE COURT:  Mr. Buscemi.

2          MR. BUSCEMI:  Your Honor, just so the record is clear

3    about what our discovery plan was, our discovery plan was not

4    that there would be no discovery until summary judgment motions

5    had been decided.  Our discovery plan was that we would file

6    our motion for summary judgment, and then our opponents would

7    indicate what, if any, discovery they needed to respond to that

8    motion under Rule 56(f).  If the court decided that discovery

9    was warranted once they explained why they needed it to respond

10   to the points made in our motion, then that discovery would

11   occur before summary judgment was decided.  But not just

12   open-ended discovery when we think we can substantially narrow,

13   if not eliminate the issues through an early motion.  That was

14   our plan.

15          THE COURT:  How do you respond to their argument that

16   even if you were right, it would only deal with one but not

17   both counts of the --

18          MR. BUSCEMI:  We don't think that's true at all, Your

19   Honor, for a couple of reasons.  Number one, the second count,

20   the count that's plead only against our client BCOA, is a state

21   law count.  It's here only under Section 1367, supplemental

22   jurisdiction.  It wouldn't be here at all were it not for their

23   Count One.  So that's point number one.

24          Point number two, we think that's also subject to

25   being dealt with on summary judgment.  They're claiming, for

1  example, that the contribution rate that was negotiated in the

2  National Bituminous Coal Wage Agreement of 2007 is arbitrary,

3  capricious and unreasonable.  Well, every coal company in the

4  country except the two that are here in this courtroom is

5  paying it.  So we don't think it's arbitrary, capricious and

6  unreasonable, and we don't think there's going to be a genuine

7  issue of material fact about that.  Thank you.

8          THE COURT:  Well, if we go forward as I was

9  suggesting with more general discovery, maybe you can't answer

10  this question today, would it still be your intention to file a

11  motion for summary judgment early?

12          MR. BUSCEMI:  Yes, Your Honor.

13          THE COURT:  So that's going to happen regardless.

14          MR. BUSCEMI:  Yes, it is.

15          THE COURT:  Well, I guess that's going to happen

16  regardless, and you're going to have to respond to it.

17          MR. ROBINSON:  Your Honor, that would be the standard

18  procedure in any case, that if a motion for summary judgment is

19  filed I'll need to respond to it.  It may include Rule 56(f)

20  issues, but until we see the motion, until we see what the

21  issues are, we don't have to anticipate that other than knowing

22  what our obligations are under the rules when and if that

23  comes.

24          THE COURT:  Mr. Buscemi raises the breadth of 2-A,

25  and I suppose that if the actual discovery requests are as

1  broad as this paragraph suggests that they are, there are going
2  to be a lot of objections that are going to be filed by the
3  other side, overbreadth going back too many years, and things
4  like that, that a Magistrate Judge is going to have to decide.
5  So you don't want to create more problems for yourself than you
6  need to.
7       MR. ROBINSON:  I understand, and I appreciate the
8  Court's guidance on that.  I think the fact that much of this
9  discovery, as they have said, or at least of the older
10 discovery, much of it may already be in boxes that are waiting
11 to be reviewed, and then for us to review may certainly lessen
12 the burden, not on those of us reviewing them, but the burden
13 of gathering these documents or saying you're going back too
14 many years.  If the material was developed in the litigation 15
15 years ago, it may very well simply be waiting for us to see.
16      THE COURT:  The question always is do you really need
17 it all?
18      MR. ROBINSON:  I understand.
19      THE COURT:  Just because it's sitting there in boxes,
20 if they don't think it's material or relevant to this lawsuit,
21 they're going to have objections.
22      MR. ROBINSON:  I understand.  And if those objections
23 are unopposed, counsel will have to confer and try to work
24 those out, and then either narrow the issues or present more
25 narrowed issues to the Court if that becomes necessary.  I

1    think we weren't trying to set forth specific discovery
2    requests in that plan.  We were really giving the Court an idea
3    of the topics, and not simply setting out the specific requests
4    that might be coming.
5         THE COURT:  Well, I think what we should do is, I'll
6    issue some sort of a scheduling order which deals with this,
7    but I think for now we should deal with fact -- I'm not going
8    to set any dates for expert discovery, and nobody is going to
9    do anything about expert discovery.  It's going to be fact
10   discovery relating to liability.  And if in the meantime the
11   plaintiffs file a motion for summary judgment, depending upon
12   when they file it, you may say that we can't respond yet.
13        Now, under Rule 56(f), as I understand Rule 56(f),
14   even though general discovery is going on, what you're supposed
15   to do under Rule 56(f) is not to say we need to complete
16   discovery to respond.  You're supposed to say this is the
17   nature of the discovery that we need in order to respond to the
18   motion that we now have.
19        So we may find ourselves on two different tracks,
20   that you're trying to do all discovery within six months, and
21   at the same time be asking for 30 or 45 days to finish more
22   targeted limited discovery in order to respond.  But we'll just
23   have to see.
24        What I'm going to do is, I'm going to issue an order,
25   after thinking a little further about this, and I may talk with

1    Judge Kay since his name has been invoked here, he'll be
2    delighted, and see what his schedule looks like, and let him
3    deal with these problems.
4           Now, I don't know whether Mr. Buscemi was suggesting
5    that there should be another status conference before me
6    somewhere in the middle of this six months period.  He was
7    suggesting that there might be broader issues that I ought to
8    deal with rather than the narrower issues that a Magistrate
9    Judge ought to deal with.  Or do you want to leave it open, and
10   if you need me you'll call and we'll set something up?
11          MR. BUSCEMI:  That's fine, Your Honor.  What I was
12   suggesting was that if we get the kind of discovery request
13   that we feared we would after seeing the proposed discovery
14   plan, I think you're looking at the overall metes and bounds of
15   the litigation and not whether this particular request or that
16   one should be tweaked a little bit.  And in the event that
17   that's the nature of the debate that we've having, I would
18   suggest that we'll wind up before you, in any event, even if
19   only after Magistrate Judge key gets involved.  So just in the
20   interest of efficiency, I was thinking that kind of dispute
21   ought to come to you.
22          THE COURT:  That may be, if it's a global kind of
23   issue.  All right, in the meantime, assuming six months for
24   discovery, do you want to set a status conference sometime in
25   January?

1          MR. ROBINSON:  That's fine with us, Your Honor.

2          THE COURT:  Well, the week of January 21st begins

3    with Martin Luther King Day, which is a holiday, so is any time

4    later that week or the following week good for everybody?

5          MS. CLARK:  Yes, Your Honor.

6          MR. ROBINSON:  That's fine, Your Honor, yes.

7          THE COURT:  All right, just pick a day.  Any

8    particular days of the week you like better?

9          MR. ROBINSON:  Saturday.

10         Your Honor, that Tuesday after the holiday would be

11   fine.

12         THE COURT:  Mr. Buscemi doesn't want to do that.  Mr.

13   Buscemi lives in two cities.

14         MR. BUSCEMI:  How about Thursday?

15         THE COURT:  Mr. Buscemi leaves in two cities now, I

16   happen to know.  How about Thursday at 9:30, Thursday the 24th.

17         All right, anything else that we can fruitfully

18   discuss, assuming that this was fruitful.  All right, I'll see

19   you then.  I will issue some sort of an order.  I will talk

20   with Judge Kay and see where we are in that as well.  Thank

21   you.

22         (Proceedings concluded.)

23

24

25

1                              CERTIFICATE

2              I, LINDA L. RUSSO, Official Court Reporter, certify

3      that the foregoing pages are a correct transcript from the

4      record of proceedings in the above-entitled matter.

5

6

7

8              Linda L. Russo, RPR
               Virginia CCR No: 0313102

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 2
## Declaration of Charles S. Perkins

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Holland, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 07-cv-490 (PLF) |
| Freeman United Coal Mining Company, *et al.*, | ) | |
| Defendants. | ) | |
| Freeman United Coal Mining Company, | ) | |
| Plaintiff, | ) | Case No. 07-cv-1050 (PLF) |
| v. | ) | |
| United Mine Workers of America, *et al.*, | ) | |
| Defendants. | ) | |

## DECLARATION OF CHARLES S. PERKINS, III

I, Charles S. Perkins, III, do hereby declare as follows:

### A.    Introduction

1.    I am currently the Secretary-Treasurer of the Bituminous Coal Operators' Association, Inc. ("BCOA"). I became employed by BCOA in April 1976 and have worked continuously as an economist employed by BCOA for 31 years until May 2007. I currently provide economic and other services to BCOA as a consultant.

2.    I have been involved with or assisted BCOA in collective bargaining with the United Mine Workers of America ("UMWA") throughout the term of my

employment. Among my duties at BCOA, I have monitored the UMWA 1974 Pension

Plan and Trust ("1974 Pension Plan"), analyzed its financial condition, and assisted

BCOA in collective bargaining involving the 1974 Pension Plan.

**B.    The Bituminous Coal Operators' Association ("BCOA")**

3.     BCOA is a non-profit corporation incorporated in the District of

Columbia. BCOA was formed in 1950 to bring order and stability to labor negotiations

and labor relations in the bituminous coal industry. BCOA's offices are located at 1776 I

Street, NW, Washington, D.C. 20036.

4.     BCOA has negotiated each National Bituminous Coal Wage Agreement

("NBCWA") with the UMWA since 1951. Most recently, BCOA negotiated the 2007

NBCWA with the UMWA. Negotiations for the 2007 NBCWA were conducted

primarily in Washington, D.C. or at the UMWA's headquarters in Fairfax County,

Virginia.

5.     BCOA's members consist of bituminous coal companies that have

authorized BCOA to represent them in the negotiation of collective bargaining

agreements with the UMWA ("Operator Members"), and bituminous coal companies that

have special expertise in coal industry matters, including health, safety, training, and

government affairs ("Industry Committee Members").

6.     At one time, BCOA represented more than 200 companies in the

bituminous coal industry. Because of changes in the industry over the last 50 years,

however, BCOA's membership has declined considerably.

7.     At present, BCOA's Operator Members include the Consolidation Coal

Company and ten of its commonly-owned affiliated companies: Central Ohio Coal

Company, Eighty-Four Mining Company, Helvetia Coal Company, Island Creek Coal Company, Keystone Coal Mining Corporation, Laurel Run Mining Company, McElroy Coal Company, Quarto Mining Company, Southern Ohio Coal Company, and Windsor Coal Company. These companies were represented by BCOA during the negotiation of the 2007 NBCWA.

8.    BCOA currently has the following Industry Committee Members: Peabody Energy, Foundation Coal Company, and Jim Walter Resources, Inc. Industry Committee Members do not participate in BCOA's negotiation of the NBCWA. In 2007, BCOA's Industry Committee Members signed "me too" agreements with the UMWA.

9.    There is no minimum membership requirement for BCOA in negotiating the NBCWA on behalf of its Operator Members. Instead, in every NBCWA negotiated between 1978 and 2007, BCOA and the UMWA have included the following provision to address the possibility of BCOA ceasing to exist in the future, or the possibility of more than 50% of the tonnage membership of BCOA withdrawing from the Association:

> In the event BCOA ceases to exist, or in the event that more than 50% of the tonnage membership of BCOA on the Effective Date [of the NBCWA] has withdrawn prior to the time when the BCOA is required or permitted to take action under this Article [XX], then such action may be taken by majority vote, based on tonnage, of Employers who were BCOA members on the Effective Date.

10.    On the effective date of the 2002 NBCWA and the effective date of the 2007 NBCWA, Consolidation Coal Company and its affiliates represented more than 50% of the tonnage membership of BCOA, and neither Consolidation Coal nor its affiliates have withdrawn from BCOA since that time.

3

C.     **The National Bituminous Coal Wage Agreement ("NBCWA")**

11.     One of BCOA's principal functions is the negotiation of the NBCWA with the UMWA.  BCOA has negotiated every NBCWA with the UMWA since 1950 – namely, the 1951, 1952, 1955, 1956, 1958, 1964, and 1966 amendments to the NBCWA of 1950 and the NBCWAs of 1968, 1971, 1974, 1978, 1981, 1984, 1988, 1993, 1998, 2002, and 2007.

12.     The NBCWAs govern the terms and conditions of employment in the organized sector of the bituminous coal industry, including the provision of pension benefits to retired coal miners covered by the NBCWA, which incorporates by reference the 1974 Pension Plan and Trust.  When ratified by the employees represented by the UMWA, the NBCWA applies to all covered operations of BCOA Operator Members, as well as other coal operators who agree to its terms by signing so-called "me-too" agreements directly with the UMWA.

13.     The principal negotiators for the 2007 NBCWA were Peter Lilly, Chairman of the BCOA Negotiating Committee and Chief Operating Officer ("COO") of Consolidation Coal Company, and Cecil Roberts, President of the UMWA.  The principal negotiators for the 2002 NBCWA were Brett Harvey, Chairman of the BCOA Negotiating Committee and President of Consolidation Coal Company, and Cecil Roberts, President of the UMWA.  The principal negotiators for the 1998 NBCWA were Bobby Brown, Chairman of the BCOA Negotiating Committee and Chairman of Consolidation Coal Company, and Cecil Roberts, President of the UMWA.

14.     In 2007, following the negotiation of the 2007 NBCWA between BCOA and the UMWA, numerous organized bituminous coal companies signed "me-too"

4

agreements with the UMWA based on the terms of the 2007 NBCWA. These companies

ranged from small operators to medium-sized companies to the largest coal companies in

the United States that produce the majority of the tonnage produced in the organized

sector of the coal industry, including Peabody Energy, Foundation Coal, Jim Walter

Resources, PinnOak Resources, and P&M Coal.

### D.     Freeman United's Membership In And Withdrawal From BCOA

15.     Freeman United Coal Mining Company ("Freeman") joined BCOA in

April 1966 and remained a member for approximately 31 years until it withdrew its

membership from BCOA on July 29, 1997. When doing so, Freeman revoked "any and

all authority which may previously [have] been granted to the BCOA to negotiate on its

behalf" with the UMWA. Freeman also requested that BCOA erase completely

Freeman's status as a member of BCOA by requesting that BCOA "take all actions

necessary to remove" Freeman's name from "BCOA's official membership roster and

committees, as well as any other lists, forms, summaries, or other documents (including

all electronic media) within the control of BCOA." A copy of Freeman's letter of

withdrawal from BCOA is appended hereto as Attachment 1.

16.     BCOA complied with Freeman's requests, and no longer represented

Freeman's interests in collective bargaining with the UMWA.

17.     After Freeman withdrew from BCOA in 1997, it exercised no control over

the conduct of BCOA in subsequent negotiations with the UMWA, including the conduct

of BCOA in negotiation of the 2007 NBCWA. Freeman did not inform BCOA of any

intent to participate in, receive information about, or influence the negotiation of the 2007

NBCWA, including provisions regarding the 1974 Pension Trust. Freeman did not make

any inquiry of BCOA before or during the 2007 negotiations, did not offer any

suggestions or comments regarding contributions to the 1974 Pension Trust, and did not

attempt to influence or exercise control over BCOA's negotiations.

### E. Monterey Coal Company's Membership In And Withdrawal From BCOA

18.     Monterey Coal Company ("Monterey") joined BCOA in 1972 and

remained a member for 20 years until it unilaterally withdrew its membership from

BCOA on September 22, 1992.  When doing so, Monterey "revoke[d] any and all

authority previously granted BCOA as a multi-employer bargaining agent to act on

[Monterey's] behalf."  Monterey also noted that it would "continue to comply with the

lawful provisions of the National Bituminous Coal Wage Agreement of 1988," but would

not "recognize any extension or successor agreement negotiated by BCOA."  A copy of

Monterey's letter of withdrawal from BCOA is appended hereto as Attachment 2.

19.     BCOA complied with Monterey's request, and no longer represented

Monterey's interests in collective bargaining with the UMWA.

### F. The Evergreen Clause

20.     During the negotiations that led to the 1978 NBCWA, BCOA and the

UMWA amended the 1974 Pension Plan to include a provision known as the "evergreen"

clause.  As negotiated by BCOA on behalf of its members, including Freeman and

Monterey, the evergreen clause was intended to ensure that all participating employers in

the 1974 Pension Plan, as well as other health and pension plans contained in the

NBCWA (collectively, "UMWA Health & Retirement Funds"), would continue to share

in the financial burden of funding benefits provided by the Plan.  The language of the

clause as negotiated in 1978 provided as follows:

> Any Employer who employed any participant eligible for
> coverage under, or who received or receives benefits under,
> the 1974 Pension Plan, or any Employer who was or is
> required to make, or who has made or makes contributions
> to the 1974 Pension Plan and Trust, is obligated and
> required to comply with the terms and conditions of the
> 1974 Pension Plan and Trust, as amended from time to
> time, including, but not limited to, making the contributions
> required under the National Bituminous Coal Wage
> Agreement of 1978, as amended from time to time, and any
> successor agreements thereto.

By insisting on these contractual preconditions for participation in the UMWA Health &

Retirement Funds in 1978 and thereafter, the Funds' settlors, BCOA and the UMWA,

agreed that the UMWA Health & Retirement Funds should not become a "last man's

club" where certain employers could pull out entirely, or contribute at reduced rates, at

the expense of the remaining employers.

      21.     BCOA and the UMWA, as the 1974 Pension Plan's settlors, have the

power to amend the 1974 Pension Plan and Trust documents to reflect the agreement that

was negotiated between BCOA and the UMWA in the NBCWA. Historically, BCOA

and the UMWA have amended the 1974 Pension Plan and Trust documents immediately

after reaching agreement over the terms of the NBCWA. BCOA and the UMWA

amended the 1974 Pension Plan immediately after completing negotiations for the 1981,

1984, 1988, 1993, 1998, 2002, and 2007 NBCWAs. The 1974 Pension Plan and Trust

documents are incorporated by reference in, and thus made part of, each NBCWA.

      22.     BCOA and the UMWA retained the evergreen clause in each NBCWA

from 1978 to the present, including the recently negotiated 2007 NBCWA. Each such

NBCWA added in the Plan and Trust documents for the 1974 Plan, at the end of the

evergreen clause, the phrase "including, but not limited to, the National Bituminous Coal

7

Wage Agreement of [current year]." In keeping with this pattern, the current NBCWA

adds, at the end of the evergreen clause, "including, but not limited to, the National

Bituminous Coal Wage Agreement of 2007."

    23.    The evergreen clause in the plan document of the 1974 Pension Plan

currently states as follows:

> Any Employer who employed any participant eligible for
> coverage under, or who received or receives benefits under,
> the 1974 Pension Plan, or any Employer who was or is
> required to make, or who has made or makes contributions
> to the 1974 Pension Plan and Trust, is obligated and
> required to comply with the terms and conditions of the
> 1974 Pension Plan and Trust, as amended from time to
> time, including, but not limited to, making the contributions
> required under the National Bituminous Coal Wage
> Agreement of 1978 as amended from time to time, and any
> successor agreements thereto, including, but not limited to,
> the National Bituminous Coal Wage Agreement of 2007.

    24.    BCOA and the UMWA amended the 1974 Pension Plan to require

employers to contribute to the 1974 Pension Plan at the rates set forth in the 2007

NBCWA. The contribution rates for the 1974 Pension Trust are $2.00 per hour for each

hour of classified work, for calendar year 2007; $3.50 per hour for calendar year 2008;

$4.25 for calendar year 2009; and $5.00 per hour for calendar year 2010; and $5.50 for

the period beginning on January 1, 2011 and ending when the 2007 NBCWA is

terminated.

    25.    Freeman and Monterey were members of BCOA when BCOA and the

UMWA negotiated the evergreen clause with the UMWA in the 1978 NBCWA.

    26.    Freeman remained a member of BCOA when BCOA and the UMWA

renegotiated and retained the evergreen clause in the NBCWAs of 1981, 1984, 1988, and

1993.

27.    Monterey remained a member of BCOA when BCOA and the UMWA renegotiated and retained the evergreen clause in the NBCWAs of 1981, 1984, and 1988.

G.    **Freeman's and Monterey's Participation In The Evergreen Litigation**

28.    During the 1980's, numerous coal companies withdrew from BCOA and either refused to contribute to the UMWA Health & Retirement Funds (including the 1974 Pension Trust) or negotiated separate agreements with the UMWA that purported to allow those companies to contribute to the applicable Trusts at reduced rates or not at all. The 1974 Pension Plan and other UMWA Health & Retirement Funds initiated litigation in the District of Columbia during 1988 to enforce the evergreen clause, asserting (1) that these companies had a contractual obligation to contribute at the rate set in the then-current NBCWA, and (2) that the rate could not be modified or superseded by individual company agreements with the UMWA. *See In re United Mine Workers of America Employee Benefit Plans Litigation*, 782 F. Supp. 658 (D.D.C. 1992).

29.    BCOA, including Freeman and Monterey, participated in the litigation as amicus curiae, in support of the UMWA Health & Retirement Funds (including the 1974 Pension Plan) to enforce the evergreen clause.

30.    In February 1992, while Freeman and Monterey were still members of BCOA, the United States District Court for the District of Columbia granted the Funds' motion for summary judgment, concluding, among other things, that (1) the evergreen clause binds coal companies that withdraw from BCOA, (2) the evergreen clause binds companies that negotiate separate agreements with the UMWA that purport to allow such companies to pay less than the contribution rate in the NBCWA or nothing at all, and (3) the reference to "successor agreements" in the evergreen clause refers to the NBCWAs of

9

1984, 1988, and "subsequent years." *In re UMWA Benefit Plans Litig.*, 782 F. Supp. at 664-67.

31.    In 1993, the United States Court of Appeals for the D.C. Circuit affirmed. *United Mine Workers of America 1974 Pension Trust v. Pittston*, 984 F.2d 469 (D.C. Cir. 1993).

32.    After the evergreen litigation was concluded, BCOA negotiated the 1993 NBCWA that again included the evergreen provision. Freeman continued to be a member of BCOA during those negotiations, and was signatory to the 1993 NBCWA at the time it withdrew from BCOA in 1997.

**H.    Contributions To, And Benefits From, the 1974 Pension Plan**

33.    From 1978 to 1988, contributions to the 1974 Pension Trust were based on a combination of per hour and per-ton contributions, with the hourly rate ranging from $0.75 to $1.03, and the per-ton rate from $.06 to $.08. In the 1988 NBCWA, BCOA and the UMWA changed the funding basis for the 1974 Pension Plan exclusively to a per-hour basis. BCOA and the UMWA have not deviated from that standard in the last 20 years.

34.    The 1998 NBCWA negotiated between BCOA and the UMWA provided that contributions to the 1974 Pension Plan would be 75.0 cents per hour until the 1974 Pension Trust reached "full funding," at which time the contribution rate would be reduced to 0.0 cents per hour. "Full funding" was defined as when the "market value of assets of the 1974 Pension Trust exceeds the present value of accrued benefits of the Trust," using the Plan's funding assumptions.

35.     On July 1, 1998, pursuant to the terms of the 1998 NBCWA, the 1974 Pension Plan reached full funding, and the contribution rate to the 1974 Pension Plan was reduced effective August 1998 to 0.0 cents per hour for all existing signatory employers. When this funding threshold was reached, participating employers (including Freeman and Monterey) were not required to contribute to the 1974 Pension Trust unless and until BCOA and the UMWA established a new contribution rate. Employees and retirees of participating employers, however, including employees and retirees of Freeman and Monterey, continued to earn pension credits or receive benefits from the assets of the 1974 Pension Plan.

36.     The zero contribution rate to the 1974 Pension Plan remained in place throughout the remaining term of the 1998 NBCWA and through the term of the 2002 NBCWA. As a result, contributing employers, including Freeman and Monterey, were not required to make contributions to the 1974 Pension Plan for nine years, even though their retirees and their dependents continued to receive pension and other benefits from the Plan and their current employees continued to accrue benefits under the Plan.

37.     On December 15, 2006, after months of negotiations, BCOA and the UMWA reached a tentative agreement for the 2007 NBCWA, a five-year agreement effective January 1, 2007. Among other things, the 2007 NBCWA contained pension and benefit increases for the 1974 Pension Plan, as well as the new contribution rate that BCOA and the UMWA had negotiated.

38.     The new contribution rates for the 1974 Pension Plan require that obligated employers (including Freeman and Monterey) contribute at the rate of $2.00 per hour during calendar year 2007; $3.50 an hour during calendar year 2008; $4.25 an

hour during calendar year 2009; $5.00 an hour during calendar year 2010; and $5.50 an hour during calendar year 2011.

39.    BCOA and the UMWA negotiated these contribution rates with the intent to fund the agreed-upon benefits and comply with the recently enacted Pension Protection Act of 2006 ("PPA"), which (a) imposes certain obligations on employers to fully fund their pension obligations and (b) requires certain remedial actions by employers and employee pension plans when such pension plans face funding deficiencies.  Most significantly, if a pension plan, including a multiemployer pension plan like the 1974 Pension Plan, falls below the PPA's 80% fully funded threshold, it is considered "endangered" under the PPA, and several affirmative steps must be taken to rise above the 80% funding threshold.

40.    During negotiations for the 2007 NBCWA, the UMWA made several proposals for increased pension benefits that would have altered significantly the 1974 Pension Plan's funding status and placed the 1974 Pension Plan in "endangered" status during the term of the 2007 NBCWA.

41.    BCOA and the UMWA reached agreement on a series of benefit increases for both active employees and retirees.  These benefit increases include (a) for active employees, an increase of $10 per month per year of service for each year of future service; (b) for active employees, an increase of $10 per month for each year of past service, payable on their retirement; (c) for retirees, an increase in their pensions of $15.00 per month; and (d) lump sum payments of $565 for retirees, $440 for surviving spouses, and $440 for disability pensioners.  These negotiated benefit increases were incorporated into the 1974 Pension Plan's governing plan documents.

42.    In order to pay for the UMWA bargaining demands, comply with the Pension Protection Act, and prevent the 1974 Pension Trust from falling below the 80% funded level and into "endangered" status, BCOA engaged its actuaries, analyzed the funding status of the Trust in light of the pension increases demanded by the UMWA, and determined that employer contributions starting at $2.00 per hour and increasing over the term of the 2007 NBCWA were appropriate. These contribution rates, in light of the negotiated benefit increases for plan participants, were projected to be sufficient to keep the Plan out of "endangered" status.

43.    After the 2007 negotiations were concluded, the 1974 Pension Plan's actuaries from Mercer Human Resource Consulting performed an analysis of the financial condition of the 1974 Pension Plan reflecting the effects of what had been negotiated in the 2007 NBCWA. The February 9, 2007 Mercer analysis estimated that, as of July 1, 2006, in light of the negotiated benefit changes, the actuarial value of the 1974 Pension Plan's assets was approximately $5.8 billion and its liability was approximately $6.98 billion within the meaning of the Pension Protection Act of 2006.


I declare under penalty of perjury that the foregoing is true and correct.

Charles S. Perkins, III

Date: SEPTEMBER 7, 2007

13

# ATTACHMENT 1

Jun-09-2007  03:23am  From-BCOA                                    T-988  P.002/004  F-383

**FREEMAN UNITED**

JUL 2 9 1997

B.C.O.A.

**Freeman United Coal Mining Company**

1999 Wabash Ave., Suite 200B
Springfield, IL 62704-5364
217/698-3300
Fax 217/698-3379

July 29, 1997

Mr. Joseph Brennan, President
Bituminous Coal Operators Association
918 Sixteenth Street
Washington, DC  20006

Re: <u>Resignation of Membership</u>

Dear Mr. Brennan,

Pursuant to Article VII, Section (a) of the BCOA By-Laws, Freeman United Coal Mining Company (Freeman) hereby resigns its membership in the Bituminous Coal Operators Association (BCOA), effective immediately. Accordingly, please take all actions necessary to remove our company name from the BCOA official membership roster and committees, as well as any other lists, forms, summaries, or other documents (including all electronic media) within the control of the BCOA.

Freeman also hereby withdraws any and all authority which may previously have been granted to the BCOA to negotiate on its behalf with the International Union, United Mine Workers of America, any other labor organization, or any other entity whatsoever. This unequivocal withdrawal of bargaining authority is effective immediately, this 29th day of July, 1997.

Finally, to the extent that Freeman may be required, by the BCOA By-Laws or otherwise, to make any payments to the BCOA in the future, these payments will be made solely because of such obligations, and any such payments shall not be construed as granting any authority to the BCOA or otherwise continuing any relationship between the BCOA and Freeman United Coal Mining Company.

Thank you for your prompt attention to this matter.

Sincerely,

*Walter A. Gregory* DHD

Walter A. Gregory, President and COO
Freeman United Coal Mining Company

By *Donald H Dame*

Donald H. Dame
Authorized Representative

LH/102

# ATTACHMENT 2

# MONTEREY COAL COMPANY

POST OFFICE BOX 496 · CARLINVILLE, ILLINOIS 62626 · (217) 854-2611

J. D. GOODRICH, JR.
PRESIDENT

September 22, 1992

RECEIVED

SEP 2 5 1992

Mr. Joseph P. Brennan, President
Bituminous Coal Operators' Association, Inc.
918 16th Street, N.W. -- Suite 303
Washington, D.C. 20006 - 2971

Mr. Richard Trumka, President
United Mine Workers of America
900 15th Street N.W.
Washington, D.C. 20005

Gentlemen:

Pursuant to the constitution and by-laws of the Bituminous Coal Operators' Association, Inc. (BCOA), Monterey Coal Company (Monterey), hereby resigns membership in the BCOA.

Monterey revokes any and all authority previously granted BCOA as a multi-employer bargaining agent to act on our behalf. Monterey will continue to comply with the lawful provisions of the National Bituminous Coal Wage Agreement of 1988, but will not recognize any extension or successor agreement negotiated by BCOA.

Please advise immediately if you have any questions concerning this correspondence.

Very Truly Yours,

JDG:kks

c:  J. R. Angelton, President
    UMWA District 12

    All BCOA Member Companies

A division of EXXON COAL USA, INC.

# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Holland, et al.,      )<br>    )<br>    )<br>Plaintiff,      )<br>    )<br>v.      )<br>    )<br>Freeman United Coal Mining Company, )<br>et al.,      )<br>    )<br>Defendants.      )<br>    ) | Case No. 07-cv-490 (PLF) |

| | |
|---|---|
| Freeman United Coal Mining Company, )<br>    )<br>Plaintiff,      )<br>    )<br>v.      )<br>    )<br>United Mine Workers of )<br>America, et al.,      )<br>    )<br>Defendants.      )<br>    ) | Case No. 07-cv-1050 (PLF) |

## [PROPOSED] ORDER

Upon consideration of the motion of the Bituminous Coal Operators' Association, Inc. ("BCOA") for a protective order regarding the proper scope of the deposition of BCOA Secretary-Treasurer Charles S. Perkins, including any response thereto and other relevant record materials,

It is, on this _____ day of December, 2007, hereby

ORDERED that BCOA's motion for a protective order is GRANTED; and it is further

ORDERED that the scope of Mr. Perkins' deposition shall be limited to the contribution rate for the UMWA 1974 Pension Trust contained in the National Bituminous

Coal Wage Agreement of 2007 and any other matters addressed by Mr. Perkins in his prior

declaration filed in this case.

_____
United States Magistrate Judge

cc:    Counsel of Record