UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
Michael H. Holland, et al.,                        )
                                                   )
            Plaintiffs,                            )
                                                   )
v.                                                 )      Case No.  07-cv-490 (PLF/AK)
                                                   )
Freeman United Coal Mining Co., et al.,            )
                                                   )
                                                   )
            Defendants.                            )
_____)

_____
Freeman United Coal Mining Co.,                    )
                                                   )
            Plaintiff,                             )
                                                   )
v.                                                 )      Case No.  07-cv-1050 (PLF/AK)
                                                   )
United Mine Workers of                             )
America, et al.,                                   )
                                                   )
            Defendants.                            )
_____)

**MEMORANDUM OF UNITED MINE WORKERS
OF AMERICA IN OPPOSITION TO FREEMAN UNITED COAL MINING
COMPANY'S MOTION TO COMPEL DISCOVERY**

Defendant United Mine Workers of America ("UMWA" or "Union"), by its undersigned

counsel and pursuant to Local Rule 7(d), hereby submits this memorandum of law in opposition

to the motion to compel discovery filed by Freeman United Coal Mining Company ("Freeman").[1]

---

[1]In a Minute Order issued by Magistrate Judge Kay on December 11, 2007, the Court indicated that the Union's opposition was due on December 10, 2007.  The Union respectfully disagrees with the Court's calculation and submits that the date for filing an opposition to Freeman' motion to compel is December 11, 2007.  The Union arrived at this date based upon its reading of Local Rule 4 which provides that "within 11 days of the date of service . . . an opposing party shall serve and file a memorandum of points and authorities in opposition to the motion." When this Rule is read in conjunction with Federal Rule of Civil Procedure 6(a), (d) - which excludes the day of the event which begins the period and adds three days to the applicable response time - the correct date for the Union's opposition is December 11, 2007.  The motion to compel was filed on November 27, 2007.  Thus, 11 days beginning

For the reasons set forth below, the motion to compel should be denied and any discovery directed to the Union should be limited and directly related to the sole claim brought against the UMWA by Freeman. If the Court does not impose such reasonable discovery limitations, Freeman will be allowed to improperly transform this case from a discrete matter that is capable of being resolved by the Court after fairly narrow and limited discovery into a needless and wasteful re-litigation of a matter involving many of the same parties which was fully litigated and previously decided by this Court, and affirmed by the Court of Appeals.

## RELEVANT FACTUAL BACKGROUND

In order to place the pending motion to compel in its proper context, it is necessary to provide a brief summary of the history of this litigation, as well as previous litigation brought before this Court on the same issue raised by Freeman in this case. As demonstrated below, when this case in considered in the proper context, it becomes apparent that much of Freeman's current discovery serves only to further an improper attempt to place before this Court a legal issue that it has already conclusively and definitively decided.

These consolidated cases concern obligations owed by Freeman and Monterey Coal Company ("Monterey") under National Bituminous Coal Wage Agreements ("NBCWAs") which were negotiated between the Union and the Bituminous Coal Operators Association ("BCOA"). The UMWA and BCOA have maintained a bargaining relationship since approximately 1950. See Freeman Complaint, at ¶ 13, Defendant United Mine Workers of America's Statement of Material Facts As To Which There Is No Genuine Dispute ("SOF"), at ¶ 3. Freeman was a

---

on November 28, 2007 brings the date to December 8, 2007, with an additional 3 days rendering the appropriate response time to December 11, 2007.

member of the BCOA from 1966 until 1997.  Id. at ¶ 21; SOF, at ¶ 25.  Monterey was a member

of BCOA from at least 1974 through 1988.  SOF, at ¶ 27.

As part of their collective bargaining negotiations, the Union and BCOA created certain

pension funds, including the 1974 UMWA Pension Plan ("1974 Plan") - which is involved in

these consolidated cases.  The 1974 Plan was initially created when the UMWA Welfare and

Retirement Fund of 1950 was split in response to the passage of the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq.  SOF, at ¶ 4.  The 1974 Plan was

created to provide pension benefits to miners (and their dependents) who retired after December

31, 1975.  Id.  The 1950 UMWA Pension Plan and Trust was created to provide pension benefits

to miners (and their dependents) who retired prior to December 31, 1975.  Id.

These pension plans were to be funded by contributions from coal operators, like

Freeman and Monterey, who were parties to the NBCWAs.  In fact, every NBCWA negotiated

since 1974 has contained both the contribution rates to the pension trusts and the precise level of

benefits to be provided by the pension plans.  SOF, at ¶ 7.  The negotiated rates and benefit levels

have been uniform for all current signatory employers and for all beneficiaries.  Id.

Because the Union and BCOA were concerned with the financial stability of their health

and retirement funds, they agreed upon certain provisions during negotiations for the 1978

NBCWA to address these concerns.  These provisions were adopted so that signatory employers

(like Freeman and Monterey) would not be able to withdraw from the Trust Funds and dump

their liability for benefit obligations on remaining employers.  SOF, at ¶ 8.  Thus, the Union and

BCOA agreed on a contractual provision that required all employers to pay the same level of

contributions.  Id.

The parties also adopted a provision that became know in the industry as the "evergreen" provision. Id. That clause, which was inserted in the controlling plan and trust documents, provides that any employer who employed a participant eligible for benefits from the 1974 Plan (as well as other pension and benefit plans) or any employer that was obligated to make contributions to the 1974 Plan was "obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto." SOF, at ¶ 8.

This Court has ruled that the evergreen clause contained in the NBCWAs "was an important provision negotiated to make sure that any coal operator that voluntarily agreed to participate in the [UMWA] Funds in 1978 could not simply walk away from the Funds and leave its retirees behind, or negotiate cut-rate contributions with the UMWA, at the expense of the remaining employers." In re United Mine Workers of America Employee Benefit Plans Litigation, 782 F.Supp. 658, 665 (D.D.C. 1992). In upholding the district court's enforcement of the evergreen clause, the Court of Appeals reasoned that coal companies "agreed to be bound by the evergreen clause to make contributions to the trusts, and the obligation included an agreement to make contributions at the rates specified in subsequent NBCWAs, without regard to whether the employer was still a party to the subsequent agreement." United Mine Workers of America 1974 Pension Trust v. Pittston Co., 984 F.2d 469, 474 (D.C. Cir. 1993).

It is undisputed that both Freeman and Monterey have signed NBCWAs containing the "evergreen" provision. See 1974 Pension Trust Complaint, at ¶ 22, 44, Freeman Answer, at ¶ 24;

4

Monterey Answer, at ¶ 44; SOF, at ¶ 25, ¶ 27.  The 2007 NBCWA sets the relevant contribution

rate to the 1974 Plan at $2.00 per hour worked.  <u>See</u> 1974 Trust Complaint, at ¶ 23; SOF, at 15.

Despite their status as signatory employers, neither company has remitted contributions to the

1974 Trust at the rate set by the 2007 NBCWA.

Instead, in February, 2007 Freeman commenced a lawsuit against the Union, the 1974

Trust and BCOA in the United States District Court for the Central District of Illinois.[2]  In that

suit, Freeman seeks a declaration that it is not obligated to contribute to the 1974 Plan at the rates

established in the 2007 NBCWA because, according to Freeman, the 2007 NBCWA is a national

agreement in name only and should not be considered a successor NBCWA.  <u>See</u> Freeman

Complaint, at ¶ 45 (d)-(f).   Thus, Freeman essentially seeks to avoid the decision in <u>Pittston</u>.[3]

The 1974 Plan, under the controlling authority of <u>Pittston</u>, initiated a separate collection

action in this Court against Freeman and Monterey seeking to enforce the obligation of those

companies under the "evergreen" provision to make contributions to the 1974 Plan at the rate set

in the 2007 NBCWA.[4]  Thereafter, Freeman's action was transferred to this Court and the two

cases were subsequently consolidated.

Through is motion to compel, Freeman continues to maintain its erroneous position that

the sole claim brought against the Union justifies the expansive discovery it seeks to obtain from

the UMWA.  Because the Court's decision in <u>Pittston</u> controls the outcome of this case, its

resolution can be achieved through much more narrow and limited discovery.  Accordingly, the

---

[2]The Freeman action the Union has been docketed in this Court as 07-cv-1050.

[3]Monterey seeks the same relief with respect to its obligations to the 1974 Plan.

[4]The 1974 Plan action against Freeman and Monterey has been docketed in this Court as 07-cv-490.

Court should deny Freeman's motion to compel and should uphold the objections set forth by the Union concerning the scope of Freeman's document requests and the relevance of much of these requests.

## ARGUMENT

In <u>Bethea v. Comcast</u>, 218 F.R.D. 328, 330 (D.D.C. 2003), this Court explained that "[w]hen a party seeks to compel discovery, it first has the burden of demonstrating the relevance of the information to the lawsuit."   In order to meet this burden a party must make a "showing of need [, as] for the purpose of prosecuting or defending a specific pending civil action." <u>Burlington Insurance Co v. Okie Dokie, Inc.</u>, 386 F.Supp.2d 83, 86 (D.D.C. 2005), <u>quoting</u> <u>Friedman v. Bache Halsey Stuart Shields, Inc.</u>, 738 F.2d 1336, 1341 (D.C. Cir. 1984).  Thus, "one is presumed to have no need of a matter not relevant to the subject matter involved in the pending action."  <u>Id</u>.   Similarly, "relevancy does not encompass discovery of information with 'no conceivable bearing on the case.'"  <u>Id</u>.

Trial courts are granted considerable discretion over discovery matters, including determinations with respect to relevance.  <u>See</u> <u>e.g.</u> <u>United States v. Krizek</u>, 192 F.3d 1024, 1029 (D.C. Cir. 1999).  In <u>Herbert v. Lando</u>, 441 U.S. 153 (1979) the Supreme Court succinctly summarized the role of a trial court in determining what matters may be considered relevant in a particular case. The Court explained that:

> [t]he discovery provisions, like all the Federal Rules of Civil Procedure, are subject to the injunction of Rule 1 that they 'be construed to secure the just, speedy and inexpensive determination of every action.'  To this end, the requirement of Rule 26(b)(1) that the material sought in discovery be 'relevant' should be firmly applied, and the district courts should not neglect their power to restrict discovery where 'justice requires [protection for] a party or

> person from annoyance, embarrassment, oppression, or undue
> burden or expense . . .'  With this authority at hand, judges should
> not hesitate to exercise appropriate control over the discovery
> process.

Id. at 177.

In this case, Freeman has failed to demonstrate why the additional discovery it seeks is relevant to the pending action against the Union.   Therefore, consistent with the direction provided in Lando, the Court should deny Freeman's motion to compel.

As the Union explained in its recently filed motion for protective order, this litigation raises only one issue, namely  - is the current contribution required to be paid to the 1974 Plan by contributing employers, like Freeman and Monterey, valid?  Even this question has been reduced to marginal significance given the fact that both Freeman and Monterey have recently either ceased mining operations (in the case of Freeman) or are in the process of discontinuing active mining operations (in the case of Monterey).[5]  The Union submits that resolution of this question requires fairly limited and refined discovery, focused on the circumstances that led to the setting of the current contribution rate, which Freeman and Monterey have refused to pay.

The Pittston case resolved the question of the validity of the evergreen clause as applied to coal companies like Freeman and Monterey who were signatory to past NBCWAs but not to the current agreement.  Such companies must contribute to the 1974 Plan at the rate set forth in the current NBCWA.  Thus, the only additional information relevant to Freeman's current claim against the Union involves how that rate was set by the parties to the 2007 NBCWA.

---

[5]Freeman sold its operations to Springfield Coal in August, 2007 and Monterey will shut down its mining operations by the end of this month.

The Union has provided approximately 1100 pages of documents to Freeman in response to its discovery requests that pertain to the 1974 Plan contribution rate and the circumstances that required the bargaining parties to increase that rate for the first time in nearly nine years. In addition, the Union also has provided a detailed declaration from the Union's President, Cecil Roberts, setting forth information on bargaining over the increased contribution rate, the relevant background with respect to past NBCWAs, the manner through which the Union's membership ratified the 2007 NBCWA, and the industry response to the ratified agreement.[6]

In light of the Union's document production, Freeman's claim that the UMWA has engaged in "widespread defiance of discovery obligations" (see Motion to Compel, at 5) is wrong. The Union has engaged in a good faith effort to produce responsive documents based upon what it views to be the legitimate scope of this litigation, while raising reasonable objections to Freeman's attempt to obtain additional information and documents from the Union that have nothing whatsoever to do with its claim that the 1974 Plan contribution rate is not valid.

The Union also disputes Freeman's suggestion that the Union's discovery responses are inconsistent with orders issued by the Court. See Memo. in support of Motion to Compel, at 5, 7. As Freeman is well aware, the Court has yet to rule on any of the Union's discovery objections. Instead, the Court has merely indicated to the parties that any discovery disputes, including the appropriate scope of discovery under Rule 56(f), will be resolved by the magistrate

---

[6]In addition, the Union intends to produce additional documents in response to Freeman's Second Request for Production of Documents, including "me-too" agreements signed by coal operators that adopted the terms of the 2007 NBCWA, and documents relevant to the mandate from the Union's membership to focus its attention on pension issues during negotiations that led to the 2007 NBCWA. Also, through the noticed deposition of President Roberts, Freeman may inquire further into the information set forth in his declaration, which the Union submitted in support of its motion for summary judgment.

judge.  See November 19, 2007 Minute Order issued as Docket Entry No. 35 in Case No. 07-1050.  Thus, these issues will be addressed at the hearing scheduled by the Court for December 18, 2007.[7]

The discovery requests to which the Union has objected are far reaching and involve matters wholly unrelated to the challenged contribution rate.  Indeed, Freeman's extensive requests for production of documents seek to investigate numerous aspects of collective bargaining between the Union and BCOA and between the UMWA and other companies that have nothing whatsoever to do with the matter at issue in this case.  Moreover, through its recently served discovery requests, Freeman also seeks documents dating back to the original negotiation of the evergreen clause in 1978.

Freeman argues that its broad discovery requests are necessary because the 2007 NBCWA is not a  "successor agreement" to previous NBCWAs as required by the evergreen clause and thus, the Pittston decision does not apply in this case.   See Memo. in Support of Motion to Compel, at 10-11.  Specifically, Freeman defends its discovery requests because it claims that such requests are relevant to its claim that the BCOA is no longer a multi-employer association, as well as its claim that the 2007 NBCWA is not a national agreement because it was negotiated with a single employer.   Id. at 11.   Freeman fails to provide any legal support or citation that BCOA, however constituted, cannot negotiate a successor NBCWA with the Union, as the parties have done for nearly 60 years.  See Roberts Declaration at, ¶ 6.  Similarly,

---

[7]In its legal memorandum in support of its motion to compel, Freeman suggests that the Union did not undertake a search of its email and other electronic documents as part of its response to the pending discovery requests.  This claim is untrue.  See Declaration of Deborah Stern attached hereto as Exhibit 1.  In the course of responding to Freeman's discovery requests, the Union conducted a thorough search of all its files, including those maintained in electronic format.  See Stern Declaration at ¶¶ 3-5.

9

Freeman's unsupported contention concerning the alleged single-employer nature of the 2007

NBCWA is directly contrary to the fact that nearly 75% of the organized bituminous coal

industry have accepted the terms of that agreement.  <u>See</u> Roberts Declaration at, ¶ 6.

Much of the additional discovery that Freeman seeks with respect to all aspects of the

parties' collective bargaining and the history of the evergreen clause is also rendered irrelevant

by the fact that, regardless of whether the 2007 NBCWA is a successor agreement, the 1974 Plan

contribution rate contained in the 2007 NBCWA is valid based upon operation of Article XX of

the NBCWA.  Article XX establishes the appropriate parties who may set the rate to be paid to

the 1974 Plan by contributing employers.  Specifically, Article XX (d)(1)(v) provides that

> [i]n the event the BCOA ceases to exist, **or** in the event more than 50% of the tonnage membership of the BCOA on the Effective Date has withdrawn prior to the time when the BCOA is required or permitted to take action under this Article, then such action may be taken by majority vote, based on tonnage, of Employers who were BCOA members on the Effective Date.

<u>See</u> Article XX (d)(1)(v) of the 2002 NBCWA attached hereto as Exhibit 2.

In previous filings, Freeman and Monterey failed to recognize the inclusion of the

disjunctive "or" in Article XX.  Thus, they mistakenly argued that this provision is only triggered

if BCOA ceases to exist.  <u>See</u> <u>e.g.</u> Freeman Opposition to Motion for Summary Judgment, at  12

n.2.  That is simply not true.

Article XX can be triggered if BCOA members representing more than 50% of the

member tonnage withdraw from the association during the applicable time period.   At the time

of the 2006 negotiations, Consol and its subsidiaries represented over 50% of the tonnage of the

BCOA membership on the effective date of the 2002 NBCWA.  <u>See</u> UMWA SOF at ¶ 10.

Therefore, according to the language of Article XX, the UMWA properly viewed the employers comprising BCOA (regardless of their corporate structure) to be the appropriate entity with which to bargain over the 1974 Plan contribution rate. Accordingly, the 1974 Plan contribution rate that was set by the Union and this group of employers (whether they are considered BCOA, Consol or some differently named trade group or association) is valid and applies to Freeman and Monterey.

## **CONCLUSION**

Because Freeman cannot establish any legal or factual basis for its effort to expand discovery beyond the factual circumstances involving the increase to the 1974 Plan contribution rate, its motion to compel must be denied. If, as the Union contends, this Court determines that the Pittston decision applies to this case, the additional discovery sought by Freeman amounts to nothing more than a wasteful, burdensome and duplicative effort to explore an issue that has already been resolved.[8]

---

[8]Even if Freeman's motion to compel is granted, its request for attorneys' fees and costs should be denied. In Burlington Insurance Co v. Okie Dokie, Inc., 386 F.Supp.2d at 88, this Court stated that "[a] court may not award Rule 37 expenses, . . . if it finds, inter alia, that 'the opposing party's nondisclosure, response, or objection was substantially justified." It has been determined that "an opposing party's objection qualifies as 'substantially justified' if 'there is a genuine dispute or if reasonable people could differ as to the appropriateness of the contested action." Id. citing Pierce v. Underwood, 487 U.S. 552, 565 (1988) 2005); Cobell v. Norton, 213 F.R.D. 48, 61 (D.D.C. 2003). Here, as explained above, there is a legitimate dispute between the parties with respect to whether the Pittston decision controls this litigation. Such a dispute has led the parties to take divergent views of the appropriate scope of discovery. Because reasonable people could differ on this issue, Freeman's request for attorneys' fees and costs should be denied.

Respectfully submitted,

_____/s/_____
John R. Mooney, Bar No. 375886
Mark J. Murphy, Bar No.  453060
Mooney, Green, Baker & Saindon, P.C.
1920 L Street, N.W.
Suite 400
Washington, D.C. 20036
(202) 783-0010
(202) 783-6088 facsimile

Counsel for Defendant
United Mine Workers of America

December 11, 2007

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Holland, et al., ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 07-cv-490 (PLF/AK) |
| ) | |
| Freeman United Coal Mining Company, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| Freeman United Coal Mining Company, ) | |
| ) | |
| Plaintiff, ) | Case No. 07-cv-1050 (PLF/AK) |
| ) | |
| v. ) | |
| ) | |
| United Mine Workers of ) | |
| America, et al., ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF DEBORAH STERN

I, Deborah Stern, hereby declare as follows:

1.    I currently hold the position of Associate General Counsel of the United Mine Workers of America ("UMWA" or "Union"). My office is located at UMWA Headquarters, at 8315 Lee Highway, Fairfax, VA, 22031. I have been employed as an attorney for the UMWA since 1982.

2.    I am one of the attorneys who represent the UMWA in Case No. 07-cv-1050, above.

3.     On August 7, 2007, Freeman United Coal Mining Company ("Freeman")

served its First Request for Production of Documents upon the Union.  I

met with UMWA International President Cecil E. Roberts, with his

Executive Assistant Marty Hudson, with UMWA International Secretary-

Treasurer Daniel J. Kane, and with his Executive Assistant Ron Airhart,

and reviewed the enumerated requests, to determine both the paper and

electronic files that might contain documents related to the 2007 National

Bituminous Coal Wage Agreement and to its negotiation by the UMWA

and BCOA (as defined by the Request for Production, including

memoranda, notes, proposals and counterproposals, minutes, transcripts,

drafts, e-mails and attachments thereto, and correspondence); the paper

and electronic files that might contain documents related to the negotiation

of the level of pension and health benefits and the rates of contributions in

particular; and the paper and electronic files that might contain the various

historic documents predating the 2007 NBCWA requested by Freeman.  I

searched the files they identified for all responsive documents, and copied

and/or printed those documents.  I have retained in my office copies of

documents that are responsive to Freeman's Requests, from which the

Union has produced to Freeman those documents that it regards as

relevant to this litigation.

4.     In addition, I met with Micheal Buckner, who was employed by the

UMWA from September, 1978 through January, 2005 as its Research

Director, at which time he retired.  Mr. Buckner has continued to work as

a consultant to the UMWA on matters related to NBCWA pension and health benefit costs in connection with the UMWA's most recent effort to negotiate the 2007 NBCWA. Mr. Buckner reviewed the Request for Production as well, and searched his paper and electronic files, including e-mails and attachments thereto, and copied and/or printed documents in his possession that were responsive. I have retained copies of those documents in my office as well, and the UMWA has produced those which it regards as relevant to this litigation.

5.     Finally, I engaged in a search of older files that the UMWA has sent to storage which might contain historic documents requested by Freeman that predate the 2007 NBCWA. From those files, I copied documents that are responsive to Freeman's Production Request and have maintained them in my office, although only those particular documents which the UMWA regards as relevant have actually been produced.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Deborah Stern*

Deborah Stern
Associate General Counsel,
United Mine Workers of America

Executed December 11, 2007



# National Bituminous Coal Wage Agreement of 2002

# TABLE OF CONTENTS

Page

**Article I - ENABLING CLAUSE** . . . . . . . . . . . . .   1

**Article IA - SCOPE AND COVERAGE** . . . . . . . .   3
Section (a)    Work Jurisdiction . . . . . . . . . . . .   3
Section (b)    Exemptions Clause . . . . . . . . . . .   4
Section (c)    Supervisors Shall Not Perform
               Classified Work . . . . . . . . . . . . . .   5
Section (d)    Management of the Mines . . . . . .   5
Section (e)    Union's Rights . . . . . . . . . . . . . .   5
Section (f)    Application of This Contract to
               the Employer's Coal Lands . . . . .   6
Section (g)    Contracting and Subcontracting . .   6
Section (h)    Leasing, Subleasing and
               Licensing Out of Coal Lands . . .   8
Section (i)    Construction Work . . . . . . . . . . .   8

**Article II - JOB OPPORTUNITY AND BENEFIT
SECURITY (JOBS)** . . . . . . . . . . . . . . . . . . . . . .   9
A      Non-Signatory Operations of the
       Signatory Employer . . . . . . . . . . . . . . . . . .   10
B      Lessee-Licensee . . . . . . . . . . . . . . . . . . . . .   13
C      Coordination of Employment Obligations
       Under the JOBS Program . . . . . . . . . . . . . .   17
D-1    Employer-Wide Panel Rights to
       Signatory Operations . . . . . . . . . . . . . . . .   18
D-2    Exhaustion of Employer Panel . . . . . . . . . . .   18
D-3    Monitoring of Job Selections . . . . . . . . . . . .   18
E      UMWA-BCOA Training and Education
       Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
F      Skills Training . . . . . . . . . . . . . . . . . . . . . .   24
G      UMWA-BCOA Labor Management
       Positive Change Process ("LMPCP") . . . . .   26
H      UMWA-BCOA Labor Management
       Policy Committee . . . . . . . . . . . . . . . . . . . .   36
I      UMWA-BCOA Resolution of Disputes Trust .   38

i

## Contents

|  |  |  | Page |
|---|---|---|---|
| Section (i) | Job Bidding | ................. | 126 |
| Section (j) | Training for Vacancy Not Filled by Bidding | ................. | 130 |
| Section (k) | Transfer to Other Mines of Employer | ................. | 131 |
| Section (l) | Leave of Absence | ............. | 133 |
| Section (m) | Permanent and Temporary Supervisors | ................. | 133 |
| Section (n) | Shift Preference | .............. | 134 |

**Article XVIII - TONNAGE RATES AND HAND LOADING** ............................. 134

| Section (a) | Tonnage Rates | ............... | 134 |
| Section (b) | Checkweighman | ............... | 134 |
| Section (c) | Preparation and Cleaning of Coal | . | 136 |
| Section (d) | Delivery of Cars | ............. | 137 |
| Section (e) | Explosives | ................ | 137 |
| Section (f) | Bottom Coal | ................ | 137 |
| Section (g) | Cutting Coal | ................ | 138 |
| Section (h) | Blacksmithing | ................ | 138 |
| Section (i) | Rockdusting | ................ | 138 |
| Section (j) | Day Men Transferred | ......... | 138 |

**Article XIX - CLASSIFICATION** ............... 138

| Section (a) | Working in Classification | ......... | 138 |
| Section (b) | Classification Requirement | ...... | 138 |
| Section (c) | Temporary Assignments | ........ | 139 |
| Section (d) | Protection Against Discrimination | | 139 |
| Section (e) | Compensation for Temporary Assignments | ............... | 139 |

**Article XX - HEALTH AND RETIREMENT BENEFITS** ............................. 140

| Section (a) | General Purpose | ............. | 140 |
| Section (b) | 1950 Pension Plan and Trust | ..... | 142 |

vi

Contents
Page

Section (c)    1974 Pension Plan and Trust,
              1993 Benefit Plan and Trust,
              and Employer Benefit Plans  ....   143
Section (d)    Contributions by Employers  .....  148
Section (e)    Responsibilities and Duties
              of Trustees .................   157
Section (f)    Audits, Reports and Notices  .....  159
Section (g)    Administration of Trusts  ........  161
Section (h)    Guarantee of 1950 and 1974 Plans
              and Trusts  .................   163

## GENERAL DESCRIPTION OF THE HEALTH AND RETIREMENT BENEFITS ................. 164

(1)     Pensions for Miners Retired Under the
        1950 Pension Plan ....................   168
(1A)    1950 Widows' Pension .................   171
(2)     Pensions for Miners Who Retired Under the
        1974 Pension Plan Prior to the
        Effective Date .........................   172
(3)     Pensions for Miners Who Retire on or
        after the Effective Date ...............   175
(4)     Signatory Service .......................   178
(5)     Pensions for Disabled Miners .....................   180
(6)     Pensions for Surviving Spouses .................   181
(6A)    Pre-retirement Survivor's Pension .............   184
(7)     Deferred Vested or Special Pensions ...........   185
(7A)    Pension Bonuses ..........................   191
(8)     Life and Accidental Death and
        Dismemberment Benefits ........................   192
(9)     Pensioner's Death Benefits ..........................   193
(10)    Health Care ..............................   195
(11)    Vision Care ..................................   208
(12)    Health Care Cost Containment ....................   208
(13)    National Health Care ....................................   210

vii

Art. XX

shall not be construed to apply to Employees whose regular job duties include the relief of other Employees for short periods of time which do not exceed thirty (30) minutes for each occurrence during the basic workday. For such relief periods, however, the Employee providing relief shall be paid the higher rate.

## Article XX—HEALTH AND RETIREMENT BENEFITS

*Section (a)* **General Purpose**

This Article makes provision for pension, health and other benefits for Employees covered by this Agreement, and for former Employees who were covered under the United Mine Workers of America Welfare and Retirement Fund of 1950 ("1950 Fund"), and for the spouses and dependents of such Employees. The benefits to be provided are as set forth under separate plans and trusts referred to in Sections (b) and (c) of this Article.

A general description of the benefits to be provided appears immediately following this Article. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

Pursuant to the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), the health benefits (and in some cases the death benefits) provided to retirees who were age and service eligible as of February 1, 1993,

140

Art. XX

and who actually retired by September 30, 1994, are guaranteed by an Act of Congress. The Coal Act, which was enacted with the active support of the United Mine Workers of America and the BCOA, requires responsible employers to provide and pay for these benefits for life. Although, under certain circumstances, employers are permitted to adopt cost containment and managed care programs, the levels of benefits provided to retirees and dependents covered by the Coal Act are fixed by law, and may not be changed by any employer.

Benefits under the Coal Act are provided either by the employer who was providing those benefits on February 1, 1993, or by two newly-created Funds: the United Mine Workers of America Combined Benefit Fund and the United Mine Workers of America 1992 Benefit Plan. Those benefits are not governed by this Agreement.

For purposes of this Article, the 1950 Pension Plan and Trust and the 1974 Pension Plan and Trust shall be a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950 (hereinafter the 1950 Fund).

Each participant and beneficiary shall be entitled only to the pension benefits provided in and paid from either the 1950 Pension Plan and Trust or the 1974 Pension Plan and Trust and each participant, beneficiary and dependent shall be entitled only to the benefits provided in and paid from the 1993 Benefit Trust, or the individual benefit plans referred to in Section

141

Art. XX

(c). An individual that is entitled to health benefits from a plan maintained pursuant to the Coal Act will receive benefits from such plan, and not from a plan maintained pursuant to this Article. In addition, an individual that is entitled to death benefit coverage from the United Mine Workers of America Combined Benefit Fund shall not be entitled to death benefit coverage from any plan maintained pursuant to this Article.

The general purpose of the plans referred to in this Article shall be to provide health care for working and retired miners and their dependents; pensions for miners upon their retirement; health care and financial support for eligible disabled miners; and financial support for surviving spouses and surviving dependents provided by each of the Trusts and Plans referred to in this Article.

Except as otherwise specifically set forth in this Article, it is agreed that the Trusts referred to in this Article are irrevocable Trusts created pursuant to, and within the scope of, Section 302(c) of the Labor-Management Relations Act, 1947, and shall endure as long as the purposes for their creation shall exist.

## Section (b) 1950 Pension Plan and Trust

(1) The United Mine Workers of America 1950 Pension Trust ("1950 Pension Trust") is incorporated by reference and made a part of this Agreement. The United Mine Workers of America 1950 Pension Plan (the "1950 Pension Plan") is incorporated by refer-

142

Art. XX

ence and made a part of this Agreement. The pensions to be paid from the 1950 Pension Trust are as set forth in the 1950 Pension Plan.

(2) Pursuant to the requirements of the Coal Act, the United Mine Workers of America 1950 Benefit Plan and Trust ("1950 Benefit Trust") and the United Mine Workers of America 1974 Benefit Plan and Trust (the "1974 Benefit Trust") were merged into the United Mine Workers of America Combined Benefit Fund (the "Combined Fund"). The Combined Fund is governed by the terms of the Coal Act, and is not maintained pursuant to this Article. Health benefits for individuals who would be eligible for benefits under the 1950 Benefit Plan but for the passage of the Coal Act and who are not entitled to benefits under the Coal Act will be provided by the 1993 Benefit Fund during the term of this Agreement.

(3) Upon the discharge of all its obligations, any remaining assets in the 1950 Pension Trust shall, upon termination of such Trust, be transferred to the 1974 Pension Trust.

*Section (c)* **1974 Pension Plan and Trust, 1993 Benefit Plan and Trust, and Employer Benefit Plans**

(1) The United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1974 Pension Trust are

143

Art. XX

as set forth in the United Mine Workers of America 1974 Pension Plan ("1974 Pension Plan"), which is incorporated by reference and made a part of this Agreement. This Plan is a continuation of the pension program of the 1950 Fund and was effective December 6, 1974.

(2) The United Mine Workers of America 1993 Benefit Trust ("1993 Benefit Trust") is incorporated by reference and made a part of this Agreement. The 1993 Benefit Trust provides certain health benefits, not including pension benefits, and the terms and conditions under which those benefits will be provided are as set forth in the plan under the 1993 Benefit Trust and under the terms of this Article.

(3)(i) Each signatory Employer shall establish and maintain an Employee benefit plan to provide, implemented through an insurance carrier(s), health and other non-pension benefits for its Employees covered by this Agreement as well as pensioners under the 1974 Pension Plan and Trust whose last signatory classified employment was with such Employer and who are not eligible to receive benefits from a plan maintained pursuant to the Coal Act. The benefits provided by the Employer to its eligible Participants pursuant to such plan shall be guaranteed during the term of this Agreement by that Employer at levels set forth in such plan. The plans established pursuant to this subsection are incorporated by reference and made a part of this Agreement, and the terms and

144

Art. XX

conditions under which the health and other non-pension benefits will be provided under such plans are as to be set forth in such plans.

(ii) The 1993 Benefit Plan and Trust provides health and other non-pension benefits during the term of this Agreement, to any retired miner (or the eligible dependent of such retired or deceased miner) who meets the conditions of one of the following:

(a) The retired miner is described in Section (b)(2).

(b) The retired miner separated from classified employment prior to December 16, 1993, would be eligible to receive benefits from the 1974 Benefit Plan but for the passage of the Coal Act, is not entitled to benefits under the Coal Act, and whose last signatory employer was no longer deriving revenue from the production of coal on December 16, 1993.

(c) The miner is retired under the 1974 Pension Plan or any successor plan(s) thereto, last worked in signatory classified employment for an Employer who was obligated to contribute and contributed to the 1993 Benefit Trust at the rates specified in Section (d) and would otherwise cease to receive the health and other non-pension benefits provided herein because such last signatory Employer (including successors and assigns) is no longer in business. An Employer's obligation to contribute at the rates specified in Section (d) must be in effect on the date the Employer is first considered to be "no longer in business." For purposes of determining eligibility

145

Art. XX

under the 1993 Benefit Plan and Trust, the Employer is considered to be "no longer in business" only if the Employer meets the conditions of (I) and (II) below. The parties expressly intend that each of the requirements of (I) and (II) be met.

(I) The Employer has ceased all mining operations and has ceased employing persons under this Wage Agreement, with no reasonable expectation that such operations will start up again; and

(II) The Employer is financially unable (through either the business entity that has ceased operations as described in subparagraph (a) above, including such company's successors or assigns, if any, or any other related division, subsidiary, or parent corporation, regardless of whether covered by this Wage Agreement or not) to provide health and other non-pension benefits to its retired miners and surviving spouses.

In the case of an otherwise qualifying last signatory Employer that first became obligated to contribute to the 1993 Trust after December 31, 2001, within the meaning of Section (d)(1)(iii) of this Article, and that did not contribute to the 1993 Benefit Trust substantially all amounts owed and at the rates specified in Section (d), eligible retired miners and dependents shall receive only limited coverage under a separate program of benefits designed by the Plan's Trustees. The Trustees shall design the program taking into account the need for the Plan to remain sol-

146

vent throughout the term of this Agreement, while providing more complete benefits for individuals whose last signatory Employer met the "substantially all" contribution requirement of this Article.

Each Employer is required to maintain, and make available to the Trustees, those business and financial records that may be necessary to determine whether the eligibility requirements of the 1993 Benefit Trust have been satisfied. If a miner's last signatory Employer ceases to provide health benefits as required under Section (c)(3)(i) of this Article, and the Trustees are investigating whether the Employer is "no longer in business" within the meaning of Section (c)(3)(ii)(c) of this Article, the Employer shall make available to the Trustees those business and financial records that may be necessary to the "no longer in business" determination, including but not limited to financial statements, tax returns, bank statements, coal production and sales data, and information on equipment and other property and assets of the signatory Employer. The Trustees shall make their initial determination of whether an Employer is "no longer in business" no later than 90 days following receipt of such business and financial records, as practicable.

(d) The retired miner worked under the terms of the 1974 NBCWA (but not under the terms of the 1978 NBCWA), has been or would have been denied a benefit by the UMWA 1974 Benefit Plan solely because the miner did not work under the terms of a

147

Art. XX

1978 or subsequent NBCWA; and is not eligible to receive benefits under the Coal Act.

The Union and Trustees shall assist and fully cooperate with the Employers in obtaining all necessary opinion letters, exemptions, or rulings from the Department of Labor, the Internal Revenue Service or other applicable federal agencies, in order to implement the provisions of this subsection so as to ensure compliance with all applicable federal laws and regulations and ensure the deductibility for income tax purposes of any and all contributions made by signatory Employers to the 1993 Benefit Trust and the individual health plans referred to in this Section.

## Section (d) Contributions by Employers

(1) During the life of this Agreement, for the periods of time indicated below, each signatory Employer (including those engaged in the production of coal and those not engaged in the production of coal) shall contribute to the Trusts referred to in this Article the amounts specified below based on cents per hours worked by each of the Employer's Employees who perform classified work under this Agreement.

(i) Into the 1950 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 0.0¢ per hour on each such hour worked;

(ii) Into the 1974 Pension Trust: for the period beginning on the Effective Date and ending when this

148

Art. XX

Agreement is terminated, 0.0¢ per hour on each such hour worked for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1974 Pension Trust meeting the required standard of such Trust; and $0.75 per hour on each such hour worked for any Employer that became obligated to contribute for the first time on or after January 1, 2002.

(iii) Into the 1993 Benefit Trust: for the period beginning on the Effective Date and ending the day prior to the first anniversary of the Effective Date, 13¢ per hour on each such hour worked for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1993 Benefit Trust meeting the required standard of such Trust; and 75¢ per hour on each such hour worked for any Employer that became obligated to contribute for the first time on or after January 1, 2002; and for the period beginning on the first anniversary of the Effective Date and ending when this Agreement is terminated, 50¢ per hour on each such hour worked for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to

149

Art. XX

make contributions to the 1993 Benefit Trust meeting the required standard of such Trust; and 75¢ per hour on each such hour worked for any Employer that became obligated to contribute for the first time on or after January 1, 2002; provided that the obligation of each signatory Employer to make contributions into the 1993 Benefit Trust shall be suspended at any time that the net assets available for future benefits equal or exceed $20 million, and shall not resume following any such suspension until such time as the net assets available for future benefits are less than $15 million. For purposes of this subdivision, "net assets available for future benefits" is the amount shown as such on the 1993 Benefit Plan monthly financial statement, under "Statements of Net Assets Available for Plan Benefits."

(iv) In addition to the contributions indicated above, during the life of the Agreement, each signatory Employer shall, for the periods of time indicated below, contribute to the Trusts established in this Article in the amounts shown below based on cents per ton on each ton of two thousand (2,000) pounds of bituminous coal after production by another operator, procured or acquired by such Employer for use or for sale on which contributions to the appropriate Trusts as provided for in this Article have not been made (amounts shown below include cents per hours worked contributions converted to tonnage equivalents).

150

Art. XX

(a) Into the 1950 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 0.0¢ per ton on each such ton;

(b) Into the 1974 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 0.0¢ per ton on each such ton for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1974 Pension Trust meeting the required standard of such Trust; and 14.5¢ per ton on each such ton for any Employer that became obligated to contribute for the first time on or after January 1, 2002; and

(c) Into the 1993 Benefit Trust: for the period beginning on the Effective Date and ending the day prior to the first anniversary of the Effective Date, 2.5¢ per ton on each such ton for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1993 Benefit Trust meeting the required standard of such Trust; and 14.5¢ per ton on each such ton for any Employer that became obligated to contribute for the first time on or after January 1, 2002; and for the period beginning on the first anniversary of the Effec-

151

Art. XX

tive Date and ending when this Agreement is terminated, 10¢ per ton on each ton for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1993 Benefit Trust meeting the required standard of such Trust; and 14.5¢ per ton on each such ton for any Employer that became obligated to contribute for the first time on or after January 1, 2002; subject to the provision regarding suspension of the contribution obligation in (iii) above.

The parties hereto mutually agree that, if at any time during the term of this Agreement a court or tribunal of competent jurisdiction determines by a final decision that is not appealable that the provision appearing in paragraph (iv) just preceding is invalid or in violation of the National Labor Relations Act, 1947, as amended, or other Federal or state law, the parties shall, at the option of and upon demand by the Union, without affecting the integrity of any other provision of this Section or any other provision of the National Bituminous Coal Wage Agreement, meet and engage in good faith negotiations to agree upon a clause to be inserted into this Agreement in replacement of the provision found invalid or unlawful.

(v) In the event the BCOA ceases to exist, or in the event that more than 50% of the tonnage membership of BCOA on the Effective Date has withdrawn prior

152

Art. XX

to the time when the BCOA is required or permitted to take action under this Article, then such action may be taken by a majority vote, based on tonnage, of Employers who were BCOA members on the Effective Date.

(vi) At any time during the term of this Wage Agreement, the Bituminous Coal Operators' Association may reallocate the contributions to be paid under the respective subdivisions (i) and (ii) in this Section, which reallocation will increase the cents per hour to be contributed into the 1950 Pension Trust and correspondingly will decrease the cents per hour to be contributed by the Employers into the 1974 Pension Trust, or which will decrease the cents per hour to be contributed into the 1950 Pension Trust and correspondingly will increase the cents per hour to be contributed by the Employers into the 1974 Pension Trust, provided that notice shall be given to the Union, and to the Trustees (who shall in turn notify all contributing Employers) of the cents per hour to be allocated to each such Trust at least 30 days prior to the date the contributions become due and owing to the respective Trusts. No reallocation of the contributions to be paid to the two Trusts shall be made which will increase the total combined contributions required by this Article to be made by the Employers to those two Trusts.

(vii) Hours of work for purposes of Employer contributions to the plans and trusts described in this Article shall include all hours worked, or fractions

153

Art. XX

thereof, by Employees in a classified job covered by this Agreement. Hours actually worked for which a premium pay of any type is provided shall be treated for purposes of Employer contributions to the Trusts as though worked on a straight-time basis. Reporting pay for hours not actually worked shall not be included for the purpose of making Employer contributions to the Trust.

(2) The sole obligation under this Section of any Employer signatory hereto shall be to contribute the amounts specified in this Section.

(3) The obligation to make payments to the Trusts specified in this Article shall become effective on the dates specified in the respective Subdivisions (i) through (iv) of this Section, and the first payments are to be made on the 10th day of each month after such specified dates, and thereafter continuously on the 10th day of each succeeding calendar month.

(4) It shall be the duty of each of the Employers signatory hereto to keep current said payments due to the Trusts, and to furnish to the International Union, United Mine Workers of America and to the Trustees of those Trusts a monthly statement showing on a mine-by-mine basis the full amounts due hereunder and the tons of coal produced, procured or acquired for use or for sale and the hours worked with respect to which the amounts are payable. Payments to those Trusts shall be made by check payable, as appropriate, to:

Art. XX

"Trustees of the United Mine Workers of America 1950 Pension Trust"

"Trustees of the United Mine Workers of America 1974 Pension Trust"

"Trustees of the United Mine Workers of America 1993 Benefit Trust"

The Trustees are hereby authorized to require each signatory Employer to make payment of all contributions to the 1993 Benefit Trust, the 1950 Pension Trust and the 1974 Pension Trust by a single check made payable in such manner as may be specified by the Trustees.

(5) Payments shall be delivered or mailed to such location as designated by the Trustees of those Trusts.

(6) Failure of any Employer signatory hereto to make full and prompt payments to the Trusts specified in this Article in the manner and on the dates herein provided shall be deemed a violation of this Agreement. This obligation of each Employer signatory hereto, which is several and not joint, to so pay such sums shall be a direct and continuing obligation of said Employer during the life of this Agreement and it shall be deemed a violation of this Agreement, if any mine, preparation plant or other facility to which this Agreement is applicable shall be sold, leased, subleased, assigned, or otherwise disposed of for the purpose of avoiding any of the obligations hereunder.

155

Art. XX

(7) Each Employer agrees to give proper notice to the president of the appropriate local union by the 18th day of each month that the Employer has made the required payment to the Trusts for the previous month, as required by this Article, or is delinquent in such payment, such notice to set forth the amount paid to the Trusts, or the amount of the delinquency, the tonnage procured or acquired for use or for sale and the hours worked with respect to the mine or mines under the jurisdiction of such local union. Each Employer agrees to give notice to the appropriate president of the local union by the 18th day of each month that the Employer has made the appropriate payment to the insurance carrier for the Employer benefit plan established under (c)(3) above, or is delinquent in such payment.

(8) Title to all the monies paid into and/or due and owing to the Trusts specified in this Article shall be vested in and remain exclusively in the Trustees of those Trusts. It is the intention of the parties hereto that those Trusts shall constitute irrevocable trusts and that no benefits or money payable from those Trusts shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and that any attempt so to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same shall be void.

(9) It is understood that the individual Employees of Employers agree, through their representative, the

156

Art. XX

United Mine Workers of America, to surrender any personal or individual right to or interest in monies paid or required to be paid to the Trusts pursuant to this Agreement.

(10) Any judgment obtained by the Trustees of the Trusts established pursuant to this Agreement for a default giving rise to damages accruing to more than one of the Trusts established hereunder shall be allocated by the Trustees among such Trusts in proportion to the amounts owing to each which gave rise to such judgment.

## Section (e) Responsibilities and Duties of Trustees

(1) The 1950 Pension Trust, the 1974 Pension Trust, and the 1993 Benefit Trust shall each be administered by a Board of four Trustees, two of whom shall be appointed by the Employers and two of whom shall be appointed by the Union. Either party may, but shall not be required to, appoint an individual to serve as a Trustee on more than one Trust. One of the Trustees appointed by the Union shall be the Chairman. Each Board of Trustees shall perform its duties in accordance with the requirements, terms and conditions of each such Trust.

(2) It is the intent and purpose of the contracting parties that full cooperation shall be given by each of them to one another, to the Trustees provided for under this Article, and to all affected mine workers, to the eventual coordination and development of poli-

157