## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Holland, et al., | ) |
|               Plaintiff, | ) |
|     v. | )     Case No. 07-cv-490 (PLF/AK) |
| Freeman United Coal Mining Company, et al., | ) |
|               Defendants. | ) |

| | |
|---|---|
| Freeman United Coal Mining Company, | ) |
|               Plaintiff, | )     Case No. 07-cv-1050 (PLF/AK) |
|     v. | ) |
| United Mine Workers of America, et al., | ) |
|               Defendants. | ) |

## MEMORANDUM OF THE BITUMINOUS COAL OPERATORS' ASSOCIATION, INC. IN OPPOSITION TO FREEMAN UNITED COAL COMPANY'S MOTION TO COMPEL

The Bituminous Coal Operators' Association, Inc. ("BCOA"), a defendant in Case No. 07-cv-1050, through its undersigned counsel, hereby opposes the motion filed by Freeman United Coal Mining Company ("Freeman") to compel further discovery from BCOA in response to Freeman's first set of document requests.

### INTRODUCTION

This case involves Freeman's refusal to honor its obligation to contribute to the UMWA 1974 Pension Trust ("1974 Pension Trust" or "Trust") under a contractual provision

known as the evergreen clause at the rates negotiated by BCOA and the United Mine Workers

of America ("UMWA") and contained in the National Bituminous Coal Wage Agreement

("NBCWA") of 2007.  This case also involves Freeman's violation of its own contractual

commitment to contribute to the 1974 Pension Trust at the rates contained in the Trust's plan

and trust documents, as amended from time to time, by the UMWA and BCOA, the settlors of

the Trust.

Since the outset of this litigation, the parties have disagreed over the proper scope of

discovery necessary to resolve this issue.  In light of this Court's prior enforcement of the

evergreen clause against another group of delinquent coal operators approximately 15 years

ago, BCOA, along with the UMWA and the 1974 Pension Trust, have sought to avoid

unnecessary, irrelevant, and unduly burdensome discovery (including, for example, discovery

into matters already resolved in the prior litigation) in a case that concerns one provision in a

374-page collective bargaining agreement.  Freeman has disagreed with this approach, and has

propounded document requests into matters far removed from whether it has an obligation *now*

to contribute to the 1974 Pension Trist at the current negotiated rate.

Freeman's present motion is flawed in several ways.

First, it mischaracterizes the Court's prior rulings.  Contrary to Freeman's

representations, Judge Friedman has not ruled on BCOA's discovery objections; rather, the

Court explicitly has referred those objections to the Magistrate Judge.  That referral would

have made no sense if, as Freeman contends, the Court already had overruled BCOA's

objections.

Second, Freeman exaggerates the substantive breadth of this lawsuit.  The case

concerns only whether or not Freeman must contribute to the 1974 Pension Trust at the rates

prescribed in the 2007 NBCWA.  It does not involve any other aspect of the collective

bargaining agreement.  Nor does it involve past collective bargaining agreements or past

contribution rates.  Freeman's effort to expand this case into subject matter other than its

contested obligation to contribute to the 1974 Pension Trust is not justified.

Third, Freeman significantly understates the amount of discovery it has obtained to

date.  Freeman fails even to mention the extensive production by the 1974 Pension Trust.

Many of the documents in that production came from BCOA and the UMWA and were

originally produced in the evergreen clause litigation more than 15 years ago.  BCOA and the

UMWA agreed, at Freeman's request, that these voluminous documents could be produced in

this case.  Now, it is as if that never happened.  Freeman's tendency to shed more heat than

light is further reflected in last week's embarrassing episode in which Freeman – having

incorrectly represented to this Court that BCOA had not searched the emails of BCOA's

Secretary-Treasurer, Charles S. Perkins – was obliged to file and serve an amended motion

deleting that inaccurate claim.  In fact, Freeman already has obtained substantial discovery, but

no amount of discovery would have been enough.  Freeman has been determined from the

outset to undertake a gigantic discovery fishing expedition, in an effort to prolong this

litigation and obtain leverage for a potential compromise.

Among other things, in its motion:

- Freeman fails to mention that BCOA has produced several thousand pages of documents directly related to the negotiation of the current contribution rate specified in the NBCWA of 2007 and Freeman's obligation to contribute to the Trust;

- Freeman fails to acknowledge that, along with the Monterey Coal Company, a defendant in the consolidated action brought by the 1974 Pension Trust, it is the only coal company obligated under the evergreen clause to contribute to the 1974 Pension Trust that has failed to make such contributions in accordance with the rate specified in the 2007 NBCWA; and

- Despite the seeming urgency of its motion, Freeman fails to note that it has had BCOA's objections in hand since September and that when Freeman recently first broached the subject of BCOA's objections, BCOA offered to produce additional materials, only to be met immediately with the present motion to compel.

Freeman's mischaracterizations and omissions cannot obscure the key point. The issue raised in Freeman's complaint is whether Freeman is obligated to contribute to the 1974 Pension Trust at the rate currently specified in the NBCWA of 2007. On that issue, BCOA has produced all relevant materials it so far has located. Moreover, BCOA not only continues to search for additional materials relevant to this issue, but has indicated – notwithstanding its objections – to provide Freeman additional materials to the extent such materials exist.

The materials that BCOA has produced to Freeman demonstrate that the current contribution rate agreed to by the Trust's settlors, BCOA and the UMWA, reflected the bargaining parties' efforts to ensure that the Trust stayed in compliance with the funding obligations recently imposed by Congress in the Pension Protection Act of 2006 ("PPA"). Freeman makes only passing reference to the PPA in its motion, and ignores completely the significance of this material as it relates to the effort to reach agreement over the new rate. Instead, Freeman offers only its own unfounded conjecture that this was not the *real* reason behind the current negotiated contribution rate, and requests that the Court grant it the opportunity to explore in virtually limitless discovery the hypothetical possibility that some other justification for the rate increase may be lurking in some file somewhere in BCOA's possession.

Freeman fails to show how any of the disputed discovery is actually relevant to the sole issue in this case. Freeman's self-serving speculation is not a sufficient basis for imposing further discovery obligations on BCOA. BCOA therefore requests that the Court deny

Freeman's motion in its entirety, and limit the scope of discovery in this case as outlined by the objections that BCOA has properly asserted in response to Freeman's first set of document requests.

**A.      Freeman's Assertion That The Court Previously Has Resolved The Parties' Discovery Dispute In Freeman's Favor Is False.**

As Freeman acknowledges in its motion, the parties fundamentally disagree over the proper scope of discovery in this case. To date, the Court has not resolved this disagreement. Rather, it has issued two scheduling orders in which it has declined to address summary judgment before the close of discovery and has referred any discovery disputes to the Magistrate Judge. Freeman's effort to transform these prior scheduling orders into a ruling on the propriety of Freeman's blunderbuss discovery requests is unwarranted.

These two consolidated cases concern whether Freeman and Monterey are required, under the evergreen clause and their own contractual commitments, to make contributions to the 1974 Pension Trust at the rates specified in the NBCWA of 2007. The meaning of the evergreen clause was settled by this Court in 1992 after extensive litigation, when the Court granted summary judgment to the 1974 Pension Trust and against various coal companies that had challenged their obligations to contribute to the Trust at the rates negotiated by BCOA and the UMWA. In doing so, this Court held that the evergreen clause "was an important provision negotiated to make sure that any coal operator that voluntarily agreed to participate in the [UMWA] Funds in 1978 could not simply walk away from the Funds and leave its retirees behind, or negotiate cut-rate contributions with the UMWA, at the expense of the remaining employers." *In re United Mine Workers of America Employee Benefit Plans Litigation*, 782 F. Supp. 658, 665 (D.D.C. 1992).

The D.C. Circuit affirmed that ruling in February 1993, holding that the coal companies "agreed to be bound by the evergreen clause to make contributions to the trusts, and the obligation included an agreement to make contributions at the rates specified in subsequent NBCWAs, without regard to whether the employer was still a party to the subsequent agreements." *United Mine Workers of America 1974 Pension Trust v. Pittston Co.*, 984 F.2d 469, 474 (D.C. Cir. 1993) *("Pittston")*.

The specific issue in this litigation involves the 1974 Pension Trust's attempt to enforce the current contribution rate of $2.00 per hour under the recently negotiated NBCWA of 2007 for each hour of work performed by an employer's employees. Freeman has refused to pay the required contributions to the Pension Trust since January 1, 2007, the date the new contribution rate became effective, despite the fact that (1) Freeman signed numerous collective bargaining agreements obligating it to contribute to the Pension Trust under the evergreen provision; (2) Freeman is contractually committed to contribute to the 1974 Pension Trust at the rates set forth in the Trust's plan and trust documents which now are the rates specified in the 2007 NBCWA; (3) Freeman was a member of BCOA and thus stood with BCOA in seeking to enforce the meaning of the evergreen clause in the *Pittston* litigation; and (4) Freeman has thousands of retirees currently receiving pensions from the Pension Trust, as well as hundreds of active employees currently receiving pension credit applicable toward future benefits from the Pension Trust, even though Freeman has refused to make contributions to the Trust.[1]

In light of the narrow issue raised in this case involving the enforcement of a single provision of the 2007 NBCWA, the prior decisions in the *Pittston* litigation regarding the

---

[1]    Although it has yet to disclose this to the Court, Freeman apparently sold its coal operations in August 2007. As a result, its obligation to contribute to the 1974 Pension Trust ceased earlier this year. Significantly, the purchasers of Freeman's coal operations have agreed to contribute to the 1974 Pension Trust at the rates contained in the 2007 NBCWA.

meaning of the evergreen clause, and concerns over efficiency and judicial economy, BCOA, the UMWA, and the 1974 Pension Trust initially proposed that this case proceed through motions for summary judgment, followed by whatever responses Freeman might choose to make, either in opposition to such motions or under Fed. R. Civ. P. 56(f), regarding its obligations under the evergreen clause. By doing so, BCOA sought to avoid unnecessary, irrelevant, and unduly burdensome discovery, including, for example, discovery into matters already resolved in the *Pittston* litigation. Freeman opposed this approach, and instead requested that the Court allow discovery to begin immediately. Freeman assured the Court at the July 19, 2007 Scheduling Conference that it did not intend to relitigate the meaning of the evergreen clause itself.

The Court's July 20 scheduling order sought to balance these competing approaches. The Court granted the parties the opportunity to submit motions for summary judgment at any time, with response dates set by the Local Rules, but otherwise allowed discovery to proceed. The Court, however, cautioned Freeman regarding the possibility of overreaching in discovery, presciently predicting that, if Freeman served overbroad discovery, "there are going to be a lot of objections that are going to be filed by the other side, overbreadth going back too many years, and things like that, that a Magistrate Judge is going to have to decide." *See* Exhibit 1 (Transcript of July 19 Hearing), at 14.

BCOA, the UMWA, and the 1974 Pension Trust subsequently filed motions for summary judgment in early September. In the meantime, Freeman served its first set of document requests on all three defendants on August 5. BCOA responded to these requests –

which are the subject of this motion – on September 11, after obtaining Freeman's agreement to a one-day extension of the time to respond.[2]

Rather than respond to the summary judgment motions filed by BCOA, the UMWA, and the 1974 Pension Trust within 11 days as required by the July 20 order, Freeman moved for an extension of time. When the Court did not rule on Freeman's motion by the time Freeman's opposition would have been due in late September, Freeman granted itself the extension anyway, thus delaying completion of the summary judgment briefing until mid-November. In the meantime, when opposing the pending summary judgment motions, Freeman raised no issue with BCOA over its responses and objections to its document requests. Instead, Freeman filed a consolidated opposition to the pending summary judgment motions, as well as a motion to stay resolution of summary judgment pending completion of discovery. In both papers, Freeman professed a need for general discovery before it could adequately respond to BCOA's summary judgment motion.

Freeman subsequently wrote BCOA on November 9, 2007 and, for the first time, took issue with BCOA's objections to Freeman's first set of document requests. Before BCOA responded to Freeman's letter, however, the Court issued its second scheduling order in this case on November 19. In the second order, the Court granted Freeman's motion to continue discovery before a summary judgment ruling, and it authorized Freeman to file a supplemental summary judgment opposition brief after the close of discovery. At the same time, however,

---

[2]    Freeman erroneously asserts in its motion that BCOA, the UMWA, and the 1974 Pension Trust failed to respond to its August 5, 2007 discovery requests within the period specified by the Federal Rules. In making this assertion, however, Freeman ignores Fed. R. Civ. P. 6(e), which allows additional time for responding to discovery served either by mail or by email. The UMWA and the 1974 Pension Trust responded to Freeman's discovery requests on September 10, the date the responses were due under the Federal Rules. BCOA requested, and Freeman agreed to, a one-day extension of this deadline, and BCOA served the responses and objections at issue in this motion on September 11, 2007.

the Court referred resolution of "all discovery disputes, including those related to Rule 56(f) discovery," to the Magistrate Judge.

Until Freeman's present motion, the Court has never been asked about – and thus has never addressed – BCOA's objections to the scope of Freeman's discovery.[3]  Instead, as the Court's July 20 and November 19 orders make clear, the Court merely has expressed a preference that discovery proceed before the Court addresses the pending summary judgment motions filed by BCOA, the UMWA, and the 1974 Pension Trust.  The proper scope of that discovery has been referred to the Magistrate Judge.  In making that referral, the Court did not limit the Magistrate's authority, for the Court referred "all" discovery issues to the Magistrate, including any issues related to Rule 56(f) discovery that Freeman may claim it needs in order to respond to the pending summary judgment motions.

**B.    The Current Contribution Rate Was Negotiated To Ensure That The 1974 Pension Trust Met The Funding Obligations Imposed By Congress Under The Pension Protection Act Of 2006.**

The 1974 Pension Trust is a multiemployer pension plan that was created by BCOA and the UMWA in 1974 after the passage of the Employee Retirement Income Security Act, or ERISA.  29 U.S.C. §§ 1001 *et seq*.  BCOA has negotiated pension benefits – including pension benefits under the 1974 Pension Trust – with the UMWA for more than 50 years.  These pension benefits, and the corresponding contribution obligations imposed on participating employers, have been set forth or incorporated by reference in a series of NBCWAs stretching back to 1950.

In seeking to justify its alleged need for expansive discovery, Freeman makes several unfounded allegations regarding the negotiation of the current contribution rate and BCOA's

---

[3]    On November 30, BCOA, as well as the UMWA, moved for a protective order that raises similar issues regarding the scope of discovery in the context of upcoming depositions that Freeman has noticed in this case.

"real" reasons for negotiating that rate. Nowhere in its motion, however, does Freeman acknowledge that, except for Freeman, a wholly-owned subsidiary of General Dynamics Corporation, and Monterey, a wholly-owned subsidiary of Exxon-Mobil Corporation, every coal company that is obligated to contribute to the 1974 Pension Trust has agreed to contribute at the rates specified in the NBCWA of 2007. Moreover, even though the Trust continues to provide benefits to Freeman's retirees – and, until Freeman's recent sale of its coal operations, Freeman's active employees continued to accrue pension credits based on their work for Freeman – the rate increase negotiated by BCOA and the UMWA and contained in the 2007 NBCWA was the first time in approximately nine years that employers (including Freeman) have been asked to contribute *anything* to the 1974 Pension Trust.

Under the stewardship of BCOA, the UMWA, and the 1974 Pension Trust's trustees, participating employers were not required to make contributions during this nine-year period because the Trust had reached certain funding levels that enabled it to provide benefits out of its own assets. Freeman, as a former member of BCOA, has contributed nothing to the costs associated with monitoring the financial success and investment performance of the Trust. All that was required of Freeman was that it fulfill its evergreen obligation and contribute to the Trust at the rates – if any – specified in successor NBCWAs negotiated by BCOA and the UMWA.[4]

---

[4]    The evergreen clause in the plan document of the 1974 Pension Plan currently states as follows:

> Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the

The 1974 Pension Trust's financial status, however, was in many ways an anomaly in the multiemployer pension world. Because Congress perceived that, in general, most such plans faced mounting financial difficulties that potentially jeopardized the pension benefits promised employees from these plans, it tightened the funding requirements for multiemployer plans in the Pension Protection Act of 2006 that was signed into law as negotiations over the NBCWA of 2007 took place. Both BCOA and the UMWA, in response to Freeman's document requests, have produced hundreds, if not thousands, of pages of material detailing the parties' collective bargaining over proposed benefit increases for plan beneficiaries and participants, as well as the corresponding employer contribution increases necessary to pay for these increases. These documents conclusively show that the bargaining parties, in making these changes, acted to ensure that the 1974 Pension Trust remained in compliance with the PPA's funding requirements during the term of the NBCWA of 2007 itself.

Specifically, under the PPA, if a plan is funded at less than 80% of the present value of the plan's benefit obligations, has an accumulated funding deficiency in the current year, or is projected to have a funding deficiency in any of the next six years, it will be considered "endangered" under ERISA. In addition, if a plan's funding level drops below 65%, and its assets and projected contributions are less than the present value of all nonforfeitable benefits projected to be payable during the current year and each of the next six years, it will enter "critical status" under the statute. *See generally* 29 U.S.C. § 1085. Such events have real-

---

> terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978 as amended from time to time and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2007.

*See* Perkins Decl., ¶23 (attached to BCOA's Motion for Summary Judgment), at Dkt. No. 19.

world consequences because, if the Trust enters "endangered" or "critical status," the Trust and

its settlors must comply with a host of new obligations and requirements.  Among other things,

if the Trust's actuary certifies that the Trust is in either "endangered" or "critical" status, then:

- The Trust would have to notify its participants and beneficiaries, the Pension Benefit Guaranty Corporation, and the Department of Labor of that fact;

- BCOA and the UMWA would be required to adopt a Funding Improvement Plan designed to bring the 1974 Pension Trust's funding up to certain benchmark levels at the end of a ten-year Funding Improvement Period (which could be extended to a fifteen-year period under certain circumstances);

- While that Funding Improvement Plan was in place, the 1974 Pension Trust would not be permitted to accept collective bargaining agreements that provided for a reduction in the level of contributions, a suspension of contributions for any participants, or any new or indirect exclusion of younger or newly-hired employees from plan participation; and

- BCOA and the UMWA would not be permitted to increase benefit levels for any participant or beneficiary unless the Trust's actuary certifies that any such increases were paid for.

*See generally* 29 U.S.C. § 1085.

BCOA already has produced scores of documents in discovery that reflect BCOA's

efforts during bargaining over pension benefits with the UMWA to keep the Trust's projected

funding levels above the 80% trigger for "endangered" status during the life of the 2007

NBCWA.  Exhibit 2 provides a sample of BCOA's on-going efforts.  This internal BCOA

email dated August 21, 2006 examined the impact on the Trust in the event of an agreement to

provide pension benefit increases in an amount comparable to the increases to which BCOA

had agreed in bargaining with the UMWA during the 2002 negotiations.  Under the 2002

NBCWA, these benefit increases did not require any employer contribution at all to the Trust.

As Exhibit 2 shows, however, the same benefit increases, in light of the Trust's financial

condition in 2006 and an assumed investment return of 7.8%, were projected to put the Trust

into endangered status by 2013 even if the Trust had a contribution rate starting at $2.50 an hour and increasing in 50¢ increments over the life of the 2007 NBCWA. To correct this deficiency, BCOA further projected that the contribution rate would have to jump from $4.50 to $12.50 an hour in 2014 to bring the Trust out of endangered status.[5]

Exhibit 3 is another example from BCOA's document production reflecting this analysis. This December 1, 2006 email from BCOA to the UMWA contains BCOA's analysis of its pension benefit proposal using the proposed contribution rate increases that ultimately were specified in the 2007 NBCWA. The email also includes BCOA's analysis of the UMWA's bargaining proposal regarding proposed pension benefit increases. As the document shows, BCOA's proposed pension benefit package under an initial contribution rate of $2.00 an hour rising to $5.50 an hour by 2011, was projected to keep the Trust out of endangered status until 2021. In contrast, BCOA projected that the UMWA pension benefit proposal would have required a rate increase of $6.25 an hour starting immediately to keep the Trust out of endangered status during the same period.

Freeman does not mention any of the voluminous materials already produced by BCOA and the UMWA in discovery that detail these efforts to ensure the future financial footing of the 1974 Pension Trust. Instead, Freeman makes unfounded and specious allegations involving alleged "illegal" transfers of assets from the Trust, the UMWA's alleged "coercion" of other employers that resulted in the apparent capitulation and acceptance of the terms of the 2007 NBCWA, and an alleged anti-competitive conspiracy supposedly designed by BCOA and its members to drive Freeman and Monterey, the coal company affiliates of General Dynamics and Exxon-Mobil, out of business. As the documents produced in discovery reveal, Freeman's

---

[5]    Exhibit 2 and Exhibit 3 refer to documents covered by the Protective Order previously entered in this case and will be filed under seal with the Court on December 12.

conjecture about some as-yet-undisclosed "real" reason for the rate increase is just that, for the bargaining parties were focused on complying with Congress' clear provision in the PPA to tighten the funding requirements of multiemployer pension plans. In the face of this bargaining record, Freeman should not be permitted to rely on its alleged hunch as a basis for taking further discovery regarding the reasons for the current collectively bargained contributions rates.

### C.    Freeman Has Ignored BCOA's Effort To Accommodate Freeman's Discovery Demands Notwithstanding BCOA's Objections.

Freeman also seeks to create a false impression that it has been diligent in pursuing discovery and that only recently, BCOA begrudgingly agreed to make additional materials available to it in response to its document requests. In fact, despite having received BCOA's objections on September 11, Freeman did not raise any issue over BCOA's responses until November 9. Moreover, rather than respond to BCOA's good-faith effort to resolve this dispute on November 21, Freeman rushed to file the present motion to compel, which contained enough errors in describing what in fact BCOA already had produced that Freeman was forced to substitute a corrected motion that purportedly describes more accurately BCOA's production so far.

Indeed, up until Freeman's November 9 letter, Freeman never once raised an issue over the scope of BCOA's production, even though it filed an opposition to BCOA's motion for summary judgment, submitted a Rule 56(f) affidavit requesting additional time to respond to the pending motions for summary judgment filed by BCOA, the UMWA, and the 1974 Pension Trust, and moved for a stay pending completion of discovery in this case. In its November 21 response, BCOA agreed to produce to Freeman additional material, notwithstanding BCOA's prior objections. Among other things, BCOA agreed to look for or

produce irrelevant versions of its by-laws, certain financial information, and other material related to its operations and membership. In addition, BCOA indicated to Freeman that, at least with respect to certain information Freeman sought, BCOA was either not aware of the existence of the sought-after material or had produced everything on the subject located to date.

Despite Freeman's obligations under both the Federal Rules and this Court's Local Rules to meet and confer over discovery issues, Freeman never responded to BCOA's letter. Instead, following the Thanksgiving holiday weekend, Freeman filed the present motion to compel. In its apparent rush, however, Freeman apparently did not even examine what in fact BCOA had produced, for it initially sought to compel material that BCOA already had provided. Freeman's failure even to examine what already has been produced undercuts its professed need for additional material.

**D.     Freeman Fails To Demonstrate The Relevance Of The Materials It Seeks To Justify Imposing On BCOA The Burden Of Searching For, And Producing, The Additional Material Freeman Seeks.**

Freeman identifies four categories of additional discovery not yet produced that it claims it needs to prove its case. Fed. R. Civ. P. 26(b)(2)(C) authorizes the Court to limit discovery if:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C). Courts can limit discovery under this Rule "to 'that which is proper and warranted in the circumstances of the case,'" and should balance the need for discovery against the burden imposed in producing it. *Wyoming v. USDA*, 208 F.R.D. 449, 452 (D.D.C. 2002) (citations omitted). In assessing the burden of discovery, the Court should look at the relevance of the material sought, the actual need for the documents, the breadth of the requests, the time period covered, the particularity with which the documents are described, and the actual burden imposed. *Flatow v. Islamic Republic of Iran*, 196 F.R.D. 203, 206-07 (D.D.C. 2000). Finally, the moving party in a motion to compel bears the burden of demonstrating the relevance of the material sought. *Alexander v. FBI*, 186 F.R.D. 185, 187 (D.D.C. 1999).

As described below, under these standards, Freeman fails to carry its burden with respect to each of the four categories of documents its seeks. Accordingly, its motion to compel should be denied.

### 1.    Documents Surrounding the 2007 Negotiations

Freeman seeks "*all* documents" related to BCOA's negotiation of the NBCWA of 2007. To date, BCOA has produced all material that it has located related to the specific contractual provision at issue in this case: the current contribution rate for the 1974 Pension Trust. Freeman claims that this in insufficient because it is entitled to "challenge" BCOA's assertion that the PPA drove its negotiations, and that "the total bargaining history *may* reveal a different reason" for the new rate. Freeman's rank speculation over what it imagines it "*may*" find in the overall bargaining history does not outweigh the burden and expense that such production would entail. As this Court has noted in the context of discovery in analogous ERISA litigation:

> That there is a needle in a haystack does not make searching the
> haystack worthwhile. [The Court] must weigh the possibility
> that a damaging admission by [Defendants] is contained in their
> files is only theoretical and that it may have precious little
> probative force, even if found, against the cost and expense in
> searching for it.

*Fitts v. Fed. Nat'l Mortgage Ass'n*, 204 F.R.D. 1, 5 (D.D.C. 2001).

To be clear: the NBCWA of 2007 is a 374-page collective bargaining agreement that covers the terms and conditions of employment in the unionized sector of the United States bituminous coal industry. It addresses the wages, benefits, work rules, health and safety of miners, seniority rights, the grievance machinery, and scores of other issues that have no bearing on whether Freeman, under the evergreen clause, has an obligation today to contribute to the 1974 Pension Trust. Moreover, bargaining over the terms of the NBCWA of 2007 stretched from the Spring of 2006 until ratification in December 2006. Freeman's attempt to engage in a similar search for a needle in the haystack on only the hunch something "may be revealed" is insufficient to justify its demands.

Moreover, Freeman's professed need for such information is undercut by its own motion. Specifically, the sole basis for Freeman's refusal to contribute to the Trust rests on its claim that the NBCWA of 2007 is not a true "successor" agreement within the meaning of the evergreen clause, because BCOA, as currently constituted, is not a proper multiemployer bargaining association. Freeman asserts, without any authority, that BCOA must be a multiemployer bargaining association in order to negotiate a "successor" NBCWA under the evergreen clause.

Even if Freeman's theory were correct – and it lacks any legal support – there still would be no need for the broad-based discovery Freeman seeks because this Court already has identified the factors necessary to decide whether the 2007 NBCWA qualifies as a successor

agreement. Indeed, as Freeman acknowledges in its own motion, this Court, in *Flynn v. Dick Corporation*, 384 F. Supp. 2d 189 (D.D.C. 2005), *rev'd on other grounds*, 481 F.3d 824, 827 n.2 (D.C. Cir. March 20, 2007), looked to the identity of the signatories to the wage agreements, the scope of work covered by the agreements, and the agreements' effective dates in deciding whether a collective bargaining agreement that imposed on an employer a contribution obligation to a multiemployer pension plan was a "successor" to prior agreements.

Information on these factors for this case is readily available from the 2007 and 2002 NBCWAs, which Freeman presumably has, and does not require any discovery into the actual negotiations over the terms of these agreements, let alone a fishing expedition for "*all*" such documents spanning a nine-month period. In light of the discovery BCOA already has produced, as well as the factors this Court has identified as relevant to the issue that Freeman claims is the key in this case, Freeman can offer no credible justification for seeking every document surrounding the 2007 negotiations.[6]

### 2. Miscellaneous Information Dating Back To The Negotiation Of The Evergreen Clause in 1978.

Freeman also requests documents that date back to 1978 and involve events surrounding negotiation of the evergreen clause itself. With respect to these documents, Freeman fails to acknowledge that BCOA already has authorized the 1974 Pension Trust to make available to Freeman all documents that BCOA previously produced in the prior *Pittston* litigation. In that litigation, BCOA would have produced any and all documents that related to the meaning of the evergreen clause and its reference to "successor" NBCWAs, for that case

---

[6]    Freeman also complains that BCOA did not produce numerous documents related to the 2007 negotiations that were produced by non-party Consol Energy Inc. ("Consol"). To the extent that Consol produced documents that do not relate to the contribution rate set forth in the 2007 NBCWA, BCOA stands on its objections. Regarding documents that Consol produced that do relate to this subject, BCOA has produced all documents in its possession, custody, and control that it has identified to date.

involved enforcement of the clause against similar recalcitrant employers. BCOA searched for all documents concerning the evergreen clause more than 15 years ago, and Freeman has suggested no reason to believe that a search for 1978 documents will turn up anything in 2007 that it did not turn up more than 15 years ago. Freeman should not be allowed to redo the evergreen clause litigation, and it has not offered even speculation as to what BCOA might possess that is in any way relevant and that was not produced in the prior litigation. Given the fact that the evergreen clause was negotiated almost 30 years ago, to require BCOA to search its files again on the off-chance of finding something not produced in the *Pittston* litigation would be unduly oppressive.

> **3.    Documents Regarding Negotiation of the 2002 NBCWA, Including Documents Regarding The Financial Condition Of The Trust At That Time.**

Freeman further seeks documents surrounding the negotiation of the 2002 NBCWA, including documents related to the Trust's financial condition at that time. With respect to these documents, Freeman again fails to identify what specific material would be relevant from those negotiations that would have any bearing on the negotiation of the contribution rate for the 2007 NBCWA. As noted above, Freeman has not had an obligation to contribute to the 1974 Pension Plan for nine years. This contribution holiday predates the negotiation of the 2002 NBCWA by four years. Moreover, the passage of the PPA in 2006 radically changed the landscape surrounding the funding requirements for multiemployer pension plans and, as the documents previously produced to Freeman show, drove the parties' negotiations over the contribution rate to ensure that the Trust remained in compliance with the statute. Given this changed landscape, information related to the negotiation of a zero contribution rate five years ago – to the extent such material even exists – is simply irrelevant to the claims and defenses asserted in this action. In addition, if Freeman truly wants information regarding the financial

condition of the 1974 Pension Trust, Freeman can obtain that material from the Trust itself, rather than demanding that BCOA attempt to locate such information from five years ago – to the extent it even still exists.

### 4.    Information Regarding Transfers From The Trust

Finally, Freeman seeks information related to what it characterizes as the "improper or unlawful siphoning of funds" from the 1974 Pension Trust.  Information related to the 1974 Pension Trust's financial condition as of the negotiation of the 2007 NBCWA is readily available to Freeman.  Save for its spurious and unfounded conjecture that any such transfers are "unlawful," Freeman has provided no showing that any additional information is relevant to whether it has an obligation to contribute at the contribution rate specified in the 2007 NBCWA.  Freeman has not even attempted to provide a legal justification for why any such transfer would relieve an employer of its obligation to contribute to the 1974 Pension Trust at the same rate as all other participating employers.  Moreover, the 2007 NBCWA does not contain any financial transfers between the 1974 Pension Trust and any other non-pension plan.  To the extent that any alleged "improper or unlawful siphoning of funds" occurred in prior years, information related to the impact on the financial condition of the 1974 Pension Trust can be obtained from the Trust's own financial statements.

## CONCLUSION

For all of the foregoing reasons, BCOA respectfully requests that the Court deny Freeman's motion in its entirety.

Respectfully submitted,

_____/s/_____
Peter Buscemi
D.C. Bar No. 269092
Stanley F. Lechner
D.C Bar No. 370986
Charles P. Groppe
D.C. Bar No. 464035

DATED: December 11, 2007

MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004
Tel:    (202) 739-3000
Fax:    (202) 739-3001
E-mail: pbuscemi@morganlewis.com
            slechner@morganlewis.com
            cgroppe@morganlewis.com

*Counsel for Defendant*
Bituminous Coal Operators' Association, Inc.

# EXHIBIT 1
## Transcript of July 19, 2007 Status Conference

1

1               IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF COLUMBIA

3  MICHAEL H. HOLLAND, et al,    . Docket No. CV-07-490 (PLF)

4      Plaintiff,          .

5         v.             . Washington, D.C.
                          . July 19, 2007

6  FREEMAN UNITED COAL MINING  . 10:00 a.m.
    COMPANY, et al,

7      Defendant.         .

8  . . . . . . . . . . . . . . .
                 TRANSCRIPT OF HEARING
9       BEFORE THE HONORABLE PAUL L. FRIEDMAN
            UNITED STATES DISTRICT JUDGE

10  APPEARANCES:

11  For the Plaintiffs:      Bredhoff & Kaiser, PLLC
12                      By: Julia Penny Clark, Esquire

13                    UMWA Health & Retirement Funds
                      By Christopher F. Clarke, Esquire

14                    Morgan, Lewis
15                      By: Peter Buscemi, Esquire

16  For the Defendants:      Jenner & Block
                      By: Jessica Ring Amunsom, Esquire
17                        Susan C. Levy, Esquire

18                    Venable, LLP
                      By: Michael W. Robinson, Esquire
19                        Gregory J. Ossi, Esquire

20                    Ogletree, Deakins, Nash,
                    Smoak & Stewart, P.C.
21                    By: John R. Woodrum, Esquire

22                    Mark Murphy, Esquire

23  Court Reporter:          Linda L. Russo, RPR
                      Official Court Reporter
24                    Room 6403, U.S. Courthouse
                      Washington, D.C. 20001
                      202.354.3244
25  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription

1               P R O C E E D I N G S

2        THE CLERK:  Civil action 07-490, Michael H. Holland

3  et al, versus Freeman United Coal Mining Company, et al.  For

4  the plaintiff, Ms. Clark, Mr. Clarke and Mr. Buscemi.  For the

5  defendants, Ms. Amunson, Mr. Robinson, Ms. Levy, Mr. Woodrum,

6  Mr. Murphy and Mr. Ossi.

7        THE COURT:  Good morning.  You need all these people

8  for a status conference?  Well, I was thinking that since you

9  can't agree on anything, that what we ought to do is go ahead

10  with fact discovery on liability but not damages, forget about

11  expert discovery for the time being.  The party that thinks

12  it's all a matter of law and we don't need any discovery can,

13  in addition to participating in discovery, move for summary

14  judgment any time they want to.  If the other side, any other

15  side will respond in accordance with the days set forth in the

16  rules, and if they think it's premature they can tell me it's

17  premature and that I shouldn't decide it until after fact

18  discovery is over.  And just because you file a motion, there's

19  no obligation to decide it.

20        With this many people here, it seems to me I should

21  refer all discovery disputes to a Magistrate Judge, and I'll

22  see you when the summary judgment motions are filed.

23        So all we need to do is set dates, since there are no

24  dates in your Rule 16.3 because you couldn't agree on a

25  procedure.  But I think we should set dates for fact discovery

3

1   and, as I said, if you want to file a motion for summary

2   judgment, the other side has to respond.  But I'm not sure

3   whether that makes sense.

4         I don't know how I can decide at this point whether

5   it's a pure question of law on one count or both counts.  If

6   it's a pure question of law, I guess you can move to dismiss.

7   But if you need some things outside the four corners of the

8   pleadings and the other side thinks you need discovery, I don't

9   know how to decide that other than to go ahead and have

10   discovery.

11         So who wants to suggest something in view of my

12   comments?

13         MR. ROBINSON:  I guess I'll take a shot at that.

14   Michael Robinson on behalf of the defendant Freeman.

15         Your Honor, during the conference we had suggested a

16   six month time period for fact discovery that I think would

17   take us to the end of January.  There was no magic to six

18   months.  I'm not suggesting that it necessarily has to be six

19   months, but that's at least the time frame that was discussed

20   in the context of the Rule 16, that if we were to proceed with

21   fact discovery that a period of six months would be more than

22   sufficient to complete that.

23         THE COURT:  And that's on liability.

24         MR. ROBINSON:  That's on the issue of liability.

25         THE COURT:  Do you think if at the end of that time

4

1    your client's going to file a motion for summary judgment, one

2    thing I wasn't clear on from what I read is whether or not

3    anybody believes that expert discovery has to take place before

4    a viable summary judgment motion can be filed.

5         I think the party that would like to go forward with

6    briefing without discovery, part of it is that discovery takes

7    time and it costs money for everybody, and nothing costs more

8    than expert discovery.

9         MR. ROBINSON:  At this point in trying to predict the

10   future, I can't tell the Court that I think expert discovery

11   will be necessary to address whatever issues they wish to

12   raise.  I don't know the exact issues that they will raise, so

13   I think in that context, if we got to that point and there was

14   a summary judgment motion in which I needed an expert, I think

15   it would be incumbent on me at that point to come forward

16   pursuant to Rule 56 and tell the Court at that time.

17        As we stand here today I can't tell the Court that I

18   think expert discovery will be necessary to resolve the issues

19   that they may want to raise.

20        THE COURT:  Okay.  So you're suggesting six months

21   liability only, not experts yet.

22        MR. ROBINSON:  In that time frame like I -- you know,

23   again, the six months wasn't magic.  We were talking the four

24   to six month time period, and the four and five month period

25   put us right into the middle of the holidays, so we just pushed

5

1    it to January.

2         THE COURT:  Who else wants to weigh in?

3         MS. CLARK:  Your Honor, Julia Penny Clark for the

4    Pension Trust.  I think that we're going to need very little

5    discovery for our part.  I think that six months is probably an

6    adequate amount of time for fact discovery.  The main

7    complication on our side is that we have a very large volume of

8    materials from the prior litigation over the meaning of this

9    Evergreen clause, as well as the meaning of the Guarantee

10   clause, which they have listed as one of the topics they wish

11   to have discovery on.  And it's complicated with

12   confidentiality agreements that we signed in order to get those

13   documents.  And so the main thing that's going to take time on

14   our side is simply mustering those materials to respond to any

15   discovery requests that we receive.

16        THE COURT:  So you have confidentiality agreements

17   with people who are not parties to this litigation?

18        MS. CLARK:  That's correct.  Each of the coal

19   companies that produce negotiating materials to us has insisted

20   on confidentiality agreements, so we will need to get back to

21   them and try to negotiate with them an amendment to the

22   agreement that permits us to put it here under a similar

23   confidentiality agreement, which we hope to bring to the Court

24   fairly shortly.  But that will take some time.  And in light of

25   that, I think from our standpoint the six month period sounds

6

1  appropriate, but not because we're going to need a lot of fact
2  discovery on our side.
3      THE COURT:  And the other side is going to have to be
4  sympathetic and sensitive to the notion that you have to work
5  things out with other people before they get some of the
6  documents, so don't run in and try to take depositions before
7  you have the documents you need.
8      MS. CLARK:  Right.  And that, of course, depends on
9  what the scope of their actual requests are.  But they did list
10  negotiating documents in what they thought were the appropriate
11  subjects for discovery, and those are virtually all covered by
12  confidentiality agreements.  The ones that were actually filed
13  in court in the earlier litigation, many of them, the
14  confidentiality ended up being waived so that we wouldn't have
15  to file them under seal.  Those, once we sort them out, we'll
16  be able to provide free of those agreements, but there are,
17  many of the underlying documents are still confidential.
18      THE COURT:  The case you're referring to, was that
19  before Judge Hogan?
20      MS. CLARK:  Yes, primarily.  That was the
21  multidistrict litigation and the Pittston case, and a couple of
22  others.  That litigation went on for about ten years.
23      THE COURT:  Is that what's in store?
24      MS. CLARK:  We hope not, but that was one of the
25  reasons we were proposing a summary judgment motion up front to

7

1  try to narrow the issues, was in order to avoid any repeat of
2  that lengthy litigation.
3          There were other cases, the Island Creek case, in
4  which there was also extensive discovery following a Court of
5  Appeals ruling in I believe it was 1992, that reversed a
6  dismissal order that Judge Harris had entered.  And then the
7  Guarantee clause litigation, which went on for several years
8  itself.  So there's a lot of litigation, a lot of files, and I
9  asked my paralegals to give me an estimate of how many boxes,
10 and we're talking in the hundreds.
11         THE COURT:  Since you seem to be knowledgeable about
12 all this history, did Judge Hogan or Judge Harris use a
13 Magistrate Judge to assist in managing the discovery?
14         MS. CLARK:  Judge Hogan referred some discovery
15 disputes to Judge Kay, and that was, I think that was the
16 limit.  Deborah Robinson also saw something, but I think it was
17 extremely limited.  Judge Kay was the one who had more contact
18 with this.
19         THE COURT:  Obviously in a case this big with this
20 many documents, and confidentiality and protective orders, the
21 more you can try to work things out with each other in a
22 professional way will be helpful to everybody.
23         MS. CLARK:  Certainly.  It's also we find in the
24 interest of our clients not to spend a lot of money litigating
25 over issues that can be worked out.

8

```
1          THE COURT:  I agree with that absolutely.  All right,
2     any other thoughts, or anything else we should talk about?
3          MR. ROBINSON:  Michael Robinson again.  In light of
4     the comments regarding the confidentiality, I think our report
5     indicated that if a protective order became necessary, that the
6     parties would work that out.  I think that's probably something
7     we need to start on right away.  There will need to be a
8     protective order, and that is not an issue.  We should be able
9     to work that out.
10         THE COURT:  I think Ms. Clark was suggesting just
11    that, that you need to work out a protective order.  She needs
12    to work things out with other people, and then you can start
13    the discovery process.
14         Maybe what we ought to do, and again, if the
15    plaintiffs want to file motion for summary judgment they can,
16    but I think what we ought to do is to go forward down this road
17    for six months.  And then maybe should we have another status
18    conference before anybody -- I'm not precluding anybody from
19    filing motions, but does it make sense to come back at that
20    point and say, okay, here's where we are, and we have now
21    decided this is what we want to do on motions, or we have now
22    decided we need experts before we do motions, or we need a
23    limited number of experts.  Is there something to be gained by
24    coming back in six months rather than just, say, the middle of
25    January, or the end of January discovery closes and here's the
```

9

1   dates for motions.  I'll do it however you all want.

2           You don't have to bring everybody next time.

3   Mr. Buscemi probably flew in from San Francisco, for all I

4   know.

5           MR. BUSCEMI:  Your Honor, I don't want to anticipate

6   disputes that may never arise, but I do think it's important to

7   inform the Court at the outset because we have an indication of

8   what we are likely to receive.  We haven't received any

9   discovery requests yet, of course, but we do have in paragraph

10  2-A of the proposed discovery plans submitted by opposing

11  counsel a laundry list of 11 different subject areas that they

12  say they wish to explore in discovery.  And I'll call Your

13  Honor's attention to just a couple of them.  If you look, for

14  example, at number --

15          THE COURT:  I don't know if I've seen that.  Have I

16  seen that?

17          MR. BUSCEMI:  Well, it's their proposed discovery

18  plan that was submitted with the local Rule 16.3 report.

19          THE COURT:  Okay, I have it.  Go ahead.

20          MR. BUSCEMI:  So if you look at paragraph 2-A, you

21  can see that they have already announced that they are going to

22  seek, for example look at number six, all negotiations and all

23  communications among or between the 1974 Pension Trust, BCOA,

24  and the UMWA regarding the Evergreen clause.  Number seven, all

25  negotiations regarding the Guarantee clause.  Well, those

10

1  clauses were initially adopted back in 1978.

2           This is essentially an effort to redo the extended

3  litigation to which Ms. Clark referred before Judge Hogan.  And

4  if in fact those are the discovery requests that we receive, at

5  least our clients intention would be to object to those

6  requests because there is no reason to start all over again

7  from the beginning, which is what they are suggesting they want

8  to do.

9           So I just wanted the Court to be aware, and I agree

10  with Ms. Clark that I know that Magistrate Judges can be very

11  helpful on discovery things, but on some of these big picture

12  items that have to do with the entire scope and context of the

13  litigation and what tasks we're going to try to perform in the

14  litigation, the Court's involvement might be very helpful

15  because I think there are going to be some threshold questions,

16  at least if the discovery requests that we get track what's

17  here in paragraph 2-A.

18           THE COURT:  Mr. Robinson.

19           MR. ROBINSON:  Briefly, Your Honor, in response to

20  the Court's question about whether an additional conference

21  would be helpful, we believe that it would be helpful.  And

22  whether you set that in January or at the end of the six

23  months, we think that would be helpful.  It may be very short

24  if the parties have made progress and we have an agreed plan at

25  that point as to how to go forward, but we think that would be

11

1    helpful.

2            In response to the anticipated objections to

3    discovery, we're not relitigating the Pittston case.  There are

4    facts and evidence that are relevant to today's issues that

5    were also relevant to that case, but that doesn't make us

6    attempting, or it shouldn't be suggested that we're simply

7    trying to relitigate that case.  Facts and evidence can be

8    relevant to many different issues.  And so when we submitted

9    our discovery plan where we gave the Court some suggested dates

10   and gave a preview of some of the types of issues, that was in

11   the spirit of showing the Court the types of issues that might

12   come up.

13           If they have objections to the actual discovery

14   requests when they are served, I'm assuming that will be

15   referred to the Magistrate Judge as the Court suggested

16   earlier.

17           THE COURT:  I've got two competing discover plans

18   here, or are they the same?

19           MR. ROBINSON:  I believe you do have two competing

20   discovery plans.  One was submitted as our proposed plan if

21   discovery was to proceed as has now been decided, and the

22   funds -- and the Union had submitted their own plan based on I

23   believe some period of time where there would be no discovery

24   until after summary judgment motions were decided.  So each

25   side had put their competing ideas into a plan.

12

1          THE COURT: Mr. Buscemi.

2          MR. BUSCEMI: Your Honor, just so the record is clear

3   about what our discovery plan was, our discovery plan was not

4   that there would be no discovery until summary judgment motions

5   had been decided. Our discovery plan was that we would file

6   our motion for summary judgment, and then our opponents would

7   indicate what, if any, discovery they needed to respond to that

8   motion under Rule 56(f). If the court decided that discovery

9   was warranted once they explained why they needed it to respond

10  to the points made in our motion, then that discovery would

11  occur before summary judgment was decided. But not just

12  open-ended discovery when we think we can substantially narrow,

13  if not eliminate the issues through an early motion. That was

14  our plan.

15          THE COURT: How do you respond to their argument that

16  even if you were right, it would only deal with one but not

17  both counts of the --

18          MR. BUSCEMI: We don't think that's true at all, Your

19  Honor, for a couple of reasons. Number one, the second count,

20  the count that's plead only against our client BCOA, is a state

21  law count. It's here only under Section 1367, supplemental

22  jurisdiction. It wouldn't be here at all were it not for their

23  Count One. So that's point number one.

24          Point number two, we think that's also subject to

25  being dealt with on summary judgment. They're claiming, for

13

1   example, that the contribution rate that was negotiated in the

2   National Bituminous Coal Wage Agreement of 2007 is arbitrary,

3   capricious and unreasonable.  Well, every coal company in the

4   country except the two that are here in this courtroom is

5   paying it.  So we don't think it's arbitrary, capricious and

6   unreasonable, and we don't think there's going to be a genuine

7   issue of material fact about that.  Thank you.

8        THE COURT:  Well, if we go forward as I was

9   suggesting with more general discovery, maybe you can't answer

10  this question today, would it still be your intention to file a

11  motion for summary judgment early?

12       MR. BUSCEMI:  Yes, Your Honor.

13       THE COURT:  So that's going to happen regardless.

14       MR. BUSCEMI:  Yes, it is.

15       THE COURT:  Well, I guess that's going to happen

16  regardless, and you're going to have to respond to it.

17       MR. ROBINSON:  Your Honor, that would be the standard

18  procedure in any case, that if a motion for summary judgment is

19  filed I'll need to respond to it.  It may include Rule 56(f)

20  issues, but until we see the motion, until we see what the

21  issues are, we don't have to anticipate that other than knowing

22  what our obligations are under the rules when and if that

23  comes.

24       THE COURT:  Mr. Buscemi raises the breadth of 2-A,

25  and I suppose that if the actual discovery requests are as

14

 1   broad as this paragraph suggests that they are, there are going

 2   to be a lot of objections that are going to be filed by the

 3   other side, overbreadth going back too many years, and things

 4   like that, that a Magistrate Judge is going to have to decide.

 5   So you don't want to create more problems for yourself than you

 6   need to.

 7        MR. ROBINSON:  I understand, and I appreciate the

 8   Court's guidance on that.  I think the fact that much of this

 9   discovery, as they have said, or at least of the older

10   discovery, much of it may already be in boxes that are waiting

11   to be reviewed, and then for us to review may certainly lessen

12   the burden, not on those of us reviewing them, but the burden

13   of gathering these documents or saying you're going back too

14   many years.  If the material was developed in the litigation 15

15   years ago, it may very well simply be waiting for us to see.

16        THE COURT:  The question always is do you really need

17   it all?

18        MR. ROBINSON:  I understand.

19        THE COURT:  Just because it's sitting there in boxes,

20   if they don't think it's material or relevant to this lawsuit,

21   they're going to have objections.

22        MR. ROBINSON:  I understand.  And if those objections

23   are unopposed, counsel will have to confer and try to work

24   those out, and then either narrow the issues or present more

25   narrowed issues to the Court if that becomes necessary.  I

1    think we weren't trying to set forth specific discovery

2    requests in that plan.  We were really giving the Court an idea

3    of the topics, and not simply setting out the specific requests

4    that might be coming.

5         THE COURT:  Well, I think what we should do is, I'll

6    issue some sort of a scheduling order which deals with this,

7    but I think for now we should deal with fact -- I'm not going

8    to set any dates for expert discovery, and nobody is going to

9    do anything about expert discovery.  It's going to be fact

10   discovery relating to liability.  And if in the meantime the

11   plaintiffs file a motion for summary judgment, depending upon

12   when they file it, you may say that we can't respond yet.

13        Now, under Rule 56(f), as I understand Rule 56(f),

14   even though general discovery is going on, what you're supposed

15   to do under Rule 56(f) is not to say we need to complete

16   discovery to respond.  You're supposed to say this is the

17   nature of the discovery that we need in order to respond to the

18   motion that we now have.

19        So we may find ourselves on two different tracks,

20   that you're trying to do all discovery within six months, and

21   at the same time be asking for 30 or 45 days to finish more

22   targeted limited discovery in order to respond.  But we'll just

23   have to see.

24        What I'm going to do is, I'm going to issue an order,

25   after thinking a little further about this, and I may talk with

1   Judge Kay since his name has been invoked here, he'll be

2   delighted, and see what his schedule looks like, and let him

3   deal with these problems.

4          Now, I don't know whether Mr. Buscemi was suggesting

5   that there should be another status conference before me

6   somewhere in the middle of this six months period.  He was

7   suggesting that there might be broader issues that I ought to

8   deal with rather than the narrower issues that a Magistrate

9   Judge ought to deal with.  Or do you want to leave it open, and

10  if you need me you'll call and we'll set something up?

11         MR. BUSCEMI:  That's fine, Your Honor.  What I was

12  suggesting was that if we get the kind of discovery request

13  that we feared we would after seeing the proposed discovery

14  plan, I think you're looking at the overall metes and bounds of

15  the litigation and not whether this particular request or that

16  one should be tweaked a little bit.  And in the event that

17  that's the nature of the debate that we've having, I would

18  suggest that we'll wind up before you, in any event, even if

19  only after Magistrate Judge key gets involved.  So just in the

20  interest of efficiency, I was thinking that kind of dispute

21  ought to come to you.

22         THE COURT:  That may be, if it's a global kind of

23  issue.  All right, in the meantime, assuming six months for

24  discovery, do you want to set a status conference sometime in

25  January?

1          MR. ROBINSON:  That's fine with us, Your Honor.

2          THE COURT:  Well, the week of January 21st begins

3     with Martin Luther King Day, which is a holiday, so is any time

4     later that week or the following week good for everybody?

5          MS. CLARK:  Yes, Your Honor.

6          MR. ROBINSON:  That's fine, Your Honor, yes.

7          THE COURT:  All right, just pick a day.  Any

8     particular days of the week you like better?

9          MR. ROBINSON:  Saturday.

10          Your Honor, that Tuesday after the holiday would be

11     fine.

12          THE COURT:  Mr. Buscemi doesn't want to do that.  Mr.

13     Buscemi lives in two cities.

14          MR. BUSCEMI:  How about Thursday?

15          THE COURT:  Mr. Buscemi leaves in two cities now, I

16     happen to know.  How about Thursday at 9:30, Thursday the 24th.

17          All right, anything else that we can fruitfully

18     discuss, assuming that this was fruitful.  All right, I'll see

19     you then.  I will issue some sort of an order.  I will talk

20     with Judge Kay and see where we are in that as well.  Thank

21     you.

22          (Proceedings concluded.)

23

24

25

18

```
 1                         CERTIFICATE
 2          I, LINDA L. RUSSO, Official Court Reporter, certify
 3     that the foregoing pages are a correct transcript from the
 4     record of proceedings in the above-entitled matter.
 5
 6
 7                              _____
 8                              Linda L. Russo, RPR
                                Virginia CCR No: 0313102
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Linda L. Russo, RPR
Official Court Reporter

# EXHIBIT 2

**Email dated August 21, 2006 re**
**Additional [Pension Funding Status] Cases**

**(Filed under Seal)**

# EXHIBIT 3

**Email dated December 1, 2006 re
Pension Funding Status Projections**

**(Filed under Seal)**