## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Michael H. Holland, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | Case No. 07-cv-490 (PLF) |
| Freeman United Coal Mining Company, ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| Freeman United Coal Mining ) | |
| Company, ) | |
| ) | |
| Plaintiff, ) | Case No. 07-cv-1050 (PLF) |
| ) | |
| v. ) | |
| ) | |
| United Mine Workers of ) | |
| America, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## SUPPLEMENTAL REPLY MEMORANDUM IN SUPPORT
## OF THE UNITED MINE WORKERS OF AMERICA 1974
## PENSION TRUST'S MOTION FOR SUMMARY JUDGMENT

Pursuant to the Court's November 19, 2007 Order (Dkt. #63)[1] granting Defendants' Rule

56(f) motions and ordering supplemental briefing on pending summary judgment motions after

the close of discovery, Plaintiffs United Mine Workers of America 1974 Pension Trust ("1974

Pension Trust" or "Trust") and its Trustees submit this Supplemental Reply Memorandum in

support of their summary judgment motion, in which they seek a ruling that Defendants Freeman

United Coal Mining Company ("Freeman") and Monterey Coal Company ("Monterey") are

liable under the "evergreen clause" to make contributions to the Trust at the rates set in the 2007

---

[1] Unless otherwise noted, all docket citations are to case number 07-cv-490.

National Bituminous Coal Wage Agreement ("NBCWA") between the United Mine Workers of

America ("UMWA") and the Bituminous Coal Operators' Association ("BCOA").[2]

**ARGUMENT**

**I.     AS A MATTER OF LAW, THE EVERGREEN CLAUSE OBLIGATES
FREEMAN AND MONTEREY TO MAKE CONTRIBUTIONS TO THE TRUST
AT THE RATES SET IN THE 2007 NBCWA.**

In our opening brief, we established that in *United Mine Workers of America 1974*

*Pension Trust v. Pittston*, 984 F.2d 469, 473 (D.C. Cir. 1993) ("*Pittston*"), the Court of Appeals

for this Circuit definitively determined the meaning and enforceability of the evergreen clause

"as a matter of law" – by holding that *every* coal company employer that signed an NBCWA

between the UMWA and the BCOA containing the evergreen clause thereby assumed a "fully

enforceable," *id.* at 479, obligation

> to make continuing contributions to the [UMWA] trusts; and this obligation
> include[s] an agreement to make contributions at [the] rates specified in
> subsequent NBCWAs, without regard to whether the employer [is] still a party
> to the subsequent agreements.

*Id.* at 474.  *See* Memorandum of Points and Authorities in Support of the [1974 Pension Trust's]

Motion for Summary Judgment on the Issue of Liability ("Pl. Mem.") (Dkt. #46) at 2, 4-10.  We

further established:  (i) that both Freeman and Monterey signed multiple NBCWAs containing

the evergreen clause, *see* Pl. Mem. at 2-3; and (ii) that under the familiar principle of *stare*

*decisis*, Freeman and Monterey are bound by the *Pittston* court's decision respecting the meaning

and enforceability of the evergreen clause, *see id.* at 10-12.

It bears emphasis at the outset that neither Freeman nor Monterey has disputed *any* of the

foregoing propositions in their respective supplemental memoranda in opposition to the Trust's

---

[2] Separate motions for summary judgment seeking the same ruling have been filed by the
UMWA and the BCOA.  The BCOA's motion also seeks dismissal of Freeman's damages claim
against the BCOA.

summary judgment motion.  *See* Freeman's Supplemental Memorandum ("Freeman Mem.") (Dkt. #78); Monterey's Supplemental Memorandum ("Monterey Mem.") (Dkt. #77).

We went on in our opening brief to rebut certain arguments that we anticipated Freeman and Monterey would make (based on their pleadings) in an effort to escape their obligation under the evergreen clause.  *See* Pl. Mem. at 12-28.  In their opposition memoranda, Freeman and Monterey do *not* make the arguments that we anticipated and rebutted at pages 12-14 & 19-20 of our opening brief –namely, Freeman's arguments respecting its 2003 agreement with the UMWA and the "guarantee clause" therein, and Monterey's argument respecting its failure to reach a new agreement with the UMWA.  That being so, we regard these arguments as abandoned.

The *one* argument suggested by their pleadings that Freeman and Monterey *do* press forcefully in their supplemental memoranda in opposition is the argument that they have no contribution obligation to the Trust under the evergreen clause because the 2007 NBCWA providing for such contributions does not qualify as a "successor agreement" within the meaning of the evergreen clause.  We showed in our opening brief that this "non-successor-agreement" argument fails as a matter of law for two reasons – either of which is sufficient standing alone to defeat Freeman's and Monterey's effort to escape their obligation under the evergreen clause "to make continuing contributions to," *Pittston*, 984 F.2d at 474, the Trust.  *See* Pl. Mem. at 15-19 (reason #1); *id.* at 20-24 (reason #2).  We will now show that Freeman and Monterey have failed in their effort to contravene the Trust's showing on either of these two separate points.

First, however, one point is important to put Freeman's and Monterey's arguments in perspective.  They focus entirely on the obligation that the Pension Trust seeks to enforce against them – to pay $2.00 for each hour worked in the year 2007 by an employee in the UMWA bargaining unit.  Their briefs never mention the other side of that coin, namely, the obligation of

the 1974 Pension Trust to pay benefits to the retired miners that worked for them. That obligation includes both 10 years' worth of benefits accrued by miners working during the lengthy period when employers enjoyed a zero contribution rate to the 1974 Pension Trust, and also increased levels of pension benefits that the 1974 Pension Trust must pay to retired miners as a result of the same 2007 negotiations that created the $2.00 per hour contribution rate for 2007. Dep. of Cecil Roberts [Att. #5 to Dkt. #78], at 40 lines 1-12; 75 line 8 through 76 line 9; 77 line 2 through 81 line 2. The retired miners who are entitled to those benefits include more than 1200 Freeman current retirees and more than 400 Monterey current retirees, plus some number of miners who will qualify for future benefits out of the 360 active miners Freeman employed in 2007 and the 260 active miners Monterey employed in 2007.[3] Freeman and Monterey are asking this Court for dispensation from making those contributions, but with no dispensation for the 1974 Pension Trust from its benefit obligations. Whatever the outcome of this case, the 1974 Pension Trust must continue to pay benefits (including the 2007 increases) to all retired miners in the industry who qualify for benefits under the 1974 Pension Trust, including those who previously retired or retire in the future from Freeman and Monterey.

      A.     Freeman's and Monterey's Non-Successor-Agreement Argument
             Fails Without Regard to Whether the 2007 NBCWA Is a
             Successor Agreement Within the Meaning of the Evergreen Clause

The first reason that Freeman's and Monterey's non-successor-agreement argument fails is that it rests on a false premise – the proposition that the obligation of evergreen clause signatory employers is limited to the obligation to make the contributions required by "successor agreements" to the 1978 NBCWA.

---

[3] The numbers of retired miners for each company are found in the Declaration of Dale Stover [Att. #1 to Dkt. #46] ¶ 8. The numbers of active miners are found in the Declaration of Cecil Roberts [Exh. 1 to Att. #2 to Dkt. #17 in Case No. 07-cv-1050] ¶ 27.

4

To reiterate, the evergreen clause expressly provides, in the plainest of language, that signatory employers are "obligated and required to comply with *the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time*, *including*, *but not limited to*, making the contributions required under the [NBCWA] of 1978 . . . and any successor agreements thereto." *See* Pl. Mem. at 6 (emphasis added).

It is undisputed that the obligation to make contributions required under the 2007 NBCWA is a "term[] and condition[] of the 1974 Pension Plan and Trust," as that plan document was amended by the UMWA and the BCOA effective January 1, 2007. As the 1974 Pension Trust explained in detail in its opening brief, the Trust's 2007 plan document addresses in three separate provisions employers' obligations to contribute to the Trust. In each of those provisions, the plan document specifies that contributions shall be made in accord with the "National Bituminous Coal Wage Agreement of 2007." Pl. Mem. at 18-19.

All this being so, we explained that it is clear as a matter of law that Freeman and Monterey are obligated by the evergreen clause to make the contributions required by the 2007 NBCWA – wholly without regard to whether the 2007 NBCWA qualifies as a "successor agreement" under the evergreen clause. *See* Pl. Mem. at 15-19.

Freeman and Monterey tender a smorgasbord of arguments in response to the foregoing "[a]mended [t]rust [a]rgument" – as Freeman dubs it. *See* Freeman Mem. at 36 (section title). Grouping those various arguments together in a manner that strikes us as analytically sound and also fair, we show in subsections 1-3 below that none of those arguments is remotely sufficient to avert summary judgment in the Trust's favor.[4]

_____

[4] In its November opposition memorandum [Dkt. #57] at 19-20, Freeman asserted that the 1974 Pension Trust is judicially estopped from making this argument. We demonstrated in the 1974 Pension Trust Reply Memorandum (Dkt. # 59) ("Initial Reply Mem.") at 10-13, that the

Before turning to this showing, however, we pause to make an important legal point that forms the backdrop against which each of Freeman's and Monterey's arguments must be evaluated.

The Trust brought this action to collect delinquent pension plan contributions from Freeman and Monterey under section 515 of ERISA, *see* Cplt. (Dkt. #1) ¶¶ 6, 72, which provides in full:

> **Delinquent Contributions**
>
> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.

The Court of Appeals for this Circuit explained the meaning and purpose of § 515 of ERISA in *BCOA v. Connors*, 867 F.2d 625 (D.C. Cir. 1989) – a case involving the UMWA 1950 Pension Trust.[5]  Section 515, the D.C. Circuit held, "entitles pension funds to rely upon, and to enforce, the written terms of collective bargaining agreements insofar as they relate to pension contributions," *id.* at 633; and, that being so, "their [enforcement] suit[s] *cannot be thwarted by defenses not apparent from the face of the Agreement*," *id.* at 634 (emphasis added).  As the appellate court elaborated:

> [S]ection 515 was adopted in order to ease the burden of uncertainty on the trustees of a pension trust by allowing them to rely upon the language of the agreement itself.  This purpose would be frustrated if

---

assertion of judicial estoppel failed at every level.  Freeman's final opposition brief omits any such argument.

[5] The *BCOA v. Connors* case involved a contribution obligation arising directly under the NBCWA, rather than under a provision of the plan and trust documents such as the evergreen clause.  But § 515 by its express terms applies equally to contributions arising "under the terms of the plan or under the terms of a collectively bargained agreement."  Accordingly, the legal principles established by the D.C. Circuit in *BCOA v. Connors* apply with full force in the present context involving contribution obligations arising under the evergreen clause.

the trustees were forced to meet defenses that go to the conduct of
the parties to a facially valid trust agreement.

. . .

. . . Section 515 *ends our inquiry* with a determination of what is
required by the written terms of the Agreement.

*Id.* at 635-36 (emphasis added).

Against this backdrop, we turn to consider Freeman's and Monterey's arguments.

1.    Freeman and Monterey first argue that the Trust's amended trust argument

does not rest on the plain language of the evergreen clause at all – as the Trust has asserted, *see*

Pl. Mem. at 15-20 – but instead ignores and distorts that language.  Thus, says Freeman, the

Trust's amended trust argument "fails" at its inception "because it relies on the first part of the

evergreen clause and ignores the remainder, which expressly addresses the issue raised in this

case – namely, the scope of an employer's obligation to make contributions as set forth in

'successor [NBCWA] agreements.'"  Freeman Mem. at 36.  Similarly, Monterey asserts that the

Trust has "stake[d]" its amended trust argument "on an out of context reference to a phrase in the

evergreen clause that employers are required 'to comply with the terms and conditions of the

1974 Pension Plan and Trust, as amended from time to time.'"  Monterey Mem. at 21.

Given these assertions – which, ironically, are accompanied by quotations from selected

snippets of the evergreen clause – we quote *the full text* of the evergreen clause here, with an

emphasis on those words that *Defendants* have chosen to "ignore":

Any Employer who employed any Participant eligible for coverage
under, or who received or receives benefits under, the 1974 Pension
Plan, or any Employer who was or is required to make, or who has
made or makes contributions to the 1974 Pension Plan and Trust, is
obligated and required to comply with the terms and conditions of the
1974 Pension Plan and Trust, as amended from time to time,
*including*, *but not limited to*, making the contributions required under
the National Bituminous Coal Wage Agreement of 1978 as amended
from time to time, and any successor agreements thereto, including,

7

but not limited to, the National Bituminous Coal Wage Agreement of [1981, 1984, 1988, 1993, 1998, 2002, 2007].[6]

The italicized phrase "*including, but not limited to*" belies in the plainest terms imaginable Freeman's and Monterey's bald assertion that their contractual obligations under the evergreen clause *are limited to* the singular "obligation to make contributions as set forth in 'successor [NBCWA] agreements.'" Freeman Mem. at 36. On its face, the evergreen clause imposes a broader, unqualified obligation on signatory employers "to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended." As previously noted, it is undisputed in this case that making the contributions required by the 2007 NBCWA is a "term[] and condition[] of the 1974 Pension Plan and Trust, as amended." *Supra* p.5. In suing Freeman and Monterey to enforce that broad, unqualified obligation appearing on the face of the evergreen clause, as it is "entitled" by ERISA § 515 to do, *BCOA v. Connors*, 867 F.2d at 633, the Trust has neither "ignore[d]" language in the evergreen clause, Freeman Mem. at 36, nor taken language in the evergreen clause "out of context," Monterey Mem. at 21. To the contrary, as we have shown, the shoe is on the Defendants' foot in this regard.

Monterey makes three other miscellaneous arguments in an effort to contravene the Trust's argument that the plain language of the evergreen clause obligates evergreen clause signatory employers to contribute to the Trust at the rates set out in the 2007 NBCWA without regard to whether the 2007 NBCWA qualifies as a successor agreement. None of these arguments has a kernel of merit.

(a) First, Monterey contends that "the thrust of" the Trust's argument is that "the evergreen forefathers" were "so prescient" and exhibited such "remarkable foresight"

---

[6] After each NBCWA negotiation from 1981 through 2007, BCOA and UMWA amended the final date in the evergreen clause to make explicit reference to the then-current NBCWA. Decl. of Charles Perkins [Att. #3 to Dkt. #19 in Case No. 1:07-cv-01050, ¶¶ 21-22.

that they anticipated the possibility that the BCOA's membership might someday dwindle to a single employer and – with that possibility in mind – drafted the evergreen clause so as to ensure that former BCOA employers would be bound by a resulting agreement between the BCOA and the UMWA providing for contributions to the Trust without regard to whether that agreement could be conceived of as a "true" successor NBCWA.  *See* Monterey Mem. at 21.  But that is not even an element of – much less "the thrust of" – the Trust's argument at all.

Under normal contract interpretation principles, the issue to be decided in a suit to enforce a contract is not whether the parties were "prescient" enough to foresee the precise circumstances at hand and to draft their contract accordingly, but whether the contract *on its face* dictates a certain result in those circumstances.  *Kyriakopoulos v. George Washington Univ.*, 866 F.2d 438, 444 (D.C. Cir. 1989) ("[t]his court adheres to the 'objective law' of contracts whereby the 'written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered the contract . . . .") And, as we have shown, that normal rule of contract interpretation applies with even greater force in a suit by a pension plan under ERISA § 515 to enforce the written terms of the plan. *Supra* pp.  6-7.  "[T]he thrust of" the Trust's argument in this case is that – quite apart from whether "the evergreen forefathers" were "prescient" enough to foresee the precise circumstances that have arisen in the coal industry three decades later – they drafted the evergreen clause in sufficiently broad and sweeping terms to dictate the result urged by the Trust here.  Monterey has no persuasive retort to that argument, *see id.*, so it chooses to parody that argument instead – to no avail under ERISA § 515.

Although it may be gilding the lily given ERISA § 515, we would be remiss if we failed to note that this case amply demonstrates the wisdom – if not the "remarkable foresight" – of "the evergreen forefathers" in drafting the evergreen clause in the broad and sweeping terms that

they did.  As the "forefather[]" on the BCOA side of the table (Roger Haynes) explained in his

Declaration in *Pittston*:

> The evergreen clause was . . . negotiated *to make sure* that any coal
> operator that voluntarily agreed to participate in the Funds in 1978
> could not simply walk away from the Funds and leave its retirees
> behind . . . at the expense of the remaining employers.
>
> .          .          .          .          .
>
> These provisions were placed in the trust documents *so that we could
> be sure* that the trust documents would apply to any non-BCOA
> employer that wanted to participate in the Funds, even if that
> employer was not signatory to the NBCWA.

*See* Haynes Decl. ¶ 19 (quoted in Pl. Mem. at 26) (emphasis added).  Freeman's and Monterey's

protestations to the contrary notwithstanding, "the evergreen forefathers" achieved their

objective of *making sure* that coal operators who signed the evergreen clause in 1978 could not

thereafter escape their continuing contribution obligations to the Trust, by drafting the evergreen

clause in sufficiently broad and sweeping terms to block all conceivable avenues of escape –

"including, but not limited to," the avenue of escape Freeman and Monterey seek here.

   (b)  Second, Monterey argues that the Trust's reading of the evergreen

clause is "nonsensical," because if that reading "were correct, then BCOA and the Union . . .

could at any time since 1978 have changed substantive terms that had been reached in

multiemployer bargaining by the expedient of a 1974 Plan amendment . . . [thereby] creat[ing]

irreconcilable conflicts between a true NBCWA and the 1974 Plan."  Monterey Mem. at 24.[7]

---

[7] Indeed, Monterey repeats this argument like a mantra in its brief.  *See, e.g.*, Monterey Mem. at
27-28 ("If Consol/BCOA and the Union may change substantive aspects of the 1974 Plan
without bargaining, the NBCWA would become irrelevant as far as the rate of contributions to
the 1974 Plan is concerned.  For example, once the 2002 NBCWA was ratified, BCOA and the
Union could have decided a few months later to amend Section B(8) of the 1974 Plan to impose
a contribution rate of say $8.00 per hour without going through the collective bargaining process
required for a true NBCWA, including consulting with the BCOA membership and obtaining
ratification by Union members"); *id.* at 29 ("If the Trustees interpretation were correct, then
BCOA and the Union would have been empowered to create a conflict between a true NBCWA
and the 1974 Plan because they could have changed the rates to be paid the 1974 Plan by

Insofar as the summary judgment record shows, the BCOA and the UMWA never have agreed to increase employer contribution rates to any of the UMWA Funds through a plan amendment without a corresponding term in an NBCWA, and the prospect that they would so agree in the future seems remote. But that being said, Monterey does not even attempt to explain why a reading of the evergreen clause that would allow such joint action by the BCOA and the UMWA is "nonsensical." If the BCOA and the UMWA were to agree during the term of an NBCWA that an increase in contribution rates to the Trust is warranted, they readily could accomplish that result in one of two ways: they could amend the plan and trust documents incorporated by reference in the NBCWA, or they could modify the NBCWA itself mid-term. In either event, BCOA employers would have to shoulder the burden of that rate increase along with non-BCOA evergreen employers, producing a result that is neither inequitable nor inconsistent with the purposes of the evergreen clause in the slightest.

(c)  Third, Monterey argues (again in mantra-like fashion) that the Trust's argument runs afoul of the "labor law" principle, Monterey Mem. at 24, that a waiver of an employer's right to bargain over such issues as participation in and contributions to a multiemployer pension fund will not be found "[a]bsent an express statement or 'unequivocal manifestation' of intent to be bound in a collective bargaining group," *id.* at 13. *See also id.* at 14-15, 24-25, 38-40. This is a reprise of an argument "reject[ed]" by the D.C. Circuit in *Pittston* as "specious":

> As we explained in detail in *Link Coal*, the "waiver" argument misses the distinction between the waiver of a right and the exercise of a right that extends into the future. 970 F.2d at 905. "[T]o the extent that a bargain resolves any issue, it removes that issue *pro tanto* from the range of bargaining." *Id.* Here, the UMWA and the

---

amending Section B(8) without changing parallel provisions in a true NBCWA Agreement. This would create an irreconcilable conflict between the rate established in Article XX of a true NBCWA and the 1974 Plan").

> BCOA agreed [in the evergreen clause] on a basis for determining
> the employers' pension fund contributions. When the Coal
> Companies signed onto the applicable agreements, they bound
> themselves to abide by the agreed-upon contribution rates into the
> future. This was a valid exercise of bargaining rights, and the
> agreement reached by the parties is fully enforceable against the
> Coal Companies. There is no issue of waiver in this case.

*Pittston*, 984 F.2d at 479, *citing Connors v. Link Coal Inc.*, 970 F.2d 902 (D.C. Cir. 1992).

2.     Freeman goes on to argue that the Trust's amended trust argument "not only ignores [the] plain language [of the evergreen clause], but also contradicts its drafters' intent." Freeman Mem. at 36. As support for that argument, Freeman cites statements in two of the five declarations submitted by the Trust in *Pittston* and in the deposition testimony in this case of a third *Pittston* declarant (Donald Pierce) that – to use one of the declaration statements as an illustrative example—the drafters of the evergreen clause "did not create, and did not intend to create, an obligation to contribute to the Funds forever. The obligation to contribute continues only so long as successor NBCWAs are negotiated by BCOA and UMWA, and require contributions to the Funds." *See id.* at 37 (incorporating by reference Section I(A), pp. 19-22, of Freeman's brief). This argument is doubly flawed.

First, Freeman has taken the statements in two of the Trust's five *Pittston* declarations and in Donald Pierce's deposition testimony herein out of context, thereby distorting that extrinsic evidence regarding the "[evergreen clause] drafters' intent." Each of the Trust's five *Pittston* declarations (including one from Donald Pierce) speak at length about the intent of the evergreen clause, and each of those five declarations, read as a whole, gives the same account of what that intent was.[8] As previously noted, Roger Haynes, the BCOA's lead negotiator of the

---

[8] The five declarations are appended as Exhibits A-E to the Declaration of Julia Penny Clark, submitted on September 7, 2007 in support of the Trust's summary judgment motion (Dkt. #46-8) ("Clark Decl.").

evergreen clause, stated in his *Pittston* declaration that the intent of the evergreen clause was "to make sure that any coal operator that voluntarily agreed to participate in the Funds in 1978 could not simply walk away from the Funds and leave its retirees behind . . . at the expense of the remaining employers." *Supra* p. 10. As we show in the margin, the remaining four *Pittston* declarations are to the same effect.[9]

The five *Pittston* declarations thus corroborate, rather than contravene, the conclusion that flows ineluctably from the plain language of the evergreen clause itself — that where, as here, the continuation of contributions to the Trust by *all* coal operators "that voluntarily agreed to participate in the [Trust] in 1978" remains a "term[] and condition[] of the . . . Trust, as amended," *none* of those coal operators is free "simply [to] walk away from the [Trust] and leave its retirees behind . . . at the expense of the remaining employers."

Indeed, even taken in isolation, the statements seized upon by Freeman are a red herring. The central point of each of those statements is that the evergreen clause negotiators did not create, and did not intend to create, an obligation to contribute to the Funds that would of

---

[9] *See* Clark Decl., Exh. D (Declaration of K.L. Young) ¶ 8 ("The intent and effect of the evergreen clause" was "to ensure that if an employer chose to participate in 1978 or thereafter, that employer would have to participate on the same terms as all other participating employers. An expression that we used in the negotiations to convey this point was, 'If you want to play ball in our park [i.e., the Funds], you have to play by our rules [*i.e.,* the contributions required by the NBCWA *and trust documents*]'") (bracketed material in original; emphasis added); *id.*, Exh. C (Declaration of David W. Kempken) ¶ 6 ("[O]ur intent [in the evergreen clause] was to make sure that if an employer voluntarily agreed with the UMWA to participate in the Funds and to provide benefits through the Funds to its employees and retirees, then that employer would pay its fair share of the Funds' expenses, and not dump its liabilities onto the remaining employers"); *id.*, Exh. B (Declaration of B.M. Shaner) ¶ 6 ("The evergreen clause was intended to protect BCOA member companies against other employers pulling out of the Funds and dumping their liabilities on the remaining employers"); *id.*, Exh. A (Declaration of Donald E. Pierce, Jr.) ¶¶ 7-11 (The evergreen clause and its related plan and trust document provisions were intended to back up the UMWA's oral assurances at the bargaining table with iron-clad contract language "bind[ing] all employers who agreed to participate in the Trusts" to "pay the same levels of contributions that were required of BCOA members under the NBCWA," and precluding such employers from "withdraw[ing] from the Funds and leav[ing] liabilities as the responsibility of the remaining employers").

necessity continue "forever."  *See* Freeman Mem. at 20-21.   The Trust agrees wholeheartedly with that point, and its amended trust argument is not to the contrary, inasmuch as under that argument there is no contribution obligation to the Trust under the evergreen clause if at some future time the UMWA and the BCOA do not amend the plan and trust documents to impose such a contribution obligation.

Second, even if the extrinsic evidence cited by Freeman contravened the language of the evergreen clause – which it does not – Freeman's argument based on that extrinsic evidence would fail nevertheless under ERISA § 515 and the D.C. Circuit's decision in *BCOA v.Connors* construing and applying § 515.  As previously noted, *supra* pp. 6-7, the *BCOA v. Connors* Court held that § 515 "entitles pension funds to rely upon, and to enforce, the written terms of collective bargaining agreements insofar as they relate to pension contributions."  867 F.2d at 633.  A corollary to that rule, the Court held, is that the defendant employer in a § 515 suit may not rely on extrinsic evidence "to alter the terms of" a "facially valid trust agreement."  *Id.* at 635-36.  Applying that corollary, the Court waved off the defendant coal company's "suggestion that it should be permitted discovery regarding the bargaining history of the national agreement," stating:  "Section 515 *ends our inquiry* with a determination of what is required by the written terms of the Agreement."  *Id.* at 636 (emphasis added).

As we have shown, the evergreen clause *expressly provides on its face* that the contractual obligations imposed on employers by that clause are "not limited to" the obligation to make the contributions required by a successor NBCWA.  *Supra* pp. 7-8.   That being so, it is clear under controlling D.C. Circuit authority that Freeman may not rely on extrinsic evidence "to alter the terms of" the evergreen clause so as to provide that Freeman's contractual obligations thereunder *are* so "limited."

3.     Finally, Freeman asserts two alternative defenses to the Trust's claim that Freeman is required by the evergreen clause to make contributions to the Trust at the rates set out in the 2007 NBCWA by virtue of the 2007 BCOA-UMWA plan amendment imposing that requirement (and without regard to whether the 2007 NBCWA qualifies as a "true" successor agreement).

On the one hand, Freeman accepts the proposition that the BCOA (acting jointly with the UMWA) had the authority to adopt plan amendments to change contribution obligations, but argues that the BCOA's exercise of that authority in 2007 was *ultra vires* and of no legal force and effect, because at the time "BCOA was illegally constituted with only a single director in violation of District of Columbia law."  Freeman Mem. at 37; *id.* at 32-34.

On the other hand, Freeman contends that the BCOA did not have the authority to adopt the 2007 plan amendment at all, even in compliance with all applicable corporate formalities, "[b]ecause BCOA is no longer an association of 'employers,' but a shell for a single company." *Id.* at 37.  It follows, says Freeman, that BCOA's action (jointly with the UMWA) in amending the plan and trust documents in 2007 must be disregarded by this Court under traditional piercing-of-the-corporate-veil principles applicable "in a case like this." *Id.* at 26-28.

Both of these asserted defenses fail at their inception under ERISA § 515 and the D.C. Circuit's decision in *BCOA v. Connors*, *supra*, construing and applying § 515.  To reiterate, the *BCOA v. Connors* Court squarely held that a suit brought by a pension fund under § 515 to enforce the written terms of a collective bargaining agreement or a trust agreement "cannot be thwarted by defenses not apparent from the face of the Agreement."  867 F.2d at 634.  Here, as set out in our opening brief, the governing plan and trust documents *expressly provide on their face* that they may be amended by joint action of the Union and "The Employers" – defined to include all "Employers" who have signed a prior NBCWA – and that "[a]ny action of the

Employers which may, or must be taken hereunder *may be taken by BCOA*." *See* Pl. Mem. at 16-18 & nn.5 & 6 (emphasis added). In the latter regard, the express textual reference to action that "may be taken by BCOA" is unqualified: the plan and trust documents do *not* state that amendments thereto "may be taken" only by a BCOA acting in compliance with all applicable corporate formalities, and/or a BCOA that consists of multiple unaffiliated employers rather than a single group of affiliated employers. That being so, the defenses asserted by Freeman to the Trust's evergreen clause enforcement action under ERISA § 515 are "*not* apparent from the face of" the governing plan and trust documents, and they "*cannot* be [invoked by Freeman to] thwart[]" the Trust's enforcement action. 867 F.2d at 634 (emphasis added).

Although the foregoing is dispositive, we note that both of Freeman's asserted defenses would be unavailing even if this case were not an action by the Trust under ERISA § 515 to enforce the written terms of "a facially valid trust agreement." *Id.* at 636. As for Freeman's *ultra vires* defense based on the BCOA's asserted noncompliance with D.C. law governing nonprofit corporations, Freeman inexplicably ignores a provision of that law, entitled "**Defense of ultra vires**," which specifically enumerates the parties who have standing to assert such a defense—an enumeration that does *not* include non-members of the nonprofit corporation such as Freeman. *See* D.C. Code § 29-301.06 (2001 ed.).[10] And, as for Freeman's piercing-of-the-corporate-veil defense, Freeman cites no case law, and we know of none, recognizing and applying such a defense "in a case like this." Freeman Mem. at 26. The cases Freeman relies

---

[10] As the D.C. Circuit has observed in the context of an analogous provision in the D.C. law governing for-profit corporations, the above-referenced D.C. Code provision embodies "the modern view as to the limitations which should be placed upon capacity to challenge asserted excesses of corporate powers." *Association of Fair Competitive Practices in Air Conditioning, Inc. v. Public Service Comm'n*, 372 F.2d 934, 935 (D.C. Cir. 1967). The New York and Virginia cases cited by Freeman at page 33 of its supplemental brief are entirely consistent with that "modern view" and of no conceivable relevance here, inasmuch as both cases involved suits by corporate shareholders to invalidate alleged *ultra vires* acts of the corporation.

on, *id.* at 26-27, are cases in which the plaintiff sought to pierce the corporate veil as a means of upholding the corporate acts in question and binding the person controlling the corporation to those corporate acts.  Here, in direct contrast, Freeman seeks to press the piercing-of-the-corporate-veil doctrine into service as a means of invalidating the corporate acts in question and escaping a liability to the Trust that arose from those corporate acts.

*            *            *            *

The long and short of the matter is this.  The UMWA and the BCOA had the authority to amend and did amend the 1974 Pension Trust effective January 1, 2007 to make the payment of contributions set by the 2007 NBCWA a "term[] and condition[] of" the Trust, and under the plain language of the evergreen clause, Freeman and Monterey are "obligated and required to comply with th[at] term[] and condition[] of" the Trust.  *On this ground alone* – as to which there is no genuine issue of material fact – the Trust's summary judgment motion should be granted.[11]

    B.    Freeman's and Monterey's Non-Successor-Agreement Argument
              Also Fails on the Ground That the 2007 NBCWA *Is* a
              "Successor Agreement" Within the Meaning of the Evergreen Clause

In our opening brief, we also showed that there is a fully sufficient alternative ground for granting the Trust's summary judgment motion – that as a matter of law, the 2007 NBCWA *does*

---

[11] Monterey also asserts that the 1974 Pension Trust's Complaint pleads only a claim under the "successor agreement" theory and that the "amended trust" theory  should have been pleaded as a separate claim based on a violation of the 1974 Plan.  Monterey Mem. at 26-27 & n.19.  The Complaint, however, quotes the entire evergreen clause and specifically alleges that each defendant is obligated "[p]ursuant to the Evergreen Clause" (which, of course, is part of the 1974 Plan) to make contributions at the rate in the 2007 NBCWA. Cplt. (Dkt. #1) ¶¶  19, 25, 45. The Complaint also alleges that each defendant's failure to make those contributions is a violation of ERISA § 515, as well as of the collective bargaining agreement.  Cplt. ¶ 72.  Fairly construed, these allegations encompass both of the 1974 Pension Trust's arguments.  And, of course, the 1974 Pension Trust's motion for summary judgment in early September gave defendants ample notice of these arguments early in the discovery period.

17

qualify as a "successor agreement" under the evergreen clause. *See* Pl. Mem. at 20-24. And our

showing on this point, stripped to its essence, was that the 2007 NBCWA (like each NBCWA

that came before it) was an agreement between the UMWA and the BCOA of nationwide scope

that was designed to establish, and did establish, the industry standard respecting the terms and

conditions of employment under which UMWA-represented coal miners would work during the

period covered by that NBCWA.

Here again, Freeman and Monterey tender a smorgasbord of responsive arguments, and

here again, those responsive arguments fail.

1.    Freeman's principal responsive argument proceeds from the premise that

"Many Factors Influence Whether An Agreement Is A 'Successor Agreement' Within The

Meaning Of The Evergreen Clause." Freeman Mem. at 19 (section title). "*[T]he most*

important of those factors, says Freeman, is whether the Agreement in question has been

negotiated by a BCOA comprising multiple unaffiliated coal companies or, as here, a single

group of affiliated coal companies. *Id.* at 22 (emphasis in original). But according to Freeman,

other factors include: whether the BCOA has, in negotiating the Agreement, pursued the

interests of its own members to the exclusion of non-members, *id.* at 28-32; whether the BCOA,

in negotiating the Agreement, has observed all applicable corporate formalities, *id.* at 32-34; and

whether the UMWA had to resort to "coerci[ve]" tactics such as strikes in order to obtain near

universal industry-wide assent to the principal terms of the 2007 NBCWA, *id.* at 34-36.

This responsive argument suffers from the same fatal flaw as Freeman's response to the

Trust's amended trust argument. Under ERISA § 515, the Trust is entitled to enforce the

evergreen clause in accordance with its written terms, *supra* pp. 6-7, and there quite simply is

nothing on the face of the evergreen clause to suggest that any of the "[m]any [f]actors" Freeman

points to are relevant in determining whether an NBCWA negotiated by the UMWA and the

BCOA constitutes a "successor" NBCWA.  It is apparent in these circumstances that what

Freeman is asking this Court to do is impose *unstated conditions* on the unqualified obligation of

evergreen clause signatory employers to, *inter alia*, "mak[e] the contributions required under the

National Bituminous Coal Wage Agreement of 1978 . . . and any successor agreements thereto"

– a result that would run afoul of the D.C. Circuit's decision in *BCOA v. Connors.*

  Notably, in pressing its argument along these lines, Freeman seeks to make much of the

undisputed fact that "BCOA was a multi-employer bargaining unit comprised of multiple

unaffiliated companies when it negotiated every other NBCWA [that has included the evergreen

clause] – the NBCWAs of 1978, 1981, 1984, 1988, 1993, 1998, and 2002."  Freeman Mem. at

23.  But the mere fact that BCOA historically has represented multiple unaffiliated companies in

negotiations with the UMWA affords no basis for reading such an unstated requirement into the

evergreen clause.  On this line of reasoning, any number of additional unstated requirements

could be read into the evergreen clause, including the requirement that an NBCWA does not

qualify as a "successor agreement" unless it is negotiated by a BCOA whose member companies

together produce a "significant percentage" of "the unionized coal in the United States."  *See id.*

at 1.[12]  That is a slippery slope which *BCOA v. Connors* blocks at its highest point.

    2.  Without saying so directly, Freeman also seeks to leave the impression

that the *Pittston* decision forecloses the Trust's contention in this case that the 2007 NBCWA

qualifies as a successor agreement under the evergreen clause.  Thus, after belaboring the point

---

[12] Hinting at an argument that such an additional unstated requirement should be imposed by the
Court, Freeman represents in its supplemental brief that at the time of the 2007 NBCWA
negotiations, Consol and its affiliated companies produced less than 7% of "the unionized coal in
the United States."  Freeman Mem. at 1, 7.  But, as the UMWA Supplemental Reply
Memorandum (filed today in Case 07-cv-1050) explains, at 8-9, that representation is based on a
misreading of the deposition testimony of Peter J. Lilly.  What Lilly said was that Consol and its
affiliated companies together produce less than 7% of *all* coal produced in the United States.  In
actuality, Consol and its affiliate companies produced upwards of 30 percent of "the unionized
coal" in the United States in 2007.  *Id.*

that BCOA was composed of only one group of affiliated coal companies when it negotiated the 2007 NBCWA, Freeman states that "[u]nder *Pittston,* a single employer's 'individual collective bargaining agreement[] with the UMWA' cannot be a 'successor agreement[]' within the meaning of the evergreen clause."  Freeman Mem. at 28 (quoting *In re United Mineworkers of America Employee Benefit Plan Litigation,* 782 F. Supp. 658, 662-63 (D.D.C. 1992)); *see also* Freeman Mem. at 19-20.  The impression Freeman seeks to leave is a false one that distorts the *Pittston* decision beyond recognition.

The question presented in *Pittston* was whether it was permissible for individual coal companies that signed the evergreen clause and later "withdrew from the BCOA" to "negotiate[] individual labor agreements with the UMWA which included modifications of" the contribution requirements set out in the NBCWA between the UMWA and the BCOA.  984 F.2d at 472.  The *Pittston* court answered this question in the negative, rejecting, *inter alia,* the non-BCOA-member coal companies' argument that their individual "non-NBCWA labor agreements" with the UMWA qualified as "successor agreements" under the evergreen clause.  *Id.* at 475.  In so doing, the *Pittston* court had no occasion to address, and did *not* address, the altogether different question of whether an NBCWA between the UMWA and a BCOA consisting of a single group of affiliated coal companies would qualify as a "successor agreement" under the evergreen clause.

3.    Beyond the foregoing, Freeman and Monterey make the same arguments in response to the Trust's second ground for summary judgment as they do in response to the Trust's first ground.  *See* Freeman Mem. at 26-28 (Freeman's piercing-the-corporate-veil argument); *id.* at 32-34 (Freeman's *ultra vires* argument); Monterey Mem. at 13-15 (Monterey's waiver argument).  As we already have shown, each of those arguments is wholly without merit.

\*          \*          \*          \*

20

In sum, Freeman and Monterey have failed to contravene the Trust's showing that it is entitled to summary judgment on the alternative ground that the 2007 NBCWA *does* qualify as a "successor agreement" under the evergreen clause.

II.    **THERE IS NO MERIT IN MONTEREY'S ARGUMENT THAT WHAT IT CALLS THE "DISCONTINUANCE OF CONTRIBUTIONS" PROVISION IN THE 1974 PENSION PLAN "SUPERSEDES AND NEGATES THE TRUSTEES' RELIANCE ON THE EVERGREEN CLAUSE AS A BASIS FOR ITS CLAIM IN THIS CASE."**

In its initial memorandum in opposition to the Trust's summary judgment motion, Monterey argued that "[a] separate 'discontinuance of contributions' provision in the UMWA Pension Plan – which was not before the court in *Pittston* – supersedes and negates the Trustees' reliance on the evergreen clause as a basis for its claim in this case." *See* Monterey Memorandum in Opposition (Dkt. #55) at 13.

We addressed Monterey's argument based on the "discontinuance of contributions" provision in our initial reply memorandum, and showed that Monterey's argument gives new meaning to the words "last ditch." *See* Initial Reply Memorandum (Dkt. # 59) at 20-24. Specifically, we showed that the plan and trust documents governing the Trust belie the notion that the "discontinuance of contributions" provision "supersedes" and "negates" the continuing contributions obligation imposed by the evergreen clause under the circumstances presented here – or under *any* circumstances for that matter.  Rather, it is abundantly clear that the limited purpose and effect of the "discontinuance of contributions" provision is to comply with a Treasury Regulation mandating that a provision safeguarding the right of plan participants to receive accrued pension benefits upon plan termination *or its functional equivalent* – the permanent cessation of contributions to the Trust – be included in the plan document as a condition of the Trust's tax-exempt status.

Monterey continues to press this last-ditch argument in its supplemental memorandum in opposition,[13] but Monterey's tactic in doing so is to distort the responsive arguments made by the Trust in its initial reply memorandum.  According to Monterey, "[t]he *only* substantive argument offered by the Trustees [in their initial reply memorandum] to support their contention that the discontinuance provision is relevant only to intentionally permanent cessations of contributions" – and irrelevant insofar as the evergreen clause is concerned – is the Trustees' "surmise that the provision was included in the 1974 Plan to conform the Plan to governmental regulations." Monterey Mem. at 36 (emphasis added).  That simply is not so.  The Trustees also argued that it was highly probative – if not dispositive – that the "discontinuance of contributions" provision (i) was agreed to four years *before* the evergreen clause was agreed to, and (ii) was placed in the plan document only, and not, like the evergreen clause, in *both* the plan document *and* the trust document.  *See* Initial Reply Memorandum at 20-21.  Monterey has no answer to these additional arguments, so it chooses instead to wish them away.

As for the one argument made by the Trust that Monterey deigns to acknowledge, Monterey's retort is that the Trustees' "surmise" regarding the limited purpose and effect of the "discontinuance of contributions" provision cannot be credited, inasmuch as it "is drawn from a comparison of the similarity of language in the cited Treasury Regulation and is not supported by extrinsic evidence of the intention of the [provision's] drafters."  Monterey Mem. at 36.  That retort is doubly flawed.  First, the inference to be drawn from the fact that a pension plan provision mirrors the language of a federal regulation requiring such provisions to be placed in ERISA pension plans is an exceptionally strong one to say the least, *e.g. U.S. v. City of Fulton*, 475 U.S. 657, 671-72 (1986) (rejecting contention that contractual language that tracked the

---

[13] Although Freeman adopted Monterey's argument in its initial memorandum in opposition to the Trust's summary judgment motion, *see* Freeman Memorandum in Opposition (Dkt. # 57) at 10 n.1, Freeman does not do so in its supplemental memorandum in opposition.

language of a statute was intended to achieve a different result from the statute, where respondent did not submit evidence to the contrary).  It is no mere "surmise" as Monterey would have it.  Second, given the strength of that inference, the absence of "support[ing]" extrinsic evidence hardly is a shortcoming in the Trust's argument.  The same cannot be said of Monterey's failure, after a full opportunity for discovery, to adduce extrinsic evidence "support[ing]" its *ipse dixit* respecting "the intention of the [provision's] drafters."

Taking its argument based on the "discontinuance of contributions" provision to truly ridiculous extremes, Monterey proceeds to argue that "[t]he Trustees certainly have not established that the BCOA member companies who ratified the 1978 NBCWA, and who were aware of the discontinuance clause, did not or could not have considered the clause as establishing one of the watershed conditions terminating the binding effect of the evergreen clause on their future obligation to contribute to the 1974 Plan . . . ."  Monterey Mem. at 36. This argument stands the ERISA § 515 law, *see supra* pp. 6-7, on its head.  Under that law, it is not the Trustees' burden to "establish[]" that the parties to the 1978 NBCWA "did not" intend or "could not have" intended that the previously-negotiated "discontinuance of contributions" provision would negate the binding effect of the evergreen clause under certain "watershed conditions."  Rather, it is *Monterey's* burden to "establish[]"  that, *on the face of the governing plan and trust documents*, the "discontinuance of contributions" provision negates the evergreen clause upon the occurrence of such "watershed conditions."  Monterey has not met, and cannot meet, that burden.

## CONCLUSION

For the foregoing reasons, as well as those set forth in the Trust's prior memoranda, the

Trust's Motion for Summary Judgment on the Issue of Liability (Dkt. #46) should be granted.

Respectfully submitted,

_____/s/_____
JULIA PENNY CLARK
D.C. Bar No. 269609
ANDREW D. ROTH
D.C. Bar No. 414038
CHARLOTTE GARDEN
D.C. Bar No. 489040
Bredhoff & Kaiser P.L.L.C.
805 Fifteenth Street N.W.
Suite 1000
Washington, DC 20005
Telephone:  202-842-2600

*Counsel for Plaintiffs Michael H. Holland,
Micheal W. Buckner, B.V. Hyler and Steven
F. Schaab and the United Mine Workers of
America 1974 Pension Trust*

DAVID W. ALLEN
General Counsel
D.C. Bar No. 81638
LARRY D. NEWSOME
Associate General Counsel
D.C. Bar No. 254763
CHRISTOPHER F. CLARKE
Senior Assistant General Counsel
D.C. Bar No. 441708
UMWA HEALTH & RETIREMENT
FUNDS
Office of the General Counsel
2121 K Street, N.W.
Washington, D.C.  20037
Telephone:  202-521-2238

24