UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Michael H. Holland, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  07-cv-490 (PLF) |
| | ) | |
| Freeman United Coal Mining Co., et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| Freeman United Coal Mining Co., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  07-cv-1050 (PLF) |
| | ) | |
| United Mine Workers of America, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**SUPPLEMENTAL REPLY MEMORANDUM IN SUPPORT OF
THE UNITED MINE WORKERS OF AMERICA'S
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Local Civil Rules 7(a) and 56.1, and this Court's February 25, 2008 scheduling order, Defendant United Mine Workers of America ("UMWA" or "Union"), by its undersigned counsel, hereby submits its reply memorandum in support of its motion for summary judgment.  As demonstrated below, the supplemental brief filed by Freeman United Coal Mining Company ("Freeman") fails to demonstrate why the UMWA is not entitled to the relief it requests.

In its supplemental brief, Freeman opposes the Union's motion for summary judgment because it claims that the 2007 National Bituminous Coal Wage Agreement ("2007 NBCWA") is a single-employer agreement which was not bargained for by a multi-employer association and thus, cannot be considered a "successor" agreement under the evergreen clause. As previously explained by the Union and as discussed again below, the underlying reasons Freeman relies upon for its collateral attack on the 2007 NBCWA find no support in the record evidence, the language of the evergreen clause or the interpretation of that language by this Circuit in United Mine Workers of America 1974 Pension Plan v. Pittston Co., 984 F.2d 469 (D.C. Cir. 1993).

The evergreen clause, negotiated by the Union and the Bituminous Coal Operators' Association ("BCOA") and included in each NBCWA from 1978 through the most current 2007 NBCWA, requires employers - like Freeman and Monterey (signatories to previous NBCWAs that contained the "evergreen" language) - to continue to make contributions to the 1974 UMWA Pension Plan ("1974 Plan) at rates set forth in successor NBCWAs regardless of whether these employers are still parties to the subsequent agreements. See Pittston, 984 F.2d at 474. The evergreen clause ensured that the 1974 Plan would not become "a last man's club" with an increasing number of Employers pulling out, leaving a dwindling group of participating Employers to shoulder an ever expanding financial burden for their retirees, as well as the retirees of withdrawing Employers. See In Re United Mine Workers of America Benefit Plans Litigation, 782 F.Supp. 658, 665-66 (D.D.C. 1992).

If this Court were to accept the arguments presented by Freeman in its supplemental filing, the inevitable result would lead to the precise outcome the evergreen clause seeks to prevent - a "last man's club" with employers like Freeman and Monterey allowed to walk away

from the obligations they owe to their retirees. The 2007 NBCWA is a valid agreement which establishes, on a nationwide scale, the terms and conditions of employment for an overwhelming majority of UMWA members employed in the organized sector of the bituminous coal industry. Moreover, from the inception of bargaining both the Union and the organized sector of the bituminous coal industry understood that the resulting agreement would be considered a successor labor contract to previous NBCWAs dating back more than 50 years to the time when the Union and the BCOA first began their collective bargaining relationship.

Although the industry has changed a great deal in the last 50 years, with a significant degree of consolidation occurring during that time, these changes provide added urgency and relevance to the underlying purpose of the evergreen clause. Despite Freeman's suggestions to the contrary, such changes do not provide any basis to support the claim that the 2007 NBCWA is not a successor agreement under the evergreen clause. Therefore, the Union respectfully requests that this Court grant its motion for summary judgment and prevent Freeman from shirking obligations owed to its retirees.

I.    **THE EVERGREEN CLAUSE DOES NOT CONTAIN A CONDITION THAT A SUCCESSOR AGREEMENT MUST ONLY BE REACHED AS THE RESULT OF MULTI-EMPLOYER BARGAINING**

Freeman claims that the 2007 NBCWA cannot be a successor agreement under the evergreen clause because it was not the result of multi-employer bargaining. See Freeman's Supplemental Opposition, at 1, 2, 6, 7, 22-27. It is from this factual premise that Freeman constructs the entirety of its opposition to the Union's motion for summary judgment. This fundamental premise, however, is false.

3

The evergreen clause does not contain the restriction that Freeman asks this Court to read into the contractual language.  Rather, the evergreen clause provides that:

> Any Employer who employed any participant eligible for coverage under, or who received or receives benefits under, the 1974 Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto, including, but not limited to the [then current] National Bituminous Coal Wage Agreement

It is difficult to see how Freeman falsely extrapolates from this language a requirement that the Union must only deal with a multi-employer association when seeking to bargain a successor NBCWA.

Although Freeman suggests that this Circuit's Pittston decision supports its strained reading of the evergreen clause, that case does not impose the added condition that Freeman asks this Court to adopt.   Pittston does not stand for the proposition that, in order to qualify as a successor to an NBCWA, a subsequent agreement must be negotiated by a multi-employer association.

The Pittston decision was based upon this Court's understanding that "the [evergreen] clause was intended to ensure that all participating employers would contribute equally to the Trusts and would not be permitted to withdraw from participation and leave the burden for funding the pensions and health benefits of retired miners to the remaining employers."   In Re United Mine Workers of America Benefit Plans Litigation, 782 F. Supp. at 667.  Because the labor agreements negotiated by the employers in Pittston were viewed as the first step in

4

rendering the UMWA Funds a "last man's club," such agreements were correctly rejected by this Court and the D.C. Circuit.

Here, by suggesting that an NBCWA can only be reached by multi-employer bargaining, Freeman seeks to accomplish the same result rejected by <u>Pittson</u>. For the same reasons relied on by <u>Pittston</u>, this renewed effort must fail. Freeman must not be allowed to convert the 1974 Plan into a last man's club by virtue of a non-existent condition that it insists upon reading into the evergreen clause.[1]

In <u>Pittson</u>, this Circuit emphatically rejected a direct attack on the evergreen clause by coal operators who sought to negotiate their way out of previous commitments made to their retirees and dump those obligations on a shrinking base of responsible employers. This Court must reject with equal force Freeman and Monterey's collateral attack on the evergreen clause. The back door through which Freeman and Monterey seek to escape their evergreen obligations simply does not exist.

---

[1]Because neither the evergreen clause, nor <u>Pittston</u> require a successor NBCWA to be the result of multi-employer bargaining, the attention Freeman focuses on the internal corporate structure of BCOA is wholly misplaced. In addition, the Union incorporates by reference the arguments set forth by both the 1974 Plan and BCOA that provide alternate reasons for rejecting Freeman's attempt to avoid its evergreen obligations by alleging shortcomings in BCOA's corporate governance. Finally, the Union also notes that if this Court were to adopt Freeman's reasoning, such a ruling would lead to the extremely odd result of encouraging employers to disregard their own by-laws so that they could then use this ploy to avoid obligations they make in collective bargaining.

## II.    THE 2007 NBCWA WAS NEVER A SINGLE-EMPLOYER AGREEMENT AS FREEMAN SUGGESTS

In addition to its misguided effort to rewrite the evergreen clause, Freeman also falsely claims that the 2007 NBCWA cannot be a successor agreement under the evergreen clause because it is a single-employer agreement with Consol Energy Inc. ("Consol") - an employer that Freeman would have this Court believe is only a bit player in the unionized segment of the bituminous coal industry, producing "less than 7% of the unionized coal in the United States." See Freeman Supplemental Brief, at 1, 7.  Freeman neglects to explain how such a marginal company could also simultaneously dominate the BCOA and, according to Freeman, take steps to impose unfavorable contract terms on other coal industry employers that controlled the remaining 93 % of the unionized coal.  Similarly, Freeman neglects to explain why, together with Monterey, it is the only coal company that protested this purported arrangement, while the remaining 93% of the unionized coal industry stayed silent.  Aside from these significant unanswered questions, the Union submits that Freeman's claim that the 2007 NBCWA is a single-employer agreement is simply false.

In its initial submissions in support of summary judgment, the Union explained that it entered into an agreement with a non-BCOA company that agreed to be bound by the terms of the 2007 NBCWA prior to its negotiation.  See Reply Memorandum in Support of United Mine Workers of America's Motion for Summary Judgment, at 6 and Exhibit 1.  As the Union previously explained, that agreement - reached with Ohio Valley Coal Company - served to contradict Freeman's attack on the national character and scope of the 2007 NBCWA.  Id.  This agreement, however, also unquestionably establishes that the 2007 NBCWA was not a single-

employer agreement as Freeman repeatedly claims throughout its supplemental filing.[2]

At a minimum, after its ratification, the 2007 NBCWA covered the employees of at least two major coal operators. Freeman does not contest this fact. Rather, Freeman's supplemental filing simply ignores the existence of the Ohio Valley agreement and the devastating impact such an agreement has upon its collateral attack on the 2007 NBCWA. Once it is established that the 2007 NBCWA is not a single-employer agreement, the entirety of Freeman's argument which relies on this premise crumbles away.

### III. FREEMAN'S SUPPLEMENTAL SUBMISSION IS LITTLE MORE THAN A LOOSE COLLECTION OF FACTUAL MISSTATEMENTS AND MISCHARACTERIZATIONS OF THE RECORD

After it is recognized that 1) the evergreen clause does not limit successor agreements to labor contracts bargained with multi-employer associations and 2) the 2007 NBCWA was never a single-employer agreement, the remaining portion of Freeman's supplemental filing is readily exposed as nothing more than an incredibly brazen combination of wild distortions of the record, blatant mischarcterizations of testimony and in many cases flat out incorrect assertions as to what the record includes. Indeed, Freeman's consistent disregard for the record facts renders its most recent submission to the Court more akin to a fictional memoir where cracks quickly appear once the many little pieces of its argument are given a closer look. Although not material, the Union submits that, because of the consistently outrageous manner in which Freeman presents the "facts" of this case, a brief response to some of the more egregious examples of the "factual"

---

[2]Ohio Valley Coal Company is a significant operator in the organized sector of the bituminous coal industry. Indeed, based upon publicly available information maintained by the U.S .Department of Energy's Energy Information Administration ("EIA"), Ohio Valley Coal Company produced 4,370,226 tons of coal in 2006. This tonnage information can be found at the EIA's website located at www.eia.doe.gov/cneaf/coal/page/database.html.

pieces of Freeman's argument is both appropriate and necessary.

The first example of Freeman's willingness to mold the "facts" of this case to more closely fit its argument can be seen in Freeman's previously discussed suggestion that Consol produced less than 7 % of the unionized coal in the United States but yet, through its participation in the BCOA, was able to impose a collective bargaining agreement upon the remaining 93 % of the organized bituminous coal industry. The implied injustice that Freeman seeks to create, while portraying itself as an unwitting victim is not subtle. It also is not accurate.

Freeman's 7% figure is based upon one line of deposition testimony from Peter Lilly - the President of Consol Energy and the individual who negotiated the terms of the 2007 NBCWA on behalf of BCOA. See Freeman's Supplement Brief, at 7. In response to a question posed to Mr. Lilly concerning "market share," and after several objections to the underlying question, Mr. Lilly first defined his understanding of market share as "Consol's share of the US production." See Freeman Appendix at 135, (page 151 of Lilly Deposition, lines 21-22). Mr. Lilly then stated that in 2006 Consol controlled approximately "six to six and a half, seven percent" of that market. Id. (page 151 of Lilly Deposition, lines 24-25). Mr. Lilly further qualified his answer by explaining that the extent of Consol's coal production would "depend[ ] on how you define the market." Id. (page 152 of Lilly Deposition, lines 1-2).

At no point during Mr. Lilly's examination did counsel for Freeman suggest, nor did the witness state, that the relevant market share was confined or restricted to Consol's production of unionized coal. Nevertheless, undeterred from facts not in the record, Freeman relies on Mr. Lilly's statement as the sole basis for its claim that Consol produced less than 7 % of the total unionized coal in the United States.

8

Contrary to Freeman's claim, Consol is not a marginal coal producer in the unionized segment of the bituminous coal industry. Indeed, based on publicly available information, in 2006 Consol produced approximately 33% of the NBCWA coal tonnage.[3] This production, when coupled with the significant amount of production by Ohio Valley, demonstrates that immediately upon ratification the 2007 NBCWA covered the terms and conditions of employment for the employees of two of the major unionized coal producers in the United States. Moreover, with other major coal producers like Peabody already indicating their acknowledgment of the 2007 NBCWA as a successor agreement under the evergreen clause" (see Freeman Appendix, at A372), Freeman's portrayal of this agreement as tantamount to the "smallest mine company in the United States" negotiating on behalf of the BCOA and then binding every other coal mining company to that agreement is utter nonsense. See Freeman's Supplement Brief, at 25.

---

[3] According to the U.S. Dep't. of Engery/EIA's databases, during 2006 - the most current year for which such information is available - approximately 1.162 billion tons of coal was produced in the U.S. See www.eia.doe.gov/cneaf/coal/page/database.html. In addition, based upon information maintained by the EIA on its website, approximately 1.030 billion tons of this total tonnage was produced on a non-union (or non-UMWA-represented) basis, and that approximately 133 million tons (or approximately 11% of all U.S. production) was produced on a UMWA-represented basis. BCOA members produced 34,044,804 tons of coal during 2006, see Freeman Appendix at A728 (BCOA Annual Coal Production Report), or approximately 26% of all UMWA-represented coal in the U.S. UMWA-represented coal production includes mining operations covered by the NBCWA, as well as mining operations covered by non-NBCWA contracts, including certain surface mining agreements which historically have covered UMWA members working in surface mines in the western U.S. When viewed solely as a share of the coal produced under the NBCWA (approximately 102 million tons, or 77% of the unionized coal produced in 2006), the BCOA members produced approximately 33% of all coal tonnage produced under the NBCWA during 2006.

It was because of Consol's tonnage, that the remaining BCOA members, like Peabody, voluntarily decided not to continue their membership. As Mr. Lilly explained during his deposition, the departing employers recognized that they did not have sufficient tonnage to control the decision-making process in negotiations regardless of whether they stayed in the BCOA. See Freeman Appendix, at 104 (Lilly Deposition, page 29, lines 1-20). Therefore, even if they remained in the BCOA, because of the tonnage disparity between Consol and other BCOA members, that decision would have had no significant impact on the bargaining between the Union and BCOA.[4]

Despite Freeman's claim, Consol did not "force[ ] all companies to withdraw from BCOA." More importantly, the departing employers expressly stated to the Union that they still considered the 2007 contract to be bargained between the UMWA and BCOA as a successor NBWA which would set the contribution rates required under the evergreen clause. The Union's President, Cecil Roberts, explained that during negotiations for the 2007 NBCWA he also spoke with Jiri Nemec - the President of Peabody Coal - who acknowledged that the applicable contribution rate under the evergreen clause "would obviously be driven by the BCOA negotiations." See Freeman Appendix, at A372 (Roberts Deposition, at 106, lines 3-10.). By withdrawing from BCOA, Peabody and other coal operators would have to decide if they would accept the terms of the resulting 2007 NBCWA (other than the 1974 Plan contribution rates set forth in Article XX), or would seek to negotiate a different agreement.

---

[4]For the same reason, Freeman's allegation that another coal operator - Jim Walters Resources, Inc. - sought to join BCOA but was refused membership is not relevant. Freeman does not contend that BCOA membership by this coal operator would alter the significant tonnage advantage of Consol. Thus, if this coal operator had joined BCOA, it would not have altered, in any way, how the subsequent negotiations between the Union and BCOA took place.

Freeman's claim that 2007 NBCWA was result of "secret" negotiations is also flat out wrong and concocted to support Freeman's attempt to present itself as the victim of a non-existent conspiracy. The organized sector of the bituminous coal industry was well aware of the 2007 negotiations between the Union and BCOA. As discussed above, former BCOA members like Peabody not only knew that negotiations were occurring but also understood the impact of those negotiations upon their evergreen obligation. Moreover, during negotiations that led to the 2007 NBCWA, Mr. Lilly explained that he received telephone calls from other coal companies and confirmed that negotiations were taking place. See Freeman Appendix, at 105-06 (Lilly Deposition, pages 32-35).

To the extent that the Union and BCOA did not disclose the terms of the 2007 NBCWA before they were finalized and ratified, this practice was no different than during previous negotiations. As President Roberts explained, such a practice was also followed during negotiations in 1996, 1998 and 2002. See Freeman Appendix, at 363 (Roberts Deposition, pages 70-71). President Roberts also explained that the purpose of keeping the negotiations confined to the "bargaining table" was not motivated by a specific desire to withhold information from any individual or company within the industry. Id. (Roberts Deposition, at 71, lines 6-10). Rather, the parties agreed not to speak about the negotiations because they knew once the media began to report on the progress of bargaining, reaching a final agreement would become much more difficult. Id. (Roberts Deposition, at 71, lines12-18).

As evident from the above, the record is devoid of any support for Freeman's implication that the 2007 NBCWA negotiations were conducted in an unusual, clandestine or nefarious manner. Moreover, although it alleges that the 2007 NBCWA was a "secret, sweetheart deal,"

11

Freeman fails to explain why it (along with Monterey) remain the only employers in the organized sector of the bituminous coal industry that do not view the 2007 NBCWA as a national agreement and as the successor to previous agreements between the UWMA and BCOA.

Freeman also claims that the 2007 NBCWA provided important benefits to Consol that were of no benefit to "Freeman and other coal companies." See Freeman Supplemental Brief, at 11. In making this argument, Freeman again suggests that the facts support their "victim" argument and their view of this case as an "us" (Freeman and the entire coal industry) versus "them" (Consol) scenario. The facts relied on by Freeman suggest a much different reality. For example, Freeman states that the elimination of retiree health care for new hires "was of no benefit to Freeman or to other coal companies that provide health care benefits to retirees via separate agreements." See Freeman Supplemental Brief, at 11. Freeman does not provide the names of any of the "other coal companies." Not surprisingly, the only portion of the record relied on by Freeman for its sweeping claim can be found in one paragraph of a declaration submitted by a longtime Freeman employee who only states that "[t]he elimination of retiree healthcare for new miners is of no benefit to Freeman." See Freeman Appendix, at A561, ¶ 14 (Austin Declaration).

Freeman also relies on the Austin Declaration to support its claim that more flexible scheduling which was included in the 2007 NBCWA benefitted Consol at the expense of the rest of the industry, and that legislative changes secured in part by the BCOA also disproportionately benefitted Consol over the rest of the coal industry. See Freeman Supplement Brief, at 11. The declaration submitted by Mr. Austin, a Freeman employee of more than 30 years, makes absolutely no reference and offers no insight into how the "other coal companies" view the

12

benefits provided by the 2007 NBCWA, or how those benefits impact their operations. This declaration merely establishes that Freeman was not particularly fond of the 2007 NBCWA. Such a revelation, however, falls significantly short of demonstrating any industry-wide discontent with the 2007 NBCWA, as Freeman disingenuously implies in its submission to the Court. Freeman points to no evidence in the record that would allow the Court to deem Freeman's opinion of the 2007 NBCWA as representative of the entire coal industry.

The final example that calls into serious question Freeman's obligation to present its argument based on the record facts involves its claim that the contribution rates set in the 2007 NBCWA negotiations were established to provide Consol a competitive advantage over other coal companies. Specifically, Freeman states that "a former Consol executive admitted that Consol established new contribution rates in order to gain a competitive advantage over other coal companies who would bound by the 2007 Agreement." See Freeman's Supplemental Brief, at 15.

In support of its allegation, Freeman relies solely on the declaration of William D. Stanhagen - a former Consol employee. See Freeman Appendix, at A563. In his declaration, Mr. Stanhagen states that the alleged "competitive advantage" statement was made to him by Patricia Lang, also a former Consol employee and previous Vice-President of Human Resources for the company. Id. at A564-565. While casually lobbing this incendiary accusation, Freeman fails to disclose to the Court that during the deposition of Ms. Lang, she categorically denied making any such statement to Mr. Stanhagen. See Freeman Appendix, A071 (Lang Deposition, at 161, lines 18-24.).

13

Freeman also neglects to inform the Court that substantial issues concerning the credibility of Mr. Stanhagen as a witness were uncovered during the course of discovery. For example, in response to a question by counsel for Freeman, Ms. Lang stated that the last time she spoke to Mr. Stanhagen was "via a telephone call after he left Consol on a disciplinary matter." See Freeman Appendix, A072 (Lang Deposition, at 165, lines 8-12). Upon further questioning by Freeman's counsel concerning the substance of that conversation, Ms. Lang indicated that "[b]asically [Consol] had to let [Mr. Stanhagen] go because he refused to get treatment for what appeared to be a drug and alcohol problem." See Freeman Appendix, at A072 (Lang Deposition, at 165, lines 19-21.) Ms. Lang also explained that Mr. Stanhagen "made some threats to some individuals at work" and "left a number of lewd voice mails for one of the secretaries." See Freeman Appendix, at A072-73 (Lang Deposition, at 165, lines 24-24; 166, lines 2-3). Based upon this additional testimony, the Union submits that any reliance Freeman places on Mr. Stanhagen's statements is misplaced, particularly with respect to the serious allegation it makes concerning the intention of the bargaining parties when setting the contribution rates contained in the 2007 NBCWA. Obviously, Mr. Stanhagen is nothing more than a disgruntled former Consol employee with no first hand knowledge of any material fact.

In its previous submission, the Union explained that the underlying motivation for setting the contribution rates in the 2007 NBCWA was driven by the concerns over compliance with the recently passed federal pension legislation - the Pension Protection Act of 2006. See Memorandum of Points and Authorities in Support of UMWA's Motion for Summary Jugement, at 8 and Defendant United Mine Workers of America's Statement of Material Facts As to Which There is No Genuine Issue, at ¶¶ 11-14. During discovery, the parties' reiterated this view.

14

For example, President Roberts explained that during 2007 NBCWA negotiations the parties were very aware of "legislation ongoing on Capitol Hill that put greater restrictions on pension plans" and had the potential of imposing "severe penalties" if a plan did not maintain certain funding levels. See Freeman Appendix, at A364 (Roberts' Deposition, at 77, lines 11-22.) President Roberts explained that much of the parties' disagreement in this area involved how close the 1974 Plan was to the statutory threshold and what contribution rate was needed to keep it from surpassing that statutory threshold. See Freeman Appendix, at A365-366. President Roberts also stated that during this aspect of the negotiations "BCOA was concerned about the risk the industry as a whole would be running."

Peter Lilly, the BCOA negotiator for the 2007 NBCWA, echoed the same concerns articulated by President Roberts. He explained that during negotiations BCOA was also concerned with "the potential severe penalty if the funding dropped below a threshold level." See Freeman Appendix, at A127 (Lilly Deposition, at 119, lines 20-25. In addition, Mr. Lilly also stated that regardless of whether the parties agreed to pension benefit increases it was his understanding that the funding level of the 1974 Plan would require an increase in contribution rates to comply with the new statutory funding levels. See Freeman Appendix, at A124 (Lilly Deposition, at 109, lines 8-15.)

Given the ample record evidence discussed above, the Union can think of no legitimate reason why Freeman would not disclose this information to the Court. Freeman's failure to do so, and its highly questionable reliance on the declaration of Mr. Stanhagen provides a fitting example of how it has litigated this case from its inception, determined to advance its far-fetched conspiracy theory regarding the 2007 NBCWA completely unencumbered by the actual language

15

of evergreen clause; the underlying rationale which led to the <u>Pittson</u> decision; or the record

evidence developed in this case - all of which demonstrate that Freeman's case against the Union

is completely without merit.

## IV.    THE 2007 NBCWA IS A SUCCESSOR AGREEMENT UNDER THE EVERGREEN CLAUSE

In its initial filing in support of its motion for summary judgment, the Union explained

that the 2007 NBCWA must be seen as a successor agreement to previous NBCWAs and

therefore, under the evergreen clause, this agreement is properly viewed as setting the

contribution rates owed to the 1974 Plan by companies like Freeman and Monterey.  As

explained above, Freeman does not provide this Court with any reason to reject the Union's

position.  Moreover, nothing in the voluminous amount of discovery demanded by Freeman

raises any question concerning the status of the 2007 NBCWA as a successor agreement.[5]

For example, President Roberts explained that prior to the commencement of bargaining

for the 2007 NBCWA, the Union conducted the same type of preparations as it did in the past.

The Union held its Convention to survey its membership and determine what issues they

considered important.  <u>See</u> Freeman's Appendix, at A358 (Roberts Deposition, at 52, lines 11-

22).  The Union's Convention was not limited to members who worked for Consol or Consol

subsidiaries - as one would expect if the Union considered its upcoming negotiations to only be

limited to Consol.  <u>See</u> Freeman Appendix, at A363 (Roberts Deposition, at 71 (lines 20-22), 72

(lines 1-22), 73 (lines 1-22) and 74 (lines 1-22).

---

[5]In its supplemental filing, the 1974 Plan provides additional grounds to demonstrate why the claims brought by Freeman and Monterey should be dismissed.  The Union incorporates by reference those arguments as further grounds to reject the effort by these coal operators to avoid their obligations under the evergreen clause.

Similarly, President Roberts explained that as part of the Union's pre-negotiation preparation it also conducted research on an industry wide basis with respect to pension and health benefit costs. See Freeman's Appendix, at A358 (Roberts Deposition, at 53, lines 2-18). President Roberts further stated that rather than look at company specific data, the Union prepared for the 2007 NBCWA negotiations by

> "more or less [ ] look[ing] at the industry itself. You might look at a region of the country. What companies are selling metallurgical coal versus steam coal and what the price of that coal is. But you don't say, well, bring me this particular company, I'll look at that. It's looking at the industry **because you're looking at a large segment of the industry that will be covered by this contract.**

See Freeman's Appendix, at A358 - A359 (Roberts Deposition, at 53 (lines 19-22) and 54 (lines 1-8) (emphasis supplied).[6] Thus, the manner in which the Union approached the negotiations for the 2007 NBCWA are fully consistent with its view that the resulting contract would be national in scope and coverage.

As previously addressed, the Union's conduct during negotiations for the 2007 NBCWA, and immediately thereafter, also reflect an understanding that the resulting contract was viewed as a national agreement. For example, when the Union performed calculations to determine how to pay for the pension benefits it sought for members, it took into account the projected hours to

---

[6]When Freeman presented President Roberts with a copy of Consol's publicly filed financial report during his deposition and asked if he had reviewed such a document his answer quickly dispelled any suggestion that the Union's focus was soley on Consol - which of course is the underlying premise of Freeman's case. Rather than fuel Freeman's unfounded conspiracy theory, President Roberts stated that he most likely did look at this document because he "looks at these kinds of documents on a continuous basis to see how companies we deal with and others are doing." See Freeman's Appendix, at A359 (Roberts Deposition, at 57, lines 1-3.) In further response to this same line of questioning, President Roberts also explained that he probably looked at the publicly available financial information for Peabody Coal, as well as the "selling price of coal in various regions of the country." Id. (Roberts Deposition, at 57, lines 12-16.)

be worked in the organized sector of the bituminous coal industry over the life of the agreement rather than the hours to be worked only by BCOA member companies. If, as Freeman contends, the parties intended the 2007 NBCWA to be a single-employer agreement, such calculations would only have included hours worked by Consol employees.

Finally, the Union's post-negotiation conduct provides further evidence that it did not view the 2007 NBCWA any differently than the previous national agreements it bargained with BCOA dating back more than 50 years. President Roberts explained that, like previous NBCWAs, a ratification vote was taken involving all members who are covered by the current contract or who work for an employer that has a contract substantially the same as the national contract with a common expiration date or expiration date that is reasonably close to the national contract. See Freeman's Appendix, at A351 (Roberts Deposition, at 24 (lines 12-22), 25 (lines 1-10). President Roberts indicated that this practice has remained essentially unchanged for at least 37 years. See Freeman's Appendix, at A351 (Roberts Deposition, at 25 (lines 9-10). The reason the Union conducts its ratification vote in this manner is because the Union fully anticipates that the employers of these members - whether BCOA companies or not - "will either sign that agreement identical to the one that's been negotiated or one very similar to . . . the one that's been bargained."

The process described above was followed with respect to the 2007 NBCWA. The Union's members collectively ratified the 2007 NBCWA by an overwhelming margin of votes. The members that ratified the 2007 NBCWA represented approximately 75% of the Union's active membership in the coal mining industry. Thus, immediately upon ratification, the 2007 NBCWA covered the operations of both Consol and Ohio Valley Coal. See Freeman's

18

Appendix, at A372 (Roberts Deposition, at 107 (lines 16-22), 108 (lines 1-15)). Then, in relatively short order following the nationwide ratification vote, all of the major coal operators in the bituminous coal industry signed on to the relevant provisions of the 2007 NBCWA. See Defendant United Mine Workers of America's Statement of Material Facts As To Which There Is No Genuine Dispute ("SOF"), at ¶ 20.

Because the Union threatened to strike employers who did not agree to the terms of the 2007 NBCWA, Freeman argues that the above circumstances cannot "magically transform a single-company agreement into a 'successor agreement' under the evergreen clause." See Freeman's Supplemental Brief, at 36. Freeman is wrong for two reasons.

First, as previously established, the 2007 NBCWA was **never** a single-company agreement. By virtue of the MOU entered into between the Union and Ohio Valley, the 2007 NBCWA covered, at minimum, the employees of two major coal operators.[7]

Second, the Union's strike threat cannot taint or diminish the subsequent actions by the coal companies that signed on to the 2007 NBCWA. Federal labor law has long ago legitimized the right to strike or to threaten a strike as the "ultimate weapon in labor's arsenal for achieving agreement upon its terms." See NLRB v. Allis-Chalmers Mfg., 388 U.S. 175, 181 (1967). Thus, the national scope of the agreement is not affected by the fact that some of the employers agreed to the 2007 NBCWA only after the Union threatened to strike. If this were the case, then the national scope of the 1993 NBCWA would also have been called into question because, as

_____

[7]This is true if the Court credits Freeman's argument that all of Consol's separate operations should be viewed as a single employer. If the Court rejects this position, then immediately upon ratification the 2007 NBCWA covered the operations of 12 different employers - the 11 BCOA represented companies and Ohio Valley. Regardless, the 2007 NBCWA was never a single-employer agreement as Freeman suggests.

President Roberts explained, that agreement was not reached until the industry and the Union

went through a long, protracted strike. See Freeman's Appendix, at A353-54 (Roberts

Deposition, at 33 (lines 16-22), 34 (lines 1-22), 37 (lines 5-9). Once that strike was settled,

however, no coal industry employer questioned the national scope of the 1993 NBCWA or its

status as a successor agreement under the evergreen clause.

There simply is nothing inappropriate with the manner in which the Union presented the

2007 NBCWA to other companies after it had been ratified by its membership and by BCOA.

Accordingly, Freeman's efforts to insinuate otherwise should be rejected.

Finally, Freeman misstates the Union's argument with respect to the contractual language

contained in each NBCWA since 1978 which specifies the appropriate parties who may set the

rate to be paid to the 1974 Plan by contributing employers. See Freeman Supplemental Brief, at

38, n.7. As previously explained, even if this Court were to determine that the 2007 NBCWA

was not a successor agreement, Freeman and Monterey would still be required to contribute to

the 1974 Plan at the present rate agreed to by the UMWA and BCOA. This is true because

Article XX of the NBCWA establishes the appropriate parties who may set the rate to be paid to

the 1974 Plan by contributing employers.

Specifically, Article XX (d)(1)(v) provides that

> [i]n the event the BCOA ceases to exist, **or** in the event more than
> 50% of the tonnage membership of the BCOA on the Effective
> Date has withdrawn prior to the time when the BCOA is required
> or permitted to take action under this Article, then such action may
> be taken by majority vote, based on tonnage, of Employers who
> were BCOA members on the Effective Date.

See Freeman Appendix, at A596 (v). Article XX can be triggered if BCOA members

representing more than 50% of the member tonnage withdraw from the association.   At the time of the 2006 negotiations, Consol and its subsidiaries represented over 50% of the tonnage of the BCOA membership on the effective date of the 2002 NBCWA.  See UMWA SOF at ¶ 10. Therefore, according to the language of Article XX, the UMWA properly viewed the employers comprising BCOA (regardless of their corporate structure) to be the appropriate entity with which to bargain over the 1974 Plan contribution rate.  The 1974 Plan contribution rate that was set by the Union and this group of employers (whether they are considered BCOA, Consol or some differently named trade group or association) is valid and applies to Freeman and Monterey.[8]

---

[8]The Ohio Valley Coal Company agreement which adopted the terms of the anticipated 2007 NBCWA also relied on the concept of "tonnage" to indicate which party or parties the Union could properly deal with in bargaining a successor agreement if there was no BCOA at the time of bargaining for the 2007 NBCWA.  See Reply Memorandum in Support of United Mine Workers of America's Motion for Summary Judgment, at 6 and Exhibit 1, at p.1.

## V.  CONCLUSION

For the reasons discussed above, as well as those set forth in the Union's previous submissions to the Court, the Union submits that its motion for summary judgment should be granted and Freeman's request for declaratory judgment should be denied.

Respectfully submitted,

_____

John R. Mooney, Bar No. 375886
Mark J. Murphy, Bar No. 453060
Mooney, Green, Baker & Saindon, P.C.
1920 L Street, N.W.
Suite 400
Washington, D.C. 20036
(202) 783-0010
(202) 783-6088 facsimile

Counsel for Defendant
United Mine Workers of America

April 11, 2008

22