**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————————— ) | |
| Holland, et al., ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | Case No. 07-cv-490 (PLF/AK) |
| Freeman United Coal Mining Company, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |
| ————————————————————) | |
| ) | |
| Freeman United Coal Mining Company, ) | |
| ) | |
| Plaintiff, ) | Case No. 07-cv-1050 (PLF/AK) |
| ) | |
| v. ) | |
| ) | |
| United Mine Workers of ) | |
| America, et al., ) | |
| ) | |
| Defendants. ) | |
| ————————————————————) | |

**BCOA'S SUPPLEMENTAL REPLY IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7 and 56.1, Defendant

Bituminous Coal Operators' Association, Inc. ("BCOA") submits this supplemental reply

memorandum in support of its motion for summary judgment against Plaintiff Freeman United

Coal Mining Company ("Freeman") in Case No. 07-cv-1050.

**INTRODUCTION**

Freeman, in the first paragraph of its supplemental opposition ("Supplemental Opp."),

admits that the evergreen clause was adopted "to prevent a single coal company from shirking

the pension obligations set by the rest of the industry." Supplement Opp. at 1. Freeman then

spends the remaining forty-plus pages of its Supplemental Opposition attempting to do precisely

what the evergreen clause was designed to prevent: shirk its contribution obligation to the

UMWA 1974 Pension Trust ("1974 Pension Trust" or "Trust") and dump its liability on the

remaining industry employers contributing to the Trust.  Freeman and Monterey Coal Company

("Monterey"), the remaining defendants in the companion action brought by the Trust, are the

only companies bound by the evergreen clause that have refused to make the contributions

required by the National Bituminous Coal Wage Agreement ("NBCWA") of 2007.

As BCOA explained in its Motion for Summary Judgment ("Motion"), the evergreen

clause, which is contained in the Trust's governing documents and incorporated by reference in

every NBCWA negotiated by BCOA and the United Mine Workers of America ("UMWA")

since 1978, provides in relevant part that participating employers are "obligated and required to

comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time

to time, including, but not limited to, making the contributions required under the [NBCWA] of

1978 as amended from time to time and any successor agreements thereto, including, but not

limited to, the [NBCWA] of 2007."  Despite the binding precedent in the *Pittston* litigation, *In re*

*United Mine Workers of America Benefit Plans Litig.*, 782 F. Supp. 658 (D.D.C. 1992), *aff'd,*

*United Mine Workers of America 1974 Pension Plan, et al. v. Pittston Co.*, 984 F.2d 469 (D.C.

Cir.), *cert. denied*, 509 U.S. 924 (1993) ( *"Pittston"*), Freeman contends that it need not

contribute to the 1974 Pension Trust.  The only excuse offered by Freeman is that the 2007

NBCWA allegedly is not a true "successor agreement" to the NBCWAs of 1978, 1981, 1984,

1988, 1993, 1998, and 2002 within the meaning of the evergreen clause.

In the first place, as the Trust has explained in detail in an argument that BCOA adopts

but does not repeat, Freeman's position simply ignores that portion of the evergreen clause that

appears before the "including, but not limited to" phrase.  Freeman is required to comply with

the "terms and conditions" of the Trust, as amended from time to time.  And the Trust has been

amended to prescribe contributions at the rates set in the 2007 NBCWA. That should be the end of the matter.

But, even taking Freeman's argument on its own terms, why is the 2007 NBCWA allegedly not a "true" successor agreement to the several previous NBCWAs? Freeman offers four reasons, none of which is valid. First, Freeman says BCOA has too few members, because all of BCOA's members are companies affiliated with Consol Energy Inc. ("Consol"). Second, Freeman says BCOA did not consult with non-members or consider their views during negotiations of the 2007 NBCWA. Third, according to Freeman, the negotiation and ratification of the 2007 NBCWA by BCOA allegedly violated BCOA's by-laws and D.C. corporate law. Fourth, the UMWA allegedly "coerced" other coal companies to accept the 2007 NBCWA terms.

Freeman is grasping for a legal rationale, but it has found none. It has "discovered" many irrelevant facts, but it has provided no legal authority that BCOA must have some minimum number of members in order to have authority to negotiate a successor NBCWA, or that BCOA lacked the ability to do so simply because its current membership consists of affiliated companies of Consol. Freeman suggests, on one hand, that it would have had no grounds to challenge the 2007 NBCWA if Peabody Energy and its affiliated companies (collectively, "Peabody") had not withdrawn their membership in BCOA in early 2006, just before the start of collective bargaining. In that event, Freeman would have agreed that BCOA's membership was adequate. On the other hand, Freeman complains that, even when Peabody was a member, Consol effectively controlled BCOA, leading to Peabody's exit. Supplemental Opp. at 6. Freeman never resolves this contradiction, or provides any authority why Peabody's presence in BCOA would (or would not) defeat its claim.

In addition, as this Court recognized in *Pittston*, the evergreen clause was adopted to ensure that the 1974 Pension Trust's funding obligations would not fall on a dwindling number of employers and create what was referred to as a "last man's club." Under Freeman's theory, however, the departure of Peabody and another BCOA member during the term of the 2002 NBCWA rendered BCOA incapable of negotiating an NBCWA, thus transforming BCOA into the very "last man's club" that the evergreen clause was designed to prevent. If the evergreen clause could be defeated by simply reducing BCOA's membership, coal companies seeking to avoid their contribution obligation could simply have arranged to withdraw from BCOA, so that BCOA (according to the Freeman view) no longer could negotiate new contribution rates with the UMWA.

Ultimately, Freeman's attack on BCOA and the evergreen clause threatens the very existence of the 1974 Pension Trust. Freeman and Monterey fully expected and intended that their former employees would receive the same pension benefits as every other participant in the Trust. Neither company, however, offers any solution for how the 1974 Pension Trust will be able to continue paying for these benefits if BCOA no longer can negotiate a contribution rate with the UMWA that governs under the evergreen clause. Instead, Freeman merely offers the bland assurance that, with the exception of Freeman and Monterey, the remaining evergreen contributors are required by their individual contracts to continue contributing during the term of the 2007 NBCWA.

Other than this, and Freeman's desire to have the pension benefits for its own retirees paid for by others, Freeman says nothing about what will happen next. Assuredly no individual employer will be willing to assume the financial burden of all other employers' retirees. How the Trust will be funded on a going-forward basis Freeman leaves entirely unanswered, leading only to uncertainty and chaos for both the Trust's contributing employers and its retirees.

I.    **UNDER *PITTSTON*, FREEMAN AND MONTEREY ARE REQUIRED TO CONTRIBUTE TO THE 1974 PENSION TRUST AT THE RATES CURRENTLY CONTAINED IN THE 2007 NBCWA.**

   A.    **The Evergreen Clause Requires Participating Employers To Contribute At The Rate Set Forth In The 2007 NBCWA.**

As BCOA explained more fully in its Motion, BCOA and the UMWA negotiated the evergreen clause in 1978 to ensure that "all participating employers would contribute equally to the [UMWA Health and Retirement] Trusts[, including the 1974 Trust,] and would not be permitted to withdraw from participation and leave the burden of funding health and retirement benefits of retired miners to the remaining employers." *Pittston*, 782 F. Supp. at 667.  To accomplish this, the bargaining parties in 1978 inserted the evergreen clause into the plan and trust documents for the 1974 Pension Trust (as well as the plan and trust documents for the other UMWA pension and health benefit trusts then in existence).  The plan and trust documents, in turn, were incorporated by reference into each NBCWA negotiated by BCOA and the UMWA from 1978 through 2007.  *See Pittston*, 984 F.2d at 472; Perkins Decl., ¶¶21-23 (Dkt. No. 19-4); Roberts Decl., ¶11 (Dkt. No. 17-3).

As Roger M. Haynes, the former chairman of the BCOA benefits committee, explained during the *Pittston* litigation, the BCOA negotiators, when adopting the evergreen clause, did not care whether or not an individual employer decided to participate in the various UMWA Health and Retirement Funds then available to eligible retirees.  BCOA's negotiators, however, did "care strongly that 'if you play our game, you will play by our rules,'" Haynes Decl. ¶12 (Dkt. No. 46-14 in Case No. 07-cv-0490), including the rule that participating employers abide by the evergreen clause.

It is undisputed that the evergreen provision was intended to ensure that the 1974 Pension Trust would not become a "last man's club where one company's benefits costs could be shifted to another, or industry-wide benefits costs could be transferred to a few remaining employers."

Kempken Decl. ¶7 (Dkt. No. 46-12 in Case No. 07-cv-490); *see also* Freeman Appendix at A234

(Pierce Dep. at 23-24) (BCOA and the UMWA did not "want to create an incentive for there to

be a last man's club holding all the liabilities and responsible for funding them" ).  As a result,

when a new NBCWA imposes a contribution obligation, the evergreen clause requires that all

employers bound by the clause contribute to the 1974 Pension Trust at the rates contained in the

NBCWA.  Nothing in the evergreen clause suggests that BCOA must have some minimum

number of members, or deprives BCOA of authority to negotiate a successor NBCWA even if its

membership consists only of affiliated companies.[1]

   This Court confirmed the purpose of the evergreen clause in the *Pittston* litigation.  In

explaining its operation, both this Court and the Court of Appeals recognized that the reference

to "successor" agreements in the evergreen clause referred to subsequent NBCWAs negotiated

between BCOA and the UMWA.  Indeed, Judge Hogan held that the meaning of the clause

"successor agreements [to the 1978 NBCWA]" referred to "the National Bituminous Coal Wage

Agreement of 1984, 1988, and subsequent years," and "*only*" to those wage agreements.  782 F.

Supp. at 664.  The Court of Appeals confirmed this reading, holding that the evergreen clause

"unambiguously obligated signatory employers to contribute to the trusts at the rates specified in

the current NBCWA, irrespective of the employer's failure [to] sign that NBCWA," and that

"only a subsequent NBCWA can qualify as such a successor agreement" within the meaning of

---

[1]    It is not unusual that a collective bargaining association consisting of affiliated companies
could negotiate a national agreement that serves as the industry model.  To take just one recent
example: on December 13, 2007, Trucking Management Inc. ("TMI"), a multiemployer
bargaining association that represents the trucking industry in negotiations with the International
Brotherhood of Teamsters, announced that it had reached a tentative agreement with the
Teamsters on the National Master Freight Agreement ("NMFA"), the industry-wide collective
bargaining agreement that covers most truck drivers, dock workers and other union employees in
the trucking industry.  YRC Worldwide and Teamsters Reach Tentative Agreement (Dec. 13,
2007), available at http://phx.corporate-ir.net/phoenix.zhtml?c=71156&p=irol-
newsArticle&ID=1087349&highlight=.  The current members of TMI are all affiliated companies.
They share one corporate parent, YRC Worldwide.

the evergreen clause. 984 F.2d at 473-74. Under the factors that this Court has identified for

determining whether an agreement in fact is a "successor" agreement, as well as the undisputed

facts of record, the 2007 NBCWA qualifies as a successor agreement to previous NBCWAs. *See*

*Flynn v. Dick Corporation*, 384 F.Supp.2d 189, 194-95 (D.D.C. 2005), *rev'd other grounds*, 481

F.3d 824, 827 n.2 (D.C. Cir. March 20, 2007) (examining signatories, scope of work covered by

the agreements, and agreements' effective dates in determining whether agreement imposing a

contribution obligation to a multiemployer benefit plan was a successor agreement).

In summary, *Pittston* holds that once BCOA and the UMWA negotiate the NBCWA and

its contribution rate to the 1974 Pension Trust, a single coal company cannot change or escape its

contribution obligation by signing individual labor agreements with the UMWA or no agreement

at all. This conclusion flows directly from the courts' acknowledgment that the "evergreen

clause was written to ensure that all employers participating in the Trusts would share equally in

the burden of amortizing the existing Trust deficits and *in funding future benefits*," and "to

prevent employers from pulling out of the Trusts and leaving remaining employers to foot the

bill for retirees of those employers who had pulled out or had gone out of the coal-mining

business." 782 F. Supp. at 665, 666 (emphasis added). Nothing in the 1974 Pension Trust or the

language of the evergreen clause, and nothing in the *Pittston* decision enforcing the clause,

suggests that BCOA, when negotiating the 2007 NBCWA, lacked authority to do so.

**B.      The Undisputed Facts In This Case Demonstrate That The 2007 NBCWA
         Was Negotiated And Ratified As A National Agreement And Has Been
         Accepted As Such In The Same Way As Earlier NBCWAs Negotiated By
         BCOA.**

Despite Freeman's effort to paint the 2007 NBCWA as a single employer agreement

between BCOA and Consol, the undisputed facts in this case reveal that the 2007 NBCWA was

negotiated as a national – and not a single company – agreement and that the negotiation,

ratification, and treatment of the contribution obligation to the 1974 Pension Trust by other coal

companies render the 2007 NBCWA indistinguishable from prior NBCWAs.  Specifically:

- BCOA, on behalf of its member companies, has negotiated with the UMWA over the terms of each NBCWA for more than fifty years.  In addition, BCOA has negotiated with the UMWA over the terms of the 1974 Pension Trust.

- Freeman was a member of BCOA during 1978 when the evergreen clause was adopted, and remained signatory to the NBCWAs of 1981, 1984, 1988, and 1993 by virtue of its BCOA membership.

- Following its unilateral withdrawal from BCOA during 1997, Freeman negotiated two additional collective bargaining agreements directly with the UMWA.  In those two collective bargaining agreements, Freeman chose to continue participating in the 1974 Pension Trust.  In doing so, it affirmatively renewed its evergreen obligation.

- BCOA's members (the companies affiliated with Consol) accounted for more than 33% of the coal produced under the NBCWA during 2006, the year in which the 2007 NBCWA was negotiated, and collectively made the largest contribution to the 1974 Pension Trust.

- The UMWA recognized that BCOA had authority to negotiate the 2007 NBCWA on behalf of its members, and was aware that BCOA's members were all affiliates of Consol.

- Both BCOA and the UMWA intended from the outset that their negotiations would result in the 2007 NBCWA, and the 2007 NBCWA was intended to be the successor agreement to the 2002 NBCWA.  In addition, both BCOA and the UMWA understood that other coal companies throughout the United States, by their prior contractual agreement under the evergreen clause, would be bound by the contribution rate to the 1974 Pension Trust that would be negotiated during collective bargaining.

- During negotiations of the 2007 NBCWA, the bargaining parties calculated the contribution rate for the 1974 Pension Trust based on their best estimate of signatory hours to be worked nationwide during the term of the 2007 NBCWA by all contributing employers and not just the signatory hours expected to be worked by BCOA's 11 member companies.

- After BCOA and the UMWA reached an agreement over the terms of the 2007 NBCWA, the UMWA sent the tentative national agreement out to its members for a nationwide ratification vote.  This vote resulted in approval of the 2007 NBCWA by UMWA members working for employers nationwide, not just UMWA members who worked for BCOA's member companies.

- Following this nationwide ratification vote, the UMWA negotiated individually with the employers of its members nationwide and in relatively short order virtually all the coal operators in the industry agreed to adopt or "me-too" the 2007 NBCWA, some with minor changes, but none with changes that affected the 1974 Pension Trust or the contribution rate to the Trust.

- At present, all employers but two – Freeman and Monterey – that are obligated by the evergreen clause to make contributions to the 1974 Pension Trust are making such contributions at the rates set forth in the 2007 NBCWA. This includes Springfield Coal Company LLC, which purchased Freeman's coal mining operations after this litigation began.

- Despite Freeman's refusal to make any contributions to the 1974 Pension Trust at any time during the term of the 2007 NBCWA, approximately 1,291 former employees of Freeman, as well as 410 former employees of Monterey, were receiving pension benefits from the 1974 Pension Trust as of September 1, 2007, and will continue to receive benefits from the 1974 Pension Trust, including the increased benefits provided under the 2007 NBCWA.

Based on these undisputed facts, and the controlling legal authority, summary judgment is appropriate in this case.

## II. FREEMAN OFFERS NO CREDIBLE LEGAL JUSTIFICATION TO SUPPORT ITS CLAIM THAT THE 2007 NBCWA IS NOT A TRUE "SUCCESSOR AGREEMENT" WITHIN THE MEANING OF THE EVERGREEN CLAUSE.

Although Freeman acknowledges the intent of the evergreen clause in the opening paragraph of its Supplemental Opposition, it ultimately seeks to walk away from its evergreen obligation and leave the remaining participating employers free to negotiate individual agreements that set varying rates of contribution – or no rate at all – to the Trust. This result is directly contrary to the decision in *Pittston* and the intent of the evergreen clause.[2] *See, e.g., In re Chateaugay Corp.*, 53 F.3d 478, 483 (2d Cir. 1995) (the effect of the evergreen clause "was to

---

[2]     Freeman also claims that its position here will not financially imperil the Trust because participating employers remain contractually obligated, and statutory withdrawal liability will provide additional safeguards. Supplemental Opp. at 43-45. As explained more fully in BCOA's initial Reply (Dkt. No. 31), Freeman's argument is both wrong as a matter of law and disingenuous, for (1) the evergreen clause was designed to prevent the creation of a "last man's club," where a dwindling number of employers shoulder an increasing share of liabilities; and (2) Freeman is attempting to use this litigation to deprive the Trust of more than $22 million in the very withdrawal liability under MPPAA that Freeman claims provides future protection to the Trust. *See* BCOA's Reply at 20-22.

prevent still active coal companies from avoiding their contribution responsibilities by signing 'nonconforming' agreements with the UMWA instead of joining a successor NBCWA.")

Freeman's effort to rid itself of its evergreen obligation rests on a long list of assertions that serve only to obscure Freeman's lack of legal authority for its claim that the 2007 NBCWA is not a proper "successor agreement" under the evergreen clause. The existence of proper legal authority is necessary to oppose summary judgment. *Bussie v. Stenocard Corp.*, 460 F.2d 116, 119 (9th Cir. 1972) (holding that the showing of a "genuine" issue "is predicated upon the existence of a legal theory which remains viable under the asserted version of facts, and which would entitle the party opposing the motion (assuming his version to be true) to a judgment as a matter of law.") Here, Freeman's failure to anchor its facts to proper legal support is fatal, and its claim fails as a matter of law.

### A. Freeman's Unhappiness Over BCOA's Current Membership Does Not Rob BCOA Of Authority To Negotiate A Successor NBCWA For Purposes Of The Evergreen Clause.

Freeman claims in its Supplemental Opposition that the number of companies currently in BCOA "is *the most* material fact in this case." Supplemental Opp. at 22 (emphasis in original). Despite spilling considerable ink contrasting BCOA in 1978 and BCOA today (after numerous companies like Freeman have withdrawn), Freeman provides no legal authority to explain why BCOA's current make-up would preclude BCOA from negotiating a successor NBCWA under evergreen.

Under Freeman's theory, it appears that BCOA would have the authority to negotiate a successor agreement for purposes of the evergreen clause if BCOA had two unaffiliated members. But where does this "rule" come from? Freeman doesn't say. Moreover, Freeman provides no credible reason why BCOA, if composed of the *two* smallest coal companies in the U.S., would have authority to set a contribution rate for the 1974 Pension Trust under the

evergreen clause, whereas BCOA's current members – who represented more than 33% of the

coal tonnage produced under the NBCWA during 2006 – do not.  Nor can Freeman offer a

plausible explanation why adding the nation's smallest coal company to BCOA's current

membership somehow would enable BCOA to negotiate a binding successor agreement.  Indeed,

despite Freeman's apparent acceptance of BCOA's authority if BCOA were composed of two

unaffiliated members, Freeman also asserts that, even when Peabody was a member, Consol and

its affiliated companies effectively controlled BCOA.  *See* Supplemental Opp. at 6.

       In addition, Freeman has omitted at least two significant facts that further substantiate

BCOA's continued ability to negotiate successor NBCWAs.  Specifically, Freeman's own

discovery revealed that several companies in the organized sector of the coal industry recognized

that collective bargaining between BCOA and the UMWA during 2006 would result in a

successor agreement to the 2002 NBCWA.  In fact, one company – the Ohio Valley Coal

Company – reached its own agreement with the UMWA prior to the start of the UMWA's

negotiation with BCOA.  In its "me-too" agreement, Ohio Valley agreed (with slight

modifications not pertinent here) to be bound by whatever terms BCOA and the UMWA set in

the 2007 NBCWA, including the contribution rate for the 1974 Pension Trust.  *See*

Memorandum of Understanding Regarding UMWA and Ohio Valley Coal Company Wage

Agreement ("the terms of the successor agreement negotiated between the UMWA and [BCOA]

(the anticipated 2007 NBCWA) shall be incorporated and provide the base labor terms of the

2005 UMWA-Ohio Valley Wage Agreement") (Dkt. No. 29-2); Freeman Appendix at A374

(Roberts Dep. at 115.)

       Moreover, Peabody, after it resigned membership in BCOA, acknowledged during its

own collective bargaining with the UMWA that the contribution rate for the 1974 Pension Trust

was not a proper subject of negotiation between Peabody and the UMWA because Peabody

recognized that it was bound under evergreen to contribute to the Trust at the rate negotiated by BCOA. *See* Freeman Appendix at A372 (Roberts Dep. at 106) (the bargaining parties agreed that "Article XX was pretty much off the table for discussions because that would obviously be driven by the BCOA negotiations.")

> **B.** **The Evergreen Provision Governs Only The Contribution Rate To The 1974 Pension Trust, And Leaves Non-BCOA Companies Free To Negotiate Separate Terms And Conditions Of Employment In Collective Bargaining With The UMWA.**

Freeman also contends that the 2007 NBCWA is not a successor agreement because BCOA kept its negotiations secret from the rest of the industry and "pursued" the objectives of its own membership when bargaining with the UMWA. Like Freeman's argument based on the number of BCOA's members, this argument lacks any legal authority. Nor does Freeman even allege that, in negotiating earlier NBCWAs, BCOA involved the rest of the coal industry or pursued the objectives of non-BCOA members. Freeman also ignores its own voluntary withdrawal from BCOA membership in 1997 and its accompanying revocation of BCOA's authority to negotiate with the UMWA on Freeman's behalf. Perkins Decl. ¶15. As a result, BCOA owed Freeman *no duty* when negotiating the terms of the 2007 NBCWA.

Freeman's argument also disregards the limits of the obligations imposed by the evergreen clause. Those obligations focus on compliance with the terms and conditions of the UMWA Trusts, including the 1974 Pension Trust. The evergreen clause does not affect other terms and conditions of employment contained in the NBCWA (or any successor agreements), and non-BCOA members remain free to negotiate their own separate wage agreements with the UMWA. Indeed, Freeman itself admits in its Supplemental Opposition that it negotiated terms in its 1998 and 2003 stand-alone agreements with the UMWA that were different from those contained in the then-current NBCWA. Among other things:

- Freeman ceased participating in the UMWA 1993 Benefit Plan (to which the evergreen clause does not apply), thus relieving itself of the $2.00 per hour obligation BCOA members and most other me-too signatories have to contribute to retiree health benefits for retired coal miners whose employers are no longer in business. *See* Freeman Appendix at A560 (Second Austin Decl. ¶9).

- Freeman, although it complains that BCOA negotiated certain flexible scheduling options in the 2007 NBCWA, in fact negotiated even better terms for itself during its own bargaining with the UMWA over scheduling. *Id.* at ¶13.

- Despite casting aspersions on the alleged savings that BCOA members potentially may realize as a result of the elimination of retiree health benefits for new employees hired under the 2007 NBCWA, Freeman admits that it negotiated nine years ago the elimination of retiree heath benefits *for all its miners* who retired after 1998. *Id.* at ¶14.

As BCOA discussed in great detail in its Motion at pages 24-26, the contribution rate negotiated for the 1974 Pension Trust was designed to ensure that the Trust remains out of "endangered status" under the recently enacted Pension Protection Act of 2006. It is that rate that is binding on Freeman under the evergreen clause; the other components of the NBCWA are simply not relevant to this dispute.

### C. Whether Or Not BCOA Complied With Its Own By-Laws Or D.C. Law Is Immaterial To Whether The 2007 NBCWA Is A Successor Agreement Under The Evergreen Clause.

In its Supplemental Opposition, Freeman also claims that the 2007 NBCWA cannot be a "successor agreement" because BCOA, when negotiating and ratifying it, allegedly failed to comply with its own by-laws and the law of the District of Columbia concerning non-profit corporations. Freeman's argument, however, lacks legal authority and improperly seeks to rely on provisions that are not for the benefit of Freeman.

First, Freeman provides no authority for the proposition that, as a former member of BCOA, it has standing to complain that BCOA did not follow its by-laws when it negotiated and ratified the 2007 NBCWA. In D.C., "[t]he law is clear that a [non-profit] corporation is bound by the acts of its officers so long as they act with either apparent of actual authority." *Columbia*

13

*Hosp. for Women Found., Inc. v. The Bank of Tokyo-Mitsubishi, Ltd.*, 15 F. Supp. 2d 1, 7 (D.D.C. 1997). "Apparent authority arises when a principal places an agent in a position which causes a third person to reasonably believe the principal had consented to the exercise of authority the agent purports to hold." *Makins v. D.C.*, 861 A.2d 590, 594 (D.C. 2004) (internal quotation marks and citations omitted). As such, even if BCOA lacked actual authority to negotiate the NBCWA under its by-laws, the UMWA reasonably believed that BCOA had the authority to enter a binding collective bargaining agreement. Even if Freeman's allegations were true, they would not upset the validity of the 2007 NBCWA.

Moreover, despite Freeman's attempt to suggest otherwise, BCOA's by-laws are not for Freeman's benefit. Among other things, Freeman claims that BCOA's by-laws ensure that "non-represented *member companies* had a full opportunity 'to make known their views,' thereby ensuring that the NBCWA would represent the views of more than just the nine companies represented on [BCOA's] CEO Committee and the four members represented on [BCOA's] Negotiating Committee." Supplemental Opp. at 8 (emphasis added). Freeman appears to suggest that, under this and similar provisions, BCOA had some duty to solicit non-members' views during bargaining over the 2007 NBCWA. This is not correct. BCOA's by-laws concern BCOA and its members, and Freeman revoked its membership in BCOA more than a decade ago. As such, Freeman enjoys no rights under BCOA's by-laws and is in no position to complain about whether BCOA complied with them.

Finally, Freeman's claim that BCOA's actions were *ultra vires* because BCOA purportedly did not meet the technical requirements of D.C. law is erroneous. D.C. law provides in relevant part that "[n]o act of a corporation . . . shall be invalid by reason of the fact that the corporation was without capacity or power to do such act" except in three limited circumstances: (1) in an action by a member or director to enjoin such an act; (2) in a proceeding by the

corporation against any trustee or other legal representative; or (3) in a proceeding brought

directly by the Mayor of Washington, D.C.  *See* D.C. Code § 29-301.06.  Under this statute,

Freeman cannot challenge BCOA's authority to act because it simply is "not one of those in

whom such capacity has been vested."  *Association of Fair Competitive Practices in Air*

*Conditioning v. Public Service Comm'n*, 372 F.2d 934, 935-36 (D.C. Cir. 1967) (in rejecting

challenge to corporation's action, noting that Congress "adopted for the District of Columbia the

modern view as to the limitations which should be placed upon capacity to challenge asserted

excesses of corporate powers.")[3]

> **D.    Freeman's Supplemental Opposition Is Rife With Gross Misrepresentations And Inaccuracies That Are Not Material To Resolving This Case.**

To obscure its lack of credible argument supporting its claims, Freeman has resorted to

stuffing its Supplemental Opposition with a catalogue of "disputed" facts that it contends

preclude entry of summary judgment.  Freeman's facts, however, are not material to resolving

this case and instead appear to have been asserted in the hope that the sheer volume of minutiae

gathered in discovery will create some genuine issue in dispute.  Freeman's effort is unavailing,

for "the mere existence of *some* alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no

*genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Nonetheless, BCOA does identify some of the more glaring inaccuracies in Freeman's

Supplemental Opposition.  Although BCOA does not intend to respond to every incorrect factual

---

[3]    Freeman's also asserts that the 2007 NBCWA is not a "successor agreement" because the UMWA had to "coerce" other companies to sign it.  *See* Supplemental Opp. at 16-17.  As we understand Freeman's assertion, it challenges the UMWA's right to engage in collective action in order to reach agreement with coal industry employers over a labor contract acceptable to the UMWA membership.  Federal labor law recognizes the right of union members to engage in concerted activities, including the right to strike.  *See, e.g., NLRB v. Allis-Chalmers Mfg.*, 388 U.S. 175, 181 (1967) (describing a strike as "the ultimate weapon in labor's arsenal for achieving agreement upon its terms").  We expect that the UMWA will address Freeman's assertion in more detail in the UMWA's own supplemental reply.

assertion in Freeman's submission, and none of these facts is material to the pending summary judgment motions, the Court should not be misled by Freeman's distortions. *Cf. Scott v. Harris*, __ U.S. __, 127 S. Ct. 1769, 1776 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for purposes on a ruling for summary judgment.").

### 1.    Freeman misrepresents the production of BCOA's members.

From the first page of its Supplemental Opposition, Freeman seeks to diminish the significance of BCOA in the coal industry by claiming that it represents only 7% of the "unionized coal" produced in the United States. This assertion is false and contradicted by publicly-available information maintained by the U.S. Department of Energy's Energy Information Administration ("EIA").

The EIA's databases provide comprehensive information on each mining operation in the U.S., including information on each mine's ownership, whether its employees are represented by the UMWA, and total tonnage produced each year from 1991 to 2006.[4] We know from the EIA's databases that during 2006, the most current year for which such information is available, approximately 1.162 billion tons of coal were produced in the U.S. In addition, we know that approximately 1.030 billion tons of this total tonnage was produced on a non-union (or non-UMWA-represented) basis, and that approximately 133 million tons (or approximately 11% of all U.S. production) was produced on a UMWA-represented basis. We also know that the BCOA members produced 34,044,804 tons of coal during 2006, *see* Freeman Appendix at A728 (BCOA Annual Coal Production Report), or approximately 26% of all UMWA-represented coal in the U.S. UMWA-represented coal production includes mining operations covered by the NBCWA, as well as mining operations covered by non-NBCWA contracts, including certain

---

[4]    The EIA's website is located at: www.eia.doe.gov/cneaf/coal/page/database.html.

surface mining agreements that historically have covered UMWA members working in surface mines in the western U.S. When viewed solely as a share of the coal produced under the NBCWA (approximately 102 million tons, or 77% of the unionized coal produced in 2006), the BCOA members produced approximately 33% of all coal tonnage produced under the NBCWA during 2006.

Freeman bases its erroneous assertion on certain testimony given by Peter Lilly, the current President of Consol's Coal Group. As Mr. Lilly's testimony clearly shows, however, he was describing the total U.S. market share for Consol and its affiliated companies, not these companies' share of unionized coal or coal produced under the NBCWA. *See* Freeman Appendix at A135 (Lilly Dep. at 151-52). Freeman's effort to diminish the share of NBCWA production attributable to BCOA members is inaccurate.

> **2.**  **Freeman also misrepresents the benefit to BCOA from recent legislation enacted by Congress that provides additional funding for the Coal Act retiree health benefit plans.**

Freeman also inaccurately describes recent legislation that provides substantial financial relief to the health benefit plans created by the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"), 26 U.S.C. §§ 9701 *et seq*. Freeman tries to suggest that the intervention by Congress in 2006 benefited only BCOA and its members. Supplemental Opp. at 11-12. Freeman's suggestion is false, and misrepresents the legislation and the benefits that Freeman itself enjoyed under it.

Specifically, during December 2006, Congress amended the Coal Act and agreed among other things to assume a larger share of the cost of providing retiree health benefits to retirees participating in the Coal Act retiree benefit plans. *See* Surface Mining Control and Reclamation Act Amendments of 2006, enacted as Title II of the Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922, 3006-3027 (Dec. 20, 2006). In its Supplemental

17

Opposition, Freeman tells only a small part of the story, and even then gets it wrong, for it suggests that BCOA's members pushed for this legislation at the expense of non-BCOA companies. What Freeman omits is that the legislation benefited *all* employers with Coal Act obligations, including Freeman, and the savings to each company on a per-beneficiary basis were the same. If the savings for BCOA member companies were higher in total dollars, it is only because those companies were shouldering a larger financial burden in the UMWA multiemployer pension and health benefit system generally.

Moreover, the legislation was not part of the NBCWA but a joint effort involving BCOA, the UMWA, and non-BCOA companies to shore up the funding base for the Coal Act plans. Although Freeman does not appear to have contributed to this legislative effort, BCOA wrote Freeman in December 2006 to inform Freeman of the savings that Freeman could expect to obtain from the legislation. Freeman Appendix at A736 (December 11, 2006 e-mail from M. Feibusch, BCOA, to W. Gregory, Freeman Energy).

### 3.    Freeman grossly mischaracterizes certain hardship payments made by the 1974 Pension Trust to certain Trust pensioners.

Freeman also accuses BCOA of "mismanaging" the 1974 Pension Trust by agreeing to make certain hardship payments out of Trust assets to 1974 Pension Trust beneficiaries who also participate in the UMWA 1993 Benefit Plan ("1993 Benefit Plan"). Supplemental Opp. at 41. This assertion rings especially hollow, given that these payments were authorized *under the 2002 NBCWA* and were not continued under the 2007 NBCWA, when BCOA allegedly was a mere "instrumentality" of a single employer. Moreover, the total amounts at issue represent approximately six-tenths of one percent of the total funding deficit in the 1974 Pension Trust that needed to be addressed by the contribution rate in the 2007 NBCWA. *See* Freeman Appendix at A566 (Second Perkins Decl. at ¶6.)

18

BCOA and the UMWA negotiated a provision in the 2002 NBCWA that provided pensioners who also participated in the UMWA 1993 Benefit Plan with an annual payment from the 1950 or 1974 Pension Trust. *Id.* at ¶2. In addition, the NBCWA contained a second provision that allowed the recipients, at their discretion, to use that payment to help defray the cost of the per beneficiary annual premium required for the 1993 Benefit Plan. *Id.* at ¶3. During 2005 and 2006, BCOA and the UMWA further amended the relevant plan and trust documents to provide an additional payment for each of those years. *Id.* at ¶4. No such payments were included in the 2007 NBCWA. Despite Freeman's accusations, at no time was money transferred directly from the 1974 Pension Trust to the 1993 Benefit Plan; instead, the 1974 Pension Trust pensioners who received these payments elected whether to keep them or to direct any portion of the funds to the 1993 Benefit Plan. *Id.* at ¶5.

Further, the total amount of money paid out to affected pensioners from 2002 to 2006 in full view of the industry had no material effect on BCOA's efforts to negotiate a contribution rate in the 2007 NBCWA that would keep the 1974 Pension Trust out of "endangered status" under the Pension Protection Act of 2006. The total amount of payments from the 1974 Pension Trust to the affected pensioners from 2002 to 2006 was approximately $61.56 million. *Id.* at ¶6. If this money had been included in the Trust's assets, the then-current funding percentage of the Trust would have risen from 83.8% to 84.6%. *Id.* As such, the payments had no appreciable effect on the agreed-upon contribution rates contained in the 2007 NBCWA. *Id.*

**4.    Freeman's claim that BCOA's members have engaged in anti-competitive conduct is erroneous and based solely on inadmissible hearsay.**

Finally, Freeman complains that BCOA and its members set the contribution rate in the 2007 NBCWA on a "per hour," not on a "per ton" basis, in order to hurt competitors. Supplemental Opp. at 14. This is silly, for, as BCOA explained more fully in its Motion, the

undisputed evidence in this case establishes that the change to a contribution formula based exclusively on hours worked was introduced not in 2007 but instead in 1988, when Freeman was a member of BCOA. *See* Motion at 22. The "per hour" formula has remained in place since that time. *Id.* Freeman has presented no evidence that it complained about this approach at any time.

Moreover, Freeman alleges that BCOA structured this contribution rate "because it knew the [per hour] rates would disproportionately affect its competitors, and thereby permit Consol to 'absorb the market' left by coal operators struggling to remain competitive and financially viable." Supplemental Opp. at 14-15. Freeman's source for this assertion is the declaration of a former Consol executive, William D. Stanhagen, that Freeman submitted previously in this case. In his declaration, Mr. Stanhagen admits that he is not speaking from personal knowledge but instead is reporting the alleged statement of Patricia Lang, a former VP of Human Resources at Consol. As such, the Stanhagen declaration is classic hearsay, and his declaration does not meet the requirements of Rule 56(e)(1).

After submitting Mr. Stanhagan's declaration, Freeman deposed Ms. Lang but never asked her at all about the statements Mr. Stanhagen had attributed to her. On cross-examination, Ms. Lang denied ever making the comments to Mr. Stanhagen that are contained in his declaration. *See* Freeman Appendix at 071-72 (Lang Dep. at 161-62). Freeman's continued reliance on Mr. Stanhagan's declaration is improper, and the declaration should be stricken from the record. *See, e.g., Judicial Watch, Inc. v. Dep't of Commerce*, 224 F.R.D. 261, 265 (D.D.C. 2004) (striking affidavits where deponent lacks first-hand knowledge and statements are based on impermissible hearsay).

## III.    FREEMAN CANNOT SURVIVE SUMMARY JUDGMENT AS TO COUNT II OF ITS COMPLAINT AGAINST BCOA.

Count II of Freeman's complaint in Case No. 07-cv-1050 alleges that if Freeman is required to contribute to the 1974 Pension Trust at the rate prescribed in the 2007 NBCWA, then

Freeman should be entitled to recover such contributions from BCOA, because BCOA allegedly breached certain duties it allegedly owed to Freeman when BCOA and the UMWA negotiated the pension contribution rate in the 2007 NBCWA.

A.    **The Court Should Decline To Exercise Supplemental Jurisdiction Over Freeman's State Law Claim.**

In BCOA's motion for summary judgment, we cited authority authorizing a federal court to dismiss state law claims where all of the federal claims have been resolved. Motion at 16. Freeman's allegations in Count II that BCOA breached an alleged "duty of good faith and fair dealing" to Freeman and acted arbitrarily and capriciously in negotiating the 1974 Pension Trust contribution rate in the 2007 NBCWA assert a state law claim. *See* Motion at 16-20.

Freeman's response to this point (Supplemental Opp. at 39 & n. 8) is without merit because (1) Judge Scott did not address a situation in which the federal claims in Count I had been resolved, and (2) there is no "federal common law" under Section 301 of the Labor-Management Relations Act concerning an alleged principal-agency relationship between an association and a former member that resigned 10 years ago. Freeman does not cite any federal cause of action even remotely similar to its agency claim in Count II. The only case it cites is one from another jurisdiction in which a union was attempting to enforce an arbitration subpoena against a nonsignatory employer. *See Teamsters Nat'l Auto. Transporters Industry Negotiating Comm. v. Troha*, 328 F.3d 325 (7th Cir. 2003). That is no help to Freeman here.

B.    **Even If Considered, Freeman's State Law Claims Cannot Survive Summary Judgment.**

One of the duties that Freeman claimed that BCOA owed to it was an alleged "duty of good faith and fair dealing to its former members, including Freeman." Complaint ¶52. We demonstrated the lack of legal support for this state law claim in BCOA's motion for summary

judgment, Motion at 20-21, and Freeman has failed altogether to address this in its supplemental submission. We therefore consider this argument abandoned.

The only claim that Freeman attempts to pursue regarding Count II is based on an agency argument. This claim, however, cannot survive summary judgment because Freeman is unable, as a matter of law, to establish the existence of an agency relationship with BCOA. In addition, even assuming, *arguendo*, that Freeman somehow could establish the consensual and control elements necessary to establish an agency relationship (which it has not done and cannot do), Freeman still, after several months of discovery, has not presented any evidence whatsoever showing that BCOA breached any duty allegedly owed to Freeman when it negotiated a pension contribution rate that complies with a federal statute and applies equally to all contributing employers.

**C.    Freeman Has Not Presented Any Evidence Establishing The Existence Of An Agency Relationship With BCOA.**

Freeman's supplemental submission attempts to avoid settled law holding that, as the party asserting the existence of an agency relationship, Freeman must demonstrate by "clear and convincing evidence" that (1) it authorized BCOA to act on Freeman's behalf and serve as Freeman's agent in the 2007 NBCWA negotiations, (2) BCOA consented to act as Freeman's agent for the 2007 negotiations, and (3) Freeman possessed the "right to control" BCOA during the 2007 negotiations. *See Restatement (Third) of Agency* §§ 1.01, 3.01. *See also Communications Vending Corp. of Ariz., Inc. v. FCC*, 365 F.3d 1064, 1072 (D.C. Cir. 2004). Freeman has presented no evidence to support any of these essential elements of its agency claim.

It is undisputed that in 1997, when Freeman withdrew from BCOA, it stated clearly and unequivocally that it was withdrawing, from that date forward, "any and all authority which may previously have been granted to the BCOA to negotiate on its behalf with the International

Union, United Mine Workers of America, any other labor organization, or any other entity whatsoever." Motion at 18. Freeman offers no evidence that it ever changed this revocation of authority. Similarly, Freeman has not presented any evidence that BCOA consented to serve as Freeman's agent in any capacity during the 2007 NBCWA negotiations. In opposing summary judgment on this issue, Freeman attempts to rely on Judge Scott's opinion in which she stated that there might be a factual issue as to "whether BCOA agreed, in exchange for that perpetual agreement by the coal companies [to contribute under the evergreen clause] to act as the agent for these companies in all future negotiations with the UMWA." *Freeman United Coal Mining Co. v. UMWA, et al.*, No. 07-3048, 2007 WL 1549489, at *6 (C.D. Ill. May 25, 2007). That ruling was on a pre-discovery motion to dismiss, which Freeman can no longer hide behind. Freeman has had ample time to discover whether any such agreement existed, and it has produced nothing.

An additional independent reason why Freeman cannot survive summary judgment on Count II is because Freeman has presented no evidence that it controlled or had the right to control its putative agent, BCOA, during the 2007 NBCWA negotiations. It is hornbook agency law that the principal's right to control the agent is critical to the existence of an agency relationship. *See* Motion at 19-20, citing cases. Freeman's supplemental submission simply states that if Freeman is bound by the contribution rate in the 2007 NBCWA, then Freeman "necessarily" would have had the requisite "right of control" over BCOA. Supplemental Opp. at 42. This is not evidence but just unsupported assertion.

> **D. Freeman Cannot Establish That BCOA Breached Any Duty Owed To It By Negotiating A Contribution Rate That Complies With A Federal Statute And Applies Equally To All Contributing Employees.**

Because Freeman has not established, as a matter of law, that BCOA owed its former member Freeman any duty as its alleged "agent" during the 2007 NBCWA negotiations, the

alleged "abuse[s] [of] authority *as the employer's agent*" listed on pages 40-41 of Freeman's supplemental submission are immaterial and BCOA has no obligation to respond to them. In addition, they are grossly misleading and avoid two fundamental points, which are based on undisputed facts.

First, it is undisputed that the Pension Protection Act of 2006, enacted in August 2006 while BCOA and the UMWA were in negotiations for the 2007 NBCWA, requires employers to fund pension plans and imposes various obligations on employers and pension plans if a plan falls below 80% funded. *See* Motion at 25-26. It is undisputed that the UMWA proposed pension increases of approximately $1.2 billion, which BCOA resisted, and the parties eventually agreed on pension increases in the 2007 NBCWA of approximately $576 million. Freeman Appendix at A1092. The 2007 NBCWA pension increase is comparable to the pension increase negotiated in the 2002 NBCWA. *Id.* at A364 (Roberts Dep. at 75-76). In addition, there is undisputed evidence from BCOA's economist stating that, in order to pay for the increased benefits and "prevent the 1974 Pension Trust from falling below the 80% funded level and into endangered status," a contribution rate increase was required. (Perkins Dec. ¶ 42). Moreover, the negotiated rate increase resulted in the 1974 Pension Trust becoming 83% funded, only slightly above the "endangered threshold," with little margin for error. Freeman Appendix at A1092.

In light of these undisputed facts, Freeman contends that no contribution increase would have been necessary if BCOA had not agreed to increases in pension benefits for UMWA members. Freeman's attempt to have the Court make a judgment on the reasonableness of the substantive benefit levels of the 2007 NBCWA is contrary to settled law. *See United Mine Workers of America Health & Retirement Funds v. Robinson,* 455 U.S. 562,574 (1982) ("[t]here

is no general requirement that the complex schedule of various employee benefits must withstand judicial review under an undefined standard of reasonableness.").

Finally, Freeman's claim that BCOA breached some undefined duty to Freeman when BCOA and the UMWA negotiated the contribution rates to the 1974 Pension Trust founders on the undisputed fact that the negotiated rates apply equally to all BCOA and non-BCOA companies, including Freeman. Freeman's lament that the hourly-based contribution rate unfairly affected its less efficient operations provides no basis for avoiding summary judgment, because, among other things, the per-hour approach was adopted at least two decades ago when Freeman was a member of BCOA. Motion at 22-23.

## CONCLUSION

For all of the foregoing reasons, as well as those set forth in BCOA's motion for summary judgment and in the separate motions for judgment filed on behalf of the Trustees of the 1974 Pension Trust and the UMWA, BCOA requests that the Court grant its motion for summary judgment and the motions of the Trustees and the UMWA.

Respectfully submitted,

_____/s/_____

Peter Buscemi
D.C. Bar No. 269092
Stanley F. Lechner
D.C Bar No. 370986
Charles P. Groppe
D.C. Bar No. 464035

DATED: April 11, 2008

MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004
Tel:    (202) 739-3000
Fax:    (202) 739-3001
E-mail: pbuscemi@morganlewis.com
        slechner@morganlewis.com

*Counsel for Defendant*
Bituminous Coal Operators' Association, Inc.