# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Holland, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Case No. 07-cv-490 (PLF) |
| Freeman United Coal Mining Company, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| Freeman United Coal Mining Company, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07-cv-1050 (PLF) |
| | ) | |
| v. | ) | |
| | ) | |
| United Mine Workers of America, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## BCOA'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7 and 56.1, Defendant Bituminous Coal Operators' Association, Inc. ("BCOA") submits this reply memorandum in support of its motion for summary judgment against Plaintiff Freeman United Coal Mining Company ("Freeman") in Case No. 07-cv-1050.

It is important at the outset to underscore the many points that Freeman does not challenge. They include:

1.    Freeman is bound by the evergreen clause.

2.      The evergreen clause, as interpreted by this Court and the D.C. Circuit, was designed to ensure that employers participating in the 1974 Pension Trust would continue to do so and would not walk away and dump their funding obligations on other employers.

3.      Some 1,291 former employees of Freeman have received, and are continuing to this day to receive, benefits from the 1974 Pension Trust, including the increased benefits provided under the National Bituminous Coal Wage Agreement ("NBCWA") of 2007.

4.      Notwithstanding the benefits being provided to Freeman's former employees, Freeman has made no contributions to the 1974 Pension Trust at any time during the term of the 2007 NBCWA.

5.      Freeman has refused to contribute to the 1974 Pension Trust, despite the fact that such contributions are prescribed by both the 2007 NBCWA and the 1974 Pension Trust's trust document.

6.      The 2007 NBCWA, like previous NBCWAs extending back more than 50 years, and the current version of the 1974 Pension Trust trust document, like all previous versions of that document, were negotiated by BCOA and the United Mine Workers of America ("UMWA").

7.      The 2007 NBCWA's contribution rate for the 1974 Pension Trust was negotiated on the basis of hours expected to be worked throughout the organized sector of the coal industry (not just by employees of BCOA members), was ratified by a national vote of the UMWA, and has been accepted and paid by all employers in the organized sector of the coal industry other than the two companies that are parties in this Court.

All of this is not in dispute. How then does Freeman seek to justify its refusal to make required contributions to the 1974 Pension Trust?

Freeman offers essentially one argument, stated in various ways. Freeman contends that BCOA is no longer "a multiemployer bargaining unit," that therefore the 2007 NBCWA cannot be a "successor agreement" to earlier NBCWAs, and that therefore Freeman need not make the contributions required by the 2007 NBCWA and the 1974 Pension Trust trust document.

This argument cannot defeat the summary judgment motions filed by BCOA, the UMWA, and the 1974 Pension Trust. Freeman identifies no legal authority requiring BCOA to be a multiemployer entity as a precondition of negotiating the NBCWA. Nor are we aware of any such authority. Accordingly, any factual question about whether BCOA is or isn't a multiemployer bargaining unit (given that BCOA's eleven Operator Members are affiliated companies), does not present any genuine issue of *material* fact. Likewise, whether or not BCOA is or isn't a multiemployer bargaining unit cannot change the terms of the 1974 Pension Trust to which Freeman is obliged to adhere. Again, therefore, questions about BCOA's status or characteristics do not raise any genuine issue of *material* fact. Freeman cannot prevail however such questions might be answered.

Nor has Freeman raised any genuine issues of material fact with respect to Count II. Count II seeks damages from BCOA for an alleged breach of a duty BCOA purportedly owed Freeman when it negotiated the current contribution rates for the 1974 Pension Trust. Freeman cannot, however, demonstrate the existence of an agency relationship with BCOA. In fact, more then ten years ago, Freeman explicitly, unequivocally, and unilaterally revoked any authority of BCOA to act on Freeman's behalf and has never manifested any intent to control BCOA since then. Moreover, even if BCOA owed Freeman some duty – which it does not – BCOA's actions could not constitute a breach of any such duty, when the undisputed facts establish (a) that the contribution rate set for the 1974 Pension Trust is being paid not only by BCOA members but by

employers throughout the organized sector of the coal industry, and (b) that the rate is rationally related to the benefit obligations and funding requirements of the 1974 Pension Trust.

Accordingly, BCOA requests that the Court grant its Motion and dismiss Freeman's claims in their entirety.

I.   **FREEMAN OFFERS <u>NO</u> AUTHORITY IN SUPPORT OF ITS CLAIM THAT BCOA MUST BE A "MULTIEMPLOYER BARGAINING UNIT" IN ORDER TO NEGOTIATE CONTRIBUTION RATES TO THE 1974 PENSION TRUST THAT ARE BINDING ON FREEMAN UNDER THE EVERGREEN CLAUSE**

   A.   **Freeman's Argument Is Directly Contrary To This Court's Interpretation Of The *Pittston* Case.**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted where the record in the case shows "that there is no genuine issue as to any *material* fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis added). The showing of a "genuine" issue, however, "is predicated upon the existence of a legal theory which remains viable under the asserted version of facts, and which would entitle the party opposing the motion (assuming his version to be true) to a judgment as a matter of law." *Bussie v. Stenocard Corp.*, 460 F.2d 116, 119 (9th Cir. 1972). *See also Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's facts. . . . The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law") (citations omitted).

In this case, Freeman, despite highlighting numerous subject areas where it claims it needs additional discovery, in fact provides no legal authority, that is, no case, statute, regulation, or administrative decision, that supports its assertion that the obligation imposed on employers under the evergreen clause must be the product of multiemployer bargaining. When coupled

4

with the fact that Freeman's assertion conflicts with this Court's decision in *Pittston*, it should be clear that BCOA is entitled to judgment as a matter of law. *See In re United Mine Workers of America Benefit Plans Litig.*, 782 F. Supp. 658 (D.D.C. 1992), *aff'd, United Mine Workers of America 1974 Pension Plan, et al. v. Pittston Co.*, 984 F.2d 469 (D.C. Cir.), *cert. denied*, 509 U.S. 924 (1993) (*"Pittston"*).

As explained more fully in BCOA's Motion, BCOA and the UMWA negotiated the evergreen clause in 1978 to ensure that "all participating employers would contribute equally to the [UMWA Health and Retirement] Trusts[, including the 1974 Trust,] and would not be permitted to withdraw from participation and leave the burden of funding health and retirement benefits of retired miners to the remaining employers." 782 F. Supp. at 667. To accomplish this, the bargaining parties in 1978 inserted the following clause into the plan and trust documents for the 1974 Pension Trust, which were then incorporated by reference into each NBCWA negotiated by BCOA and the UMWA from 1978 through 2007:

> Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978 as amended from time to time and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2007.

*See Pittston*, 984 F.2d at 472; Perkins Decl., ¶¶21-23; Roberts Decl., ¶11.

In explaining the operation of this provision, both this Court and the Court of Appeals recognized that the reference in the provision to "successor" agreements referred to subsequent NBCWAs negotiated between BCOA and the UMWA. Indeed, Judge Hogan held that the

meaning of the clause "successor agreements [to the 1978 NBCWA]" referred to "the National

Bituminous Coal Wage Agreement of 1984, 1988, and subsequent years," and *only* to those

wage agreements. 782 F. Supp. at 664. The Court of Appeals confirmed this reading, holding

that the evergreen clause "unambiguously obligated signatory employers to contribute to the

trusts at the rates specified in the current NBCWA, irrespective of the employer's failure [to]

sign that NBCWA," and that "only a subsequent NBCWA can qualify as such a successor

agreement" within the meaning of the evergreen clause. 984 F.2d at 473-74.

Despite the holding in *Pittston*, Freeman asserts that the 2007 NBCWA is not a true

"successor" agreement to the 2002 and earlier NBCWAs for purposes of the evergreen clause.

Under the factors that this Court has identified as critical to this inquiry, however, there should

be no dispute that the 2007 NBCWA qualifies as a successor agreement. Specifically, in *Flynn*

*v. Dick Corporation*, 384 F. Supp. 2d 189 (D.D.C. 2005), *rev'd on other grounds*, 481 F.3d 824,

827 n.2 (D.C. Cir. March 20, 2007), this Court, in determining whether a collective bargaining

agreement that imposed on an employer a contribution obligation to a multiemployer pension

plan was a "successor" to prior agreements, identified several relevant factors, including the

identity of the signatories, the scope of work covered by the agreements, and the agreements'

effective dates. 384 F. Supp. 2d at 194-95. In deciding that the later agreement was indeed a

"successor," the Court found that the agreements were "essentially identical" in that the same

unions were a party to both, the scope of covered work was the same, and the agreements

covered the same employees. *Id*. at 195. These identical factors are present here. It is

undisputed that BCOA and the UMWA were parties to both the 2002 and 2007 NBCWAs and

that both agreements covered the same work and the same employees in the industry. Moreover,

the 2007 NBCWA was negotiated by BCOA and the UMWA to replace the expiring 2002

NBCWA, and became effective on January 1, 2007, immediately after the term of the 2002

NBCWA ended on December 31, 2006. Indeed, the only difference that the Court found in

*Flynn* between the two agreements at issue was the fact that the later agreement was signed by

only one of the two employer associations that signed the prior agreement. 384 F. Supp. 2d at

195. The Court concluded that this change on the employer side was immaterial. Likewise,

changes in BCOA's membership are not material, and should not affect whether the 2007

NBCWA is a successor agreement for purposes of the evergreen clause.

In summary, *Pittston* holds that once BCOA and the UMWA (the settlors or creators of

the 1974 Pension Trust) negotiate the NBCWA and its contribution rate to the 1974 Pension

Trust, a single coal company (such as Pittston then, and Freeman now) cannot change or escape

that contribution rate payment obligation by signing an individual labor agreement with the

UMWA or no agreement at all. This conclusion flows directly from the courts' acknowledgment

that the "evergreen clause was written to ensure that all employers participating in the Trusts

would share equally in the burden of amortizing the existing Trust deficits and *in funding future*

*benefits*," and "to prevent employers from pulling out of the Trusts and leaving remaining

employers to foot the bill for retirees of those employers who had pulled out or had gone out of

the coal-mining business." 782 F. Supp. at 665, 666. Nothing in the 1974 Pension Trust or the

evergreen clause, and nothing in the *Pittston* decision enforcing the clause, requires BCOA to be

a "multiemployer bargaining unit." Instead, as this Court recognized, all that is required is that

BCOA and the UMWA negotiate the new NBCWA and establish the contribution rate for the

1974 Pension Trust.

In seeking to evade and avoid its contribution payment obligation here, Freeman seeks to

turn the *Pittston* precedent upside down, and invite the very thing that the evergreen clause was

created to prevent – the elimination or splintering of the 1974 Pension Trust contribution
obligation for employers who sign no new agreement with the UMWA (or who sign a separate
non-conforming agreement with respect to the Trust) and the resulting dumping of the future
funding obligations for the Trust onto other coal operators. Because Freeman's position is
directly contrary to the holding in *Pittston*, it should be rejected here.[1]

**B.     Freeman's Argument Is Undercut By The Negotiation and Establishment Of
         The 2007 NBCWA As The Industry Standard.**

Although Freeman quibbles that it needs additional, unspecified discovery regarding the
2007 bargaining process, the undisputed facts already submitted by BCOA and the UMWA
confirm the national – and not singular – character of the 2007 NBCWA and the fact that its
negotiation and ratification is indistinguishable from prior NBCWAs. As the undisputed facts
already in the record make clear:

- The UMWA chose to recognize and bargain with the BCOA as the bargaining
  representative of its 11 Operator members in 2006 over the terms of the 2007
  NBCWA, just as the UMWA has done for more than 50 years.

- At the time of the negotiations, BCOA had 11 Operator Members, each a
  separately incorporated entity affiliated with Consol.

- The UMWA recognized that BCOA had authority to negotiate the 2007 NBCWA
  on behalf of its 11 Operator Members, and was aware that these 11 Operator
  Members were all affiliates of Consol.

- The UMWA also recognized that BCOA's 11 Operator Members for which
  BCOA had authority to negotiate the 2007 NBCWA had produced more than 50
  percent of the tonnage membership of BCOA on the Effective Date of the
  predecessor NBCWA, the 2002 NBCWA.

- Both BCOA and the UMWA intended from the outset that their negotiations
  would result in the 2007 NBCWA, and the 2007 NBCWA was intended to be the
  successor agreement to the 2002 NBCWA.

---

[1]     Freeman claims in its response to BCOA's Statement of Material Facts Not in Dispute that it is not even a
material fact that, though 1,291 of its own retirees continue to receive benefits from the 1974 Pension Plan, Freeman
has not made any contributions to the Trust from January 1, 2007 to the present. *See* Freeman's Statement of Issues
Setting Forth All Material Facts To Which There Is A Genuine Issue Necessary To Be Litigated, at 21. This is an
extraordinary statement, especially in light of this Court's recognition in *Pittston* that the evergreen provision was
designed to protect against imposing on other employers the obligation to fund the retirement benefits of persons
formerly employed by companies who sought to walk away from the 1974 Pension Trust.

- In addition, both BCOA and the UMWA understood that other coal companies throughout the United States, by their prior contractual agreement under the evergreen clause, would be bound by the contribution rate to the 1974 Pension Trust that would be negotiated during collective bargaining.

- During the negotiations, in reaching agreement on the 1974 Pension Trust contribution rate, the parties calculated the contribution rate based on their best estimate of signatory hours to be worked nationwide during the term of the 2007 NBCWA by all contributing employers and not just the signatory hours expected to be worked by BCOA's 11 Operator Members.

- After the BCOA and the UMWA reached an agreement over the terms of the 2007 NBCWA, the UMWA sent the tentative national agreement out to its members for a nationwide ratification vote.

- Both BCOA and the UMWA viewed the 2007 NBCWA as the successor agreement to the 2002 NBCWA.

- The UMWA ratification vote resulted in the approval of the 2007 NBCWA by UMWA members working for employers nationwide, not just UMWA members who worked for BCOA's 11 Operator Members.

- After this nationwide ratification vote, the UMWA negotiated individually with the employers of its members nationwide, and in relatively short order virtually all of the coal operators in the industry agreed to adopt or "me-too" the 2007 NBCWA, some with minor changes, but none with changes that affected the 1974 Pension Trust or the contribution rate to the 1974 Pension Trust.

Outside its naked assertion that BCOA is not a "multiemployer bargaining unit," Freeman provides no legitimate grounds why, in light of these facts, the 2007 NBCWA is not a "successor" agreement that is national (not individual) in character. *See Pittston*, 984 F.2d at 473 (in matters involving a contract, summary judgment is appropriate where the agreement "admits of only one reasonable interpretation.")

Although Freeman claims that the current 11 Operator Members of BCOA constitute a "single employer," Freeman provides no reason why BCOA as currently constituted cannot represent its employer-members in negotiation with the UMWA over the 2007 NBCWA and the 1974 Pension Trust contribution rate. Freeman claims it needs additional discovery to determine whether the 11 Operator Members are a "single employer" under federal labor law. Although BCOA does not concede that a "single employer" relationship exists among this group of

employers, there simply is no reason to address this issue in this litigation.  The single employer doctrine serves among other things to ensure that employers do not deprive employees of bargaining or representation rights under the National Labor Relations Act ("NLRA") by examining whether two or more employers should be treated as one under the Act; as part of this inquiry, the National Labor Relations Board "NLRB") or a court examines several factors, include whether the various employers have common management, centralized control of labor relations, interrelated operations, and common ownership or financial control.  *See, e.g., RC Aluminum Industries, Inc. v. NLRB*, 326 F.3d 235, 239 (D.C. Cir. 2003).

In contrast, one hallmark of multiemployer bargaining is that individual employers agree to sacrifice their right to bargain as distinct entities with a union by voluntarily submitting to be bound by an agreement that covers a group of employers, and the NLRB has long sanctioned the ability of employers to band together and bargain on such a basis.  *Id.*  As such, it makes no sense to engage in discovery on an issue – whether the 11 current Operator Members of BCOA should be treated as one for purposes of collective bargaining – when those members already have agreed to have BCOA bargain on their behalf under the NLRA and BCOA has negotiated the 2007 NBCWA on that basis.  The NLRB requires on an agreement by individual employer members to be bound by collective bargaining on a group basis, *and* the union's consent to enter into negotiations on a group basis.  *Joseph J. Callier, et al., d/b/a Callier's Custom Kitchens*, 243 NLRB 114, 117 n. 8 (1979), *enf'd* 630 F.2d 595 (8th Cir. 1980); *see also Western States Regional Council No. 3 v. NLRB*, 398 F.2d 770, 773 (D.C. Cir. 1968) (adopting test for determining existence and status of multiemployer unit).  Both factors were plainly present here.

In addition, Freeman ignores language within the NBCWAs that clearly undermines its unsupported contention that multiemployer bargaining is necessary when negotiating a successor

10

NBCWA for purposes of the evergreen clause. Specifically, every NBCWA negotiated between 1978 and 2007 has contained the following provision to address the possibility that BCOA has ceased to exist, or the possibility that more than 50% of BCOA's tonnage membership has withdrawn from the Association:

> In the event BCOA ceases to exist, or in the event that more than 50% of the tonnage membership of BCOA on the Effective Date [of the NBCWA] has withdrawn prior to the time when the BCOA is required or permitted to take action under this Article [XX], then such action may be taken by majority vote, based on tonnage, of Employers who were BCOA members on the Effective Date.

Perkins Decl., ¶9.

As this provision makes clear, at least with respect to Article XX of the NBCWA (the Article that includes the contribution rate for the 1974 Pension Trust), the bargaining parties already have made provision for the consequences stemming from the disappearance of BCOA from the bargaining relationship. At the present time, BCOA continues to exist, and more than 50% of its tonnage membership in place on the effective date of the 2002 NBCWA remains in place. Absent any development that would trigger this clause (and there has been none), nothing in the NBCWA deprives BCOA of the authority to act with respect to Article XX, and nothing in the NBCWA requires that BCOA be, or remain, the "multiemployer bargaining unit" that Freeman insists, incorrectly, is required to negotiate a binding contribution rate to the 1974 Pension Trust under the evergreen clause. Indeed, given this language, and the absence of any other restrictions in the NBCWA, Freeman's attempt to create some intermediate status for BCOA – one that allows BCOA to exist and negotiate collective bargaining agreements but deprives it of the ability to negotiate a successor NBCWA for purposes of the evergreen clause – is groundless.

II.    **FREEMAN'S CLAIM UNDER COUNT II FAILS BECAUSE FREEMAN CANNOT ESTABLISH THE EXISTENCE OF AN AGENCY RELATIONSHIP AND, EVEN IF IT COULD, FREEMAN REVOKED BCOA'S AUTHORITY TO ACT 10 YEARS BEFORE BCOA NEGOTIATED A CONTRIBUTION RATE IN THE 2007 NBCWA THAT APPLIES TO ALL PARTICIPATING EMPLOYERS ON AN EQUAL BASIS.**

If it is found liable to contribute to the 1974 Pension Trust, Freeman seeks damages from BCOA in Count II of the Complaint stemming from an alleged breach of the "duties of good faith and fair dealing" that BCOA purportedly owes it and presumably other former members. In its Opposition, however, Freeman fails to make even a rudimentary showing that BCOA was in fact Freeman's agent for purposes of negotiating the current contribution obligation to the 1974 Pension Trust. In addition, Freeman cannot demonstrate that the contribution rate that BCOA negotiated with the UMWA in the 2007 NBCWA is unreasonable or arbitrary and capricious. Accordingly, BCOA renews its request that the Court dismiss Count II, and grant BCOA judgment as a matter of law.

A.    **Freeman Fails To Establish The Existence Of Any Agency Relationship With BCOA.**

It is hornbook law that an agency relationship arises where one person (the "principal") manifests assent to another person (the "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act. *Restatement (Third) of Agency* §1.01. Freeman, as the party seeking to establish that some form of agency relationship existed between it and BCOA, bears the burden of doing so by clear and convincing evidence. *See id.*, §3.01; *Communications Vending Corp. of Ariz., Inc. v. FCC*, 365 F.3d 1064, 1072 (D.C. Cir. 2004) (citations omitted) (party asserting existence of relationship has burden of establishing both the existence of the relationship and the authority of the agent). Because Freeman:

1-WA/2852587.4

- fails to make even a rudimentary showing regarding the creation of such a relationship, and instead relies on conjecture and the excuse that it needs additional discovery to demonstrate the existence of a relationship based on the explicit manifestation of mutual consent, and

- after 1997, when it withdrew from BCOA, signed "me-too" agreements directly with the UMWA that incorporated by reference the 1974 Pension Trust and the evergreen clause, thus creating a separate and independent contractual obligation with the UMWA to be bound to the terms and conditions of the Trust,

its claim under Count II should be dismissed and BCOA should be granted judgment as a matter of law.

First, in its effort to meet its burden of establishing the purported agency relationship, Freeman places undue reliance on the decision of Judge Scott that addressed BCOA's motion to dismiss Freeman's Complaint. In her decision, Judge Scott refused to dismiss Count II in part on the grounds that the establishment of an agency relationship involved a "factual issue." *See* Opposition at 24. Motions under Rule 12(b)(6), however, explore only the four corners of the Complaint, and require a court to accept as true the factual allegations set forth in it. In contrast, at the summary judgment stage, Rule 56 requires Freeman to come forward with admissible evidence that would demonstrate the existence of such a relationship that goes beyond the naked allegations contained in the Complaint. This Freeman utterly fails to do, even though Freeman has the obligation to establish the existence of an agency relationship by "clear and convincing evidence."

Instead, Freeman simply asks "whether BCOA agreed, in exchange for that perpetual agreement by the coal companies [to contribute under the evergreen clause], to act as the agent for these companies in all future negotiations with the UMWA." Opposition at 25-26. But Freeman offers no evidence of any such agreement or agency relationship, and BCOA knows of no such evidence. Freeman's failure to adduce evidence in support of its agency claim is especially telling because ordinarily one would expect that evidence of the principal's assent and

the principal's efforts to exercise control over the agent would be within the principal's, *i.e.*, Freeman's, control.[2]

Second, Freeman's claim that some form of agency relationship exists with BCOA ignores the fact that, when it agreed with the UMWA to "me-too" the NBCWAs in 1998 and 2002, it voluntarily chose to negotiate directly with the UMWA, and did so without the benefit of BCOA. Regardless of any duty allegedly owed by BCOA to Freeman, Freeman reached direct agreement with the UMWA that included a stand-alone obligation to be bound by the evergreen clause. *See* Excerpts from Freeman United Coal Mining and UMWA Bituminous Coal Wage Agreement of 2003 (attached as Exhibit 1 to Declaration ("Decl.") of Charles P. Groppe submitted in support of BCOA's opposition to Freeman's Rule 56(f) motion) at 67 ("The United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") [, including the evergreen clause,] is incorporated by reference and made a part of this Agreement.").

Given this status, it is irrelevant whether BCOA's conduct when Freeman was a member gave rise to an agency relationship, for Freeman subsequently obligated itself to honor the evergreen clause independently with the UMWA. Under that separate contractual obligation, Freeman agreed with the UMWA to abide by the terms and conditions of the 1974 Pension Trust and to contribute to the Trust at whatever rate was provided in subsequent NBCWAs and the

---

[2]        In support of its Opposition, Freeman has submitted two short declarations that contain only hearsay and unsubstantiated conclusory allegations regarding Consol's alleged conduct. The first declaration, attached as Exhibit B to Freeman's Opposition, is from William P. Stanhagan and serves merely to report what someone else allegedly told him in a conversation. This is pure hearsay, and his affidavit is insufficient to defeat a motion for summary judgment. *See Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998). *See also Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (rejecting as hearsay conversation reported in affidavit submitted in opposition to motion for summary judgment). The declaration submitted by Thomas J. Austin does not even rise to this level, for it merely contains Mr. Austin's conclusory statements that several unidentified employers that he talked with told him that they did not like the contribution rate increase negotiated by BCOA and the UMWA in the 2007 NBCWA. Putting aside the fact that the more surprising testimony would have been a statement from an employer expressing a desire to contribute more, rather than less, in the 1974 Pension Trust, these conclusory allegations, without a smidgen of factual basis, are insufficient to support Freeman's claim. *See, e.g., Black v. Roadway Express, Inc.*, 297 F.3d 445, 454 (6th Cir. 2002) (affidavit that merely summarized findings and lacked any specific evidence "merely conclusory").

14

trust document. Freeman did so without the benefit of BCOA serving as Freeman's agent. In short, even if Freeman could establish by clear and convincing evidence the existence of an agency relationship, it would still have a separate contractual obligation to the contribute to the 1974 Pension Trust under the terms of its independent agreement with the UMWA.

### B.    Freeman Terminated Its Right To Control – And Thus Any Purported Agency Relationship – When It Revoked Its Membership In BCOA.

Freeman's effort to demonstrate the existence of an agency relationship with BCOA is also undercut by the fact that Freeman unequivocally severed its relationship with BCOA and withdrew BCOA's authority to negotiate on its behalf in 1997, almost 10 years before negotiations over the 2007 NBCWA began. As a result of this conduct, Freeman cannot as a matter of law establish the existence of a consensual relationship – let alone any right of control in that relationship.

Freeman does not dispute that, on July 29, 1997, it sent the following letter to BCOA terminating its membership:

> Pursuant to Article VII, Section (a) of the BCOA By-Laws, Freeman United Coal Mining Company (Freeman) hereby resigns its membership in the Bituminous Coal Operators Association (BCOA), effective immediately. Accordingly, please take all actions necessary to remove our company from the BCOA official membership roster and committees, as well as any other lists, forms, summaries, or other documents (including all electronic media) within the control of the BCOA.
>
> *Freeman also hereby withdraws any and all authority which may previously have been granted to the BCOA to negotiate on its behalf with the International Union, United Mine Workers of America, any other labor organization, or any other entity whatsoever.* This unequivocal withdrawal of bargaining authority is effective immediately, this 29th day of July, 1997.

Perkins Decl., ¶15, Attachment 1 (emphasis added).

In its Opposition, however, Freeman virtually ignores the import of this letter, acknowledging its existence only in a footnote and claiming that the letter does not really mean what it says it means because the withdrawal of *"any and all authority"* does not apparently include Freeman's grant of authority to BCOA to negotiate contribution rates under the evergreen clause in successor NBCWAs. Freeman's effort to walk away from its own words in unavailing. The phrase *"any and all authority"* – as well as the *"unequivocal withdrawal of bargaining authority"* – does not permit the carve-out of some limited grant of authority or express any manifestation of Freeman's right to control BCOA for some purpose. Given that the *Pittston* decision was issued in 1992, roughly five years *before* Freeman revoked BCOA's authority to act on its behalf, Freeman certainly had ample opportunity to make its understanding of the relations between the parties clear when it resigned from BCOA's membership. Instead, rather than reserve any rights that it now asserts in this lawsuit, or confirm any understanding that it had regarding alleged duties BCOA may have owed it, or even put BCOA on notice of the conditions Freeman now claims must be in place regarding its obligation to the 1974 Pension Trust, Freeman simply revoked BCOA'a authority. Under any plausible interpretation of the language, such conduct clearly severed any alleged agency relationship.

Moreover, Freeman freely admits that it did not exercise any control over BCOA's conduct during negotiation of the 2007 NBCWA. *See* Opposition at 25. Among other things, Freeman's failure to monitor negotiations includes Freeman's failure to engage in even the most basic conduct a principal would undertake to ensure the performance of its purported agent. For example:

- Freeman did not inform BCOA of any intent to participate in, receive information about, or influence in any way, the negotiation of the 2007 NBCWA, including provisions regarding the 1974 Pension Trust. Perkins Decl., ¶17.

- Freeman did not make any inquiry of BCOA before or during the 2007 negotiations, or offer any suggestions or comments regarding contributions to the 1974 Pension Trust. *Id.*

Freeman contends that it is sufficient that it possessed the abstract "right to control" BCOA during the negotiations. But the lack of any manifestation of assent by Freeman for BCOA to act on Freeman's behalf is fatal to Freeman's agency claims, especially after Freeman unilaterally revoked "*any and all*" authority of BCOA to do so. Moreover, Freeman's argument entirely fails to account for the fact that BCOA already served as the agent of its current members in the same negotiations and, by the logic of Freeman's position, also the agent of all former BCOA members obligated to contribute to the 1974 Pension Trust. Freeman does not even attempt to explain how BCOA could act exclusively in the interest of, or be controlled by, each such alleged principal. Given the obvious potential for conflict among multiple principals, Freeman's failure to express the slightest interest in the negotiations leading up to the 2007 NBCWA demonstrates the flawed nature of its agency claim.

## C.    BCOA Did Not Breach Any Duty To Freeman When Negotiating The Current Contributions In The 2007 NBCWA.

Finally, Freeman contends that the reasonableness of the contribution rates set forth in the 2007 NBCWA raises material issues of disputed fact that should not be decided at the summary judgment stage of this litigation. In making this claim, however, Freeman fails to acknowledge that BCOA already has produced to Freeman during discovery ample documentary evidence that reveals how the rate was calculated to pay for the collectively bargained benefits contained in the 2007 NBCWA while remaining above certain funding thresholds that, if not met, would impose more draconian requirements on the 1974 Pension Trust under the recently-enacted Pension Protection Act of 2006, P.L. No. 109-280. Moreover, despite its claim that BCOA breached some duty of good faith and fair dealing BCOA allegedly owed it, Freeman makes no mention of

what that duty actually consists of, let alone of how and by what standards one might determine whether the duty was breached.

In its Opposition, Freeman complains that the Pension Protection Act did not "compel" BCOA or the UMWA to increase the contributions rates for the 1974 Pension Plan. Opposition at 28. Freeman's position is myopic at best, for the Pension Protection Act, among other things, tightened funding requirements for multiemployer pension plans and, in particular, the obligations involving a pension plan's minimum funding standards. Under these amendments to ERISA, a plan's funding status generally is based on its current funding percentage and any projected accumulated deficiencies. With passage of the statute, if a plan is funded at less than 80%, has an accumulated funding deficiency in the current year, or is projected to have a funding deficiency in any of the next six years, it will be considered "endangered" under ERISA. In addition, if its funding level drops below 65%, and its assets and projected contributions are less than the present value of all nonforfeitable benefits projected to be payable during the current year and each of the next six years, it will enter "critical status" under the Act. *See generally* 29 U.S.C. § 1085.

These are real-world consequences that will trigger a host of new obligations and requirements for the 1974 Pension Trust and its settlors – the BCOA and the UMWA – if the Trust enters "endangered" or "'critical" status. Among other things, if a plan's actuary certifies that the plan is in such status, then the plan must notify its participants and beneficiaries, the Pension Benefit Guaranty Corporation, and the Department of Labor of that fact. In addition, BCOA and the UMWA would be required to adopt a Funding Improvement Plan designed to bring the 1974 Pension Trust's funding up to certain benchmark levels at the end of a ten-year Funding Improvement Period (which could be extended to a fifteen-year period under certain

1-WA/2852587.4

circumstances). While that Funding Improvement Plan was in place, the 1974 Pension Trust

would not be permitted to accept collective bargaining agreements that provided for a reduction

in the level of contributions, a suspension of contributions for any participants, or any new or

indirect exclusion of younger or newly-hired employees from plan participation. In addition,

BCOA and the UMWA would not be permitted to increase benefit levels for any participant or

beneficiary unless the Trust's actuary certifies that any such increases were paid for. *See*

*generally* 29 U.S.C. § 1085.

Freeman is simply disingenuous when it claims that the proposed contribution rate

increase for the 1974 Pension Trust was not "compelled" by the Act, for BCOA produced to

Freeman in this case extensive documentary analysis done by BCOA and its own independent

actuaries that reflect BCOA's efforts to negotiate a contribution rate that kept the Trust out of

"endangered" or "critical" status during the life of the 2007 NBCWA while meeting the

UMWA's collective bargaining demand for increased pension benefits. Groppe Decl., ¶¶ 8-9;

Perkins Decl. ¶¶40, 42. Ultimately, BCOA shared with UMWA President Roberts BCOA's

actuarial calculations regarding the Trust's funding in light of the UMWA's bargaining demands

and the requirements of the new legislation. Roberts Decl. ¶17. The UMWA's own actuaries

also analyzed the data, and reported back that BCOA's projections were "reasonably based,"

leading ultimately to agreement over the contribution rate contained in the 2007 NBCWA. *Id*.

In its Opposition, Freeman does not even seek to subject these facts to the law governing

the duty of good faith and fair dealing that it claims BCOA allegedly owes it. Freeman's

omission is understandable, for under these standards, BCOA breached no alleged duty. The

"good faith" required by this cause of action "emphasizes faithfulness to an agreed common

purpose and consistency with the justified expectation of the other party," and requires conduct

rising above "mere negligence." *See Allworth v. Howard Univ.*, 890 A.2d 194, 201-02 (D.C. 2006). Conduct that has been found to constitute "bad faith" for purposes of a breach includes a "lack of diligence and slacking off, willful rendering of imperfect performance, [or an] abuse of a power to specify terms . . . ." Restatement (Second) of Contracts § 205(d) (1981). In contrast, the "fair dealing" requirement "involves reasonable rather than arbitrary or capricious action." *Allworth*, 890 A.3d at 202 (quoting *Adler v. Abramson*, 728 A.2d 86, 90 (D.C. 1999)).

Under these standards, even if the negotiated contribution rate for the 1974 Pension Trust resulted in a rate that Freeman contends is unfavorable to it, Freeman has failed to show – or even failed to allege – how BCOA's actions constitute an act of more than "mere negligence." or were arbitrary and capricious, for purposes of stating a claim.

## III.    FREEMAN'S ATTEMPT TO RELY ON STATUTORY WITHDRAWAL LIABILITY TO SAFEGUARD THE FINANCIAL CONDITION OF THE 1974 PLAN IS WRONG AND DISINGENUOUS

Freeman states in its Opposition that escaping the contribution obligations of the evergreen clause would not harm other contributing employers or the financial condition of the 1974 Pension Trust because companies that cease participating in a multiemployer plan are required by law to pay "withdrawal liability." Opposition at 21-22. According to Freeman, the payment of withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") "ensures that the multiemployer plan will not suffer any loss because of the withdrawal." *Id* at 21. Not only is this assertion wrong, it is a disingenuous argument for Freeman to make because it has sold its coal mines, withdrawn from the 1974 Pension Plan, and is attempting to drastically reduce its withdrawal liability through this litigation.

First, due to the nature of a multiemployer fund, if some employers cease contributing, other employers have to contribute more. *See Connors v. Link Coal Co.*, 970 F.2d 902, 906 (D.C. Cir. 1992) ("[w]ithdrawal at the option of each employer would leave [the remaining

employers] bearing a disproportionate share of the load.")  Indeed, one of the main reasons that

BCOA first insisted on the evergreen clause in 1978 (when Freeman was a member of BCOA)

was to prevent the UMWA multiemployer funds from becoming a "last man's club," whereby

the refusal to pay by some would leave the remaining employers "holding the bag." *Pittston*,

782 F. Supp. 658, 665-66 (D.D.C. 1992) (evergreen clause was "an important provision

negotiated to make sure that any coal operator that voluntarily agreed to participate in the Funds

in 1978 could not simply walk away from the Funds and leave its retirees behind, or negotiate

cut-rate contributions with the UMWA, at the expense of the remaining employers.")  Thus, if

coal companies such as Freeman (a subsidiary of General Dynamics) and Monterey (a division

of ExxonMobil) could cease contributing to the 1974 Pension Trust as they urge, they would be

foisting their retiree pension costs onto their competitors who would be required to bear a

disproportionate burden of the Trust's costs.

Second, Freeman's assertion that "contributions do not matter" and that withdrawal

liability under MPPAA is sufficient to ensure that solvency of the 1974 Pension Trust, is absurd.

MPPAA was enacted in 1980.  If withdrawal liability were sufficient to fully protect the pensions

of American workers, then we would not have experienced the pension funding crisis that led to

the enactment of the Pension Protection Act of 2006.  *See, e.g., The Pension Underfunding

Crisis: How Effective Have Reforms Been?: Hearing Before the H. Comm. on Education and

the Workforce,* 108th Cong. 2 (2003).  *See also* H.R. Rep. No. 109-745 (2006) ("Comprehensive

legislation passed by Congress and signed by President Bush includes tough new funding

requirements to ensure employers adequately and consistently fund their pensions, gives workers

meaningful information about the financial status of their benefits, and protects taxpayers from a

possible multi-billion bailout of the Pension Benefit  Guaranty Corporation.")

1-WA/2852587.4

Freeman's assertion that withdrawal liability ensures that the 1974 Pension Trust will "not suffer any loss" is an inaccurate and cynical attempt to deceive the Court. Incredibly, Freeman fails to inform the Court that it recently sold all of its coal operations to Springfield Coal, and therefore no longer has an obligation to make the $2.00 per hour contribution to the 1974 Pension Trust as required under the evergreen clause. *See* Second Declaration of Dale Stover, at ¶¶3-4, appended to the Trustees' Reply Brief in Support of its Motion for Summary Judgment. As such, the principal liability that Freeman now has to the 1974 Pension Plan is statutory withdrawal liability under MPPAA, and not contractual hourly-based contributions under the evergreen clause.

The continued pursuit of this litigation by Freeman appears to be an attempt by Freeman to avoid the arbitration forum that Congress created in MPPAA to resolve withdrawal liability disputes. *See* 29 U.S.C. § 1401. In addition, as demonstrated in the Second Declaration of Dale Stover, Freeman's position, if successful, would drastically reduce the amount of withdrawal liability payments that Freeman would be obligated to pay to the 1974 Pension Trust. Preliminary calculations by the 1974 Pension Trust estimate that, under the 2007 NBCWA's $2.00 per hour contribution rate, Freeman's annual withdrawal liability payments to the 1974 Pension Trust would be approximately $1.8 million. If Freeman is able to reduce its contribution rate to zero in this litigation, Freeman's annual withdrawal liability payments would be approximately $690,000. Over the course of 20 years, this would deprive the 1974 Pension Trust of more than $22 million. In short, Freeman is attempting to use this litigation to undermine the very statutory mechanism, withdrawal liability, that it claims is a panacea for the 1974 Pension Trust --- which by the most recent estimate is underfunded by more than one <u>billion</u> dollars. *See* Perkins Decl. ¶ 43.

## CONCLUSION

For all of the foregoing reasons, as well as those set forth in BCOA's motion for summary judgment and in the separate motions for judgment filed on behalf of the Trustees of the 1974 Pension Trust and the UMWA, BCOA requests that the Court grant its motion for summary judgment and the motions of the Trustees and the UMWA.

Respectfully submitted,

_____/s/_____

Peter Buscemi
D.C. Bar No. 269092
Stanley F. Lechner
D.C Bar No. 370986
Charles P. Groppe
D.C. Bar No. 464035

DATED: November 13, 2007

MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004
Tel:    (202) 739-3000
Fax:    (202) 739-3001
E-mail: pbuscemi@morganlewis.com
        slechner@morganlewis.com
        cgroppe@morganlewis.com

*Counsel for Defendant*
Bituminous Coal Operators' Association, Inc.