UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ‎ | ) | |
| MICHAEL H. HOLLAND, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0490 (PLF) |
| | ) | |
| FREEMAN UNITED COAL MINING CO., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| FREEMAN UNITED COAL MINING CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1050 (PLF) |
| | ) | |
| UNITED MINE WORKERS OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

OPINION

   These cases involve a dispute over two coal mining companies' obligations to contribute to a pension trust benefiting retired coal miners.  The matter is before the Court on four motions for summary judgment in these two consolidated cases: Civil Action No. 07-0490 and Civil Action No. 07-1050.[1]

---

  [1]  The papers submitted in connection with this matter in Civil Action No. 07-0490 include: Motion for Summary Judgment on the Issue of Liability by the United Mine Workers of America 1974 Pension Trust and its Trustees ("Trust Mot."); Freeman United Coal Mining Company's Opposition to the Motions for Summary Judgment Filed by the 1974 Pension Trust, United Mine Workers of America and Bituminous Coal Operators' Association ("Freeman Opp."); Memorandum of Points and Authorities in Support of Freeman United Coal Mining

In Civil Action No. 07-0490, plaintiffs Michael Holland, Michael Buckner, B.V. Hyler and Steven Schaab, trustees of the United Mine Workers of America 1974 Pension Trust (the "Trust"), bring suit under Sections 502 and 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132 and 1145, respectively, and Section 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), against defendants Freeman United Coal Mining Company ("Freeman") and Monterey Coal Company

---

Company's Supplemental Opposition to the Motions for Summary Judgment Filed by the 1974 Pension Trust, United Mine Workers of America and Bituminous Coal Operators' Association ("Freeman Supp. Opp."); Monterey Coal Company's Memorandum of Points and Authorities in Opposition to the Motion for Summary Judgment Filed by the Trustees of the United Mine Workers of America 1974 Pension Trust and in Support of Monterey's Alternative Motion that the Court Deny the Trustees' Motion in Order to Permit Discovery ("Monterey Opp."); Monterey Coal Company's Supplemental Memorandum of Points and Authorities in Opposition to the Motion for Summary Judgment Filed by the Trustees of the United Mine Workers of America 1974 Pension Trust ("Monterey Supp. Opp."); Reply Memorandum in Support of the United Mine Workers of America 1974 Pension Trust's Motion for Summary Judgment, and Memorandum in Opposition to Defendants' Rule 56(f) Motions ("Trust Reply"); Supplemental Reply Memorandum in Support of the United Mine Workers of America 1974 Pension Trust's Motion for Summary Judgment ("Trust Supp. Reply").

The papers submitted in connection with this matter in Civil Action No. 07-1050 include: Motion for Summary Judgment on the Issue of Liability by the United Mine Workers of America 1974 Pension Trust and its Trustees ("Trust Mot."); Defendant United Mine Workers of America's Motion for Summary Judgment ("Union Mot."); Motion of Defendant Bituminous Coal Operators' Association, Inc. for Summary Judgment ("BCOA Mot."); Freeman United Coal Mining Company's Opposition to the Motions for Summary Judgment Filed by the 1974 Pension Trust, United Mine Workers of America and Bituminous Coal Operators' Association ("Freeman Opp."); Memorandum of Points and Authorities in Support of Freeman United Coal Mining Company's Supplemental Opposition to the Motions for Summary Judgment Filed by the 1974 Pension Trust, United Mine Workers of America and Bituminous Coal Operators' Association ("Freeman Supp. Opp."); Supplemental Reply Memorandum in Support of the United Mine Workers of America 1974 Pension Trust's Motion for Summary Judgment ("Trust Supp. Reply"); Reply Memorandum in Support of the United Mine Workers of America's Motion for Summary Judgment ("Union Reply"); Supplemental Reply Memorandum in Support of the United Mine Workers of America's Motion for Summary Judgment ("Union Supp. Reply"); BCOA's Reply in Support of its Motion for Summary Judgment ("BCOA Reply"); and BCOA's Supplemental Reply in Support of its Motion for Summary Judgment ("BCOA Supp. Reply").

("Monterey").[2]  The Trust argues that Freeman and Monterey have failed to contribute to the

Trust as required by an agreement called the 2007 National Bituminous Coal Wage Agreement,

and it has moved for summary judgment on the issue of the coal mining companies' liability for

the allegedly delinquent contributions.

In Civil Action No. 07-1050, Freeman has brought suit against the Trust, the

United Mine Workers of America (the "Union") and the Bituminous Coal Operators' Association

("BCOA") seeking a declaration that Freeman is *not* required to contribute to the Trust according

to the 2007 National Bituminous Coal Wage Agreement.[3]  In the alternative – that is, if the Court

concludes that Freeman *is* obligated to contribute to the Trust according to that agreement –

Freeman seeks damages against BCOA on the theory that (1) BCOA served as Freeman's agent

during the negotiation of the 2007 National Bituminous Coal Wage Agreement, (2) BCOA

therefore owed duties of good faith and fair dealing to Freeman, and (3) BCOA breached those

duties by negotiating pension contribution rates that are adverse to Freeman's interests.  The

Trust, the Union and BCOA have moved for summary judgment in Civil Action No. 07-1050.[4]

---

[2]      Several other coal mining companies were also named as defendants at the outset; all but Freeman and Monterey were eventually dismissed voluntarily.

[3]      Freeman originally filed Civil Action No. 07-1050 in the United States District Court for the Central District of Illinois on February 9, 2007.  The case was then transferred to this Court.  See Freeman United Coal Mining Company v. United Mine Workers of America, Civil Action No. 07-3048, Opinion at 16-20 (C.D. Ill. May 24, 2007).

[4]      After the Trust, the Union and BCOA moved for summary judgment, Freeman and Monterey responded to these motions, and also asked for discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.  The Court granted the Rule 56(f) motions.  After taking discovery, Freeman and Monterey filed supplemental oppositions to the motions for summary judgment.  The Trust, the Union and BCOA then filed supplemental replies to Freeman's and Monterey's supplemental oppositions.  The Court heard oral argument on the motions for summary judgment on April 29, 2008.

Upon consideration of the parties' papers, the oral arguments of counsel and the entire record in this case, the Court will grant summary judgment in favor of the Trust in Civil Action No. 07-0490. The Court will also grant summary judgment in favor of the Trust, the Union and BCOA on the issue of Freeman's liability in Civil Action No. 07-1050. It declines to exercise supplemental jurisdiction over Freeman's agency claim.

## I.  BACKGROUND

### A. The Parties

The Union is a labor organization representing mine workers. BCOA is a non-profit corporation that bargains with the Union on behalf of its member companies – *i.e.*, those companies that authorize BCOA to engage in collective bargaining on their behalf. The Trust was created by the Union and BCOA in 1974. Its purpose is to provide benefits to retired coal miners and their eligible dependents, and it is funded by contributions from employers who agree to participate in the Trust. Employers agree to participate in the Trust by signing agreements to that effect with the Union. Freeman and Monterey agreed to participate in the Trust by signing many such agreements over the years. See BCOA Mot., Defendant BCOA's Statement of Material Facts Not in Dispute ¶¶ 2-3; Monterey Supp. Opp., Ex. E, Declaration of Howard C. Schulz ¶¶ 4-5.[5]

One of BCOA's principal functions is to negotiate with the Union collective bargaining agreements called National Bituminous Coal Wage Agreements, or "NBCWAs." NBCWAs typically expire after three to five years, and the Union and BCOA then engage in

---

[5]    Both Freeman and Monterey are former members of BCOA. Freeman withdrew from BCOA in 1997; Monterey withdrew in 1992. See BCOA Mot. at 8.

negotiations to create "successor" NBCWAs. See Trust Mot. at 22. Generally speaking, the terms of any particular NBCWA – which include wages, hours and other terms and conditions of employment – are binding only upon BCOA members and those non-BCOA members who affirmatively "sign on" to the NBCWA or another agreement incorporating its terms. See BCOA Supp. Reply at 12-13. One important exception to this rule is at the heart of this case.

### B. The Evergreen Clause and the _Pittston_ Litigation

In addition to wages and other terms and conditions of employment, each NBCWA also establishes the rates at which all employers who have ever agreed to participate in the Trust must contribute to the Trust.[6] In other words, an employer who has agreed to participate in the Trust at any time – whether by signing a previous NBCWA as a member or non-member of BCOA, or by signing a different agreement with the Union that requires the employer to contribute to the Trust – is bound by the rates set forth in a new NBCWA, even if that employer is not a BCOA member at the time the new NBCWA is executed, and even if that employer does not affirmatively sign on to the new NBCWA or a similar agreement. See United Mine Workers of America 1974 Pension v. Pittston Co., 984 F.2d 469, 473-74 (D.C. Cir. 1993). To explain why requires a short digression.

Every NBCWA executed since 1978 has incorporated by reference the documents setting forth the terms and conditions of participation in the Trust (hereinafter the Trust's "governing documents"). See, e.g., National Bituminous Coal Wage Agreement of 2002, art. XX

---

[6]     For example, the most recent NBCWA, which became effective January 1, 2007, requires employers contributing to the Trust to contribute at a rate of $2.00 per miner hour worked, with the rate increasing on an annual basis throughout the life of the agreement. See National Bituminous Coal Wage Agreement of 2007, art. XX § d(1)(ii) at 148-49 (2007).

§ c(1) at 143-44 (2002).[7]  The Trust's governing documents include a provision called the "evergreen clause."  The current version of the evergreen clause provides:

> Any Employer who employed any Participant eligible for coverage under, or who receives or received benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2007.

Trust Mot., Ex. E to the Declaration of Dale Stover, United Mine Workers of America 1974 Pension Plan, art. VIII § B(16) at 33 (2007).[8]

---

[7]    This is also true, it seems, of virtually every non-NBCWA agreement between the Union and individual employers in which the employers agreed to contribute to the Trust.

[8]    The last phrase of the evergreen clause is amended by the Union and BCOA every time a new NBCWA is negotiated so that it refers to the most recent NBCWA.  For example, after the parties negotiated the 1984 NBCWA, the evergreen clause was revised to read:

> Any Employer who employed any Participant eligible for coverage under, or who receives or received benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto, including, but not limited to, *the National Bituminous Coal Wage Agreement of 1984*.

Trust Mot., Ex. A to the Declaration of Dale Stover, United Mine Workers of America 1974 Pension Plan, art. VIII § B(16) at 33(1984) (emphasis added).

6

The meaning of the evergreen clause – and in particular the effect of its incorporation in all post-1978 NBCWAs and similar agreements – was the subject of extensive litigation before this Court and the D.C. Circuit.  See United Mine Workers of America 1974 Pension v. Pittston Co., 984 F.2d 469 (D.C. Cir. 1993); In re United Mine Workers of America Employee Benefit Plans Litigation, 782 F. Supp. 658 (D.D.C. 1992) (collectively, "the Pittston litigation").  In the Pittston litigation, a dispute between the pension trusts and certain employers who had previously agreed to participate in the trusts

> arose upon the expiration of the NBCWAs to which the appellant [employers] were signatories.  Instead of entering into successor NBCWAs, the [employers] withdrew from the BCOA and negotiated individual labor agreements with the [Union] which included modifications of their contribution obligations to the trusts.  The Trustees then brought . . . suit, contending that the evergreen clause obligates the [employers] to continue contributing to the trusts at the levels established in successor NBCWAs [rather than the levels established in the employers' non-NBCWA agreements with the Union].

United Mine Workers of America 1974 Pension v. Pittston Co., 984 F.2d at 472 (footnotes omitted).

The trustees' theory in the Pittston litigation was that the employers were subject to the evergreen clause in the Trust's governing documents by virtue of having signed one or more NBCWAs (or other agreements incorporating the Trust's governing documents), and that the evergreen clause imposed a perpetual obligation on those employers to contribute to the Trust at rates set forth in "any successor agreements" to the 1978 NBCWA.  See In re United Mine Workers of America Employee Benefit Plans Litigation, 782 F. Supp. at 661.  The trustees further argued that only a subsequent NBCWA could qualify as a "successor agreement" within

7

the meaning of the evergreen clause, and hence that the coal mining companies could not escape their contribution obligations under the current NBCWA by entering into individual, non-NBCWA agreements with the Union.  Id. at 663-64.  Judge Hogan agreed with the trustees and granted summary judgment in their favor.

The D.C. Circuit affirmed.  Specifically, the court concluded that because the employers had signed NBCWAs or similar agreements incorporating the Trust's governing documents, including the evergreen clause, those employers had

> agreed to be bound by the evergreen clause to make continuing
> contributions to the [Trust]; and this obligation included an
> agreement to make contributions at rates specified in subsequent
> NBCWAs, without regard to whether the employer was still a party
> to the subsequent agreements.  The Coal Companies cannot now
> rely on their refusal to sign successor NBCWAs to release them
> from a previously agreed-upon perpetual obligation.

United Mine Workers of America 1974 Pension v. Pittston Co., 984 F.2d at 474.  The court of appeals also found "unconvincing . . . the Coal Companies' argument that the evergreen clause allows for the modification of contribution requirements in non-NBCWA labor agreements," reasoning that "the only 'successor' agreement to an NBCWA is another NBCWA."  Id. at 475.  The Circuit agreed with Judge Hogan that these conclusions were consistent with the intentions of the evergreen clause's drafters, which were to (1) "ensure that all employers participating in the [Trust] would share equally in the burden of amortizing the existing Trust deficits and in funding future benefits," and (2) prevent employers from terminating or reducing their contributions by negotiating individual labor agreements with the Union, thereby "leaving other employers to carry more than their share of the [Trust's] liabilities."  In re United Mine Workers of America Employee Benefit Plans Litigation, 782 F. Supp. at 665.

8

*C.  The Instant Dispute*

All of this is common ground for the parties.  Freeman and Monterey acknowledge that they obligated themselves to contribute to the Trust by signing multiple NBCWAs while members of BCOA.  Freeman and Monterey further acknowledge that, by signing multiple NBCWAs – all of which incorporated by reference the evergreen clause in the Trust's governing documents – they incurred a perpetual obligation to contribute to the Trust at rates set forth in all "successor" agreements.  See, e.g., Freeman Supp. Opp., Freeman Response to UMWA's Statement of Material Facts Not In Dispute ¶ 25; see also Monterey Supp. Opp. at 7.

Nevertheless, Freeman and Monterey contend that they need not comply with the increased contribution rates set forth in the latest NBCWA.  As discussed in more detail below, they offer two main arguments on this score.  First, the coal mining companies seem to argue that the behavior of the Union and BCOA during the negotiation, adoption and implementation of the 2007 NBCWA permits them to refuse to contribute to the Trust under that agreement.  See, e.g., Freeman Supp. Opp. at 2-3.  Second, the coal mining companies argue that they are not bound by the 2007 NBCWA because (1) the evergreen clause requires them to comply only with "successor agreements" to the NBCWAs to which they are parties, see Monterey Supp. Opp. at 10 ("[The evergreen clause] requires contributions only if a 'successor NBCWA' is negotiated."), and (2) the 2007 NBCWA is not a successor agreement within the meaning of the evergreen clause.  See Freeman Supp. Opp. at 3 ("Because it is not a 'successor' agreement [within the meaning of the evergreen clause], the increased contribution rates contained in the 2007 [NBCWA] are not binding [on] non-signatories to the [NBCWA], including Freeman.").

9

With respect to the second argument, the coal mining companies reason as follows:  The drafters of the evergreen clause intended the term "successor agreement" to apply to agreements negotiated by the Union and BCOA, but not to any and all agreements negotiated by the Union and BCOA.  In particular, the drafters did not intend the term to apply to agreements negotiated by the Union and BCOA *regardless of BCOA's composition*.  Rather, according to the coal mining companies, the drafters of the evergreen clause intended that an agreement would qualify as a "successor agreement" – and thus bind all participating employers by operation of the evergreen clause – if and only if BCOA was "a robust multi-employer bargaining unit of numerous unaffiliated companies" representing "a significant percentage of the unionized coal industry" at the time the agreement was negotiated.  Freeman Supp. Opp. at 1, 3. All acknowledge that at the time the 2007 NBCWA was negotiated, voluntary withdrawals had reduced BCOA's membership – which once numbered in the hundreds – to eleven member companies, all of which were owned by one company (the Consolidated Coal Company, or "Consolidated").  See id. at 1-2.  The coal mining companies therefore claim that the 2007 NBCWA is not a product of multiemployer bargaining, and thus is not a binding successor agreement.  See id.; see also Monterey Supp. Opp. at 10.

## II.  STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  "A fact is 'material' if a dispute over it

might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." Holcomb v. Powell, 433 F.3d at 895 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; Holcomb v. Powell, 433 F.3d at 895. When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [his or her] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. Potomac Electric Power Co., 447 F.3d 843, 849-50 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc); Washington Post Co. v. Dep't of Health and Human Servs., 865 F.2d 320, 325 (D.C. Cir. 1989). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. See FED. R. CIV. P. 56(e)(2); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor. Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50. To defeat summary judgment, a plaintiff must produce more than "a scintilla of evidence to support [its] claims." Freedman v. MCI Telecomm. Corp.,

255 F.3d 840, 845 (D.C. Cir. 2001).  While on summary judgment the Court must accept as true

the non-movant's factual assertions and all reasonable inferences therefrom, a non-moving party

is obligated to produce affirmative evidence supporting the challenged aspects of its claims by

affidavit or other competent evidence setting forth "specific facts" sufficient to allow a

reasonable jury to find in the non-movant's favor.  See FED. R. CIV. P. 56(e)(2).

## III.  DELINQUENT CONTRIBUTION CLAIM

### A.  The Trust's "Amended Trust" Argument

As noted above, Freeman and Monterey argue – among other things – that (1) the

evergreen clause requires them to contribute to the Trust only as provided by "successor"

NBCWAs; (2) the 2007 NBCWA is not a "successor" NBCWA; and thus (3) they are not

required to contribute to the Trust at the rates set forth in the 2007 NBCWA.

One of the Trust's responses to this argument is that it rests on a false premise –

namely, that "the obligation of evergreen clause signatory employers is limited to the obligation

to make the contributions required by 'successor agreements' to the 1978 NBCWA."  Trust

Supp. Reply at 4.  According to the Trust, the plain language of the evergreen clause *does* require

participating employers to make contributions as required by successor agreements – but it does

*not* specify that employers are *only* required to make contributions as required by successor

agreements.  Rather, it provides that participating employers must contribute as required by

successor agreements and otherwise comply with all "terms and conditions" of the Trust's

governing documents.  See id. at 5; see also United Mine Workers of America 1974 Pension

Plan, art. VIII § B(16) at 33 (2007) (most recent version of the evergreen clause, stating that

participating employers are "*obligated and required to comply with the terms and conditions of*

*the 1974 Pension Plan and Trust,* as amended from time to time, including, *but not limited to,* making the contributions required under the [1978 NBCWA] as amended from time to time and any successor agreements thereto . . . ") (emphasis added).

After the 2007 NBCWA was negotiated, the Union and BCOA amended the Trust's governing documents so that the obligation to contribute according to the 2007 NBCWA is mentioned explicitly in three places: once in the evergreen clause, <u>see</u> United Mine Workers of America 1974 Pension Plan, art. VIII § B(16) at 33 (2007) (providing that participating employers must make "contributions required under the [1978 NBCWA] as amended from time to time and any successor agreements thereto, including . . . [the 2007 NBCWA]"), and twice elsewhere. <u>See</u> <u>id.</u> art. VIII § B(8) at 31 (providing that "[c]ontributions to the 1974 Pension Trust to fund the benefits under this Plan shall be paid solely by the Employers in accordance with . . . the [2007 NBCWA]"); <u>id.</u> art. VIII § B(10) at 32 (providing that "[i]n the event that an Employer fails to make the contributions to the Plan required by . . . the [2007 NBCWA], interest . . . shall accrue from the date due").[9]  The Trust and BCOA therefore argue that the 2007 NBCWA is now binding on Freeman and Monterey because, even if it is not a "successor agreement" within the meaning of the evergreen clause, compliance with the 2007 NBCWA is indisputably a "term and condition" of the Trust within the meaning of the evergreen clause. <u>See</u> Trust Mot. at 16.

For the reasons explained below, the Court concludes that the 2007 NBCWA is a successor agreement.  As Freeman and Monterey therefore are bound by the 2007 NBCWA,

---

[9]      The Trust's governing documents give the Union and BCOA, as settlors of the Trust, authority to amend those documents.  <u>See</u> United Mine Workers of America 1974 Pension Plan, art. VIII § B(3) at 30 (2007).

there is no need to address other possible sources of their obligation to contribute to the Trust. Thus, the Court need not and will not decide whether the Union and BCOA can impose new contribution rates upon employers contributing to the Trust simply by amending the Trust's governing documents.

### B.  The Coal Mining Companies' Principal Arguments

Freeman and Monterey make two conceptually distinct but factually intertwined arguments in opposition to the motions for summary judgment.  First, they assert that (1) "BCOA negotiated the 2007 Agreement in secret and with only [Consolidated Coal's] interests in mind"; (2) "the negotiation and ratification process [for the 2007 NBCWA] violated BCOA's bylaws and [District of Columbia] law"; and (3) "other coal companies later signed separate agreements patterned after the 2007 [NBCWA] only after [the Union] coerced them to do so."  Freeman Supp. Opp. at 2-3.  Freeman and Monterey believe that some or all of these facts, if true, constitute a *defense* to the Trust's claim.  This argument focuses on the conduct of the Union and BCOA during the negotiation, adoption and implementation of the 2007 NBCWA.

Second, Freeman and Monterey argue that a proper *interpretation* of the evergreen clause absolves them of any liability under the facts of this case.  Specifically, they argue that the 2007 NBCWA does not qualify as a "successor agreement" within the meaning of the evergreen clause and therefore does not bind them – mainly because "at the time it negotiated the 2007 [NBCWA], BCOA was no longer a multi-employer bargaining unit."  Id. at 2; see also Monterey Supp. Opp. at 19; *supra* at 9-10. This argument focuses on the intent of the original contracting parties when they first agreed to be bound by the evergreen clause.  See, e.g., Monterey Supp. Opp. at 17 (noting that "the issue [before the Court] is the intention of the parties in 1978 when

14

the evergreen clause was drafted").  For the sake of analytical clarity, the Court first discusses Section 515 of ERISA and then addresses each of the coal mining companies' two separate arguments.

### 1. Section 515

The Trust brings suit under Section 515 of ERISA.  Section 515 provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.  Section 515 "establishes an independent federal right of action distinct from the contract on which the duty to contribute is based, through which ERISA funds may seek to compel employer contribution."  Trustees of the Nat'l Automatic Sprinkler Indus. Pension Fund v. Fairfield County Sprinkler Co., 243 F.3d 112, 115 (2d Cir. 2001) (internal quotation marks and citation omitted); see also BCOA v. Connors, 867 F.2d 625, 633 (D.C. Cir. 1989).  By enacting Section 515, "Congress intended to limit the defenses available to an employer when sued by an employee benefit plan."  DeVito v. Hempstead China Shop, Inc., 38 F.3d 651, 653 (2d Cir. 1994).  As then-Chief Judge Ginsburg has explained:

> Section 515 was a response to the problem created when an employer defaults upon its obligation to fund a multiemployer defined-benefit pension plan: If one employer does not make its contributions to such a plan, then the other participating employers must make larger contributions to cover the shortfall. . . . The funding burden may be shifted beyond other participating employers to taxpayers via the Pension Benefit Guaranty Corporation, and to beneficiaries in the form of reduced pension benefits. . . .

> Section 515 evinces a strong congressional desire to minimize contribution losses and the resulting burden such losses impose upon other plan participants. The statute puts multiemployer plans in a stronger position than they otherwise occupy under common law contract principles [and] facilitates recovery of contributions from delinquent employers by limiting the defenses available to an employer in an action brought to enforce the obligation created by § 515.

Flynn v. R.C. Tile, 353 F.3d 953, 958 (D.C. Cir. 2004) (internal quotation marks and citations omitted). In light of Congress' evident "desire to minimize contribution losses," courts have recognized only "three possible defenses an employer may raise to delinquent-contribution suits" under Section 515: "(1) the pension contributions themselves are illegal; (2) the collective bargaining agreement is void *ab initio* . . . ; and (3) the employees have voted to decertify the union as [their] bargaining representative." Flynn v. Thibodeaux Masonry, Inc., 311 F. Supp. 2d 30, 43-44 (D.D.C. 2004); see also DeVito v. Hempstead China Shop, Inc., 38 F.3d at 653 ("Our research has disclosed only two defenses recognized by the courts: (1) that the pension contributions themselves are illegal, and (2) that the collective bargaining agreement is void (not merely voidable).").

## 2. Contract Defense Argument

The coal mining companies devote many pages to the alleged misconduct of BCOA and the Union during and after negotiation of the 2007 NBCWA. See, e.g., Freeman Supp. Opp. at 27 (arguing that "the evidence shows that . . . BCOA has abused the corporate form and is in reality nothing more than a shell for [Consolidated]"); id. at 29 (alleging that BCOA "kept the [2007 NBCWA] negotiations a secret from the rest of the industry" and pursued only Consolidated's interests); id. at 32-34 (alleging that ratification of the 2007 NBCWA

16

violated BCOA's bylaws and District of Columbia corporate law because BCOA had too few directors; further alleging that ratification violated BCOA's bylaws because negotiators failed to employ certain committee structures and failed to follow certain notification requirements); id. at 35 (alleging that the Union "coerced other coal companies to sign separate agreements adopting some of the terms of the 2007 [NBCWA] by either striking the companies . . . or threatening strikes"). Though it is not entirely clear, it appears that these allegations are offered mainly as defenses to the Trust's Section 515 claim. They fail in that regard.

As discussed above, Section 515 strictly limits the defenses available to employers sued for delinquent contributions. See supra at 15-16. None of the coal mining companies' complaints about BCOA's and the Union's behavior fall within those limited defenses. To begin with, neither Freeman nor Monterey argue that the contributions required under the 2007 NBCWA are illegal. Freeman and Monterey do argue (at length) that BCOA and the Union acted selfishly and perhaps even underhandedly in negotiating the 2007 NBCWA and in "urging" other coal mining companies to adopt its terms. But even if those allegations are true, there is no authority for the proposition that Freeman and Monterey may assert BCOA's or the Union's alleged misconduct as a defense to the Trust's Section 515 claims. To the contrary, such a defense – a defense "going to the conduct of the parties to a facially valid trust agreement" – is precisely the type of defense that Section 515 was intended to foreclose. BCOA v. Connors, 867 F.2d at 636; see also JAMES F. JORDEN ET AL., HANDBOOK ON ERISA LITIGATION § 7.01[F] at 7-19 (2003).[10]

---

[10]    Though neither party addresses the point, the Court observes that cases interpreting Section 515 – and in particular the limited range of defenses available to Section 515 defendants – tend to be distinguishable from this case in one respect. In those cases, the resisting

The closest the coal mining companies come to raising a cognizable defense to the Section 515 claim is to argue that BCOA's alleged failure to obey certain procedural aspects of its own bylaws and District of Columbia law renders the 2007 NBCWA void *ab initio*. See Freeman Supp. Opp. at 33-34. Again, Freeman and Monterey point to no authority for this argument, and the Court is aware of none.[11] Indeed, even the case upon which the coal mining companies principally rely does not support this argument. See CarrAmerica Realty Corp. v. Kaidanow, 321 F.3d 165, 170-71 (D.C. Cir. 2003) (interpreting Delaware law; holding that shares issued in violation of state corporate law were voidable but not void, and hence subject to ratification). In CarrAmerica, the D.C. Circuit observed that "a void result occurs when a corporate board acts without authorization, while the result of an authorized act improperly accomplished may be voidable." Id. at 171. Here, no party disputes that BCOA is authorized to negotiate NBCWAs with the Union. Therefore, at most, BCOA can be accused of accomplishing an authorized act in a procedurally improper manner. Arguably, that renders the 2007 NBCWA voidable. But a *voidable* agreement – as opposed to a *void* agreement – is binding on an employer in the context of a Section 515 suit. See Connors v. Fawn Mining Corp., 30 F.3d 483,

_____

employer participated in the execution of the agreement that the trust was trying to enforce. Here, of course, Freeman and Monterey did not participate in the execution of the 2007 NBCWA because they were not BCOA members at the time of its negotiation. Thus, they are essentially third parties accusing BCOA and the Union of "combining" to further their own interests. This difference is immaterial. Section 515 was intended to ensure that employers comply with facially valid agreements. As Freeman and Monterey voluntarily agreed to be bound by the evergreen clause, and as they are third parties only because they decided to withdraw from BCOA, there is no justification for permitting them to raise defenses that would not otherwise be available in a Section 515 action.

[11]    Nor is it even clear that Freeman and Monterey – neither of whom are BCOA members – are permitted to raise such claims under District of Columbia corporate law. See D.C. Code § 29-301.06 (specifying that only a member or director of a corporation, shareholders, or the Mayor may assert a claim based on a corporation's lack of capacity or power to act).

490 (3d Cir. 1994); Southwest Administrators, Inc. v. Rozay's Transfer, 791 F.2d 769, 775 (9th

Cir. 1986).  The Court therefore concludes that the coal mining companies' complaints about the

conduct of BCOA and the Union are unavailing.

### 3.  Contract Interpretation Argument

As noted above, courts have recognized a very limited range of *defenses* in the

Section 515 context.  But Section 515 does not preclude employers from invoking the "ordinary

process of interpretation" to demonstrate that the terms of the agreement at issue do not require

them to make the contributions for which they allegedly are liable.  Central States, Southeast &

Southwest Areas Pension Fund v. Joe McClelland, Inc., 23 F.3d 1256, 1258 (7th Cir. 1994); see

also Flynn v. Dick Corp., 384 F. Supp. 2d 189, 193-95 (D.D.C. 2005), *rev'd on other grounds*,

481 F.3d 824 (D.C. Cir. 2007).  In this case, for example, the evergreen clause provides that any

participating employer must contribute to the Trust at rates set forth in the 1978 NBCWA "and

any successor agreements thereto."  Freeman and Monterey deny that the 2007 NBCWA

constitutes a "successor agreement" to the 1978 NBCWA, mainly on the ground that the original

parties to the evergreen clause never intended for that term to encompass an agreement

effectively negotiated by and in furtherance of the interests of one coal mining company.  The

coal mining companies therefore argue that the evergreen clause does not compel them to pay the

contributions sought by the Trust.

Formulated as an argument about how to interpret the agreement, this amounts to

a claim that the evergreen clause includes an implicit term or condition under which a particular

NBCWA may not be regarded as a successor agreement unless, at the time the NBCWA is

negotiated, BCOA's membership is sufficiently numerous, diverse and representative.  See

19

Freeman Supp. Opp. at 25 (arguing that "there is indeed a 'minimum membership' requirement for BCOA to negotiate a successor NBCWA"); Transcript of Oral Argument at 34 (April 29, 2008) (counsel for Freeman arguing that "in order to be a successor agreement, [a particular NBCWA] must be a national agreement involving multiple companies and a valid national representative of the industry"); id. at 47-48 (counsel for Freeman arguing that the coal mining companies agreed to be parties to the evergreen clause on the understanding that BCOA would remain "an association representing all of us with the industry's interests in mind"); Monterey Supp. Opp. at 13-15 (arguing that Monterey never intended to permit BCOA to bind it to contribution rates in the event that BCOA ceased being a multiemployer organization). The Court rejects this argument because it does not comport with the plain language of the evergreen clause or the relevant extrinsic evidence of the drafters' intent.

### a. Interpreting the Evergreen Clause

Courts interpret collective bargaining agreements according to the general rules of contract law (unless federal labor law provides contrary rules). See, e.g., Sheet Metal Workers Local 19 v. Keystone Heating & Air Conditioning, 934 F.2d 35, 40-41 (3d Cir. 1991) (Alito, J.). When interpreting contractual provisions, "the judicial task . . . is to give effect to the mutual intent of the parties," and "when the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intention of the parties." Mesa Air Group, Inc. v. Dep't of Transp., 87 F.3d 498, 503 (D.C. Cir. 1996) (quoting NRM Corp. v. Hercules, Inc., 758 F.2d 676, 681 (D.C. Cir. 1985)).

If contractual language is ambiguous or vague, courts may consider extrinsic evidence to ascertain the parties' intent. See United Mine Workers of America 1950 Benefit

20

Plan and Trust v. BCOA, 898 F.2d 177, 181 (D.C. Cir. 1990) (noting that "extrinsic evidence of the meaning of disputed clauses [in collective bargaining agreements] such as past practice, related agreements, and bargaining history are quite properly considered to determine the parties' intentions"); In re United Mine Workers of America Employee Benefit Plans Litigation, 782 F. Supp. at 664 (resorting to extrinsic evidence to interpret the evergreen clause after determining that certain aspects of the clause were ambiguous). Contractual language is "ambiguous or vague" if it is "reasonably susceptible to different constructions and interpretations." Carey Canada, Inc., v. Columbia Casualty Co., 940 F.2d 1548, 1556 (D.C. Cir. 1991). Neither the mere absence of a definition of a contested term or a dispute about the meaning of a contested term necessarily renders that term ambiguous. Id. "In cases requiring the court to construe the meaning of a contract, the dispute may be resolved as a matter of law if the contested agreement admits of only one reasonable interpretation." United Mine Workers of America 1974 Pension v. Pittston Co., 984 F.2d at 473.

### b. Plain Language

It is difficult to see how the plain language of the evergreen clause is reasonably susceptible of different interpretations on the point in dispute. While it is true that the term "successor agreement" is nowhere defined, that does not necessarily mean that the term is susceptible of different constructions. Carey Canada, Inc., v. Columbia Casualty Co., 940 F.2d at 1556. As the Trust, the Union and BCOA correctly argue, the plain language of the evergreen clause does not even hint at the membership condition urged by the coal mining companies. That suggests that the term "successor agreement" should be interpreted to mean what it appears to mean: that is, a subsequent agreement regarding similar subjects negotiated by the same parties.

21

Cf. United Mine Workers of America 1974 Pension v. Pittston Co., 984 F.2d at 475 (observing

that "the only 'successor' agreement to an NBCWA is another NBCWA"); In re United Mine

Workers of America Employee Benefit Plans Litigation, 782 F. Supp. at 664 (same).

        Moreover, the coal mining companies have failed to identify any other evidence

within the documents at issue suggesting that the original contracting parties intended to strip

BCOA of authority to negotiate successor agreements if its membership fell below a certain level

of numerosity or representativeness.  Nor can the coal mining companies explain away this lack

of evidence by arguing that nobody foresaw the possibility that BCOA would cease to be "a

robust multi-employer bargaining unit of numerous unaffiliated companies" representing "a

significant percentage of the unionized coal industry."  Freeman Supp. Opp. at 1, 3.  After all,

every NBCWA since 1978 has included a provision specifying that

> in the event BCOA ceases to exist, or in the event that more than
> 50% of the tonnage membership of BCOA on the Effective Date
> [of the NBCWA] has withdrawn prior to the time when the BCOA
> is required or permitted to take action under [Article XX of the
> NBCWA], then such action may be taken by majority vote, based
> on tonnage, of Employers who were BCOA members on the
> Effective Date.

BCOA Mot. at 13 (quoting National Bituminous Coal Wage Agreement of 2002, art. XX

§ d(1)(v) at 152-53 (2002)); see also National Bituminous Coal Wage Agreement of 1978, art.

XX § d(1)(vi)(a) at 101 (1978).  Thus, it is clear that the original contracting parties at least

considered the possibility that the BCOA of today would look very different from the BCOA of

1978.  Presumably, if they believed that changes in the membership of BCOA would or should

affect BCOA's ability to negotiate valid successor agreements, they would have provided for that

contingency – particularly in light of their intent to bind all participating employers to the rates

22

negotiated by the Union and BCOA in the future.  They did not do so.

       The coal mining companies urge this Court to go behind the plain language of the evergreen clause and discover an implicit limitation on BCOA's authority to negotiate successor NBCWAs.  But neither the text nor the structure of the evergreen clause (or any other relevant provision) requires BCOA to be constituted in a particular way in order to negotiate valid successor agreements.  Therefore, much as the D.C. Circuit declined to read into the evergreen clause "a durational limitation to the employer's duty to contribute to the trusts," this Court declines to read into the evergreen clause a membership requirement limiting BCOA's authority to negotiate sucessor NBCWAs.  United Mine Workers of America 1974 Pension v. Pittston Co., 984 F.2d at 473.  Thus, summary judgment in favor of the Trust, the Union and BCOA on the issue of the coal mining companies' obligation to contribute to the Trust at the rates set forth in the 2007 NBCWA is appropriate.

### c.  Extrinsic Evidence

       Summary judgment in favor of the Trust, the Union and BCOA would be appropriate even if the evergreen clause were to be considered ambiguous on the interpretive point in dispute.  When a contract is susceptible of different meanings, a court looks to extrinsic evidence of the parties' intent to ascertain its meaning.  See, e.g., In re United Mine Workers of America Employee Benefit Plans Litigation, 782 F. Supp. at 664.  The mere presence of ambiguity, however, does not preclude summary judgment.  See, e.g., Farmland Indus., Inc. v. Grain Board of Iraq, 904 F.2d 732, 736 (D.C. Cir. 1990) (noting that "if [extrinsic] evidence demonstrates that only one view [of the contract] is reasonable – notwithstanding the . . . ambiguity – the court must decide the contract interpretation question as a matter of law"); see

also <u>United Mine Workers of America 1974 Pension v. Pittston Co.</u>, 984 F.2d at 473 (noting that "[i]n order to . . . avoid summary judgment, the evidence submitted by the non-moving party must show that more than one *reasonable* interpretation [of the disputed agreement] exists"). Here, the extrinsic evidence offered by the coal mining companies fails to establish that their interpretation of the evergreen clause is reasonable.

        To show that the drafters did not intend to saddle BCOA with a membership requirement, the Trust, the Union and BCOA rely primarily on the declarations of certain individuals intimately involved with the initial adoption of the evergreen clause.  <u>See</u> Trust Mot. at 25-28 (discussing the declarations of Roger Haynes and Donald Pierce, originally filed in the case before Judge Hogan).  The gist of these declarations is that the evergreen clause was "negotiated to make sure that any coal operator that voluntarily agreed to participate in the [Trust] . . . could not simply walk away from the [Trust] and leave its retirees behind . . . ."  Trust Mot., Ex. E to the Declaration of Julia Penny Clark, Declaration of Roger M. Haynes ¶ 19 (March 7, 1991) ("Haynes Decl."); <u>see also</u> <u>id</u>. ("Stated another way, this provision was negotiated to make sure that each [participating] employer . . . would continue to pay its fair share of . . . liabilities, and to prevent the Funds from becoming a 'last man's club' where ever-increasing costs would be paid by an ever-decreasing number of employers.")  Judge Hogan relied heavily on these declarations to conclude that one of the basic purposes of the evergreen clause was

> to ensure that all participating employers would contribute equally to the Trusts and would not be permitted to withdraw from participation and leave the burden for funding the pension and health benefits of retired miners to the remaining participating employers.

24

In re United Mine Workers of America Employee Benefit Plans Litigation, 782 F. Supp. at 667. The Trust, the Union and BCOA argue that this evidence of the original parties' intent and the intended purposes of the evergreen clause cuts strongly against any interpretation of the evergreen clause that would permit employers to withdraw from the Trust unilaterally.

To counter this evidence and demonstrate that it is reasonable to conclude that the drafters of the evergreen clause intended to impose a "minimum membership" limitation on BCOA's authority to negotiate successor NBCWAs, Freeman and Monterey rely on: (1) the history of negotiations between the Union and BCOA after the evergreen clause was adopted, see Freeman Supp. Opp. at 23; (2) BCOA's bylaws, see id. at 25-26; and (3) isolated statements from the same declarations relied upon by the Trust, the Union and BCOA.  See Monterey Supp. Opp. at 15-17.  None of this evidence demonstrates that the coal mining companies' interpretation of the evergreen clause is reasonable, particularly in light of the plain language of the evergreen clause.

First, Freeman and Monterey point out that the NBCWAs of 1978, 1981, 1984, 1988, 1993, 1998, and 2002 were all "negotiated and ratified . . . in a similar manner – with multiple companies[, through BCOA,] negotiating and ratifying each NBCWA."  Freeman Supp. Opp. at 4.  From this undisputed fact they invite the Court to infer that the original parties intended to impose a minimum membership requirement on BCOA's authority to negotiate successor NBCWAs.  The Court declines the invitation because the inference is unjustified.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 (courts are to draw all *justifiable* inferences in favor of non-movants).  The mere fact that BCOA represented multiple unaffiliated companies in the past hardly compels the conclusion that the original parties considered that a condition

25

precedent to the negotiation of a successor NBCWA.  Furthermore, the inference urged by the

coal mining companies conflicts in a fundamental way with the established goals of the

evergreen clause.  Again, all acknowledge that the evergreen clause was intended to (1) "ensure

that all employers participating in the Trusts would share equally in the burden of amortizing the

existing Trust deficits and in funding future benefits," and (2) prevent employers from "leaving

other employers to carry more than their share of the Trusts' liabilities."  In re United Mine

Workers of America Employee Benefit Plans Litigation, 782 F. Supp. at 665.  Inferring an ill-

defined membership requirement would severely undermine these goals, because such a

requirement would permit employers unilaterally to "walk away from [the Trust] and leave

[their] retirees behind" whenever they regarded BCOA's membership as insufficiently numerous

and/or representative.  Trust Mot. at 27-28.   The Court simply cannot justify drawing an

inference so adverse to the fundamental goals of the evergreen clause on the basis of such

inconclusive evidence.

        Second, Freeman and Monterey contend that BCOA's bylaws demonstrate "that

there is indeed a 'minimum membership' requirement for BCOA to negotiate a successor

NBCWA."  Freeman Supp. Opp. at 25.  Briefly, the coal mining companies observe that BCOA's

bylaws at the time of the 2007 NBCWA negotiations prescribed certain procedures for

negotiating with the Union (such as committee structures, reporting requirements, etc.).[12]  They

argue that this procedural framework "contemplate[d] that BCOA would be comprised of

multiple, unaffiliated member companies," and thereby demonstrates that the drafters of the

---

[12]    To be clear, nowhere in the bylaws is it stated that BCOA's authority to negotiate
a successor NBCWA is contingent on its remaining "a robust multi-employer bargaining unit of
numerous unaffiliated companies."  Freeman Supp. Opp. at 3.

evergreen clause intended to authorize BCOA to negotiate successor NBCWAs *only if* it was so constituted.  Id. at 26.  This argument fails for the same reasons as the first.  It is true that BCOA's bylaws reflected the historical fact that BCOA was once comprised of multiple unaffiliated companies.  But this fact does not lead ineluctably to the conclusion that the drafters of the evergreen clause intended to make that state of affairs a condition precedent to the negotiation of a successor NBCWA; indeed, it does not even strongly suggest that conclusion.  Moreover, as noted above, to infer the membership requirement urged by the coal mining companies would severely undermine the undisputed goals of the evergreen clause.  Thus, the Court declines to draw this unjustifiable inference as well.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

Third, Freeman and Monterey argue that certain statements in the declarations submitted by the Trust, the Union and BCOA support their reading of the evergreen clause.  See, e.g., Monterey Supp. Opp. at 16.  For example, Monterey cites the declaration of Roger Haynes, a former BCOA official, in which Mr. Haynes states that "[t]he term 'successor agreements thereto' [in the evergreen clause] was intended to be successor national agreements, and not agreements between [the Union] and an individual company."  Haynes Decl. ¶ 18.  From this and similar statements the coal mining companies argue that the 2007 NBCWA cannot be considered a "national agreement" – and thus cannot be considered a valid successor agreement – because it is essentially an agreement between the Union and Consolidated.  See, e.g., Monterey Supp. Opp. at 16 (arguing that "the [original] members of BCOA were [not] manifesting through the evergreen clause an intention to be bound by an individual employer's contract with the Union").

27

The problem with this argument is that it ignores the legal and factual context in which the declarations were submitted. See Trust Supp. Reply at 12-14. The declarations were produced in response to the Pittston litigation, and the portions cited by the coal mining companies focus on one of the main questions presented in that litigation: whether the drafters of the evergreen clause would have regarded an individual agreement between the Union and a coal mining company that had withdrawn from BCOA as a "successor" agreement. This case turns on a different question: whether the drafters of the evergreen clause would have considered an NBCWA negotiated between *the Union and BCOA* to be a successor agreement within the meaning of the evergreen clause, even though all but one company had withdrawn from BCOA at the time of the negotiation. Read in context, the portions of the declarations cited by Freeman and Monterey neither contemplate nor address that question. They therefore are "not significantly probative" here. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.

In sum, even if the evergreen clause were ambiguous with respect to whether it incorporates a membership requirement, the extrinsic evidence offered by the coal mining companies does not establish that their reading of the evergreen clause is reasonable. For that reason, summary judgment in favor of the Trust, the Union and BCOA is warranted. See United Mine Workers of America 1974 Pension v. Pittston Co., 984 F.2d at 473.

### C. Discontinuance of Contributions Argument

Monterey offers one last reason why it is not bound by the 2007 NBCWA. As Monterey points out, the Trust's governing documents state that

> [u]pon the termination of this Plan or the complete discontinuance of contributions to the 1974 Pension Trust, this Plan shall remain in force and effect for the period necessary to complete the

> payment of benefits in accordance with the terms of this Plan to the
> extent assets in the 1974 Pension Trust are available to pay such
> benefits.

United Mine Workers of America 1974 Pension Plan, art. VIII § B(4) (2007).  Monterey reads

this provision – which it refers to as the "discontinuance of contributions clause" – to mean that

upon the negotiation of an NBCWA that discontinues contributions to the Trust (because, for

example, the Trust is fully funded) participating employers are released from their evergreen

clause obligations.  See Monterey Supp. Opp. at 32 (arguing that this reading makes sense

because once the Trust is fully funded, "the underlying purpose of the evergreen clause, which

was to prevent employers participating in the [Trust] from withdrawing and dumping liability on

BCOA members, would be accomplished").  According to Monterey, the discontinuance clause

took effect with the execution of the 2002 NBCWA, "which set employers' contribution rate at

zero for the term of that NBCWA."  Trust Reply at 21.  The Trust contends that this argument

fails because the discontinuance clause applies only if the parties permanently discontinue

contributions, not if they temporarily discontinue contributions.  See id. at 23.  It is the Trust's

position, of course, that the 2002 NBCWA instituted a temporary discontinuance of contributions

which came to an end with the 2007 NBCWA, which does require contributions.  See id.

Contrary to Monterey's view, the plain language of the discontinuance clause

supports the Trust's argument that the clause applies only when contributions are permanently

discontinued, not when they are temporarily discontinued.  Monterey is correct that the clause

uses the word "complete" rather than the word "permanent," but this hardly supports Monterey's

strained reading.  First, the use of the word "complete" strongly suggests that the drafters had in

mind a total *and* permanent discontinuance of contributions.  See BLACK'S LAW DICTIONARY at

285 (6th ed. 1990) (defining "complete" as "[f]ull; entire; . . . . Perfect; consummate; not lacking

in any element or particular . . . ."). Second, the structure of the clause suggests that *complete*

discontinuance means *permanent* discontinuance, because it provides that "complete

discontinuance" shall have the same effect as "termination of this Plan." Third, had the drafters

intended to absolve employers of their evergreen clause obligations upon any discontinuance of

obligations, it would have been easy for them to do so; they had only to omit the words "the

complete" – or substitute for those two words the word "any" – to convey that idea. Of course,

they did not.[13]

        Anticipating this conclusion, Monterey argues that the 2002 NBCWA *did*

constitute a permanent discontinuance of contributions. See Monterey Supp. Opp. 33-34 ("The

2002 NBCWA does not include a commitment that the employers would agree to new benefits or

resume contributing to the [Trust] in the future."). The Court is not persuaded that the parties to

the 2002 NBCWA believed that it ended contributions completely and permanently. As the

Trust points out, the 2002 NBCWA included a "guarantee clause," pursuant to which "the zero

_____

        [13]    One last point militates in favor of concluding that the discontinuance clause is
triggered only in the event of a *permanent* discontinuance of obligations. As the Trust points out,
the language of the discontinuance clause suggests that it was added to the Trust's governing
documents to satisfy an ERISA regulation which requires that trust plans "must expressly
provide that, upon the termination of the plan or upon the complete discontinuance of
contributions under the plan, the rights of each employee to benefits accrued to the date of such
termination or discontinuance . . . are nonforfeitable." See Trust Reply at 22 (quoting 26 C.F.R.
§ 1.401-6(a)(1)-(2)(i)). The Trust further argues that "[t]his being so, the terms that the
'discontinuance' clause borrowed from the regulations must be given the same meaning that they
have in the regulations." Trust Mot. at 22.

        The Court agrees that, at the very least, the regulations provide useful guidance on
the meaning of the phrase "complete discontinuance." The regulations provide that "a complete
discontinuance of contributions is contrasted with . . . a temporary cessation of contributions by
the employer." 26 C.F.R. § 1.401-6(c)(1).

contribution rate [established by the 2002 NBCWA] could have been raised if necessary to ensure that participants received benefits at the levels promised to them in the NBCWA without interruption." Trust Reply at 24. This clause – and the absence of any indication that the zero contribution rate established by the 2002 NBCWA was intended to be permanent – demonstrates that the 2002 discontinuance was intended to be contingent and temporary.

## IV.  AGENCY CLAIM

Finally, Freeman seeks damages against BCOA in the event that the Court determines that Freeman is bound by the 2007 NBCWA. Freeman reasons as follows: First, if BCOA retains the power to bind Freeman to new contribution rates, then BCOA is effectively Freeman's agent and "therefore owes Freeman the duties of an agent to its principal," Freeman Supp. Opp. at 38, including the duties of good faith and fair dealing. See id. at 40 n.9. Second, BCOA breached its duties to Freeman because, among other things, (1) BCOA never informed Freeman that it was negotiating increased contribution rates with the Union; (2) BCOA considered only Consolidated's interests; (3) BCOA mismanaged the Trust; and (5) BCOA negotiated an exorbitant contribution rate. See id. at 40-42. Freeman argues that its agency claim "is pled under both state law and the federal common law of Section 301 of the Labor Management Relations Act." Id. at 39 n.8.[14] The Court disagrees that Section 301 may serve as

---

[14]      Section 301(a) provides:

> Suits for violation of contracts between an employer and a labor
> organization representing employees . . . , or between any such
> labor organizations, may be brought in any district court of the
> United States having jurisdiction of the parties . . . .

29 U.S.C. § 185(a).

a valid federal law basis for Freeman's agency claim; as a result, it must be regarded as a state

law claim.  And as the Court has already determined that Freeman's federal law claims must be

rejected, the Court declines to exercise jurisdiction over this remaining state law claim.

      Freeman frankly asks this Court to find that Section 301(a) of the LMRA – which

on its face is limited to suits "for violation of contracts" among employers and labor

organizations – supports an implied federal cause of action for disenchanted employers who

believe that their collective bargaining representatives have breached their duties of good faith

and fair dealing.  See Freeman Supp. Opp. at 39 n.8 ("Because BCOA's duties arise from the

parties' relationship surrounding collective-bargaining agreements, this Court can look to, and

develop, federal common law in giving Freeman a remedy for BCOA's breaches of its duties.").

Freeman cites no authority for its novel theory, and the Court has discovered none.[15]  Nor has

Freeman suggested that Congress intended for Section 301(a) to support such a suit.  Cf.

Alexander v. Sandoval, 532 U.S. 275, 287 (2001).  The Court therefore will not accept

Freeman's invitation to fashion a new federal cause of action.

      The only remaining question is whether the Court should or should not assert

supplemental jurisdiction over Freeman's state law agency claim.  A district court may decline to

exercise supplemental jurisdiction over such a claim where, as here, it has "dismissed all claims

---

[15]    Freeman relies primarily on Teamsters Nat'l Automotive Transporters Indus.
Negotiating Committee v. Troha, 328 F.3d 325 (7th Cir. 2003).  That case – in which the Seventh
Circuit concluded that Section 301(a) implied a federal cause of action allowing a signatory to a
collective bargaining agreement to sue a non-signatory resisting an administrative subpoena
related to an underlying arbitration between signatories – is too distinguishable to be persuasive
here.  See id. at 330.  Even if that case were persuasive, this Court would conclude that
Freeman's suggested cause of action, unlike the cause of action implied in Teamsters, is "not
necessary to the purpose of enforcing the collective bargaining agreement" at issue.  Id.

over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  As the D.C. Circuit has

explained:

> [I]n the usual case in which all federal-law claims are dismissed
> before trial, the balance of factors to be considered under the
> pendent jurisdiction doctrine – judicial economy, convenience,
> fairness, and comity – will point toward declining to exercise
> jurisdiction over the remaining state-law claims.

Shekoyan v. Sibley Int'l, 409 F.3d 414, 424 (D.C. Cir. 2005) (quoting Carnegie-Mellon Univ. v.

Cohill, 484 U.S. 343, 350 n.7 (1988)).  Here, the Court concludes that the balance of factors

favors declining jurisdiction of the state law agency claim.

## V.  CONCLUSION

For all of these reasons, the Court will grant the motions for summary judgment of

the Trust, the Union and BCOA.  An Order consistent with this Opinion will issue this same day.

SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: September 4, 2008

33